UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, :
INC., and OPEN SOCIETY INSITUTE,

               :

                     Plaintiffs,

               :

v.                            :

UNITED STATES AGENCY FOR INTERNATIONAL
DEVELOPMENT and ANDREW S. NATSIOS, in his    :
Official Capacity as Administrator of the United States
Agency for International Development,          :

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x



COMPLAINT

Civil Action No.

## I.     INTRODUCTORY STATEMENT

       1.      This is a civil action arising under the First Amendment to the United States

Constitution, seeking redress against the United States Agency for International Development

(hereafter "USAID"), an agency of the United States, on behalf of entities whose constitutional

rights are violated by a policy directive issued by USAID, which requires private non-profit

organizations based in the United States to adopt the government's ideology opposing sex work

in exchange for the receipt of USAID funding to stop the spread of HIV/AIDS.[1]

       2.      Plaintiffs, a non-profit recipient of USAID funding and an affiliated not-for-profit

charitable foundation, both of which are based in the United States, challenge the requirement

that they adopt a policy opposing prostitution as violative of the First Amendment in three ways:

a) it is unconstitutionally vague, b) it requires grantees to adopt as their own organization-wide

---

[1] The terms "sex work" and "sex worker" are used in this document because they are the terms
generally used in the public health and international relief fields. The terms "prostitute" and
"prostitution" are viewed as stigmatizing by the sex workers whose trust public health officials
must gain in order to engage them in the fight against HIV/AIDS.

policy the ideologically motivated position of the government regarding sex work, and c) it imposes an absolute bar on grantees using their own, non-government funding to engage in speech activities. Plaintiffs also challenge USAID's implementation of the pledge requirement as being contrary to the governing law.

## II.    JURISDICTION AND VENUE

3.    Subject matter jurisdiction is conferred upon the Court by 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b), (e).

## III.    THE PARTIES

### The Plaintiffs

4.    Plaintiff OPEN SOCIETY INSTITUTE ("OSI") is a charitable trust organized and existing under New York law. It is a private foundation enjoying tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 400 West 59th Street, New York, New York 10019.

5.    Plaintiff OSI is the principal United States-based foundation of the philanthropist George Soros. OSI works to support a network of more than 30 "Soros Foundations," which operate in more than 60 countries worldwide.

6.    In general, Plaintiff OSI and the Open Society network promote democratic governance, human rights, and economic, legal and social reform. On a local level, members of the network implement a range of initiatives to support the rule of law, education, public health, and independent media.

7.    Plaintiff OSI has received USAID funding in the past, and is interested in preserving its eligibility to receive Global AIDS Act funding from USAID in the future.

8.    Plaintiff ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC. ("AOSI") is a not-for-profit corporation incorporated under Delaware law. It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 400 West 59th Street, New York, New York 10019. It has a branch office in Almaty, Kazakhstan.

9.    Plaintiff OSI established Plaintiff AOSI in July, 2003 as a separately incorporated not-for-profit organization. Among the reasons for AOSI's separate existence are: 1) a desire to concentrate in a separate vehicle the expertise OSI and the Open Society network in general have gained in implementing U.S. federal grants, and 2) a desire to coordinate OSI and Open Society network programs in Central Asia.

10.    In October, 2003, Plaintiff OSI agreed to provide Plaintiff AOSI with a five-year grant in the amount of $2,177,700 to support AOSI's work in seeking and implementing U.S. government grants, as well as to support the creation of a Central Asia office of AOSI that would help coordinate Open Society network projects in that region.

The Defendants

11.    Defendant USAID is an agency of the United States government. Its primary office is located in the Ronald Reagan Building, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20523.

12.    Defendant USAID uses funding provided by Congress for economic, development and humanitarian assistance around the world.

13.    Defendant ANDREW S. NATSIOS is the Administrator of Defendant USAID. His office is located at Ronald Reagan Building, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20523.

14.    Defendant NATSIOS has responsibility for formulating and implementing USAID policies and practices.  He is sued in his official capacity.

## IV.    THE GLOBAL AIDS ACT

15.    In 2003, Congress passed, and the President signed, the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act" or "Act"), which is codified at 22 U.S.C. § 7601 *et seq.*

16.    The Act implements the President's Emergency Plan for AIDS Relief, which is a five-year global strategy for fighting HIV/AIDS, focusing on education, research, prevention, treatment and care of persons living with HIV/AIDS.  The Act authorizes the appropriation of $3 billion in funding for each of fiscal years 2004 through 2008.  22 U.S.C. § 7671(a).  For fiscal year 2005, Congress has appropriated $2.8 billion under the Act.

17.    The funds, which are distributed mainly by Defendant USAID and by the United States Department of Health and Human Services, go to many non-governmental organizations based in the United States but doing work abroad ("US NGOs"), including Plaintiff AOSI.  The funds also go to foreign non-governmental organizations ("foreign NGOs"), which often receive the funds as subgrantees of U.S. groups, and to foreign governments and multilateral organizations.

18.    The Act imposes on recipients of funding distributed under the Act two restrictions regarding sex work.  The first provision (the "government funds restriction") prohibits funds made available under the Act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care to a sex worker.  22 U.S.C. § 7631(e).

4

19.    Plaintiffs do not challenge either the government funds restriction or USAID's implementation of it.

20.    The second restriction (the "pledge requirement") provides, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). The Act does not define "opposing prostitution."

21.    During the sole legislative debate on the scope of the pledge requirement prior to passage of the Global AIDS Act, Senate Majority Leader Bill Frist stated that "a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women . . . would satisfy the intent of the provision." 149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. Frist).

22.    While plaintiffs believe it is unconstitutional for the government to force them to adopt a policy position in order to qualify for Global AIDS Act funds, given their significant history of combating sex trafficking they do not challenge either the requirement that they have a "policy explicitly opposing . . . sex trafficking," or USAID's implementation of that requirement.

V.    USAID'S IMPLEMENTATION OF THE PLEDGE REQUIREMENT

23.    From February 2004 until June 2005, Defendant USAID did not apply the pledge requirement to US NGOs on the advice of the federal Department of Justice, which had issued a draft opinion stating that enforcement of the pledge requirement against organizations based in the United States would be unconstitutional.

24.    Then, in a letter dated September 20, 2004, the DOJ's Office of Legal Counsel withdrew its earlier draft opinion that had declared enforcement of the pledge requirement

against US NGOs to be unconstitutional, and stated that "there are reasonable arguments to support [the] constitutionality" of the requirement.

25.    USAID, in turn, began applying the pledge requirement to US NGOs. USAID did this by issuing a policy directive requiring grantees to have in place "a policy explicitly opposing . . . prostitution and sex trafficking." *See* USAID Acquisition & Assistance Policy Directive 05-04 (June 9, 2005). Neither in this policy directive, nor in any other written document, does USAID either define "explicitly opposing prostitution" or provide guidance on what privately funded activities are permissible and impermissible under the pledge requirement.

## VI.    BROAD CONSTRUCTIONS THAT USAID AND OTHERS HAVE PLACED ON THE PLEDGE REQUIREMENT

26.    USAID officials and others have placed a number of broad interpretations on the pledge requirement. These interpretations all indicate how broadly observers can construe the pledge requirement in the absence of any guidance from USAID.

27.    In a meeting with AOSI and OSI personnel in April 2005, Kent Hill, the acting assistant administrator for global health of Defendant USAID, articulated several broad, but vague, interpretations of the pledge requirement, although he emphasized that he could not provide official guidance on the policy. First, he stated that he believed the pledge requirement bars grantees from advocating legalization of sex work, and might bar advocating for too great a reduction in penalties for sex work, or helping to unionize sex workers.

28.    Second, he stated that he thought organizing sex workers to prevent police from brutalizing them might violate the requirement if USAID decided that the work was merely a front for advocating the legalization of sex work.

29.    Third, he stated that he believed even if a group adopted a policy statement that was compliant on its face, that organization could be found to be in violation of the pledge

6

requirement if USAID concluded that the organization truly felt sex work should be legalized and that the totality of statements made that clear.

30.    Even before USAID started applying the pledge requirement to Plaintiff AOSI, staff at the Central Asia Republics mission of Defendant USAID cautioned AOSI not to use the term "sex worker" in publicly available documents because that might connote acceptance of sex work. Plaintiffs do not know whether USAID will construe all public use of the term "sex worker" as violating the pledge requirement.

31.    Senator Tom Coburn has construed the pledge requirement as barring Global AIDS Act grantees from running a program providing educational materials and health safety training for sex workers. On May 19, 2005 he demanded that President Bush investigate a USAID grantee for engaging in such activities. Sen. Coburn does not charge that the grantee promoted changes in the legal status of sex work. Rather, his complaint seems to be that the grantee uses non-traditional teaching methods to educate sex workers about HIV transmission. On information and belief, Defendant USAID is delaying renewed funding of this program as a result of Sen. Coburn's complaint.

32.    In still another far-reaching interpretation of the pledge requirement, on July 15, 2005, 28 members of Congress wrote to Defendant USAID charging that an HIV prevention project carried out by a USAID grantee violates the pledge requirement because it has "a rights-based" approach to sex work, which the members of Congress interpret as advocating "the legalization of prostitution and its cultural acceptance as a legitimate form of employment." On information and belief, USAID has not yet responded to this allegation.

33.    Likewise, some members of Congress have asserted that a debate program for high school and university students run by the Soros Foundation Kazakhstan, which received

7

USAID civic education funding, promoted the legalization of sex work. Defendant USAID found this assertion to be unfounded.

## VII.    HOW THE PLEDGE REQUIREMENT AFFECTS THE PLAINTIFFS

### The Effect of the Pledge Requirement on Plaintiffs AOSI and OSI

34.    Plaintiffs AOSI and OSI are opposed to the harms that sex work inflicts both on the individuals directly involved and to others in various ways.

35.    Nonetheless, the pledge requirement detrimentally affects Plaintiff AOSI and the clients it serves in several ways. If Defendant USAID construes the pledge requirement as covering Plaintiff OSI, then the pledge requirement detrimentally affects OSI too.

36.    Both AOSI and OSI have, as their principles of governance, an adherence to the principles of an open society, including opposition to adopting any policy positions that would lead to the stigmatization of socially marginalized groups. Adopting a policy opposing sex work violates this principle.

37.    In addition to requiring USAID grantees and contractors to adopt a policy, the pledge requirement appears to also require USAID grantees and contractors, including Plaintiff AOSI, to conform their activities to the policy. The pledge requirement applies both to activities conducted with government funding and to activities conducted with funding that comes from other sources.

38.    Consequently, the pledge requirement places a blanket ban on the use of the private, non-governmental funds possessed by Plaintiff AOSI to do work that Defendant USAID construes as being insufficiently opposed to sex work.

39.    Plaintiffs do not know whether USAID also construes the pledge requirement as requiring Plaintiff OSI to also conform its activities – including its privately funded activities –

8

to any policy opposing sex work that AOSI may adopt. On at least one occasion, USAID has indicated that it views OSI as a "partner" in AOSI's USAID-funded work.

40.     AOSI and OSI engage in a significant amount of privately funded activity that could be barred by the pledge requirement. Both are at the forefront of efforts to reduce the spread of HIV/AIDS by working with people who are at particularly high risk of contracting HIV/AIDS and of passing it on to others.

41.     In many regions, when the HIV/AIDS epidemic begins it is concentrated in small populations of people, including sex workers, drug users, and others. When public health officials are able to focus their efforts on those populations, they can stop the epidemic before it spreads to the rest of the population.

42.     In order to stop the epidemic among sex workers it is necessary to approach sex workers and other people at high risk for becoming infected with HIV in a non-judgmental manner, in order to establish a trusting relationship with them and engage them in needed HIV prevention efforts.

43.     Efforts recognized as highly successful in fighting the spread of HIV/AIDS have involved organizing sex workers, or working cooperatively with sex worker organizations.

44.     In some regions, advocating for a change in the legal regime surrounding sex work has been an essential part of fighting the HIV/AIDS epidemic, because when sex workers are subject to high fines, arrest or violence, they go underground, avoiding doctors, outreach workers, and others who want to provide them with the education, condoms, and other tools they need to avoid becoming infected and infecting others.

45.     As discussed above, Plaintiffs do not know how broadly USAID construes the pledge requirement. However, if USAID construes the pledge requirement broadly to bar

advocating changes in the legal treatment of sex workers; promoting community organizing among sex workers; or working with, or talking about, sex workers in a non-judgmental fashion, then advocacy of the most successful tactics in the fight against HIV/AIDS may well be forbidden.

46.    For this reason, the government of Brazil, and a number of highly respected US NGOs and foreign NGOs, have turned down USAID funding since implementation of the pledge requirement. Other NGOs operating under the pledge requirement have documented the ways in which the requirement is impeding their efforts to fight HIV/AIDS.

47.    Plaintiffs AOSI and OSI are committed to using their private funding to facilitate discussion among public health experts, doctors, social service providers, advocates, government officials and others regarding the most effective ways to fight the spread of the epidemic in the populations at the highest risk for contracting HIV/AIDS.

48.    For example, OSI's Sexual Health and Rights Program attempts to foster debate regarding policies designed to improve the sexual health and rights of socially marginalized populations, including sex workers, and to encourage the adoption and implementation of the most effective policies. It would be difficult for OSI to advocate for a free debate regarding policies to improve sexual health if it had to stigmatize sex workers.

49.    Likewise, a broad implementation of the pledge requirement could prevent OSI from continuing to promote a publication it has funded, titled *Sex Work, HIV/AIDS, and Human Rights in Central and Eastern Europe and Central Asia*, which recommends that sex work be decriminalized as a means of protecting sex workers from abuse by law enforcement personnel, traffickers, and pimps, thus making it easier for sex workers to access the health and social services they require in order to remain healthy and informed. OSI does not itself take any

position regarding the contents of the report, or regarding the desirability of changes in the legal

status of sex work. However, it did provide funding and technical assistance for the Central and

Eastern European Harm Reduction Network, which wrote the report, and it desires to continue

assisting the Network in distributing the report.

    50.    The Plaintiffs conduct many other activities potentially affected by a broad

implementation of the pledge requirement. These include:

> a) co-sponsoring a conference in New York on October 14, 2005
> entitled, "Sex Work, Sexual Rights and Countering the
> Conservative Sexual Agenda." The goal of the conference is to
> bring together members of different advocacy and service delivery
> communities – such as domestic and international groups, and
> groups working with sex workers and victims of trafficking – to
> discuss key policy issues. Among the topics to be discussed is the
> legal status of sex work;
>
> b) operating a listserv that provides a forum for participants to
> share information, opinions, and resources related to the health,
> safety and well-being of sex workers in Eastern Europe and the
> former Soviet Union. Participants post content regarding best
> practices, service gaps, model legislation, advocacy strategies, and
> new initiatives; and
>
> c) providing funding and technical assistance to a number of other
> non-profit organizations working with sex workers to fight the
> spread of HIV/AIDS. Several of these groups are studying the
> circumstances in which sex workers work and developing policy
> recommendations. It is essential that these groups remain free to
> advocate for the most effective policies, including – where
> appropriate – changes in the legal treatment of sex workers in
> order to facilitate outreach to them and ensure their access to
> needed health care and social services.

    51.    There exists a serious risk that AOSI and OSI will be subject to intrusive and

unwarranted governmental investigations regarding whether AOSI and OSI are engaged in

activities that the investigators construe as insufficiently opposed to sex work.

52.     Plaintiffs AOSI and OSI find the pledge requirement to be vague and confusing. They do not know which of their current or future activities Defendant USAID will construe as running afoul of the pledge requirement.

53.     Under Acquisition & Assistance Policy Directive 05-04, if a recipient violates the pledge requirement, USAID will unilaterally terminate the funding agreement or contract.

54.     Were Defendant USAID to find Plaintiffs AOSI or OSI out of compliance with the pledge requirement and unilaterally terminate Plaintiff AOSI's grant, AOSI's clients would suffer.

55.     Were Defendant USAID to find Plaintiffs AOSI or OSI out of compliance with the pledge requirement, a danger exists that civil or criminal penalties would be imposed on Plaintiff AOSI for falsely certifying compliance with the requirement.

### AOSI's Decision to Sign the Pledge

56.     AOSI is in the middle of operating a highly successful, five-year Drug Demand Reduction Program aimed at reducing the use of heroin and other injectable opiates, and stopping the spread of HIV/AIDS, in a region of Central Asia where drug use is rising as a result of rampant drug trafficking and is fueling the spread of HIV/AIDS.

57.     AOSI operates this program primarily with a $16,507,402 five-year grant from Defendant USAID.  AOSI contributes some of its non-government funding, and OSI contributes funding, technical assistance and administrative support.

58.     OSI is not a party to, and has no legal obligations under, the Cooperative Agreement with USAID establishing the Drug Demand Reduction Program.

59.     Since USAID began implementing its pledge requirement, the Plaintiffs have been torn between their desire to continue this successful, life-saving work, and their desire to

12

avoid adopting an ideologically driven government policy that will hurt their ability to do their life-saving work with their own funding.

60.    In the spring of 2004, when AOSI's Drug Demand Reduction Program subgrantees based outside of the United States were required to comply with the pledge requirement, AOSI adopted the following statement:

> AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways. AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities. Rather, our approach is to try to reduce the harms caused by disseminating credible information on questions such as the prevention of disease, and by providing direct public health assistance to vulnerable populations. …

61.    AOSI then wrote to USAID, asking whether this policy statement satisfied the version of the pledge requirement then in effect. USAID responded twice, both times failing to indicate whether the policy was compliant. In the second response, however, USAID warned AOSI that any failure to comply would be subject to investigation by USAID's Inspector General.

62.    In July 2005, after USAID imposed the pledge requirement on US NGOs, AOSI again wrote to USAID, asking whether the policy statement AOSI had adopted in the spring of 2004 satisfied the pledge requirement, and also whether USAID would take OSI's activities into account in determining whether AOSI is in compliance.

63.    After receiving that letter, USAID held up releasing the latest installment of funds for the Drug Demand Reduction Program for six weeks, throwing the work of the Drug Demand Reduction Program into disarray.

64.    AOSI finally received a response from USAID on August 2, 2005, stating yet again that it could not provide any guidance regarding whether AOSI's policy satisfies the pledge requirement but that AOSI would be subject to sanctions if it failed to comply.

65.    The next day, USAID sent a grant agreement to AOSI, obligating USAID to fund an additional $542,300 for the Drug Demand Reduction Program, but only if AOSI certified its compliance with USAID's pledge requirement.  In order to restart the flow of USAID funding, and to avoid the harm that clients would suffer if additional components of the Drug Demand Reduction Program were forced to shut down, AOSI decided to sign the certification.  It did so after carefully reviewing its own policy and the language of the pledge requirement, and assuring itself that, according to its interpretation of the requirement, it was in compliance.

66.    On August 3, 2005, AOSI sent the signed grant agreement to USAID, along with a cover letter reciting the required pledge.  In that letter, AOSI stated its belief that the policy it had implemented in the spring of 2004 complies with the pledge requirement and that OSI's actions have no bearing on AOSI's compliance or noncompliance with the requirement. Additionally, AOSI reserved its rights "to challenge the pledge requirement as violative of the First Amendment and other law."

67.    USAID has now issued an agreement obligating itself to provide enough funding to AOSI to enable the Drug Demand Reduction Program to operate through the middle of next year.  Accordingly, AOSI now feels free to file this lawsuit without risking a hold-up in USAID funding of the sort it experienced after it sent its letter to USAID in mid-June.

14

## VII.  CAUSES OF ACTION

68.    The pledge requirement contained in Acquisition & Assistance Policy Directive 05-04 is unconstitutionally vague, in violation of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

69.    The pledge requirement contained in Acquisition & Assistance Policy Directive 05-04 violates the rights of Plaintiffs AOSI and OSI under the First Amendment to the United States Constitution by forcing them to adopt an entity-wide policy opposing sex work in exchange for the receipt of government funds.

70.    The pledge requirement contained in Acquisition & Assistance Policy Directive 05-04 violates the rights of Plaintiffs AOSI and OSI under the First Amendment to the United States Constitution by imposing the pledge requirement on the funding that the Plaintiffs receive from sources other than USAID.

71.    Any application by USAID of the anti-prostitution pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f), to require a policy statement by the Plaintiffs broader than the policy statement that AOSI implemented in the spring of 2004 is not in accordance with the Global AIDS Act and should be held unlawful pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702, 706(2)(A).

72.    Any application by USAID of the anti-prostitution pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f), to bar the Plaintiffs from engaging in particular activities because they are perceived as being insufficiently opposed to sex work is not in accordance with the Global AIDS Act and should be held unlawful pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702, 706(2)(A).

WHEREFORE, Plaintiffs respectfully request the Court to:

15

(1) declare that USAID's application to the Plaintiffs and other US NGOs of the pledge requirement contained in Acquisition & Assistance Policy Directive 05-04 violates the First and Fifth Amendments to the United States Constitution;

(2) grant appropriate preliminary, and final, equitable relief (a) barring defendants United States Agency for International Development ("USAID") and Andrew Natsios, Administrator of USAID, from discontinuing and/or delaying the funding of plaintiff AOSI pending a final ruling on the merits, and (b) barring USAID from taking the following actions against any US NGO, solely on the grounds that the US NGO has failed to comply with the pledge requirement, or has taken action that USAID deems to be inconsistent with the pledge requirement: (i) denying funding to any person or entity, (ii) refusing to enter into or unilaterally terminating a grant agreement, cooperative agreement, or contract with any person or entity, or (iii) disciplining or seeking civil or criminal sanctions against any person or entity; and

(3) grant such other and further relief as the Court shall deem proper, including the award of reasonable attorneys' fees and costs.

Dated: New York, New York
September 23, 2005

Burt Neuborne (BN 9092)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
Laura K. Abel (LA 6831)
Aziz Huq (AH 3227)*
Brennan Center for Justice
  at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 998-6730

*Attorneys for Plaintiffs*

*Not admitted in this District.