Exhibit 10



# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 15, 2005

The Honorable Andrew Natsios
Administrator
United States Agency for International Development
Ronald Reagan Building
1300 Pennsylvania Avenue, NW
Washington D.C. 20523-1000

Dear Mr. Administrator:

As Members of Congress who advocate for the faith community, we write to express our deep concern about the way in which the United States Agency for International Development (USAID) is implementing the Communities Responding to the HIV/AIDS Epidemic (CORE). As a pillar of the Administration's faith-based outreach abroad, CORE is an innovative initiative that partners USAID with faith communities to address the HIV/AIDS epidemic.

CORE's operating consortium is composed of five groups including CARE USA, the World Council of Churches (WCC), the International Center for Research on Women (ICRW), the International HIV/AIDS Alliance (the Alliance), and the Johns Hopkins Bloomberg School of Public Health/Center for Communication Programs. We draw your attention to the first four organizations because their policies often run contrary to U.S. HIV/AIDS policy and frequently promote policies that are offensive to people of faith.

Most disconcerting is the consortium's primary contractor, CARE USA. The President of CARE, Peter Bell, has signed public attacks on the Administration's pro-life policies, calling them "undemocratic" and "unethical"—and this is only the beginning of CARE's opposition to American policy.[1]

CARE's programs in India, most notably the Sonagachi Project in Calcutta, have promoted a pro-prostitution agenda. Samarjit Jana, CARE's Assistant Country Director in India, is one of the world's leading crusaders for the legalization of prostitution and for the *right* of HIV-infected prostitutes to have sex without a condom.[2]

---

[1] Peter Bell and ten other signers issued a press release on February 23, 2003 opposing the Administration's pro-life policy. This statement can be found at http://www.planetwire.org/details/1263.

[2] Samarjit Jana is a member of the Board of Directors of the Network of Sex Work Projects (NSWP), an advocacy group for the legalization of prostitution. NSWP maintains a policy that one hundred-percent condom use by prostitutes is undesirable because it would forfeit the "human and civil right" against mandatory sexually transmitted infection testing. This and other NSWP policies can be found at http://www.nswp.org/safety/100percent.html.

In Lesotho, CARE used USAID funding to campaign for a so-called "rights-based" approach to prostitution—in other words, for the legalization of prostitution and its cultural acceptance as a legitimate form of employment.[3] Despite the Administration's policy directive that all grantees of taxpayer monies for work overseas must pledge to oppose the legalization of prostitution, CARE continues to lead the CORE consortium.[4]

We are also concerned about the policies of ICRW, another CORE member. In 2001, ICRW held a conference to plan strategy for an agenda that included the legalization of prostitution. Its pro-prostitution stance is so radical that ICRW even objected to the late Senator Paul Wellstone's Trafficking Victims Protection Act (S.1842, 106th Congress) because "the legislation does not currently distinguish between forced prostitution and voluntary prostitution. Thus [ICRW argued] it may be used as a punitive measure against voluntary sex workers."[5]

ICRW also holds other policy views that most faith-based groups would find offensive. ICRW president Geeta Rao Gupta is a strong critic of abstinence programs, arguing that "the traditional norm of virginity for unmarried girls that exists in many societies, paradoxically, increases young women's risk of infection because it restricts their ability to ask for information about sex out of fear that they will be thought to be sexually active." Gupta also objects to the "stigmatizing [of] sex workers" because it "increase[es] their vulnerability to infection and violence."[6]

The Alliance is the third CORE consortium organization of concern. The Administration's own policy may prohibit this group from receiving government grants because of its veiled support for the legalization of prostitution. The Alliance appears to be at the vanguard of prostitution legalization efforts through its many activities. In one instance, it employs two highly placed associates of the Network of Sex Work Projects, an outspoken pro-prostitution advocacy group. In another instance, the Alliance purposefully organizes with pro-prostitution groups.[7] Nonetheless, USAID is working with the Alliance to implement the Administration's HIV/AIDS policy among faith-based groups.

The fourth disturbing CORE consortium member is the WCC. With a reputation for more than half a century of unrelenting criticism of the United States, WCC consistently seeks to undermine American foreign policy.

---

[3] CARE's USAID-funded "Sexual Health and Rights Project" (SHARP), which has described itself as having a "rights-based focus" and being concerned with stigma and discrimination against prostitutes. "Like Plastic That Blows In the Wind, Mobile Sex Workers in Southern Africa," Research for Sex Work, Volume 5, June 2002. Http://hcc.med.vu.nl.artikelen/robinson.htm

[4] "As a condition of entering into the referenced agreement, the recipient agrees that it is opposed to the practices of prostitution and trafficking because of the psychological and physical risks they pose for women, men and children;" found in "Acquisition & Assistance Policy Directive 04-04," issued January 15, 2004; available at http://www.usaid.gov/business/business_opportunities/cib/pdf/aapd04_04_original.pdf

[5] "Global AIDS Advocacy Consultation: Vulnerable Populations Brief," International Center for Research on Women, March 24, 2001; formerly available at http://www.ird-renew.org/atf/cf/{8548C466-7ECE-4AF1-B844-49C289CE5165}/Human_Rights_Report.pdf

[6] "Gender, Sexuality, and HIV/AIDS: The What, the Why, and the How," presentation to the XIII International AIDS Conference, Durban, South Africa, July 12, 2000, at 2, 4.

[7] Cheryl Overs, founder of Network of Sex Work Projects (NSWP), and Paulo Longo are employed by the International HIV/AIDS Alliance and simultaneously maintain their links to the Network of Sex Work Projects. A clear example of the Alliance's pro-prostitution advocacy can be found at, http://archives.healthdev.net/sex-work/msg00203.html.

A study published in 2004 by the well-regarded Institute on Religion and Democracy surveyed WCC's public statements on human rights over the past several years. The report discovered that 21% of all WCC complaints about human rights were directed against the United States and 43% were directed against Israel, though WCC cited no human rights violations in China.[8] Apparently, WCC believes that China is not culpable for any violation of human rights, while the Unites States and Israel account for two-thirds of the world's violations. This is a distortion of the meaning of "human rights."

Astonishingly, such propagandistic condemnation is not an isolated incident. WCC issued a statement which linked the tsunami in the Indian Ocean to the U.S. refusal to sign the Kyoto Protocol on Global Warming.[9] After September 11, WCC General Secretary Konrad Raiser attacked the U.S. war against terrorism as "outside the rule of law," and claimed that our anti-terrorism efforts have led to the "harsh suppression" of the "people's struggles for social justice" because they appear as "potential manifestations of terrorism." Raiser also dismissed the tragedy of September 11, stating that it would "create a sense of solidarity in pain with those who had been exposed to the structural violence of a global economic system which serves the interests of a minority of rich people and countries."[10]

Last year, three of USAID's CORE consortium members (CARE, the International HIV/AIDS Alliance and the World Council of Churches) joined with eight other organizations to produce a so-called "Code of Good Practice for NGOs Responding to HIV/AIDS," which includes statements antithetical to American policy. The document states that, "In the context of individual behavior change, abstinence, fidelity and use of condoms all have a role to play in reducing HIV transmission. However, it is critical that abstinence and fidelity are not promoted as the preferred approach, with condoms as a last resort, thereby stigmatising [sic] condom use."[11]

The code also calls for "the full range of prevention options" to be available to injecting drug users "in a manner that is free of judgment," including "utilising [sic] non-injecting methods of drug use and effective use of sterile injecting equipment."[12] The code states that "the illegality and stigma associated with injecting drug use invariably lead to discrimination against people who use drugs and create barriers to accessing services" and protests the "failure to protect the human rights of people who inject drugs," linking it to the "undermining [of] HIV prevention efforts."[13] If the sponsors of this code seriously believe that legalizing drug use and making drugs and equipment available—protecting the "human rights" of drug users—will prevent the spread of HIV, then we cannot understand why USAID would contract with these organizations.

---

[8] Erik R. Nelson & Alan F.H. Wisdom, "Human Rights Advocacy in the Mainline Protestant Churches (2000-2003): A Critical Analysis," The Institute on Religion and Democracy, at 12.

[9] Peter Kenny, "Christian Leaders Urge Politicians: After Tsunami, Heed Climate Change," Episcopal News Service, December 30, 2004.

[10] Mark Tooley, "World Council of Churches Leaders Oppose War on Terrorism," Institute on Religion and Democracy, March 8, 2002.

[11] "Renewing Our Voice: Code of Good Practice for NGOs Responding to HIV/AIDS," issued by ActionAid International, CARE USA, Global Health Council, Global Network of People Living with HIV/AIDS, Grupo Pela Vidda, Hong Kong AIDS Foundation, International Council of AIDS Service Organizations, International Federation of Red Cross and Red Crescent Societies, International Harm Reduction Association, International HIV/AIDS Alliance, World Council of Churches, December 2004, at 66.

[12] Ibid. For alternative non-injection methods to use heroin, see e.g., "H is for Heroin," The Harm Reduction Coalition, found at http://www.harmreduction.org/pubs/PUBSpdfs/heroin.pdf, at 5-8.

[13] Ibid, at 35.

Furthermore, the code advances the legalization of prostitution, stating that "the stigma associated with sex work in many countries around the world creates significant barriers to sexual health and HIV prevention efforts among sex workers and their clients... Supporting sex workers, including through collective action, empowers them to negotiate transactions, and address the health and social contexts that increase their vulnerability to HIV infection."[14] Apparently, the code considers the legalization of prostitution to be a way to improve HIV prevention efforts.

Such policy statements are clearly contrary to American foreign policy and offensive to a vast majority of religious adherents the world over—though they are made by contractors for the Administration's central faith-based response to the HIV/AIDS policy.

Any reasonable pre-award evaluation by USAID of its contractors should have confronted the records of CARE, ICRW, the Alliance and WCC. If such an evaluation failed to uncover the concerns we have enumerated above, we must question USAID's procedures for selecting its contractors. We would be most concerned, however, to learn that USAID had initiated its collaboration with these CORE consortium members with full knowledge of their policy positions.

U.S. government outreach to the range of faith-based communities delivered by anti-American, anti-abstinence, pro-prostitution and pro-drug use groups should not be allowed to undermine the work of the Administration. Organizations entrusted with taxpayers' money and charged with a mission to represent our nation to people abroad must themselves represent the values inherent in American foreign policy.

Thank you for considering these views, and for your work to ensure that people of faith may participate fully in the public square.

Sincerely,

[signatures]

[14] Ibid, at 34.

Dana Rohrabacher

[signature]

Sam Cox

John Shadegg

J. Mark Bentt

Lynn Westmoreland

Virginia Foxx

E. Scott Garrett    NJ-05

Sue Myrick

Virgil Goode

[signature]    TX-02

Steve King

Dan Weber

Tom Tancredo

Steve Chabot

Sam Johnson

Walter B. Jones

Marilyn Musgrave

John N. Hostettler

Kira Terry

| | |
|---|---|
| **Mark Souder (IN)** | **Tom Feeney (FL)** |
| **Todd Akin (MO)** | **John Doolittle (CA)** |
| **Phil Gingery (GA)** | **Darrell Issa (CA)** |
| **Gil Gutknecht (MN)** | **John Shadegg (AZ)** |
| **Jeff Flake (AZ)** | **Lynn Westmoreland (GA)** |
| **Dana Rohrabacher (CA)** | **Scott Garrett (NJ)** |
| **Tom Cole (OK)** | **Virgil Goode (VA)** |
| **J. Gresham Barrett (SC)** | **Sue Myrick (NC)** |
| **Virginia Foxx (NC)** | **Steve King (IA)** |
| **Joe Pitts (PA)** | **Ted Poe (TX)** |
| **Jim Ryun (KS)** | **Dave Weldon, M.D. (FL)** |

_____Steve Chabot (OH)_____


_____Tom Tancredo (CO)_____


_____Walter B. Jones (NC)_____


_____John Hostettler (IN)_____


_____Marilyn Musgrave (CO)_____


_____Lee Terry (NE)_____

Exhibit 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DKT INTERNATIONAL, INC.        )
                                  )
        Plaintiff,         )
                                  )
     v.                      )  Civil Action Case No.
                                  )
                                  )
UNITED STATES AGENCY FOR     )
INTERNATIONAL DEVELOPMENT, *et al.* )
                                  )
                                  )
        Defendants.     )
                                  )
                                  )

## DECLARATION OF LAWRENCE C. HOLZMAN

I, Lawrence C. Holzman, under penalty of perjury, hereby declare:

       1.    I make this declaration of my own personal knowledge; if called as a witness, I would testify to the contents thereof.

       2.    I make this declaration in support of Plaintiff's Motion for a Preliminary Injunction in this action.

       3.    I am the country representative in Vietnam for DKT International.  I have served in this position for four years.  Prior to joining DKT International in 2001, I was employed by CARE International for over thirty years in fifteen countries overseas.

       4.    DKT International has operated in Vietnam since 1993, distributing condoms in all sixty-four of Vietnam's provinces.  During that time, it has distributed more than four hundred million condoms throughout Vietnam using social marketing techniques.

5.    DKT 's budget for fiscal year 2004 in Vietnam was U.S. $3,611,265.
DKT International had a worldwide budget of U.S. $43,194,440 for fiscal year 2004.

6.    USAID funds represent approximately 13 percent of DKT's funding in
Vietnam.

7.    Since 1998, DKT has run a program called the "100% Condom
Access" project with USAID funding. Another private organization, Family Health
International, provides DKT with the USAID funds by agreement with USAID. The most recent
grant under this program was awarded in July 2003. That grant expired on June 30, 2005.

8.    Because approximately U.S. $57,000 remained unspent in the grant,
DKT requested a "no-cost extension" to permit the organization to spend the funds for an
additional two months.

9.    On June 27, 2005, the FHI office sent me the documents to sign the no-
cost extension, which had been approved by USAID and signed by the FHI country director.
(Exh. A). After signing my name to the amendment to the subagreement, I realized that FHI had
included a certification among the papers that I was required to sign. The certification stated that
DKT had an organization-wide policy opposing prostitution. (Exh. B)

10.    Upon realizing that I was required to certify that DKT had adopted a
policy explicitly opposing prostitution, I immediately voided my signature on the amendment to
the subagreement, and sought a waiver of the certification requirement. (Exh. C).

11.    Within a few days, FHI responded to my request for a waiver with an
email stating, "FHI will not be able to execute the no-cost extension unless DKT is able to sign
the anti-prostitution statement. Furthermore, we would not be able to support DKT for any
activities with USAID funds if this is not signed." (Exh. D).

12.    Several days later, FHI advised DKT that it had misinterpreted the USAID policy, and that FHI would be allowed to authorize the no-cost extension since those funds originated before the USAID guidance. (Exh. E).

13.    In August 2004, DKT prepared a proposal to FHI and USAID seeking funding for a project to market and distribute lubricant for use with condoms.  This proposal was part of the HIV/AIDS work of DKT because condoms are more effective if used with lubricant to reduce the chances of breakage, and to help avoid internal scratching and bleeding.  The total budget for the program was $80,000.

14.    On June 27, 2005, I received an email message from an FHI representative stating that FHI had received permission from USAID to fund the lubricant proposal. (Exh. F).  On June 28, 2005, the FHI representative informed me in person that the project would be funded with $60,000 in USAID funds.  I agreed to cut the budget to $60,000 by shrinking the size of the project.

15.    However, FHI cancelled the grant for lubricant distribution after I refused to sign the certification.  FHI's earlier position that DKT could no longer have access to USAID funds in the absence of the certification remained unchanged.  Consequently, on July 28, 2005, FHI confirmed that because DKT would not certify that it had a policy in place opposing prostitution, FHI would not be able to go forward with the lubricant proposal, or with any other project involving USAID funding. (Exh. G)

16.    On July 13, 2005, Dan Levitt of USAID told me personally during a phone call that DKT would be ineligible for USAID funding unless we signed the FHI certification.  He also directed me to deal directly with FHI on this matter.

17.     DKT's refusal to comply with the USAID-required certification precludes DKT from receiving the lubricant grant, and all potential USAID grants in the future.

18.     As an organization, DKT International has no policy either opposing or supporting prostitution. DKT objects to, and will not adopt a policy "opposing prostitution." Importantly, the policy USAID requires DKT to adopt would apply to DKT as an organization, and not just to projects funded with USAID funds. Thus, the policy would significantly restrict *all* DKT speech and activities, including those funded by the British government, the German government, and private donors.

19.     Signing the certification as USAID has demanded would jeopardize funding that we receive from our other government and private donors. It would place our current non-U.S. government funding and any future grants at risk. The success of all our programs depends on our ability to interact with men and women in the sex industry, to teach them and convince them to practice safe sex. Our non-USAID donors, who fund the vast majority of our work in Vietnam, expect us to work closely with sex workers in our effort to prevent HIV/AIDS. Adopting the U.S. policy would severely curtail our ability to fulfill those expectations, placing our private grants at risk.

20.     As a matter of carrying out its family-planning and HIV/AIDS work, DKT believes a policy explicitly opposing prostitution will likely result in stigmatizing and alienating many of the people most vulnerable to HIV/AIDS—the sex workers—and may result in limiting access to that vulnerable group we are trying to reach in our field work in Vietnam.

21.     Women and men working in the commercial sex sector suffer stigmatization and abuse in Vietnam and around the world. Sex workers in Vietnam, who currently suffer from an HIV infection rate of 5.2 percent, face a threat of forced rehabilitation

by the state, as well as significant other social, economic, and medical obstacles.  Effective

behavioral change in this population is essential in preventing the spread of HIV/AIDS in

Vietnam.

22.    The U.S. government-mandated policy would preclude DKT from

speaking, even when speech on the issue of prostitution and what to do about it is funded by

*private sources*.  In order to comply with the policy, DKT would be forced to police all of its

staff serving in all eleven of its country operations around the world, as well as censor its

employees, website, and training materials.

23.    DKT International refuses to surrender its First Amendment right to

speak freely and to engage in public debate on significant and controversial issues of public

importance, including discussion on what might be the most effective techniques and approaches

to combat the spread of HIV and AIDS.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and
correct to the best of my knowledge.

DATED this 8th day of August, 2005

Lawrence C. Holzman

# EXHIBIT A

07/07 2005 14:31 FAX 9437370          DKT INTERNATIONAL                    ☒009

Date Submitted: June 20th, 2005                    Amendment #: 1

FCO Number: 85107

# IMPLEMENTING AIDS PREVENTION AND CARE PROJECT (IMPACT)

## Amendment between
## Family Health International (FHI)
## and
## DKT International
## Hanoi, Viet Nam

### Cooperative Agreement #IMPACT HRN-A-00-97-00017-00

Project Title: **HIV/AIDS Prevention Program in Vietnam**

The purpose of this amendment to above-referenced sub-agreement is **to provide two-months extension without cost-increase and to replace some project activities with new ones.**

**I.    Project Description**

FHI's support to men's intervention in Thai Binh was ended, so it was no longer appropriate to carry out condom promotion in this province.    Therefore, the scope of work is revised to cancel TOT workshop for PASB staff and BCC training workshop on condom promotion and HIV/AIDS prevention for peer educators in Thai Binh province.

Budget allocated for the above-mentioned workshops and savings from other project activities which were implemented, are re-allocated for:
(i)    purchasing additional promotion materials such as penile wooden model, OK posters, OK key chains, OK wet tissues, OK bottle opener for distributing to customers who buy condoms from project-supported non-traditional outlets;
(ii)    conducting two new activities.    They include developing a website on sexual health for young people, branded with Super Trust and OK condom, inclusive of a small-scaled PR campaign nationwide to launch the website and hosting/domain name in one year; and organizing "Displaying OK and Super Trust Contest" among pharmacies in Hanoi, HCMC, Da Nang, Can Tho and Hai Phong.

Due to cancellation of several activities and replacing with some new ones, the project needs more time to implement these newly added activities.    In addition, because of the delay in setting up MSM peer educators team as well as issuing contracts with local NGOs, the two qualitative evaluation surveys in Hanoi, Hai Phong, Can Tho and HCMC has not conducted as originally planned. Therefore, the project needs to be extended two months to complete all activities mentioned above.



07/07 2005 14:31 FAX 9437370          DKT INTERNATIONAL                    ☒010

**II.     Period of Performance.**

The original period of performance of this subagreement from July 1st, 2003 through June 30th, 2005 is deleted and replaced by the new authorized period of performance from July 1st, 2003 through August 31st, 2005.

**III.    Subagreement Amount, Budget and Payment**

Attachment B, Summary Budget of the subagreement is deleted in its entirety and replaced with the revised Attachment B, Amendment # 1. The subagreement amount is not changed. Attachment C remains unchanged. The Monthly Financial Report (MFR) is deleted and replaced with the revised MFR attached to this document.

**IV.     Other Changes**

Attachment D subpart III "Special Provision" is hereby deleted in its entirety and replaced with Attachment D subpart III "Special Provisions" Amendment #1. Two new provisions #3 and #12 have been added. All subsequent provisions are numbered accordingly.

The FHI Project Monitor for this subagreement is Dr. Stephen Mills, FHI/Vietnam Country Director

The new FHI Standard Provisions for US Governmental Organization is attached to and constitutes a part of this amendment.

All other subagreement clauses remain unchanged and in effect.

The parties execute this subagreement amendment in two (2) copies, each of which shall be deemed an original.

| For DKT | | For FHI |
|---------|---------|---------|
| | Signature | |
| Larry Holzman | Typed Name | Stephen Mills |
| Country Representative | Title | Country Director |

Index of Attachments
    Attachment B: Summary Budget, Amendment # 1
    Revised MFR Format
    Attachment D subpart III "Special Provision", Amendment #1
    FHI Standard Provisions for US Non-Governmental Organization

cc:     Alexander Smith, FHI/Arlington
        Jeffery Tremelling, FHI/APD
        Aranya Ngamwong, FHI/APD
        Daniel Levitt, USAID/Viet Nam
        Stephen Mills, Country Director, FHI/Viet Nam

②

07/07 2005 14:31 FAX 9437370          DKT INTERNATIONAL                    ☒011

# SUMMARY BUDGET AMENDMENT

FCO #: 85107          IA name: DKT International          Country: Viet Nam          Amendment #: 01

| | Current Budget - US Dollars (a) | Total US Dollars Received by IA - per latest RMFR (b) | 31 May 2005 Expenses to Date per latest RMFR - US Dollars (c) | Total Remaining US Dollars (d) | Balance on Hand per latest RMFR - US Dollars (e) | Projected Expenses - US Dollars (g) | Budget Amendment - US Dollars (h) | New Total Budget - US Dollars (i) |
|---|---|---|---|---|---|---|---|---|
| I. Salaries | 76,440 | | 65,234 | | | 7,466 | (3,740) | 72,700 |
| II. Fringe Benefits | 12,985 | | 8,131 | | | 1,610 | (3,254) | 9,741 |
| III. Consultants | 0 | | 0 | | | 0 | 0 | 0 |
| IV. Equipment | 2,950 | | 3,300 | | | 0 | 350 | 3,300 |
| V. Travel | 10,483 | | 8,513 | | | 1,970 | (0) | 10,483 |
| VI. Office Expenses | 55,780 | | 52,960 | | | 6,000 | 3,180 | 58,960 |
| VII. Other Direct Costs | 340,577 | | 261,466 | | | 82,575 | 3,464 | 344,041 |
| VIII. Subrecipients | 0 | | 0 | | | 0 | 0 | 0 |
| IX. Indirect Costs | 0 | | 0 | | | 0 | 0 | 0 |
| Total Project | 499,225 | 445,933 | 399,604 | 53,292 | 46,329 | 99,621 | 0 | 499,225 |

(3)

07/07 2005 14:32 FAX 9437370        DKT INTERNATIONAL        ☑012

# FAMILY HEALTH INTERNATIONAL
## Recipient's Monthly Financial Report

*This report must be submitted not later than ten (10) workdays after the end of the month which the report covers*

FCO No   **85107**    Month of _____     Exchange Rate: _____    As of date submitted _____

Recipient Name      **DKT International**

Project Manager (Recipient)   **Mr. Larry Holzman**     Project Monitor (FHI)    **Stephen Mills**

Project Title     **HIV/AIDS Prevention Program in Vietnam**

Date Subagreement began    **July 1, 2003**     Date Subagreement ends    **August 31, 2005**

| BUDGET CATEGORY | (1) Total budget amount approved | (2) Amount expended this month | (3) Total amount expended | (4) Remaining budget balance |
|---|---|---|---|---|
| Salary * | 72,700 | | | |
| Fringe Benefits * (if applicable) | 9,741 | | | |
| Consultants and Professional Fees * | | | | |
| Procurement * | 3,300 | | | |
| Travel, Transport-ation and Per Diem | 10,483 | | | |
| Office Expenses | 58,960 | | | |
| Other Direct Cost * | 344,041 | | | |
| G&A (if applicable) | | | | |
| TOTALS | 499,225 | | | |

| Summary to date | |
|---|---|
| Previously Received | |
| Received this Month | |
| Total Received | |
| Total Amount Expended | |
| Balance on Hand | |

\* Attachment Required

Fund Received:

Wire/Check Number _____   In the Amount of (US$) _____   Local Currency _____   Exchange Rate _____

*The undersigned parties hereby certify that all expenditures reported are correct and all requirements of the Agreement have been met as of the certification date:*

Certified for Approval: _____      _____

           RECIPIENT AUTHORIZED OFFICER           FHI PROJECT MONITOR

Reviewed By: _____      _____

           FHI RO/CO FINANCE           FHI CONTRACTS & GRANTS

DISTRIBUTION: Original to FHI



**Attachment D**

**Subpart III "Special Provisions"** Amendment# 1

**III.    SPECIAL PROVISIONS**

1.  Fiscal year funding for the project is contingent upon the availability of funds to FHI.
    It is FHI's intent to make funds available for this project at budgeted US dollar
    amounts, which may or may not equal budgeted local currency amount.

2.  This Subagreement is between FHI and Subgrantee as referenced in the
    Subagreement. All responsibility for project outcome is solely that of the Subgrantee.

3.  Patient Care

    <u>Responsibility for Patient Care</u>. Recipient assumes full responsibility and liability for
    the care and treatment of its patients. To the extent that the training and other support
    provided to recipient by FHI-employed personnel under this Agreement encompasses
    treatment of patients of the recipient, recipient agrees that it is ultimately responsible
    for such treatment, that such treatment will be deemed to be done by and on behalf of
    recipient, that recipient waives any claim against FHI and/or FHI-employed personnel
    arising out of patient treatment, and that it will assume full responsibility for any
    claims by patients arising out of patient treatment, whether by recipient-employed or
    by FHI-employed personnel, and agrees to hold FHI harmless from any liability
    arising out of the assistance provided hereunder.

4.  Any deviations from the scope of work need prior approval from the Project Monitor.

5.  A successful project is the main consideration.  Project monitoring will help ensure
    success.  This project may be reviewed by FHI staff, and/or by consultants selected
    by FHI.

6.  The Subgrantee will report immediately to FHI, via telephone, fax or email, any
    serious problems encountered during the project.

7.  No participant will be coerced to participate in the project.

8.  The code of ethics and all legal and other requirements applicable to the project in the
    country, region and parent organization of the Subgrantee will be followed.

9.  The Contractor/Recipient is reminded that U.S. Executive Orders and U.S. Law
    prohibits transactions with, and the provision of resources and support to, individuals
    and organizations associated with terrorism.  It is the legal responsibility of the
    contractor/recipient to ensure compliance with these Executive Orders and Laws.
    This provision must be included in all subcontracts/subawards issued under this
    contract/agreement.



07/07 2005 14:32 FAX 9437370                DKT INTERNATIONAL                              ☑014

10. Family Health International's Subagreement Standard Provisions (Attachment E) are an integral part of this Subagreement. Particular attention should be paid to the Local Procurement section when procurement is made with funds from this agreement.

11. The Subgrantee is encouraged to publish and present results of this project. However, any publication or presentation derived from this study must abide with FHI's current publication and presentation policy, Nos. 029B and 040A respectively. The policy for use of USAID and FHI logos is found in the Publications and Media Releases Section of the Standard Provisions. A copy of these policies is included as part of Attachment E, Standard Provisions.

12. The Subgrantee is reminded that any equipment, such as computers, copiers, vehicles, purchased with funds under the terms of this Subagreement remain the property of FHI, and shall be returned FHI upon written request or termination of the project or Subagreement. Responsible security, care and maintenance of any such equipment is the sole obligation of the Subgrantee; any loss, theft or damage shall be reported to FHI immediately.

13. Accounting, Audit and Records

This Subagreement is funded by the U.S. Government. Therefore, the Subgrantee agrees to comply with the audit requirements contained in the Subagreement Standard Provisions. For all U.S.-based and Non-U.S. based Subgrantees this means the books, records, documents, and other evidence relating to this Subagreement are subject to FHI monitoring procedures. These monitoring procedures may include periodic onsite reviews and audits to determine compliance with the terms and provisions of the Subagreement. The reviews and audits will also determine if Subagreement expenditures are adequately documented. These reviews and audits may be performed by FHI or a representative designated by FHI. The Subgrantee's records, which pertain to this Subagreement, shall be retained for a period of three years from the date of completion of this Subagreement.

U.S. based government and not-for-profit Subgrantees are required to comply with the provisions of the Single Audit Act. This act requires an OMB Circular A-133 audit when $300,000 or more of federal funds are received. The Subgrantee agrees to provide audit coverage of this Subagreement and provide a copy of the audit to FHI on an annual basis during the life of this Subagreement.



07/07 2005 14:33 FAX 9437370          DKT INTERNATIONAL          ☒015

**ATTACHMENT E:**
**Standard Provisions**

1.    Standard Provision for U.S. Nongovernmental Recipients or Standard Provision for Non-U.S.
      Nongovernmental Recipients (as applicable)
2.    Financial, Administrative and Accounting Guidelines
3.    Policy No. 029C Misconduct in Science
4.    Policy No. 040A Authorship of Scientific Papers



# EXHIBIT B

06/29/05  08:30 FAX 2022238786          DKT                            ✪003
27/06 2005 16:53 FAX 9437370         DKT INTERNATIONAL        → DKT USA  ✪002


**Family Health International**

## CERTIFICATION REGARDING PROSTITUTION OR SEX TRAFFICKING
### And
### ACCURACY OF INFORMATION ON CONDOMS

FCO#: 85107          COUNTRY: VIETNAM

**PROJECT TITLE: HIV/AIDS Prevention Program in Vietnam**

I. "As a condition of entering into the referenced agreement, DKT INTERNATIONAL hereby certifies that it does not and will not promote the legalization or practice of prostitution or sex trafficking.  In addition, DKT INTERNATIONAL will use its best efforts to ensure that its subcontractors or subgrantees do not and will not promote the legalization or practice of prostitution or sex trafficking.  Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

DKT INTERNATIONAL hereby certifies that it has a policy explicitly opposing prostitution and sex trafficking.

Further, DKT INTERNATIONAL also certifies that information provided about the use of condoms as part of projects or activities that are funded under this agreement shall be medically accurate and shall include the public health benefits and failure rates of such use and shall be consistent with USAID's fact sheet entitled, "USAID: HIV/STI Prevention and Condoms". This fact sheet may be accessed at:

http://www.usaid.gov/our_work/global_health/aids/TechAreas/prevention/condomfactsheet.html

This certification is an express term and condition of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by FHI or USAID prior to the end of its term.

Name:    **Larry Holzman**              Signature: _____

Title:    **Country Representative**     Date: _____

# EXHIBIT C

—— Original Message ——
**From:** HolzmanLC@aol.com
**To:** SMills@fhi.org.vn
**Cc:** phil@dktinternational.org ; rciszewski@earthlink.net ; lin@dkt.org.vn
**Sent:** Tuesday, June 28, 2005 12:53 AM
**Subject:** No Cost Extension Documents

Dear Steve,

Thank you for providing us with an agreement for our requested two month No Cost
Extension Amendment for the ongoing project with FHI for condom promotion in
Vietnam.

We would like to request a waiver concerning DKT's signing of the document entitled,
"CERTIFICATION REGARDING PROSTITUTION OR SEX TRAFFICKING AND
ACCURACY OF INFORMATION ON CONDOMS."

We have not been required to sign this document in the past and find that some of
the wording in the document does not fit within the organizational principles of DKT.

Since all of us involved in HIV/AIDS programming in Vietnam are working toward the
same goals, we sincerely hope that you will understand our reluctance to sign the
above certification and that you are able to grant us a waiver so that we can continue
with our much needed and effective condom promotion program.

All the best.

6/28/2005

# EXHIBIT D

07/07 2005 14:30 FAX 9437370          DKT INTERNATIONAL                    ☒004

## Larry Holzman

| | |
|---|---|
| **From:** | "Steve Mills" <Steve@fhi.org.vn> |
| **To:** | <larry@dktinternational.org> |
| **Cc:** | "Hoa, Tran Duc" <Duchoa@fhi.org.vn>; "Phuong, Duong Thi Bich" <bichphuong@fhi.org.vn>; "Tung, Nguyen Duy" <Tung@fhi.org.vn>; "Bao, Vu Ngoc" <Bao@fhi.org.vn> |
| **Sent:** | Tuesday, July 05, 2005 12:24 PM |
| **Subject:** | extension |

Larry, I have confirmed that FHI will not be able to execute the no-cost extension unless DKT is able to sign the anti-prostitution statement. Furthermore, we would not be able to support DKT for any activities with USAID funds if this is not signed. Please discuss with DKT management if there is any flexibility on this and let me know.

Steve

Stephen Mills, PhD, MPH
Country Director
Family Health International, Vietnam
Tel 84-4-943-1828
Fax 84-4-943-1829
Mobile 84 (0) 903 456399

7/5/2005

# EXHIBIT E

**From:** Steve Mills
**To:** larry@dktinternational.org
**Cc:** Hoa, Tran Duc ; Bao, Vu Ngoc ; Tung, Nguyen Duy ; Phuong, Duong Thi Bich ; Jeanine Bardon ;
Deborah Murray ; steve wignall (BKK)
**Sent:** Wednesday, July 13, 2005 5:10 PM
**Subject:** DKT no-cost extension

Larry,
I have received guidance from FHI that we are able to proceed with the no-cost amendment of DKT's
existing sub-agreement without DKT having to sign the USAID anti-prostitution statement. This is because
the funds for DKT's sub-agreement with FHI originated prior to the application of the USAID guidance on
anti-prositution. I apologize that we did not interpret the USAID guidance correctly in the first place and am
sorry for any inconvenience that this may have caused.

Steve

Stephen Mills, PhD, MPH
Country Director
Family Health International, Vietnam
Tel 84-4-943-1828
Fax 84-4-943-1829
Mobile 84 (0) 903 456399

8/8/2005

# EXHIBIT F

## Larry Holzman

| | |
|---|---|
| **From:** | "Hoa, Tran Duc" <Duchoa@fhi.org.vn> |
| **To:** | <larry@dktinternational.org> |
| **Sent:** | Monday, June 27, 2005 3:47 PM |
| **Subject:** | DKT's Lubricant proposal |

Dear Larry,

There was a discussion few months ago between FHI and DKT about DKT's lubricant proposal. However, due to other programatic issues, we were not able to continue with that.

Luckily, we have just got a good sign from USAID that we can still work with DKT on lubricant. Since Dr. Bao the Program Manager will be leaving for Kobe on July 29, we would like to have a meeting with DKT tomorrow morning, at about 9:00am. Does it fit in with your schedule?

Thank you and best regards,


Hoa


Tran Duc Hoa, MHSc.
BCC Program Officer
Family Health International in Vietnam
Suite 301, 30 Nguyen Du, Hanoi, Vietnam
Tel: 84-4-943 1828   Fax: 84-4-943 1829
Mobile: 84-4- 904 140 790
E-mail: duchoa@fhi.org.vn

# EXHIBIT G

From:       "Steve Mills" <Steve@fhi.org.vn>
To:         <HolzmanLC@aol.com>
Cc:         <rprice@fhi.org>; <jbardon@fhibkk.org>; <dmurray@fhibkk.org>; "Bao, Vu Ngoc" <Bao@fhi.org.vn>
Sent:       Thursday, July 28, 2005 10:25 AM
Subject:    DKT's Lubricant proposal

Larry,

Further to our discussions regarding the development of packaging of lubricants and condoms, I have consulted with FHI's headquarters, and it will not be possible for FHI to fund DKT to carry out this work.

It is FHI's policy that its subrecipients commit, among other things, to not promoting the legalization or practice of prostitution or sex trafficking. You have indicated that DKT declines to sign the certification form provided to you to that effect.

The FHI policy and certification requirement is in compliance with FHI's Agreement with USAID, including USAID Acquisition and Assistance Policy Directive 05-04 issued June 9, 2005. Thus, FHI is unable to provide additional funding to DKT.

If you have any additional questions, please let me know.

Steve

7/28/2005

Exhibit 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DKT, INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-01604 |
| | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT | ) | |
| and ANDREW S. NATSIOS, in his | ) | |
| Official Capacity as ADMINISTRATOR, | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION
## FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act"), Pub. L. No. 108-25, 117 Stat. 711, codified at 22 U.S.C. § 7601-7682, creates a $15 billion program dedicated to the worldwide fight against HIV/AIDS, which has infected more than 65 million people since the pandemic began. The Leadership Act specifically notes that women and children in developing countries are at high risk of contracting HIV/AIDS, and identifies prostitution and sex trafficking as "factors in and causes of" the spread of HIV/AIDS. 22 U.S.C. § 7601(23). The Leadership Act establishes that it is a "priority" of Congress's comprehensive anti-HIV/AIDS program, 22 U.S.C. § 7611(a)(4), as well as the "policy of the United States," 22 U.S.C. § 7601(23), to "eradicate" prostitution and other forms of sexual victimization that contribute to the spread of HIV/AIDS, practices which Congress found to be "degrading to women and children," id.

2.    The Organizational Eligibility Requirement is Not Unconstitutional.

For purposes of the preliminary injunction proceedings, plaintiff focuses its constitutional challenge on the requirement contained in the Leadership Act that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). Plaintiff argues that this requirement has the effect of imposing constraints upon activities that a USAID grantee might undertake with its own funds, or with funds provided from other, non-federal, sources, and that such a restriction imposed on an organization that receives federal funds (as opposed to only on the use of the funds provided by the federal government) is unconstitutional. See Pls' Mem. at 12 (challenging organizational eligibility restriction because it "effectively precludes the organization from taking any other position on [the issue of prostitution] in any other context, even with wholly private funds"). (emphasis in original). The organizational eligibility restriction contained in the Leadership Act does, in fact, preclude organizations who choose to accept a federal HIV/AIDS subsidy from participating in activities at odds with that subsidy's core purpose, as defined by Congress, but there is nothing unconstitutional about such a requirement.

The Supreme Court has repeatedly recognized that "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." Velazquez, 531 U.S. at 541 (quoting Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995)). This "latitude" to take "legitimate and appropriate steps" to prevent garbling of messages flows from the understanding that "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is in the end, accountable to the electorate and the political process for

its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." Velazquez, 531 U.S. at 541-42 (quoting Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 235 (2000)).

The organizational eligibility requirement contained in the Leadership Act is nothing more than a "legitimate and appropriate" step aimed at preventing not only distortion but also outright failure of the federal government's anti-HIV/AIDS program goals. Congress has reasonably determined that providing Leadership Act subsidies to organizations with policies opposition prostitution and sex trafficking is necessary to the program it has established. In creating the approach to fighting HIV/AIDS that is set out in the Leadership Act, Congress stressed that "eradicating prostitution" – identified as a factor in and cause of the spread of HIV/AIDS – is a "priority" of the plan, see 22 U.S.C. § 7611(a)(4), and that one of the critical elements of any successful strategy to combat AIDS was to encourage "behavior change" aimed at eliminating risky behaviors that increased the chance of infection and the spread of the disease. See, e.g., 22 U.S.C. § 7601(21). Congress further condemned prostitution and sex trafficking as "degrading to women and children," 22 U.S.C. § 7602(23), a condemnation which is also reflected in the President's national security directive. See Ex. C.

In these circumstances, where the eradication of prostitution is declared to be both the policy of the United States and a specific priority of Congress's program to fight HIV/AIDS, it is both "legitimate and appropriate" for Congress to ensure that organizations to which program funds are granted operate in full support of those program goals. See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 747 (1st Cir. 1995) ("the more germane a condition to the benefit, the more deferential the review; nongermane conditions, in contrast, are suspect") (citation omitted). Here, Congress has created a program that has very specific goals and then restricted the eligibility of

- 23 -

participants in order to ensure that those goals are met, and not undermined or ignored by participants who either oppose the goal or effect a stance of "neutrality" as to its accomplishment. As a necessary component of any successful strategy to combat HIV/AIDS, Congress has determined it critical to "eradicate prostitution." Plaintiff's preferred stance, i.e., neutrality with respect to prostitution, see Pls' Mem. at 4-5, is not an option where, as here, such neutrality would operate to the detriment of Congress's stated program goals. While plaintiff may disagree as to the wisdom of Congress's preferred strategy for combating HIV/AIDS, it cannot expect taxpayer funding to support goals inconsistent with those judged by Congress to be appropriate lest Congress's methods, goals and priorities be undermined and distorted.

Plaintiff fails to pay heed to the priorities established by Congress as necessary components of the anti-HIV/AIDS program created by the Leadership Act and, instead, seeks to support its unconstitutional conditions claim by citing dicta in Rust v. Sullivan, 500 U.S. 173 (1991), a case that upheld the only restriction before it. See Pls' Mem. at 12-14. In Rust, the Supreme Court considered a funding restriction which prohibited federal funds granted to recipients under Title X of the Public Health Act from "being used in programs which advocate abortion as a method of family planning," and held that "[t]here is no question but that the statutory prohibition. . . . is constitutional." 500 U.S. at 192. The only restriction before the Court in Rust was a condition that restricted the use of federal funds granted to subsidy recipients, and the Court based its conclusion that such a funding restriction was not unconstitutional, in part, on the fact that Congress had only restricted the use of the federal funds and had not restricted, outside the scope of the federal program, the activities of organizations who received those funds. See 500 U.S. at 196-98. The Rust Court did not hold, and indeed, had no reason to squarely decide, whether a restriction on the activities of a federal funding recipient outside the scope of the federal program could ever be constitutional.



Exhibit 13

**YOUR PURCHASED ARTICLE**
powered by ProQuest



**WSJ.com THE WALL STREET JOURNAL.**
ONLINE

# Bush Ties Money For AIDS Work To a Policy Pledge

By Michael M. Phillips, The Wall Street Journal, 1410 words
Feb 28, 2005

**Document Text**

*Copyright (c) 2005, Dow Jones & Company Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission.*

WASHINGTON -- The Bush administration is barring private American AIDS organizations from winning federal grants to provide health services overseas unless they pledge their opposition to prostitution, as part of a broader Republican effort in recent weeks to apply conservative values to foreign-assistance programs.

The White House move comes as Republican lawmakers have been pressing the administration to cut off funds to private organizations that encourage clean-needle programs overseas for intravenous drug users -- a group at the center of the AIDS epidemic in Central Asia and other areas. Some also are pressing to ban federal funding of all AIDS organizations that fail to accept the president's social agenda on such issues as sexual abstinence and drug abuse.

At stake are billions of dollars in U.S. funds that private health organizations working in the developing world spend on AIDS programs.

Administration officials recently started requiring U.S. AIDS groups seeking federal grants as support for their overseas programs to sign a pledge publicly opposing prostitution.

"There is conservative support" for AIDS programs, said Sen. Sam Brownback, a Kansas Republican. "But there are areas of concern . . . that risk the continued support from a number of conservative members and conservative groups."

Many AIDS organizations are reluctant to issue a statement condemning prostitution because they work closely with prostitutes on health initiatives such as distributing condoms. The groups say such official stigmatization would increase the women's isolation, making it harder for them to receive AIDS prevention and treatment services. Many nongovernmental organizations in the AIDS field are critical of the administration moves.

"This is another salvo in the campaign that the administration and its fellow conservatives are undertaking to create more and more litmus tests and blacklists of those they're willing to do business with," said Susan Cohen, director of government affairs for the Alan Guttmacher Institute, a private think tank that does research on sexual and reproductive health and favors abortion rights.

The dispute marks an escalation in the decades-long debate over attaching moral strings to U.S. foreign assistance. Until now, that battle has centered largely on whether U.S. aid should go to groups providing abortion counseling and services overseas.

The new policy shift regarding prostitution stems from two 2003 laws, one applying to AIDS grants and the other to sex trafficking, which involves luring or forcing individuals into prostitution. The Bush administration had previously applied the requirement only to overseas groups because the Justice Department initially advised that it would be an unconstitutional violation of free speech to demand that American grant applicants support Mr. Bush's policy. But the Justice Department reversed itself last fall.

The charged debate over morality and AIDS programs has drawn new fuel recently from the practice known in the AIDS field as "harm reduction." Many AIDS groups -- some of them considered liberal on social issues -- say the best way to limit the disease is to acknowledge that some people inevitably engage in risky behavior -- intravenous drug use, prostitution or multipartner sex, for example -- and health workers should try to both discourage those activities and make them less dangerous.

Some conservative groups, on the other hand, urge a just-say-no approach, arguing that making prostitution and intravenous drug use less risky encourages people to engage in them. At a recent congressional hearing, John Walters, the director of the Office of National Drug Control Policy, said, "We have been pretty aggressive with international bodies that have . . . drifted toward harm reduction, more aggressive than I believe others have been in the past."

Mr. Bush, who has made AIDS prevention and treatment a centerpiece of his effort to convey a compassionate side to his conservatism, asked Congress for $3.2 billion for international HIV programs for fiscal 2006. Most such spending is channeled through the U.S. Agency for International Development and the Department of Health and Human Services to private organizations and other health groups working in developing nations.

The new strictures from the White House and Congress match proposals of various conservative religious groups that claim credit for helping the president win re-election. Some are now for the first time applying for such grant money.

Janice Crouse, a senior fellow at Concerned Women for America, an evangelical lobbying and advocacy group, says left-leaning groups have long dominated international AIDS programs, and the changes pursued by the administration and Congress aim to redress that imbalance.

Ms. Crouse describes the dominant side as a "connected inside group of people who are mostly liberal," and says, "They have large staffs, they have experts in grant writing, and they've had almost exclusive access to government and foundation funding."

Until last year, CWA had never applied for government funding or ventured across the line between advocacy and hands-on operations. In November, however, the group won a $113,000 State Department grant to teach Mexican church and community leaders to combat sex trafficking. The group hopes to apply for more money to help the Mexicans set up hotlines and shelters for victims of sex trafficking.

Some health groups charge that the administration and Republicans are imposing their social agenda on a medical crisis. "Social conservatives inside and outside this administration are going way beyond trying to transform what the government funds to focusing on who the government funds," Ms. Cohen said.

A major target of congressional Republicans is an institute founded by billionaire investor George Soros, who spent millions of dollars during last year's presidential campaign trying to defeat Mr. Bush. Mr. Soros's Open Society Institute supports programs that allow heroin addicts in the former Soviet bloc to swap dirty syringes for clean ones in order to limit the spread of HIV. The group receives some federal funds, though Mr. Soros's aides say that money isn't applied to needle-exchange programs.

Marc Wheat, chief counsel to the Subcommittee on Criminal Justice, Drug Policy and Human Resources, says his boss, Indiana Republican Rep. Mark Souder, began investigating Mr. Soros's group before Mr. Soros became involved in the presidential campaign. "We've been concerned about what the Open Society Institute has been doing for a while," Mr. Wheat said.

Under the new antiprostitution requirement, even organizations whose prevention and treatment programs for AIDS have nothing to do with prostitutes must now certify in writing their acceptance of the pledge or face a funding ban.

"If you're trying to go after the spread of HIV, it is not inconsistent to be concerned about issues of prostitution," said Kent Hill, USAID's acting assistant administrator for global health.

Some private organizations expressed dismay at the new policy. "I'm sure there are good intentions motivating the implementation of this policy, but . . . we feel very concerned that this will fuel stigma against sex workers," said Geeta Rao Gupta, president of the International Center for Research on Women.

U.S. officials say some AIDS grant applicants have signed the pledge, but the administration won't identify them.

While the administration has focused on prostitution, Republicans in Congress are working to yank federal funding from private groups that advocate or discuss clean-needle exchange programs. Leaders of that effort include Reps. Souder and Tom Davis, the Virginia Republican. Sen. Brownback laid out his goals in a strategy memo for allies this month that called for a ban on USAID grants to organizations that don't fully support the president's views on issues ranging from drug use to sexual abstinence.

"How many lives have been saved from this totally preventable disease by the 'disease control' efforts of these longstanding and aggressive family planners, drug legalizers and pro-prostitution groups?" the memo asked rhetorically.

The Brownback memo singled out Population Services International, a Washington-based nonprofit organization involved in family planning and AIDS work abroad, for sponsoring a sexually suggestive condom ad on Kenyan television, even though the ad itself wasn't funded by the U.S. government. PSI says that sexually provocative ads are the most effective in getting people's attention and persuading them to practice safer sex.

The memo also accused groups associated with Mr. Soros of using USAID funds to hand out clean needles in Eastern Europe and Asia. USAID policy forbids using federal money to finance needle exchanges.

Aryeh Neier, president of Mr. Soros's Open Society Institute, said it doesn't take a position on drug legalization or use federal money to finance its needle-exchange programs in Central Asia. The institute uses some USAID money to discourage drug use, but is largely funded by $400 million a year from Mr. Soros, Mr. Neier said.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

Logout | Search Tips | FAQ | My Archive Account | Help | About the Archive | Terms | ProQuest Privacy Policy



ProQuest Archiver

Exhibit 14

YOUR PURCHASED ARTICLE
powered by ProQuest


**THE WALL STREET JOURNAL.**
ONLINE

# Brazil Refuses U.S. AIDS Funds Due to Antiprostitution Pledge

By Michael M. Phillips in Washington and Matt Moffett in Rio de Janeiro, The Wall Street Journal, 774 words
May 2, 2005

**Document Text**

*Copyright (c) 2005, Dow Jones & Company Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission.*

Brazil refused $40 million in American AIDS grants to protest the U.S. requirement that recipients first sign a pledge condemning prostitution.

Brazil's decision escalates a global fight over the moral strings President Bush and his conservative allies in Congress attach to foreign assistance, especially when it comes to sex, drugs and AIDS prevention in developing nations.

Brazil is seen by some as a model in the battle against the spread of AIDS, and Brazilian officials say that is in part because they deal in an accepting, open way with prostitutes, homosexual men, intravenous-drug users and other high-risk groups. The Brazilians say it would hobble their work if they complied with U.S. demands and forced groups that implement AIDS programs -- including prostitutes' associations -- to condemn prostitution.

"We can't control [the disease] with principles that are Manichean, theological, fundamentalist and Shiite," said Pedro Chequer, director of Brazil's AIDS program and chairman of the national commission that made the decision to turn down further U.S. money as long as the antiprostitution pledge requirement remains in place. He said the commission members, including cabinet ministers, scientists, church representatives and outside activists, viewed U.S. demands as "interference that harms the Brazilian policy regarding diversity, ethical principles and human rights."

Brazil appears to be the first major recipient nation to take such a definitive stand against U.S. efforts to link billions of dollars in foreign aid to conservative responses to social ills. Some Republican lawmakers in Washington are pressing to cut off federal grants to those who don't support the president's views promoting sexual abstinence, condemning prostitution and opposing clean-needle exchanges for drug-users. Meanwhile, the White House has steered more federal money to groups that bring a religious orientation to overseas health programs.

"Obviously, Brazil has the right to act however it chooses in this regard," said Sen. Sam Brownback (R., Kan.), one of the leaders of the conservative cause on Capitol Hill. He said he hoped the money would be redirected to countries whose AIDS policies are more in line with those of the Bush administration and the Republican-controlled Congress. "We're talking about promotion of prostitution, which the majority of both the House and the Senate believe is harmful to women," he said.

Last week, Brazilian authorities wrote the U.S. Agency for International Development, one of the main distributors of official American aid, explaining the decision to reject the remainder of the grant, which began in 2003 and was to run through 2008 for a total of $48 million.

The American money was a small part of Brazil's overall anti-AIDS push. About 90% of Brazil's total funding for AIDS programs comes from its own revenue, with 7% or 8% coming from the World Bank and the rest from the U.S. and other governments. Dr. Chequer said the Brazilian government would increase its funding to make up for the lost U.S. funds.

USAID spokeswoman Roslyn Matthews said yesterday the agency is still reviewing the Brazilian decision. "This is an evolving situation," she said. "We are in the process of determining next steps."

Prostitution isn't a crime in Brazil, and prostitutes' associations are among the most active groups engaged in anti-AIDS work. The U.S. money was to have included $190,000 for eight prostitutes' groups around Brazil, according to Gabriela Leite, coordinator of the Brazilian Network of Sex Professionals and a former prostitute. Ms. Leite said

she participated in lengthy discussions with USAID to ensure that American money went only to AIDS education and prevention, and not to other prostitutes' rights issues. The result was a 50-page agreement, she said, but it broke down because her group was unwilling to condemn prostitution.

Brazil's approach to the AIDS epidemic is considered a model by some scientists and public-health specialists. The government encourages abstinence and sexual fidelity, but its prevention efforts focus more on condom education and distribution. In addition, since 1996 the country has provided free, life-extending antiretroviral drug cocktails to anyone infected with HIV.

The result is a spread of HIV far less serious than had been feared. In 1992, experts forecast 1.2 million Brazilians would carry the AIDS virus by 2002. Instead, there were an estimated 660,000 cases. World-wide almost 40 million people are thought to be infected with HIV.

"Why should we adopt a different orientation if we have been successful for the more than 10 years?" asked Sonia Correa, a Brazilian AIDS activist and co-chair of the International Working Group on Sexuality and Social Policy, a global forum of researchers and activists.

The antiprostitution pledge requirement came out of two 2003 U.S. laws, one dealing with AIDS and the other with forced prostitution or sex trafficking.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

Exhibit 15

▸ bears and North American elk (not to be confused with the European sort, known to Americans as moose). These reintroductions have faced bitter opposition from some ranchers, farmers and politicians. In Yellowstone National Park, a wolf-reintroduction programme begun in 1995 was ultimately successful, but not before a number of lawsuits were heard, thousands of dollars paid to ranchers for lost livestock, and two of the wolves illegally shot. If programmes like this were seen not merely in isolation, but as the first steps in a grand plan to reintroduce lions and cheetahs, they would be even harder to implement.

Eric Dinerstein, chief scientist at the World Wildlife Fund US, another conservation charity, has a related objection. He suggests Mr Donlan's idea might be damaging not only to efforts to conserve North American species, but also to the very Old World species it is intended to save. He thinks Mr Donlan is too pessimistic about the chances of preserving endangered animals in their African and Asian homes. Rather than spending money to establish those species in North America, Dr Dinerstein would prefer to see it spent conserving them where they live now.

Both of these objections are sensible, though not overwhelmingly so. But Dr Harney has a more visceral worry, too. Modern conservation is generally against the idea of species being spread into novel habitats, and he opposes Mr Donlan's idea on those grounds, as well.

One reason conservationists try to stop alien introductions is pragmatic—they sometimes do serious damage to native species. Rats, cats and pigs, for example, have wrecked the native fauna of many a small island. But part of the objection to alien introductions has an ideological flavour. There is a feeling that what exists now (or, at least, what existed before man stuck his oar in) is what *ought* to exist. It is pristine. Shipping in other species is, in a sense, a form of pollution.

Perhaps it is, although such pollution does happen naturally from time to time. But even if such introductions are not the ideal solution, they may be the best one available. Mr Donlan's idea is a big and imaginative proposal to solve a clear and present danger. It is certainly worth some careful scrutiny. ∎

## AIDS

# Prostitution v constitution

### A challenge to America's anti-AIDS policy

SINCE it was announced in 2003, PEPFAR, America's $15-billion aid package to help fight AIDS abroad, has stirred up a storm over its socially conservative stance on such issues as sexual abstinence and condoms. The latest controversy is over commercial sex work, as prostitution is delicately known in the AIDS-prevention community. DKT International, a social-marketing organisation that supplies condoms and other family-planning goods in the developing world, has sued USAID, America's foreign assistance agency, for requiring it to sign an "anti-prostitution pledge" in order to receive funds. DKT regards this restriction as not only detrimental to the global fight against the disease, but also a violation of its constitutional right to free speech.

According to the congressional legislation that covers PEPFAR, government funds may not be spent on activities that promote or advocate the legalisation or practice of prostitution and sex trafficking. Nor may this money be used to assist any group or organisation that does not have an explicit policy opposing prostitution and sex trafficking. DKT says it lost $60,000-worth of funding for a condom project in Vietnam, with the prospect of larger funding losses to follow, when its local representative refused to accept the latter requirement.

Phil Harvey, the head of DKT, argues that the government's policy undermines the battle against AIDS by forcing groups to condemn the very people they seek to



**Telling it like it is**

help—commercial sex workers at high risk of catching the disease. This is hardly the basis of a trusting, effective partnership to prevent the spread of AIDS.

Moreover, the policy does not clearly define what it means by prostitution. Does it include, for example, so-called "transactional sex", when women exchange favours for food or clothing and which is a fact of life in many developing countries? Nor does it make clear what "opposing prostitution" means in practice for a group receiving American government money. "No one pretends that such a policy will contain or ameliorate the darker aspects of the world's oldest profession," says Mr Harvey. "Rather it represents posturing by American politicians who are increasingly seen around the world as patronising, bullying and obsessed with sex."

This is not the first time that sex has put American foreign-development aid in a twist. In another controversial piece of legislation, the "Global Gag Rule" as its critics call it, government money cannot be given to foreign non-governmental organisations (NGOs) that perform or actively promote abortion as a method of family planning, even if the money they are using to do so comes from other sources. (America has long banned the direct funding of abortion services abroad.) But the Gag Rule does not apply to American NGOs because it was deemed a violation of the right to free speech.

The requirements for anti-prostitution policies in the current AIDS legislation are being applied to both foreign and American groups, however, after a letter from the Department of Justice late last year said that "there are reasonable arguments to support their constitutionality". DKT and others, including lawyers at the Brennan Centre for Justice at New York University's School of Law, disagree. Hence DKT's case against the government for a violation of its First Amendment rights.

Jodi Jacobson, the head of the Centre for Health and Gender Equity, an American advocacy group, worries that if DKT loses its case, then conservatives in the government might have another go at trying to apply the Gag Rule to domestic groups. Things should be a little clearer in a month or so, when Mr Harvey expects a court decision on DKT's application for a preliminary injunction against USAID. This injunction, if granted, would prevent the agency from applying its anti-prostitution policy until the full case is heard, which could take more than eight months.

Mr Harvey, who has a long history of challenging government on free speech and other issues, with several wins to his credit, says he will stay with the case all the way to the Supreme Court. Many of those working in international public health and sexual rights hope that he can add this one to his list of victories. ∎