KUSHEN
DECLARATION

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. and OPEN SOCIETY
INSTITUTE,

                Plaintiffs,

                -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.*,

                Defendants.
------------------------------------------------------------

                DECLARATION OF
                ROBERT KUSHEN

           I, ROBERT KUSHEN, hereby declare as follows:

        1.     I am Chairperson of the Board of the Alliance for Open Society

International, Inc. ("AOSI") and have held that position since 2004. I am also Director of

International Operations at the Open Society Institute ("OSI"), with which AOSI is

closely affiliated.

        2.     I make this affidavit in support of the plaintiffs' motion for a preliminary

injunction.

### Alliance for Open Society International, Inc.

        3.     AOSI is a private, not-for-profit organization incorporated in Delaware,

with home offices in New York, New York, and a branch office in Almaty, Kazakhstan.

AOSI is closely affiliated with the OSI, the New York-based flagship foundation of the

philanthropist George Soros. OSI works to support a network of more than 30 Soros

foundations operating in more than 60 countries around the world (the "Open Society

Network").

1

4.      AOSI was created by OSI in July 2003 to coordinate the projects of OSI and the Soros foundations in Central Asia and to implement Central Asia programs funded by the United States government, OSI and other donors, drawing on the experience and expertise that OSI and the Open Society Network have gained working in the region on issues such as HIV/AIDS prevention and legal reform, and administering government grants. OSI and the Soros foundations were among the earliest philanthropic institutions to provide assistance to Central Asia and remain among its most significant private donors.

5.      AOSI's mission is to promote democratic governance, human rights, public health and economic, legal and social reform. In addition to implementing programs to further these goals, AOSI seeks to contribute to debate in the United States and internationally regarding best practices for achieving effective reforms.

6.      OSI agreed in October 2003 to provide a five-year grant to AOSI totaling $2,177,700, or approximately $435,000 a year, to fund activities in the United States and abroad. I supervise OSI's grant to AOSI. OSI also contributes significant in-kind support to AOSI each year in the form of staff time.

**Conditions in Central Asia**

7.      The challenges of promoting democratic governance and effective public health measures in Central Asia are significant. The region suffers from widespread poverty, political instability, corruption and a weak to non-existent public health infrastructure.

8.      In recent years, the use of heroin and other opiates that are injected has risen dramatically in Central Asia. Unrest in the region and the war in Afghanistan have

2

led to a change in drug trafficking routes that has caused considerable amounts of heroin to be trafficked through Tajikistan, Uzbekistan, and the Ferghana Valley region of Kyrgyzstan. As a result of spillover from drug trafficking routes, heroin and other opiates are now widely and readily available. HIV/AIDS rates have increased dramatically, and many public health experts fear the outbreak of a full-scale HIV/AIDS epidemic fueled by the exploding use of injection drugs.

### Drug Demand Reduction Program

9.    AOSI runs a program called the "Drug Demand Reduction Program," or "DDRP," which aims to stem the tide of drug use in Central Asia. In addition to its activities in Uzbekistan and Tajikistan, the DDRP also operates in the Ferghana Valley region of Kyrgyzstan. By preventing injection drug use, the program also aims to prevent the spread of HIV/AIDS.

10.    The DDRP is funded by the United States Agency for International Development ("USAID") and by AOSI. USAID funds are provided pursuant to a Cooperative Agreement that sets forth the terms of the project. That Cooperative Agreement is supplemented, from time to time, by amendments that are incorporated in a document called a "Modification of Assistance." Modifications of Assistance are issued each time USAID provides incremental funding under the Cooperative Agreement.

11.    When the DDRP commenced in September 2002, the primary grantee under the Cooperative Agreement was the Soros Foundation-Kazakhstan. AOSI replaced the Soros Foundation-Kazakhstan as the primary grantee under the Cooperative Agreement on January 1, 2004.

3

12.     Under the Cooperative Agreement, USAID agreed to provide the Soros Foundation-Kazakhstan, and then AOSI, with $16,507,402 in USAID funds for the DDRP over the five-year life of the grant. The Cooperative Agreement also obligates AOSI to contribute $450,663 in non-USAID funding to the DDRP over the course of the grant period. AOSI has been fulfilling this obligation.

13.     As the prime grantee under the Cooperative Agreement, AOSI is responsible for designing and coordinating all activities of the program. In doing this work, AOSI relies on technical assistance and support from OSI's New York offices. In particular, it has benefited from the in-kind support of OSI's International Harm Reduction Development Program and Public Health Program, which offer significant public health expertise. AOSI also conducts portions of the DDRP by subcontracting with other non-governmental organizations, which it calls "partners."

14.     AOSI takes an innovative, public health approach toward preventing and stopping drug use. The DDRP has been praised by USAID officials and has been featured as a success story in a USAID fact sheet.

15.     The DDRP's work is divided into three categories: efforts aimed at drug users, efforts aimed at vulnerable groups (those at high risk of using drugs), and efforts aimed at the general public.

16.     For the general public, we conduct mass media and public education campaigns to spread information about the harms of drug use in countries in which there has previously been little to no information available.

17.     For vulnerable groups who are likely to start using drugs – young people, prisoners, sex workers, and people who have migrated from rural to urban areas in search

of work – the DDRP conducts particularized outreach programs to prevent drug use. For example, our "Sister-to-Sister" program provides vocational training in areas like sewing and computer skills so that women have economic alternatives to sex work and drug trafficking, as well as safe spaces for drug-free social gatherings, and counseling services.

18.     For drug users, AOSI has arranged for the DDRP to run drug treatment programs and programs to encourage drug users to seek treatment, which we call "treatment readiness programs." AOSI conducts trainings of counselors, psychologists, social workers and other professionals on drug and HIV prevention methods in order to create a trained workforce in a region in which counseling is a new concept.

## The Restrictions at Issue

19.     USAID's funding for the DDRP is authorized by the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

20.     The Global AIDS Act contains a "pledge requirement" providing, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

21.     USAID enforces the pledge requirement through Acquisition and Assistance Policy Directives ("AAPDs"). AAPDs are the documents that USAID issues to announce policy changes. AAPDs also set forth standard provisions that USAID incorporates into existing and new contracts.

22.     Until this year, USAID did not enforce the pledge requirement against U.S.-based non-governmental organizations like AOSI. However, under a February 2004

directive, AAPD 04-04 (Revised), USAID applied the pledge requirement to foreign

organizations. U.S. grantees were required to include a clause in all subagreements with

foreign organizations stating that, as a condition of entering the subagreement, the foreign

organization had "a policy explicitly opposing, in its activities outside of the United

States, prostitution and sex trafficking."

23.    A number of AOSI's partners in the DDRP are based outside of the United

States. Consequently, in a Modification of Assistance in May 2004, USAID applied the

revised AAPD to include the pledge requirement in our subagreements with those

partners. In May 2004, AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan,

which are partners in the DDRP, adopted a policy stating:

> AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan
> believe that trafficking and sex work do harm both to the
> individuals directly involved and to others in various ways. AOSI
> and the Soros Foundations in Tajikistan and Kyrgyzstan do not
> promote or advocate such activities. Rather, our approach is to try
> to reduce the harms caused by disseminating credible information
> on questions such as the prevention of disease, and by providing
> direct public health assistance to vulnerable populations. …

24.    While AOSI believed that the above policy complied with the February

2004 AAPD's requirement for our foreign partners, we sought clarification from USAID

because we found the pledge requirement to be vague and confusing. We submitted a

memo dated May 26, 2004 to Kerry Pelzman, Regional HIV/AIDS Adviser for

USAID/Central Asia, that included the above policy statement. We asked that Ms.

Pelzman confirm in writing whether this met USAID's requirements. A true and exact

copy of AOSI's Memorandum to Kerry Pelzman dated May 26, 2004 is attached as

Exhibit A.

25.    In an email dated June 13, 2004, Ms. Pelzman replied but did not answer

our question. She stated instead that:

> Organizations must make a decision as to whether they are able to sign the
> certification required by the AAPD. Any organization that has made a
> determination that it can sign the certification and agreement may do so.

A true and exact copy of Ms. Pelzman's email dated June 13, 2004 is attached as Exhibit

B, at 2.

26.    I replied in an email to Ms. Pelzman dated June 15, 2004, reiterating that

"[o]ur goal in sending [USAID] our policy was for [USAID] to provide an interpretation

of the AAPD and related provisions and determine if our policy complied with the law

and [USAID's] policies." I added that AOSI was able to determine that our policy met

the requirement but added that "I would hope in that case our policy will not be subject to

some future review by [USAID] that reaches a different conclusion." A true and exact

copy of my email dated June 15, 2004 is attached as Exhibit B, at 2.

27.    I then received an email dated June 18, 2004 from Belinda K. Barrington,

Acting Regional Legal Advisor, USAID/CAR, or Central Asia Region, which again did

not make any determination about whether our policy complied but indicated that we

could be audited at any time for compliance with the pledge requirement. In response to

my question about future review, Ms. Barrington wrote:

> In the general course of business, the USAID Inspector General conducts audits
> of awardees. The auditors in this case would determine whether the prime
> recipients and subrecipients are in compliance with the terms of USAID's
> agreement. This audit would include, among other things, a determination
> whether (i) the prime recipient had signed the required certification, (ii) the
> condition stated above had been included in all subawards to non-US
> organizations, and (iii) the non-US subrecipients have policies explicitly
> opposing, in their activities outside of the US, prostitution and sex trafficking.
> Further, what will be at issue when an organization has signed the certification is

compliance with certification attestations. Only future actions can determine whether recipients have complied with the certification.

A true and exact copy of Ms. Barrington's email dated June 18, 2004 is attached as Exhibit B.

### Renewed Efforts to Clarify the Parameters of the Pledge Requirement

28.     In the spring of 2005, I became aware of reports that USAID was planning to begin enforcing the pledge requirement against U.S. groups.

29.     I scheduled a meeting with Kent Hill, Acting Assistant Administrator for Global Health at USAID, in order to try to obtain guidance as to how the pledge requirement would be enforced against domestic NGOs like AOSI.

30.     On April 11, 2005, I met in USAID's Washington, D.C. office with Mr. Hill and several other USAID officials, including Susan Pascocello, Acting Assistant General Counsel to Global Health. I was joined by several other senior OSI staff members.

31.     My colleagues and I explained to Mr. Hill that OSI and AOSI were concerned about the ambiguity of the pledge requirement, as well its potential to restrict the privately funded work of OSI and AOSI. Accordingly, I asked questions about which privately financed activities would and would not be banned by the pledge requirement.

32.     Mr. Hill said that he could not provide official guidance in our conversation but that he believed organizations would clearly be out of compliance if they promoted the legalization of prostitution but clearly compliant if their activities were limited to providing health services to prostitutes. He also speculated that helping to unionize sex workers would be a clear violation because to have a union is to imply that prostitution is a legal activity.

33.    My colleagues and I asked about situations in which groups organize sex workers for other reasons such as to combat police brutality. Mr. Hill said he thought it would depend on whether the group's intention really was to fight police brutality or whether it was using that issue as a cover for advocating legalization.

34.    My colleagues and I also asked about efforts to reduce penalties against sex workers, pointing out that criminal laws frequently have the effect of punishing sex workers more than their customers. Hill said such efforts might violate the pledge requirement, depending on how much of a reduction in penalties the organization was advocating for. We also asked if sponsorship of a workshop at which someone made a presentation on the efficacy of legalization of prostitution would be permissible. That question was not answered.

35.    I asked if using the term "sex worker" instead of "prostitute" was prohibited under the pledge requirement. I was aware that AOSI personnel had been advised by the USAID mission in Almaty, Kazakhstan not to use the term sex worker in documents produced for the public because the term was viewed as indicating acceptance of prostitution as an occupation. That question was not answered.

36.    Mr. Hill also said that it was important not to be disingenuous about one's ultimate policy preferences. The clear implication was that if an organization truly felt prostitution should be legalized and the totality of statements made that clear, it would not suffice to simply take more limited public positions because they were known to be more politically acceptable.

37.    On June 9, 2005, USAID issued a new directive, AAPD 05-04, which applied the pledge requirement to United States-based organizations. AAPD 05-04 did

not provide any further explanation of what USAID means by "opposing prostitution." Nor did the AAPD explain which, if any, privately funded activities would be impermissible under the pledge requirement.

### Delays in Funding Harm Program and Its Clients

38.     It is customary for USAID to provide funds each May to finance work for the fiscal year ending September 30. However, as of June 1, 2005, AOSI had not received any of the more than $4,124,089 budgeted for the DDRP for the fiscal year ending September 30, 2005. On June 2, 2005, AOSI learned that staff at the mission planned to request two months of interim funding totaling $952,000 for the DDRP. On June 3, 2005, the mission executed a Modification of Assistance allocating $410,000 for two months of work in Uzbekistan and Kyrgyzstan. At that time, staff at the mission stated that they would request an additional $542,000 to fund two months of work in Tajikistan.

39.     On June 13, 2005, Aryeh Neier, a member of the AOSI board of directors and president of OSI, wrote to Andrew Natsios, Administrator of USAID, seeking clarification as to the scope of the pledge requirement implemented in AAPD 05-04.

40.     After Mr. Neier's letter was sent, mission staff informed AOSI that neither the promised Tajikistan funds nor any other funds budgeted for the fiscal year ending September 30, 2005 would be forthcoming until USAID's Washington, D.C., office responded to the letter.

41.     By the end of July, 2005, DDRP funds were on the verge of running out completely. AOSI had still not received a response to Mr. Neier's letter, and the mission had still not offered us a Modification of Assistance for the $542,000 in expected funds.

42.     The delay in funding had thrown the program into disarray.  At the end of July, the USAID mission tried to transfer responsibility for funding and managing six youth centers that are a critical piece of the DDRP to another organization called JSI, Inc. AOSI objected.

43.     On August 1, 2005, lack of funds caused our subgrantee Population Services International to announce that it would have to close the doors of the six youth centers, which provided thousands of young people drug-free alternative spaces, and terminating the employment of related staff.  Many other aspects of the DDRP were placed on hold due to the lack of USAID funding.  I was extremely concerned that the work of the DDRP would cease and that AOSI and the partner organizations whom we supervise in administering the DDRP would have to start laying off staff and closing facilities.

44.     Finally, on August 2, 2005, AOSI received a response to Mr. Neier's letter.  Once again, USAID did not respond to our request for confirmation that AOSI's policy met the pledge requirement but stated that AOSI could be subject to an audit regarding compliance.

45.     The next day, August 3, 2005, USAID sent a Modification of Assistance to AOSI obligating USAID to pay $542,300.  In order to restart the flow of USAID funding, and to avoid the harm that clients would suffer if additional components of the Drug Demand Reduction Program were forced to shut down, AOSI decided to sign the pledge and once again informed USAID of the policy it had adopted.  AOSI did so after carefully reviewing its own policy and the language of the pledge requirement, and

11

assuring itself that, according to its interpretation of the requirement, it was in compliance.

46.    Accordingly, on August 3, 2005, AOSI Acting Executive Director Oksana Korneo signed the Modification of Assistance, with a cover letter reciting the required pledge.  In that letter, AOSI stated its belief that the policy it had implemented in the spring of 2004 complies with the pledge requirement and that OSI's actions have no bearing on AOSI's compliance or noncompliance with the requirement.  Additionally, AOSI reserved its rights "to challenge the pledge requirement as violative of the First Amendment and other law."  A true and exact copy of the Modification of Assistance and accompanying letter to John Lord dated August 3, 2005 is attached hereto as Exhibit C.

47.    USAID has since obligated itself to provide an additional $3,922,026 to AOSI, enough to fund the Drug Demand Reduction Program through the middle of next year.  Of this amount, AOSI has now received $1.1 million in its bank account, enough to fund the program through the end of September.  It is my expectation that USAID will release additional funding from the obligated amount to AOSI when AOSI submits documentation indicating need for the funding.  Accordingly, AOSI now feels free to file this lawsuit without risking a harmful hold-up in USAID funding of the sort experienced after Mr. Neier sent his letter to USAID in mid-June.

**Harm of Pledge Requirement**

48.    USAID has never defined what it means by a policy "explicitly opposing prostitution," and our efforts to obtain clarification of USAID's position have been unavailing.  I believe that the policy that AOSI adopted in May 2004 and submitted to USAID on three occasions complies with the pledge requirement.

49.    I am aware, however, that Senator Tom Coburn (R-OK) has construed the pledge requirement as barring Global AIDS Act grantees from running a program providing educational materials and health safety training for sex workers in areas where commercial sex is common, and that apparently in response to this complaint USAID has suspended funding for that program.

50.    I am also aware that in a letter dated July 15, 2005 to the Hon. Andrew Natsios, Administrator of USAID, Representative Mark Souter (R-IN) and 27 other members of Congress construe the pledge requirement as prohibiting a "rights-based" approach to prostitution which they equate with advocacy for the legalization of prostitution and its cultural acceptance as a legitimate form of employment.

51.    I am also aware that the former executive director of AOSI and staff of DDRP partners were warned by USAID officials, even before the advent of the pledge requirement, to ensure that in public presentations and documents we use the term "prostitute" instead of "sex worker" because "sex worker" could be deemed to mean an acceptance of prostitution as an occupation.

52.    Because USAID has not clarified what it means by the phrase explicitly opposing prostitution, I do not know which privately funded AOSI activities USAID might consider to be out of compliance with the pledge requirement.  Consequently, while AOSI believes our policy accedes to the pledge requirement, the requirement harms us in several ways.

53.    First, we are severely constrained in the programs and activities we may undertake with our private funds.  AOSI engages in policy discussions and advocacy on matters ranging from best practices in HIV and drug use prevention to human rights and

13

democratic reform. For example, AOSI plans to cosponsor, with OSI's Sexual Health and Rights Program, a conference titled, "Sexual Rights, Sexual Health: Countering the Conservative Sexual Agenda." to be held in its New York offices on October 14, 2005. The goal of the conference is to bring together members of different advocacy and service delivery communities – such as domestic and international groups, and groups working with sex workers and victims of trafficking – to discuss key policy issues. Among the policy issues to be discussed in the forum are the various legal regimes applicable to sex work – including decriminalization and legalization – and their implications for the health and well-being of sex workers.

54.     I am afraid that USAID would view AOSI's cosponsorship of the forum, in which some participants may advocate reduced penalties for or legalization of sex work, as "pro-prostitution" even though our guiding concern is to foster the sharing of information and practices that can reduce the harms and abuse to which sex workers are subject. I am also afraid that AOSI staff will not be able to speak freely at the conference, for fear that any statements could place AOSI in violation of the pledge.

55.     The pledge also binds the work of a Legal Officer employed by AOSI who conducts law reform activities grounded in the protection of human rights. Her work, an extension of the New York-based Open Society Justice Initiative, includes a program to represent Central Asian torture victims in domestic courts and before the United Nations Human Rights Committee in Geneva. Since sex workers are frequently victims of police abuse in Central Asia, I fear that the pledge will constrain her work.

56.     Second, to the extent the pledge requirement requires the adoption of a policy vastly different from the one AOSI has already articulated, it forces us to make a

14

statement at odds with our beliefs.  In general, AOSI aims to shape public policy to promote democratic governance, human rights, and economic, legal, and social reform through initiatives to support the rule of law, education and public health.  It is not AOSI's regular practice to take organizational policy positions.

57.    A core tenet of our pragmatic, public health approach to reducing the risks of HIV/AIDS is that those providing assistance cannot approach marginalized groups with a message of condemnation.  This approach acknowledges that sex work is harmful in a variety of ways.  But, we also are committed to the principle of assisting sex workers and other marginalized groups.  The adoption of a policy "opposing prostitution" would force us to stigmatize sex workers, a group already subject to police abuse, discrimination and violence in Central Asia.

58.    Third, we are bound by principles of governance that prohibit us from accepting funding that restricts our advocacy and speech in manners contrary to the values of an open society.  The principles of governance also prohibit us from taking actions that harm or stigmatize marginalized groups.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 16, 2005
New York, New York

ROBERT KUSHEN

Exhibit A

TO:    Kerry Pelzman
FROM:   Robert Kushen, Chairperson, AOSI
        Martha Sickles, Executive Director, AOSI-Almaty
        Zuhra Halimova, Executive Director, Soros Foundation-Tajikistan
        Medet Tiulegenov, Executive Director, Soros Foundation-Kyrgyzstan
SUBJECT: Compliance with AAPD 04-04

We are writing to explain the policy that has been adopted by some of the organizations in the Soros Foundations Network in response to the requirements of AAPD 04-04 with regard to the Drug Demand Reduction Program ("DDRP"). It is our hope that this policy meets the requirements of the U.S. Government and will enable us to continue to partner on this valuable program. We ask that you confirm in writing whether this is the case.

First, we want to explain the framework within which we have arrived at the policy enunciated below. All of the foundations in our Network are obliged to adhere to written "Principles of Governance." Principle 16 reads as follows:

> National Foundations should not accept funding directly or indirectly from a donor, if a condition of that funding requires the foundation, or its partners, contractors or sub-grantees, to adopt a policy or restrict their advocacy, speech, association or programming in a manner contrary to the values of an open society. One instance in which unacceptable restrictions are particularly likely to arise occurs where a donor attempts to restrict even that speech, association or activity that is funded wholly by other sources. The National Foundations also should not accept funding if the donor requires the National Foundation to adopt or impose policies or take actions that harm or stigmatize marginalized groups.

AAPD 04-04 requires that any subagreement with a non-US NGO include the following language: "As a condition of entering into this agreement, the recipient agrees that it has a policy explicitly opposing, in its activities outside of the United States, prostitution and sex trafficking." As we understand it, because AOSI is a US NGO, AOSI itself is not required to have such a policy, but is required to ensure that its non-US subgrantees have such a policy.

In order for AOSI to agree to impose such a requirement, and in order for the non-US foundations in our network to agree to such a requirement, our Principles of Governance dictate that we ensure that such a policy is not "contrary to the values of an open society," and that such a policy does not "stigmatize marginalized groups."

## POLICY STATEMENT

AOSI, and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways.  AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities.  Rather, our approach is to disseminate credible information on questions such as disease prevention, and to provide direct public health assistance to vulnerable populations, thereby reducing the harms associated with trafficking and sex work.

As we engage in efforts to change the behavior of those engaged in harmful practices we believe it is counterproductive to use terminology that appears to denigrate them.  Therefore we avoid using terms such as "prostitution," which may be considered pejorative.

Exhibit B

From: Guest02, ALMATY [aguest02@usaid.gov]
Sent: Friday, June 18, 2004 1:26 AM
To: Robert Kushen
Cc: Deikun, George (Almaty); Fritz, Michael (Almaty); Pelzman, Kerry;
Pascocello, Susan(GC/G); Hill, Kent(E&E/AA); Steele, Gloria D(E&E/AA);
Griffin, John; Lord, John
Subject: RE: AOSI's policy in response to AAPD o4

Dear Mr. Kushen,

This e-mail is in response to your e-mail of June 15 addressed to Kerry Pelzman.  I am the Acting
Regional Legal Advisor of USAID in Almaty; we met at USAID's offices in Almaty on June 8.  I hope that
your meetings in Astana went well.

I have discussed the issues you raised with Mission Director George Deikun and USAID officials in
Washington, and this is our response.

The memo that Martha Sickles transmitted by e-mail on May 26, 2004 provided the policy statement that
has been adopted by some of the organizations in the Soros Foundation Network in response to AAPD 04-
04. The memo correctly states that AAPD 04-04 (revised) requires, among other things, that any sub-
agreement with a non-US NGO include the following language: "As a condition of entering into this
agreement, the recipient agrees that it has a policy explicitly opposing, in its activities outside of the United
States, prostitution and sex trafficking."  You note that for AOSI to sign a certification and an agreement
requiring it to include this provision in subawards to non-US organizations, AOSI would need to internally
determine (i) whether imposing such a requirement on a subrecipient is consistent with the AOSI
"Principles of Governance" and (ii) whether the policy adopted by the Soros Foundations in Tajikistan and
Kyrgyzstan would be "contrary to the values of an open society" or would "stigmatize marginalized
groups."  In addition, the Soros Foundations in Tajikistan and Kyrgyzstan would need to determine
whether the policy that they have adopted explicitly opposes prostitution and sex trafficking.  At the time
you sent your memo, you had evidently not made those determinations yet.

The issue was not, as your June 15th e-mail seems to suggest, whether your policy complies with the law
or USAID policies, but whether AOSI is able to sign or is comfortable with signing the certification required
of the prime recipient under AAPD 04-04 as well as including the
specified condition in all subawards to non-U.S. organizations.

You have raised the issue of USAID reviewing the policies of AOSI's subrecipients relating to prostitution
and sex trafficking at some point in the future.  In the general course of business, the USAID Inspector
General conducts audits of awardees.  The auditors in this case would determine whether the prime
recipients and subrecipients are in compliance with the terms of USAID's agreement.  This audit would
include, among other things, a determination whether (i) the prime recipient had signed the required
certification,  (ii) the condition stated above had been included in all subawards to non-US organizations,
and (iii) the non-US subrecipients have policies explicitly opposing, in their activities outside of the US,
prostitution and sex trafficking. Further, what will be at issue when an organization has signed the
certification is compliance with certification attestations.  Only future actions can determine whether
recipients have complied with the certification.

Please let me know whether you would like to discuss this issue further. I can be reached until June 26 at
this e-mail address at USAID/Almaty, (7)3272)(50-76-12 or 50-76-17, extension 439.)


Sincerely,


Belinda K. Barrington
Acting Regional Legal Advisor, USAID/CAR

-----Original Message-----
From: Robert Kushen [mailto:RKushen@sorosny.org]
Sent: Tuesday, June 15, 2004 12:54 AM
To: Pelzman, Kerry
Cc: Martha Sickles; Deborah Koeppel; Sue Simon
Subject: RE: AOSI's policy in response to AAPD o4

Kerry - Our goal in sending you our policy was for AID to provide an interpretation of the AAPD and related provisions and determine if our policy complied with the law and AID's policies. The message below states that OSI is free to make this interpretation and determination ourselves. We are certainly ready to determine that the policy we sent you is consistent with AID's policies and therefore that we can sign the certification. However, I would hope in that case our policy will not be subject to some future review by AID that reaches a different conclusion.

Rob Kushen


-----Original Message-----
From: Pelzman, Kerry [mailto:kpelzman@usaid.gov]
Sent: Sunday, June 13, 2004 10:41 PM
To: Martha Sickles
Cc: Lord, John; Harden, R. David; Robert Kushen; Medet Tiulegenov; Griffin, John; Deikun, George (Almaty); Fritz, Michael (Almaty); Guest02, ALMATY
Subject: RE: AOSI's policy in response to AAPD o4

Dear Martha:

Thank you for your patience regarding this matter. After consultation with USAID/Washington, including the General Counsel's office, we were provided with the following response to share with you.

USAID's policies are expressed in AAPD 04-04 and the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 upon which it is based. Organizations must make a decision as to whether they are able to sign the certification required by the AAPD. Any organization that has made a determination that it can sign the certification and agreement may do so.

I hope this information helps to move the matter forward.

Regards,

Kerry

Kerry Pelzman
Regional HIV/AIDS Advisor
Infectious Disease Team Leader
USAID/Central Asia

-----Original Message-----
From: Martha Sickles [mailto:msickles2000@yahoo.com]
Sent: Wednesday, May 26, 2004 2:28 PM
To: Pelzman, Kerry
Cc: Lord, John; Harden, R. David; Adams, Jennifer; rkushen@sorosny.org; medet@soros.kg
Subject: AOSI's policy in response to AAPD o4

TO:  Kerry Pelzman

FROM: Robert Kushen, Chairperson, AOSI

Martha Sickles, Executive Director, AOSI-Almaty
Zuhra Halimova, Executive Director, Soros Foundation-Tajikistan,Medet Tiulegenov, Executive Director,
Soros Foundation-Kyrgyzstan

SUBJECT: Compliance with AAPD 04-04

We are writing to explain the policy that has been
adopted by some of the organizations in the Soros
Foundations Network in response to the requirements of
AAPD 04-04 with regard to the Drug Demand Reduction
Program ("DDRP"). It is our hope that this policy
meets the requirements of the U.S. Government and will
enable us to continue to partner on this valuable
program. We ask that you confirm in writing whether
this is the case.

First, we want to explain the framework within which
we have arrived at the policy enunciated below. All of
the foundations in our Network are obliged to adhere
to written "Principles of Governance." Principle 16
reads as follows:

National Foundations should not accept funding
directly or indirectly from a donor, if a condition of
that funding requires the foundation, or its partners, contractors or sub-grantees, to adopt a policy or
restrict their advocacy, speech, association or programming in a manner contrary to the values of an open
society. One instance in which unacceptable restrictions are particularly likely to arise occurs where a
donor attempts to restrict even that speech, association or activity that is funded wholly by other sources.
The National Foundations also should not accept funding if the donor requires the National Foundation to
adopt or impose policies or take actions that harm or stigmatize marginalized groups.

AAPD 04-04 requires that any subagreement with a
non-US NGO include the following language: "As a
condition of entering into this agreement, the
recipient agrees that it has a policy explicitly
opposing, in its activities outside of the United
States, prostitution and sex trafficking." As we
understand it, because AOSI is a US NGO, AOSI itself
is not required to have such a policy, but is required
to ensure that its non-US subgrantees have such a
policy.

In order for AOSI to agree to impose such a
requirement, and in order for the non-US foundations
in our network to agree to such a requirement, our
Principles of Governance dictate that we ensure that
such a policy is not "contrary to the values of an
open society," and that such a policy does not
"stigmatize marginalized groups."

POLICY STATEMENT

AOSI, and the Soros Foundations in Tajikistan and
Kyrgyzstan believe that trafficking and sex work do
harm both to the individuals directly involved and to
others in various ways. AOSI and the Soros Foundations

in Tajikistan and Kyrgyzstan do not promote or
advocate such activities. Rather, our approach is to disseminate credible information on questions such as
disease prevention, and to provide direct public health assistance to vulnerable populations, thereby
reducing the harms associated with trafficking and sex work.

As we engage in efforts to change the behavior of
those engaged in harmful practices we believe it is counterproductive to use terminology that appears to
denigrate them. Therefore we avoid using terms such as "prostitution," which may be considered
pejorative.

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

Exhibit C



Алматы қаласындағы "Ашық қоғамның халықаралық альянстың" халықаралық коммерциялық емес ұйымның филиалы
Филиал Международной некоммерческой организации "Международный Альянс Открытого Общества" в г. Алматы
"Alliance for Open Society International", Almaty Branch

Outgoing # 131
Date: August 3, 2005

Mr. John F. Lord
Agreement Officer
United States Agency for International Development
Central Asian Region
Park Palace Building
41 Kazibek Bi Street
Almaty 480100
Kazakhstan

Dear Mr. Lord:

I enclose an executed copy of the Modification of Assistance that you forwarded me on August 3, 2005.

I take note of the new standard provisions. Accordingly, AOSI certifies as follows:

> Alliance for Open Society International certifies compliance as applicable with the standard provisions entitled "Condoms" and "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking" included in the referenced agreement.

Please note the following in connection with this certification with respect to the requirement that as a condition of entering into this agreement or any subagreement, AOSI must have a policy explicitly opposing prostitution and sex trafficking ("the pledge requirement"):

1. In making this certification, we state again, as we have indicated twice in prior correspondence with USAID, that AOSI adheres to the following policy, which AOSI has had in place since spring of 2004:

> AOSI, and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways. AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities. Rather, our approach is to disseminate credible information on questions such as disease prevention, and to provide direct public health assistance to vulnerable populations, thereby reducing the harms associated with trafficking and sex work.

2. AOSI believes that because of both the legislative history of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act"), and serious constitutional concerns raised by the pledge requirement, the proper interpretation of the Global AIDS Act, USAID Acquisition & Assistance Policy Directive 05-04, and the attached Modification of Assistance is that the above-stated policy complies with the pledge requirement.



Алматы қаласындағы "Ашық қоғамның халықаралық альянсының" халықаралық коммерциялық емес ұйымның филиалы
Филиал Международной некоммерческой организации "Международный Альянс Открытого Общества" в г. Алматы
"Alliance for Open Society International", Almaty Branch

AOSI

3. AOSI believes that, as a legal matter, the actions of the Open Society Institute, with which it is affiliated, have no bearing on AOSI's compliance or noncompliance with the pledge requirement.

4. AOSI signs the certification in order to ensure that AOSI and its partners are able to continue operating the highly successful Drug Demand Reduction Program in Central Asia, and so that client services are not interrupted.  AOSI reserves its rights to continue to express the concerns raised in its letter to Andrew Natsios of June 13, 2005 and to challenge the pledge requirement as violative of the First Amendment and other law.

Sincerely,

Oksana Komeo
Acting Executive Director

480004, Казахстан, г. Алматы, Макатаева 97, тел. +7-3272-78-01-11, тел./факс: +7-3272-79-66-11
480004, Kazakhstan, Almaty, 97 Makataev Str., Phone: +7-3272-78-01-11, Phone/Fax: +7-3272-79-66-11

## MODIFICATION OF ASSISTANCE

Page 1 of 3

| 1. MODIFICATION NUMBER | 2. EFFECTIVE DATE OF MODIFICATION | 3. AWARD NUMBER: | 4. EFFECTIVE DATE OF AWARD : |
|---|---|---|---|
| 07 | 6/17/2005 | 122-A-00-02-00042 | 09-30-2002 |

**5. GRANTEE:**
Alliance for Open Society
International, Inc. (AOSI)

400 West 59th Street

New York NY 10019

DUNS NO.:
TIN NO. :    810623035    LOC NO.:  HHS-B1573P

**6. ADMINISTERED BY:**

USAID/CAR, A&A
Park Palace Building
41 Kazibek Bi Street
Almaty 480100, Kazakhstan

**7. FISCAL DATA:**    Amount Obligated:

Budget Fiscal Year:
Operating Unit:
Strategic Objective:
Team/Division:
Benefiting Geo Area:
Object Class:

**8. TECHNICAL OFFICE:**
USAID/CAR, Health and Education

**9. PAYMENT OFFICE:**
USAID/M/FM/CMP

Washington DC 20523-0209

**10. FUNDING SUMMARY:**

|  | Obligated Amount | Total Est. Amt. |
|---|---|---|
| Amount Prior to this Modification: | $7,238,144.00 | $16,507,402.00 |
| Change Made by this Modification: | $ 542,300.00 |  |
| New/Current Total: | $7,780,444.00 | $16,507,402.00 |

**11. DESCRIPTION OF MODIFICATION:**
The purposes of this modification ate to:
  1. Incrementally fund the agreement.  The amount of $542,300 is hereby obligated;
  2. Modify the following Cooperative Agreement Provisions: "ORGANIZATIONS ELIGIBLE FOR ASSISTANCE", "CONDOMS", "PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING"


  Accordingly, the following changes are made:


(Continued on page 2)

**12. THIS MODIFICATION IS ENTERED INTO PURSUANT TO THE AUTHORITY OF** THE FOREIGN ASSISTANCE ACT OF 1961 AS AMENDED.  EXCEPT AS SPECIFICALLY HEREIN AMENDED, ALL TERMS AND CONDITIONS OF THE GRANT REFERENCED IN BLOCK #3 ABOVE, AS IT MAY HAVE HERETOFORE BEEN AMENDED, REMAIN UNCHANGED AND IN FULL FORCE AND EFFECT.

**13. GRANTEE:** [x] **IS** [ ]  **IS NOT** REQUIRED TO SIGN THIS DOCUMENT TO RECONFIRM ITS AGREEMENT WITH THE CHANGES EFFECTED HEREIN

| 14. GRANTEE: | 15.    THE UNITED STATES OF AMERICA U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT |
|---|---|
| BY: _(signature)_ | BY: _____ |
| OKSANA KORNEO | |
| (Name Typed or Printed) | (Name Typed or Printed) |
| TITLE: _Acting Executive Director_ | TITLE:  Agreement Officer |
| DATE: _August 3, 2005_ | DATE: _____ |

**1. Cover Letter, page 3, Section A. General, paragraph 2. Total obligated USAID amount, and Schedule, Section A.3 Amount of Award and Payment, paragraph 2** - delete "$7,238,144.00" and replace with "$7,780,444.00".

**2. Cover Letter, page 3, Section B. Specific**. Add the following fiscal data:

MAARD No.: 5105-01

| | |
|---|---|
| Amount: | $ 6,000.00 |
| Appropriation: | 725/61093 |
| Budget Plan Code: | WNI505221161G13 |
| Project No: | 116-0320.00 |
| Macs Pen No. & Name: | 56, Infectious Diseases |
| R/C No: | B507085 |
| EOCC: | 41000 |

| | |
|---|---|
| Amount: | $81,000.00 |
| Appropriation: | 725/61093 |
| Budget Plan Code: | WNI505221221G13 |
| Project No: | 122-0320.00 |
| Macs Pen No. & Name: | 56, Infectious Diseases |
| R/C No: | T505064 |
| EOCC: | 41000 |

| | |
|---|---|
| Amount: | $455,300.00 |
| Appropriation: | 725/61093 |
| Budget Plan Code: | WNI505221191G13 |
| Project No: | 119-0320.00 |
| Macs Pen No. & Name: | 56, Infectious Diseases |
| R/C No: | D505063 |
| EOCC: | 41000 |

The total obligated amount is broken down as follows:

| Kyrgyzstan | Uzbekistan | Tajikistan | Regional | Total |
|---|---|---|---|---|
| $96,000.00 | $3,401,000.00 | $3,083,444.00 | $1,200,000.00 | $7,780,444.00 |

**3. Schedule, Section A.3 Amount of Award and Payment, paragraph 2 –**
delete "$7,238,144.00" and replace with "$7,780,444.00".

**4.** STANDARD PROVISIONS FOR U.S., NONGOVERNMENTAL RECIPIENTS, C.20 ORGANIZATIONS ELIGIBLE FOR ASSISTANCE is revised as follows:

**"C.20 ORGANIZATIONS ELIGIBLE FOR ASSISTANCE (JUNE 2005)**

An organization that is otherwise eligible to receive funds under this agreement to prevent, treat, or monitor HIV/AIDS shall not be required to endorse or utilize a multisectoral approach to combatting HIV/AIDS, or to

Page 2

endorse, utilize, or participate in a prevention method or treatment program to which the organization has a religious or moral objection."

5. STANDARD PROVISIONS FOR U.S., NONGOVERNMENTAL RECIPIENTS, C.21 CONDOMS is revised as follows:

**"C.21 CONDOMS (JUNE 2005)**

Information provided about the use of condoms as part of projects or activities that are funded under this agreement shall be medically accurate and shall include the public health benefits and failure rates of such use and shall be consistent with USAID's fact sheet entitled, "USAID: HIV/STI Prevention and Condoms. This fact               sheet               may               be               accessed               at: http://www.usaid.gov/our_work/global_health/aids/TechAreas/prevention/condomfactsheet.html"

6. STANDARD PROVISIONS FOR U.S., NONGOVERNMENTAL RECIPIENTS, C.22 PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING is revised as follows:

**"C.22 PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING (JUNE 2005)**

(a)  The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons.  None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex trafficking.  Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

(b)  Except as noted in the second sentence of this paragraph, as a condition of entering into this agreement or any subagreement, a non-governmental organization or public international organization recipient/subrecipient must have a policy explicitly opposing prostitution and sex trafficking.  The following organizations are exempt from this paragraph:  the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and any United Nations agency.

(c)  The following definition applies for purposes of this provision:

Sex trafficking means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.  22 U.S.C. 7102(9).

(d)  The recipient shall insert this provision, which is a standard provision, in all subagreements.

(e)  This provision includes express terms and conditions of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by USAID prior to the end of its term.
(End of Provision)"

(End of Modification)