MESSINGER
DECLARATION

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. and OPEN SOCIETY
INSTITUTE,

                    Plaintiffs,

      -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT, et al.,

                    Defendants.
-----------------------------------------------------------

Civil Action Case No.:

## DECLARATION OF RUTH W. MESSINGER

1.     I serve as the President and Executive Director of American Jewish World Service (AJWS), a humanitarian organization providing non-sectarian grassroots development and emergency relief to people in developing nations. Our organization is working, among other things, to stop the spread of HIV/AIDS in various countries overseas.

2.     I have served in this position for seven years. Prior to assuming this role in 1998, I spent twenty years in public service in New York City. I served on the New York City Council for twelve years and served for eight years as Manhattan Borough President.

3.     In my capacity as President and Executive Director of AJWS, I have administered our organization's HIV/AIDS prevention programs. AJWS provides approximately $1.2 million annually to fifty-nine grassroots organizations in Africa, Asia and Latin America carrying out integrated programming to address the HIV/AIDS pandemic. The programs include peer-led prevention efforts, care and support for people living with HIV/AIDS and orphans and vulnerable children, advocacy campaigns for access to and education about anti-

retroviral treatment, and anti-stigma work. AJWS supports local groups and associations of

people living with HIV that are devising effective and innovative strategies to limit the spread

and mitigate the effects of HIV/AIDS in their communities.

    4.    In 2004, AJWS received a $60,000 U.S. government grant from the

CORE Initiative for our "Capacity Building Program for Kenyan NGOs." The award was made

under CARE's cooperative agreement with the United States Agency for International

Development ("USAID") as part of the CORE Initiative, which is a USAID-funded program

designed to strengthen and develop community and faith-based organizations worldwide to

conduct HIV/AIDS prevention and care. This is our only funding from the U.S. government.

AJWS has multiple programs funded by private donors. AJWS has a total annual budget of $11

million.

    5.    We are aware that USAID is requiring that private organizations like

ours certify that we have a policy "opposing prostitution and sex-trafficking" as a condition to

receiving USAID grant funds, even to continue funding for on-going projects that are already in

place. We signed a contract with CARE on July 28, 2004 that included language opposing

prostitution and sex trafficking because of the psychological and physical risks they pose for

women, men, and children. The contract is attached to this declaration as Exhibit A. We sent a

cover letter to CARE on July 28, 2004 stating that AJWS does not take an official organizational

position for or against the legalization of prostitution. The letter is attached as Exhibit B.

    6.    The new requirement mandated by USAID's policy directive entitled

AAPD 05-04, released in June 2005, requires us to adopt an organizational policy opposing

prostitution in order to continue receiving USAID funds. If we were to adopt such a policy, it

would necessarily apply to our entire organization irrespective of whether the source of funds for a particular project is the U.S. government or a private or multilateral donor.

       7.     We join in the universal condemnation of sex-trafficking.

       8.     American Jewish World Service has never had a policy on prostitution. As an international development and human rights organization, we generally do not adopt policies on particular political issues. Especially since we operate in a variety of African, Asian, and Latin American countries, providing services to clients from multiple cultures and backgrounds even within each particular country, we make every effort to remain neutral on issues of political or cultural conflict.

       9.     American Jewish World Service does not wish to adopt a policy on prostitution, and believes that it would be harmful to our organization to do so. AJWS would not consider adopting a policy but for the U.S. government's policy.

      10.    By compelling us to speak in order to continue receiving USAID funding, this mandate harms our organization's First Amendment rights. It further violates those rights by imposing limits on our *private*, non-federally-funded speech and activities. While USAID funding comprised approximately 5 percent of our budget for HIV/AIDS prevention and care work in 2004/2005, all of our work would be subject to the policy mandate. Because USAID seeks to force us to adopt this policy, we are concerned that we will be forced to ensure that even our non-USAID-funded work conforms to what would be an organization-wide mandate.

      11.    Finally, our organization is harmed because we would be forced to give up the right to even engage in debate about significant matters of public health that may relate to prostitution, *even when that debate is funded by wholly private funds*. For example, we often

study the efficacy of our work and the work of partner organizations in the field in order to

determine what approaches work best at preventing HIV, so that we and others can replicate

those models. With the newly-mandated USAID policy outlined in AAPD 05-04, we would be

constrained in the conclusions that we can reach.

        12.    We are also deeply troubled by the vagueness of the requirement. We

are certainly not "pro-prostitution." However, we have received no guidance from USAID as to

what it means to be opposed to prostitution. For instance, in Thailand AJWS supports an

organization that provided relief and vocational training for sex workers affected by the

Tsunami. In India, we support an organization that provides evening care for the children of

prostitutes, and in Kenya we support an organization that provides AIDS prevention and care for

sex workers. We are unclear as to how our support for the critically important AIDS prevention

and care work of these organizations, representing diverse opinions on the debate over

legalization of prostitution, would be perceived by USAID.

        13.    The required policy would harm our organization because it would

have a chilling effect upon our staff that would inhibit programs aimed at preventing HIV/AIDS,

particularly our work with the most vulnerable group of the population likely to contract this

disease—sex workers. Should we receive USAID funds in the future, all of our staff will have to

think twice when they engage in any activity promoting the health and rights of sex workers,

censor themselves when they make public statements, and monitor the issuance of written reports

to ensure that all of these representations are sufficiently opposed to prostitution.

        14.    Compelling us to adopt this policy to obtain future funding is also

harmful because, due to the policy, our organization may be seen as one that stigmatizes

vulnerable and marginalized sex workers, and our ability to offer meaningful help to that

population will likely be compromised. We know from experience that the challenges of

reaching sex workers are vast. The programs that have been most successful in reaching out to

sex workers to prevent the spread of HIV have been those that approach sex workers not with a

message of condemnation of the situations in which the men and women find themselves but

rather in a non-judgmental fashion designed to address their health and other needs.

        15.    In addition, the USAID policy prohibits USAID funds from being used

to "promote or advocate the legalization of or practice of prostitution or sex-trafficking." The

policy gives no guidance as to what constitutes promoting the practice of prostitution, except to

exclude a narrow range of specific actions, such as providing "necessary pharmaceuticals and

commodities" such as condoms. Because working to prevent HIV/AIDS often involves working

with sex workers, AJWS does not know what activities will and will not be found, at some point,

to have violated that policy. As was pointed out in the letter to President Bush from hundreds of

non-governmental organizations, this policy has already resulted in an organization in Cambodia

discontinuing plans to provide English language training classes for people working in the

commercial sex sector for fear such programs would be interpreted as "promoting" the practice

of prostitution, even though English language skills would have dramatically increased

alternative job prospects for those workers. (A copy of the letter to President Bush, which was

signed by AJWS, is attached as Exhibit C to this Declaration.) Thus, we believe the vagueness

of the USAID policy is harmful to American Jewish World Service.

Pursuant to 28 U.S.C. § 1746, I swear or affirm, under penalty of perjury, that the foregoing is
true and accurate to the best of my knowledge.

                                             Ruth W. Messinger

New York, New York
DATED this **16** day of August, 2005

Exhibit A



Date:    July 27, 2004

To:    Ruth Messinger
       Executive Director
       American Jewish World Service
       45 West 36th Street,
       New York, NY 10018-7904

Subject:    CORE Initiative Fixed Obligation No.: <u>ECA-KEN-50220-AJWS-0021-00</u>

Dear Ms. Messinger:

In response to your request for assistance, we are pleased to provide an award to the American Jewish World Service (AJWS) (hereby called as "Sub-recipient") under this CARE USA sub-agreement in the amount of Sixty Thousand Dollars *(USD$ 60,000.00)*. This will support your program on Capacity Building Program for Kenya NGOs through re-granting support to your local partner NGOs and a series of peer exchanges designed to identify and document the best practices of your local partner NGOs included as Attachment 1 during the period July 1, 2004 to July 31, 2005.

This award is made under CARE's Cooperative Agreement with USAID called CORE Initiative Award No. GPH-A-00-03-00001-00.    CARE is not liable to reimburse the sub-grantee any cost in excess of the stipulated amount.

The accomplishment of each fixed obligation grant objective will be based on the completion of the tasks and successful submission and completion of the milestone indicated below.

1.   **Objective No.1**

    A.   Re-granting to the following NGOs/CBOs and submission of schedule of activity reports as outlined in the Gantt Chart and in the Scope of Work by September 2004
         a. Carolina for Kibera – The activities will include the following: (26%)
              i.      Training for Binti Pamoja Members
              ii.     Supporting community outreach through drama and community exhibitions
              iii.    Creating and distributing newsletter
         b. Kisumu Medical Education Trust- The activities will include the following: (23%)
              i.      Training for Community Health Workers
              ii.     Processing equipment and materials for processing of dietary supplements
              iii.    Nutritional support to PLWHA
         c. Wahanda Women Development Group- The activities will include the following: (8%)
              i.      Providing agricultural inputs
              ii.     Providing animal husbandry inputs

    d. GROOTS-Kenya – The activities will include the following: (9%)
       i.    Providing seed funds for home-based care groups for community education and income generation activities
       ii.    Training for GROOTS volunteers
    e. Mwana Mwende Child Development – The activities will include the following: (18%)
       i.    Training for Community Health Workers and Guardians
       ii.    Providing material support to Orphans Vulnerable Children (OVC)
       iii.    Conduct growth monitoring in two communities

B.  Second disbursement of funds to the following NGOs/CBOs after review of mid-term reports by December 2004
       i.    GROOTS-Kenya

C.  Second disbursement of funds to the following NGOs/CBOs after review of mid-term reports by March 2005
       i.    Carolina for Kibera
       ii.    Kisumu Medical Education Trust
       iii.    Wahanda Women Development Group
       iv.    Mwana Mwende Child Development

## 2. Objective No. 2

A. Collaborate with the CBOs/NGOs to conduct four peer exchange Workshops from inception to the completion of the grant and submission of reports on the following by March 2005 (16%)
       i.    Workshop on Nutrition and HIV/AIDS
       ii.    Workshops on Psychosocial Support for OVC
       iii.    Workshops Linking Grassroots Communities and NGOs
       iv.    Workshops on Linking Community-based Outreach with Health Care Centers

**Payment:** The initial payment will be made on a cash advance basis and shall be limited to the minimum amounts needed to meet current disbursement needs (**generally 3 months**) to cover program expenses for the first quarter of the program. Subsequent cash requests will be provided on a quarterly basis. These subsequent quarterly cash requests will be based on the amounts needed by the Sub-Recipient to carry out the activities in the Scope of Work. The timing and amount of cash request shall be as close as administratively feasible to the actual disbursements to be made by the Sub-Recipient for direct program or project costs and the proportionate share of allowable indirect costs.

The Sub-recipient shall submit quarterly financial reports (see Attachment 2) to CORE Initiative office in Washington DC reflecting actual expenses obligated and expended. Approval of cash request will be based on the most recent reports, and in consultation with the Sr. Grants Manager or its designee. Cost share in the amount of **$ 52,700.00** will be provided by AJWS.

The Sub-recipient is required to open a separate bank account for this project where CARE funds will be transferred. CARE will transfer funds to the Sub-Recipient, after receipt, review and approval of the Sub-Recipient's quarterly financial and program reports.

CARE shall not be responsible to pay the Sub-recipient any amount in excess of the total budget.

By accepting this sub-agreement the Sub-recipient agrees to the following:

1. **Restriction in financing Faith-based Organization activities** - As per USAID policy, CARE-supported programs will not support activities with a <u>significant religious or proselytizing purpose or content</u>. CARE will only finance programs that have secular purpose and which <u>do not have the primary effect of advancing or inhibiting religion. Faith-based organizations are also not allowed to use these funds to discriminate service delivery based on religious affiliation.</u>

   Faith-based organizations may use their own funds for religious or sectarian purposes but these should be separated from CARE-financed activities. This will avoid appearance that CARE assistance subsidizes or endorses religion or promotes doctrine or religious indoctrination.

2. **Financial Management** – The Sub-recipient must document that reasonable steps were taken to ensure that all purchases charged to the grant are at reasonable prices and from responsible individuals. The grantee shall maintain complete records of all costs charged to the grant for a period of three years after the expiration of the grant and make such records available to CARE or its representatives for review at any time.

3. **Travel and procurement** - The sub-recipient is required to comply with all USAID rules and regulations including .22 CFR 226, Standard Provision, and OMB-A-133 in the implementation of this grant. All business class travels will be strictly prohibited and prior approval is required for vehicle purchase. Pertinent guidelines are posted to the web via on line at http://www.access.gpo.gov/nara/cfr/waisidx_02/22cfr226_02.html (for CFR 226); and http://www.whitehouse.gov/omb/circulars/ (for all OMB Circulars).

4. **Reporting requirement** - Financial and programmatic reports (see attachment 2 & 3) are required every quarter. The financial report must include a bank reconciliation report with attached copy of bank statement. The Sub-Recipient shall submit one (1) original and one (1) copy of signed Financial and Program Reports to CORE Initiative Regional Coordinator for East and Central Africa, Phoebe Kilele, on a quarterly basis-on, October 15 (for July to September), January 15 (for October to December), April 15 (for January to March), and July 15 (for April to June) of each year and shall be in line with Standard Provision. The final Financial and Programmatic reports will be submitted 30 days after the project completion date.

5. **Refunds** - Any cost determined by CARE or its representative not to meet the terms and conditions of this sub-agreement (i.e. questionable costs, etc) must be refunded to CARE upon request.

6. **Project completion** The Sub-recipient must certify in writing to the CORE Initiative Sr. Grants Manager at the end of grant that the activity was completed. If the Sub-recipient cannot certify this it shall be expected to make appropriate reimbursements.

7. **Conflict of Interest** As a Sub-recipient, it is not possible to participate in the selection, award, or administration of a contract supported by CARE funds, if real or apparent conflict of interest would involve. The Sub-recipient shall neither solicit nor accept gratuities, favors or anything of monetary value from a contractor or parties to sub-agreements.

8. **Greater Involvement of People Living with HIV/AIDS (GIPA) Guidelines** - Encouraging the involvement of **People Living with HIV/AIDS** (PLWHAs) across program implementation is critical. The Program Scope of Work and Monitoring and Evaluation reports must indicate how the GIPA guidelines are observed if appropriate. www.worldbank.org/wbi/aidsleadership/dls_principle.pdf

9. **USAID HIV/AIDS Prevention Policy** - Abstaining from sexual activity, mutual monogamy, and condom use are three key behaviors that can prevent or reduce the likelihood of sexual transmission of the

AIDS virus. These behaviors are often included together under a comprehensive "ABC" approach - A for abstinence (or delayed sexual initiation among youth), B for being faithful (or reduction in number of sexual partners), and C for correct and consistent condom use, especially for casual sexual activity and other high-risk situations. Understanding and effectively promoting these behaviors are crucial elements in combating the spread of HIV/AIDS. Based on a growing body of evidence from a number of developing countries, USAID supports the ABC approach because it can target and balance A, B, and C interventions according to the needs of different at-risk populations and the specific circumstances of a particular country confronting the epidemic.

<u>Not everyone organization needs to adapt all three prevention methods in their programming, however according to USAID policy, organizations may not denigrate one method over another within their prevention program supported with these funds.</u>

## 10. HIV/AIDS Communication Materials

The Sub-recipient shall provide the CORE Initiative Office at Washington, DC one copy of all published works developed under the award with lists of other written work produced under the award. In addition, the Sub-recipient shall submit one electronic and/or one hard copy of all health educational materials (examples: posters, pamphlets, videos, fact sheets), and /or training materials (examples: guidelines, tools, manuals, curricula) developed to the following address:

Johns Hopkins Bloomberg School of Public Health
Center for Communication Programs
Media/Materials Clearinghouse
111 Market Place, Suite 310
Baltimore, MD 21202 USA
Email: mmc@jhuccp.org

11. **Certification Regarding Terrorism** The Sub-recipient hereby certifies that it has not provided and will not provide material support or resources to any individual or organization that it knows, or has reason to know, is an individual or organization that advocates, plans, sponsors, engages in, or has engaged in an act of terrorism.

12. **Assignment:** The Sub-recipient shall not assign, in whole or in part, the implementation of this agreement without any written consent from CARE.

13. **Entire agreement:** This agreement states the complete agreement of the parties and supersedes any prior or contemporaneous agreements, whether oral or written, with respect to the subject matter hereof.

14. **Amendments and Modifications:** This agreement may not be amended or modified except by writing signed by all parties hereto.

15. **Governing Law:** This agreement shall be construed and enforced in accordance with, and governed by the laws of the State of Georgia, United States of America.

16. **PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING (JAN. 2004)**

None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or trafficking. Nothing in the preceding sentence shall be

construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

As a condition of entering into the referenced agreement, the Sub-recipient agrees that it is opposed to the practices of prostitution and trafficking because of the psychological and physical risks they pose for women, men and children.

The following definition applies for purposes of this clause:

Trafficking means the recruitment, transportation, transfer, harboring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labor or services, slavery or practices similar to slavery, servitude or the removal of organs. UN Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, which supplements the UN Convention against Transnational Organized Crime, Article 3, subparagraph (a).

17. **Publication and media releases:** The CORE Initiative and USAID logos shall be prominently displayed and acknowledged in all publications, videos or other information/media products funded or partially funded through this award, and the product shall state the views expressed by the author(s) does not necessarily reflect those of the CORE Initiative and/or USAID. Acknowledgements should identify the sponsoring CARE or USAID Office and Bureau or Mission as well as the U.S. Agency for International Development substantially as follows:

> *"Support for this communication is provided by the Global Bureau of Health, U.S. Agency for International Development (USAID), under the terms of the CORE Initiative Award No. GPH-A-00-03-00001-00. The CORE Initiative is a USAID-funded global program whose mission is to support an inspired, effective and inclusive response to the causes and consequences of HIV/AIDS by strengthening the capacity of community and faith-based groups worldwide. Leading this initiative is CARE International in partnership with the World Council of Churches (WCC), International Center for Research on Women (ICRW), International HIV/AIDS Alliance, and the Johns Hopkins Bloomberg School of Public Health, Center for Communication Programs (CCP). The opinions expressed herein are those of the author(s) and do not necessarily reflect the views of the CORE Initiative and/or U.S. Agency for International Development."*

CARE does not assume liability for any third party claims for damages arising out of this grant. CARE has the right to terminate this sub-agreement upon 30 days notice. Also, the sub-agreement will be suspended or terminated by CARE, if CARE has notice of or has reasonable cause to believe that the grantee is unable to deliver or meet its obligation as stipulated in the SOW or set milestone of this agreement or pay its obligations in the ordinary course of business. The CORE Initiative Sr. Grants Manager shall decide any disputes under or relating this grant.

Please sign the original and copies to acknowledge your receipt and to signify your acceptance of this sub-agreement and return the original and one copy to the CORE Initiative Sr. Grants Manager.

Sincerely yours,                                          Acknowledged by:

Kristin Kalla
Project Director          8/3/04
CORE Initiative

American Jewish World Service (AJWS)
Ruth Messinger
Title: AJWS Executive Director
Date: 7/28/04

Exhibit B

AMERICAN
JEWISH
WORLD
SERVICE

PURSUING GLOBAL JUSTICE...A JEWISH THING TO DO

45 WEST 36TH STREET   NEW YORK, NEW YORK 10018-7904
TEL 212.736.2597   FAX 212.736.3463   E-MAIL AJWS@AJWS.ORG   WEB WWW.AJWS.ORG

*Founder and First Chair*
Lawrence S. Phillips

BOARD OF TRUSTEES
Marty Friedman, *Chair*
Ellen Harnick, *Vice Chair*
Steve Kantor, *Treasurer*
Ruth W. Messinger, *President*
Brent Copen, *Secretary*

Donald M. Abramson
Carol Auerbach
Mark Bernstein
Jeri B. Block
Joyanne Bloom
Renee Burrows
Ruth Cowan
Carolyn Everett
Arnold Ferber
Sam Gejdenson
Peter Joseph
Linda Heller Kamm
Rabbi J. Rolando Matalon
James Meier
Sharon Miller
Leo Nevas
David Rabin
Michael C. Rothman
Nancy Schwartz Sternoff
Norman Traeger
Diane Troderman
David Ilan Weis
Herbert Weiss
Stanley Weithorn
Laurence S. Wiener

BOARD OF ADVISORS
Georgette Bennett
Hyman Bookbinder
Rabbi Balfour Brickner
Lawrence Buttenwieser
Rabbi Harvey J. Fields
Abe Foxman
Arnold Glimcher
Rabbi Irving Greenberg
Richard Gunther
Rabbi Arthur Hertzberg
Madeleine May Kunin
Joel Lamstein
Laura Heller Lauder
Gerard and Lilo Leeds
Ruth Morgenthau
Cynthia Ozick
Michael A. Pucker
John Ruskay
Jack J. Spitzer
Albert Vorspan
Elie Wiesel

SAN FRANCISCO
REGIONAL OFFICE
4173 Emerald Street
Oakland, CA 94609
TEL 510.594.9344

MIDWEST
REGIONAL OFFICE
320 W Ohio Street, Suite 650
Chicago, IL 60610-4416
TEL 312.440.0787
FAX 312.440.1479

ADVOCACY OFFICE
2027 Massachusetts Ave, NW
Washington, DC 20036
TEL 202.387.2800

July 28, 2004

Gina Farrales, Senior Grants Manager
CORE Initiative
888 17th Street, NW, Suite 310
Washington, DC 20006

Dear Gina,

American Jewish World Service is pleased to submit the enclosed grant agreement to CORE for AJWS Funding and Capacity-Building Program for Kenyan NGOs. This important grant will support several remarkable grassroots Kenyan NGOs working to confront the HIV/AIDS pandemic in innovative and meaningful ways.

Although we are signing this agreement, AJWS would like to clearly state that while the language in paragraph 16 on prostitution and trafficking is acceptable to us, AJWS does not take an official organizational position for or against the legalization of prostitution.

We are tremendously pleased to have your interest and support as we work with our project partners to establish creative and effective responses to the HIV/AIDS pandemic. We look forward to a fruitful partnership with the CORE Initiative. Please contact me or Sharon Feder, Deputy Director for Development, with any questions or for additional information at 212-273-1645 or sfeder@ajws.org.

Sincerely,

Ruth Messinger
President

Exhibit C

May 18, 2005


President George W. Bush
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Dear Mr. President:

The undersigned represent a diverse group of public health, human rights, faith-based and community-based organizations. We strongly support the U.S. government's goals of preventing the spread of HIV and ending trafficking in persons worldwide. We are concerned, however, that U.S. anti-HIV/AIDS and anti-trafficking efforts will be severely undermined by policies restricting the range of interventions that can be used to protect the lives and health of women and men in prostitution, and of trafficked persons, the very groups intended as beneficiaries of U.S. efforts.

Current U.S. law requires organizations receiving U.S. global HIV/AIDS and anti-trafficking funds to adopt specific organization-wide positions opposing prostitution.[1] Until recently, these restrictions have been applied to foreign non-governmental organizations receiving U.S. HIV/AIDS and anti-trafficking funds.[2] A September 2004 opinion letter by the U.S. Department of Justice, however, proposes expanding these policies to U.S.-based organizations.[3] Both U.S. AIDS law and anti-trafficking law also bar the use of funds, variously, to "promote, support, or advocate the legalization or practice of prostitution."[4]

Based on the experience of many of our organizations in advocating for the health and human rights of women and men in prostitution, we are deeply concerned that these restrictions will preclude recipients of U.S. funds from using the best practices at their disposal to prevent HIV/AIDS among these populations and to promote the fundamental human rights of all persons. In fact, evidence exists that these restrictions are already undermining promising interventions.

Women and men in prostitution, some of whom have been trafficked, are among the most marginalized persons in any society. The organizations with the most effective anti-AIDS and anti-trafficking strategies build their efforts on a sophisticated understanding of the social and personal dynamics underlying these issues, and start by building trust and credibility among the populations in question. They recognize that it is both possible and often necessary to provide social, legal and health services to men and women in prostitution without judging them, and without adopting positions on issues such as prostitution.[5] They may work to provide persons in prostitution with new skills essential to moving out of the commercial sex sector, to secure the legal rights of men and women in prostitution to be free from violence and discrimination, or to empower them to demand universal condom use, thereby preventing the further spread of HIV infection within and outside this sector.[6] They may also work to prevent people from being trafficked into the sex sector and to assist trafficking victims. Requiring organizations to adopt anti-prostitution policies makes it extremely difficult, if not impossible, to establish the trust necessary to provide services to these hard-to-reach groups.

We are strongly opposed to the current restrictions on working with women and men in prostitution inscribed in law and extended in U.S. HIV/AIDS and anti-trafficking policies. First, and most importantly, these policies run contrary to best practices in public health and will undermine efforts to stem the spread of HIV and human trafficking. For example, the Sonagachi Project in Calcutta, India, has reached more than 30,000 persons working in the commercial sex sector at risk of HIV, in large part through peer-based outreach services. Sonagachi's peer educators work to stop the spread of HIV among women and men in prostitution in part through strategies intended to earn their trust, reduce their social isolation, increase their participation in public life, and confront stigma and discrimination.[7] Sonagachi's work has received strong positive evaluations from both UNAIDS and the World Bank, and has been cited by UNAIDS as a "best-practice" model of working with women and men in prostitution.[8] These initiatives focus on promoting the fundamental human rights and health of persons working in prostitution, but do not equal

1

the *promotion* of prostitution. Yet valuable programs such as those run by Sonagachi and organizations like it are exactly the type threatened by current U.S. laws and policies.

Second, the broad language of the restrictions increases the risk that organizations will self-censor or curtail effective programs for fear of being seen as supporting or promoting prostitution. In fact, the restrictions are already having a chilling effect on work in the field. In Cambodia, for example, NGOs discontinued plans to provide English language training classes for people working in the commercial sex sector for fear such programs would be interpreted as "promoting prostitution."[9] Yet in Phnom Penh alone, the rapid growth of job opportunities in government, in non-governmental organizations, and in the tourist industry makes English language skills a valuable commodity and a means of accessing opportunities outside the sex sector. In Jamaica, health workers working with men and women in prostitution have expressed concern that these restrictions curtail their ability to support the efforts of people working in the commercial sex sector to protect their rights.[10]

We recognize that your goal is to address the dangers associated with prostitution and trafficking in persons. However, we are concerned that these policies will do little to advance this goal, and will instead exacerbate stigma and discrimination against already marginalized groups. Any anti-prostitution declaration by organizations working in the sex sector has the potential to judge and alienate the very people these organizations seek to assist, making it difficult or impossible to provide services or assistance to those at risk. Public statements against prostitution can also fuel the public opprobrium against men and women in prostitution, further driving them underground and away from lifesaving services. It was for these and other reasons that Brazil recently rejected $40 million in U.S. global AIDS money, noting that such restrictions undermined the very programs responsible for Brazil's success in reducing the spread of HIV.[11]

Finally, we are gravely concerned that the potential expansion of these restrictions to U.S.-based groups contradicts the fundamental right to freedom of speech guaranteed in the U.S. Constitution.[12] Requiring domestic organizations with mixed funding to adopt positions consistent with U.S. government policy compels speech, which is an unconstitutional condition on government funding in violation of the First Amendment.[13] While the U.S. government can legally require its funds be used to further government-approved messages,[14] it has not previously compelled U.S. organizations with multiple funding sources to speak explicitly on an issue in compliance with a specific U.S. objective. The courts have long held that the government does not have power to compel a U.S. grantee to pledge allegiance to the government's viewpoint in order to participate in a government program.[15] We also strongly believe that compelling foreign organizations to adopt policies consistent with the government's viewpoint raises important constitutional concerns and undermines the democratic principles for which the United States stands.[16]

Rather than requiring organizations to adopt explicit anti-prostitution policies, the U.S. government could fulfill its goals by permitting organizations that do not have a policy on prostitution to receive U.S. funds. There is bipartisan support in Congress for this solution.[17] The advantage of this approach is that it does not pressure organizations, whether international or domestic, to adopt policies that run contrary to best health-care practices, may have nothing to do with their work or organizational mission, and have the potential to undercut the very purpose of U.S. grants. Such a policy would allow a wide range of organizations to participate in the global struggle against AIDS, while recognizing the importance of freedom of speech and freedom to receive and impart information in promoting the health and well-being of all citizens.

We urge you to act immediately to:

- ◆ Request that the Department of Justice reconsider its interpretation on the application of the restrictions in the Global AIDS Act of 2003 to domestic grantees, ensuring instead that all programs are consistent with human rights and public health norms and constitutional guarantees of freedom of speech;

- ◆ Institute the practice of consultation with a broad range of experts in both the HIV/AIDS and trafficking fields before any agency or office issues program directives interpreting U.S. HIV/AIDS

2

and trafficking laws to ensure transparency in policymaking, consistency with U.S. and international human rights law, and the promotion of best practices in public health;

♦ Work with Congress to amend the TVPRA and the Global AIDS Act of 2003 so that these laws are consistent with U.S. and international human rights law and with best practices in public health.

We share your concerns about the need to stop the spread of HIV worldwide and to address the needs of trafficked persons. We hope, however, that in the future funding will be distributed to organizations based solely upon their demonstrated capacity to prevent the spread of HIV and human trafficking according to best practices in the fields of public health and human rights, to provide treatment for those suffering from AIDS, and to provide services and support to trafficked persons while simultaneously promoting the basic human rights and freedom of speech of all persons.

Sincerely,

**Organizations by Region**

**Africa**
AIDS Law Project, Centre for Applied Legal Studies, Wits University, South Africa
BAOBAB for Women's Human Rights, Lagos, Nigeria
Gays and Lesbians of Zimbabwe, Harare, Zimbabwe
Greater Nelspruit Rape Intervention Program, Mpumalanga, South Africa
International Centre for Reproductive Health and Sexual Rights, Nigeria
National Forum of People Living with HIV/AIDS Networks in Uganda, Kampala, Uganda
Resource Centre Library, Institute of Training and Education for Capacity-building, East London, South Africa
SWEAT (Sex Worker Education and Advocacy Taskforce), Cape Town, South Africa
Youth Empowered to Succeed, Kisumu, Kenya

**Asia and Pacific**
Action for REACH OUT, Hong Kong, China
Alternate Visions, Bangkok, Thailand
Asia Pacific Network of People Living with HIV/AIDS, Bangkok, Thailand
Australian AIDS Fund Incorporated, Melbourne, Australia
Australian Reproductive Health Alliance, Deakin, Canberra, Australia
Center for the Study of Sexualities, National Central University, Chungli, Taiwan
Centre for Feminist Legal Research, New Delhi, India
Delhi Network of People Living with HIV/AIDS, Delhi, India
Durbar Mahila Samanwaya Committee (Sonagachi Project), Kolkata, India
Empowering Women to Fight AIDS in Asia, Islamabad, Pakistan
Family Planning Association of New Zealand, Wellington, New Zealand
Freedom Foundation-India, Centers of Excellence, Substance Abuse & HIV/AIDS, Bangalore, India
Friends of Hope PLWHA NGO, Pokhara, Nepal
HuMaNis Foundation, Mataram, West Nusa Tenggara, Indonesia
International Secretariat of the Global Alliance Against Traffic in Women (GAATW), Bangkok, Thailand
Lawyers Collective HIV/AIDS Unit, New Delhi, India
MTAAG+ (Positive Malaysian Treatment Access & Advocacy Group), Malaysia
Nari Unnayan Shakti (Women's Power for Development), Dhaka, Bangladesh
National Association of People Living with HIV/AIDS-Australia, Australia
National Association of PLHWHA in Nepal, Kathmandu, Nepal
Network of Sex Work Projects, Hong Kong
Pelangi Community Foundation, Batu Caves, Malaysia
RISE, Peshawar, Pakistan
SANGRAM (Sampada Grameen Mahila Sanstha), Sangli, India
Solidaritas Perempuan (Women Solidarity for Human Rights), Jakarta, Indonesia

3

TARSHI (Talking About Reproductive and Sexual Health Issues), New Delhi, India
TREAT Pokhara, Nepal
Zi Teng, Hong Kong, China

**Europe/Central Asia**

AIDS Action Europe, the Pan European NGO Partnership on HIV and AIDS, Amsterdam, The Netherlands

AIDS Foundation East-West, Moscow, Russia

AIDS Information & Support Center, Tallinn, Estonia

All-Ukrainian Network of People Living with HIV/AIDS, Kiev, Ukraine

Anti Trafficking Center, Belgrade, Serbia

Child in Need Institute International, Italy

CHOICE for Youth and Sexuality, The Netherlands

Comitato per i Diritti Civili delle Prostitute Onlus, Pordenone, Italy

Droits et libertés dans les Eglises, France

European AIDS Treatment Group, Brussels, Belgium

Foundation La Strada, Programme for Prevention of Trafficking in Central and Eastern Europe, Bosnia and Herzegovina

GAT (Grupo Português de Activistas sobre Tratamentos de VIH/SIDA), Lisbon, Portugal

GNP+ (Global Network of People living with HIV/AIDS), Amsterdam, The Netherlands

Grupo de Trabajo sobre Tratamientos del VIH, Barcelona, Spain

HDN (Health & Development Networks), Dublin, Ireland

Health and Social Development Foundation, Sofia, Bulgaria

Health Education Association NGO, Yerevan, Armenia

Hope, Sofia, Bulgaria

Humanist Institute for Co-operation with Developing Countries, The Hague, Netherlands

International Community of Women living with HIV/AIDS, London, United Kingdom

International Drug Policy Consortium, London, United Kingdom

International Planned Parenthood Federation, London, United Kingdom

Irish Family Planning Association, Dublin, Ireland

John Mordaunt Trust, London, United Kingdom

La Strada Czech Republic, Prague, Czech Republic

Lesbian and Gay Federation in Germany, Cologne, Germany

NGO "TRUST," Skopje, Republic of Macedonia

Russian Harm Reduction Network, Moscow, Russia

Until the Violence Stops, London, United Kingdom

We Are Church-YOUTH, Cologne & Munich, Germany

Women for Women's Human Rights - New Ways, Istanbul, Turkey

Women in Black, Belgrade, Serbia

World Population Foundation, Hilversum, Netherlands

**Latin America**

Accion Ciudadana Contra el SIDA, Caracas, Venezuela

Agua Buena Human Rights Association, San Jose, Costa Rica

Católicas por el Derecho a Decidir, Córdoba, Argentina

Ecuadorian Coalition of People Living with HIV/AIDS, Ecuador

Foundation for Studies and Research on Women, Argentina

Huellas+, Quito, Ecuador

Intercambios Asociación Civil, Buenos Aires, Argentina

International Council of Jewish Women, Montevideo, Uruguay

Latin American and Caribbean Council of AIDS Service Organizations, Caracas, Venezuela

Red Argentina de Reducción de Daños (Argentinean Harm Reduction Network), Buenos Aires, Argentina

**Middle East/North Africa**

Egyptian Initiative for Personal Rights, Egypt

Persepolis Harm Reduction NGO, Tehran, Iran

**North America**

ACT UP East Bay, Oakland, CA, USA

ACT UP New York, NY, USA

Action Canada for Population and Development, Ottawa, ON, Canada

Africa Action, Washington, DC, USA

AIDS Action Council, Washington, DC, USA

AIDS Foundation of Chicago, Chicago IL, USA

AIDS Project Los Angeles, CA, USA

AIDS Taskforce of Greater Cleveland, Cleveland, OH, USA

4

American Academy of HIV Medicine, Washington, DC, USA
American Humanist Association, Washington, DC, USA
American Jewish World Service, New York, NY, USA
amfAR (The Foundation for AIDS Research), New York, NY , USA
Amnesty International USA, New York, NY, USA
Best Practices Policy Project, Washington, DC, USA
Boston Consortium for Gender, Security and Human Rights, Boston, MA, USA
Canadian HIV/AIDS Legal Network, Montreal, Canada
Canadian Research Institute for the Advancement of Women, Ottawa, Canada
Canadian Society for International Health, Ottawa, Canada
Catholics for a Free Choice, Washington, DC, USA
Catholics for a Free Choice-Canada, Peterborough, Ontario, Canada
Catholics Speak Out, Quixote Center, Brentwood, MD, USA
Center for Health and Gender Equity, Takoma Park, MD, USA
Center for Reproductive Rights, New York, NY, USA
Center for Women Policy Studies, Washington, DC, USA
Center for Women's Global Leadership, New Brunswick, NJ, USA
Central Conference of American Rabbis, New York, NY, USA
CHAMP (Community HIV/AIDS Mobilization Project), New York, NY, USA
Chicago Recovery Alliance, Chicago IL, USA
Choice USA, Washington, DC, USA
Columbia University Social Intervention Group, New York, NY, USA
Drug Overdose Prevention and Education Project, San Francisco, CA, USA
Episcopal Church, USA
Eve & The Snake, New York, USA and Brasilia, Brazil
Family Care International, New York, USA
Feminist Majority Foundation, Arlington, VA, USA
Foundation for Integrative AIDS Research, Brooklyn, NY, USA
Gay Men's Health Crisis, New York, NY, USA
General Board of Church and Society, United Methodist Church, Washington, DC, USA
Global AIDS Alliance, Washington, DC, USA
Global Campaign for Microbicides, Washington, DC, USA
Global Fund for Women, San Francisco, CA, USA

Global Philanthropy Partnership, Chicago, IL, USA
Global Rights, Washington, DC, USA
GW Student Global AIDS Campaign, Washington DC, USA
Gynuity Health Projects, New York, NY, USA
Harm Reduction Coalition, New York, NY, USA
Harm Reduction Project, Denver / Salt Lake City, USA
Health Equity Project, New York, NY, USA
HealthGAP (Global Access Project), New York, NY, USA
Hepatitis, AIDS, Research Trust, Florence, CO, USA
HIV Advocacy Council of Oregon and SW Washington Planned, Portland, OR, USA
HIV Resource Center, Roseburg, OR, USA
Huairou Commission, Brooklyn, NY, USA
Human Rights Watch, New York, NY, USA
Institute for Community Research, Hartford, CT, USA
International Council of AIDS Service Organizations, Toronto, ON, USA
International Gay and Lesbian Human Rights Commission, New York, NY, USA
International Planned Parenthood Federation, Western Hemisphere Region, New York, NY, USA
International Rescue Committee, Washington, DC, USA
International Sex Worker Foundation for Art, Culture and Education, Panorama City, CA, USA
International Women's Health Coalition, New York, NY, USA
Ipas, Chapel Hill, NC, USA and 11 country offices worldwide
Lambda Legal Defense & Education Fund, Inc., New York, NY, USA
MADRE, An International Women's Human Rights Organization, New York, NY, USA
National Asian Pacific American Women's Forum, Washington DC, USA
National Association of Nurse Practitioners in Women's Health (NPWH), Washington, DC, USA
National Association of People with AIDS (NAPWA-US), Silver Spring, MD, USA
National Coalition of American Nuns, USA
National Council of Jewish Women, New York, NY, USA
National Family Planning and Reproductive Health Association, Washington, DC, USA
PATH, USA
Project Inform, San Francisco, CA, USA
Religious Consultation on Population, Reproductive Health and Ethics, Milwaukee, WI, USA

5

Sakyadhita International Association of Buddhist Women, Kailua, HI, USA
Search For A Cure, Boston, MA, USA
Sex Workers Project at the Urban Justice Center, New York, NY, USA
Sexuality Information and Education Council of the United States, New York, NY, USA
SisterSong Women of Color Reproductive Health Collective, Atlanta, GA, USA
Street Works, Nashville, TN, USA
Student Campaign for Child Survival, Washington, DC, USA
Student Global AIDS Campaign, Washington, DC, USA
Treatment Action Group (TAG), New York, NY, USA

Union for Reform Judaism, New York, NY, USA
Unitarian Universalist Association of Congregations, USA
Washington Office on Africa, Washington, DC, USA
WATER (Women's Alliance for Theology, Ethics and Ritual), Silver Spring, MD, USA
WEDO (Women's Environment & Development Organization), New York, NY, USA
Women's Commission for Refugee Women and Children, New York, NY, USA
Women's World Organization for Rights, Literature and Development (Women's WORLD), New York, NY, USA

**Individuals** (*Note: Institutional affiliation is provided for identification purposes only)

Congresswoman Betty McCollum, U.S. House of Representatives, 4th district of Minnesota
Moisés Agosto, Health Care Consultant, member of the New York City AIDS Commission, community member of AIDS Research Advisory Council of the Division of AIDS of the NIAID, USA
Avni Amin, Ph.D., World Health Organization, Geneva, Switzerland
Noor Ayesha, Electoral Support Officer, United Nations Volunteers, Liberia
Phil Bossenbroek, Peer Counselor/ Southern Arizona AIDS Foundation, Member Social Justice Committee/ St Marks Presbyterian Church, Tucson, AZ, USA
Lynn Buffington, Beavercreek, OH, USA
Therese Burstow, Needle and Syringe Program Policy Officer, Northern Territory AIDS and Hepatitis Council, Australia
Dr. Wendy Chapkis, Associate Professor of Women's Studies and Sociology, University of Southern Maine, USA
Helena Chiquele, Project Officer of the Joint Oxfam Advocacy Program, Mozambique
Claire Christie, Reproductive Health Program Advisor, CARE Cambodia, Phnom Penh, Cambodia
Judith Collins, Health Consultant, Chapel Hill, NC, USA
Susie Daniel, Cooperante Tecnica - VIH/SIDA, Cooperacion Internacional para el Desarrollo, Republica Dominicana
Lila Elman, Public Health Programs Assistant, Open Society Institute, New York City, USA
Prim. d-r Slavica Gajdadzis-Knezevik, psychiatrist and Director, Center for prevention and

treatment of drug addiction, Psychiatric Hospital "Skopje", Republic of Macedonia
Raquel Gandelsman, Secretaria de Saúde do Recife, Programa de Redução de Danos no Consumo de Álcool, Fumo e Outras Drogas, Prefeitura da Cidade do Recife, Brazil
Tina Gianoulis, member Women in Black, Bainbridge Island; Dyke Community Activists, WA, USA
Janice Gutman, member Women in Black, Bainbridge Island; Dyke Community Activists; Suquamish-Ollalla Neighbors Association, WA, USA
Emma Harvey, Project Coordinator, International Human Rights Exchange, Cape Town, South Africa
Geoff Heaviside, Convenor - Brimbank Community Initiatives Inc, Secretary - International Centre for Health Equity Inc, Member - Australasian Society for HIV Medicine Inc, Victoria. Australia
Robert Heimer, Ph.D., Center for Interdisciplinary Research on AIDS, Yale University School of Medicine, New Haven, CT, USA
Chen Hong, Program Manager, Population Services International/Yunnan, China
Alice M. Miller, Assistant Professor, Clinical Public Health, Columbia University School of Public Health, New York, NY, USA
Sandhya Jain, New Delhi, India
Philippa Jungova Lawson, HIV/AIDS specialist, active member of International Community of Women Living with HIV/AIDS, Glastonbury, CT, USA
Anne Ruedisili Langdji, Primary Health Care Project Coordinator, Eglise Evangelique Lutherienne du Senegal

6

Teresa Lanza M., Coordinator of Catholics For the Right to Decide/Bolivia, La Paz, Bolivia

I.S. Levine, Chairman, Board of Directors, Adult Industry Medical Healthcare Foundation, Los Angeles, CA, USA

Professor Ann Lucas, San Jose State University, San Jose, CA, USA

Alexandra Lutnick, Research Coordinator, St. James Infirmary, Staff Research Associate II, University of California San Francisco , San Francisco, Ca, USA

Anna Marsiana, Working Group Committee, Asian Women Resource Centre for Culture and Theology, Kuala Lumpur, Malaysia

Sanja Milivojevic, Monash University, Melbourne, Australia

Veronica Monet, Sex Educator and the author of Sex Secrets of Escorts (Alpha Books 2005), member of SWOP-USA, Woodside, Ca, USA

Elena Obieta, MD, Infectious Diseases, Hospital de Boulogne and Fundacion SPES, Buenos Aires, Argentina

Julia O'Connell Davidson, Professor, School of Sociology & Social Policy, University of Nottingham, Nottingham, United Kingdom

Prisci Orozovich, MPh, HIV/AIDS Researcher, University of California at San Diego, USA

Rosalind Petchesky, Women's Environment & Development Organization, Distinguished Professor, Hunter College & the Graduate Center, City University of New York, USA

Edith Rubinstein, Women in Black, Burssels, Belgium

Larissa Sandy, Graduate Scholar/Research Assistant, Gender Relations Centre, Research School of Pacific and Asian Studies, Australian National University, Canberra, Australia

Dr. Jennifer Suchland, Assistant Professor, Southwestern University, Georgetown, Texas, USA

Celina Schocken, International Affairs Fellow with the Council on Foreign Relations, USA

Brooke Slick, WV State Director, AIDS Watch/ Campaign to End AIDS, Shepherdstown, WV, USA

Laurie Sylla, Director, Connecticut AIDS Education and Training Center, Yale School of Nursing, New Haven, CT, USA

Dechen Tsering, Program Officer, Asia and Oceania, Global Fund for Women, San Francisco, CA, USA

Stephanie Urdang, Montclair, NJ, USA

Wei V. Wang, Wellesley College, Wellesley, MA, USA

Patricia Weisenfeld, Asia Regional Program Manager, The Female Health Foundation, Chiang Mai, Thailand

Patricia Whelehan, Ph.D., medical anthropologist, HIV/AIDS education coordinator and counselor, NY, USA

Mohammad Ziaul Ahsan, Director, Program & Finance, Organization for Social Development of Unemployed Youth, Dhaka, Bangladesh

Cc:

Alex M. Azar II, General Counsel, U.S. Department of Health and Human Services

Hon. Joseph Biden, Ranking Minority Member, Committee on Foreign Relations, U.S. Senate

Hon. Bill Frist, Majority Leader, U.S. Senate

Hon. Alberto R. Gonzales, Attorney General, U.S. Department of Justice

Kent Hill, Acting Assistant Administrator, USAID

Hon. Henry Hyde, Chair, Committee on International Relations, U.S. House of Representatives

Hon. Tom Lantos, Ranking Minority Member, Committee on International Relations, U.S. House of Representatives

Hon. Patrick Leahy, U.S. Senate

Hon. Richard Lugar, Chair, Committee on Foreign Relations, U.S. Senate

Ambassador John Miller, Office to Monitor and Combat Trafficking in Persons,
U.S. Department of State
Andrew Natsios, Administrator, USAID
Hon. Chris Smith, Member, Committee on International Relations, U.S. House of
Representatives
Ambassador Randall Tobias, Global AIDS Coordinator, Department of State

[1] *See United States Leadership against HIV/AIDS, Tuberculosis, and Malaria Act of 2003*, 22 U.S.C. § 7631(f) (2003) [hereinafter, Global AIDS Act]; *Trafficking Victims Protection Reauthorization Act of 2003*, 22 U.S.C. § 7110(g) (2) (2003) [hereinafter, TVPRA].

[2] *See, e.g.*, Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Svcs., *Rapid Expansion of HIV/AIDS Activities by National Ivorian Nongovernmental Organizations and Associations Serving Highly Vulnerable Populations in Cote d'Ivoire Under the President's Emergency Plan for AIDS Relief*, Funding Opportunity No. 04199, Jul. 2004, at 9 (stating, "[A]ny foreign recipient must have a policy explicitly opposing, in its activities outside the United States, prostitution and sex trafficking..."). *See also* Bureau of Administration, U.S. Dep't of State, *Anti-Trafficking in Persons*, Funding Opportunity No. DOS-GTIP, Mar. 2005, at 11-12 (stating, "U.S. law... prohibits such funds from being used to implement any program that targets recipients of trafficking in persons involving sex trafficking by an organization that has not stated in either a grant application, a grant agreement, or both, that it does not promote, support, or advocate the legalization or practice of prostitution. It is the responsibility of the primary grantee to ensure these criteria are met by its sub-grantees").

[3] Letter from Daniel Levin, Acting Assistant Attorney General, U.S. Dep't of Justice, to Alex M. Azar II, General Counsel, U.S. Dep't of Health and Human Svcs. (Sept. 20, 2004).

[4] *See* Global AIDS Act, 22 U.S.C. § 7631(e) (barring use of funds to "promote or advocate the legalization or practice of prostitution or sex trafficking"); TVPRA, 22 U.S.C. § 7110(g) (1) (barring use of funds to "promote, support, or advocate the legalization or practice of prostitution").

[5] *See* WORLD HEALTH ORG. (WHO), TOOLKIT FOR TARGETED HIV/AIDS PREVENTION AND CARE IN SEX WORK SETTINGS (2004), available at http://www.who.int/hiv/pub/prev_care/swtoolkit/en/.

[6] *See id.* at 6 (noting "The diversity of sex work settings requires flexible, locally adapted responses. However, experience shows that HIV prevention in sex work settings should work toward three main outcomes: 1. Increased condom use and safer sex 2. Increased sex worker involvement and control over working and social conditions 3. Reduced STI burden").

[7] *See* UNAIDS, *Female Sex Worker HIV Prevention Projects: Lessons Learnt from Papua New Guinea, India and Bangladesh*, UNAIDS BEST PRACTICE COLLECTION, Nov. 2000, at 57-90.

[8] *See id.*

[9] Interview by Alice Miller, Columbia Univ. Law School, with Elaine Pearson, Anti-Slavery International, Bangkok, Thailand (July 2004).

[10] Interview by Human Rights Watch with Jamaican health worker, Kingston, Jamaica (June 2004).

[11] *See* Michael M. Phillips and Matt Moffett, *Brazil Refuses U.S. Aids Funds, Rejects Conditions*, WALL ST. J., May 2, 2005, at A3.

[12] *See* U.S. CONST. Amend. I.

[13] *See* FCC v. League of Women Voters, 468 U.S. 364 (1984). *See also* Regan v. Taxation w. Representation of Washington, 461 U.S. 540 (1983) (holding permissible speech restrictions on a government subsidy because other, non-federal contributions could be used to fund prohibited speech).

[14] *See* Rust v. Sullivan, 500 U.S. 173, 196 (1991) (holding that the Government may make a value judgment, implement that judgment by the allocation of public funds, and "leave the grantee unfettered in its other activities" funded by other sources).

[15] *See* West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943) (invalidating a requirement that children pledge allegiance to the U.S. flag in order to attend public school). *See also* Speiser v. Randall, 357 U.S. 513 (1958) (holding unconstitutional a requirement that receipt of a tax exemption was contingent on the filing of a loyalty oath to the U.S. Government); Wooley v. Maynard, 430 U.S. 705, 715 (1977), *citing* Barnette (holding that forcing an individual to be "an instrument for fostering public adherence to an ideological point of view he finds unacceptable . . . 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment . . . to reserve from all official control'").

[16] *See* DKT Memorial Fund Ltd. v. Agency for Intern. Dev't, 887 F.2d 275 (D.C. Cir. 1989) (Ginsberg, J., dissenting).

[17] *See* 108 Cong. Rec. H10287 (2003) (colloquy of Reps. Chris Smith and Tom Lantos during the reauthorization of the TVPRA). Congressman Smith, Republican Vice-Chair of the House International Relations Committee (HIRC),

8

and Congressman Lantos, Ranking Democrat Member on the HIRC, agreed on the proper interpretation of the TVPRA funding restriction related to sex trafficking and prostitution. According to Congressman Smith," an organization can satisfy the prohibition...if it states in a grant application, a grant agreement, or both that it does not promote, support, or advocate such actions since it has no policy regarding this issue." *See also* 149 Cong. Rec. S6457 (2003) (colloquy of Senator Leahy and Senator Frist during the authorization of the Global AIDS Act) Senator Frist, President Pro Tempore of the Senate, and Senator Leahy, Ranking Democrat Member on the Judiciary Committee, agreed on the proper interpretation of the Global AIDS Act funding restriction related to sex trafficking and prostitution. Senator Frist stated that "a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women . . . would satisfy the intent of the provision."

9