NEIER
DECLARATION

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. and OPEN SOCIETY
INSTITUTE,

                        Plaintiffs,

                -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT and
ANDREW NATSIOS,
                        Defendants.
----------------------------------------------------------------

DECLARATION OF
ARYEH NEIER

I, ARYEH NEIER, hereby declare as follows:

1.      I am the President of the Open Society Institute ("OSI") and a member of

the board of directors of the Alliance for Open Society International ("AOSI").

2.      I submit this declaration in support of the plaintiffs' motion for a

preliminary injunction.

<u>The Open Society Institute</u>

3.      OSI is a charitable trust organized and existing under New York law.  It is

a private foundation enjoying tax-exempt status under section 501(c)(3) of the Internal

Revenue Code.  Its primary office is located at 400 West 59th Street, New York, NY.

4.      OSI was founded in 1993 to be the principal United States-based

foundation of the philanthropist George Soros.  In general, OSI promotes democratic

governance, human rights, and economic, legal and social reform.  OSI works to support

a network of more than 30 Soros foundations operating in more than 60 countries around

the world (the "Open Society Network"). Each of the Soros foundations is independently established under local laws and is governed by a local board of directors.

5.      One of the priorities of OSI has been protecting the health and human rights, including sexual and reproductive health and rights, of socially marginalized populations. Various OSI programs have supported activities that include: capacity building for NGOs, lawyers, and health providers in policy advocacy and litigation; advocacy and model service delivery efforts; public education and training/sensitization of health providers; and research and data analysis codifying the sexual health and rights experiences of vulnerable populations.

6.      OSI and the members of the Open Society Network have adopted a set of principles of governance, one of which prohibits us from accepting funding that requires us to adopt a policy or restrict our advocacy and speech in a manner contrary to the values of an open society.

7.      The principles of governance also prohibit OSI from adopting policies or taking actions that harm or stigmatize marginalized groups.

## The Alliance for Open Society International

8.      Plaintiff AOSI is a not-for-profit organization incorporated in Delaware, with home offices in New York and a branch office in Almaty, Kazakhstan. AOSI is closely affiliated with OSI and is a member of the Open Society Network. AOSI receives funding and technical and administrative support from OSI. AOSI also has an employee who works under the auspices of OSI's Open Society Justice Initiative.

9.      AOSI is the prime grantee on a five-year grant from the United States Agency for International Development ("USAID") for a Drug Demand Reduction

Program operating in Uzbekistan, Tajikistan, and the Ferghana Valley region of Kyrgyzstan. OSI provides AOSI with funding, some of which AOSI uses to implement the Drug Demand Reduction Program. OSI also provides AOSI with administrative and technical support regarding the Drug Demand Reduction Program. OSI is not a recipient of USAID funding under the Drug Demand Reduction Program.

The Global AIDS Act Restrictions

10.    USAID's funding for the Drug Demand Reduction Program is authorized by the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

11.    The Global AIDS Act contains a "government funds restriction" prohibiting funds made available under the act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care to a prostitute. 22 U.S.C. § 7631(e).

12.    The Global AIDS Act also contains a "pledge requirement" providing, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

13.    Until this year, USAID did not enforce the pledge requirement against U.S.-based non-governmental grantees such as AOSI. However, as of June of this year it has started enforcing the requirement.

14.    OSI is concerned about harms that trafficking and sex work do both to the individuals directly involved and to others in various ways.

15.    OSI is aware that public health experts believe that there is a wide variety of techniques that, depending on the country and other factors, may alleviate the harms that people involved in trafficking and sex work suffer, and that may lessen the risk that sex work will lead to the spread of HIV/AIDS. Those methods may include engaging in outreach to sex workers, building relationships of trust with sex workers, organizing sex workers, advocating for legal reforms to facilitate outreach to sex workers, and other techniques.

16.    OSI desires that it remain free to engage in the full range of techniques that public health experts believe may alleviate the harms that people engaged in sex work suffer, and may lessen the risk that sex work will lead to the spread of HIV/AIDS. OSI's institutional culture encourages the free exchange of opinions on all matters in which it is engaged. Though OSI has neither adopted a policy favoring legalization of prostitution nor explicitly opposing prostitution and we do not anticipate that we would adopt either policy, we want to maintain an atmosphere in which our personnel, our grantees and others associated with us are free to advocate a range of policies that they believe will reduce the harms caused by trafficking and sex work.

<u>Harms Resulting From USAID's Pledge Requirement</u>

17.    OSI is concerned about the pledge requirement for a number of reasons. First, although OSI is not currently receiving Global AIDS Act funding from USAID, OSI has received other USAID funding in the past, and is interested in preserving its eligibility to receive Global AIDS Act funding in the future.

18.    Additionally, OSI fears that USAID will sanction AOSI for noncompliance with the pledge requirement if AOSI and OSI do not adopt a policy that USAID views as "explicitly opposing prostitution."

19.    I do not believe that OSI should be bound by the pledge requirement solely by virtue of AOSI's acceptance of USAID funding, because we are legally separate from AOSI, and are not a party to either the Cooperative Agreement establishing the Drug Demand Reduction Program or the Modifications of Assistance entered into between AOSI and USAID.

20.    However, I am aware that Congressional investigators have subjected OSI to scrutiny for actions allegedly taken by AOSI in connection with the Drug Demand Reduction Program.  For example, on February 11, 2005, Congressmen Tom Davis and Mark Souder wrote to USAID, asserting that "the Open Society Institute in New York" is a "partner" in AOSI's USAID-funded Drug Demand Reduction Program."

21.    USAID seemed to accede in this characterization of OSI's role, stating, "This is a correct statement."

22.    In fact, OSI is not technically a partner in the project, although AOSI and the Soros foundations in Tajikistan and Kyrgyzstan are.  However, Congressional investigators are still subjecting OSI itself to scrutiny by requesting that USAID produce "all documents related in any way to USAID involvement in, financing of, or support for programs also participated in by" a variety of organizations including "the Soros Foundation" and the Open Society Institute.

23.    For that reason, I am afraid that USAID would construe AOSI's accession to the pledge requirement as binding OSI and the Open Society Network.

5

24.     Adopting a policy statement opposing prostitution would violate the OSI principle of governance that bars us from adopting policies that are contrary to the values of an open society.  It would also violate the OSI principle of governance that bars us from adopting policies that harm or stigmatize marginalized groups.

25.     Moreover, such a policy statement could impede our work in many ways.

26.     For example, it would be difficult for us to operate in countries where sex work is legal or carries minimal penalties were we to adopt such a policy.  In Kyrgyzstan, where AOSI operates, sex work is not a crime, although brothels are forbidden by the criminal code.  Similarly, in Kazakhstan, where AOSI and the Soros Fund Kazakhstan operate, sex work itself is not illegal, although involvement in prostitution through the use of violence or the threat of its application, blackmail, the damage of property, or by fraud is a crime.  The Open Society Initiative for West Africa – a member of the Open Society Network – operates in Senegal, where sex work is legal.

27.     Another reason we do not want to adopt a position on prostitution is that it would interfere with the work of OSI's Sexual Health and Rights Program (SHARP), which is working to develop and implement a global strategy to improve the sexual health and rights of socially marginalized populations.  Among the marginalized populations it targets are sex workers.  It is working, or will work, in a variety of regions including Africa, Asia, Turkey, Central and Eastern Europe, and the former Soviet Union.

28.     There are a number of ways that the adoption of a policy opposing prostitution could impede SHARP's activities.  To take just one example, SHARP advocates for a more conducive public policy environment in which policies designed to

improve sexual health are debated, adopted, prioritized and implemented, and the sexual rights of socially marginalized populations are protected. It would be difficult for us to advocate for a free debate regarding policies to improve sexual health – including a readiness to listen to arguments for changes in the legal status of sex work – if we had a policy opposing prostitution.

29.    The second reason OSI is concerned about the pledge requirement is that it fears that USAID will sanction AOSI for noncompliance with the requirement if AOSI or OSI engages in any activities that USAID construes as promoting, or insufficiently opposing, prostitution.

30.    For example, AOSI and OSI are co-sponsoring a conference, scheduled for October 14, 2005, entitled, "Sex Work, Sexual Rights and Countering the Conservative Sexual Agenda." The goal of the conference is to bring together members of different advocacy and service delivery communities – such as domestic and international groups, and groups working with sex workers and victims of trafficking – to discuss key policy issues. Among the topics to be discussed is the legal status of sex work.

31.    If USAID considers OSI's own activities to be activities that could place AOSI in noncompliance with the pledge requirement, there are many activities by OSI itself that could potentially violate the pledge requirement, including providing financial assistance and technical and administrative support to organizations that advocate for the changes in the legal status of sex work in order to facilitate outreach to sex workers..

32.    One example is the Central and Eastern European Harm Reduction Network (the "Harm Reduction Network"), to which OSI provides funding and technical

assistance. The Harm Reduction Network has issued an OSI-funded report recommending that sex work be decriminalized as a means of protecting sex workers from abuse by law enforcement, traffickers, and pimps, thus making it easier for sex workers to access the health and social services they require in order to remain healthy and informed. This strategy, the Harm Reduction Network contends, will facilitate general HIV prevention efforts and will minimize other harms associated with sex work. A true and exact copy of this report is attached as Exhibit A.

33.     OSI does not take a position either in favor of or against the Harm Reduction Network's recommendation regarding decriminalization of sex work. However, OSI has helped conceptualize the Harm Reduction Network's report, gather information for the report, organize a media campaign for the report's launch, get feedback on the report from international experts, and provide editing support and personal feedback on content. In the coming months, OSI intends to continue helping the Harm Reduction Network distribute the report to the media and elsewhere. We do not know whether USAID will construe our providing this support and financial support for the report as violating the pledge requirement.

34.     Another OSI activity USAID might construe as violating the pledge requirement is OSI's publication of *Harm Reduction News*, which is the newsletter of OSI's International Harm Reduction Development Program. In this newsletter, we profile innovative approaches to harm reduction, which aims to fight the transmission of HIV/AIDS by drug users.

35.     The newsletter often highlights harm reduction programs that target sex workers, and that approach sex workers in a non-judgmental fashion in order to

collaborate with them.  For example, the most recent newsletter profiles a drop-in club for sex workers in Slovakia, calling it "an inviting haven for Bratislava's female street sex workers, women who face some of the worst forms of marginalization and abuse." The author of the article says that one of the main goals of the drop-in center is to "support [sex workers] in interactions with police," and says that the center "always tr[ies] to motivate the women to break their isolation, pursue positive changes in their lives, and demand the right to live free from the threat of violence, intimidation, and persecution."  A true and exact copy of this newsletter is attached as Exhibit B.

36.    It is important to OSI that we remain free to profile similarly innovative programs working with sex workers to reduce the spread of HIV/AIDS, whether or not those programs treat the sex workers non-judgmentally, and whether or not those programs advocate for changes in the legal status of sex work.

37.    Additionally, OSI's SHARP program has launched a listserv to provide a forum for interested stakeholders to share information, opinions, resources, and linkage opportunities related to service delivery, policy and advocacy issues that affect the health, safety and well-being of sex workers in Eastern Europe and the former Soviet Union. SHARP encourages participants to post content regarding best practices, service gaps, model legislation, advocacy strategies, and new initiatives.  It is essential to the success of the listserv that all participants – including OSI personnel – remain free to express their views regarding the efficacy and wisdom of a wide array of methods, including but not limited to using a non-judgmental approach in working with sex workers, organizing sex workers into associations or unions, and changes in the legal status of sex work.

38.    OSI's SHARP program also provides funding and technical assistance to a number of other NGOs doing harm reduction work with sex workers. Several of these groups are studying the circumstances in which sex workers work and developing policy recommendations. It is essential to OSI that these groups remain free to advocate for the most effective policies, including – where appropriate – changes in the legal status of sex work.

39.    The third reason OSI is concerned about the pledge requirement is that OSI fears that USAID, Congress or other governmental actors will subject AOSI and OSI to intrusive and unwarranted governmental investigations regarding whether AOSI and OSI are engaged in activities that the investigators construe as insufficiently opposed to prostitution. As stated above, the Drug Demand Reduction Program, and the roles in it played by AOSI and OSI have already been the subject of considerable Congressional interest.

<u>Vagueness of the Pledge Requirement</u>

40.    In addition to our concerns that the pledge requirement will be construed to cover OSI's activities, OSI is concerned that the pledge requirement is so vague that OSI and AOSI are unable to discern which of their activities may run afoul of this restriction.

41.    I am aware that neither the Global AIDS Act nor USAID has defined what it means to have a policy "explicitly opposing prostitution," which is required by the pledge requirement. I do not know what they mean by this phrase.

42.    I am aware that Senator Coburn has construed the pledge requirement as barring USAID grantees from enabling sex workers to enjoy the activities that grantees

engage in to educate sex workers.  Likewise, I am aware that some members of Congress have construed the pledge requirement as barring a debate program.  Finally, I am aware that 28 members of Congress have construed the pledge requirement as barring the use of a "rights-based" approach to working with sex workers.

43.     Given these far-reaching interpretations of the Global AIDS Act, and the lack of guidance by USAID, I am afraid that AOSI or OSI will unwittingly engage in work barred by these phrases.  If USAID were to take the position that OSI is bound by the pledge requirement, we would have to severely curtail our activities to ensure that they did not run afoul of even the broadest possible interpretation of that requirement.

<u>AOSI's Letter to USAID</u>

44.     AOSI has tried to obtain guidance from USAID regarding the parameters of the pledge requirement.

45.     On June 13, 2005, I wrote to Andrew Natsios, USAID's Administrator.  In that letter, I informed him that I believed that the following policy statement, which AOSI has already adopted, should satisfy the pledge requirement:

> AOSI and the Soros Foundations on Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways.  AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities.  Rather, our approach is to try to reduce the harms caused by disseminating credible information on questions such as the prevention of disease, and by providing direct public health assistance to vulnerable populations.

46.     In that letter, I also stated that "AOSI's adoption of policies and commitments concerning future action cannot bind other organizations, such as the Open Society Institute . . . , with which it is closely affiliated, or other Open Society Network

entities around the world." I stated further that "it is essential that all other members of the Open Society Network retain their full freedom to support or advocate policies designed to assist sex workers in protecting themselves from exploitation and disease, and it is essential that they retain this freedom without regard to any policy positions adopted by AOSI."

47.     A true and exact copy of my letter to Andrew Natsios dated June 13, 2005, is attached as Exhibit C.

48.     USAID delayed six weeks in responding to my letter. During that time, USAID withheld more than $500,000 in interim funding that it had promised AOSI for the Drug Demand Reduction Program. USAID also failed to provide any of the approximately $5 million in additional funding that it had promised AOSI for fiscal year 2005.

49.     As a result of USAID's delay, AOSI and its subgrantees under the Drug Demand Reduction Program were left without sufficient funds to continue to operate their programs and the program was thrown into disarray. At the beginning of August, one of AOSI's subgrantees notified AOSI that it was laying off staff and shutting down youth outreach centers it operated as part of the Drug Demand Reduction Program. There was a distinct danger that AOSI and its other subgrantees would also have to lay off staff and shut down operations.

50.     On August 2, 2005, USAID finally responded to my letter, stating: "We do not think that it is appropriate for USAID to make prospective determinations for private organizations about whether or not their policy statements comply with the statutory requirement reflected in AAPD 05-04."

51.     Notwithstanding USAID's refusal to provide any guidance regarding the meaning of the pledge requirement, USAID's letter also warned that any violation by AOSI would be subject to audit and sanction by the USAID Inspector General.

52.     A true and exact copy of the letter from USAID is attached as Exhibit D.

53.     On August 3, 2005, USAID sent AOSI a Modification of Assistance, obligating USAID to pay $542,300 to AOSI for the Drug Demand Reduction Program. AOSI signed that document and returned it to USAID, along with a cover letter reciting the required pledge.  In that letter, AOSI stated its belief that the policy it had implemented in the spring of 2004 complies with the pledge requirement and that OSI's actions have no bearing on AOSI's compliance or noncompliance with the requirement. Additionally, AOSI reserved its rights "to challenge the pledge requirement as violative of the First Amendment and other law."

54.     USAID has now released enough funding to AOSI to enable the Drug Demand Reduction Program to operate through the end of September, 2005. Accordingly, OSI and AOSI now feel free to file this lawsuit without risking a harmful hold-up in USAID funding of the sort experienced after I sent my letter to USAID in mid-June.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 13, 2005
New York, New York

ARYEH NEIER

Exhibit A

# Sex Work, HIV/AIDS, and Human Rights

## in Central and Eastern Europe and Central Asia

A report from the Central and Eastern European
Harm Reduction Network

July 2005

# Table of Contents

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Executive summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

**1. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**13**
   1.1 Background to the report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
   1.2 Report structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
   1.3 Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
   1.4 Structural and analytical limitations . . . . . . . . . . . . . . . . . . . . . . . . .17

**2. Sex Work and Associated Risk Behaviors** . . . . . . . . . . . . . . . . . . . .**19**
   2.1 Extent of sex work in CEE/CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
   2.2 Structure of sex work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
   2.3 Demographic data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
   2.4 Categories of sexual partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
   2.5 HIV cases in the region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
   2.6 STI cases in the region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
   2.7 HIV infections associated with sex work . . . . . . . . . . . . . . . . . . . . . .24
   2.8 Prevalence of HIV and STIs among sex workers . . . . . . . . . . . . . . . . .25
   2.9 Sex work and injecting drug use . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
   2.10 Injecting risk behaviors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
   2.11 Sex work and condom use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
   2.12 Internal and external migration in the context of sex work . . . . . . . . . .29

**3. Legal Regulations of Sex Work and the Human Rights of Sex Workers** . . . . . . . . . . .**31**
   3.1 International treaties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
   3.2 National regulations of commercial sex work . . . . . . . . . . . . . . . . . . . .35
   3.3 Human rights of sex workers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

**4. HIV/STI and Harm Reduction Interventions among Sex Workers** . . . . . . . . . . . . . .**53**
   4.1 Guidelines on service provision to sex workers . . . . . . . . . . . . . . . . . . .53
   4.2 Brief history of harm reduction for sex workers . . . . . . . . . . . . . . . . . .54
   4.3 Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55
   4.4 Target groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57
   4.5 Service coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57
   4.6 Project services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58
   4.7 Advocacy and policy efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67
   4.8 Self-organizing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .68

**5. Conclusions and Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**71**
   5.1 Recommendations for policymakers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .71
   5.2 Recommendations for health authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .73
   5.3 Recommendations for law-enforcement authorities . . . . . . . . . . . . . . . . . . . . . . .74
   5.4 Recommendations for service providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75
   5.5 Recommendations for external donors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76
   5.6 Recommendations for researchers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77

**6. References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**79**

**7. Appendices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**87**
   Table 1: New HIV infections in CEE/CA, 1997-2003 . . . . . . . . . . . . . . . . . . . . . . . .87
   Table 2: Syphilis diagnoses per 100,000 in CEE/CA, 1994 to 2003 . . . . . . . . . . . . . . .88
   Table 3: HIV prevalence among sex workers from routine testing . . . . . . . . . . . . . . . . .89
   Table 4: HIV prevalence in samples of sex workers and drug injecting sex workers . . . . .90
   Table 5: STI prevalence in samples of sex workers . . . . . . . . . . . . . . . . . . . . . . . . . .91
   Table 6: Project data: HIV/STI/HCV prevalence among sex workers
       and drug injecting sex workers in CEE/CA . . . . . . . . . . . . . . . . . . . . . . . . . . . .93
   Table 7: Estimates of sex workers and overall population working
       in selected CEE/CA cities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95
   Table 8: Project data: Estimates of sex workers, drug use and type of drugs used
       among sex workers attending harm reduction programs in CEE/CA . . . . . . . . . .96
   Table 9: Project data: Reported sexual risk behaviors and demographic
       characteristics of sex workers attending harm reduction programs in CEE/CA. .100
   Table 10: Legal regulation of sex work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .103
   Table 11: Estimated service coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .116
   Table 12: Project data: Services provided to sex workers, clients of the programs . . . . . .117

CA. Among these factors are economical instability, poverty, high levels of unemployment, repressive policies and laws, social inequality, poor enforcement of human rights guarantees, widespread and widely tolerated violence against women, discrimination of migrants, and lack of adequate public health services. Governments must seek to address all of these issues in order reduce the impact of HIV/AIDS in their countries, especially among their most marginalized citizens.

- **Mechanisms should be initiated, preferably in cooperation with human rights groups and civil society, to enhance the independent monitoring of human rights agreements; protect the rights of vulnerable populations; and punish violators.**

The human rights of sex workers, especially those working on the streets and injecting drugs, are easily breached on a daily basis, especially by the police, pimps, clients, the mass media, and public health providers. Apart from being important in itself, guaranteeing the human rights of sex workers should be seen as an essential element of a country's overall HIV response. Sex workers' ability and willingness to access crucial harm reduction services are greatly limited when their rights are violated regularly. They deserve equal rights and justice— and the availability of appropriate legal assistance to obtain it.

- **Repressive national legislation regarding drug use and the provision of effective interventions, such as harm reduction services, should be revised to reflect pragmatic, compassionate policies. Most importantly, harsh penalties for drug use should be eliminated because they restrict the ability and willingness of those at risk to obtain information and services to protect their own health and the health of those around them.**

Epidemiological data confirm that injecting drug use remains the main mode of transmission of HIV in most countries of CEE/CA. As suggested by the UN Guidelines on HIV/AIDS and Human Rights, national legislation and policies should be adopted to create an enabling environment for an effective HIV response. Governments should reinforce their commitments to effective HIV prevention and care in general and particularly to harm reduction measures, as outlined in the UN Declaration of Commitment on HIV/AIDS.

- **Sex work should be decriminalized, and other national policies that negatively affect sex workers' human rights and access to health services should be revised or eliminated.**

Decriminalizing sex work is a vital first step toward increasing sex workers' access to health and HIV prevention services and reducing the violence and abuse they regularly face. Getting to that point might require different processes across CEE/CA because the legal status of sex work and sex workers varies by country. In countries where sex work is not criminalized, national and local authorities should strive to ensure that policies and procedures do not have the ultimate effect of violating sex workers' rights, such as arbitrary detention and harassment. In countries where sex work is legal, efforts should be made to properly regulate the industry and eliminate the existing obstacles for one to legally engage in sex work. Where commercial sex work is directly prohibited by law, policymakers are encouraged to closely examine the laws'

public health implications, which experience indicates are nearly always profoundly negative—and then to revise them in accordance with international human rights instruments.

All of these steps toward decriminalization should be taken in tandem with efforts to educate a potentially hostile general public as to the usefulness and appropriateness of regulating sex work. Hungary and Latvia, where sex work has been decriminalized, can serve as helpful models, although certain policies in those countries should be changed (such as safeguarding confidentiality of health information and enforcing legislation mandating "tolerance zones" in which sex work can take place).

A concerted effort should be made to weaken the power of pimps when introducing or reforming regulations governing sex work. Pimps are often violent, coercive, and extortive; most sex workers' lives would improve immeasurably if they were able to end relationships with their pimps and work on their own. This step would also increase the likelihood of sex workers being able and willing to organize among themselves and create supportive peer networks.

- **Sex workers' involvement in all government-organized HIV/AIDS and human rights initiatives should be made a priority and guaranteed.**

Sex workers should be represented on human rights commissions; local and national HIV/AIDS planning organizations, including those dealing with prevention and treatment; and country coordinating mechanisms (CCMs) in countries where the GFATM operates. Furthermore, any and all policies that affect sex workers should be considered and introduced only with the participation and acceptance of sex worker representatives.

## 5.2 Recommendations for health authorities

- **HIV testing must be voluntary and confidential for all individuals, including sex workers, IDUs, and others at high risk for contracting the virus.**

Forced or compulsory testing, whether initiated by health or law-enforcement authorities, breeds distrust and fear among sex workers and members of other marginalized groups. They may therefore shun or avoid health facilities and treatment centers; as a consequence, they are less likely to be integrated into public health systems. This limits health authorities' ability to establish a comprehensive HIV/AIDS response.

- **Harm reduction services, including needle/syringe exchange, should be available at all public health facilities.**

The number and scope of existing harm reduction programs is far too limited in most of CEE/CA, especially in countries of the former Soviet Union. Public health facilities should offer such services as a matter of course as part of an overall effort to prevent the spread of HIV. The services available should include voluntary counseling and testing for HIV and STIs; condom promotion and availability; safer sex education; needle and syringe exchange; substitution treatment for drug dependence; and HIV and STI treatment. In particular, sex workers who inject drugs should be made aware of the availability of these services and how they can access them.

Exhibit B

NEWSLETTER OF THE INTERNATIONAL HARM REDUCTION DEVELOPMENT PROGRAM OF THE OPEN SOCIETY INSTITUTE   SPRING 2005 • VOLUME 6, ISSUE 1

# Harm Reduction News

**Newsletter Focus**

## INNOVATIONS IN SERVICE AND ADVOCACY

*by Erin Finnerty*

In country after country, when politicians, health care professionals, and advocates first respond to the crisis of drug use, they hew to a narrow, abstinence-only approach—whether in terms of treatment, education, or public policy. Likewise, their initial response to AIDS is typically to segregate people with HIV through campaigns of isolation. The use of harsh approaches to drug use and HIV—chaining people to a bed frame while they detox cold turkey, creating separate zones in prison for inmates with HIV, denying antiretrovirals or substitution treatment to drug users—has been repeated again and again throughout Central and Eastern Europe and the former Soviet Union.

> The creativity of these models mirrors the flexible attitude that any successful approach to drug use and HIV requires.

And what happens when these approaches fail the people that they were designed to help? We see systematic discrimination and countless avoidable deaths. These tragedies demand new responses: crafting direct service programs to meet the specific needs of drug users and people with HIV, empowering these communities to shape their own advocacy messages, curbing human rights abuses by forming partnerships with law enforcement officials, and pressing for legislative reform.

Fortunately, alternative approaches to drug use are now a reality across the region. In medicine, a shift has begun in the thinking of some narcologists, who are moving away from a strictly medical understanding of drug use to one that takes into account social and environmental factors. Support groups exist where none did before. Drug users are no longer automatically separated from their family and community for lengthy "treatment." Some clinics are piloting comprehensive services to drug users—from clean injection equipment to methadone—all offered in a single location.

New approaches are being launched on the advocacy front as well. Drug users with HIV are making advances in the fight for equal access to antiretrovirals by disproving baseless arguments that they are incapable of treatment adherence. Campaigns were launched in Russia and Tajikistan to decriminalize personal possession in order to halt the flow of drug users into the prison system—where they are at high risk of contracting HIV, TB, and hepatitis—and to reverse drug users' reluctance to access lifesaving services for fear of being arrested.

This issue of *Harm Reduction News* highlights a spectrum of innovative models that challenge inadequate national responses to rising drug use and HIV infections. Profiled inside is a drop-in club for sex workers in Slovakia, located in a subway passage, where it's most accessible to clients, and an AIDS protest movement in Russia that garnered positive media attention and invitations for collaboration from local officials. In some instances, the models themselves are new, such as a project in Iran that offers methadone maintenance, needle exchange, hot showers, and haircuts all at the same site; in other cases, approaches developed elsewhere are being boldly adopted for the first time in a new country, such as the embrace of harm reduction by a network of people with HIV in Ukraine.

The creativity of these models mirrors the flexible attitude that any successful approach to drug use and HIV requires. Powerful opposition to the human rights of drug users shows no signs of waning. Central in the fight for drug users' survival is a willingness to be open-minded and resourceful in developing strategies to convince local powerbrokers that protecting and defending drug users is fundamental to public health.

*Erin Finnerty is a program coordinator with the International Harm Reduction Development program.*

## INSIDE

One Drug User's Journey to Leadership — 3

Drugusers.ru Grows from Web Forum to Drug Users Union — 4

Slovakia's First Safe Space for Sex Workers — 6

Persepolis: A Unique Haven for Drug Users — 7

Gay Men, Sex Workers, and IDUs Take Power in Romania — 8

People with HIV and Harm Reduction Advocates Join Forces — 9

FrontAIDS: Taking Direct Action to Russia's Streets — 10

A Landmark Assessment of Romani HIV Risk — 13

Harm Reduction Gains Momentum in Tajikistan — 14

Legal Aid, Advocacy, and Media Reform in Hungary — 15

A Pioneering Harm Reduction Network Makes Change — 16

The Movement for AIDS Treatment Access Goes Global — 18

Breaking Down Barriers to Clinical Trials — 19

Mauro Guarinieri: Profile of a Path-Finder — 20

News Briefs — 23

OPEN SOCIETY INSTITUTE
International Harm Reduction Development

Slovakia

# SLOVAKIA'S FIRST SAFE SPACE FOR SEX WORKERS

Collectively, they can develop mechanisms to complain more effectively about police harassment or develop a blanket policy on condom use.



Social worker Sona Javorkova, right, and other Odyseus staff at Klub Podchod in Bratislava, Slovakia. Photo by Katarina Jirešová.

*By Katarina Jirešová*

Odyseus, an NGO working in four cities in Slovakia, has a long history of working with marginalized communities such as injecting drug users, sex workers, and at-risk youth. As our work progressed in Bratislava, outreach workers from Odyseus and their sex worker clients began to feel the need for their own safe space. During outreach encounters, there is never enough time to discuss complex problems, and privacy is rare. Despite opposition from the local authorities and potential neighbors, we finally found a space that seems ideal—a storefront along a commercial strip in the underground passage of a subway station, just below the street where sex workers meet. The former shop is quite tiny, and the rent is high, but the space is accessible day and night, and is far from residential areas where neighbors might complain.

We named the space Klub Podchod (the Underground Club) and opened it as Slovakia's first ever sex worker center on World AIDS Day, December 1, 2003. The club's accessibility and privacy make it an inviting haven for Bratislava's female street sex workers, women who face some of the worst forms of marginalization and abuse.

Street sex workers find themselves at considerably higher risk of physical and sexual abuse from clients, partners, and pimps than indoor workers. Being a sex worker, and possibly also a drug user or homeless, closes many doors, evokes constant prejudice, and cuts women off from the information and services they need. Most women who are street sex workers in Bratislava have extremely limited access to basic information about their legal rights, or their right to health care services and welfare support. Few are fully aware that prostitution is not a punishable offense here, or that the police have no right to confiscate clean syringes or condoms.

Additionally, afraid of being treated with contempt, women sex workers tend to avoid public services that could help improve their working conditions and health, or aid them in moving out of the sex trade. Many suffer great emotional stress, the product of constantly living in fear of violence or arrest.

Our main goals for Klub Podchod are to provide sex workers with information about their health, domestic and sexual violence, and safer working conditions; ease their access to legal, health, and social welfare systems; support them in interactions with the police; encourage them to engage in self-help; and reduce their social marginalization.

At first, we opened Klub Podchod every Wednesday night between 6 and 10 p.m., and invited sex workers, through our outreach team and *Intoxi* (a monthly magazine by and for our clients), to have a cup of tea or coffee with us, to read the newspaper, or to pick up educational materials from the library. The club provided a safe environment where sex workers could chat among themselves or with club supervisors about any problems they were experiencing. They were also invited to claim the club as their own by devising its rules and decorating the space. Within weeks, we expanded our hours and moved them later into the night, reflecting patterns of actual usage. The club is now open 7 to 11 p.m. every Monday and Wednesday.

Sometimes empowerment is defined merely as participation, but at Klub Podchod we brought sex workers into a position where they steer the program and decide its priorities. Some sex workers come just to take a break and enjoy a cup of coffee. Others take part in one-on-one or group counseling related to their health or legal needs. Some receive assistance in accessing social services, with the help of onsite social workers, while others pick up condoms and lubricant or take English classes. We also distribute clothes and cosmetics and exchange gifts at Christmastime. After our first year of operation, we have more than 70 "regulars" and we hope to offer Internet access, as well as training courses in hairdressing, makeup, and fashion, in the year ahead.

By bringing female sex workers together in a secure environment where they can openly discuss their needs and how to meet them, we aim to empower these women at the community level. Collectively, through self-help groups, they can develop mechanisms to complain more effectively about police harassment, or develop a blanket policy on condom use. They can tackle practical work-related issues as well, circulating information about "bad dates" to avoid, or agreeing on minimum prices for services. We always try to motivate the women to break their isolation, pursue positive changes in their lives, and demand the right to live free from the threat of violence, intimidation, and persecution.

*Katarina Jirešová was a cofounder of Odyseus and now serves as its director.*

Exhibit C

# ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC.

June 13, 2005

Mr. Andrew Natsios
U. S. Agency for International Development
Office of the Administrator
Ronald Reagan Building, Room 6.8
1300 Pennsylvania Avenue N.W.
Washington, D.C. 20523

Dear Mr. Natsios:

I am writing this letter on behalf of the Alliance for Open Society International, Inc. ("AOSI"), on whose Board I sit. AOSI appreciates USAID's recent extension of our existing, annually renewable award for two months under 2004 grant guidelines and would like to be able to continue with the important work of providing services to at risk populations in Central Asia. I write in the hope of clarifying ambiguity surrounding the requirement that AOSI, a domestic organization, adopt a policy opposing prostitution and sex trafficking, as reflected in USAID's Acquisition and Assistance Policy Directive, AAPD 05-04, issued June 9, 2005.

On January 1, 2004, AOSI became the primary recipient of USAID funding for the Drug Demand Reduction Program ("DDRP") in Central Asia (award number 122-A-00-02-0042), following the signing of a novation agreement between USAID, AOSI, and the Soros Foundation Kazakhstan, the latter having been the original primary recipient. The award funds the DDRP in Central Asia, an area of the world in which the Soros foundations have developed considerable expertise. For the past 18 months, AOSI has satisfactorily administered the DDRP award through its Almaty branch office. In administering the DDRP award, AOSI has made numerous sub-awards to other organizations, including the three Soros-funded foundations in Kyrgyzstan, Tajikistan, and Uzbekistan (latter now closed), as well as other U.S. and foreign NGOs. Given the successful implementation of the DDRP award by AOSI, renewal of the existing award to AOSI for the year ahead would be expected in due course. Indeed, USAID's welcome offer to extend the grant for two months under the 2004 grant guidelines reflects the excellent quality of AOSI's work in administering the grant.

As you know, however, renewal has been complicated by concern over the imminent enforcement against domestic organizations of a provision in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS

Mr. Andrew Natsios
June 13, 2005
Page 2

Act"), 22 U.S.C.A. § 7601 *et seq.* that requires grantees to adopt policies explicitly
opposing sex trafficking and prostitution as a condition of receiving funds. The Global
AIDS Act contains two restrictions regarding prostitution. The first provision (the
"government funds restriction") prohibits funds made available under the act from being
spent on activities that "promote or advocate the legalization or practice of prostitution
and sex trafficking." 22 U.S.C.A. § 7631(e). The restriction allows for the provision of
health care to a sex worker. I have no hesitation in assuring you that no USAID funds
made available to AOSI will be expended to promote or advocate the legalization or
practice of prostitution and/or sex trafficking.

       The second restriction (the "pledge requirement") provides, in pertinent part, that
"no funds made available to carry out this Act . . . may be used to provide assistance to
any group or organization that does not have a policy explicitly opposing prostitution and
sex trafficking." 22 U.S.C.A. § 7631(f).

       Unfortunately, the statute does not define the terms "explicitly opposing
prostitution and sex trafficking." Last year, in response to USAID's enforcement of the
pledge requirement against organizations based outside the U.S., AOSI communicated
the following policy statement to USAID:

> **AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan believe
> that trafficking and sex work do harm both to the individuals directly
> involved and to others in various ways. AOSI and the Soros
> Foundations in Tajikistan and Kyrgyzstan do not promote or advocate
> such activities. Rather, our approach is to try to reduce the harms
> caused by disseminating credible information on questions such as the
> prevention of disease, and by providing direct public health assistance to
> vulnerable populations.**

       I believe that such a statement satisfies the above-quoted Congressional
provisions.

       To the extent that USAID interprets the Congressional requirement to require
more than the above-quoted policy statement, I have three primary concerns: (1) any
effort to condition receipt of USAID funding on a promise to limit what an organization
says and does with its own private funds is both unfair and unconstitutional; (2) the
ambiguity of Congress's language may invite a divisive ideologically driven debate over
what constitutes compliance; and (3) a pejorative pledge requirement may lead to further
stigmatization of this vulnerable, marginalized population, and compromise the United
States government's historic commitment to combat the spread of HIV.

Mr. Andrew Natsios
June 13, 2005
Page 3

Finally, although AOSI is a legally distinct entity, it is part of a broader network of foundations funded by George Soros (the "Open Society Network"). AOSI's adoption of policies and commitments concerning future action cannot bind other organizations, such as the Open Society Institute ("OSI"), with which it is closely affiliated, or other Open Society Network entities throughout the world. In October, 2003, OSI agreed to provide AOSI a five-year grant in the amount of $2,177,700 to support AOSI's work in implementing U.S. government grants in the areas of public health, civil society, law reform, and education, as well as to support the creation and operation of a Central Asia branch office that would help coordinate OSI network projects in that region.

In general, the Open Society Network promotes democratic governance, human rights, and economic, legal, and social reform. On a local level, members of the Network implement a range of initiatives to support the rule of law, education, public health, and independent media. At the same time, the Network works to build alliances across borders and continents on issues such as combating corruption and rights abuses. As part of our work to secure human rights and the rule of law, the Open Society Network has sought to eliminate sex trafficking and bring justice to victims of sex trafficking. The Network has supported organizations that seek to ensure that the civil and human rights of sex workers are respected and upheld and to mobilize communities to advocate for their needs.

In addition, members of the Open Society Network work on a broad range of public health issues, with a particular focus on the crises of vulnerable and marginalized populations that regularly contend with harassment, discrimination, and abuse which, in turn, place them at greater risk for contracting HIV. Because these populations are socially marginalized, it is essential for the success of health care services that such services be delivered in a non-judgmental fashion. For these reasons, I consider it counterproductive for AOSI, or any other Network entity, to adopt a policy describing sex workers pejoratively that by its terms is likely to alienate members of this difficult-to-reach community, and thus minimize the effectiveness of health care interventions designed to limit the spread of HIV in general.

Thus, it is essential that all other members of the Open Society Network retain their full freedom to support or advocate policies designed to assist sex workers in protecting themselves from exploitation and disease, and it is essential that they retain this freedom without regard to any policy positions adopted by AOSI.

I am concerned that the certification provision will further stigmatize vulnerable and brutalized sex workers. In too many places in the world today police refuse to intervene when sex workers are attacked or even killed. They are routinely denied health care and other social services. Stigmatizing sex workers makes it even more difficult to combat sex trafficking and forced sex work. This violence, discrimination and indifference not only violate what President Bush has called "the non-negotiable demands of human dignity," they also have catastrophic consequences for society at large in the form of increased violence and the spread of the HIV infection.

Mr. Andrew Natsios
June 13, 2005
Page 4

     I understand that USAID is seeking to implement a congressional mandate. However, to the extent USAID interprets Congress's actions as requiring more than the above-quoted policy statement that was acceptable in 2004, AOSI objects to the provision not because it supports or advocates for the legalization of sex work. It does not. AOSI objects because such an overbroad certification requirement violates the First Amendment by requiring domestic, private organizations to adopt the government's point of view as a condition of participating in a federal program, and by mandating what private organizations like AOSI may do and say with their own funds.

     I believe you will agree that AOSI's existing policy statement makes it possible to renew the DDRP award after the two-month interim period expires.

Sincerely yours,

Aryeh Neier

cc: Kent Hill
    Susan Pascocello
    Kerry Pelzman

Exhibit D

08/02/2005  17:33    212-548-4665    USI LEGAL                    202 216 3055    P.01



U.S. AGENCY FOR
INTERNATIONAL
DEVELOPMENT

# U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
## OFFICE OF GENERAL COUNSEL

## FAX COVER SHEET

**DATE** __08/02/05__    **PAGES, INCLUDING COVER:** _____

**TO:** __Aryeh Neier__ _____

**PHONE:** _____    **FAX NO.** __212-548-4646__

**FROM:** __Arnold Haiman, Acting General Counsel__
Room 6.06 Ronald Reagan Building (RRB)
1300 Pennsylvania Avenue, N.W.
Washington, DC 20523

**PHONE:** __202-712-5874__        **FAX: (202) 216-3055**

**EMAIL:** _____ @usaid.gov

---
This fax may contain confidential information. If you have received this fax in
error, please contact us at the above number. Thank you.
---

**Comments:**

08/02/2005   17:33    212-548-4655    USAID OGC    USI LEGAL    202 216 3055    P.02

 **USAID**
FROM THE AMERICAN PEOPLE

August 2, 2005

Mr. Aryeh Neier
Alliance for Open Society International, Inc.
400 West 59th Street
New York, NY 10019

Dear Mr. Neier:

Thank you for your letter to Mr. Natsios of June 13, 2005 requesting guidance on the implementation of a provision in USAID's Acquisition and Assistance Policy Directive 05-04 (AAPD 05-04) requiring that, as a condition to entering into a grant or contract with USAID for HIV/AIDS-funded activities, recipients "must have a policy explicitly opposing prostitution and sex trafficking."

We do not think that it is appropriate for USAID to make prospective determinations for private organizations about whether or not their policy statements comply with the statutory requirement reflected in AAPD 05-04. Congress has required that organizations receiving HIV/AIDS funds must have a policy explicitly opposing prostitution and sex trafficking and the statutory language is clear on its face. Should AOSI sign the certification required for prime recipients of grants and cooperative agreements and the modification to add funds for HIV/AIDS activities to AOSI's cooperative agreement with USAID, AOSI must be prepared to ensure that it complies with AAPD 05-04.

After award, in the general course of business, recipients of all USAID awards are subject to audits by the USAID Inspector General. An audit of organizations receiving funds for HIV/AIDS activities, consistent

U.S. Agency for International Development
1300 Pennsylvania Avenue, NW
Washington, DC 20523
www.usaid.gov

202 216 3055    P.03

with USAID practice, would include any and all terms of the agreement including, among other things, a determination whether: (i) the prime recipient had signed the certification in the case of grants and cooperative agreements; (ii) the AAPD 05-04 clauses had been included as applicable in all subawards; and (iii) the recipients and subrecipients have policies explicitly opposing prostitution and sex trafficking (except for those recipients, specified in the AAPD, that the statute exempts from this requirement).

Sincerely,

Arnold J. Haiman
Acting General Counsel