**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. and OPEN SOCIETY
INSTITUTE,

                                    Plaintiffs,                    **Civil Action No. 05-cv-8209**

v.

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT and
ANDREW S. NATSIOS, in his official capacity as
Administrator of the United States Agency for
International Development,

                                    Defendants.
-----------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFFS ALLIANCE FOR OPEN SOCIETY INTERNATIONAL AND OPEN SOCIETY INSTITUTE FOR A PRELIMINARY INJUNCTION

Burt Neuborne (BN 9092)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
Laura K. Abel (LA 6831)
Aziz Huq (AH 3227)*
Brennan Center for Justice
  at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 998-6730


*Attorneys for Plaintiffs*

*Not admitted in this District

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

FACTS ................................................................................................................................. 7

ARGUMENT ....................................................................................................................... 15

I.    Plaintiffs' Claims Are Substantially Likely to Succeed on the Merits. .................... 15

   A.    USAID's Construction of the Pledge Requirement Is Too Broad. ...................... 16

      1.    The Pledge Requirement, Properly Read, Requires Only a
            Statement by AOSI That Sex Work Causes Harm. ................................. 16

         a.    Text ............................................................................................. 16

         b.    Relation to Other Provisions of the Global AIDS Act ................. 17

         c.    Legislative History ...................................................................... 19

         d.    The Canon of Constitutional Avoidance ..................................... 19

      2.    The Pledge Requirement Does Not Apply to OSI ................................... 21

   B.    As Currently Construed by USAID, the Pledge Requirement Is
         Unconstitutionally Vague. ................................................................................. 21

      1.    The Requirement That Organizations Have a Policy Fails to Make
            Clear What It Means to "Oppose Prostitution." ..................................... 23

      2.    USAID's Failure to Delineate Which Privately Funded Activities
            Are Prohibited Renders the Pledge Requirement Impremissibly
            Vague. ..................................................................................................... 24

      3.    The Pledge Requirement Is Impermissibly Vague as Applied to
            OSI. ......................................................................................................... 25

   C.    The Pledge Requirement Unconstitutionally Compels Speech and
         Restricts the Plaintiffs' Use of Private Funds. .................................................. 26

      1.    The Pledge Requirement Unconstitutionally Compels Speech. .............. 27

      2.    The Pledge Requirement Unconstitutionally Bars Privately Funded
            Speech. ..................................................................................................... 29

      3.    USAID Cannot Show That It Has Advanced a Sufficient
            Government Interest to Justify the Wholesale Restriction on
            Privately Funded Speech. ........................................................................ 32

II.   Plaintiffs Will Suffer Irreparable Injury if Preliminary Injunctive Relief Is Not
      Granted. ................................................................................................................... 33

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Ashwander v. TVA*, 279 U.S. 288 (1936) ........................................................................20

*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) .......................................................27

*Bd. of County Comm'rs Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668 (1996)................6, 28

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342 (2d Cir. 2003) .............34

*Brown v. Gardner*, 513 U.S. 115 (1994).........................................................................16

*Chatin v. Coombe*, 186 F.3d 82 (2d Cir. 1999)..........................................................23, 25

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, -- U.S. -  125 S. Ct. 577 (2004)......................................18

*Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002)...........................................30

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866) .....................................................28

*DKT Int'l, Inc. v. USAID*, Civil Action No 05-01604 ................................................9, 14

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568 (1988)............5, 20

*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984) ....................................7, 29, 30, 33

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................20

*Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992).........................................6, 22

*Forum for Academic & Institutional Rights v. Rumsfeld*, 390 F.3d 219 (3d Cir. 2004),
      *cert. granted*, -- U.S. --, 125 S.Ct. 1977 (2005)....................................................................28

*Ex parte Garland*, 71 U.S. (4 Wall) 333 (1866) ..........................................................28

*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004) .......................................16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).......................................................22

*Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411 (2d Cir. 2004)..........................33

*Housing Works, Inc. v. City of New York*, 72 F. Supp. 2d 402 (S.D.N.Y. 1999) ..........................34

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .........................................................19

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993)....................17

*Kolender v. Lawson*, 461 U.S. 352 (1983)...................................................................22

*Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 961 F. Supp. 1402 (D. Haw. 1997) ...................34

*Lutwin v. Thompson*, 361 F.3d 146 (2d Cir. 2004) .........................................................19

*MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994)............................................20

*Million Youth March v. Safir*, 18 F. Supp. 2d 334 (S.D.N.Y. 1998) ..............................................23

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)................................................5, 20

*Nichols v. Vill. of Pelham Manor*, 974 F. Supp. 243 (S.D.N.Y. 1997)..........................................23

*Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325 (2d Cir. 2005)....................................................18

*O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712 (1996).................................................6, 28

*Planned Parenthood Fed'n of Am. v. Agency for Int'l Dev.*, 915 F.2d 59 (2d Cir. 1990)..............30

*Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 544-46 (1983) ................29

*Rush v. Sullivan*, 500 U.S. 173 (1991).......................................................................30

*Smith v. Goguen*, 415 U.S. 566 (1974) .....................................................................6, 23

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)........................................................................................5, 20

*Speiser v. Randall*, 357 U.S. 513 (1958)..........................................................................6

*Streetwatch v. Nat'l R.R. Passenger Corp.*, 875 F. Supp. 1055 (S.D.N.Y. 1995) ........................25

*Time Warner Cable of N.Y.C., a Div. of Time Warner Entm't Co., L.P. v. Bloomberg
    L.P.*, 118 F.3d 917 (2d Cir. 1997) ..................................................................15

*U.S. v. Gatewood*, 173 F.3d 983 (6th Cir. 1999) ...........................................................22

*U.S. v. United Foods, Inc.*, 533 U.S. 405 (2001) ...........................................................28

*Velazquez v. Legal Servs. Corp.*, 164 F.3d 757 (2d Cir. 1999).................................4, 30, 31, 33

*Velazquez v. Legal Servs. Corp.*, 349 F. Supp. 2d 566 (E.D.N.Y. 2004) ...............................31, 34

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)..........................6

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ...............................................4

*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................................6, 27

*Wooley v. Maynard*, 430 U.S. 705 (1977) ...............................................................6, 27

## STATUTES

18 U.S.C. § 1001 ..........................................................................................................22

22 C.F.R. §§ 208.800, 226.62(a)(3), 226.73 ..............................................................22

22 U.S.C. § 2293(b) .....................................................................................................17

22 U.S.C. § 2751 ..........................................................................................................17

22 U.S.C. §§ 7631(e), 7631(f) ..............................................................................*passim*

22 U.S.C. § 7652 ..........................................................................................................17

31 U.S.C. § 3729 ..........................................................................................................22

149 Cong. Rec. S6457 (daily ed. May 15, 2003) ........................................................19

United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003
("the Global AIDS Act"), 22 U.S.C. § 7601 *et seq* ..............................................1, 17

## OTHER AUTHORITIES

*Blacks Law Dictionary* 1157 (6th ed. 1990) (emphasis added) .................................16

*The American Heritage Dictionary of the English Language* 1401 (3d ed. 1996)........16

## PRELIMINARY STATEMENT

Plaintiffs seek preliminary injunctive relief against efforts by the defendant United States Agency of International Development ("USAID") to curtail the exercise of plaintiffs' core First Amendment rights.  USAID is taking the challenged actions in the course of administering a crucial federal program aimed at slowing the global spread of HIV/AIDS, which is the fourth highest cause of death in the world.[1]  In 2003, Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 ("the Global AIDS Act"), 22 U.S.C. § 7601 *et seq.*, which authorizes the appropriation of $15 billion over a five year period to fight HIV/AIDS worldwide through education, research, prevention, treatment and care.[2]  An important component of the worldwide effort is a series of public/private partnerships:  Private organizations like plaintiff Alliance for Open Society International ("AOSI"), with expertise in delivering HIV/AIDS prevention services to at-risk populations throughout the world, and agencies of the federal government, primarily defendant the United States Agency for International Development ("USAID"), which administer federal Global AIDS prevention funding, cooperate to implement Global AIDS Act programs.

One of the most important federally funded tasks is the provision of education, counseling, and services to at-risk populations, such as sex workers,[3] in an effort to limit the

---

[1] *See* 22 U.S.C. § 7601(2) (discussing harms caused by HIV/AIDS).  AIDS, short for Acquired Immunodeficiency Syndrome, is caused by the Human Immunodeficiency Virus (HIV).

[2] Pursuant to the Act, Congress has appropriated $2.8 billion for fiscal year 2005.  (*See* U.S. Global AIDS Coordinator, Emergency Plan for AIDS Relief Fiscal Year 2005 Operational Plan 6-7 (Feb. 2005), attached as Ex. 8 to Declaration of Rebekah Diller, dated Sep. 22, 2005.)

[3] In this brief, plaintiffs use the terms "sex work" and "sex worker."  Those are the terms generally used in the public health and international relief fields, because the terms "prostitute" and "prostitution" are viewed as stigmatizing by the sex workers whose trust public health officials must gain in order to engage them in the fight against HIV/AIDS.  Declaration of Chris

spread of the HIV/AIDS virus through sexual contact or drug use. No dispute exists concerning the duty of participants in the Global AIDS program to perform their federally funded tasks in an efficient and effective manner, and to respect the limits set by Congress on the uses of Global AIDS Act funding.[4]

Unfortunately, however, USAID demands that private organizations wishing to participate in the *federally funded* HIV/AIDS prevention program must submit to a comprehensive restriction on their *privately funded* First Amendment freedoms. It is from this intrusion on their First Amendment rights that plaintiffs are seeking judicial relief.

In 2003, Congress required that all private recipients of federal Global AIDS Act funds adopt "a policy explicitly opposing prostitution." 22 U.S.C. § 7631(f) (hereafter "the pledge requirement").[5] The sole legislative debate on this provision's scope contains a statement by Senate Majority Leader Bill Frist that the pledge requirement requires only that funding recipients oppose sex work because of the harms it causes women. *See* discussion *infra* at 20. AOSI has accordingly adopted a policy acknowledging and decrying the social harms caused by sex work and sex trafficking. It has further certified that it is in compliance with its understanding of the obligations imposed by 22 U.S.C. § 7631(f). *See* discussion *infra* at 15.

_____

Beyrer, dated Sep. 21, 2005, ("Beyrer Decl.") ¶ 28; Declaration of Maurice I. Middleberg, dated Aug. 12, 2005, ("Middleberg Decl.") ¶ 14.

[4] Those restrictions include a ban on the use of federal funding to promote the legalization or practice of sex work. 22 U.S.C. § 7631(e). The plaintiffs are in compliance with, and do not challenge, that ban.

[5] The relevant text of the congressional provision governing private funds states: "No funds made available to carry out this Act…may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking…." While plaintiffs believe it is unconstitutional for the government to force them to adopt a policy position in order to qualify for Global AIDS Act funds, plaintiffs are not here challenging the portion of the pledge requirement pertaining to sex trafficking.

USAID, however, believes 22 U.S.C. § 7631(f) requires recipients of Global AIDS Act funds to do far more than merely acknowledge and oppose the social harms caused by sex work and sex trafficking. Rather, it has warned that the statutory language requires recipients to refrain from using their *private* funding to engage in speech that USAID deems to be insufficiently opposed to sex work. Moreover, at least one USAID official has warned that support for, or advocacy of, reforms in the legal treatment of sex work, or for unionization of sex workers, anywhere in the world risks violating a recipient's pledge to "oppose prostitution," even when the support or advocacy is privately funded. Such an overly broad interpretation of the statute improperly converts a generalized congressional command to acknowledge the self-evident social harms of sex work into a requirement that non-governmental organizations adopt a punitive and judgmental attitude towards the very people they must reach to successfully fight HIV/AIDS, even when operating programs wholly funded by sources other than the U.S. government. *See* discussion *infra* at 9-10.

Plaintiff AOSI, and its related organization, the Open Society Institute ("OSI"),[6] carry out a host of privately funded speech-related activities that risk being deemed violations of an overly broad reading of the pledge requirement, including facilitating discussions of the best ways to address the spread of HIV/AIDS among sex workers, and of whether reforming the legal treatment of sex work will help slow the spread of HIV/AIDS.[7] *See* discussion *infra* at 12-13.

Plaintiffs do not believe that such privately funded speech can reasonably be said to violate Congress's requirement that AOSI adopt a policy opposing sex work and sex trafficking

---

[6] OSI works to support a worldwide network of privately funded organizations engaged in efforts to build civil societies. *See* discussion *infra* at 7-8.

[7] The plaintiffs currently take no position on whether sex work should be legalized but rather seek to retain the freedom to use their private funds to engage in policy debates about the legal status of sex workers and its impact on HIV prevention efforts.

as a condition of continuing its drug demand reduction work in Central Asia. However, repeated efforts by AOSI and OSI to obtain clarification from USAID that such First Amendment activities will not be deemed to violate the congressional mandate have been unavailing. Instead of providing guidance, USAID has only provided warnings that USAID's construction of the mandate may preclude privately funded support or advocacy for a wide range of speech activities concerning sex work, and that any violations will be severely punished. *See* discussion *infra* at 9-10.

A finding by USAID that AOSI has violated the policy of "opposing prostitution" would render it subject to potentially draconian government sanctions ranging from unilateral cancellation of the existing drug demand reduction program in Central Asia to criminal or civil prosecution. *See* discussion *infra* at 22. Thus, USAID's warnings, coupled with a refusal by USAID to clarify the scope of 22 U.S.C. § 7631(f), function as a continuing threat to plaintiffs' privately funded speech questioning whether a punitive, judgmental approach towards sex work is the most effective approach to the social issue. To remove the ongoing, irreparable harm to their First Amendment rights, plaintiffs seek a remedial order enjoining USAID from imposing sanctions based on their privately funded speech concerning alternatives to treating sex workers punitively and judgmentally.[8]

---

[8] Plaintiffs who are required to either take significant compliance measures or risk criminal prosecution or defunding have clear standing to challenge restrictions on their First Amendment rights. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 384 (1988) (finding "injury in fact" requirement met where plaintiffs alleged that government regulation, "aimed directly" at their First Amendment protected activity, would cause them "to take significant and costly compliance measures"); *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 767 (2d Cir. 1999) (federal funding recipients experiencing "serious difficulty" exercising First Amendment rights as a result of government restrictions on privately funded activity could challenge the restrictions), *aff'd on other grounds*, 531 U.S. 533 (2001).

USAID's effort to force its private partners to abide by the United States government's current position that worldwide criminalization and condemnation of sex workers is the only acceptable approach to the practice is unlawful on three levels. First, USAID's extraordinarily broad reading of the scope of Congress's statutory command that recipients adopt a "policy explicitly opposing prostitution" is untenable. From a congressional statute that requires a generalized statement, USAID has spawned a First Amendment nightmare. Requiring, as a condition of receiving Global AIDS Act funds, that private organizations pledge fealty to the government's current view that criminalization and condemnation is the only proper approach to sex work anywhere in the world, and demanding that organizations refrain from engaging in certain privately funded speech, are both flatly contrary to the canon of constitutional avoidance, which counsels the narrow construction of ambiguous statutes to avoid potential constitutional violations. *See, e.g.*, *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568 (1988); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-500 (1979). Moreover, such a reading is not supported by: 1) the text of the statute requiring a policy, not a reshaping of an organization's privately funded activities; 2) the fact that interpreting the provision to bar grantees from engaging in specific activities would render useless the government funds restriction, § 7631(e), and sap other of the Act's provisions of meaning; 3) an assurance by Senate Majority Leader Frist during debate regarding the statute's reach; or 4) the canon of constitutional avoidance. *See* discussion *infra* Argument § I.A.

Second, USAID's extraordinarily broad reading of the statutory term "opposing prostitution" reveals the phrase's unconstitutional vagueness. Under existing ground-rules, private recipients of Global AIDS prevention funding are forced to guess at whether their

privately funded speech will be deemed by some USAID official to violate the policy of

"opposing prostitution." Given the draconian consequences of hazarding a wrong guess,

including potential interference with the delivery of important HIV/AIDS prevention work to

desperately needy persons, and the potential for civil and criminal prosecution, the statute

violates the First Amendment vagueness doctrine. *See, e.g., Smith v. Goguen*, 415 U.S. 566

(1974); *Vill. of Hoffman Estates  v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982);

*Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992).  *See also* discussion *infra*

Argument § II.C.

　　　　Third, the statute, as construed by USAID, flatly violates two important lines of First

Amendment precedent. The Supreme Court has repeatedly refused to permit government to force

private individuals to pledge fealty or support for a government policy as a condition of

qualifying for government benefits.  *See, e.g., O'Hare Truck Serv. v. City of Northlake*, 518 U.S.

712 (1996) (invalidating requirement that those seeking government business agree with

government political position); *Bd. of County Comm'rs Wabaunsee County, Kan. v. Umbehr*,

518 U.S. 668 (1996) (striking down conditions on government contract demanding agreement

with government position); *Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that the right to

drive a vehicle cannot be conditioned on agreement with government message); *Speiser v.

Randall*, 357 U.S. 513 (1958) (invalidating loyalty oath condition on tax benefit); *West Va. State

Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (ruling that access to education cannot be

conditioned on pledge of allegiance).[9]  Requiring public health organizations to pledge

allegiance to the government's current policy regarding sex work as a condition of participating

---

[9]The very idea of a political pledge as a condition of participating in the Global AIDS
prevention program violates the First Amendment. The constitutional injury is massively
increased by the construction placed upon the pledge required by at least one USAID official.

in the Global AIDS prevention program runs headlong into Supreme Court precedent. *See* discussion *infra* Argument § I.C.

Similarly, the Supreme Court has refused to permit the government to condition access to government funding on a waiver of the First Amendment right to use private funds to engage in constitutionally protected speech. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 400-01 (1984) (cannot condition grant of public funding on flat ban on use of private funds to engage in First Amendment activity). *See also* discussion *infra* Argument § I.C.

Since USAID's construction of the requirements of 22 U.S.C § 7631(f) constitutes an ongoing, irreparable threat to the vigorous exercise of plaintiffs' First Amendment rights, and since USAID's construction of the statute is clearly unlawful on at least three grounds, the plaintiffs respectfully seek preliminary injunctive relief permitting them to continue their privately-financed activities involving the rights and health of sex workers, including the sponsorship of a privately funded conference entitled "Sex Work, Sexual Rights, and Countering the Conservative Sexual Agenda," scheduled for October 14, 2005, free from the threat that vigorous discussion of the legal treatment of sex work will be deemed a violation of AOSI's obligation under 22 U.S.C. § 7631(f) to have a policy "opposing prostitution." They also seek preliminary injunctive relief barring USAID from sanctioning them for participating in a number of other ongoing, privately funded discussions of sex work, and directing USAID to continue funding AOSI pending the outcome of this case.

## FACTS

Plaintiffs the Open Society Institute ("OSI") and plaintiff Alliance for Open Society International ("AOSI") are working to halt the spread of the HIV/AIDS epidemic by reaching out to assist people who are at particularly high risk of contracting HIV/AIDS and passing it on to others. OSI, the principal United States-based foundation of the philanthropist George Soros,

supports a network of more than 30 "Soros Foundations," which operate in more than 60 countries worldwide. Declaration of Aryeh Neier, dated Sep. 13, 2005, ("Neier Decl.") ¶ 4. AOSI, a member of the "Open Society Network," is using a $16.5 million, five-year grant from defendant United States Agency for International Development ("USAID") to finance a program in Central Asia that USAID considers highly successful in fighting HIV/AIDS. AOSI is a legally independent not-for-profit organization based in the United States.[10]

AOSI rigorously complies with the federal rule that mandates that the federal funding it receives not be used "to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U.S.C. § 7631(e) (hereafter "government funds restriction"). *See also* USAID Acquisition & Assistance Policy Directive ("AAPD") 05-04, at 5, attached as Ex. 3 to Declaration of Rebekah Diller ("Diller Decl.").[11] This federal restriction, by its own terms, does not apply to the substantial additional advocacy that the plaintiffs finance with non-government funding.

Significantly, the same general statute that contains this restriction encumbering the federal funds received by AOSI also contains an additional provision that operates to encumber the entire USAID recipient organization once it has accepted its first dollar in federal funds. This distinct provision declares that the recipient organization must adopt a policy "explicitly opposing prostitution." It provides that: "no funds made available to carry out this Act . . . may

---

[10] AOSI was founded to coordinate the projects of OSI and the Soros foundations in Central Asia, and to implement Central Asia programs funded by the United States government, OSI and other donors. Declaration of Robert Kushen, dated Sep. 13, 2005, ¶ 4.

[11] Acquisition and Assistance Policy Directives ("AAPDs") are the documents that USAID issues to announce policy changes. AAPDs also set forth standard provisions that USAID incorporates into existing and new contracts. All of the AAPDs referenced in this brief are attached to the Declaration of Rebekah Diller.

8

be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f); Diller Decl. Ex. 5, at 5-7.

Although this statutory restriction was enacted in 2003, USAID intentionally chose not to enforce this law for a year and a half against organizations based in the United States, as the plaintiffs are, having been warned by the Department of Justice that application of the requirement to such organizations would be unconstitutional. *See* Letter from Daniel Levin to Alex M. Azar, II, dated Sep. 20, 2004 ("Levin Letter"), attached as Ex. 7 to Diller Decl.; USAID, Guidance on the Definition and Use of the Child Survival and Health Programs Fund and the Global HIV/AIDS Initiative Account: FY2004 Update (July 22, 2004), at 35 n.10, attached as Ex. 4 to Diller Decl.

This changed in September 2004, when the Justice Department reversed course to opine for the first time, albeit tepidly, that "reasonable arguments" exist to support the constitutionality of the pledge requirement as applied by the government to domestic non-profit organizations. Levin Letter. USAID now applies the pledge requirement to organizations based in the United States. *See generally* Diller Decl. Ex. 5. Its first application to the plaintiffs came this summer, when USAID required AOSI to certify that it has a policy opposing sex work as a condition of receiving continued funding for its work in Central Asia. Kushen Decl. ¶¶ 37, 39-40, 44-45.

USAID has issued no regulation explaining what would constitute a "policy" sufficient to comply with the pledge requirement. Nor has USAID specified the full range of activities that, in its view, would constitute a violation of a recipient's pledge.

However, USAID has made clear that it intends to scrutinize the activities in which recipients engage with their private funding to ensure that they are sufficiently opposed to sex work. *See DKT International v. USAID*, Civ. Action No. 05-01604, Brief of Defendants USAID

9

and Andrew Natsios (D.D.C. brief filed Aug. 26, 2005), at 22-24 ("The organizational eligibility restriction contained in the Leadership Act does, in fact, preclude organizations who choose to accept a federal HIV/AIDS subsidy from participating in *activities* at odds with that subsidy's core purpose ..."), attached as Ex. 12 to Diller Decl.  A USAID official, furthermore, while warning that he was not at liberty to give official guidance, has offered an opinion to AOSI that the pledge requirement may well prohibit a recipient from advocating for the legalization of sex work, from advocating too great a reduction in the penalties for sex work, and from helping to unionize sex workers.  Kushen Decl. ¶¶ 30-36.   However, he and other USAID officials have refused to respond to questions the plaintiffs have asked in an attempt to clarify the scope of prohibited speech:  Does an AOSI policy statement, opposing the harms sex work causes, suffice?[12]  Does using the term "sex work" – which is standard usage in the public health community – in lieu of the more judgmental "prostitution" violate the pledge?  Will USAID construe OSI's actions as putting AOSI in violation of the pledge?  *See* Kushen Decl. ¶¶ 24-27, 34-35; Neier Decl. ¶¶ 45-47, 50.

Regardless of how broadly USAID interprets the pledge requirement, at a minimum the requirement both obligates AOSI to adopt a policy against its wishes, and bars AOSI from using

---

[12]AOSI's policy provides:

> AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to other in various ways. AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities.  Rather, our approach is to try to reduce the harms caused by disseminating credible information on questions such as prevention of disease, and by providing direct public health assistance to vulnerable populations....

Kushen Decl. ¶ 23.

its non-USAID funding to engage in activities that AOSI believes are critical to fighting HIV/AIDS.

Adopting a policy "explicitly opposing prostitution" directly undermines AOSI's work for a variety of reasons. When an HIV/AIDS epidemic begins it is often initially concentrated in select populations of people, including sex workers, drug users, and others. When public health officials are able to stop the spread of HIV among those populations, they can stop the epidemic from spreading to the rest of the population.[13] It is essential to approach sex workers and others at high risk for becoming infected with HIV in a non-judgmental manner, in order to establish a trusting relationship with them and engage them in needed HIV prevention efforts.[14] Many of the most successful efforts at fighting the spread of HIV/AIDS involve organizing sex workers, or working cooperatively with sex worker organizations to develop and implement life-saving HIV prevention strategies.[15] In some regions, it is necessary to advocate for a change in the legal treatment of sex work, because when sex workers are threatened with high fines, arrest or other

─────────────────────

[13] Beyrer Decl. ¶¶ 17-18; *see also* USAID, USAID's Expanded Response to HIV/AIDS (June 2002) at 6-7, attached as Ex. 17 to Diller Decl.

[14] Beyrer Decl. ¶ 24. USAID has noted that that communication aimed at changing risky behavior among members of "vulnerable sub-populations" "is the essential program element" in settings where HIV/AIDS is not yet prevalent in the general population, that among the problems effective programs must address are "stigma and discrimination," and that "stigma and discrimination" are among the issues that "increase communities' vulnerability to HIV/AIDS." Diller Decl. Ex. 17 at 9.

[15] Beyrer Decl. ¶¶ 24-27, 30-31, 35, 39-43, 45-48, 54. USAID has written that "[r]esearch . . . shows that involving individuals from the particular target community – sex workers, for example – in delivering the message [about which behaviors will reduce the risk of HIV/AIDS] gives credibility, reduces fear and stigma, and makes it more likely that people hearing the message will follow through with specific behaviors, such as using condoms or getting tested for infection." USAID, Leading the Way: USAID Responds to HIV/AIDS, 1997-2000 (2001), at 23-24, attached as Ex. 18 to Diller Decl. In the past, USAID itself has supported "[a] women's health club for sex workers" and "[p]eer counseling training for sex workers" as part of its HIV prevention efforts in Vietnam. *Id.* at 113.

11

violence, they go underground, avoiding doctors, outreach workers, and others who want to provide them with the education, condoms, and other tools they need to avoid becoming infected and infecting others.[16]

The government's claim of authority to mandate a broad "anti-prostitution" pledge, and to prosecute those who violate such a pledge, directly interferes with the plaintiffs' First Amendment freedom to use non-USAID funding to support purposely non-judgmental - HIV/AIDS prevention initiatives, and to facilitate discussion regarding the most effective ways to fight the spread of the epidemic in the populations at the highest risk for contracting HIV/AIDS. For example, the plaintiffs are co-sponsoring a conference in New York on October 13, entitled, "Sex Work, Sexual Rights and Countering the Conservative Sexual Agenda." The goal of the conference is to bring together members of different advocacy and service delivery communities – such as domestic and international groups and groups working with sex workers and victims of trafficking – to discuss key policy issues. Among the topics to be discussed is the legal treatment of sex work. Kushen Decl. ¶¶ 53-54; Neier Decl. ¶ 30.)

Other activities that may be affected by the pledge requirement include:

> 1) promoting a publication OSI has funded, titled *Sex Work, HIV/AIDS, and Human Rights in Central and Eastern Europe and Central Asia*, which recommends that the legal treatment of sex work be changed as a means of protecting sex workers from abuse by law enforcement personnel, traffickers, and pimps, and as a way of making it easier for sex workers to access health and social services needed in order to remain healthy and risk-aware. Although OSI does not itself take any position regarding the contents of the report, it provides funding and technical assistance for the Central and Eastern European Harm

---

[16] Beyrer Decl. ¶¶ 20, 25, 27, 31-32, 35-36, 52. According to USAID, "Stigma and discrimination push people in high-risk groups (e.g., sex workers, injecting drug users) underground, making them difficult to reach through prevention programs and thus creating more opportunities for HIV/AIDS to spread to the general population." Diller Decl. Ex. 18 at 11.

Reduction Network, which wrote the report, and it desires to continue assisting the Network in distributing the report.

2) operating a listserv that provides a forum for participants to share information, opinions, and resources related to the health, safety and well-being of sex workers in Eastern Europe and the former Soviet Union. Participants post content regarding best practices, service gaps, model legislation, advocacy strategies, and new initiatives.

3) providing funding and technical assistance to a number of other non-profit organizations working with sex workers to fight the spread of HIV/AIDS. Several of these groups are studying the circumstances in which sex workers work and developing policy recommendations. It is essential that these groups remain free to advocate for the most effective policies, including – where appropriate – changes in the legal treatment of sex workers in order to facilitate outreach to them and ensure their access to needed health care and social services.

Neier Decl. ¶¶ 32-33, 37-38. As a result, the plaintiffs are in urgent need of guidance from this Court as to whether USAID is statutorily and constitutionally entitled to bar these activities.

The plaintiffs are joined in their ethical and constitutional concerns by many other recipients of USAID funding.[17] The government of Brazil, and a number of highly respected US and foreign non-governmental organizations, have turned down USAID funding since implementation of the pledge requirement. Declaration of Pedro Chequer, dated Aug. 24, 2005, ("Chequer Decl.") ¶¶ 3, 5-8 (explaining that Brazil was forced to turn down this money because its highly successful anti-HIV effort, which has reduced the rate of HIV in the country, is

---

[17] In addition to the declarations cited below, there are numerous newspaper articles in which recipients of USAID funding, and public health experts, have described the harm that the pledge requirement is causing to the international fight against HIV/AIDS. *See, e.g.*, Michael M. Phillips, *Bush Ties Money for AIDS Work to a Policy Pledge*, Wall St. J., Feb. 28, 2005, attached as Ex. 13 to Diller Decl.; Michael M. Phillips, *Brazil Refuses U.S. AIDS Funds*, Wall St. J., May 2, 2005, at A3, attached as Ex. 14 to Diller Decl.; *Prostitution v. Constitution: A Challenge to America's Anti-AIDS Policy*, The Economist, Aug. 20, 2005, at 58, attached as Ex. 15 to Diller Decl.

premised on working in partnership with sex workers to persuade Brazilians to give up
dangerous sexual behaviors). Declaration of Rosanna Barbero, dated Sep. 19, 2005, ("Barbero
Decl.") ¶¶ 9-10 (describing Cambodian NGO's decision to turn down USAID funds because
pledge requirement would obstruct successful work with sex workers). Likewise, DKT
International, a US non-profit that uses social marketing techniques to distribute condoms in
Vietnam and elsewhere, has refused to sign the pledge requirement because of concerns that the
requirement will impede its efforts to fight the HIV/AIDS epidemic, and instead has sued to
enjoin its enforcement.[18] *See* Declaration of Lawrence Holtzman, dated Aug. 8, 2005, attached
as Ex. 11 to Diller Decl.

      Many other eminent US and foreign non-governmental organizations that have continued
to receive USAID funding have documented ways in which the pledge requirement interferes
with their ability to fight HIV/AIDS. *See* Declaration of Ruth Messinger, dated Aug. 16, 2005,
("Messinger Decl.") ¶¶ 8, 11-15 (documenting concerns of American Jewish World Service);
Middleberg Decl. ¶ 16 (concerns of EngenderHealth); Letter from Peter Bell et al. to Hon.
Randall Tobias, dated Feb. 25, 2005, ("Bell Letter") attached as Ex. D to Middleberg Decl.
(listing concerns of CARE, International Rescue Committee, Save the Children, and 10 other
major humanitarian organizations based in the US).

      Like these organizations, AOSI has signed the pledge to ensure that its important, life-
saving work fighting HIV/AIDS continues. Kushen Decl. ¶¶ 41-43, 45. Upon signing the
pledge, AOSI informed USAID that it believes both that its current policy statement accords
with the pledge requirement, and that OSI's actions have no bearing on AOSI's compliance or

---

[18] The case is docketed as *DKT International, Inc. v. USAID*, Civil Action No 05-01604.
The plaintiffs' motion for a preliminary injunction, which has been fully briefed, is pending
before the Honorable Emmett Sullivan.

noncompliance with the requirement. Additionally, AOSI reserved its rights "to challenge the pledge requirement as violative of the First Amendment and other law." *See* Letter from Oksana Korneo to John Lord, dated Aug. 30, 2005, ("Korneo Letter") at 1, attached as Ex. E to Kushen Decl.

## ARGUMENT

In this Circuit, plaintiffs seeking to enjoin "'governmental action taken . . . pursuant to a statutory or regulatory scheme'" are entitled to a preliminary injunction if they demonstrate both "a threat of irreparable injury" and "a probability of success on the merits." *Time Warner Cable of N.Y.C., a Div. of Time Warner Entm't Co., L.P.  v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir. 1997). As discussed below, there is a clear and substantial likelihood of success on the merits, and plaintiffs are even now suffering irreparable harm. Consequently, preliminary injunctive relief is warranted here.

## I.    Plaintiffs' Claims Are Substantially Likely to Succeed on the Merits.

There are three distinct legal problems with USAID's construction of the pledge requirement, each of which provides an independent reason for the Court to grant plaintiffs a preliminary injunction. First, USAID's extraordinarily broad reading of the scope of Congress's statutory command that recipients adopt a "policy explicitly opposing prostitution" is untenable as a matter of statutory construction. Second, USAID's extraordinarily broad reading of the statutory term "opposing prostitution" reveals the phrase's unconstitutional vagueness. Third, the statute, as construed by USAID, flatly violates two fundamental First Amendment principles: government may not force private individuals to pledge fealty or support for a government policy as a condition of qualifying for government benefits, and government may not condition access to government funding on a waiver of the First Amendment right to use private funds to engage in constitutionally protected speech.

A.    **USAID's Construction of the Pledge Requirement Is Too Broad.**

1.    **The Pledge Requirement, Properly Read, Requires Only a Statement by AOSI That Sex Work Causes Harm.**

Plaintiffs seek a declaration that the Global AIDS Act's anti-prostitution pledge requirement, 22 U.S.C. § 7631(f), is satisfied by an organization's statement that it opposes the harms sex work causes. This interpretation of the pledge requirement – that it calls for a *general* statement and does not ban *specific* actions – is compelled by four factors: the Act's clear text; the pledge requirement's relation to other parts of the Act; the legislative history; and the constitutional avoidance canon of statutory construction. "[D]eference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 600 (2004). Here, all indicia of congressional intent contradict the agency's reading of the pledge requirement.

a.    **Text**

The pledge requirement's operative phrase – "a *policy* explicitly opposing prostitution," 22 U.S.C. § 7631(f) (emphasis added) – makes clear that only a *policy* – and not a reshaping of an organization's activities – is needed. Legal and non-technical dictionaries define "policy" as a statement of general orientation only. *Black's Law Dictionary* defines policies as "*general principles* by which a government is guided." *Blacks Law Dictionary* 1157 (6th ed. 1990) (emphasis added). "Policy" in a non-technical dictionary is similarly elucidated as a "plan or course of action," or a "guiding principle." *The American Heritage Dictionary of the English Language* 1401 (3d ed. 1996). Congress's use of the word "policy" elsewhere in the Act confirms this as the proper reading of "policy." *Cf. Brown v. Gardner,* 513 U.S. 115, 118 (1994) (using "[t]extual cross-reference" to confirm Court's conclusion about a statute's proper

meaning).  In the Act, the term "policy" refers consistently to generalized goals, not to means, while other words – such as project or program – refer to activities.[19]

By using the term "policy," Congress thus categorically precluded agency scrutiny of grantees' specific activities.  *Cf.* discussion *supra* at 9-10.  The government's contrary construction must be rejected.  *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 109 (1993) ("'no deference is due to agency interpretations at odds with the plain language of the statute itself'") (quoting *Public Employees Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989)).

### b.    Relation to Other Provisions of the Global AIDS Act

Narrow construction is also compelled by the pledge requirement's relation with other provisions of the Act, which leave no room for USAID's expansive interpretation.  A broad interpretation of that provision would render one provision in the Act superfluous, contradict a

_____

[19] Elsewhere in the Act, for example, Congress distinguishes between a "policy" that "[t]he United States Government's response to the global HIV/AIDS pandemic should place high priority on the prevention of mother-to-child transmission, the care and treatment of family members and caregivers, and the care of children orphaned by AIDS," and a set of "requirements," which obligate the government to carry out that policy in specific ways, including by implementing particular programs. 22 U.S.C. § 7652; *see also id.* § 7601(22)(d) (distinguishing "policies that treat HIV/AIDS as a multisectoral public health problem affecting not only health but other areas such as agriculture, education, the economy, the family and society," and "programs corresponding to these needs"); *id.* § 7631(d) (distinguishing between endorsement of the government's policy and participation in a particular approach, method, or program).

In other foreign aid programs, Congress also distinguishes between a "policy," which refers to generalized goals, and a project or program, which refer to activities. *See, e.g.*, 22 U.S.C. § 2293(b) (authorizing President to furnish "project and program assistance . . . in accordance with policies contained in this section," for sub-Saharan African development); *id.* § 2501 (using "policy" to describe goals of Peace Corps); *see also* 22 U.S.C. § 2751 (distinguishing policies underlying international defense cooperation and military export controls, from the "programs," "projects," and "procedures" by which those policies are carried out). In each of these areas, Congress left broad discretion to the relevant agency as to how policies would be implemented.

second provision, and finally render Congress's deliberate use of different language in different provisions meaningless.

First, broadly reading the pledge requirement would render the neighboring "government funds restriction," § 7631(e), superfluous. *Cf. Cooper Indus., Inc. v. Aviall Servs., Inc.*, __U.S.__, 125 S. Ct. 577, 583 (2004) (courts are "loath" to interpret statutory text as superfluous); *accord Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 329 (2d Cir. 2005). If the pledge requirement barred specific tactics alleged to be inconsistent with the broader goal of opposing sex work, it would clearly prohibit the promotion of the legalization and practice of sex work. As a result, § 7631(e)'s ban on using government funds "to promote . . . the legalization or practice of prostitution" would lose independent meaning. Only if the pledge requirement cuts more narrowly than § 7631(e) (*i.e.*, by demanding only a general statement) is there room for the government funds restriction to play an independent role.

Second, broad reading of the pledge requirement also undermines a second provision of the Global AIDS Act. Congress insulated grantees from "participat[ion] in a prevention method or treatment program to which the organization has a religious *or moral* objection." 22 U.S.C. § 7631(d) (2005) (emphasis added). Given Congress's clear requirement that the agency avoid imposing obligations on grantees to which the grantees have a moral objection, in addition to religious objections, USAID should not be permitted to police grantees' activities aggressively via the pledge requirement in ways that threaten grantees' moral values. In this case, for example, one of the reasons that the plaintiffs believe it essential to approach sex workers in a non-judgmental manner is that they have adopted governing principles that require them to treat socially marginalized groups in a manner that does not marginalize them further. *See* Neier Decl. ¶¶ 6-7, 24; Kushen Decl. ¶ 58.

18

Finally, when Congress wanted to bar particular activities in the Global AIDS Act, it did so explicitly. Hence, the government funds restriction forbids aid recipients from using federal money "to promote or advocate the legalization or practice of prostitution." 22 U.S.C. § 7631(e). As this provision illustrates, Congress knows how to bar the specific activity of advocating "the legalization or practice of prostitution." Yet the pledge requirement uses language different from § 7631(e), requiring only that grantees have a "policy explicitly opposing prostitution." Courts presume a "disparity in use of language has a purpose." *Lutwin v. Thompson*, 361 F.3d 146, 155 (2d Cir. 2004). *See also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987)(same). Congress's decision to exclude specific tactics from the pledge requirement compels a narrow reading of that requirement.

### c.    Legislative History

The sole legislative history addressing the provision's scope supports the conclusion that the pledge requirement compels only a general statement of opposition to the harms sex work causes: In the only floor debate on the pledge requirement preceding the Act's passage, Senate Majority Leader Senator Bill Frist stated that "a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women . . . would satisfy the intent of the provision." 149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. Frist).

### d.    The Canon of Constitutional Avoidance

All this conclusive textual evidence of the pledge requirement's meaning, standing alone, condemns the government's position. Application of the constitutional avoidance canon of statutory interpretation, however, furnishes an additional, independent ground to reject USAID's construction of the Act. Broad application of the pledge requirement unquestionably trenches

deeply on First Amendment interests. *See* discussion *infra* Argument § I.C; *see also* discussion

*supra* at 9 (Justice Department held up application of pledge requirement to U.S. NGOs for

eighteen months based on constitutional concerns). But a "clear indication" of congressional

intent is needed "[w]here an administrative interpretation of a statute invokes the outer limits of

Congress' power." *Solid Waste Agency*, 531 U.S. 159, 172 (2001); *accord Edward J. DeBartolo*

*Corp.*, 485 U.S. 568, 575 (1988); *NLRB*, 440 U.S. 490, 499-500 (1979); *cf. Ashwander v. TVA*,

279 U.S. 288, 345-48 (1936) (Brandeis, J., concurring). In *Solid Waste Agency*, the Supreme

Court declined to defer to an agency's interpretation of a statute, and interpreted narrowly the

statute out of a "prudential desire not to needlessly reach constitutional issues and our

assumption that Congress does not casually authorize administrative agencies to interpret a

statute to push the limit of congressional authority." 531 U.S. at 172-73.[20] While the provision

at issue in *Solid Waste Agency* raised a federalism flag, the pledge requirement trenches on

equally important First Amendment concerns. Here, there is "nothing approaching a clear

statement," *id.* at 174, that Congress intended to impair Global AIDS Act grantees' constitutional

rights.

To summarize, the text of the pledge requirement, its relation to surrounding provisions,

the sole legislative history, and the canon of constitutional avoidance compel the conclusion that

––––––––––––––––––––––––––

[20] Even with non-constitutional questions of "economic and political magnitude," this
canon applies. In *FDA v. Brown & Williamson Tobacco Corp.*, the Court cautioned judges to
exercise "common sense as to the manner in which Congress is likely to delegate a policy
decision of such … magnitude." 529 U.S. 120, 132 (2000). Thus, it rejected the FDA's effort to
regulate tobacco given the latter's "unique political history." *Id.* at 159; *see also MCI Telecomm.*
*Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994) (finding it "highly unlikely" Congress
would use the term "modify" to grant the FCC absolute discretion over an "essential
characteristic" of telecommunication regulation). Speech shielded by the First Amendment, of
course, finds no less "unique" a home in our constitutional firmament than tobacco.

the pledge requirement must be read narrowly to require only a demand for a general statement of policy, and not specific speech.

### 2.    The Pledge Requirement Does Not Apply to OSI

In addition, the plaintiffs seek a declaration that USAID cannot enforce the pledge requirement against OSI, and cannot enforce it against AOSI based on the activities of OSI.  The plain language of the pledge requirement applies only to organizations or groups to which USAID "provide[s] assistance."  22 U.S.C. § 7631(f).  Congress thus strictly cabined the pledge requirement to those entities *directly* receiving federal funds.  USAID itself recognizes this limit. It embeds the pledge requirement in "clauses to be included as new standard provisions for assistance agreements and contracts."  *See* Diller Decl. Ex. 5 at 2.  Only groups and organizations signing an assistance agreement thus are told to abide by the pledge.  Moreover, USAID concedes that only "recipients" and "subrecipients" must hue to the pledge requirement. *Id.* at 5.  This reading gives content to Congress's use of the term "group," and its requirement that an entity receive federal aid before government-imposed speech restrictions kick in.  A broader reading, pulling affiliates of funding recipients within the ambit of § 7631(f), would wreak havoc, with U.S. organizations having to scrutinize closely their associational ties to determine which of their allies might trigger the federal speech gag.

### B.    As Currently Construed by USAID, the Pledge Requirement Is Unconstitutionally Vague.

USAID's pledge requirement violates the constitutional ban on vague enactments because it regulates constitutionally protected speech, carries the threat of severe criminal and civil sanctions, and fails to inform both the grantees who must comply with it and the government officials who must enforce it what the parameters of the requirement are.

21

As discussed above, the pledge requirement regulates a substantial amount of constitutionally protected speech. Moreover, violation of the requirement carries potentially severe criminal and civil sanctions.[21] The Supreme Court has made clear that an enactment either regulating speech or carrying potential criminal sanctions must be clear in two ways. First, it must allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). *See also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Second, the regulation must provide "narrow, objective, and definite standards" to guide government officials in applying the rule. *Forsyth County Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Regulations that fail to provide such standards "encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. *See also Grayned*, 408 U.S. at 108.

The pledge requirement fails to satisfy these requirements in at least three ways: 1) it is unclear what sort of policy statement satisfies the requirement that an organization adopt a policy that "explicitly opposes prostitution"; 2) it is unclear which privately funded activities by an organization that has signed the pledge will be construed as insufficiently opposing sex work and, thus, as violating that pledge; and 3) it is unclear whether plaintiff OSI is bound by the pledge requirement.

---

[21] Under the federal criminal fraud and false statements statute, a knowing and willful misrepresentation to a federal agency in a certification in connection with a contract may be punished by up to five years imprisonment. 18 U.S.C. § 1001. *See, e.g., U.S. v. Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999) (if contractor made false certification in invoice submitted to U.S. Navy he would be subject to criminal penalties under 18 U.S.C. § 1001). Under the federal false claims statute, grantees could also be subject to civil penalties for misrepresentations of compliance. 31 U.S.C. § 3729. Even without the operation of these statutes, the penalties for violating the certification are quite harsh: USAID may unilaterally terminate the contract, terminate the award, seek a refund of money already disbursed, and permanently disqualify the grantee from receiving future funding. *See* 22 C.F.R. §§ 208.800, 226.62(a)(3), 226.73; Diller Decl. Ex. 5, § 3.II(e).

### 1.    The Requirement That Organizations Have a Policy Fails to Make Clear What It Means to "Oppose Prostitution."

First, USAID does not specify what an organization must say in order to meet the requirement of having a policy "explicitly opposing prostitution." Diller Decl. Ex. 5. In an earlier policy directive, USAID had stated that a grantee could satisfy that requirement by "agree[ing] that it is opposed to the practices of prostitution and trafficking because of the psychological and physical risks they pose for women, men and children." *See* Diller Decl. Ex. 2. USAID's current policy directive, however, provides no guidance as to whether such a statement would suffice.

USAID's withdrawal of guidance and changing signals demonstrate that the pledge requirement vests USAID officials with unconstitutionally broad discretion to decide which policy statements are in compliance. *See Smith v. Goguen*, 415 U.S. 566, 575-76 (1974) (statute prohibiting "treat[ing] the U.S. flag "contemptuously" was unconstitutionally vague because it invited standardless enforcement); *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999) (multiplicity of ways that officials had interpreted regulation showed that regulation did not provide sufficiently clear standards and was thus unconstitutionally vague); *Million Youth March v. Safir*, 18 F. Supp. 2d 334, 344 (S.D.N.Y. 1998) (statute allowing license to be denied in the "best interest of the community" was unconstitutionally vague, because it permitted officials to make decisions "'guided only by their own ideas' of what constitutes the good of the community") (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150 (1969)); *Nichols v. Village of Pelham Manor*, 974 F. Supp. 243 (S.D.N.Y. 1997) (statute barring solicitation "where such solicitation is objected to" was unconstitutionally vague, because officials could interpret "objection" in a number of ways).

23

Moreover, in the face of multiple conflicting interpretations, grantees are left without any guidance regarding whether their policy statements comply. In fact, AOSI has twice asked USAID directly whether USAID views AOSI's policy statement as satisfying the pledge, and USAID has twice refused to answer. *See* discussion *supra* at 10-11; Kushen Decl. ¶¶ 24-27, 39; Neier Decl. ¶¶ 45-47, 50. Thus, the pledge requirement unconstitutionally fails to provide the ordinary observer with adequate guidance. *See Nichols*, 974 F. Supp. at 254 (ordinance that "forces people to guess, at their peril, whether certain public reactions to their expression would be regarded as 'objections' in the meaning of the statute" is unconstitutionally vague).

> **2.    USAID's Failure to Delineate Which Privately Funded Activities Are Prohibited Renders the Pledge Requirement Impermissibly Vague.**

The second way in which the pledge requirement is vague is that it provides absolutely no guidance as to what types of activities an organization that has signed the pledge may undertake with its private funds. Neither USAID's current policy directive nor any other source contains guidelines to constrain the discretion of USAID officials or to provide clear notice to grantees. The only guidance the plaintiffs have been able to obtain is from a dialogue in a meeting with USAID official Kent Hill, who listed several activities, not enumerated in the pledge requirement itself, that he speculated could be noncompliant. He stated that he believed that grantees would clearly violate the pledge requirement if they used private funds to advocate for the legalization of sex work, and may violate the requirement if they advocate for too great a reduction in the penalties for sex work, or for help in unionizing sex workers. Kushen Decl. ¶¶ 32-34. However, Hill failed to clarify just how low an organization might advocate that penalties be reduced without violating the requirement. *Id.* ¶¶ 33, 36. He also mentioned other activities that *might* violate the pledge requirement, but did not provide clear guidelines. For example, organizing sex workers to prevent police from brutalizing them would violate the

24

requirement if USAID concluded that the work was merely a front for advocating the legalization of sex work. Mr. Hill also said that even if a group adopted a policy that was compliant on its face, if USAID determined that the group truly felt sex work should be legalized, as evidenced by the totality of its statements, the organization would violate the requirement. (*Id.* ¶¶ 32-34.)

This mind-reading approach to enforcement that Hill describes is one in which USAID officials, operating without guidelines, will assess not only the speech but also the internal beliefs of organizations to determine if they are sufficiently opposed to sex work. It is hard to imagine a regime that would vest more unfettered discretion in the hands of government officials, or provide less clarity to the entities struggling to comply. *See Chatin*, 186 F.3d at 87 (enforcement of regulation explicitly barring only unauthorized religious services or speech, to bar quiet prayer, rendered regulation unconstitutionally vague); *Streetwatch v. Nat'l R.R. Passenger Corp.*, 875 F. Supp. 1055, 1062-64 (S.D.N.Y. 1995) (enforcement of Penn Station rules requiring persons on premises to be engaged in legitimate business was unconstitutionally vague because it barred activities not mentioned in the rules, such as walking around station). Demonstrating the breadth of the possible interpretations of what private activities the pledge requirement bars is the fact that Senator Tom Coburn (R-OK) has construing the pledge requirement as barring a Global AIDS Act grantee from running a health education program that uses non-traditional teaching methods to educate sex workers about HIV transmission. *See* Letter from Tom Coburn to President Bush, May 19, 2005, at 2, attached to Diller Decl. as Ex. 9. On information and belief, defendant USAID is delaying renewed funding of this program as a result of Sen. Coburn's complaint. *See* Helene Cooper, *Editorial Observer; What? Condoms Can*

25

*Prevent AIDS?  No Way!*, N.Y. Times, Aug. 26, 2005, at A18, attached to Diller Decl. as Ex. 16.[22]

### 3.    The Pledge Requirement Is Impermissibly Vague as Applied to OSI.

The third area of impermissible vagueness is USAID's refusal to clarify whether the activities of OSI, with which AOSI is closely affiliated, could bring AOSI into noncompliance with the pledge requirement. *See* discussion *supra* at 9-10.  OSI is a distinct legal entity, separately incorporated from AOSI. *See* Neier Decl. ¶ 19.  As plaintiffs discuss above, section 7631(f) should be construed as applying only to AOSI's activities. *See* discussion *supra* Argument § I.A.

However, in the past, USAID and members of Congress have considered OSI to be a partner of AOSI in the DDRP, and they may be tempted to claim authority to sanction AOSI based on OSI's activities. *See* Neier Decl. ¶¶ 20-21; USAID, Response to Congressional Inquiries Regarding Health Activities in Central Asia: Briefing Book (Feb. 16, 2005), attached as Ex. 5 to Diller Decl.  AOSI has explicitly asked USAID whether it considers OSI to be bound by the pledge requirement, but USAID has refused to answer. *See* discussion *supra* at 10.  Since officials have no guidelines regarding whether OSI is bound, and since USAID has failed to provide AOSI or OSI with any guidance on this question, the pledge requirement is impermissibly vague.

---

[22] The vagueness of the pledge requirement has invited yet more far-reaching interpretations.  In a letter to defendant USAID, 28 members of Congress charge that an HIV-prevention project carried out by a USAID grantee that is not a party to this case violates the pledge requirement because of its "rights-based" approach to sex work, which the members of Congress view as advocating "the legalization of prostitution and its cultural acceptance as a legitimate form of employment."  Letter From Rep. Mark Souder to Andrew Natsios, July 15, 2005, at 2, attached as Ex. 10 to Diller Decl.  On information and belief, USAID has not yet responded to this allegation.

**C.    The Pledge Requirement Unconstitutionally Compels Speech and Restricts the Plaintiffs' Use of Private Funds.**

There are two lines of Supreme Court cases making clear that USAID's interpretation of the pledge requirement is unconstitutional.  First, the pledge requirement violates the compelled speech doctrine by forcing organizations to articulate the government's point of view on a contested social issue in order to obtain government funds.  Second, the pledge requirement acts as a complete bar to the ability of USAID grantees to use their private funds to engage in speech that is not prescribed by the government.  Under either doctrine, USAID cannot advance a sufficient government interest to justify the severe constraints on privately funded speech.

**1.    The Pledge Requirement Unconstitutionally Compels Speech.**

First, the Supreme Court has repeatedly held that government may not compel an individual or corporation to pledge allegiance to the government's viewpoint on a contested moral or political issue in order to participate in a government program.  In *West Virginia State Bd. of Educ. v. Barnette*, the Supreme Court refused to permit West Virginia to compel dissenting schoolchildren to salute the flag in order to receive a public school education, warning:  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  319 U.S. 624, 642 (1943).  In *Speiser v. Randall*, the Court held that California could not require veterans to declare that they did not advocate the forcible overthrow of the government in order to receive a property tax exemption.  357 U.S. 513 (1958).  In *Abood v. Detroit Bd. of Educ.*, the Supreme Court decided that Michigan could not require dissenting public employees to support union political activities with which they disagreed.  431 U.S. 209 (1977).  Similarly, in *Wooley v. Maynard*, the Supreme Court held that New Hampshire could not require dissenting automobile owners to

27

display license plates bearing the motto "Live Free or Die" in order to drive on the public highway. 430 U.S. 705 (1977). In *Wabaunsee Co.*, the Supreme Court refused to permit the cancellation of a trash hauling contract because the contractor had vigorously criticized the local government. 518 U.S. 668 (1996). In *O'Hare Truck Service*, the Supreme Court refused to countenance the removal of a tow truck operator from the city's rotation list as a penalty for refusing to support the mayor's re-election. 518 U.S. 668 (1996). Finally, in *U.S. v. United Foods, Inc.*, in the context of commercial speech receiving a lower level of First Amendment protection than political speech, the Supreme Court struck down a regulation requiring participants in a government-sponsored agricultural program to support generic (as opposed to branded) mushroom advertising. 533 U.S. 405 (2001). *See also Cummings v. Missouri*, 71 U.S. 4 Wall.) 277 (1866) (requirement that ex-rebels disavow Confederate sympathies before being permitted to preach violated the Constitution); *Ex parte Garland*, 4 Wall. (71 U.S.) 333 (1867) (requirement that ex-rebels disavow Confederate sympathies before admission to the bar violated the Constitution). *Cf. Forum for Academic & Institutional Rights v. Rumsfeld*, 390 F.3d 219, 235-43 (3d Cir. 2004), *cert. granted*, -- U.S. --, 125 S. Ct. 1977 (2005) (federal government may not deny funding to institutions of higher education that refuse to allow military representatives to recruit students on their campuses, because such a penalty would compel the schools to engage in expression).[23]

---

[23] Notably, the compulsion to engage in speech at issue here is far more intrusive than the compulsion that the Third Circuit found unconstitutional in *Forum for Academic & Institutional Rights, 390 F.3d 219*. There, the government required law schools to open their doors to military recruiters, who would themselves engage in speech not directly attributable to the schools. 390 F.3d at 239-40. Here, in contrast, the government requires USAID grantees to adopt the government's ideological message as their own organizational belief.

In each case, the Court has refused to permit government to condition participation in a government program on a coerced endorsement of the government's viewpoint. If government cannot compel dissenting children to salute the flag as a condition of attending a public school, or dissenting veterans to promise not to advocate the forcible overthrow of the government as a condition of receiving a property tax exemption, or dissenting mushroom growers to endorse the principle that branded mushrooms are roughly equivalent to generic mushrooms as a condition of participating in a government agricultural program, surely Congress cannot compel dissenting international aid organizations to advocate criminalization and condemnation of sex work as a condition of participating in government aid programs.

### 2.    The Pledge Requirement Unconstitutionally Bars Privately Funded Speech.

The second line of relevant Supreme Court cases makes clear that the government cannot condition participation in a government program on complete abstention from using non-government funding to engage in constitutionally protected speech. In the sole instance in which the Supreme Court has been confronted with an entity-wide restriction on the use of private funding by a recipient of federal funding, the Court struck it down, ruling that a congressional ban on the broadcast of editorial opinions by television stations receiving federal subsidies was unconstitutional because it extended even to privately funded broadcasts of editorial opinion. *F.C.C. v. League of Women Voters*, 468 U.S. 364, 400-01 (1984).

In two other cases, the Supreme Court upheld speech restrictions on federal grantees, but only because the government allowed the grantees an alternative avenue for the exercise of speech. In *Regan v. Taxation With Representation of Washington*, the Supreme Court's ruling that Congress could prohibit lobbying by 501(c)(3) groups that Congress exempts from federal taxation was contingent on the fact that Congress allowed the groups to lobby through closely

affiliated, legally separate 501(c)(4) groups. 461 U.S. 540, 544-46 (1983). *See also League of Women Voters*, 468 U.S. at 400-01 (explaining *Regan*'s holding in these terms). Then, in *Rust v. Sullivan*, the Court upheld restrictions on the ability of organizations receiving funds under the federal Title X program to conduct abortions, but only because Congress permitted the grantees to use their private funding to engage in the prohibited activities in a separate physical location. 500 U.S. 173, 196 (1991). The Court's holding relied on its observation that the regulations at issue "do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities." *Id.*

Like the Supreme Court, when the Second Circuit has upheld speech restrictions on federal grantees, it has made clear that the grantees must be allowed to use their private funding free of restrictions that would preclude private speech. In *Planned Parenthood Fed'n of Am. v. Agency for Int'l Dev.*, the Second Circuit rejected a challenge by U.S. non-profits to a federal requirement that foreign groups receiving federal funding refrain from pursuing abortion-related activities. 915 F.2d 59 (2d Cir. 1990). In stark contrast to the pledge requirement, the U.S. groups were not covered by the restriction. Thus, noted the court, the U.S. groups could "continue to participate as a conduit for AID funds that are restricted to non-abortion activities while maintaining with [their] own funds abortion-related activities in the same countries." *Id.* at 64. *See also Ctr. for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 190 (2d Cir. 2002) (rejecting on same grounds second challenge to same requirement).

In *Velazquez v. Legal Services Corp.*, the Circuit was confronted with a challenge by non-profit recipients of federal legal services funding to a federal Legal Services Corporation regulation permitting them to engage in a variety of constitutionally protected activities (such as class action litigation and representing immigrants) only through legally and physically separate

entities that received no federal funding.  164 F.3d 757 (2d Cir. 1999), *aff'd on other grounds*,

531 U.S. 533 (2001).  Notably, the regulation at issue had been issued after a federal court in

California had struck down as unconstitutional an earlier version of the regulation which, like

USAID's pledge requirement at issue here, placed an absolute bar on grantees using their private

funds to engage in class actions and the other restricted activities.  *Id.* at 761.  Although the

Second Circuit rejected the facial challenge to the subsequent regulation, which permitted

grantees to use private money free of the restrictions under some circumstances, it ruled that the

plaintiffs would eventually prevail if they could show that the restriction left them without

adequate alternative avenues to exercise their constitutional rights, or that the restriction unduly

burdened those rights.[24]  *Id.* at 767.

    These binding precedents make clear that Congress may not require aid organizations

based in the United States to refrain from raising and spending private funds to advocate policies

that the current government opposes, as a condition of continuing to participate in foreign aid

programs.

    In violation of this clear principle, USAID has made clear that it will sanction grantees

that engage in activities with their private funding that USAID perceives as being insufficiently

opposed to sex work.  *See* discussion *supra* at 9-10.  USAID does not permit grantees based in

the U.S. any alternative avenue for using private funding to exercise their constitutional rights.

This is an unconstitutional restriction on the plaintiffs' First Amendment rights.

---

[24] Last December, a district court judge in the Eastern District of New York issued a
preliminary injunction as applied to the three plaintiff legal services programs, holding that they
had demonstrated that the restriction on their private funding was unduly burdensome.
*Velazquez v. Legal Servs. Corp.*, 349 F. Supp. 2d 566, 613 (E.D.N.Y. 2004).  Even the enjoined
restriction stands in stark contrast to the restriction here, which permits plaintiffs *no* avenue for
the exercise of constitutional rights.  The decision is currently on appeal to the Second Circuit.

Regardless of the nature of the plaintiffs' work, the mere knowledge that USAID asserts the authority to scrutinize their privately funded speech to determine whether they are sufficiently opposed to sex work will have an inevitable chilling effect on that speech. Here, the effect will be particularly chilling, because the plaintiffs are involved in a number of ongoing activities that they know may come under USAID scrutiny: co-sponsoring a conference on important policy issues raised by sex work, distributing a report recommending changes in the legal treatment of sex work to facilitate access to health and social services, operating a listserv regarding best practices in work aimed at sex workers, and providing funding and technical assistance to a number of other non-profit organizations working with sex workers to fight the spread of HIV/AIDS. In all of these activities, how can the plaintiffs engage in a robust debate regarding the best policies for keeping sex workers safe, healthy and engaged in appropriate HIV prevention strategies, knowing that USAID retains authority to scrutinize their statements to ensure that they are sufficiently opposed to sex work?

The answer is that they cannot. It is essential to the success of all of these initiatives that OSI and AOSI remain free to discuss sex work without limits on what they can say or do. In particular, it is essential that they remain free to advocate for changes in the legal or practical treatment of sex workers that would facilitate the reduction of HIV/AIDS, to promote or work with sex worker organizations, and to discuss sex work in a non-judgmental fashion. It is also essential that they remain free to promote innovative programs that engage in any of these activities in the course of working to reduce the spread of HIV/AIDS.

> **3.    USAID Cannot Show That It Has Advanced a Sufficient Government Interest to Justify the Wholesale Restriction on Privately Funded Speech.**

Of course, the government may attempt to demonstrate that its assertion of broad control over the privately funded speech of its grantees is supported by a sufficient government interest.

When the government imposes an absolute bar on the ability of its grantees to use their private funding to engage in speech activities, those conditions must be at least narrowly tailored to furthering a substantial government interest. *See League of Women Voters*, 468 U.S. at 380 (applying heightened scrutiny to funding restrictions affecting use of private funding, and declining to apply strict scrutiny only because the case involved radio broadcasting, over which the government exercises significant control). *Cf. Velazquez*, 164 F.3d at 767 (even when funding restrictions affecting use of private funding afford an alternative avenue for expression the restrictions must not be unduly burdensome).

Even if the government is able to demonstrate a substantial interest behind the pledge requirement, it is highly unlikely that the government will be able to demonstrate that an absolute bar to using private funding to engage in constitutionally protected speech is narrowly tailored to that interest. *See League of Women Voters*, 468 U.S. at 395, 399-01 (holding that absolute restrictions on public funding were unconstitutional where disclaimers and other measures were sufficient to satisfy government interests). Moreover, since the pledge requirement burdens a significant amount of speech aimed at fighting the spread of HIV/AIDS, and thus undermines the primary goal of the Global AIDS Act, it is doubtful that the government can demonstrate that the requirement is supported by any substantial interest whatsoever. *See generally* Declaration of Chris Beyrer.

For these reasons, plaintiffs have a clear likelihood of success on the merits of their challenge to the pledge requirement.

## II.    Plaintiffs Will Suffer Irreparable Injury if Preliminary Injunctive Relief Is Not Granted.

Irreparable harm is presumed where the infringement of constitutionally protected rights is alleged, particularly of those rights sheltered by the First Amendment. *Green Party of N.Y. v.*

*N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004) (citing *Elrod v. Burns*, 427 U.S.

347, 373 (1976)); *Bronx Household of Faith v. Board of Educ. of City of N.Y.*, 331 F.3d 342, 349

(2d Cir. 2003). Courts routinely apply this presumption and issue preliminary injunctions when

a plaintiff alleges restrictions on free speech, including in cases where the harm alleged is that a

condition on the receipt of government funding is violating the recipient's First Amendment

rights. *See, e.g.*, *Velazquez v. Legal Servs. Corp.*, 349 F. Supp. 2d 566, 613 (E.D.N.Y. 2004)

(preliminarily enjoining federal Legal Services Corporation from withholding federal grant funds

to prevent an irreparable loss of plaintiffs' First Amendment rights); *Housing Works, Inc. v. City*

*of New York*, 72 F. Supp. 2d 402, 421 (S.D.N.Y. 1999) (issuing preliminary injunction to prevent

loss of government funding and protect plaintiff from retaliation against First Amendment

activities); *Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 961 F. Supp. 1402, 1417 (D. Haw.

1997) (issuing preliminary injunction to prevent loss of funding because resulting harm to

plaintiffs' First Amendment rights would be irreparable).

Here, plaintiffs have alleged that USAID's implementation of the Global AIDS Act's

pledge requirement deprives the plaintiffs of their First Amendment free speech rights by

compelling them to engage in certain speech against their will, and by subjecting their use of

private, non-government funds to unconstitutional conditions. Compl. ¶¶ 35-40, 45, 47-52, 68-

70. These allegations suffice, standing alone, to demonstrate the threat of irreparable harm

absent preliminary injunctive relief.

Moreover, the plaintiffs are operating under a regime that threatens them with criminal

sanctions, the loss of their grants, the resulting harm to their allies and clients, and a clawback

claim by USAID for repayment of the millions of USAID dollars they have already spent, if they

fail to comply with USAID's implementation of the pledge requirement. Nonetheless, the

agency has provided no clear guidelines whatsoever regarding what is and is not permitted. Accordingly, although the plaintiffs are in compliance with the pledge requirement as they construe it, they cannot be sure that USAID construes it the same way. That, too, constitutes irreparable harm.

## CONCLUSION

For the reasons stated, plaintiffs are entitled to a declaratory judgment that the pledge requirement contained in 22 U.S.C. § 7631(f) requires only that U.S.-based non-profits receiving Global AIDS Act funding state that sex work causes harm to the women involved, does not in any way restrict the activities in which those non-profits may engage with their non-government funding, and does not impede the activities of plaintiff OSI in any way. Plaintiffs also seek entry of a declaratory judgment that USAID's application of the pledge requirement to the plaintiffs and other non-profit organizations based in the United States is unconstitutional. Compl. at 16. Pursuant to Federal Rule of Civil Procedure, the Court "may order a speedy hearing of an action for a declaratory judgment and advance it on the calendar." Given the ongoing irreparable injury outlined below, a speedy hearing is appropriate here. *See* discussion *supra* Argument § II.

Plaintiffs are also entitled to a preliminary injunction: (1) barring defendants United States Agency for International Development ("USAID") and Andrew Natsios, Administrator of USAID, from discontinuing and/or delaying the funding of plaintiff AOSI pending a final ruling on the merits;

(2) barring USAID from unilaterally terminating its Cooperative Agreement with AOSI or the Modifications of Assistance thereto, seeking a refund of moneys disbursed under the cooperative agreement, debarring AOSI, or otherwise taking action against AOSI, solely on the grounds that they have used their private funding to engage in any privately funded actions protected by the First Amendment, including but not limited to:

35

(a) sponsoring or participating in a conference in New York this October entitled, "Sex Work, Sexual Rights and Countering the Conservative Sexual Agenda,"

(b) publicizing *Sex Work, HIV/AIDS, and Human Rights in Central and Eastern Europe and Central Asia*, published by the Central and Eastern European Harm Reduction Network,

(c) operating a listserv that provides a forum for participants to share information, opinions, and resources related to the health, safety and well-being of sex workers in Eastern Europe and the former Soviet Union, or

(d) providing funding and technical assistance to non-profit organizations working with sex workers to fight the spread of HIV/AIDS, including organizations that advocate for the most effective policies, including – where appropriate – changes in the legal treatment of sex workers in order to facilitate outreach to them and ensure their access to needed health care and social services.

(3) granting such other and further relief as the Court shall deem proper.

Dated: September 28, 2005

Respectfully submitted,

/s/ Rebekah Diller
Burt Neuborne (BN 9092)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
Laura K. Abel (LA 6831)
Aziz Huq (AH 3227)*
Brennan Center for Justice
    at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY  10013
(212) 998-6730

*Attorneys for Plaintiffs*

*Not admitted in this District

36