UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALLIANCE FOR OPEN SOCIETY INTERNATIONAL,     :
INC., OPEN SOCIETY INSITUTE, and PATHFINDER
INTERNATIONAL,                                                          :

                               Plaintiffs,          :

v.                                                                                  :

UNITED STATES AGENCY FOR INTERNATIONAL     :
DEVELOPMENT and ANDREW S. NATSIOS, in his
Official Capacity as Administrator of the United States     :
Agency for International Development, and his successors;

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES and MICHAEL O. LEAVITT, in his
official capacity as Secretary of the U.S. Department of
Health and Human Services, and his successors; and

UNITED STATES CENTERS FOR DISEASE CONTROL
AND PREVENTION and JULIE LOUISE GERBERDING,
in her official capacity as Director of the U.S. Centers for
Disease Control and Prevention, and her successors;

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**AMENDED COMPLAINT**

Civil Action No. 05-CV-8209
(VM) (DF)

## I.    INTRODUCTORY STATEMENT

1.      This is a civil action arising under the First Amendment to the United States

Constitution, seeking redress against three agencies of the United States on behalf of entities

whose constitutional rights are violated by a requirement that private, non-profit organizations

based in the United States adopt the government's ideology opposing sex work in exchange for

the receipt of U.S. government funding to stop the spread of HIV/AIDS.[1]

---

[1] The terms "sex work" and "sex worker" are used in this document because they are the terms
generally used in the public health and international relief fields. The terms "prostitute" and

2.      Plaintiffs are two non-profit recipients of U.S. government funding and a not-for-profit charitable foundation affiliated with one of the recipients, all of which are based in the United States. Plaintiffs challenge the requirement that they adopt a policy opposing prostitution ("the pledge requirement") as violative of the First Amendment in three ways: a) it is unconstitutionally vague, b) it requires grantees to adopt as their own organization-wide policy the ideologically motivated position of the government regarding sex work, and c) it imposes an absolute bar on grantees using their own, non-government funding to engage in speech activities. Plaintiffs also challenge the implementation of the pledge requirement by the defendant agencies as being contrary to the governing law.

## II.    JURISDICTION AND VENUE

3.      Subject matter jurisdiction is conferred upon the Court by 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b), (e).

## III.    THE PARTIES

### The Plaintiffs

4.      Plaintiff OPEN SOCIETY INSTITUTE ("OSI") is a charitable trust organized and existing under New York law. It is a private foundation enjoying tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 400 West 59th Street, New York, New York 10019.

5.      Plaintiff OSI is the principal United States-based foundation of the philanthropist George Soros. OSI works to support a network of more than 30 "Soros Foundations," which operate in more than 60 countries worldwide.

---

"prostitution" are viewed as stigmatizing by the sex workers whose trust public health officials must gain in order to engage them in the fight against HIV/AIDS.

6.      In general, Plaintiff OSI and the Open Society network promote democratic governance, human rights, and economic, legal and social reform. On a local level, members of the network implement a range of initiatives to support the rule of law, education, public health, and independent media.

7.      Plaintiff OSI has received United States Agency for International Development funding in the past, and is interested in preserving its eligibility to receive Global AIDS Act funding from USAID in the future.

8.      Plaintiff ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC. ("AOSI") is a not-for-profit corporation incorporated under Delaware law. It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 400 West 59th Street, New York, New York 10019. It has a branch office in Almaty, Kazakhstan.

9.      Plaintiff OSI established Plaintiff AOSI in July, 2003 as a separately incorporated not-for-profit organization. Among the reasons for AOSI's separate existence are: 1) a desire to concentrate in a separate vehicle the expertise OSI and the Open Society network in general have gained in implementing U.S. federal grants, and 2) a desire to coordinate OSI and Open Society network programs in Central Asia.

10.      In October, 2003, Plaintiff OSI agreed to provide Plaintiff AOSI with a five-year grant in the amount of $2,177,700 to support AOSI's work in seeking and implementing U.S. government grants, as well as to support the creation of a Central Asia office of AOSI that would help coordinate Open Society network projects in that region.

11.      Plaintiff PATHFINDER INTERNATIONAL ("Pathfinder") is a non-profit corporation incorporated under District of Columbia law. It enjoys tax-exempt status under

3

section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 9 Galen Street, Suite 217, Watertown, Massachusetts, 02472-4501.

12.      Pathfinder was founded in 1957 by Dr. Clarence J. Gamble, a private philanthropist and it was one of the first U.S.-based organizations to address international population issues. Working in over 20 countries throughout Africa, Latin America, Asia, and the Near East, Pathfinder's mission is to provide access to quality family planning and reproductive health services to women, men, and adolescents throughout the developing world. Pathfinder's philosophy is to provide this assistance with concern for human rights, for the status and role of women, and from the perspective of the clients it serves. In addition to its family planning work, Pathfinder also works to halt the spread of HIV/AIDS, improve maternal and child health, and prevent unsafe abortions. It accomplishes these goals by developing partnerships with local non-governmental organizations, host country governments, the private sector, and health care providers.

13.      Pathfinder's annual budget, which in fiscal year 2005 totaled more than $76 million, is funded by grants and donations from multiple sources, including Defendants United States Agency for International Development and the United States Centers for Disease Control and Prevention, an operating agency of Defendant Department of Health and Human Services. Pathfinder also receives funds from several agencies of the United Nations, the Swedish, Canadian, British, and Dutch governments, the World Bank, and numerous foundations, corporations and individual donors.

### The Defendants

14.      Defendant UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT ("USAID") is an agency of the United States government. Its primary office

4

is located in the Ronald Reagan Building, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20523.

15.     Defendant USAID uses funding provided by Congress for economic, development and humanitarian assistance around the world.

16.     Defendant ANDREW S. NATSIOS is the Administrator of Defendant USAID. His office is located at Ronald Reagan Building, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20523.

17.     Defendant NATSIOS has responsibility for formulating and implementing USAID policies and practices. He is sued in his official capacity.

18.     Defendant U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("DHHS") is an agency of the United States government. Its primary office is located in the Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, D.C. 20201.

19.     Defendant DHHS uses funding provided by Congress to develop programs for health protection and to provide human services to Americans in need.

20.     Defendant MICHAEL O. LEAVITT is the Secretary of Defendant DHHS. His office is located at Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, D.C. 20201.

21.     Defendant LEAVITT has responsibility for developing and implementing DHHS policies and priorities. He is sued in his official capacity.

22.     Defendant United States Centers for Disease Control and Prevention ("CDC") is an operating agency of DHHS. Its primary office is located at 1600 Clifton Road, NE, Atlanta, GA, 30333.

23.    Defendant CDC uses Congressional funding to prevent and control infectious and chronic diseases and environmental health threats.

24.    Defendant JULIE LOUISE GERBERDING is the Director of Defendant CDC. Her office is located at 1600 Clifton Road, NE, Atlanta, GA 30333.

25.    Defendant GERBERDING is responsible for managing and directing the administrative and scientific activities of the CDC.  She is sued in her official capacity.

## IV.    THE GLOBAL AIDS ACT

26.    In 2003, Congress passed, and the President signed, the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act" or "Act"), which is codified at 22 U.S.C. § 7601 *et seq.*

27.    The Act implements the President's Emergency Plan for AIDS Relief, which is a five-year global strategy for fighting HIV/AIDS, focusing on education, research, prevention, treatment and care of persons living with HIV/AIDS.  The Act authorizes the appropriation of $3 billion in funding for each of fiscal years 2004 through 2008.  22 U.S.C. § 7671(a).  For fiscal year 2005, Congress has appropriated $2.8 billion under the Act.

28.    The funds, which are distributed by Defendants USAID, CDC, and DHHS, and by other U.S. government entities, go to many non-governmental organizations based in the United States but doing work abroad ("US NGOs"), including Plaintiffs AOSI and Pathfinder. The funds also go to foreign non-governmental organizations ("foreign NGOs"), which often receive the funds as subgrantees of U.S. groups, and to foreign governments and multilateral organizations.

29.    The Act imposes on recipients of funding distributed under the Act two restrictions regarding sex work.  The first provision (the "government funds restriction")

prohibits funds made available under the Act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care to a sex worker. 22 U.S.C. § 7631(e).

30.    Plaintiffs do not challenge either the government funds restriction or Defendants' implementation of it.

31.    The second restriction (the "pledge requirement") provides, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). The Act does not define "opposing prostitution."

32.    During the sole legislative debate on the scope of the pledge requirement prior to passage of the Global AIDS Act, Senate Majority Leader Bill Frist stated that "a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women . . . would satisfy the intent of the provision." 149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. Frist).

33.    While plaintiffs believe it is unconstitutional for the government to force them to adopt a policy position in order to qualify for Global AIDS Act funds, they do not challenge either the requirement that they have a "policy explicitly opposing . . . sex trafficking," or the Defendants' implementation of that requirement.

## V.    USAID'S IMPLEMENTATION OF THE PLEDGE REQUIREMENT

34.    From February 2004 until June 2005, Defendant USAID did not apply the pledge requirement to US NGOs on the advice of the federal Department of Justice, which had

issued a draft opinion stating that enforcement of the pledge requirement against organizations based in the United States would be unconstitutional.

35.    Then, in a letter dated September 20, 2004, the DOJ's Office of Legal Counsel withdrew its earlier draft opinion that had declared enforcement of the pledge requirement against US NGOs to be unconstitutional, and stated that "there are reasonable arguments to support [the] constitutionality" of the requirement.

36.    USAID, in turn, began applying the pledge requirement to US NGOs. USAID did this by issuing a policy directive requiring grantees to have in place "a policy explicitly opposing . . . prostitution and sex trafficking." *See* USAID Acquisition & Assistance Policy Directive 05-04 (June 9, 2005). Neither in this policy directive, nor in any other written document, does USAID either define "explicitly opposing prostitution" or provide clear guidance on what privately funded activities are permissible and impermissible under the pledge requirement.

## VI.    CDC AND DHHS'S IMPLEMENTATION OF THE PLEDGE REQUIREMENT

37.    Until May 2005, Defendants DHHS and CDC did not apply the pledge requirement to US NGOs. Instead, DHHS and CDC required that "any foreign recipient" that received funding under the Global AIDS Act have "a policy explicitly opposing, in its activities outside the United States, prostitution and sex trafficking." *See, e.g.,* Implementation of Prevention of Mother to Child Transmission Services in Kenya, 69 Fed. Reg. 35360, 35363 (June 24, 2004).

38.    Beginning on or about May 2005, DHHS and CDC began applying the pledge requirement to US NGOs. They required that "any recipient" of funds under the Global AIDS Act must have "a policy explicitly opposing prostitution and sex trafficking." *See, e.g.,*

8

Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment, 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005).

39.    DHHS and CDC have not defined the term "explicitly opposing prostitution" nor have they issued guidance to the public explaining which types of activities are permissible and impermissible under this restriction.

40.    DHHS and CDC have required all recipients of Global AIDS Act funding to "agree that HHS may, at any reasonable time, inspect the documents and materials maintained or prepared by the recipient in the usual course of its operations that relate to the organization's compliance [with the pledge requirement]." *See, e.g.,* Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment, 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005).

## VII.   BROAD CONSTRUCTIONS PLACED ON THE PLEDGE REQUIREMENT

41.    USAID officials and others have placed a number of broad interpretations on the pledge requirement.  These interpretations all indicate how broadly observers can construe the pledge requirement in the absence of any guidance from USAID.

42.    In a meeting with AOSI and OSI personnel in April 2005, Kent Hill, the acting assistant administrator for global health of Defendant USAID, articulated several broad, but vague, interpretations of the pledge requirement, although he emphasized that he could not provide official guidance on the policy.  First, he stated that he believed the pledge requirement bars grantees from advocating legalization of sex work, and might bar advocating for too great a reduction in penalties for sex work, or helping to unionize sex workers.

9

43.    Second, he stated that he thought organizing sex workers to prevent police from brutalizing them might violate the requirement if USAID decided that the work was merely a front for advocating the legalization of sex work.

44.    Third, he stated that he believed even if a group adopted a policy statement that was compliant on its face, that organization could be found to be in violation of the pledge requirement if USAID concluded that the organization truly felt sex work should be legalized and that the totality of statements made that clear.

45.    In a subsequent fax from the Mission Director of the USAID Mission to the Central Asia Republics to Plaintiff AOSI, USAID repeated part of Hill's interpretation. The October 7, 2005, fax stated that two activities -- "advocating for the legalization of the institution of prostitution" and "organizing or unionizing prostitutes for the purposes of advocating for the legalization of prostitution, as distinct from organizing for the purposes of deterring human rights abuses and addressing public health issues" -- would indicate that an organization "does not explicitly oppose prostitution." USAID has refused to confirm that these two activities are the only activities barred by the pledge requirement.

46.    Even before USAID started applying the pledge requirement to Plaintiff AOSI, staff at the Central Asia Republics mission of Defendant USAID cautioned AOSI not to use the term "sex worker" in publicly available documents because that might connote acceptance of sex work. Plaintiffs do not know whether USAID will construe all public use of the term "sex worker" as violating the pledge requirement.

47.    Senator Tom Coburn has construed the pledge requirement as barring Global AIDS Act grantees from running a program providing educational materials and health safety training for sex workers. On May 19, 2005 he demanded that President Bush investigate a

USAID grantee for engaging in such activities. Sen. Coburn does not charge that the grantee promoted changes in the legal status of sex work. Rather, his complaint seems to be that the grantee uses non-traditional teaching methods to educate sex workers about HIV transmission. On information and belief, Defendant USAID is delaying renewed funding of this program as a result of Sen. Coburn's complaint.

48.      In still another far-reaching interpretation of the pledge requirement, on July 15, 2005, 28 members of Congress wrote to Defendant USAID charging that an HIV prevention project carried out by a USAID grantee violates the pledge requirement because it has "a rights-based" approach to sex work, which the members of Congress interpret as advocating "the legalization of prostitution and its cultural acceptance as a legitimate form of employment." On information and belief, USAID has not yet responded to this allegation.

49.      Likewise, some members of Congress have asserted that a debate program for high school and university students run by the Soros Foundation Kazakhstan, which received USAID civic education funding, promoted the legalization of sex work. Defendant USAID found this assertion to be unfounded.

50.      Upon information and belief, Defendants DHHS and CDC have made no effort to limit or define the scope of the pledge requirement.

## VIII.  HOW THE PLEDGE REQUIREMENT AFFECTS THE PLAINTIFFS

### The Effect of the Pledge Requirement on Plaintiffs AOSI and OSI

51.      Plaintiffs AOSI and OSI are opposed to the harms that sex work inflicts both on the individuals directly involved and to others in various ways.

11

52.     Nonetheless, the pledge requirement detrimentally affects Plaintiff AOSI and the clients it serves in several ways. If Defendant USAID construes the pledge requirement as covering Plaintiff OSI, then the pledge requirement detrimentally affects OSI too.

53.     Both AOSI and OSI have, as their principles of governance, an adherence to the principles of an open society, including opposition to adopting any policy positions that would lead to the stigmatization of socially marginalized groups. Adopting a policy opposing sex work violates this principle.

54.     In addition to requiring USAID grantees and contractors to adopt a policy, the pledge requirement appears to also require USAID grantees and contractors, including Plaintiff AOSI, to conform their activities to the policy. The pledge requirement applies both to activities conducted with government funding and to activities conducted with funding that comes from other sources.

55.     Consequently, the pledge requirement places a blanket ban on the use of the private, non-governmental funds possessed by Plaintiff AOSI to do work that Defendant USAID construes as being insufficiently opposed to sex work.

56.     Plaintiffs do not know whether USAID also construes the pledge requirement as requiring Plaintiff OSI to also conform its activities – including its privately funded activities – to any policy opposing sex work that AOSI may adopt. On at least one occasion, USAID has indicated that it views OSI as a "partner" in AOSI's USAID-funded work.

57.     AOSI and OSI engage in a significant amount of privately funded activity that could be barred by the pledge requirement. Both are at the forefront of efforts to reduce the spread of HIV/AIDS by working with people who are at particularly high risk of contracting HIV/AIDS and passing it on to others.

58.    In many regions, when the HIV/AIDS epidemic begins it is concentrated in small populations of people, including sex workers, drug users, and others. When public health officials are able to focus their efforts on those populations, they can stop the epidemic before it spreads to the rest of the population.

59.    In order to stop the epidemic among sex workers it is necessary to approach sex workers and other people at high risk for becoming infected with HIV in a non-judgmental manner, in order to establish a trusting relationship with them and engage them in needed HIV prevention efforts.

60.    Efforts recognized as highly successful in fighting the spread of HIV/AIDS have involved organizing sex workers, or working cooperatively with sex worker organizations.

61.    In some regions, advocating for a change in the legal regime surrounding sex work has been an essential part of fighting the HIV/AIDS epidemic, because when sex workers are subject to high fines, arrest or violence, they go underground, avoiding doctors, outreach workers, and others who want to provide them with the education, condoms, and other tools they need to avoid becoming infected and infecting others.

62.    As discussed above, Plaintiffs do not know how broadly USAID construes the pledge requirement. However, if USAID construes the pledge requirement broadly to bar advocating changes in the legal treatment of sex workers; promoting community organizing among sex workers; or working with, or talking about, sex workers in a non-judgmental fashion, then advocacy of the most successful tactics in the fight against HIV/AIDS may well be forbidden.

63.    For this reason, the government of Brazil, and a number of highly respected US NGOs and foreign NGOs, have turned down USAID funding since implementation of the pledge

requirement. Other NGOs operating under the pledge requirement have documented the ways in which the requirement is impeding their efforts to fight HIV/AIDS.

64.    Plaintiffs AOSI and OSI are committed to using their private funding to facilitate discussion among public health experts, doctors, social service providers, advocates, government officials and others regarding the most effective ways to fight the spread of the epidemic in the populations at the highest risk for contracting HIV/AIDS.

65.    For example, OSI's Sexual Health and Rights Program attempts to foster debate regarding policies designed to improve the sexual health and rights of socially marginalized populations, including sex workers, and to encourage the adoption and implementation of the most effective policies. It would be difficult for OSI to advocate for a free debate regarding policies to improve sexual health if it had to stigmatize sex workers.

66.    Likewise, a broad implementation of the pledge requirement could prevent OSI from continuing to promote a publication it has funded, titled *Sex Work, HIV/AIDS, and Human Rights in Central and Eastern Europe and Central Asia*, which recommends that sex work be decriminalized as a means of protecting sex workers from abuse by law enforcement personnel, traffickers, and pimps, thus making it easier for sex workers to access the health and social services they require in order to remain healthy and informed. OSI does not itself take any position regarding the contents of the report, or regarding the desirability of changes in the legal status of sex work. However, it did provide funding and technical assistance for the Central and Eastern European Harm Reduction Network, which wrote the report, and it desires to continue assisting the Network in distributing the report.

67.    The Plaintiffs conduct many other activities potentially affected by a broad implementation of the pledge requirement. These include:

14

a) co-sponsoring a conference in New York on October 14, 2005 entitled, "Sex Work, Sexual Rights and Countering the Conservative Sexual Agenda." The goal of the conference is to bring together members of different advocacy and service delivery communities – such as domestic and international groups, and groups working with sex workers and victims of trafficking – to discuss key policy issues. Among the topics discussed was the legal status of sex work;

b) operating a listserv that provides a forum for participants to share information, opinions, and resources related to the health, safety and well-being of sex workers in Eastern Europe and the former Soviet Union. Participants post content regarding best practices, service gaps, model legislation, advocacy strategies, and new initiatives; and

c) providing funding and technical assistance to a number of other non-profit organizations working with sex workers to fight the spread of HIV/AIDS. Several of these groups are studying the circumstances in which sex workers work and developing policy recommendations. It is essential that these groups remain free to advocate for the most effective policies, including – where appropriate – changes in the legal treatment of sex workers in order to facilitate outreach to them and ensure their access to needed health care and social services.

68.    There exists a serious risk that AOSI and OSI will be subject to intrusive and unwarranted governmental investigations regarding whether AOSI and OSI are engaged in activities that the investigators construe as insufficiently opposed to sex work.

69.    Plaintiffs AOSI and OSI find the pledge requirement to be vague and confusing. They do not know which of their current or future activities Defendant USAID will construe as running afoul of the pledge requirement.

70.    Under Acquisition & Assistance Policy Directive 05-04, if a recipient violates the pledge requirement, USAID will unilaterally terminate the funding agreement or contract.

71.    Were Defendant USAID to find Plaintiffs AOSI or OSI out of compliance with the pledge requirement and unilaterally terminate Plaintiff AOSI's grant, AOSI's clients would suffer.

72.     Were Defendant USAID to find Plaintiffs AOSI or OSI out of compliance with the pledge requirement, a danger exists that civil or criminal penalties would be imposed on Plaintiff AOSI for falsely certifying compliance with the requirement.

### AOSI's Decision to Sign the Pledge

73.     AOSI is in the middle of operating a highly successful, five-year Drug Demand Reduction Program aimed at reducing the use of heroin and other injectable opiates, and stopping the spread of HIV/AIDS, in a region of Central Asia where drug use is rising as a result of rampant drug trafficking and is fueling the spread of HIV/AIDS.

74.     AOSI operates this program primarily with a $16,507,402 five-year grant from Defendant USAID.  AOSI contributes some of its non-government funding, and OSI contributes funding, technical assistance and administrative support.

75.     OSI is not a party to, and has no legal obligations under, the Cooperative Agreement with USAID establishing the Drug Demand Reduction Program.

76.     Since USAID began implementing its pledge requirement, the Plaintiffs have been torn between their desire to continue this successful, life-saving work, and their desire to avoid adopting an ideologically driven government policy that will hurt their ability to do their life-saving work with their own funding.

77.     In the spring of 2004, when AOSI's Drug Demand Reduction Program subgrantees based outside of the United States were required to comply with the pledge requirement, AOSI adopted the following statement:

> AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways.  AOSI and the Soros Foundations in Tajikistan and

Kyrgyzstan do not promote or advocate such activities. Rather, our approach is to try to reduce the harms caused by disseminating credible information on questions such as the prevention of disease, and by providing direct public health assistance to vulnerable populations. ...

78.    AOSI then wrote to USAID, asking whether this policy statement satisfied the version of the pledge requirement then in effect. USAID responded twice, both times failing to indicate whether the policy was compliant. In the second response, however, USAID warned AOSI that any failure to comply would be subject to investigation by USAID's Inspector General.

79.    In July 2005, after USAID imposed the pledge requirement on US NGOs, AOSI again wrote to USAID, asking whether the policy statement AOSI had adopted in the spring of 2004 satisfied the pledge requirement, and also whether USAID would take OSI's activities into account in determining whether AOSI is in compliance.

80.    After receiving that letter, USAID held up releasing the latest installment of funds for the Drug Demand Reduction Program for six weeks, throwing the work of the Drug Demand Reduction Program into disarray.

81.    AOSI finally received a response from USAID on August 2, 2005, stating yet again that it could not provide any guidance regarding whether AOSI's policy satisfies the pledge requirement but that AOSI would be subject to sanctions if it failed to comply.

82.    The next day, USAID sent a grant agreement to AOSI, obligating USAID to fund an additional $542,300 for the Drug Demand Reduction Program, but only if AOSI certified its compliance with USAID's pledge requirement. In order to restart the flow of USAID funding, and to avoid the harm that clients would suffer if additional components of the Drug Demand Reduction Program were forced to shut down, AOSI decided to sign the certification. It

did so after carefully reviewing its own policy and the language of the pledge requirement, and assuring itself that, according to its interpretation of the requirement, it was in compliance.

83.    On August 3, 2005, AOSI sent the signed grant agreement to USAID, along with a cover letter reciting the required pledge. In that letter, AOSI stated its belief that the policy it had implemented in the spring of 2004 complies with the pledge requirement and that OSI's actions have no bearing on AOSI's compliance or noncompliance with the requirement. Additionally, AOSI reserved its rights "to challenge the pledge requirement as violative of the First Amendment and other law."

84.    USAID has now issued an agreement obligating itself to provide enough funding to AOSI to enable the Drug Demand Reduction Program to operate through the middle of next year. Accordingly, AOSI now feels free to file this lawsuit without risking a hold-up in USAID funding of the sort it experienced after it sent its letter to USAID in mid-June.

### The Effect of the Pledge Requirement on Plaintiff Pathfinder

85.    In order to be eligible to continue receiving U.S. government funds for HIV/AIDS work, Pathfinder adopted the following policy in July 2005:

> In order to be eligible for federal funding for HIV/AIDS, Pathfinder opposes prostitution and sex trafficking because of the harm they cause primarily to women. Pathfinder's HIV/AIDS programs seek to promote effective ways to prevent the transmission of HIV/AIDS and to reduce the suffering caused by HIV/AIDS. In order to achieve these goals, Pathfinder works with, and provides assistance and support to and for, many vulnerable groups, including women who are commercial sex workers, who, if not effectively reached by HIV/AIDS programs, will suffer and can become drivers of the HIV/AIDS epidemic.

86.    Pathfinder adopted this policy solely in order to remain eligible to receive U.S. government funding to provide desperately needed HIV/AIDS prevention and care work around the world. Pathfinder was required to adopt the policy as a condition of receiving funds to

continue its U.S. government-funded work to provide health services in Mozambique, Peru, Kenya, Tanzania, Botswana, Nigeria and elsewhere.

87.    The pledge requirement detrimentally affects Plaintiff Pathfinder and the clients it serves in several ways.

88.    First, Pathfinder has been forced to stake out a policy position on an issue on which it wished to remain neutral at this time. Were it not for the mandate in the Global AIDS Act, Pathfinder would not have adopted the above policy. As an international relief organization operating in multiple countries, each with their own set of laws and cultures, Pathfinder is mindful of the need to refrain from taking policy positions without careful study and deliberation. With the exception of the anti-prostitution policy it adopted to comply with the pledge requirement, its policy positions have been formed only after deeply studying the issue, primarily by examining its own experience promoting access to health care in the developing world.

88.    Second, Pathfinder has been forced to adopt a policy to comply with a provision that is vague and confusing. Pathfinder believes it is in compliance with the pledge requirement. However, given the lack of guidance from USAID, DHHS and CDC as to the requirement's meaning, it operates in constant fear that defendants USAID, DHHS and CDC will apply an overly broad interpretation of the pledge requirement to its activities and find it out of compliance with the pledge requirement.

89.    Third, Pathfinder engages in a significant amount of privately funded activity that could be barred by an overly broad construction of the pledge requirement's blanket ban on the use of the private, non-U.S. government funds possessed by Plaintiff Pathfinder to do work that Defendants construe as being insufficiently opposed to sex work. Pathfinder firmly believes that

19

it is complying with the pledge requirement, but it does not know whether defendants USAID, DHHS and CDC agree.

90.    Much of Pathfinder's HIV/AIDS prevention work is aimed at vulnerable populations, including sex workers. Pathfinder currently runs programs in Ethiopia and India to prevent the spread of HIV among sex workers and has in the past run similar programs in Nigeria and Brazil. Key to these programs are efforts to organize sex workers and to work cooperatively with existing organizations composed of individuals involved in sex work to promote the health, human rights and well-being of sex workers.

91.    As is common among most international relief organizations, Patfhinder works with local groups to identify their needs and priorities. Pathfinder seeks to assist local groups, including organizations composed of sex workers, in achieving the goals they have identified.

92.    For example, Pathfinder's privately funded Targeted Intervention for Groups at Risk ("TIGRIS") program in India seeks to organize sex workers so that they will collectively agree to engage in HIV prevention methods, such as using condoms. While Pathfinder believes that its organizing of sex workers in India complies with the pledge requirement, it fears that defendants USAID, DHHS and CDC may construe the pledge requirement overly broadly and subject Pathfinder to penalties should sex worker organizations it has fostered or cooperated with then pursue goals that Defendants view as being inconsistent with opposition to prostitution.

93.    Pathfinder's TIGRIS program also conducts outreach to brothel owners and pimps in an attempt to foster safer sex practices. While Pathfinder conducts this work for the purpose of promoting HIV prevention and assisting the women in the brothels, it also must at times gain the trust of brothel owners in order to gain access to the women it is trying to help. Although Pathfinder believes that this outreach does not violate the pledge requirement as set forth in the

Global AIDS Act, it fears that defendants USAID, DHHS and CDC might view this outreach as being insufficiently "opposed to prostitution."

94.    Fourth, Pathfinder has an active, privately funded advocacy program within the United States that could be forced to censor itself as a result of the pledge requirement. Part of Pathfinder's mission is to improve the U.S. policy environment for international family planning and reproductive health programs. Pathfinder accomplishes this by educating U.S. policy-makers and the general public about conditions facing women and their families in developing countries and the impact U.S. policies have on the effectiveness of family planning and HIV/AIDS service delivery. Pathfinder now must ensure that any advocacy it undertakes conforms to the pledge requirement.

95.    Fifth, Pathfinder has previously worked with community organizations in Brazil that, as part of their efforts to limit exploitation of sex workers, have sought to change laws and regulations surrounding commercial sex work so that they do not serve as a pretext for brothel owners, corrupt police and others to abuse sex workers.

96.    Pathfinder understands that such activity would likely be construed by defendants USAID, DHHS and CDC as violative of the pledge requirement. Pathfinder is not currently involved in such work. However, Pathfinder is interested in being able to resume such advocacy with private funding.

## IX.    CAUSES OF ACTION

97.    The pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f); Acquisition & Assistance Policy Directive 05-04; and as effectuated by CDC and DHHS is unconstitutionally vague, in violation of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

98.    The pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f); Acquisition & Assistance Policy Directive 05-04; and as effectuated by CDC and DHHS violates the rights of Plaintiffs under the First Amendment to the United States Constitution by forcing them to adopt an entity-wide policy opposing sex work in exchange for the receipt of government funds.

99.    The pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f); Acquisition & Assistance Policy Directive 05-04, and as effectuated by CDC and DHHS violates the rights of Plaintiffs under the First Amendment to the United States Constitution by imposing the pledge requirement on the funding that the Plaintiffs receive from sources other than the U.S. government.

100.    Any application by Defendants of the anti-prostitution pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f), to require a policy statement broader than the policy statement that plaintiff AOSI implemented in the spring of 2004 and plaintiff Pathfinder International adopted in the summer of 2005 is not in accordance with the Global AIDS Act and should be held unlawful pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702, 706(2)(A).

101.    Any application by Defendants of the anti-prostitution pledge requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f), to bar the Plaintiffs from engaging in particular activities because they are perceived as being insufficiently opposed to sex work is not in accordance with the Global AIDS Act and should be held unlawful pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702, 706(2)(A).

WHEREFORE, Plaintiffs respectfully request the Court to:

(1) declare that USAID's application to the Plaintiffs and other US NGOs of the pledge requirement contained in Acquisition & Assistance Policy Directive 05-04 violates the First and Fifth Amendments to the United States Constitution;

(2) declare that the application by DHHS and CDC to Plaintiff Pathfinder and other US NGOs of the pledge requirement violates the First and Fifth Amendments to the United States Constitution;

(3) grant appropriate preliminary, and final, equitable relief

(a) barring Defendants from discontinuing and/or delaying the funding of plaintiffs AOSI and Pathfinder pending a final ruling on the merits, and

(b) barring USAID, DHHS and CDC from taking the following actions against any US NGO, solely on the grounds that the US NGO has failed to comply with the pledge requirement, or has taken action that USAID, DHHS or CDC deems to be inconsistent with the pledge requirement: (i) denying funding to any person or entity, (ii) refusing to enter into or unilaterally terminating a grant agreement, cooperative agreement, or contract with any person or entity, or (iii) disciplining or seeking civil or criminal sanctions against any person or entity; and

(3) grant such other and further relief as the Court shall deem proper, including the award of reasonable attorneys' fees and costs.

Dated: New York, New York
        December 5, 2005

Burt Neuborne (BN 9092)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
Laura K. Abel (LA 6831)
Aziz Huq (AH 3227)*
Brennan Center for Justice
 at NYU School of Law
161 Avenue of the Americas, 12th Floor

New York, NY  10013
(212) 998-6730

*Attorneys for Plaintiffs*
*Not admitted in this District