UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
ALLIANCE FOR OPEN SOCIETY INTERNATIONAL,    :
INC., OPEN SOCIETY INSTITUTE, and PATHFINDER    :
INTERNATIONAL,    :
                              Plaintiffs,    :    05 Civ. 8209 (VM)
                                                      :

              v.    :

                                                       :

UNITED STATES AGENCY FOR INTERNATIONAL    :
DEVELOPMENT and ANDREW S. NATSIOS, in his    :
Official Capacity as Administrator of the United States    :
Agency for International Development, and his successors;    :

UNITED STATES DEPARTMENT OF HEALTH AND    :
HUMAN SERVICES and MICHAEL O. LEAVITT, in his    :
official capacity as Secretary of the U.S. Department of    :
Health and Human Services, and his successors; and    :

UNITED STATES CENTERS FOR DISEASE CONTROL :
AND PREVENTION and JULIE LOUISE GERBERDING, :
in her official capacity as Director of the U.S. Centers for    :
Disease Control and Prevention, and her successors,    :

                            Defendants.    :
-----------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION AND FOR A TEMPORARY RESTRAINING ORDER

                                 MICHAEL J. GARCIA
                                 United States Attorney for the Southern
                                 District of New York
                                 Attorney for Defendants

RICHARD E. ROSBERGER (RR-1632)
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel.: (212) 637-2716
Fax: (212) 637-2730
Of Counsel

**TABLE OF CONTENT**

Page

PRELIMINARY STATEMENT ................................................... 1

FACTUAL BACKGROUND ................................................... 5

    A.    The Leadership Act ................................................... 5

    B.    USAID's Implementation of the Leadership Act .......................... 11

        1.    USAID's Acquisition and Assistance Policy Directive .............. 11

        2.    USAID's Additional Guidance to AOSI ......................... 13

    C.    HHS's Implementation of the Leadership Act ........................... 13

    D.    Plaintiffs' Complaint and Motions for a Preliminary Injunction
        and TRO ......................................................... 13

        1.    OSI and AOSI ............................................. 14

        2.    Pathfinder ................................................ 15

    E.    The Amici ...................................................... 16

ARGUMENT ................................................... 17

POINT I -    PLAINTIFFS FAIL TO DEMONSTRATE ANY LIKELIHOOD OF
        SUCCESS ON THE MERITS OF THEIR CLAIM THAT DEFENDANTS'
        CONSTRUCTION OF THE LEADERSHIP ACT IS IMPERMISSIBLE ..... 18

    A.    Defendants' Interpretation of the Leadership Act is Entitled to Deference ..... 18

    B.    Plaintiffs' Construction of the Term "Policy" Is At Odds With Its Ordinary
        Meaning ....................................................... 20

    C.    Plaintiffs' Interpretation Impedes the Overall Purpose of the Act ............ 21

    D.    Plaintiffs' Reliance on the Legislative History is Unavailing ............... 23

    E.    The Doctrine of Constitutional Avoidance Is Not Applicable Here .......... 24

-i-

F.    The Government Has Consistently Interpreted the Organizational
      Eligibility Restriction as Applying Exclusively to Organizations
      Receiving Leadership Act Funds ...................................... 25

POINT II -  PLAINTIFFS' ARGUMENT THAT THE ORGANIZATIONAL
            ELIGIBILITY RESTRICTION IS UNCONSTITUTIONAL IS
            UNLIKELY TO SUCCEED ON THE MERITS ......................... 26

A.    The Leadership Act is a Spending Clause Enactment Subject
      to a Rational Relationship Test ...................................... 27

B.    The Organizational Eligibility Restriction Does Not Impose an
      "Unconstitutional Condition" on Recipients of Federal
      HIV/AIDS Grants .................................................. 31

      1.    The Denial of Federal Subsidies Is not a Penalty for Purposes of the
            Unconstitutional Conditions Doctrine .......................... 31

      2.    The Organizational Eligibility Requirement Does Not
            Impermissibly Compel AOSI or Pathfinder To Express
            A Particular Viewpoint ...................................... 32

      3.    The Organizational Eligibility Restriction Does Not Impermissibly
            Restrict Privately-Funded Conduct ............................ 36

      4.    This Court Should Not Consider the Wisdom of Congress's
            Policy Choice In Enacting the Organizational
            Eligibility Provision ........................................ 43

C.    The Leadership Act is Not Impermissibly Vague ........................ 44

POINT III -  PLAINTIFFS ALSO FAIL TO DEMONSTRATE
             IRREPARABLE HARM ............................................ 49

A.    Plaintiffs' Alleged Harm is Speculative and Could Be Compensated
      By Money Damages ................................................ 51

B.    Plaintiffs' Delay in Moving for Preliminary Injunction Further Confirms the
      Absence of Irreparable Harm ........................................ 52

CONCLUSION ........................................................... 54

## TABLE OF AUTHORITIES

Cases                                                                        Page(s)

1185 Avenue of the Americas Associates v. Resolution Trust Corp.,
     22 F.3d 494 (2d Cir. 1994) .............................................................................................. 19

Alvarez v. City of New York,
     2 F. Supp. 2d 509 (S.D.N.Y. 1998) ............................................................................... 51

American Tobacco Co v. Patterson,
     456 U.S. 63 (1982) ......................................................................................................... 20

Bell & Howell: Mamiya Co. v. Masel Supply Co.,
     719 F.2d 42 (2d Cir. 1983) ............................................................................................. 49

Bordell v. General Electric Co.,
     922 F.2d 1057 (2d Cir. 1991) ......................................................................................... 26

Borey v. National Union Fire Insurance Co. of Pittsburgh v. Martin,
     934 F.2d 30 (2d Cir. 1991) ............................................................................................. 17

Bowen v. Kendrick,
     487 U.S. 589 (1988) ....................................................................................................... 27

Bronx Household of Faith v. Board of Education,
     331 F.3d 342 (2d Cir. 2003) ........................................................................................... 51

Buckley v. Valeo,
     424 U.S. 1 (1976) ..................................................................................................... 36, 43

Center for Reproductive Law and Policy v. Bush,
     304 F.3d 183 (2d Cir. 2002) ........................................................................................... 42

Charles v. Verhagen,
     220 F. Supp. 2d 955 (W.D. Wisc. 2002) ........................................................................ 45

Charles v. Verhagen,
     348 F.3d 601 (7th Cir. 2003) .......................................................................................... 45

Chatin v. Coombe,
     186 F.3d 82 (2d Cir. 1999) ....................................................................................... 47, 49

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
     467 U.S. 837 (1984) ................................................................................................... 19, 20

Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates North America, Inc.,
    270 F. Supp. 2d 432 (S.D.N.Y. 2003) ........................................................................ 52, 53

Cohn v. Federal Bureau of Prisons,
    302 F. Supp. 2d 267 (S.D.N.Y. 2004) ............................................................................. 19

Comic Strip, Inc. v. Fox Television Stations, Inc.,
    710 F. Supp. 976 (S.D.N.Y. 1989) .................................................................................. 49

DKT Memorial Fund, Ltd. v. Agency for International Development,
    810 F.3d 1236 (D.C. Cir. 1987) ............................................................................. passim

Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction,
    485 U.S. 568 (1988) ........................................................................................................ 25

Escondido Mutual Water Co. v. La Jolla Band of Mission Indians,
    466 U.S. 765 (1984) ........................................................................................................ 20

FCC v. League of Women Voters of California,
    468 U.S. 364 (1984) ........................................................................................................ 40

Food and Drug Administration v. Brown & Williamson Tobacco Corp.,
    529 U.S. 120 (2000) ................................................................................................. 21, 25

Forum for Academic and Institutional Rights v. Rumsfeld,
    390 F.3d 219 (2004) ........................................................................................................ 35

General Media Communications, Inc. v. Cohen,
    131 F.3d 273 (2d Cir. 1997) .............................................................................. 46, 47, 48

Gidatex, S.R.L. v. Campaniello Imports, Ltd.,
    13 F. Supp. 2d 417 (S.D.N.Y. 1998) .............................................................................. 52

Gomez v. United States,
    490 U.S. 858 (1989) ........................................................................................................ 24

Grayned v. City of Rockford,
    408 U.S. 104 (1972) ........................................................................................................ 47

Harris v. McRae,
    448 U.S. 297 (1980) ........................................................................................................ 29

Heart of Atlanta Motel, Inc. v. United States,
    85 S.Ct. 1 (1964) ............................................................................................................ 18

Housing Works, Inc. v. City of New York,
   72 F. Supp. 2d 402 (S.D.N.Y. 1999) .................................................................................. 51

Kansas v. United States,
   214 F.3d 1196 (10th Cir. 2000) .................................................................................. 33, 46

Kolender v. Lawson,
   461 U.S. 352 (1983) ............................................................................................................ 46

Latino Officers Associate v. Safir,
   170 F.3d 16 (2d Cir. 1999) ........................................................................................... 50, 51

Loeffler v. Menifee,
   326 F. Supp. 2d 454 (S.D.N.Y. 2004) ............................................................................... 19

Loverage v. Pendleton Woolen Mills, Inc.,
   788 F.2d 914 (2d Cir. 1986) .............................................................................................. 50

MCI Telecommunications Corp. v. AT&T,
   512 U.S. 218 (1994) ........................................................................................................... 25

National Endowment for the Arts v. Finley,
   524 U.S. 569 (1998) ..................................................................................................... passim

National Amusements, Inc. v. Town of Dedham,
   43 F.3d 731 (1st Cir. 1995) ............................................................................................... 30

National Home Equity Mortgage Associate v. Office of Thrift Supervision,
   271 F. Supp. 2d 264 (D. D.C. 2003) ................................................................................. 19

New York City Environmental Justice Alliance v. Giuliani,
   214 F.3d 65 (2d Cir. 2000). ............................................................................................... 17

Nitke v. Ashcroft,
   253 F. Supp. 2d 587 (S.D.N.Y. 2003) ............................................................................... 51

Pennhurst State Sch. & Hospital v. Halderman,
   451 U.S. 1 (1981) ......................................................................................................... 44, 45

Perry v. Sindermann,
   408 U.S. 593 (1958) ........................................................................................................... 31

Planned Parenthood Federation of America, Inc. v. AID,
   838 F.2d 649 (2d Cir. 1988) .............................................................................................. 19

Planned Parenthood of Central and Northern Arizona v. Arizona,
        718 F.2d 938 (9th Cir. 1983) ........................................................................... 49

Planned Parenthood v. Agency for International Development,
        915 F.2d 59 (2d Cir. 1990) ................................................................... 32,42, 43

Planned Parenthood v. State of Minnesota,
        910 F.2d 479 (8th Cir. 1990) ........................................................................... 49

Population Institute v. McPherson,
        797 F.2d 1062 (D.C. Cir. 1986) ....................................................................... 19

Regan v. Taxation with Representation,
        461 U.S. 540 (1983) ..................................................................... 4, 28, 31, 38

Reno v. Koray,
        515 U.S. 50 (1995) ........................................................................................... 19

Roberts v. Atlantic Recording Corp.,
        892 F. Supp. 83 (S.D.N.Y. 1995). .................................................................... 18

Rust v. Sullivan,
        500 U.S. 173 (1991) .................................................................................. passim

Smith v. Goguen,
        415 U.S. 566 (1974) ........................................................................................ 47

Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,
        531 U.S. 159 (2001) ........................................................................................ 25

South Dakota v. Dole,
        483 U.S. 203 (1987) .................................................................................. passim

Speiser v. Randall,
        357 U.S. 513 (1958) .................................................................................. 31, 35

Spencer Trask Software and Information Services, LLC v. Rpost International Limited,
        90 F. Supp. 2d 577 (S.D.N.Y. 2002) ............................................................... 18

State of New York Department of Social Services v. Shalala,
        21 F.3d 485 (2d Cir. 1993) ............................................................................. 48

Steward Machine Co. v. Davis,
        301 U.S. 548 (1937) ........................................................................................ 45

Tunick v. Safir,
  209 F.3d 67 (2d Cir. 2000) .............................................................................. 50

Turner Broadcasting System, Inc. v. F.C.C.,
  507 U.S. 1301 (1993) ...................................................................................... 18

United States v. $359,500 in United States Currency,
  828 F.2d 930 (2d Cir. 1987) ............................................................................ 24

United States v. American Library Association, Inc.,
  539 U.S. 194 (2003) ........................................................................... 28, 35, 36

United States v. Awadallah,
  349 F.3d 42 (2d Cir. 2003) .............................................................................. 25

United States v. Butler,
  297 U.S. 1 (1936) ............................................................................................ 28

United States v. Lucien,
  347 F.3d 45 (2d Cir. 2003) ........................................................................ 20, 23

United States v. McGoff,
  831 F.2d 1071 (D.C. Cir. 1987) ...................................................................... 24

United States v. Thomas,
  864 F.2d 188 (D.C. Cir. 1988) ........................................................................ 48

Velazquez v. Legal Services Corp., 164 F.3d 757 (2d Cir. 1999), aff'd,
  Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001) ....................... passim

Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001) .................................... passim

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
  455 U.S. 489 (1982) ................................................................................... 47, 48

Virginia v. America Booksellers Association, Inc.,
  484 U.S. 383 (1984) ........................................................................................ 26

Weinberger v. Rossi,
  456 U.S. 25 (1982) .......................................................................................... 24

West Virginia State Board of Education v. Barnette,
  319 U.S. 624 (1943) ........................................................................................ 35

Wooley v. Maynard,
  430 U.S. 705 (1977) .......................................................................................... 35

## FEDERAL STATUTES

20 U.S.C. § 9134(f)(1)(A) ........................................................................................ 36

22 U.S.C. § 2151 ............................................................................................ 6, 12, 19

22 U.S.C. § 7102 .................................................................................................... 12

22 U.S.C. § 7601 ............................................................................................ passim

22 U.S.C. § 7601(1) ................................................................................................. 7

22 U.S.C. § 7601(3) ................................................................................................. 7

22 U.S.C. § 7601(22) ............................................................................................... 8

22 U.S.C. § 7601(23) ......................................................................................... 11, 33

22 U.S.C. § 7603 ................................................................................................. 2, 8

22 U.S.C. § 7611(a) .............................................................................. 2, 8, 34, 36, 39

22 U.S.C. § 7631(e) .............................................................................................. 11

22 U.S.C. § 7631(f) ........................................................................................... 2, 45

22 U.S.C. § 7652 .................................................................................................. 21

22 U.S.C. § 7671 ................................................................................................... 7

42 U.S.C. § 300 ................................................................................................... 39

42 U.S.C. § 300-300a-6 ......................................................................................... 38

47 U.S.C. § 254(h)(6) ............................................................................................ 36

Defendants United States Agency for International Development and Andrew S. Natsios,

in his official capacity as its Administrator (collectively "USAID"), respectfully submit this

memorandum of law in opposition to the motions for a temporary restraining order and for a

preliminary injunction of plaintiffs Alliance for Open Society International, Inc. ("AOSI") and

Open Society Institute ("OSI"; collectively, with AOSI, "AOSI/OSI"). In addition, defendants

United States Department of Health and Human Services and Michael O. Leavitt, in his official

capacity as its Secretary, and the United States Centers for Disease Control and Prevention and

Julie Louise Gerberding, in her official capacity as its Director (collectively, "HHS"),[1] as well as

USAID, hereby submit their opposition to a second motion for preliminary injunction by plaintiff

Pathfinder International ("Pathfinder").[2]

## **PRELIMINARY STATEMENT**

Plaintiffs, three U.S.-based organizations, challenge a statute, the United States

Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003[3] (the "Leadership Act").

Under the Leadership Act, AOSI receives federal funding through USAID, and Pathfinder

receives such funding through both HHS and USAID, to combat HIV/AIDS internationally. OSI

does not allege that it has ever sought, nor does it receive, funding under the Act.

Though Defendants are entitled to deference in construing the Leadership Act, a statute

that they implement, Plaintiffs seek injunctive relief on the ground that the agencies'

interpretation of one of the Act's funding conditions is purportedly impermissible. And, though

---

[1]     The United States Centers for Disease Control and Prevention ("CDC") is an operating division within the Department of Health and Human Services ("DHSS"). USAID and HHS will be referred to herein collectively as Defendants.

[2]     AOSI/OSI and Pathfinder will be referred to herein collectively as Plaintiffs.

[3]     Pub. L. No. 108-25, 117 Stat. 711, codified at 22 U.S.C. §§ 7601-7682.

no court should invalidate an Act of Congress save as a last resort, Plaintiffs (after both AOSI and Pathfinder accepted federal funding) allege that the funding restriction is unconstitutionally vague and violates their First Amendment rights. None of Plaintiffs' claims is likely to succeed on the merits; indeed, each claim will ultimately fail. Plaintiffs also cannot demonstrate that they will suffer any irreparable harm resulting from the application of the challenged statutory provision. Accordingly, Plaintiffs' motions should be denied.

As described in more detail below, the Leadership Act creates a $15 billion program dedicated to the international fight against HIV/AIDS. As part of that fight, Congress singled out prostitution and sex trafficking as two of the key "causes of and factors in" the spread of HIV/AIDS. 22 U.S.C. § 7601(23). The Leadership Act emphasizes that it is both a "priority" of Congress's comprehensive strategy to fight HIV/AIDS, 22 U.S.C. § 7611(a)(4), as well as the "policy of the United States," 22 U.S.C. § 7601(23), to "eradicate" prostitution and other forms of sexual victimization that contribute to the spread of HIV/AIDS. To succeed in its mission of combating HIV/AIDS, Congress encouraged the "expansion of private sector efforts and public-private sector partnerships." See 22 U.S.C. § 7603(4).

Nevertheless, against Congress's express findings concerning the deleterious effect of prostitution on the spread of HIV/AIDS, Plaintiffs challenge a provision in the Act providing that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f) (hereinafter, the "organizational eligibility restriction").[4] As implemented by Defendants, as a condition to receiving federal

---

[4]     Plaintiffs do not challenge that part of the organizational eligibility restriction providing that, to receive funding, an organization must have a policy explicitly opposing sex trafficking. Amended Complaint ("Compl.") ¶ 33. Moreover, they do not challenge the application

funds to conduct HIV/AIDS activities under a grant or cooperative agreement with the United

States, an organization must certify that it has a policy opposing prostitution, and a violation of

the certification is grounds for unilateral termination of the agreement by the responsible agency.[5]

As the eligibility requirement demonstrates, Congress established the Leadership Act, not to

facilitate private speech, but to promote its own efforts to fight the spread of HIV/AIDS,

including by the eradication of prostitution.

Plaintiffs challenge the organizational eligibility restriction, and its implementation by

Defendants, on two separate fronts, each deficient. First, Plaintiffs argue that Defendants'

reading of the organizational eligibility restriction – as  prohibiting funding recipients, such as

AOSI and Pathfinder, from engaging in conduct supporting prostitution – is an improper reading

of the statute. As Plaintiffs construe the restriction, an organization would be eligible for funding

under the Act by simply making a general written statement professing opposition to prostitution

In Plaintiffs' view, Defendants then would be bound to continue funding, even if such

organization engaged in activities inconsistent with that written statement. Plaintiffs' reliance on

various tools of statutory construction to support their skewed reading is unavailing, including

that the phrase "policy explicitly opposing prostitution" plainly connotes more than a mere

written statement, and Plaintiffs' reading is at odds with the plain purpose and policies expressly

---

of the restriction to foreign nongovernmental organizations ("NGOs") that receive funding under the
Act.

    [5]    For the Court's ease of reference, it should be noted that Plaintiffs refer to the
organizational eligibility restriction as a "pledge requirement." See, e.g., Memorandum of Law in
Support of Motion of Plaintiffs Alliance for Open Society International and Open Society Institute
for a Preliminary Injunction ("AOSI/OSI Mem.") at 2; Compl. ¶ 31. As described below, Plaintiffs'
characterization of this eligibility restriction fails to describe its actual force, as it does not require
any organization to make a pledge, but only prohibits the provision of federal HIV/AIDS funding
to organizations that do not have a policy opposing prostitution.

stated in the Act.

Second, Plaintiffs argue that the Leadership Act's organizational eligibility restriction is unconstitutional. According to Plaintiffs, requiring an organization to adopt a policy opposing prostitution compels it to adopt the federal government's viewpoint, and deprives it of its First Amendment right to adopt a different policy or not to speak at all. Plaintiffs also contend that the organizational eligibility restriction, as implemented by Defendants, imposes an unconstitutional condition under the First Amendment by effectively precluding an organization from using private funds to engage in activities inconsistent with a policy opposing prostitution. Finally, Plaintiffs contend that the restriction is unconstitutionally vague and that it is unwise on policy grounds.

Plaintiffs' constitutional arguments are insufficient to support their request for injunctive relief. At the outset, the Supreme Court has long held that conditions attached to subsidies granted by Congress do not directly restrain speech and, thus, do not directly implicate the First Amendment. Instead, Congress has greater leeway to attach conditions to its spending than it has when it regulates directly, and the Spending Clause provides the proper framework in which to evaluate such conditions. See, e.g., Nat'l Endowment for the Arts v. Finley, 524 U.S. 569 (1998); South Dakota v. Dole, 483 U.S. 203 (1987); Regan v. Taxation with Representation, 461 U.S. 540 (1983). Thus, under the Leadership Act, an organization is free not to adopt a policy opposing prostitution, but must forego government funding. Plaintiffs' claim that the organizational eligibility restriction compels them to speak therefore fails.

Plaintiffs' argument that the organizational eligibility restriction unconstitutionally bars them from engaging in privately-funded activities contrary to the purpose of the Leadership Act similarly cannot succeed. When creating a federal spending program, Congress has the power to

- 4 -

ensure that its program is not undermined. The Leadership Act identifies the eradication of

prostitution as not only a goal necessary to any successful international strategy aimed at fighting

HIV/AIDS, but also as a priority of that effort. The organizational eligibility restriction does no

more than take legitimate and appropriate steps to protect the integrity of Congress's

comprehensive strategy to fight HIV/AIDS and, thus, is constitutional. Plaintiffs' argument that

the restriction is unwise has no bearing on whether the condition is reasonably related to the

purpose of the Leadership Act, and this Court should not second-guess Congress's judgment that

the limitation advances the general welfare.

As to Plaintiffs' claim that the organizational eligibility restriction is unconstitutionally

vague, AOSI and Pathfinder plainly were aware of the existence of the funding condition and the

potential consequences for its violation. Further, the terms of the restriction – that funding

recipients must have a "policy explicitly opposing prostitution" – provide sufficient guidance as

to what is required under the condition.

Because Plaintiffs' statutory and constitutional claims are without merit, and because

Plaintiffs fail to demonstrate irreparable harm, this Court should not exercise its equitable power

to take the extraordinary step of enjoining the operation of an Act of Congress.

## **FACTUAL BACKGROUND**

A.    The Leadership Act

In May 2003, Congress enacted the Leadership Act as part of the President's "emergency

effort [to] provide $15 billion over the next 5 years to fight AIDS abroad." Remarks on Signing

the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, 39

- 5 -

Weekly Comp. Pres. Docs. 663 (May 27, 2003).[6]  The $15 billion commitment reflected in the

Leadership Act constitutes "the largest, single upfront commitment in history for an international

public health initiative involving a specific disease." Id.  As the President explained, "[t]his Act

of Congress addresses one of the most urgent needs of the modern world.  Because of the AIDS

pandemic, a child born today in sub-Sahara Africa has a life expectancy of 47 years.  This disease

falls most heavily on women and children.  Nearly 60 percent of those infected by HIV in sub-

Sahara Africa are women.  Three million African children under 15 have the AIDS virus – 3

million.  And the disease has left 11 million orphans, more children than live in the entire state of

California."  Id.

The Leadership Act is a "massive undertaking" that creates a "comprehensive program

that has the potential in this decade to prevent 7 million new HIV infections, provide life-

extending drugs to at least 2 million infected people, [and] give humane care to 10 million HIV

sufferers and AIDS orphans."  Remarks on Signing, at 665.  Specifically, the Leadership Act

authorizes the President "to furnish assistance, on such terms and conditions as the President may

determine, for HIV/AIDS, including to prevent, treat, and monitor HIV/AIDS, and carry out

related activities, in countries in sub-Saharan Africa, the Caribbean, and other countries and

areas."  § 22 U.S.C. § 2151b-2 (incorporated in 22 U.S.C. § 7631); see also 22 U.S.C. § 2151b-

2(d) (describing the activities supported).  The Leadership Act similarly authorizes the President

to "furnish assistance, on such terms and conditions as the President may determine, for the

prevention, treatment, control and elimination of" tuberculosis, see 22 U.S.C. §§ 2151b-3, 7632,

and malaria, see 22 U.S.C. §§ 2151b-4, 7633.  For these purposes, the Leadership Act authorizes

---

[6]     A copy of the foregoing Remarks is attached as Exhibit A to the accompanying
Declaration of Richard E. Rosberger ("Rosberger Decl."), executed January 3, 2006.

an appropriation of a total of $15 billion, $3 billion for each of the fiscal years 2004 through

2008. 22 U.S.C. § 7671.

In enacting the Leadership Act, Congress found that HIV/AIDS "has assumed pandemic

proportions," and that more than 65 million people worldwide have been infected with HIV since

the epidemic began.  22 U.S.C. § 7601(1) & (2).  Congress further found that "[w]omen are four

times more vulnerable to infection than are men and are becoming infected at increasingly high

rates, in part because many societies do not provide poor women and young girls with the social,

legal, and cultural protections against high risk activities that expose them to HIV/AIDS." 22

U.S.C. § 7601(3)(B).  Congress determined that "[s]uccessful strategies to stem the spread of the

HIV/AIDS pandemic will require . . . measures to address the social and behavioral causes of the

problem."  22 U.S.C. § 7601(15); see also id. § 7601(20)(D) ("behavior change . . . is a very

successful way to prevent the spread of HIV").  Specifically focusing on high-risk behaviors,

Congress found that:

> Prostitution and other sexual victimization are degrading to women and children
> and it should be the policy of the United States to eradicate such practices.  The
> sex industry, the trafficking of individuals into such industry, and sexual violence
> are additional causes of and factors in the spread of the HIV/AIDS epidemic. . . .
> Victims of coercive sexual encounters do not get to make choices about their
> sexual activities.

22 U.S.C. § 7601(23); see also H.R. Rep. No. 108-60, at 33-34 (2003) ("prostitution, sex

trafficking and sexual violence are additional causes and factors in the spread of HIV/AIDS").

It was Congress's considered view that "the magnitude and scope of the HIV/AIDS crisis

demands a comprehensive, long-term, international response focused upon addressing the causes,

reducing the spread, and ameliorating the consequences of the HIV/AIDS pandemic."  22 U.S.C.

§ 7601(21).  Congress determined that a critical element of this comprehensive plan was to

"increase the participation of at-risk populations in programs designed to encourage behavioral

and social change," id. § 7601(21)(C), and that a focus of United States international leadership on halting the spread of HIV/AIDS and eliminating the behaviors that contribute to its spread would be to "promot[e] healthy lifestyles, including abstinence, delaying sexual debut, monogamy, marriage, faithfulness, use of condoms, and avoiding substance abuse." 22 U.S.C. § 7601(22)(E); accord H. Rep. 108-60 (noting that the bill "stresses the importance of behavior change . . . as the foundation of efforts to fight HIV/AIDS").

Thus, the Leadership Act "endorses a multisectoral approach to fighting AIDS," H. Rep. No. 108-60, at 23, and requires "establishing a comprehensive, integrated five-year, global strategy to fight HIV/AIDS . . . ." 22 U.S.C. § 7603(1). A key element of this comprehensive strategy is to "provide that the reduction of HIV/AIDS behavioral risks shall be a priority of all prevention efforts in terms of funding, educational messages, and activities by promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault and sexual exploitation of women and children." 22 U.S.C. § 7611(a)(4) (emphasis added).

Congress's conclusion that prostitution and sex trafficking are "causes of and factors in the spread of the HIV/AIDS epidemic," 22 U.S.C. § 7601(23), and that eradication of these practices was a necessary element of any comprehensive plan to fight HIV/AIDS, was supported by the testimony Congress heard in the course of considering both the Leadership Act and the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (December 2003), which amended the Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (October 2000). Thus, for example, the Senate heard from the Honorable Frank E. Loy, then the Undersecretary of State for Global Affairs, who testified that

- 8 -

"[i]ndividuals trafficked into the sex industry are coerced by their criminal captors to engage in activities that will expose them to deadly diseases, including HIV and AIDS. We understand that of the thousands of women and girls trafficked from Nepal annually – many of whom are in their early teens or younger – of the few hundred who may escape – more than 65 percent are HIV positive." International Trafficking in Women and Children, Hearings before the Subcommittee on Near Eastern and South Asian Affairs of the Comm. on Foreign Relations, United States Senate, S. Hrg. 106-705 (February 22, 2000 & April 4, 2000).

Congress also heard from Dr. Donna M. Hughes, Professor and Carlson Endowed Chair in Women's Studies, University of Rhode Island, Kingston, RI, who testified that "[w]omen and children who are trafficked are at high risk for infection for HIV which is a death sentence for victims. Brothels and other sites for women and children who are used in prostitution are markets for the distribution of the AIDS virus." Trafficking in Women & Children in East Asia and Beyond: A Review of U.S. Policy, Hearing before the Subcommittee on East Asian and Pacific Affairs of the Comm. on Foreign Relations, United States Senate, S. Hrg. 108-105 (April 9, 2003), at 18.

Gary Haugen, President and CEO, International Justice Mission, Washington, DC, agreed: "Federal funding of programs aimed at combating the international AIDS epidemic must include support of programs to combat sex trafficking and other forms of sexual violence against women and girls, or else our effort to fight AIDS will simply fail to address one of the most fundamental and certainly most brutal causes of the epidemic. . . . You could fill this hearing room with the children today who are passing away painfully because of the AIDS virus that was forcibly infected on them in brothels." Id. at 29; see also id. at 41 ("I don't think anybody doubts that there's a tremendous nexus between prostitution and the spread of AIDS").

- 9 -

In one hearing, Senator Sam Brownback of Kansas provided statistics regarding the

connection between prostitution and the spread of sexually transmitted diseases, including

HIV/AIDS:

> 50 to 70 percent of the Burmese prostitutes in Thailand are HIV-positive. The rate of HIV infection is 50 percent or higher among female prostitutes in Northern Thailand, 40 to 50 percent of the prostitutes in Cambodia are HIV positive, 60 percent of women prostitutes in Bombay's red light district are infected with STDs or AIDS. In 1991, Bombay's 100,000 prostitutes averaged 600,000 sexual contacts a day, and at that time 30 percent were HIV positive. . . .
>
> You can see that the spread of HIV associated with prostitution is just a clear, huge problem for us . . . .

S. Hrg. 108-105, at 18.

Congress's enactment of the Leadership Act was also guided by the National Security

Presidential Directive relating to trafficking in persons. See Press Release, Trafficking in

Persons National Security Presidential Directive, Feb. 25, 2003, attached as Ex. B to the

Rosberger Decl.[7] The President's directive explains that "trafficking in persons refers to actions,

often including the use of force, fraud, or coercion, to compel someone into a situation in which

he or she will be exploited for sexual purposes, which could include prostitution or pornography,

or for labor without compensation. . . ." Id. The President determined that "[p]rostitution and

related activities, which are inherently harmful and dehumanizing, contribute to the phenomenon

of trafficking in persons, as does sex tourism, which is an estimated $1 billion per year business

worldwide." Id. Like Congress, the President deplored the "exposure of trafficked people to

abuse, deprivation and disease, including HIV," and committed the United States to a policy of

eradicating such practices. Id.

In light of the clear evidence connecting prostitution, sex trafficking and the spread of

---

[7] The text of the National Security Presidential Directive is classified.

HIV/AIDS, and given Congress's policy goal of prioritizing behavior change and, specifically, the eradication of prostitution and other sexual victimization, as part of its fight against the disease, see 22 U.S.C. §§ 7601(23), 7611(a)(4), the Leadership Act imposed two limitations on the $15 billion program it created to prevent, treat, and monitor HIV/AIDS: the organizational eligibility restriction, see 22 U.S.C. §§ 7631(f), and a second limitation providing that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U.S.C. § 7631(e) (hereinafter, the "government funding restriction").[8]

B.    USAID's Implementation of the Leadership Act

    1.    USAID's Acquisition and Assistance Policy Directive

In order to implement the Leadership Act, on June 9, 2005, USAID issued Acquisition and Assistance Policy Directive ("AAPD") 05-04, attached as Ex. C to Rosberger Decl. AAPD 05-04 requires, among other things, that HIV/AIDS grants and cooperative agreements include a standard provision, entitled "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking," which requires that recipients of HIV/AIDS funds must have a policy explicitly opposing prostitution and sex trafficking. Specifically, AAPD 05-04 requires that the following language be "included as part of the Standard Provisions of any grant or cooperative agreement or subagreement funded with FY04-FY08 HIV/AIDS funds with a U.S. nongovernmental organization, non-U.S., non-governmental organization or public international organizations":

---

    [8]    Plaintiffs do not challenge the government funding restriction. See Compl. ¶¶ 29-30.

"PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE
LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX
TRAFFICKING (ASSISTANCE) (JUNE 2005)

(a) The U.S. Government is opposed to prostitution and related activities, which
are inherently harmful and dehumanizing, and contribute to the phenomenon of
trafficking in persons. None of the funds made available under this agreement
may be used to promote or advocate the legalization or practice of prostitution or
sex trafficking. Nothing in the preceding sentence shall be construed to preclude
the provision to individuals of palliative care, treatment, or post-exposure
pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities,
including test kits, condoms, and, when proven effective, microbicides.

(b) Except as noted in the second sentence of this paragraph, as a condition of
entering into this agreement or any subagreement, a non-governmental
organization or public international organization recipient/subrecipient must have
a policy explicitly opposing prostitution and sex trafficking. The following
organizations are exempt from this paragraph: the Global Fund to Fight AIDS,
Tuberculosis and Malaria; the World Health Organization; the International AIDS
Vaccine Initiative; and any United Nations agency.

(c) The following definition applies for purposes of this provision:

Sex trafficking means the recruitment, harboring, transportation, provision, or
obtaining of a person for the purpose of a commercial sex act. 22 U.S.C. 7102(9).

(d) The recipient shall insert this provision, which is a standard provision, in all
subagreements.

(e) This provision includes express terms and conditions of the agreement and
any violation of it shall be grounds for unilateral termination of the agreement by
USAID prior to the end of its term.

AAPD 05-04 at 5. AAPD 05-04 further provides that, prior to receipt of funds, all prime

recipients of FY04-FY08 HIV/AIDS funds must "provide to the Agreement Officer a

certification substantially as follows":

[Recipient's name] certifies compliance as applicable with the Standard
Provision[] entitled . . . "Prohibition on the Promotion or Advocacy of the
Legalization or Practice of Prostitution or Sex Trafficking" included in the
referenced agreement.

AAPD 05-04 at 6.

- 12 -

2.    USAID's Additional Guidance to AOSI

With respect to the Plaintiffs here, upon inquiry by AOSI/OSI, USAID confirmed to

AOSI, both orally and in writing, that advocating for the legalization of prostitution would be a

clear indication that an organization does not explicitly oppose prostitution, and that organizing

or unionizing prostitutes for the purposes of advocating for the legalization of prostitution, as

distinct from organizing for the purposes of deterring human rights abuses and addressing public

health issues, would further indicate that an organization does not explicitly oppose prostitution.

See October 7, 2005 Letter, from USAID to AOSI ("USAID Guidance"), attached as Ex. D to

Rosberger Decl.

C.    HHS's Implementation of the Leadership Act

As of May 2005, HHS required that all new program announcements for its grant and

cooperative agreements that were funded under the Leadership Act in 2005 contain a standard

provision entitled "Prostitution and Related Activities," providing, among other things, that all

funding recipients, including U.S.-based NGOs and non-U.S.-based NGOs, "must have a policy

explicitly opposing prostitution."[9] See, e.g., 70 F.R. 29759 (May 24, 2005) (attached as Exhibit

E to the Rosberger Decl. and containing complete provision). In addition, HHS required that all

prime recipients receiving Leadership Act funds certify compliance with the standard provision

prior to actual receipt of such funds. The provision stated that recipients' compliance with the

provision was an "express term and condition of receiving U.S. government funds," and that

"any violation of it shall be grounds for unilateral termination by HHS of the agreement with

---

[9]     In addition, existing grantees and cooperative agreement holders that were initially
funded prior to 2005, but which were receiving continued funding in fiscal year 2005 under a
continuation award, also received notice of the foregoing provision in their 2005 continuation awards
with HHS.

HHS."

D.     Plaintiffs' Complaint and Motions for a Preliminary Injunction and TRO

On September 23, 2005, AOSI/OSI filed their original complaint, which they later amended on December 5, 2005 to include Pathfinder as an additional plaintiff and DHHS and CDC as additional defendants. Plaintiffs' Amended Complaint challenges, on statutory and constitutional grounds, the organizational eligibility restriction and its implementation by the Defendants. Compl. ¶¶ 97-101.[10]

1.     OSI and AOSI

According to the Amended Complaint, OSI is a U.S.-based foundation that established AOSI as a separately incorporated not-for-profit organization. Id. ¶¶ 4, 9. AOSI operates a program aimed at reducing the use of drugs, and stopping the spread of HIV/AIDS in a region of Central Asia, primarily with a five-year, $16 million grant from USAID. Id. ¶¶ 73-74.

Plaintiffs allege that, to be eligible for continued HIV/AIDS funding, AOSI signed a certification on August 3, 2005, affirming its compliance with the requirement that it have a policy explicitly opposing prostitution. Id. ¶ 83. Plaintiffs allege that OSI is not a party to, and has no legal obligation, under AOSI's cooperative agreement with USAID, id. ¶ 75, and do not allege that OSI ever sought or received funding under the Act, though OSI purportedly wishes to preserve its eligibility for such funding. Id. ¶ 7.

According to the Amended Complaint, AOSI/OSI met with a USAID official in April 2005 who stated that, among other things, the organizational eligibility restriction barred recipients from advocating the legalization of sex work. Id. ¶ 42. The Amended Complaint further acknowledges that USAID expressly advised AOSI in October 2005 that (i) advocating

---

[10]     Citations to "Compl. ¶ __" are to paragraphs of the Amended Complaint.

the legalization of the institution of prostitution and (ii) organizing or unionizing prostitutes for the purposes of advocating for the legalization of prostitution would violate the organizational eligibility restriction. Id. ¶ 45.

Based on such allegations, as initially pleaded in the original complaint, AOSI/OSI moved for a preliminary injunction on September 28, 2005, and for a temporary restraining order ("TRO") on October 12, 2005, barring USAID from applying the eligibility requirement established by Congress with respect to AOSI's activities, and directing USAID to continue to fund AOSI pending the outcome of this case. See AOSI/OSI Notice of Motion for Preliminary Injunction.[11] Among other things, in its motion papers, AOSI/OSI claim that AOSI became aware in the Spring of 2005 that USAID was planning to enforce the organizational eligibility requirement with respect to U.S.-based organizations. See Declaration of Robert E. Kushen ("Kushen Decl."), attached to Notice of Motion, at ¶ 28. AOSI/OSI further indicate that, following AOSI's certification in August 2005 that it had a policy opposing prostitution, USAID obligated itself to provide almost $4 million dollars to AOSI through the middle of 2006, and that AOSI/OSI "now feels free to file this lawsuit without risking a harmful hold-up in USAID funding." Id. ¶ 47; see also Compl. ¶ 84.

2.    Pathfinder

The Amended Complaint alleges that Pathfinder is a U.S.-based non-profit organization that, among other things, works to halt the spread of HIV/AIDS. Compl. ¶¶ 11-12. Pathfinder receives grants from multiple sources, and receives funding under the Leadership Act from

---

[11]    As part of their motion for a preliminary injunction, Plaintiffs also seek a declaration affirming their interpretation of the organizational eligibility restriction or declaring that Defendants' application of the organizational eligibility restriction to U.S.-based NGOs is unconstitutional. See AOSI/OSI Not. of Mot. at 2-3; Pathfinder Not. of Mot. at 3. Plainly, such final relief going to the merits is beyond the scope of their preliminary injunction motion.

- 15 -

USAID and HHS. Id. ¶¶ 13, 28.

According to the Amended Complaint, HHS began applying the organizational eligibility restriction to U.S.-based NGOs in May 2005. Id. ¶ 38. Pathfinder alleges that HHS has not defined the phrase "explicitly opposing prostitution," or issued any guidance to explain what is permissible or impermissible under the restriction, id. ¶ 39, but does not allege that it ever sought such guidance. In July 2005, Pathfinder allegedly adopted a policy explicitly opposing prostitution in order to continue to receive funding under the Leadership Act. Id. ¶ 85.

On December 7, 2005, more than two months after the original complaint was filed in this action and nearly five months after it allegedly adopted the aforementioned policy and accepted continued government funding to conduct HIV/AIDS activities, Pathfinder joined the complaint as a plaintiff and submitted a separate motion for a preliminary injunction, adopting and incorporating arguments raised by AOSI/OSI in their motion (apart from those arguments that were specific to OSI), see Memorandum of Law in Support of Motion of Plaintiff Pathfinder International for a Preliminary Injunction ("Pathfinder Mem."), at 6, and seeking essentially the same type of relief. See Pathfinder Not. of Motion.

E.    The Amici

Two sets of amici, each representing a number of NGOs, have submitted briefs that draw starkly different conclusions from the policy choices reflected in the Leadership Act. Certain NGOs, including AIDS Action (the "AIDS Action Amici"), which purportedly provide services relating to the global effort to combat HIV/AIDS, have submitted an amicus brief in support of Plaintiffs' motions, arguing that their mission is threatened by the organizational eligibility restriction. See Memorandum of Law of AIDS Action and Twenty-One Other Organizations as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction ("AIDS Action Am.

- 16 -

Br."). According to the AIDS Action Amici, the restriction would have a "potentially"

devastating effect on public health, AIDS Action Am. Br. at 2, because by requiring that

organizations have a policy opposing prostitution, organizations will have to "stigmatize the very

individuals they are trying to help," which would, in turn, undermine efforts to prevent the spread

of HIV/AIDS. Id. at 4-5. The AIDS Action Amici further argue that the organizational

eligibility restriction cannot pass First Amendment scrutiny because the restriction "undermines

rather than reinforces the government's goal" of reducing the spread of HIV/AIDS. Id. at 6-7.

In direct contrast, other NGOs, including Coalition Against Trafficking in Women and

Equality Now (the "Equality Now Amici"), which also provide HIV/AIDS prevention services,

flatly reject the argument that the Leadership Act's requirement that funding recipients have a

policy explicitly opposing prostitution would somehow undermine efforts to combat HIV/AIDS.

Memorandum of Law of Organizations as Amici Curiae ("Equality Now Am. Br.") at 1. On the

contrary, the Equality Now Amici assert that organizations that oppose prostitution are the most

effective in combating the spread of HIV/AIDS, id. at 8-11, and that the United States has

compelling reasons for deciding that Leadership Act funds should be granted only to

organizations with such a policy. Id. at 2, 15.

## ARGUMENT

Preliminary injunctive relief, such as that demanded by Plaintiffs, is an "extraordinary"

and "drastic" measure that should be sparingly exercised. Borey v. National Union Fire Ins. Co.

of Pittsburgh v. Martin, 934 F.2d 30, 33-34 (2d Cir. 1991). Further, where as a here, a party

seeks a preliminary injunction enjoining the enforcement of governmental rules, the party's

burden is increased. Velazquez v. Legal Services Corp., 164 F.3d 757, 763 (2d Cir. 1999), aff'd,

Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001). The movant must demonstrate both

"(1) that it will suffer irreparable harm and (2) that it is likely to succeed on the merits." New

- 17 -

York City Environmental Justice Alliance v. Giuliani, 214 F.3d 65, 68 (2d Cir. 2000).

When contemplating a preliminary injunction enjoining the operation of a duly enacted statute, moreover, a court is considering "in reality a suspension of an act, delaying the date selected by Congress to put its chosen policies into effect." Heart of Atlanta Motel, Inc. v. United States, 85 S. Ct. 1, 2 (1964) (Black, J., in chambers). Thus, "judicial power to stay an act of Congress, like judicial power to hold that act unconstitutional, is an awesome responsibility calling for the utmost circumspection in its exercise." Turner Broadcasting System, Inc. v. F.C.C., 507 U.S. 1301, 1301 (1993) (Rehnquist, J., in chambers) (quoting Heart of Atlanta Motel, Inc., 85 S. Ct. at 2).[12]

As fully described herein, Plaintiffs fail to satisfy either of the strict prerequisites for the requested injunctive relief.

### POINT I

### PLAINTIFFS FAIL TO DEMONSTRATE ANY LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIM THAT DEFENDANTS' CONSTRUCTION OF THE LEADERSHIP ACT IS IMPERMISSIBLE

Plaintiffs assert that Defendants have exceeded their statutory authority by interpreting the organizational eligibility restriction to mandate that organizations receiving U.S. Government funds for HIV/AIDS activities not engage in speech or conduct inconsistent with an opposition to prostitution. Rather, Plaintiffs argue that, to be eligible for funding, organizations need simply state, in writing, words to the effect that they oppose the harms caused by prostitution; they are then free to engage in any conduct without risking funding eligibility. AOSI/OSI Mem. at 16. This Court should uphold Defendants' reasonable construction, consistent with the statutory text

---

[12]      AOSI/OSI's motion for a TRO should be denied under the same stringent standards that govern Plaintiffs' motions for a preliminary injunction. See Spencer Trask Software and Information Services, LLC v. Rpost International Limited, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002); Roberts v. Atlantic Recording Corp., 892 F. Supp. 83, 86 (S.D.N.Y. 1995).

and the intent of Congress, and reject Plaintiffs' implausible one.

A.      Defendants' Interpretation of the Leadership Act is Entitled to Deference

"Considerable weight should be accorded to an executive department's construction of a

statutory scheme it is entrusted to administer." Chevron U.S.A., Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837, 844 (1984). Where, as here, the agencies' challenged interpretation

is not the result of formal rulemaking or adjudication, its construction generally is entitled to at

least "some deference" provided it is a "permissible construction of the statute." See Reno v.

Koray, 515 U.S. 50, 61 (1995) (quoting Chevron, 467 U.S. at 843); Loeffler v. Menifee, 326 F.

Supp. 2d 454, 458 (S.D.N.Y. 2004); Cohn v. Federal Bureau of Prisons, 302 F. Supp. 2d 267,

271 (S.D.N.Y. 2004).[13] Additionally, "special deference [] should be accorded to the executive

in those activities that impinge on foreign activities." Population Institute v. McPherson, 797

F.2d 1062, 1070, 1072 (D.C. Cir. 1986) (upholding USAID Administrator's interpretation of

statutory amendment as a "reasonable view of the amendment's meaning").[14]

That an agency's interpretation of a statute may depart from a previous construction does

---

[13]      Likewise, because HHS and USAID have policy expertise in the fight against HIV/AIDS, and the Government-wide funding thereof, their interpretation should be given at least some deference, though not necessarily full Chevron deference. See 1185 Avenue of the Americas Assocs. v. Resolution Trust Corp., 22 F.3d 494, 497 (2d Cir. 1994) ("[W]here ... Congress has entrusted more than one federal agency with the administration of a statute ... a reviewing court does not ... owe as much deference as it might otherwise give if the interpretation were made by a single agency similarly entrusted with powers of interpretation.") (citation omitted); see also National Home Equity Mortgage Assoc. v. Office of Thrift Supervision, 271 F. Supp. 2d 264, 274 (D. D.C. 2003) (discussing broad range of deference courts afford to agency's interpretation of statute that is implemented by several agencies).

[14]      Thus, the Second Circuit and other courts have previously afforded USAID substantial deference under Chevron in implementing a policy withholding federal funding, under the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 et seq., from foreign non-governmental organizations that engaged in abortion-related activities. Planned Parenthood Federation of America, Inc. v. AID, 838 F.2d 649, 654 (2d Cir. 1988); Population Institute v. McPherson, 797 F.2d 1062, 1070 (D.C. Cir. 1986).

- 19 -

not alter the deference afforded. See Rust v. Sullivan, 500 U.S. 173, 186 (1991) ("This Court has

rejected the argument that an agency's interpretation 'is not entitled to deference because it

represents a sharp break with prior interpretations' of the statute in question") (citation omitted).

"An initial agency interpretation is not instantly carved in stone"; rather, the agency "must

consider varying interpretations and the wisdom of its policy on a continuing basis." Chevron,

467 U.S. at 863–64.

Here, this Court should defer to Defendants' reasonable construction of the organizational

eligibility restriction as requiring that recipients of federal funding not engage in speech or

conduct that is inconsistent with an opposition to prostitution. Moreover, the very statutory tools

of construction relied on by Plaintiffs to support their notion that the Act merely requires a

statement opposing prostitution actually counsels in favor of Defendants' straightforward

construction.

B.    Plaintiffs' Construction of the Term "Policy" Is At Odds With Its Ordinary Meaning

The starting point in interpreting the Leadership Act's organizational eligibility restriction

is the language itself, and courts should construe the Act's terms to have their ordinary meaning.

See Escondido Mutual Water Co. v. La Jolla Band of Mission Indians, 466 U.S. 765, 772 (1984);

American Tobacco Co v. Patterson, 456 U.S. 63, 68 (1982); United States v. Lucien, 347 F.3d

45, 51 (2d Cir. 2003). Plaintiffs assert that the operative phrase in the provision – that funding

recipients must have a "policy explicitly opposing prostitution" – makes clear that recipients are

required only to make a mere "statement of general orientation" with respect to their opinion on

prostitution, and are not required to act in conformance to their stated opposition. AOSI/OSI

Mem. at 16.

Plaintiffs argument that the term "policy" connotes a mere "statement" is refuted by the

very dictionary sources on which they rely. See The American Heritage Dictionary of English

(4th ed. 2000) (AOSI/OSI Mem. at 16) (defining policy as "A plan or course of action, as of a government, political party or business, intended to influence and determine decisions, actions, and other matters" and listing as example of usage, "American foreign policy").[15] None of the definitions relied on by Plaintiffs reduces the term "policy" to a simple, empty statement, as Plaintiffs erroneously assert. Rather, there is an interdependence between an organization's policies and its past and future conduct. Accordingly, Defendants' reading of the organizational eligibility restriction to require that, as a condition of funding, an organization's conduct must be consistent with an opposition to prostitution is fairly supported by the language of the Leadership Act.[16]

C.    Plaintiffs' Interpretation Impedes the Overall Purpose of the Act

Plaintiffs mistakenly argue that the organizational eligibility restriction's relationship to other provisions in the Leadership Act precludes Defendants' interpretation of the restriction as requiring that recipients not engage in conduct supporting prostitution. On the contrary, when the restriction is examined in context, it is plain that Defendants' interpretation is supported by the overall statutory scheme and by common sense. See Food and Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (AOSI/OSI Mem. at 20)

---

[15]    See also The New Oxford American Dictionary (2001) (defining policy as a "course or principle of action adopted or proposed by a government, party, business, or individual").

[16]    Plaintiffs' reference to other sections of the Leadership Act to try to show that the term "policy" refers to the mere making of a statement, irrespective of inconsistent conduct, AOSI/OSI Mem. at 17 n.19, is unavailing. For example, 22 U.S.C. § 7652(a), under the title heading "Policy," provides that the United States places "high priority" on certain specified conduct such as the prevention of mother-to-child transmission of HIV/AIDS, and then proceeds to describe, in the following sub-section, the "Requirements" of such a policy. 22 U.S.C § 7652(b). To engage in conduct that is at odds with the "priority" of preventing mother-to-child transmission would plainly violate the foregoing policy. Likewise, by requiring that organizations adhere to a policy (not simply issue a statement) opposing prostitution, Congress obligated organizations not to engage in acts, such as supporting the legalization of prostitution, that fail to conform with their professed opposition. Again, as components of a policy, statements and conduct are inextricably intertwined.

- 21 -

(holding that the plaintiff's reading of the statute was consistent with the overall purpose and core objectives of statute and supported by common sense). Plaintiffs' interpretation – reducing an organization's obligation to oppose prostitution to a mere empty statement, while the organization remains free to engage in conduct fully supportive of prostitution – would frustrate the Act's strategies and goals, and create an environment for risky behavior that the Act aims to prevent as part of its comprehensive approach to fighting the spread of HIV/AIDS. See 22 U.S.C. §§ 7601(23), 7611(a)(4) (stating that it is a "priority" of Congress's HIV/AIDS strategy and a "policy" of the United States to "eradicat[e]" prostitution).

Plaintiffs' contention that Defendants' construction of the organizational eligibility restriction would, in turn, render the government funding restriction[17] superfluous, AOSI/OSI Mem. at 18, lacks merit. In fact, the organizational eligibility and government funding restrictions act in tandem, but have discrete purposes. The government funding restriction, 22 U.S.C. § 7631(e), is directed solely to federally-funded activities, prohibiting the use of funds to promote or advocate the legalization or practice of prostitution or sex trafficking, and then clarifying that certain acts (e.g., the provision to individuals of palliative care, and necessary pharmaceuticals and commodities, such as condoms) are not precluded. In contrast, the organizational eligibility restriction applies to organizations, serving to ensure that federal subsidies are not awarded to entities that have policies inconsistent with the goals of the program created by the Leadership Act. In other words, the government funding restriction reflects Congress's choice as to what activities it will subsidize, whereas the organizational eligibility restriction reflects its choice as to which entities it will subsidize.

In addition, Plaintiffs' argument (AOSI/OSI Mem. at 18) that 22 U.S.C. § 7631(d), a

---

[17]     The relevant portion of the government funding restriction is quoted supra at page 11.

provision allowing an organization to receive funding despite the fact that it does not endorse, on "religious or moral" grounds, every treatment program or prevention method that Congress supports in the fight against HIV/AIDS, somehow militates in favor of their interpretation that the organizational eligibility restriction allows funding recipients to support behavior that Congress has expressly found would harm its strategy to fight HIV/AIDS would turn the Act on its head. Section 7631(d) of the Leadership Act merely allows entities that are otherwise eligible to receive assistance to seek funding solely for prevention methods or treatment programs for which the entity has no religious or moral objections.

D.    Plaintiffs' Reliance on the Legislative History is Unavailing

Plaintiffs also allege that the legislative history of the Leadership Act's organizational eligibility restriction supports their view that the restriction merely requires the making of a written statement, in so many words, opposing prostitution. AOSI/OSI Mem. at 19. However, the legislative history of the restriction provides no particular guidance in ascertaining the meaning of its terms. As the term "policy" plainly connotes a plan and course of conduct, rather than a mere statement, resort to legislative history is, in any event, unwarranted. See Lucien, 347 F.3d at 51 ("Where the text of a statute is unambiguous, judicial inquiry ends" and "legislative history is instructive only upon 'the most extraordinary showing of contrary intentions'") (citation omitted).

Moreover, legislative history that does not establish clear and certain congressional intent cannot form the basis for enjoining regulations. See Rust v. Sullivan, 500 U.S. 173, 189-90 (1991). Here, the thin reed on which Plaintiffs base their legislative history argument is a solitary statement by a single legislator that does not substantiate congressional intent. Pl. Mem. at 19; see also 149 Cong. Res. S6451-01, 6457 (daily ed. May 15, 2003). Nothing in the brief floor exchange from which Plaintiffs cite indicates that a funding recipient that makes a statement

- 23 -

seemingly opposing prostitution can then engage in conduct actively supportive of prostitution without violating its representations under the Act and being subject to unilateral termination of the funding agreement. Plaintiffs do not, and cannot, cite to any House or Senate committee report that reflects the floor statement or their construction of it. Therefore, the plain language of the organizational eligibility restriction, as well as Defendants' reasonable construction thereof, controls. See Weinberger v. Rossi, 456 U.S. 25, 34 n.15 (1982) ("the contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history"); United States v. McGoff, 831 F.2d 1071, 1091 (D.C. Cir. 1987) (holding that statement of single senator, even when a sponsor, carries "little weight"); see also Velazquez, 164 F.3d at 757 (holding that agency's construction of statute was permissible despite fact that the legislative history gave some limited support to plaintiffs' reading where the statutory text was "silent" on the point).

E.    The Doctrine of Constitutional Avoidance Is Not Applicable Here

Under the doctrine of constitutional avoidance, a court should "avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." Gomez v. United States, 490 U.S. 858, 864 (1989); United States v. $359,500 in United States Currency, 828 F.2d 930, 934 (2d Cir. 1987) (declining to apply doctrine of constitutional avoidance where the language and history of the statutory provision foreclosed construction that allegedly would not reach constitutional issue).

Plaintiffs argue that this Court should interpret the organizational eligibility restriction as merely requiring the making of a general statement to avoid rendering the restriction unconstitutional by virtue of its otherwise allegedly impermissible conditions on privately-funded conduct. AOSI/OSI Mem. at 19-20. Contrary to Plaintiffs' assertion, the doctrine of

constitutional avoidance has no bearing.[18] First, Plaintiffs themselves have raised the argument that even if the statute only required that a funding recipient make a written statement opposing prostitution, that requirement alone would be unconstitutional, thereby not permitting the avoidance of a constitutional issue. See Compl. ¶ 33 ("plaintiffs believe it is unconstitutional for the government to force them to adopt a policy position"); AOSI/OSI Mem. at 6 & n.9 ("idea of a political pledge" violates First Amendment"). Moreover, Plaintiffs' construction of the organizational eligibility restriction as requiring that funding recipients make only a written statement in opposition to prostitution is not a plausible reading of Congressional intent. The organizational eligibility restriction unambiguously requires, as a condition of funding, that organizations not engage in conduct that supports prostitution. See United States v. Awadallah, 349 F.3d 42, 55 (2d Cir. 2003) (canon of constitutional avoidance applies only where statute is ambiguous and a viable alternative interpretation exists).

The cases cited by Plaintiffs do not support the application of the doctrine of constitutional avoidance under the circumstances here; rather, they demonstrate that the doctrine does not apply where, as here, Congressional intent is clear. For example, in Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction, 485 U.S. 568 (1988) (AOSI/OSI Mem. at 20), the Court applied the doctrine, because unlike here, the statutory provision was ambiguous and permitted the competing interpretation avoiding the constitutional issue. In the other cases cited, the Court did not have to consider the doctrine of constitutional avoidance because the meaning of the statutes was clear. See Food and Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000) (AOSI/OSI Mem. at 20 n.20) (Congress unambiguously expressed its intent in the statute); MCI Telecommunications Corp. v.

[18] Moreover, as set forth in Point II supra, the organizational eligibility restriction is not unconstitutional and does not violate Plaintiffs' First Amendment rights.

- 25 -

AT&T, 512 U.S. 218 (1994) (same); Solid Waste Agency of Northern Cook County v. United

States Army Corps of Engineers, 531 U.S. 159 (2001) (AOSI/OSI Mem. at 20) (holding that

statutory provision at issue was clear, and further holding in dicta that canon of constitutional

avoidance precluded agency's construction).

F.     The Government Has Consistently Interpreted the Leadership Act's Organizational
       Eligibility Restriction as Applying Exclusively to Organizations Receiving Leadership
       Act Funds

AOSI/OSI argue that, by its terms, the organizational eligibility restriction does not apply

directly to OSI, which does not receive Leadership Act funds, and that USAID cannot enforce the

restriction's terms against OSI. AOSI/OSI Mem. at 21; Compl. ¶ 75 ("OSI is not a party to, and

has no legal obligations under, the Cooperative Agreement with USAID"). On this limited point,

AOSI/OSI's interpretation is correct: OSI is not subject to the Leadership Act's organizational

eligibility restriction because it receives no Leadership Act funds.[19]

---

[19]     For this reason, OSI lacks standing to challenge the organizational eligibility
restriction. Although OSI states that it is interested in preserving its eligibility to receive funding,
see Compl. ¶ 7, it does not allege that it has sought or intends to seek such funding. Therefore, it
cannot allege any violation of its own First Amendment rights. See generally DKT Memorial Fund,
Ltd. v. Agency for International Development, 810 F.3d 1236, 1238 (D.C. Cir. 1987) (considering
standing of NGO that sought USAID funding, and addressing issue whether organization had
established that it was otherwise qualified for funding). Further, with respect to the required
showing of injury, AOSI/OSI relies on cases (AOSI/OSI Mem. at 4 n.8) conferring standing on
booksellers required to take significant and costly compliance measures or risk criminal prosecution,
Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383 (1984), or holding that funding recipients that
risk defunding unless they implement costly measurements might be able to bring an as-applied
challenge to statute. See Velazquez v. Legal Servs. Corp., 164 F.3d 757, 767 (2d Cir. 1999), aff'd,
Legal Servs. Corp. v. Velazquez, 531 U.S. 533 (2001). Here, OSI cannot allege any harm to itself,
nor can it base standing on its fear that USAID will sanction AOSI for OSI's conduct, see Neier
Decl. ¶¶ 18, 29, attached to AOSI/OSI Not. of Motion. See Bordell v. General Electric Co., 922 F.2d
1057, 1061 (2d Cir. 1991) (plaintiff cannot base standing on alleged "subjective chill" on speech or
on injury to third party, but must show his own cognizable injury).

## POINT II

### PLAINTIFFS' ARGUMENT THAT THE ORGANIZATIONAL ELIGIBILITY RESTRICTION IS UNCONSTITUTIONAL IS UNLIKELY TO SUCCEED ON THE MERITS

Acts of Congress are presumptively constitutional, Bowen v. Kendrick, 487 U.S. 589,

617 (1988), and facial invalidation of an Act of Congress "is, manifestly, strong medicine" that

"has been employed by the Court sparingly and only as a last resort." Nat'l Endowment for the

Arts v. Finley, 524 U.S. 569, 580 (1998) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613

(1973)); see also Rust v. Sullivan, 500 U.S. 173, 191 (1991) ("a decision to declare an Act of

Congress unconstitutional 'is the gravest and most delicate duty that [a] Court is called on to

perform'") (quoting Blodgett v. Holden, 275 U.S. 142, 148 (1927)). Accordingly, Plaintiffs

cannot prevail on their facial attack to the constitutionality of the Leadership Act if there are

"'any circumstances under which the prohibitions of the Act are permissible.'" Velazquez, 164

F.3d at 763, quoting Able v. United States, 88 F.3d 1280, 1290 (2d Cir. 1996). Plaintiffs fall far

short of satisfying this exacting burden.

A.    The Leadership Act is a Spending Clause Enactment Subject to a Rational Relationship Test

Congress enacted the Leadership Act under the Constitution's Spending Clause, which

empowers Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and

provide for the common Defence and general welfare of the United States." See U.S. Const.,

Art. I, § 8, cl.1. Courts have repeatedly upheld Congress's use of the spending power "to further

broad policy objectives by conditioning receipt of federal moneys upon compliance by the

recipient with federal statutory and administrative directives." South Dakota v. Dole, 483 U.S.

203, 206 (1987) (quoting Fullilove v. Klutznick, 448 U.S. 448, 474 (1980) (opinion of Burger,

C.J.)). "Congress has wide latitude to attach conditions to the receipt of federal assistance in

- 27 -

order to further its policy objectives." United States v. American Library Assoc., Inc., 539 U.S. 194 (2003) (plurality opinion).

The reach of the spending power is broad, and it "is not limited by the direct grants of legislative power found in the Constitution." United States v. Butler, 297 U.S. 1, 66 (1936). The constitutional limitations on Congress when it exercises its spending power therefore "are less exacting than those on its authority to regulate directly." Dole, 483 U.S. at 209. As the Supreme Court explained in Finley with respect to Congress's use of its spending clause authority, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 524 U.S. at 588. The "basic difference" referred to by the Finley Court is the distinction between a legal obligation that is imposed by the coercive power of the government and a course of action that is voluntarily assumed by persons or entities seeking to avail themselves of a government-conferred subsidy. As set forth below, this distinction plays a critical role in the evaluation of government action: the constraints imposed by the First Amendment are substantially less demanding in circumstances where the activity that is alleged to violate the First Amendment arises not from governmentally imposed regulation, but instead from a voluntary undertaking by the recipient of a government subsidy.

Thus, where, as here, Congress exercises its power to condition federal spending on compliance by recipients of federal funding with conditions dictated by federal policy, the appropriate framework for assessing the constitutionality of such conditions are the less rigorous standards that govern Congress's exercise of its Spending Power. See Am. Library Ass'n v. United States, 539 U.S. 194, 203 n. 2 (applying South Dakota v. Dole as "the appropriate framework for assessing [the Act's] constitutionality" where "Congress has exercised its Spending Power by specifying conditions on the receipt of federal funds," and where statute does

- 28 -

not "directly regulate private conduct"). Under that framework, Congress may impose conditions on grants where they are reasonably related to a legitimate governmental purpose. See Dole, 483 U.S. at 207; Regan, 461 U.S. at 550 ("It was not irrational for Congress to decide that tax-exempt organizations ... should not further benefit at the expense of taxpayers at large by obtaining a further subsidy for lobbying"); DKT Memorial Fund Ltd. v. USAID, 887 F.2d 275, 291 (D.C. Cir. 1989) ("'viewpoint-based subsidization is not 'predicated on a suspect classification,' and is subject only to a rational relationship test not the sort of strict scrutiny that may require only the use of the least restrictive means") (citing Harris v. McRae, 448 U.S. 297, 323 (1980)).

Plaintiffs erroneously argue that the organizational eligibility restriction must pass a heightened scrutiny (not rational relationship) test under which the restriction must be narrowly tailored to further a substantial government interest. AOSI/OSI Mem. at 33. However, the Supreme Court has emphasized the factors that are critical to the question of whether a subsidy provision raises the level of scrutiny beyond the rational basis review, all of which strongly favor the application of a rational basis test here. First, cases where the government is providing subsidies in order to "encourage a diversity of views from private speakers" are fundamentally distinguishable from those cases where the government is acting, not as a regulator, but rather as a facilitator of its own message. See, e.g., Velazquez, 531 U.S. 533, 587-88 (2001) ("viewpoint-based funding decision can be sustained in instances in which the government is itself the speaker . .. or instances, like Rust, in which the government used 'private speakers to transmit specific information pertaining to its own programs."). Thus, when the government broadly facilitates private speech, it is entitled to less deference than where, as here, it seeks to promote its own message.

In addition, a key factor in determining whether the government may have overstepped the bounds of the First Amendment is whether the subsidy is "manipulated" to have a "coercive

effect" such that it "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" Finley, 524 U.S. at 587 (citation omitted). Again, here, the organizational eligibility restriction imposes no such coercive effect designed to suppress ideas inimical to the Government. Plaintiffs do not allege any facts supporting an argument that the restriction is "calculated to drive certain ideas or viewpoints" from the marketplace. Indeed, Defendants do not seek to prevent Plaintiffs or any other organization from speaking out on the issue of prostitution and sex-trafficking, but merely to ensure that those organizations that they fund to conduct HIV/AIDS activities do not undermine the considered approach chosen by Congress. Thus, organizations that do not have a policy opposing prostitution are not prohibited from receiving federal funds for other non-Leadership Act purposes.

Also relevant to the proper level of scrutiny is the relationship of the funding criterion to the program that is being funded. See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 747 (1st Cir. 1995) ("the more germane a condition to a benefit, the more deferential the review; nongermane conditions, in contrast, are suspect"). Here, the organizational eligibility restriction is directly related to furthering Congress's goal of eradicating behavior that it has found contributes to the spread of HIV/AIDS.

As further described below, applying these factors, the organizational eligibility restriction should be analyzed under a rational relationship test, a test which it plainly satisfies. Moreover, even assuming arguendo that a higher level of scrutiny applied, the restriction would still pass constitutional muster, because it is necessary to ensure that funding recipients do not undermine a priority of the Leadership Act.

B.     The Organizational Eligibility Restriction Does Not Impose an "Unconstitutional
       Condition" on Recipients of Federal HIV/AIDS Grants

The crux of Plaintiffs' challenge to the organizational eligibility restriction is that it

constitutes an "unconstitutional condition" on federal funding because it compels the funding

recipient to adopt a policy opposing prostitution, which is prohibited by the compelled speech

doctrine, and bars them from engaging in conduct even with non-governmental funds.  Plaintiffs'

claims are deficient.

1.     The Denial of Federal Subsidies Is not a Penalty for Purposes of the
       Unconstitutional Conditions Doctrine

By way of background, the doctrine of "unconstitutional conditions" prohibits the

government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally

protected interests – especially his interest in freedom of speech." Perry v. Sindermann, 408 U.S.

593, 597 (1972); see also Speiser v. Randall, 357 U.S. 513 (1958).[20]  However, in a selective

spending program, like the instant one, where the Government's decides to condition its

spending on certain criteria, the "Government [is] not denying a benefit to anyone, but is . . .

simply insisting that public funds be spent for the purposes for which they were authorized."

Rust, 500 U.S. at 196.

The Supreme Court has "held in several contexts that a [government's] decision not to

subsidize the exercise of a fundamental right does not infringe the right." Regan, 461 U.S. at

549.  The mere refusal to subsidize a right "places no governmental obstacle in the path" of a

plaintiff seeking to exercise it.  Harris, 448 U.S. at 315; see also Regan, 461 U.S. at 549-50 ("the

---

[20]     In Perry, an employee at a State college alleged that he was denied tenure in
retaliation for espousing positions unpopular with the Board of Regents.  408 U.S. at 597.  In
Speiser, the Court invalidated a state statute denying tax exemptions to taxpayers who failed to sign
a statement stating that they did not engage in activities advocating the overthrow of the government.
357 U.S. at 516.

Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the

advantages of that freedom'"). As the Rust Court noted, "subsidies are just that, subsidies . . . ;

to avoid the force of the regulations, [a prospective funding recipient] can simply decline the

subsidy." 500 U.S. at 198 n.5. Because, "[a] refusal to fund protected activity, without more,

cannot be equated with the imposition of a 'penalty' on that activity," Harris, 448 U.S. at 317

n.19, Congress's determination that it will not, for purposes of funding a program aimed at

fighting HIV/AIDS, subsidize organizations that refuse to oppose practices that contribute to the

spread of HIV/AIDS, is not unconstitutional. See Rust, 500 U.S. at 194 ("When Congress

established a National Endowment for Democracy to encourage other countries to adopt

democratic principles, . . . it was not constitutionally required to fund a program to encourage

competing lines of political philosophy such as communism and fascism.").

  Thus, in DKT Memorial Fund, the D.C. Circuit, like the Court here, was confronted with

conditions attached to funding under the Foreign Assistance Act; in that case, the President had

determined that federal funds for family planning activities abroad would not be distributed to

foreign "nongovernmental organizations which perform or actively promote abortion as a method

of family planning in other nations." See id. at 277 (quoting the Policy Statement of the United

States of America at the United Nations International Conference on Population (Second

Session), Mexico, D.F., August 6-13, 1984). Plaintiffs there, as here, "attempt[ed] to couch their

claim in terms of the imposition of an 'unconstitutional' condition on the receipt of a benefit."

Id. at 287. The D.C. Circuit, however, rejected this attempt, holding that "the Speiser case . . .

speaks not at all to an act of government which does nothing other than refuse to subsidize the

exercise of a First Amendment activity," because "[t]he question of subsidy simply was not

- 32 -

before the Speiser Court."[21]   DKT Memorial Fund, 887 F.2d at 288.[22]

      2.     The Organizational Eligibility Requirement Does Not Impermissibly Compel
            AOSI or Pathfinder To Express A Particular Viewpoint

      Plaintiffs argue to no avail that the organizational eligibility restriction impermissibly

compels speech. AOSI/OSI Mem. at 27-29. As described above, the Leadership Act does not

compel the adoption of any particular policy. Plaintiffs are free, at their pleasure, to adopt any

policy they like, or no policy at all, consistent with the First Amendment, on the subject of

prostitution.[23] The Leadership Act merely specifies that if organizations, such as AOSI and

Pathfinder, choose not to adopt a policy that is consistent with the federal goal of "eradicat[ing]

prostitution" – which is one of the "causes of and factors in" the spread of HIV/AIDS, see 22

U.S.C. § 7601(23) – they are ineligible for government subsidies aimed at fighting the HIV/AIDS

pandemic. As the Supreme Court has held, there is nothing generally coercive about imposing a

condition attached to the grant of a subsidy under Congress's broad powers under the

Constitution's Spending Clause. See Dole, 483 U.S. at 211 (holding that condition on federal

highway funds on state's adoption of minimum drinking age was not coercion; "to hold that

---

[21]      The D.C. Circuit dismissed the claims of the foreign NGOs for lack of standing, but
determined that it would also address the merits of their claims.  887 F.2d at 286.

[22]      In Planned Parenthood v. Agency for Int'l Development, 915 F.2d 59 (2d Cir. 1990),
the Second Circuit addressed a challenge to the same conditions under which funding would be
denied to foreign NGOs that performed or actively promoted abortions. As the case was brought by
domestic NGOs, the Second Circuit, unlike the D.C. Circuit, did not consider directly the argument
as to whether the funding restrictions imposed impermissible conditions on the foreign NGOs.
Nevertheless, the Court made clear that the government's decision not to subsidize the exercise of
a fundamental right was not subject to strict scrutiny, and held that the agency's implementation of
the restriction to the class of foreign beneficiaries of American assistance must be upheld if rationally
related to the policy goal.

[23]      Plaintiffs allege that several organizations have, indeed, chosen to refuse to accept
Leadership Act funds, thus avoiding the requirement that they certify that they have a policy
opposing prostitution. AOSI/OSI Mem. at 13-14.

motive or temptation is equivalent to coercion is to plunge the law in endless difficulties"),

citing Charles C. Steward Machine Co. v. Davis, 301 U.S. 548, 590 (1937); Rust, 500 U.S. at

198 n.5.[24]

Also relevant, the Supreme Court has made clear that when the Government speaks or

subsidizes the transmittal of a message it favors, it may endorse one viewpoint over another by

conditioning its spending on certain criteria. Although the Government cannot use its funds in a

way that is "aimed at the suppression of ideas thought inimical to the Government's own

interest," Velazquez, 531 U.S. at 548-49, it can "without violating the Constitution, selectively

fund a program to encourage certain activities it believes to be in the public interest, without at

the same time funding an alternative program which seeks to deal with the problem in another

way." Rust, 500 U.S. at 193. The Supreme Court also has repeatedly recognized that "[w]hen

the government disburses public funds to private entities to convey a governmental message, it

may take legitimate and appropriate steps to ensure that its message is neither garbled nor

distorted by the grantee." Velazquez, 531 U.S. at 541 (quoting Rosenberger v. Rector and

Visitors of Univ. of Va., 515 U.S. 819, 833 (1995)).[25]

---

[24]     Although, in Dole, the Supreme Court stated that, in "some circumstances, the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion,'" 483 U.S. at 211, Plaintiffs have not shown that such a circumstance obtains here. Indeed, in cases considering federal subsidies to states, courts have held that the "coercion theory is unclear, suspect, and has little precedent to support its application." See, e.g., Kansas v. United States, 214 F.3d 1196, 1202 (10th Cir. 2000).

[25]     In Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001), the Supreme Court invalidated, as unconstitutional viewpoint discrimination, a federal funding condition that restricted federally-funded legal services ("LSC") lawyers from arguing in favor of amending or otherwise challenging existing welfare laws in the course of representation of their clients. The Court focused, first, on the fact that "the LSC program was designed to facilitate private speech, not to promote a governmental message." Id. at 542 (viewpoint-based restrictions are improper "when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers") (citation omitted). Moreover, according to the Supreme Court, the condition struck down in Velazquez was "designed to insulate

- 34 -

Such is the exact case here. Congress has designed a spending program to fulfill a government goal, i.e., the prevention, treatment and monitoring of HIV/AIDS, and, to do so in a manner consistent with the government's policy of "eradicating prostitution, the sex trade, rape, sexual assault, and sexual exploitation of women and children." 22 U.S.C. § 7611(a)(4). In advancing that legitimate governmental purpose, the organizational eligibility requirement plainly is not designed to "insulate the Government ... from judicial challenge" or suppress speech "inimical to the Government's own interest." Velazquez, 531 U.S. at 548-49.

The cases relied on by Plaintiffs in support of their argument that the organizational eligibility restriction compels speech in violation of the First Amendment are inapposite. None involves a selective spending program in which Congress simply designed a limited program to expend government funds for a particular purpose. Rather, unlike here, each case concerns direct regulation of speech "aimed at the suppression of dangerous ideas," Speiser, 357 U.S. at 519. See, e.g., West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943) (AOSI/OSI Mem. at 27) (forcing a conscientious objector to say the pledge of allegiance); Wooley v. Maynard, 430 U.S. 705 (1977) (id.) (forcing a citizen to display state's motto). Indeed, in one of the cases upon which Plaintiffs rely, Forum for Academic and Institutional Rights v. Rumsfeld, 390 F.3d 219 (2004), cert. granted, Rumsfeld v. Forum for Academic and Institutional Rights, 126 S. Ct. (2005), the Third Circuit struck down a law denying federal funding to institutions of higher education that prohibited on-campus military recruiting on the ground that it impermissibly compelled speech. In so holding, the Third Circuit expressly distinguished the statute there-challenged, which allegedly imposed a penalty on funds emanating from other

---

the Government's interpretation of the Constitution from judicial challenge," and was "aimed at the suppression of ideas thought inimical to the Government's own interest." 531 U.S. at 548-49. Also, unlike here, the restrictions at issue in Velazquez "threaten[ed] severe impairment of the judicial function," and were thus "inconsistent with accepted separation-of-power principles." Id. at 546.

- 35 -

governmental sources, from laws that create selective spending programs. Id. at 229 n.9; see also Finley, 524 U.S. at 587-88 (absent a threat that denial of subsidy would "drive certain ideas or viewpoints from the marketplace," "the Government may allocate ... funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake").

3.    The Organizational Eligibility Restriction Does Not Impermissibly Restrict Privately-Funded Conduct

The Supreme Court has recognized that statutes enacted under the Spending Clause may permissibly impose conditions on recipients of funding that limit their use of private funds, as long as such conditions are sufficiently related to the objectives of the statute. Thus, in United States v. Am. Library Ass'n, 539 U.S. 194 (2003), the challenged Children's Internet Protection Act provided that libraries could receive funding for Internet services under certain federal programs only if they enforced "a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access." 47 U.S.C. § 254(h)(6)(C); see also 20 U.S.C. § 9134(f)(1)(A)(i). The Supreme Court upheld that funding restriction because it furthered Congress's purpose in creating the Internet program, namely, "to help libraries fulfill their traditional role of obtaining materials of requisite and appropriate quality for educational and informational purposes." 539 U.S. at 211-12 (as "the use of filtering software helps to carry out these programs," it is a "permissible condition"). Quoting Rust, the Court held that "within broad limits 'when the Government appropriates public funds to establish a program, it is entitled to define the limits of that program.'" Id. at 211.

Similarly, in Buckley v. Valeo, 424 U.S. 1 (1976), although the Court struck down as unconstitutional general expenditure limits on federal candidates because such limits infringed the First Amendment rights of those candidates to spend as they chose, it found no unconstitutionality in Congress's requirement that federal candidates who chose to accept public

financing of their campaigns were also required to accept limitations on their private expenditures. Id. at 57 & n.65, 85-104. The Supreme Court noted that Congress's goals of reducing the "deleterious influence of large contributions on our political process . . . and to free candidates from the rigors of fundraising," were furthered by such a requirement. Id. at 91.

Here, the organizational eligibility restriction should be upheld because it is rationally related to the Leadership Act's goal of combating the spread of HIV/AIDS. In enacting the Leadership Act, Congress stressed that "eradicating prostitution" – identified as a factor in and cause of the spread of HIV/AIDS – is a "priority" of the plan, see 22 U.S.C. § 7611(a)(4), and that one of the critical elements of any successful strategy to combat AIDS was to encourage "behavior change" aimed at eliminating risky behaviors that increased the chance of infection and the spread of the disease. See, e.g., 22 U.S.C. § 7601(21). Congress reasonably determined that providing funds to organizations to further the goals of the Leadership Act, including that of "eradicating prostitution," would be undermined if its grantees expended those funds, while simultaneously endorsing – either explicitly or implicitly – the very practices that the program aims to eliminate. See DKT Memorial Fund, 887 F.2d at 291 (rejecting the plaintiffs' argument that federal government impermissibly prohibited foreign NGOs from pursuing abortion-related goals with private funds as a condition of receiving funding for family planning activities). This plainly would "mix the message" of the government's chosen policy, see id. at 291, if not undermine the government's policy goals altogether. It is Congress's prerogative to take reasonable steps, as it did here, to further its goals by avoiding the communication of such mixed messages when creating a federal spending program. See Velazquez, 531 U.S. at 541 (citing Rosenberger, 515 U.S. at 833).

Indeed, clear communication of the government's goals is particularly critical in a program intended to further the government's goals in the field of international relations. The

Leadership Act creates an international aid program that authorizes $15 billion in targeted aid as

a supplement to the billions of dollars in federal spending already in place under the Nation's

foreign assistance activities. As the D.C. Circuit stated in <u>DKT Memorial Fund</u>, "[w]hen the

government speaks in international affairs, it speaks not only with its words and its funds, but

with its associations." 887 F.2d at 290-91; <u>see also id.</u> (noting that, in the area of foreign affairs,

"we must recognize the necessity for the nation to speak with a single voice"). Here, where both

Congress and the President have committed the United States to demonstrating its leadership in

the fight against HIV/AIDS, Congress has more cause to be concerned that funding organizations

that take positions inconsistent with the articulated policy goals of the Leadership Act will

contribute to a mixed message that will undermine the United States's policy.

The Supreme Court cases relied on by Plaintiffs to argue that the organizational eligibility

restriction impermissibly bars conduct funded by private sources are distinguishable. In <u>Regan v.

Taxation with Representation of Washington,</u> 461 U.S. 540 (1983) (AOSI/OSI Mem. at 29), the

Court applied a rational relationship test to uphold a funding restriction that prevented

organizations engaged in lobbying from receiving a government benefit, namely, tax-deductible

contributions. <u>Id.</u> at 550. Similarly, in <u>Rust v. Sullivan</u>, 500 U.S. 173 (1991) (AOSI/OSI Mem.

at 30), the Court upheld a funding restriction which prohibited federal funds granted to recipients

under Title X of the Public Health Act from being used in programs which "advocate abortion as

a method of family planning." 500 U.S. at 210. The only restriction before the Court in <u>Rust</u>

was a condition that restricted the use of federal funds granted to subsidy recipients, and the

Court based its conclusion that such a funding restriction was <u>not</u> unconstitutional, in part, on the

fact that Congress had only restricted the use of the federal funds, but had not restricted, outside

the scope of the federal program, other separate and independent projects of organizations that

received those funds. <u>See</u> 500 U.S. at 196-98. Accordingly, the <u>Regan</u> and <u>Rust</u> Courts had no

- 38 -

reason to squarely decide the issue here, namely, whether an eligibility restriction conditioned on the activities of a federal funding recipient independent of the federal program was constitutional. Plaintiffs' argument that these cases are "binding precedent" on the issue of organization-wide restrictions, AOSI/OSI Mem. at 31, therefore plainly overstates the reach of their holdings.

Plaintiffs' reliance on Rust also ignores a fundamental distinction between the purpose served by the organizational eligibility restriction here and the restriction at issue in Rust. Rust concerned Title X of the Public Health Services Act, 84 Stat. 1506, as amended, 42 U.S.C. § 300-300a-6, which authorized government "grants to . . . public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). As the Supreme Court explained, the program created by Title X was "limited to preconceptional services." 500 U.S. at 179. "Childbirth," "prenatal care," and abortion fell completely "outside the scope of the federally funded program." See id. at 179, 193, 197. Therefore, having organizations participate in abortion-related activities outside the scope of the federal program – so long as a sufficient degree of separation was maintained in order to "ensure the integrity of the federally funded program" – was not inconsistent with any of Title X's goals. All that was necessary in Rust was to ensure that federal funds "were spent for the purposes for which they were authorized." 500 U.S. at 196.[26] In short, in Rust, imposing organization-wide restrictions on abortion activity would not advance any purpose of the Title X program.

_____

[26]    In Velazquez, the Second Circuit held that the restricted speech was "at odds with the values Congress was seeking to advance through its grant program" 164 F.3d at 766. However, in describing Rust, the Supreme Court stated that Title X did not single out a particular idea for suppression because it was disfavored, but simply prohibited doctors from counseling that was outside the scope of the project. Velazquez, 531 U.S. at 541.

- 39 -

Here, in stark contrast to Rust, an organization-wide policy on conduct opposing prostitution directly relates to the overall purpose of the Leadership Act. Congress has plainly articulated that it is the policy of the United States to "eradicat[e] prostitution" and that a successful strategy to fight HIV/AIDS must include that as a priority. See 22 U.S.C. § 7611(a)(4). Congress appropriately determined that organizations that do not have a policy opposing prostitution cannot be counted on to pursue the goals of the program for which the funds are distributed, and to fund organizations that engage in acts supporting prostitution would distort Congress's message, and be counterproductive to the government's overall objective to combat HIV/AIDS.

Plaintiffs also rely heavily on FCC v. League of Women Voters of California, 468 U.S. 364 (1984) (AOSI/OSI Mem. at 29), in which the Court struck down a condition in a statute (the Public Broadcasting Act of 1967) that authorized the provision of funds to noncommercial television and radio stations to support educational programming, but which prohibited the funding of stations that engaged in editorializing. Id. at 366. That funding condition was allegedly designed to protect stations from being coerced into Government propagandizing or serving as a vehicle for partisan viewpoints. Id. at 384-85. In striking down the condition, the Court held that the expression of editorial opinion in the media on matters of public importance is entitled to "most exacting" degree of First Amendment protection. Id. at 376; see also id. at 381 (expression of editorial opinion "lies at heart" of First Amendment protection). Moreover, the Court held that the ban on editorializing was content-based and could serve as an attempt by the government to "control ... the search for political truth." Id. at 384 (citation omitted). Upon these facts, the Court applied a heightened scrutiny test to the funding condition, and held that the government interest in banning editorializing was not sufficiently substantial, and the restrictions were not crafted with sufficient precision, to justify the significant abridgment of

- 40 -

speech caused by the provision's broad ban on all types of editorializing by any individual or
entity. Id. at 398-99.

League of Women Voters does not advance Plaintiffs' argument that this Court should
apply a heightened scrutiny test to the governmental eligibility restriction because this case does
not involve a "substantial abridgment of important journalistic freedoms" that "lies at the heart"
of the First Amendment. 468 U.S. at 381, 402. Moreover, in the statute at issue in League of
Women Voters, heightened scrutiny was appropriate because, unlike here, Congress did "not
itself speak or subsidize the transmittal of a message it favor[ed]" but instead aimed to facilitate
speech from private entities.  See Velazquez, 531 U.S. at 542. Nevertheless, as described above,
the organization-wide restrictions at issue here would pass a heightened scrutiny test because
they are narrowly tailored to ensure that the governmental message of opposing prostitution in its
fight against HIV/AIDS is not distorted or undermined by the funding recipients.

Finally, Plaintiffs also rely on the Second Circuit decision in Velazquez v. Legal Services
Corp. to support their argument that the organizational eligibility restriction unconstitutionally
prohibits them from engaging in conduct with private funding.  As discussed earlier, Velazquez
involved a statute aimed at providing financial support for legal assistance to persons financially
unable to afford such assistance, which barred the provision of assistance to entities that engaged
in a host of conduct, including attempting to reform the federal or state welfare system.  164 F.3d
at 757. Although implementing regulations permitted funding recipients to maintain
relationships with affiliates that could, in turn, engage in the proscribed conduct, the plaintiffs
facially challenged those regulations as unconstitutionally burdening the use of non-federal
funds, claims which the Second Circuit rejected. Id. at 762, 765.

Therefore, in Velazquez, the Second Circuit also did not directly consider whether
spending programs that restricted organizations from engaging in certain acts as a condition of

funding, but which did not state that affiliates of the funded organization could engage in the restricted activity, would pass constitutional muster. Significantly, if it had considered this question, it would have addressed funding conditions far different than those at issue here. Unlike the Leadership Act's narrow organizational eligibility restriction, which bars recipients from engaging in conduct supporting prostitution, the restrictions in Velazquez were "extremely broad" and "prohibited [the organizations] outright from engaging in attempts to influence government's adoption of laws." Id. at 766. Moreover, according to the Second Circuit, certain barred speech involved advocating a change in governmental policy, expression which is accorded the strongest protection under the First Amendment. Id. at 771. The restriction, thus, constituted viewpoint discrimination subject to strict First Amendment scrutiny. Cf. Velazquez, 164 F.3d at 765 (citing Taxation with Representation as applying minimal scrutiny to subsidy conditions where Congress had not engaged in discrimination aimed at the suppression of dangerous ideas). Unlike here, the purpose of the statute in Velazquez (i.e., to provide affordable legal services) was not to transmit a government message but to facilitate private speech, and the conditions were therefore not aimed at avoiding distortion of the government's message. See Velazquez, 164 F.3d at 766 (holding that statute was not "advancing any particular set of values that might be diluted or distorted if the forbidden speech were permitted").[27]

---

[27] Plaintiffs also cite two other Second Circuit cases, Center for Reproductive Law and Policy v. Bush, 304 F.3d 183 (2d Cir. 2002) (AOSI/OSI Mem. at 30), and Planned Parenthood Fed'n of Am. v. Agency for Int'l Dev., 915 F.2d 59 (2d Cir. 1990) (id.), neither of which concerned restrictions on the use of private funds by domestic NGOs. Both held that the First Amendment rights of domestic organizations were not violated by USAID policies requiring foreign NGOs to certify, as a condition of funding, that they would not engage in activities promoting abortion. The Second Circuit held that any effect of the foreign-organization restriction on the domestic NGOs was too incidental, especially where the domestic NGOs could use their own funds to pursue abortion-related activities in the foreign countries. See, e.g., Center for Reproductive Law, 304 F.3d at 190. Contrary to Plaintiffs' assertion, neither of these cases "made clear" that grantees must be allowed to use their private funding free of restrictions. AOSI/OSI Mem. at 30. Indeed, both the Second Circuit and the D.C. Circuit upheld the organization-wide restrictions imposed on foreign

In sum, the Act's organizational eligibility restriction should be upheld under a rational

relationship test because its imposition of conditions on recipients is directly related to the goals

of the Act. Nevertheless, even if heightened scrutiny were applied, the condition still should be

upheld as its organization-wide application is necessary to prevent the distortion of the

governmental message and to advance its policy of combating HIV/AIDS.

4.     This Court Should Defer to Congress's Policy Judgment In Enacting the
       Organizational Eligibility Provision

Both Plaintiffs and their supporting amici question the wisdom of the organizational

eligibility restriction, and whether it will assist in reducing the spread of HIV/AIDS. AOSI/OSI

Mem. at 11-14 (citing declarations); AIDS Action Am. Br. Indeed, they argue that the restriction

cannot pass scrutiny because it does not further the goals of the Leadership Act. AOSI/OSI

Mem. at 33. However, contrary to Plaintiffs' and their amici's assertion, the Leadership Act,

and the condition at issue, are a valid exercise of Congress's power to spend for the general

welfare, and this Court should not question Congress's judgment in passing them. See Dole, 483

U.S. at 207 ("In considering whether a particular public expenditure is intended to serve general

public purposes, courts should defer substantially to the judgment of Congress."); Buckley, 424

U.S. at 91 ("whether the chosen means appear 'bad,' 'unwise,' or 'unworkable' is to us

irrelevant; Congress has concluded that the means are 'necessary and proper' to promote the

general welfare, and we thus decline to find this legislation without the grant of power in [the

Spending Clause]")[28] Indeed, the Second Circuit rejected challenges to funding restrictions on

foreign NGOs that barred them from supporting abortion, holding that the "wisdom of, and

_____

NGOs under a rational relation test.

[28]     Indeed, the "level of deference to the congressional decision is such that the
[Supreme] Court has . . . questioned whether 'general welfare' is a judicially enforceable restriction
at all." Dole, 483 U.S. at 207 (citing Buckley, 424 U.S. at 90-91).

- 43 -

motivation behind, this policy are not justiciable issues." <u>Planned Parenthood</u>, 915 F.2d at 64;

<u>see also</u> <u>DKT Memorial Fund</u>, 887 F.2d at 281.

Nevertheless, though review of the wisdom of the organizational eligibility restriction is

beyond the purview of this Court, Plaintiffs and their amici acknowledge that there is debate on

the best ways to combat HIV/AIDS. AOSI/OSI Mem. at 32. Indeed, a number of NGOs,

including amici here, have concluded that the Act's requirement that funding recipients have a

policy explicitly opposing prostitution is pivotal in fighting the spread of HIV/AIDS. Equality

Now Am. Br. at 8-11.

C.    The Leadership Act is Not Impermissibly Vague

Plaintiffs erroneously argue that the organizational eligibility restriction, as construed by

Defendants, is unconstitutionally vague because it would force them to "guess" what type of

"policy statement" is required and what type of conduct is prohibited.[29] AOSI/OSI Mem. at 5,

21-26. Plaintiffs misapprehend the test for vagueness in statutes enacted under the Spending

Clause.[30]

Under the Supreme Court's Spending Clause jurisprudence, where Congress conditions

the receipt of federal subsidies, it "must do so unambiguously, enabling the [recipients] to

exercise their choice knowingly, cognizant of the consequences of their participation." <u>Dole</u>, 483

U.S. at 203. Exercises of the spending power are "much in the nature of a contract: in return for

---

[29]    AOSI/OSI further argue that the Act is unconstitutionally vague as to whether OSI
is bound by the pledge requirement. AOSI/OSI Mem. at 26. As set forth <u>supra</u>, both AOSI/OSI and
USAID agree that the Act plainly provides that only funding recipients are subject to the conditions
of the organizational eligibility restriction.

[30]    Tellingly, Plaintiffs do not challenge the government funding restriction as vague,
Compl. ¶¶ 29-30, indicating that they understand how to conform their activities so as not to
"promote or advocate ... the practice of prostitution." <u>See</u> Declaration of Daniel E. Pellegrom,
executed December 7, 2005 ("Pellegrom Decl.") (attached to Pathfinder's Notice of Motion) ¶ 8
(stating that Pathfinder "rigorously complies with the government fund restriction").

- 44 -

federal funds, the [recipients] agree to comply with federally imposed conditions." Pennhurst
State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Thus, "if Congress intends to impose a
condition on the grant of federal moneys, it must do so unambiguously" by "speak[ing] with a
clear voice." Id.

Here, the Leadership Act is sufficiently clear to allow any potential funding recipient to
make knowing choices regarding its participation in the program. The Act expressly imposes
two limitations (under the headings "Limitation") – the government funding restriction, 22
U.S.C. § 7631(e), and the organizational eligibility restriction,  22 U.S.C. § 7631(f) – of which
any prospective funding recipient would be aware. Defendants have implemented these
restrictions by including a term in grant or cooperative agreements stating that a funding recipient
must have a policy explicitly opposing prostitution, and requiring that such organizations certify
prior to receiving funds that they are in compliance with that provision. See, e.g., AAPD 05-04
at 5-6. Each grant or cooperative agreement further states that any violation of the express terms
and conditions of the agreement shall "be grounds for unilateral termination of the agreement."
Id.

Given such clear language, organizations such as AOSI and Pathfinder were plainly
aware of the existence of the organizational eligibility restriction and could choose either to
accept or decline the terms of their funding "contract" fully "cognizant of the consequences of
their participation." Pennhurst, 451 U.S. at 17 (holding that statute failed to make clear the
existence of the condition). Should an organization determine that the costs of compliance
outweigh its benefits, or that it disagrees with the policy preferences expressed by Congress, it is
free to decline the subsidy. See Steward Mach. Co. v. Davis, 301 U.S. 548, 594-98 (1937)
(recipients of federal funds remain free to unilaterally withdraw from "contract"); Charles v.
Verhagen, 220 F. Supp. 2d 955, 962 (W.D. Wisc. 2002) ("the protection that Pennhurst provides

potential federal aid recipients is fair warning that Congress is conditioning a grant of such aid on

a state's willingness to accept a somewhat ambiguous standard. States may then decide whether

to accept the federal funds at the price of subjecting themselves to a degree of uncertainty or

decline the funds and remain uninhibited by the federal conditions"), aff'd, 348 F.3d 601, 607

(7th Cir. 2003) ("the exact nature of the conditions may be 'largely indeterminate,' provided that

the existence of the conditions is clear") (citation omitted).

.        Moreover, to the extent that it is relevant to a "vagueness" analysis of statutes enacted

pursuant to the Spending Clause, Congress has set forth the funding condition in sufficiently

clear terms so that organizations aware of its existence do not have to guess its meaning. See

Finley, 524 U.S. at 589 ("In the context of selective subsidies, it is not always feasible for

Congress to legislate with clarity"); Kansas v. United States, 214 F.3d 1196, 1199 (10th Cir.

2000) ("although contending that some of the requirements associated with the computerized

database are vague, Kansas fails to assert that the alleged ambiguity resulted in its inability to

exercise its choice to accept the subsidies knowingly and cognizant of the consequences of

participation") (internal quotes omitted). Indeed, Plaintiffs concede that "[i]f the pledge

requirement barred specific tactics alleged to be inconsistent with the broader goal of opposing

sex work, it would clearly prohibit the promotion of the legalization and practice of sex work."

AOSI/OSI Mem. at 18 (emphasis added).

        Moreover, although the restriction is plainly clear for constitutional purposes, USAID, in

response to inquiries by AOSI/OSI,[31] has provided additional guidance to AOSI, both before and

after AOSI chose to accept the requirements and sign its certification, that advocating for the

legalization of prostitution would be a clear indication that an organization does not explicitly

---

        [31]        Pathfinder does not allege that it sought any clarification from either USAID or HHS
on the scope of the organizational eligibility requirement.

oppose prostitution, and that organizing or unionizing prostitutes for the purposes of advocating

for the legalization of prostitution, as distinct from organizing for the purposes of deterring

human rights abuses and addressing public health issues, would further indicate that an

organization does not explicitly oppose prostitution.[32] See General Media Communications, Inc.

v. Cohen, 131 F.3d 273, 287 (2d Cir. 1997) (terms employed in statute, read in light of the

agency's implementing directives, sufficiently clear for constitutional purposes).[33]

      The cases relied on by Plaintiffs to support their vagueness argument have no bearing on

this case, because they concern penal statutes imposing criminal sanctions or regulatory statutes

directly impinging on constitutional rights, not statutes such as the Leadership Act that establish

a funding program. See, e.g., Smith v. Goguen, 415 U.S. 566 (1974) (AOSI/OSI Mem. at 23)

(applying vagueness test to contempt provision of flag-misuse statute); Grayned v. City of

Rockford, 408 U.S. 104 (1972) (id. at 22) (holding that criminal ordinance not impermissibly

vague); Chatin v. Coombe, 186 F.3d 82 (2d Cir. 1999) (id. at 23) (applying heightened vagueness

test to rule carrying criminal-type penalties).

      It is well-established, however, that "[t]he degree of vagueness that the Constitution

tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part

on the nature of the enactment." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,

455 U.S. 489, 498 (1982). Penal and regulatory statutes that directly affect constitutional rights

trigger a heightened vagueness standard, while funding statutes are subject to a less rigorous

standard. See Finley, 524 U.S. at 588 ("The terms of the [funding] provision are undeniably

opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise

---

[32]    See Exhibit D to Rosberger Decl.

[33]    See also Kolender v. Lawson, 461 U.S. 352, 355 (1983) (in considering facial
challenge, court must consider any limiting construction that enforcement agency has proffered).

substantial vagueness concerns"); Village of Hoffman Estates, 455 U.S. at 499 ("prohibitory and stigmatizing effect" of a "quasi-criminal ordinance" warrant relatively strict vagueness analysis); General Media Communications, 131 F.3d at 286 (finding that statute carrying indirect penalty under which plaintiffs would lose governmental assistance by selling sexually explicit material was not impermissibly vague). Because the Leadership Act is neither a penal nor a regulatory statute, its terms are sufficiently clear for constitutional purposes.[34]

In any event, courts have held that statutes, even if they are penal or regulatory in nature, must only "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them." General Media Communications, 131 F.3d at 286. Under this standard, a statute, together with any implementing guidance, may "fall short of absolute linguistic precision and yet still comply" with the Constitution. Id. "These inherent limitations obtain in a speech-laden First Amendment setting as in any other." United States v. Thomas, 864 F.2d 188, 195 (D.C. Cir. 1988). Thus, "courts do not require that an enactment touching on First Amendment interests set forth the precise line dividing proscribed from permitted behavior, or that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription." Id.

Plaintiffs allege that the agencies have taken various positions on the requirements of the organizational eligibility restriction, and that those purported "conflicting interpretations"

---

[34]    Knowing that penal statutes are subject to a more stringent vagueness standard, Plaintiffs assert that they could be subject to criminal penalties or civil liability under the False Claims Act. AOSI/OSI Mem. at 22 n.21. Apart from the fact that the statute at issue, the Leadership Act, imposes no penalties, and the cooperative agreement provides only that a violation would be grounds for unilateral termination of the agreement, any violation of the criminal laws or the False Claims Act would require a showing of scienter, which would itself mitigate any risk resulting from a law's vagueness. See Hoffman Estates, 455 U.S. at 499.

militate in favor of voiding the provision for vagueness. AOSI/OSI Mem. at 24. Even if

Plaintiffs' allegation were true, an implementing agency plainly can change its interpretation of a

statute without rendering that statute vague. See, e.g., State of New York Dept. of Social

Services v. Shalala, 21 F.3d 485, 493 (2d Cir. 1993) ("if an agency decides that regulatory

interpretation is ill-advised, the agency may (and should) change course"). Nor do Plaintiffs

contend that the Defendants, or officials of the Defendants, have at any time interpreted and

applied the organizational eligibility restriction in divergent ways. Cf. Chatin, 186 F.3d at 89

(noting that correctional employees charged with enforcing rule interpreted it in conflicting

ways).

Finally, that USAID has allegedly not indicated, to AOSI's satisfaction, whether certain

hypothetical conduct would violate the organizational eligibility restriction, AOSI/OSI Mem. at

24, does not render the restriction vague. See Planned Parenthood v. State of Minnesota,, 910

F.2d 479, 482 (8th Cir. 1990) ("Statutes should not be considered unconstitutionally vague by

speculating about possible hypothetical application"); Planned Parenthood of Central and

Northern Arizona v. Arizona, 718 F.2d 938, 948 (9th Cir. 1983) (rejecting argument that statute

was vague because state officials did not interpret the challenged term for organization:

"Substantial numbers of lawsuits arise out of disagreements over the precise meaning of a statute.

The potential for such differences of opinion cannot be enough to render a statute void for

vagueness").

## POINT III

### PLAINTIFFS ALSO FAIL TO DEMONSTRATE IRREPARABLE HARM

Further militating against the grant of injunctive relief is Plaintiffs' failure to demonstrate

that they will suffer any irreparable harm from enforcement of the organizational eligibility

restriction. Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983)

(irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction.") (citation omitted); Comic Strip, Inc. v. Fox Television Stations, Inc., 710 F. Supp. 976, 981 (S.D.N.Y. 1989) ("[p]reliminary injunctions are issued to forestall imminent and irreversible injury to the plaintiffs' rights."). To establish irreparable harm, plaintiffs must show harm that is imminent, not remote or speculative, and that the injury cannot be remedied by monetary damages. See Latino Officers Assoc. v. Safir, 170 F.3d 167, 171 (2d Cir. 1999); Loverage v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 917-18 (2d Cir. 1986).

Although, in some instances, the Second Circuit has presumed irreparable injury in cases alleging the abridgement of First Amendment, see, e.g., Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000), it has clarified that it has done so only where, unlike here, "a plaintiff alleges injury from a rule or regulation that directly limits speech." Bronx Household of Faith v. Board of Education of the City of New York, 331 F.3d 342, 349 (2d Cir. 2003) (emphasis added). In direct contrast, "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." Id. at 350; see also Latino Officers Assoc., 170 F.3d at 171 (denying motion for preliminary injunction based on allegations of violations of First Amendment for lack of showing of irreparable harm). Here, the organizational eligibility restriction does not attempt to regulate activity in a public forum, and a rebuttable presumption of irreparable harm does not exist where, as here, an indirect limitation on speech is alleged to occur as a result of an organization's freely-made decision to accept government funding and the conditions attached thereto.[35]

---

[35]     As discussed above, after accepting the terms of the Government's funding grants, AOSI and Pathfinder s allege that they were compelled to speak against their will. See AOSI/OSI

Here, as shown below, Plaintiffs have only alleged speculative harm, not injury which is imminent, nor any harm that would not be compensable by monetary relief. Moreover, even if irreparable harm were presumed, it has been rebutted by Plaintiffs' delay in moving for a preliminary injunction.

A.    Plaintiffs' Alleged Harm Is Speculative and Could Be Compensated By Money Damages

Plaintiffs only allege conjectural potential injury. See, e.g., Compl. ¶ 62 ("If USAID construes the [organizational eligibility restriction] requirement broadly ... then advocacy of the most successful tactics in the fight against HIV/AIDS may well be forbidden"); Neier Decl. ¶ 31 ("there are many activities by OSI itself that could potentially violate the [organizational eligibility restriction]"); Pellegrom Decl. ¶ 28 (Pathfinder "fears that defendants USAID, DHHS and CDC might view this outreach as being insufficiently 'opposed to prostitution'"); id. ¶ 31 (Pathfinder "could be forced to censor itself"). For this reason, Plaintiffs have not made the requisite showing of irreparable harm. See Latino Officers Assoc., 170 F.3d at 171 (denying preliminary injunction on First Amendment claims because plaintiffs' alleged "conjectural chill", was not sufficient to establish real and imminent irreparable harm; ); Alvarez v. City of New York, 2 F. Supp. 2d 509, 514 (S.D.N.Y. 1998) (denying preliminary injunction in complaint alleging First Amendment violations because plaintiff had not demonstrated direct penalization of rights and immediate harm).[36]

---

Mem. at 34. As the Court in Rust squarely recognized, "[p]otential grant recipients can choose between accepting [Government] funds – subject to the Government's conditions ... or declining the subsidy and financing their own unsubsidized program. We have never held that the Government violates the First Amendment simply by offering that choice." 500 U.S. at 199 n. 5. So too here, Plaintiffs are not harmed by being offered   a choice which they have full autonomy to accept or decline.

[36]    In contrast to Plaintiffs' speculative harm, in Housing Works, Inc. v. City of New York, 72 F. Supp. 2d 402, 420 (S.D.N.Y. 1999) (AOSI/OSI Mem. at 34), the court held that the "plaintiff will be denied HUD funding as a result of defendants' downgrading of plaintiff's projects,"

Further, the very conjectural injury that Plaintiffs allege shows the lack of irreparable harm. If the alleged harm were to occur, AOSI and Pathfinder would face the potential loss of a grant or continued funding for HIV/AIDS activities. Plaintiffs have not sufficiently alleged facts showing that the possible loss of any such HIV/AIDS grants would cause irreparable harm to their organizations,[37] and their submissions show that they receive substantial non-Leadership Act funding. See, e.g., Kushen Decl. ¶ 6 ("OSI agreed in October 2003 to provide a five-year grant to AOSI totaling $2,177,700 . . . to fund activities in the United States and abroad"); Pellegrom Decl. ¶ 5 ("Pathfinder's annual budget, which in fiscal year 2005 totaled more than $76 million, is funded by grants and donations from multiple sources"). Indeed, AOSI has stated that it has enough federal funding to assure that its program continues through the middle of 2006, and that "AOSI now feels free to file this lawsuit without risking a harmful hold-up in USAID funding." Kushen Decl. ¶ 47; Compl. ¶ 67. Accordingly, AOSI/OSI cannot establish that a sufficient threat of irreparable harm exists to warrant the grant of the extraordinary injunctive relief sought here.

B.    Plaintiffs' Delay in Moving for Preliminary Injunction Further Confirms the Absence of Irreparable Harm

AOSI and OSI did not seek injunctive relief until September 28, 2005, almost four months following the date (June 9, 2005) upon which USAID issued its new directive applying the organizational eligibility restriction to AOSI and other U.S.-based recipients of Leadership Act Funds, and more than five months after AOSI first became aware of reports that USAID was planning to enforce restriction against U.S. groups. See Kushen Decl. at ¶¶ 28, 37. Such delay is

---

and therefore, unlike here, the injury was deemed imminent and not speculative. Id,

[37]    AOSI's claim that it was "concerned" that, at one point, an absence of Leadership Act funds might require it or its partner organizations to lay off staff or close facilities, Kushen Decl. ¶ 43, is insufficient to show an imminent, irreparable harm.

at odds with a showing of irreparable injury. <u>See</u> <u>Christopher Norman Chocolates, Ltd. v.</u> <u>Schokinag Chocolates North America, Inc.</u>, 270 F. Supp. 2d 432, 439 (S.D.N.Y. 2003) (holding that four month delay was sufficient to rebut presumption of irreparable harm and noting that "[c]ourts have found the presumption of irreparable harm rebutted in the face of shorter periods"); <u>Gidatex, S.R.L. v. Campaniello Imports, Ltd.</u>, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months").[38]

Similarly, Pathfinder has delayed bringing its motion for a preliminary injunction, and has not explained the reasons for its inactivity. According to Pathfinder, HHS and USAID began applying the organizational eligibility restriction to domestic NGOs in May 2005 and June 2005, respectively. Pellegrom Decl. ¶¶ 11, 12. In July 2005, Pathfinder adopted a policy purportedly aimed at complying with the restriction. <u>Id.</u> ¶¶ 17-18. Nevertheless, Pathfinder did not bring its motion for preliminary injunction until December 7, 2005, more than seven months after Pathfinder alleges HHS started applying the restriction to domestic NGOs, and more than five

---

[38]    AOSI/OSI proffer a declaration from the President of OSI and a member of the board of directors of AOSI, stating that he wrote to USAID seeking confirmation that AOSI's policy statement satisfied the organizational eligibility restriction, and that USAID did not respond to such letter until August 2, 2005. Neier Decl. ¶¶ 45-50. To the extent that this Court finds that AOSI's communications with USAID over the implementation of the restriction excuses AOSI's delay in bringing suit, <u>see</u> <u>Christopher Norman Chocolates,</u> 270 F. Supp. 2d at 438 (noting that explanations for inactivity may excuse delay), such communications do not excuse the delay in bringing any motion based on a facial challenge to the Act.

months after Pathfinder had adopted its policy to remain eligible to receive funding. Such delay

likewise militates against a finding of irreparable harm. See Christopher Norman Chocolates,

270 F. Supp. 2d at 439.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' motions for a preliminary injunction and for a

temporary restraining order should be denied.

Dated: New York, New York
       January 4, 2006

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the Southern
District of New York
Attorney for Defendants

By:

RICHARD E. ROSBERGER (RR-1632)
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2716
Fax: (212) 637-2730

- 54 -