**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., OPEN SOCIETY INSTITUTE, and PATHFINDER INTERNATIONAL,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, and ANDREW S. NATSIOS, in his Official Capacity as Administrator of the United States Agency for International Development, and his successors;<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES and MICHAEL O. LEAVITT, in his official capacity as Secretary of U.S. Department of Health and Human Services, and his successors, and<br><br>UNITED STATES CENTERS FOR DISEASE CONTROL AND PREVENTION and JULIE LOUISE GERBERDING, in her official capacity as Director of U.S. Centers for Disease Control and Prevention, and her successors;<br><br>Defendants. | DOCKET NO. 05-CV-8209 (VM)<br><br>**ECF Case** |

<u>**MEMORANDUM OF LAW OF PROPOSED *AMICUS CURIAE* INTERACTION IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**</u>

Lawrence S. Lustberg, Esq.
Megan Lewis, Esq.
**GIBBONS, DEL DEO, DOLAN,**
**GRIFFINGER & VECCHIONE, P.C.**
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey  07102-5496
(973) 596-4500

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ii

STATEMENT OF INTEREST.....................................................................................................1

SUMMARY OF ARGUMENT.....................................................................................................4

ARGUMENT.................................................................................................................................5

      I.     THE PLEDGE REQUIREMENT IMPOSES UNCONSTITUTIONAL
           CONDITIONS ON THE FIRST AMENDMENT FREEDOMS OF NON-
           GOVERNMENTAL ORGANIZATIONS ............................................................5

      II.    THE PLEDGE REQUIREMENT RESTRICTS THE FIRST
           AMENDMENT FREEDOM OF NON-GOVERNMENTAL
           ORGANIZATIONS TO ENGAGE FREELY IN PRIVATELY
           FINANCED SPEECH ON MATTERS OF PUBLIC CONCERN ......................9

      III.   THE PLEDGE REQUIREMENT UNDERMINES THE VALUABLE
           PARTNERSHIP BETWEEN GOVERNMENT AND THE THIRD
           SECTOR. ..............................................................................................................14

CONCLUSION.............................................................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

American Communications v. Douds,
    339 U.S. 382 (1950)..............................................................................................11

Bates v. Little Rock,
    361 U.S. 516 (1960)..............................................................................................12

Bd. Of County Comm'rs Wabaunsee County, Kan. V. Umbehr,
    518 U.S. 668 (1996)................................................................................................5

Boy Scouts of America v. Dale,
    530 U.S. 640 (2000)..............................................................................................13

Citizens Against Rent Control Coalition for Fair Housing v. Berkeley,
    454 U.S. 290 (1981)................................................................................................9

Cousins v. Wigoda,
    419 U.S. 477 (1974)..............................................................................................12

DeJonge v. Oregon,
    299 U.S. 353 (1937)..............................................................................11, 13, 14

FCC v. League of Women Voters,
    468 U.S. 364 (1984)....................................................................................5, 6, 7, 8

First Nat'l Bank of Boston v. Bellotti,
    435 U.S. 765 (1978)..............................................................................................12

Gibson v. Florida Legislative Investigation Comm.,
    371 U.S. 539 (1963)..............................................................................................12

Harris v. McRae,
    448 U.S. 297 (1980)................................................................................................7

Legal Services Corporation v. Velazquez,
    531 U.S. 533 (2001)............................................................................................6, 7

Louisiana v. NAACP,
    366 U.S. 293 (1961)..............................................................................................12

NAACP v. Alabama,
    357 U.S. 449 (1958)..............................................................................11, 12, 13

NAACP v. Claiborne Hardware Co.,
    458 U.S. 886 (1982)............................................................................................9, 12

O'Hare Truck Serv. V. City of Northlake,
    518 U.S. 712 (1996)....................................................................................5

Perry v. Sindermann,
    408 U.S. 593 (1972)................................................................................5, 6

Regan v. Taxation With Representation,
    461 U.S. 540 (183)..................................................................................7, 8

Republican Part of State of Conn v. Tashjian,
    770 F.2d 265 (2d Cir. 1985) ......................................................................11

Roberts v. United States Jaycees,
    468 U.S. 609 (1984)......................................................................11, 12, 13

Rosenberger v. Rector and Visitors of Univ. of Va.,
    515 U.S. 819 (1995)......................................................................................7

Rust v. Sullivan,
    500 U.S. 173 (1991).............................................................................6, 7, 8

Schneider v. State,
    308 U.S. 147 (1939)....................................................................................11

Shelton v. Tucker,
    364 U.S. 479 (1960)....................................................................................12

Speiser v. Randall,
    357 U.S. 513 (1958)..................................................................................5, 6

Sweezy v. New Hampshire,
    354 U.S. 234 (1957)....................................................................................11

West Va. State Bd. Of Educ. V. Barnette,
    319 U.S. 624 (1943)......................................................................................6

**Statutes**
22 U.S.C. § 7601...............................................................................................1

22 U.S.C. § 7631(e) .........................................................................................2, 7

U.S.C. § 7631(f) ................................................................................................1

**Other Authorities**
Alexis De Tocqueville, DEMOCRACY IN AMERICA 117 ....................................11

Alice Gresham Bullock, Taxes, Social Policy and Philanthropy: The Untapped Potential of
    Middle- and Low-Income Generosity, 6 Cornell J.L. Pub. Pol'y 325, 332 (1997)...................15

Arnaud C. Marts, PHILANTHROPY'S ROLE IN CIVILIZATION: ITS CONTRIBUTION TO HUMAN FREEDOM 50 (1991) ........................................................................................................16

Arthur Schlesinger, Paths to the Present 23 (1949) ......................................................10

CIVIL SOCIETY AND GOVERNMENT 18 (Robert C. Post and Nancy L. Rosenbaum eds.) ........13, 14

Code of Conduct for NGOs in Disaster Relief, Articles 3, 4 ........................................16

David Cole, Hanging With The Wrong Crowd: Of Gangs, Terrorists, and The Right Of Association, 1999 Supreme Court Review 203 ........................................................10

Alexis De Tocqueville, DEMOCRACY IN AMERICA ..............................................................passim

Dean Rusk, THE ROLE OF THE FOUNDATION IN AMERICAN LIFE 14 (1961)..................................16

Henry J. Steiner and Philip Alston, INTERNATIONAL HUMAN RIGHTS IN CONTEXT: LAW, POLITICS, MORALS 943-52 (2d ed.) ..............................................................................16

John H. Filer, The Filer Commission Report; Report of the Commission of Private Philanthropy and Public Needs, in THE NON-PROFIT ORGANIZATION: THE ESSENTIAL READINGS 70, 80 (David L. Geis, et al. eds. 1990) ....................................................................................16

Larry Minear, THE HUMANITARIAN ENTERPRISE, DILEMMAS AND DISCOVERIES 76-80 ..............16

Lester M. Salamon, Partners in Public Service: The Scope and Theory of Government-Non-profit Relations, in THE NON-PROFIT SECTOR 99 (Walter W. Powell, ed., 1987) ....................15

Lester M. Salamon, The New Governance and the Tools of Public Action: An Introduction, 28 Fordham Urb. L.J. 1611, 1612 (2001) ......................................................................15

Partnerships for a Stronger Civil Society, A Report to the President from the Interagency Task Force on Non-profits and Government 6 (Dec. 2000)..................................................15

R. Wood, THE CREATION OF THE AMERICAN REPUBLIC 186-96, 319-28 (1969) ..........................10

THE FEDERALIST NO. 56, at 53 (James Madison) (Clinton Rossiter ed. 1961) ..............................10

THE HUMANITARIAN ENTERPRISE 117-18, 161-65..........................................................................17

U.S. Const. amend. I ..................................................................................................................10

## STATEMENT OF INTEREST

Proposed Amicus Curiae InterAction is the largest existing alliance of United States-based international development and humanitarian nongovernmental organizations ("NGOs"). With one hundred and sixty member organizations operating in every developing country, and with its own headquarters in the United States, InterAction works to overcome poverty, exclusion and suffering by advancing social justice and dignity for all. Founded in 1984, InterAction convenes and coordinates its members in order to improve their practices and to influence policy and debate on issues affecting tens of millions worldwide. InterAction exists to enhance the effectiveness and professional capacities of its members and to foster partnership, collaboration, and leadership within the NGO community.

InterAction includes member organizations headquartered in 25 states. Both faith-based and secular, these organizations foster economic and social development; provide relief to those affected by disaster and war; assist refugees and internationally displaced persons; advance human rights; support gender equality; protect the environment; address population concerns; and press for more equitable, just, and effective policy. InterAction's members receive more than $1 billion dollars annually from the United States government, primarily through Defendant United States Agency for International Development ("USAID"), and more than $3 billion in annual contributions from private donors. InterAction and its members value their long-standing and productive partnership with USAID and recognize the outstanding -- and unparalleled -- contributions of the United States government to the global fight against poverty.

In 2003, Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 ("the Global Aids Act"), 22 U.S.C. § 7601 et seq., which authorizes the appropriation of $15 billion over a five year period to fight HIV/AIDS worldwide through education, research, prevention, treatment and care. In 2003, Congress required that private recipients of federal Global AIDS Act funds adopt "a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f) (hereinafter "the pledge requirement").

Pursuant to this provision, recipient organizations are required to adopt an organization-wide policy opposing "sex work."[1]  Moreover, the USAID has made clear that such organizations must also refrain from using their own private funding to engage in speech and activities that USAID perceives as being insufficiently opposed to sex work.  See Defendants' Memorandum of Law in Opposition To Plaintiffs' Motions For A Preliminary Injunction And For A Temporary Restraining Order ("Defendants' Memorandum of Law"), at 20 ("Here, this Court should defer to Defendants' reasonable construction of the organizational eligibility restriction as requiring that recipients of federal funding not engage in speech or conduct that is inconsistent with an opposition to prostitution."); Letter from Christopher D. Crowley, Mission Director, USAID, to Galina Karmanova, AOSI, (October 7, 2005) (attached as Ex. A to the Declaration of Rebekah Diller in Support of Plaintiffs' Motion for a Temporary Restraining Order, dated October 12, 2005) ("Plaintiffs' TRO Motion").  The Global Aids Act also required that federal funding not be used to "promote or advocate the legalization or practice of prostitution or sex trafficking."  22 U.S.C. § 7631(e).  As opposed to the pledge requirement, this restriction does not apply to the use of non-government funds, and is not at issue here.

When this restriction was enacted in 2003, USAID intentionally chose not to enforce it against organizations based in the United States, having been warned by the Department of Justice that application of the requirement to such organizations would be unconstitutional.  See Letter from Daniel Levin to Alex M. Azar, II, dated Sept. 20, 2004 ("Levin Letter"), attached as Exh. 7 to Diller Decl.  This changed in September 2004 when Justice Department opined for the first time that "reasonable arguments" exist to support the constitutionality of the pledge requirement as applied by the government to domestic non-profit organizations, and USAID now applies the pledge requirement to organizations based in the United States.  See Diller Decl. Ex. 5.

---

[1] In this brief, Amicus uses the term "sex work" or "sex worker" because the term "prostitute" and "prostitution" is viewed as stigmatizing by sex workers whose trust public health officials must gain in order to engage them in the fight against HIV/AIDS.

Many of InterAction's members are United States based recipients of Global AIDS Act funds and are thus directly affected by the pledge requirement and its new expanded application to domestic organizations. Amicus' members use these funds to provide services or conduct programs, research, and advocacy in the global effort to combat HIV/AIDS and to stop needless deaths through prevention and access to treatment for all affected persons. A number of InterAction's members administer programs or provide health care services to people with HIV/AIDS or at high risk of transmission of the virus, or intend to administer such programs in the future. Some of these programs expressly target sex workers or include sex workers within their general scope; indeed, many of the programs targeting sex workers have a proven track record in reducing HIV infection and providing treatment to those with the virus and have led to significant advances in understanding the physical, cultural, and socioeconomic underpinnings of the AIDS epidemic.

InterAction's members -- private, voluntary associations based in the United States -- comprise an essential element of the "third sector," that part of society that is distinct from government and business. On behalf of its members, InterAction seeks to advise the Court on the fundamental importance of safeguarding the independence and autonomy of this sector. Such associational autonomy is an animating principle of our constitutional jurisprudence and a foundation upon which our democracy rests. Indeed, the right to associate for the purposes of advocacy or expression on matters of public concern is a core tenet of First Amendment jurisprudence, a right which the pledge requirement directly contravenes. However, as recipients of Global Aids Act funds, InterAction's member organizations are required by the Global Aids Act to adopt a policy explicitly opposing prostitution and to cease all activities deemed to be inconsistent with the opposition to prostitution, even where those activities are funded wholly from private sources. Each organization receiving such funds has been compelled to espouse a particular, government-sponsored, position and to forgo any alternative expression. Through the unconstitutional conditions placed on the receipt of federal funds and direct interference with the

right to associate for the purposes of speaking collectively on matters of public concern, the pledge requirement encroaches upon the associational independence upon which the third sector, and indeed, our constitutional democracy, depends.

## SUMMARY OF ARGUMENT

The pledge requirement violates the First Amendment rights of organizations that receive Global Aids Act funds. By placing unconstitutional conditions on the receipt of such funds, and by restricting their ability to engage in associational life for the purposes of expression, this provision undercuts the core functions of the third sector. Not only do such restrictions contravene the principles upon which our democracy rests, but the restriction also undermines the strength and vitality of the long-standing and productive partnership between government and society.

First, the pledge requirement violates the First Amendment rights of Global Aids Act grantees by conditioning access to Global Aids Act funds on the forfeiture of protected speech. This requirement forces private organizations to pledge support for a particular government policy as a condition of qualifying for government benefits, and conditions access to government funding on a waiver of the First Amendment right to use private funds to engage in constitutionally protected speech. Thus, the pledge requirement restricts the ability of organizations to speak freely and independently on matters of concern to them and to undertake expressive activity to that end.

Second, the freedom to engage in associational life and to associate for the purposes of expression, especially on issues of public concern, is a critical feature of this nation's history. Indeed, such freedoms undergird our democracy and are therefore strongly protected by our constitutional jurisprudence. Because the pledge requirement contravenes these freedoms and encroaches on the autonomy of NGOs and private voluntary associations to speak freely on matters of public concern, it contravenes core democratic principles.

Third, by placing unconstitutional conditions on the exercise of free speech, and by violating their right to associate for the purposes of collective speech, the pledge requirement violates the integrity of NGOs in general and of InterAction's members in particular.  In so doing, it undermines the autonomy of these organizations in particular and of the third sector more broadly.

## ARGUMENT

I.    THE PLEDGE REQUIREMENT IMPOSES UNCONSTITUTIONAL CONDITIONS ON THE FIRST AMENDMENT FREEDOMS OF NON-GOVERNMENTAL ORGANIZATIONS.

The pledge requirement violates the First Amendment rights of the recipients of Global Aids Act funds by placing unconstitutional conditions on the receipt of federal funds.  Under the unconstitutional conditions doctrine, the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 597 (1972); Speiser v. Randall, 357 U.S. 513, 526 (1958) (state cannot condition property tax exemption on loyalty oath); FCC v. League of Women Voters, 468 U.S. 364 (1984) (FCC not permitted to condition federal funds for radio and television stations on the basis of editorial content).  The pledge requirement engenders an unconstitutional condition in two specific respects.  First, it requires that the entity receiving federal funds adopt a particular viewpoint -- that is, the viewpoint espoused by the Government -- as a condition of receiving such funds.  And second, it demands that recipient organizations forgo certain speech, even when that speech is funded by non-government sources.

The United States Supreme Court has consistently refused to allow government to compel private individuals or organizations to pledge support for a particular government policy -- or for government policy in general -- as a condition of participating in a government program. See, e.g., O'Hare Truck Serv. V. City of Northlake, 518 U.S. 712 (1996) (refusing to permit cancellation of a trash hauling contract because the contractor had vigorously criticized the local government); Bd. Of County Comm'rs Wabaunsee County, Kan. V. Umbehr, 518 U.S. 668

(1996) (invalidating removal of a tow truck operator from the city's rotation list as a penalty for refusing to support the mayor's re-election); Speiser v. Randall, 357 U.S. 513 (1958) (invalidating property tax exemption conditioned on loyalty oath taken by recipients); West Va. State Bd. Of Educ. V. Barnette, 319 U.S. 624 (1943) (ruling that access to education cannot be conditioned on pledge of allegiance). The Court has also refused to allow the government to condition access to funding on a waiver of the First Amendment right to use private funds to engage in constitutionally protected speech. See FCC v. League of Women Voters of California, 468 U.S. 364, 400-01 (1984). Thus, for example, in Legal Services Corporation v. Velazquez, 531 U.S. 533 (2001), the Court invalidated a statute prohibiting the funding of federal grantees who took positions opposing existing law. The Court held that "[w]here private speech is involved, even Congress' antecedent funding decisions cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." Id. at 548-49.

The pledge requirement similarly forces nongovernmental organizations to pledge support for a particular government policy as a condition of qualifying for the receipt of federal funds. Thus, this provision conditions access to government funding on the forfeiture of free expression. But because the government may not "deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially his interest in freedom of speech," Perry v. Sindermann, 408 U.S. 593, 597 (1972), even though the person has no "right" to the government benefit, this provision is unconstitutional.

Defendants misconstrue the pledge requirement as nothing more than the refusal of the government to subsidize the exercise of a particular First Amendment activity. Defendants thus argue that the Global Aids Act is merely a selective funding program and that the "Government [is] not denying a benefit to anyone, but is . . . simply insisting that public funds be spent for the purposes for which they were authorized." Defendants' Memorandum of Law, at 31 (citing Rust v. Sullivan, 500 U.S. 173, 196 (1991)). A "prospective funding recipient," Defendants point out, can simply decline the subsidy.

- 6 -

This argument, however, profoundly mischaracterizes the pledge requirement and the conditions it places on the exercise of First Amendment activity. It is true that the mere refusal to subsidize a right "places no governmental obstacle in the path" of a plaintiff seeking to exercise it. See Defendants' Memorandum of Law (citing Harris v. McRae, 448 U.S. 297, 315 (1980); Regan v. Taxation With Representation, 461 U.S. 540, 549-50 (183)). Thus, for example, "[w]hen Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, . . . it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." Rust, 500 U.S. at 194. That is not the issue here: the requirement that federal funds not be used to "promote or advocate the legalization or practice of prostitution or sex trafficking," 22 U.S.C. § 7631(e), is one thing, its application to the use of non-federal funds is another, and simply cannot be described as a selective funding program in which the government is simply insisting that public funds be spent for the purposes for which they were authorized. Rather, the pledge requirement imposes restrictions on the use of non-government funds and thus restricts the speech of the entity as a whole, and not simply on the particular program it is funding. Thus, it is not a legitimate exercise of the government's power to take "appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." Legal Services Corp. v. Velasquez, 531 U.S. at 541 (quoting Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995)). Instead, it requires that all of the organizations funds, whether governmental or not, be spent in accordance with the government's restrictions and that the entity as a whole therefore adopt the government's position and forgo any contrary expressive activity.

The pledge requirement is unconstitutional, then, because it is the entity, not the program, that bears the burden of the condition. For example, in League of Women Voters, the Court invalidated a statute which prohibited non-commercial radio and television stations that accepted federal funds from editorializing even when funded by wholly private funds. 468 U.S. at 368.[2]

---

[2] Defendants attempt to distinguish League of Women Voters from the present case by arguing that "this case does not involve a 'substantial abridgement of important journalistic freedoms'

In <u>Regan v. Taxation With Representation</u>, the Supreme Court's ruling that Congress could prohibit lobbying by non-profit organizations was based on the fact that these same groups were permitted to lobby through affiliated, legal separate entities.  461 U.S. at 544-46.  Similarly, in <u>Rust v. Sullivan</u>, the Court upheld restrictions on the ability of federal funding recipients to conduct abortions on the grounds that grantees remained free to use private funding to engage in prohibited speech at a separate location.  500 U.S. at 196 (noting that "the regulations do not require[grantees] to give up abortion-relation speech; they merely require that the grantee keep such activities separate and distinct" from their federal funded activities).  The Court distinguished <u>Rust</u> from other unconstitutional conditions cases on the grounds that in true unconstitutional conditions cases, such as here, the "Government has placed a condition on the recipient of a subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."  500 U.S. at 197.

This is precisely why the pledge requirement is so offensive to fundamental First Amendment principles.  It requires the adoption of a particular viewpoint and places an expressive restriction on the entity as a whole prohibiting contrary expressive activity even outside of the confines of the federally funded program.  In requiring that independent, private, voluntary organizations adopt a particular viewpoint, the Government not only violates the First Amendment, but also undermines the independence and integrity of organizations which can, as a result, no longer freely adopt alternate viewpoints.

---

that 'lies at the heart of the First Amendment.'"  Defendants' Memorandum of Law, at 40-41 (quoting <u>League of Women Voters</u>, 468 U.S. at 381, 402).  However, as set forth <u>infra</u> in Section II, this case does involve a substantial abridgement of freedoms that lie at the heart of the First Amendment, that is, the right to associate for the purposes of speaking on matters of public concern.

II.   THE PLEDGE REQUIREMENT RESTRICTS THE FIRST AMENDMENT FREEDOM
      OF NON-GOVERNMENTAL ORGANIZATIONS TO ENGAGE FREELY IN
      PRIVATELY FINANCED SPEECH ON MATTERS OF PUBLIC CONCERN.

The speech engaged in by private voluntary associations, such as the international development and humanitarian organizations that make up InterAction's membership, fulfills a critically important function in a democratic society.  Such speech lessens the authority of the majority, serves as a bulwark against the power of the state, and thus enables individuals to more powerfully and effectively advance their views in the political system.  As is evident from this Nation's history and enshrined in our constitutional jurisprudence, in order to carry out these critical functions, such private associations must maintain their independence from the state.  It follows that, by suppressing their independent speech and by requiring that they espouse the governments' views as a condition of receiving government funding, the pledge requirement undermines the American democratic system as a whole.  While private voluntary associations often partner with government, this valuable partnership need not -- and indeed, must not -- compromise the associational autonomy and independence that have always been their animating principles.

The vitality, diversity and abundance of voluntary associations and non-governmental institutions is a central pillar upon which the American democracy rests.  "One of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal."  NAACP v. Claiborne Hardware Co., 458 U.S. 886, 932-33 (1982).  Indeed, the constitutional freedom of association affords protection to group activity and speech designed to advocate shared beliefs and controversial viewpoints.  "'[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process.'"  Id. at 908 (quoting Citizens Against Rent Control Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 294 (1981)).

Historically, American life has been characterized by vigorous associational activity.  "Better use has been made of association and this powerful instrument of action has been applied

- 9 -

to more varied aims in America than anywhere else in the world." Alexis de Tocqueville, DEMOCRACY IN AMERICA 113 (Phillips Bradley, ed. 1990) [hereinafter DEMOCRACY IN AMERICA]. "In their political associations the Americans of all conditions, minds, and ages, daily acquire a general taste for association and grow accustomed to the use of it. There they meet together in large numbers, they converse, they listen to one another, and they are mutually stimulated to all sorts of undertakings." DEMOCRACY IN AMERICA 129.[3] See also R. Wood, THE CREATION OF THE AMERICAN REPUBLIC 186-96, 319-28 (1969) (associations have been a distinctive feature of American life from the earliest days of the Republic); David Cole, Hanging With The Wrong Crowd: Of Gangs, Terrorists, and The Right Of Association, 1999 Supreme Court Review 203 (quoting Arthur Schlesinger, Paths to the Present 23 (1949) ("Traditionally, Americans have distrusted collective organization as embodied in government while insisting upon their own untrammeled right to form voluntary associations."). Moreover, associational activity was extolled in the Federalist Papers as a critical factor in maximizing the power of the people and minimizing the dangers of centralized government. See THE FEDERALIST NO. 56, at 53 (James Madison) (Clinton Rossiter ed. 1961) (describing the virtues of voluntary private association as minimizing the dangers attendant to centralized power).

The critical significance of voluntary association as an essential aspect of the freedom of speech was fortified by and memorialized in the Constitution. Indeed, the Constitution includes provisions which expressly protect rights of association, including the rights of free speech, assembly and petition. See U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). See also DeJonge v. Oregon, 299 U.S. 353, 364 (1937) (maintaining that "[t]he right of peaceable assembly is a right cognate to those of free

---

[3] De Tocqueville noted that "Americans of all ages, all stations in life, and all types of dispositions are forever forming associations . . . of a thousand different types, religious, moral, serious, futile, very general and very limited, immensely large and very minute." Democracy in America 53.

speech and free press and is equally fundamental"); <u>Republican Part of State of Conn v. Tashjian</u>, 770 F.2d 265, 275-76 (2d Cir. 1985) (noting that the importance of political association was enshrined in the Constitution). Furthermore, the Supreme Court has made clear that there is an independent right of association which derives from the First Amendment guarantees of speech, press, assembly and petition. <u>See</u> <u>NAACP v. Alabama</u>, 357 U.S. 449, 460 (1958). In <u>NAACP v. Alabama</u>, the Supreme Court held that the state could not constitutionally compel production of a membership listing from a private, voluntary association because compelled disclosure would likely curtail the organization's advocacy of dissident beliefs. <u>See</u> <u>id</u>. The Court reasoned that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." <u>Id</u>. And as the Court stated in <u>Roberts v. United States Jaycees</u>, "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group efforts toward those ends were not also guaranteed." 468 U.S. 609, 622 (1984).

In sum, the Supreme Court understands "as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." <u>Id</u>. Freedom of association is therfore protected as a fundamental component of our personal liberty. <u>See</u> <u>also</u> DEMOCRACY IN AMERICA 117 ("The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow creatures and of acting in common with them. The right of Association therefore . . . is as inalienable in its nature as the right of personal liberty.").[4]

---

[4] For this reason, "[s]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." <u>See</u> <u>NAACP v. Alabama</u>, 357 U.S. at 460-61; <u>Bates v. Little Rock</u>, 361 U.S. 516, 524 (1960) (in order to justify an encroachment on an associational right, the state must present a compelling reason for that encroachment). The Court has, accordingly, struck down state action which curtails the freedom to associate as unconstitutional. Such impermissible state action includes, but is not limited to, the imposition of penalties or

That right of association is, in part, a right to speak collectively on matters of public concern.  Indeed, the right of association is important precisely because it guarantees "the right of people to make their voices heard on public issues."  NAACP v. Claiborne Hardware, 458 U.S. at 908-09.  "By collective effort individuals can make their views known, when, individually, their voices would be faint or lost.'"  See id.; see also NAACP v. Alabama, 357 U.S. at 460-61 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.").

The robust right to associate for expressive purposes -- one of the "foundations of our society," NAACP v. Claiborne, 458 U.S. at 932-33 -- serves several functions that are essential to the democratic principles that undergird our constitutional democracy.  See also DeJonge, 299 U.S. at 372 ("the security of the Republic, the very foundation of constitutional government" lies in preserving the right of assembly).  First, the right of association serves to lessen the moral authority of the majority and strengthen the minority.  See NAACP v. Alabama, 357 U.S. at 460 (reasoning that the right to associate enables the expression of dissident beliefs).  As De

---

withholding of benefits from individuals because of their membership in a disfavored group, requests for disclosure of the fact of membership in a group seeking anonymity, and interference with the internal organization or affairs of the group.  See Roberts, 468 U.S. at 622-23.  See also Boy Scouts of America v. Dale, 530 U.S. 640 (2000) (holding that right of expressive association trumps state public accommodations law); Cousins v. Wigoda, 419 U.S. 477, 487-88 (1974) (holding that associations have right to be free from state interference with the internal structure of the organization); Gibson v. Florida Legislative Investigation Comm., 371 U.S. 539 (1963) (contempt conviction for refusal to divulge information in local NAACP membership lists violated the right of association); Louisiana v. NAACP, 366 U.S. 293 (1961) (if disclosure of NAACP membership lists would result in reprisals and hostility to members, the first amendment may not require such disclosure); Shelton v. Tucker, 364 U.S. 479 (1960) (statute compelling teachers to file an annual affidavit listing every organization to which they belonged or regularly contributed invalid on the grounds of associational freedom).  Cf. First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765 (1978) (noting that legislature may not limit religious, charitable or civic associations in their public message).

Tocqueville observed, "[i]n America, the citizens who form the minority associate in the first place to show their number and lessen the moral authority of the majority." DEMOCRACY IN AMERICA 117. Thus, this right "is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." Boy Scouts of America v. Dale, 530 U.S. 640, 647-48 (2000).

Second, a robust right of association which protects "expressive group effort" enhances both "political and cultural" diversity and our "abiding commitment to pluralism." See NAACP v. Alabama, 357 U.S. at 277-78 ("Because of this nation's abiding commitment to pluralism, and our candid recognition that the sum of an association may often be far greater than its individual parts, courts have been particularly hesitant to countenance any governmental intrusion -- either direct or indirect -- into the core of expressive group effort."); Roberts, 468 U.S. at 622 ("According protection to collective effort on behalf of shared goals is especially important to preserving political and cultural diversity and in shielding dissident expression from suppression by the majority."). Indeed, associational life provide the participants in the third sector with "socialization into the political values necessary for self-government." CIVIL SOCIETY AND GOVERNMENT 18 (Robert C. Post and Nancy L. Rosenbaum eds.).

Third and finally, the right of expressive association protects against tyranny and serves as a bulwark against centralized power. "Despotism, by its very nature suspicious, sees the isolation of men as the best guarantee of its own permanence." DEMOCRACY IN AMERICA 119; Laurence Tribe, AMERICAN CONSTITUTIONAL LAW 1313 (2d ed. 1988) ("[T]o destroy the authority of intermediate communities and groups . . . destroys the only buffer between the individual and the state."); Cf. DeJonge, 299 U.S. at 364-65 (reasoning that the right of assembly ensures that "government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means"). The third sector in general serves as a "center of collective political resistance against capricious and oppressive government." CIVIL SOCIETY AND GOVERNMENT 18 (Robert C. Post and Nancy L. Rosenbaum eds.).

Thus, the vital functions that associations serve in our society, as mediating institutions that stand between the individual and the state, are incompatible with government intrusion into the province of associational life. Government must not be permitted to supervise or manage civil associations and to interfere with their free speech "lest their independent influence on society be diluted." See DEMOCRACY IN AMERICA 115-119, 312. These organizations are valuable in a democratic society precisely because of their independence from government encroachment and because they speak freely on matters of public concern. This is not to say, and amicus does not contend, that there can be no laws governing this sector, only that the government must not interfere with private associations in a manner that compromises their independence, and with it, their salutary function in society. Indeed, it is the independence of associational life from government interference that animates our associational jurisprudence and that enables that sector to serve this critical function. While government should, and commonly does, partner with private associations, and while it is certainly appropriate for government to shape and tailor its funding to serve the purposes it wishes such funding to serve, it is not permissible for the government to use funding to co-opt the entities with which it partners, many of which receive much of their funding from other sources.

III.    THE PLEDGE REQUIREMENT UNDERMINES THE VALUABLE PARTNERSHIP BETWEEN GOVERNMENT AND THE THIRD SECTOR.

Requiring InterAction's members to satisfy the pledge requirement and to cease all contrary speech undermines their constitutionally protected independence. Indeed, such compelled adoption of government sponsored views compromises the right of these members to associate for the purposes of collective expression. In so doing, the pledge requirement undermines the independence of the third sector and the crucial partnership between government and civil society.

Private associations have long provided critically needed services in concert with governmental programs and entities and have assisted government in solving pressing social

problems.  See Alice Gresham Bullock, Taxes, Social Policy and Philanthropy: The Untapped Potential of Middle- and Low-Income Generosity, 6 Cornell J.L. Pub. Pol'y 325, 332 (1997); Lester M. Salamon, Partners in Public Service: The Scope and Theory of Government-Non-profit Relations, in THE NON-PROFIT SECTOR 99 (Walter W. Powell, ed., 1987).  During the Colonial period, governments provided funds to private charitable educational institutions, hospitals, and social service agencies, enabling those institutions to provide services needed by local communities.  Salamon, Partners in Public Service, at 100.  Later, public officials relied upon private non-profit agencies to assist in addressing the social problems that accompanied urbanization and industrialization.  Id.  For example, in 1898, 57 percent of New York City's expenditures for the poor went to private benevolent institutions to care for prisoners and paupers.  Id. at 101.  These partnerships continue today: while government has no inherent obligation to provide funding for NGOs, it nevertheless frequently does so.  These partnerships take a "dizzying array" of forms: loans, loan guarantees, grants, contracts, insurance, tax expenditures, vouchers and more.  See Lester M. Salamon, The New Governance and the Tools of Public Action: An Introduction, 28 Fordham Urb. L.J. 1611, 1612 (2001).  See also Partnerships for a Stronger Civil Society, A Report to the President from the Interagency Task Force on Non-profits and Government 6 (Dec. 2000) (hereinafter "Interagency Task Force Report on Non-profits and Government").

But the success of this partnerships depends upon the independence of the third sector and its institutions from governmental control.  Without such independence and autonomy, the creativity and innovation that define this sector would be undermined and its valuable contributions to American life would be lessened.  Historically, organizations in the third sector have taken on a pioneering role, and, as such, are able to bring new ideas into public consciousness, shape public policy, set standards for government performance and inspire moral and social reform.  See, e.g., Dean Rusk, THE ROLE OF THE FOUNDATION IN AMERICAN LIFE 14 (1961).  The organized efforts of third sector in the effort to abolish slavery, protect civil rights,

create public libraries, have all depended upon the independence of private, voluntary associations that arose in order to bring about these results. <u>See</u> John H. Filer, <u>The Filer Commission Report; Report of the Commission of Private Philanthropy and Public Needs</u>, in THE NON-PROFIT ORGANIZATION: THE ESSENTIAL READINGS 70, 80 (David L. Geis, et al. eds. 1990); <u>see</u> <u>also</u> Arnaud C. Marts, PHILANTHROPY'S ROLE IN CIVILIZATION: ITS CONTRIBUTION TO HUMAN FREEDOM 50 (1991) (noting that this sector has pioneered almost every cultural advance for the past three hundred years). Thus, it is precisely their independence from government control -- and their corresponding freedom to innovative and effect change -- that enables the third sector to effectively partner with government.

Here, the pledge requirement directly compromises the independence and autonomy of InterAction's member-organizations that receive Global Aids Act funds and thus cripples their valuable partnership with USAID. In particular, many NGOs adopt a principle of impartiality in providing humanitarian relief and assistance. Specifically, the Code of Conduct for NGOs in Disaster Relief provides that "[a]id not be used to further a particular political or religious standpoint," and that such agencies "act independently from governments." <u>See</u> Code of Conduct for NGOs in Disaster Relief, Articles 3, 4; <u>see</u> <u>also</u> Larry Minear, THE HUMANITARIAN ENTERPRISE, DILEMMAS AND DISCOVERIES 76-80 (describing the importance of impartiality to international relief organizations and the way in which independence from state governments enables them to carry out their "humanitarian imperative"); Henry J. Steiner and Philip Alston, INTERNATIONAL HUMAN RIGHTS IN CONTEXT: LAW, POLITICS, MORALS 943-52 (2d ed.) According to these principles, humanitarian assistance, in order to be effective, must not be linked to any political or religious viewpoint. <u>See</u> <u>id.</u> In part this is so because of the danger attendant to operating in a conflict situation in which the organization is deemed to be an agent of any one side. <u>See</u> THE HUMANITARIAN ENTERPRISE 117-18, 161-65 (describing the dangers of humanitarian operations in unstable and war-torn countries as well as the dangers of being perceived by the population to be served as affiliated with a participant in the conflict). Thus, in

many instances, NGOs depend upon their independence from government and state-actors in order to carry out their work effectively, by, for example, serving communities that might otherwise be wary of receiving assistance from government or state actors. Especially during armed conflict or in states that are suffering from significant and often violent schisms, NGOs must remain impartial to the actors in these conflicts in order to serve their broader goals, such as the protection of public health or the delivery of humanitarian assistance. This purpose is undermined by the requirement of a pledge that inexorably links them to a particular side of the conflict.

Indeed, the principle that NGOs must have independence and autonomy in order to effectively carry out their purposes, is particularly true with reference to the pledge requirement here at issue. The NGOs that receive Global Aids Act funds operate in legal regimes that vary with respect to the legality of sex work. For example, sex work is legal in Senegal and Brazil, among others. See Declaration of Chris Beyrer, submitted in support of Plaintiffs' Motion for a Preliminary Injunction, at ¶¶ 20, 27 (describing the success of Senegal in combating the spread of HIV/AIDS by decriminalizing sex work for sex workers registered with the government and noting that due to the decriminalization of sex work in Brazil, outreach programs have been successful in keeping the rates of HIV low). In the Philippines, sex workers register with the government. See id. at ¶ 26. In these and other countries in which sex work is legal, United States based NGOs may and frequently do wish to provide public health assistance or to subcontract for the provision of such assistance, in the effort to stop the spread of HIV/AIDS. Adopting the position of the United States government will undermine the work of these organizations and will hamper their ability to operate in these alternative legal regimes.

Thus, the pledge requirement has the effect of undermining the critical partnership between government and civil society. Without such autonomy, this sector of society has less to contribute and the crucial partnership that has been a cornerstone of our democracy is undermined.

## <u>CONCLUSION</u>

For the foregoing reasons, proposed <u>Amicus Curiae</u> InterAction urges this Court to grant Plaintiffs' motion to enjoin the application of the pledge requirement to United States based organizations. The application of the requirement to such organizations violates their First Amendment freedoms and their associational independence. In so doing, this requirement undermines the productive partnership between government and civil society, and contravenes core democratic principles.

Respectfully submitted,

Dated: January __, 2006                    _____/s/_____
                                           Lawrence S. Lustberg (LL-1644)
                                           Megan Lewis (ML-3429)
                                           GIBBONS, DEL DEO, DOLAN
                                           GRIFFINGER & VECCHIONE, P.C.
                                           One Riverfront Plaza
                                           Newark, New Jersey 07102
                                           llustberg@gibbonslaw.com
                                           phone: (973) 596-4700
                                           facsimile: (973) 596 0545