**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------x
ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC., OPEN SOCIETY INSTITUTE,
and PATHFINDER INTERNATIONAL,

                                    Plaintiffs,

v.

                                                            **Civil Action No. 05-cv-8209**
UNITED STATES AGENCY FOR INTERNATIONAL                      **(VM)**
DEVELOPMENT and ANDREW S. NATSIOS, in his
official capacity as Administrator of the United States Agency
for International Development, and his successors;

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES and MICHAEL O. LEAVITT, in his
official capacity as Secretary of the U.S. Department of
Health and Human Services, and his successors; and

UNITED STATES CENTERS FOR DISEASE CONTROL
AND PREVENTION and JULIE LOUISE GERBERDING,
in her official capacity as Director of the U.S. Centers for
Disease Control and Prevention, and her successors;

                                    Defendants.
----------------------------------------------------------------------x

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION OF PLAINTIFFS ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, OPEN SOCIETY INSTITUTE, AND PATHFINDER INTERNATIONAL FOR A PRELIMINARY INJUNCTION

Burt Neuborne (BN 9092)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
Laura K. Abel (LA 6831)
Aziz Huq*
Brennan Center for Justice
  at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 998-6730

*Attorneys for Plaintiffs*

*Not yet admitted in this district.

Richard A. Johnston*
Merriann M. Panarella*
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

David W. Bowker (DB 3029)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
(212) 230-8852

Table of Contents

Page

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ...............................................................................................................3

I.      THE PLEDGE REQUIREMENT VIOLATES THE FIRST
        AMENDMENT....................................................................................................3

        A.      The Pledge Requirement Unconstitutionally Restricts
                Plaintiffs' Privately Funded Speech............................................................3

                1.      A Funding Restriction May Not Impose a Blanket Ban on
                        a Recipient's Privately Funded Speech.................................................4
                2.      The Pledge Requirement Impermissibly Discriminates
                        Based on Viewpoint and Compels Speech. ..........................................7
                3.      First Amendment Protections Apply to Spending Clause
                        Enactments...........................................................................................9
                4.      The Pledge Requirement Is Not Narrowly Tailored to
                        Further Any Substantial Government Interest. ...................................11

                        a.      The Pledge Requirement Is Not Narrowly Tailored to Further
                                the Asserted Interest in Ensuring the Integrity of the
                                Government's Anti-Prostitution Message...................................12
                        b.      The Pledge Requirement Is Not Narrowly Tailored to
                                Further Any Other Purported Government Interests. ...............17

        B.      The Pledge Requirement Is Unconstitutionally Vague..............................18

                1.      First Amendment Vagueness Standards Apply to Funding
                        Conditions..........................................................................................18
                2.      Defendants' Relaxed Vagueness Standard Is Inapplicable
                        to a Speech Restriction Carrying Civil and Criminal Penalties.........19
                3.      The Pledge Requirement Fails to Inform Plaintiffs as to What
                        It Requires and Fails to Provide Standards for Enforcement............20

II.     DEFENDANTS MISCONSTRUE THE PLEDGE REQUIREMENT. ................23

        A.      Plaintiffs' Construction of the Pledge Requirement is Correct. ...............24

                1.      The Plain Language Requires Plaintiffs' Interpretation. ...................24
                2.      The Structure of the Global AIDS Act Supports Plaintiffs'
                        Interpretation.....................................................................................26
                3.      The Overall Purpose of the Global AIDS Act Supports Plaintiffs'
                        Construction of the Pledge Requirement. .........................................27

i

    4. The Legislative History of the Pledge Requirement Provides
     Additional Support for Plaintiffs' Interpretation. ...............................29

  B. The Canon of Constitutional Avoidance Precludes Defendants'
    Statutory Construction. ..............................................................30

III. PLAINTIFFS HAVE DEMONSTRATED THAT THEY WILL
  CONTINUE TO SUFFER IRREPARABLE HARM ABSENT AN
  INJUNCTION. ......................................................................................32

CONCLUSION.............................................................................................................33

## TABLE OF AUTHORITIES

### CASES

*Advance Pharmaceutical, Inc. v. United States,*
  391 F.3d 377 (2d Cir. 2004)..................................................................................................20

*Alden v. Maine,*
  527 U.S. 706 (1999)..............................................................................................................10

*American Civil Liberties Union v. Mineta,*
  319 F. Supp. 2d 69 (D.D.C. 2004).......................................................................................25

*Atascadero State Hospital v. Scanlon,*
  473 U.S. 234 (1985)..............................................................................................................10

*Bery v. City of N.Y.,*
  97 F.3d 689 (2d Cir. 1996)...................................................................................................14

*Buckley v. Valeo,*
  424 U.S. 1 (1976).....................................................................................................................7

*Capitol Square Review & Advisory Board v. Pinette,*
  515 U.S. 753 (1995)..............................................................................................................16

*Carey v. Brown,*
  447 U.S. 455 (1982).................................................................................................................5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994)..............................................................................................................24

*Charles v. Verhagen,*
  220 F. Supp. 2d 955 (W.D. Wis. 2002),
  *aff'd,* 348 F.3d 601 (7th Cir. 2003) ...................................................................................19

*Chas. C. Steward Machine Co. v. Davis,*
  301 U.S. 548 (1937)........................................................................................................10, 19

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984)..............................................................................................................32

*Christensen v. Harris County,*
  529 U.S. 576 (2000)..............................................................................................................32

*DKT Memorial Fund Ltd. v. Agency for International Development,*
  887 F.2d 275 (D.C. Cir. 1989)..............................................................................................16

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*,
    485 U.S. 568 (1988)............................................................................................................30, 31

*FCC v. League of Women Voters of California*,
    468 U.S. 364 (1984).......................................................................................... *passim*

*FEC v. Massachusetts Citizens for Life, Inc.*,
    479 U.S. 238 (1986)............................................................................................................7

*General Media Communications v. Cohen*,
    131 F.3d 273 (2d Cir. 1997).............................................................................................20

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..........................................................................................................18

*Green Party of New York v. New York State Board of Elections*,
    389 F.3d 411 (2d Cir. 2004).............................................................................................33

*Harris v. McCrae*,
    448 U.S. 297 (1980)............................................................................................................5

*In re Ben Cooper, Inc.*,
    896 F.2d 1394 (2d Cir. 1990)...........................................................................................30

*Kansas v. U.S.*,
    214 F.3d 1196 (10th Cir. 2000) ......................................................................................19

*Keyishian v. Board of Regents*,
    385 U.S. 589 (1967)..........................................................................................................18

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001).....................................................................................................11, 13

*Loper v. New York City Police Dep't*,
    999 F.2d 699 (2d Cir. 1993).........................................................................................12, 14

*Marks v. United States*,
    430 U.S. 188 (1977)............................................................................................................7

*Mattel, Inc. v. Barbie-Club.com*,
    310 F.3d 293 (2d Cir. 2002).............................................................................................27

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)............................................................................................................5

iv

*National Endowment for the Arts v. Finley*
    524 U.S. 569 (1998) ...................................................8, 10, 20

*New York City Unemployed & Welfare Council v. Brezenoff,*
    677 F.2d 232 (2d Cir. 1982)...................................................12

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)...................................................6

*North Haven Board of Education v. Bell,*
    456 U.S. 512 (1982)...................................................17

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981)...................................................19

*Planned Parenthood of Central & Northern Ariz. v. Arizona,*
    718 F. 2d 938 (9th Cir. 1983) ...................................................11, 12

*Planned Parenthood Federation of America, Inc. v. Agency for International Development,*
    838 F.2d 649 (2d Cir. 1988)...................................................32

*Planned Parenthood Federation of America, Inc. v. Agency for International Development,*
    915 F.2d 59 (2d Cir. 1990)...................................................16

*Population Institute v. McPherson,*
    797 F.2d 1062 (D.C Cir. 1986)...................................................32

*Regan v. Taxation With Representation of Washington,*
    461 U.S. 540 (1983)...................................................4, 5, 11

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997)...................................................15

*Rust v. Sullivan,*
    500 U.S. 173 (1991)................................................... *passim*

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944)...................................................32

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,*
    531 U.S. 159 (2001)...................................................31

*South Dakota v. Dole,*
    483 U.S. 203 (1987)...................................................9, 10

*Speiser v. Randall,*
    357 U.S. 513 (1958)..................................................................................................10, 18

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001).........................................................................................................26

*Trans World Airlines, Inc. v. Franklin Mint Corp.,*
    466 U.S. 243 (1984).......................................................................................................10

*United States v. American Library Association,*
    539 U.S. 194 (2003)..............................................................................................6, 7, 11

*United States v. Clark,*
    445 U.S. 23 (1980).........................................................................................................30

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936).......................................................................................................32

*United States v. Mead Corp.,*
    533 U.S. 218 (2001).......................................................................................................32

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000)................................................................................................12, 13

*United States v. Sattar,*
    272 F. Supp. 2d 348 (S.D.N.Y. 2003)...........................................................................19

*Velazquez v. Legal Services Corporation,*
    164 F.3d 757 (2d. Cir. 1999)................................................................................. *passim*

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)................................................................................................19, 20

*Village of Schaumburg v. Citizens for a Better Environment,*
    444 U.S. 620 (1980).......................................................................................................12

*Wisconsin Right to Life, Inc. v. FEC,*
    - U.S. -,  2006 WL 152676 (Jan. 23, 2006)..............................................................3, 7

## STATUTES & RULES

22 C.F.R. § 226.91(c)(1)..................................................................................................16

45 C.F.R. § 74.13 ...........................................................................................................19

45 C.F.R. § 74.61 ...........................................................................................................19

45 C.F.R. § 74.62 ...................................................................................................19

45 C.F.R. § 92.43 ...................................................................................................19

22 U.S.C. § 7601 ........................................................................................12, 27, 28

22 U.S.C. § 7603...........................................................................................................28

22 U.S.C. § 7611 ...............................................................................................12, 13

22 U.S.C. § 7631 ................................................................................................. *passim*

## OTHER AUTHORITIES

149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. Leahy) ................................29

149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. First) .............................29, 30

*American Heritage College Dictionary* 1077 (4th ed. 2002) .........................................24

H.R. Conf. Rep. No. 109-265 (2005)..........................................................................15

## PRELIMINARY STATEMENT

Plaintiffs are American non-profit organizations that are highly effective participants in the nation's worldwide effort to limit the spread of HIV/AIDS. Their successes in developing countries have resulted, in part, from their abilities to work with populations at high risk for HIV/AIDS, such as sex workers. The government Defendants argue that under 22 U.S.C. § 7631(f) of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act"), the only American non-profit organizations permitted to deliver publicly funded health care and HIV/AIDS prevention services abroad are those that adopt the government's current viewpoint that "explicitly opposing" and criminalizing prostitution are the only permissible means of combating the social ills linked to that age-old practice. Plaintiffs object to the government's restrictions because they both impede the ability of non-profit organizations to work optimally with sex workers on HIV/AIDS prevention and infringe upon Plaintiff's First Amendment rights. Defendants assert that they are entitled to regulate Plaintiffs' privately funded speech concerning prostitution as the price of Plaintiffs' continued receipt of federal funds to combat HIV/AIDS around the world.[1]

But the First Amendment does not permit such infringements on the core speech rights of American non-profit organizations: the government may not impose a blanket ban on the ability of a funding recipient to engage in privately funded speech. Confronted with extensive Supreme Court precedent, Defendants attempt a revision of well-settled law that would empower the government to force private participants in publicly funded programs to accept virtually any viewpoint-based restriction on their privately funded First Amendment activities as long as the government claims that the viewpoint-based restriction reinforces a government message. Such

---

[1] Plaintiffs use the term "privately funded" here to refer to sources other than the U.S. government. Such sources may include other organizations, foundations, and other national governments.

a rationale is unacceptable because it has no limits. In a democracy, governments come and go, each with a particular viewpoint on controversial social issues. If each succeeding administration or Congress were licensed to insist that American non-profit organizations conform their privately funded First Amendment speech and activities to the government's current political and moral views as the cost of continuing, for example, to deliver publicly funded health services, the resulting politicization of the public health sector would stifle the robust and uninhibited discussion and experimentation that is the key to progress in this area.  The First Amendment does not permit such an abuse of the government's spending power.

Moreover, Defendants refuse to delineate the outer boundaries of 22 U.S.C. § 7631(f). Rather than provide guidance to assist the grantees and officials who must comply with and enforce the pledge requirement, Defendants ignore settled First Amendment vagueness doctrine, incorrectly arguing that clarity is not necessary because the restriction is attached to a spending enactment.  But, whenever government claims the power to regulate speech, the First Amendment bans vague regulations, both to avoid unnecessary self-censorship and to provide guidance to public officials charged with enforcing the regulation.  Under such a standard, the government's reading of 22 U.S.C. § 7631(f) is unconstitutionally vague.

Defendants precipitate these constitutional collisions by adhering to an incorrect reading of 22 U.S.C. § 7631(f) as banning private speech that questions whether criminalization is the socially optimal approach to prostitution.  In fact, the correct interpretation of the relevant legislation – mandated by the text, structure and history of the statute, as well as the doctrine of constitutional avoidance – requires that participants in the nation's efforts to stem the spread of HIV/AIDS acknowledge the harms associated with sex work, but does not require Plaintiffs to pledge support for criminalization as the only means of coping with those harms.

## ARGUMENT

## I.    THE PLEDGE REQUIREMENT VIOLATES THE FIRST AMENDMENT.

### A.    The Pledge Requirement Unconstitutionally Restricts Plaintiffs' Privately Funded Speech.

Plaintiffs rigorously comply with the provision of the Global AIDS Act that restricts the use of government funds, 22 U.S.C. § 7631(e), and do not seek to have the government subsidize any of their privately funded speech regarding sex work. Plaintiffs simply wish to avoid being penalized for the constitutionally protected speech and activities that they fund with their private monies.

Yet, Defendants contend that they enjoy broad power to "require[e] that [Plaintiffs] not engage in speech or conduct that is inconsistent with an opposition to prostitution," even when such speech is financed by Plaintiffs' private funds. Defs.' Mem. of Law in Opp. to Pls.' Mot. for a Prelim. Inj. & TRO [hereinafter "Defs.' Br."] at 20. This position fails for four reasons. First, the Supreme Court and Second Circuit have made clear that a blanket ban on the ability of a government-funding recipient to speak with its private funds violates the First Amendment. Second, the pledge requirement impermissibly compels the Plaintiffs to adopt a government-dictated viewpoint on a contested social issue. Third, the government fails in arguing that spending clause enactments are immune from First Amendment scrutiny. Fourth, the government cannot demonstrate that the pledge requirement is narrowly tailored to further any substantial interest.[2]

---

[2]    Contrary to Defendants' assertion, Defs.' Br. at 27, Plaintiffs advance both facial and as-applied challenges to the pledge requirement. To prevail on their as-applied challenges, they must demonstrate only that the pledge requirement is unconstitutional as applied to the Plaintiffs. *See, e.g., Wisconsin Right to Life, Inc. v. FEC*, -U.S. -, 2006 WL 152676 (Jan. 23, 2006) (per curiam).

3

1.    **A Funding Restriction May Not Impose a Blanket Ban on a
Recipient's Privately Funded Speech.**

Applying the First Amendment to spending enactments, the Supreme Court has

repeatedly held that while the federal government has wide latitude to determine how public

money should be spent, funding conditions that limit a recipient's ability to engage in privately

funded speech must afford the recipient an alternative channel through which to engage in that

speech. *See Rust v. Sullivan*, 500 U.S. 173, 196-97 (1991); *FCC v. League of Women Voters of*

*California*, 468 U.S. 364, 400-01 (1984); *Regan v. Taxation With Representation of Washington*,

461 U.S. 540, 544-45 (1983); *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 766 (2d. Cir.

1999), aff'd, 529 U.S. 1052 (2000); *see also* Mem. of Law in Support of Mot. of Pls. Alliance for

Open Society International and Open Society Institute for a Prelim. Inj. ("AOSI Br.") at 29-31.

Defendants' attempts to distinguish those cases so holding are unavailing.

Although Congress has wide latitude to determine how federal funding should be

utilized, its attempts to bar or dissuade others from using non-federal funding to engage in

constitutionally protected speech are highly suspect. *League of Women Voters*, 468 U.S. at 400-

01.  For this reason, many decisions have allowed the government to place conditions on the use

of its own funding, while at the same time restricting the government's power to limit privately

funded speech, as the government tries to do here. *See, e.g., Rust*, 500 U.S. at 196-97

(upholding restrictions on the use of government funding to perform abortions and engage in

abortion-related advocacy only because funding recipients could continue to use non-government

funding to engage in those activities through programs separate and apart from the project

receiving federal funds); *Regan*, 461 U.S. at 544-45 (upholding ban on lobbying with tax-

subsidized funds only because the organization was easily able to establish a legally separate

affiliate to engage in lobbying with unsubsidized, non-government funds); *cf. Harris v. McCrae*,

4

448 U.S. 297, 317 n.19 (1980) (upholding Medicaid's exclusion of abortion coverage but warning that "a substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised [with resources other than Medicaid] her constitutionally protected freedom to terminate her pregnancy by abortion").

As the Supreme Court explained in *League of Women Voters*, when the government prohibits funding recipients from using private funds to engage in speech, the portions of *Regan* and similar cases upholding restrictions that define the limits of a government subsidy simply are not controlling. *See* 468 U.S. at 400-01. As a result, Defendants' reliance on portions of *Regan*, *Rust* and *Harris* that concern restrictions on uses of government monies to engage in constitutionally protected activities is misplaced. *See* Defs.' Br. at 31-32.

Thus, a blanket ban on non-governmental organizations' right to speak freely on contested social issues is impermissible. *League of Women Voters*, 468 U.S. at 401-02. Defendants fail in their attempt to distinguish *League of Women Voters* by arguing that the precise First Amendment interest at stake there – "important journalistic freedoms" – is not at issue here. Defs.' Br. at 41. The right involved here – that of non-governmental organizations to speak freely on contested social issues – is just as central to the First Amendment as is freedom of the press. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) ("expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values'") (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *see also* Defs.' Br. at 42 (conceding that "speech … advocating a change in governmental policy … is accorded the strongest protection under the First Amendment"). Indeed, in *League of Women Voters*, the Court made clear that the right at stake there – "[p]reserving the free expression of editorial

5

opinion" – is "part and parcel of 'a profound national commitment ... that debate on public issues should be uninhibited, robust, and wide-open.'" 468 U.S. at 382 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).  That right to participate in robust debate about effective HIV/AIDS prevention is precisely what Plaintiffs seek to preserve.

Defendants also attempt to distinguish the Second Circuit's decision in *Velazquez v. Legal Services Corporation* by arguing that, because the restriction at issue there permitted federal funding recipients to engage in privately funded protected speech through an affiliate, the Court did not consider whether a blanket ban would have been unconstitutional.  Defs.' Br. at 41-42.  However, the Second Circuit's decision, holding that the private money restriction at issue would be unconstitutional if the plaintiffs demonstrated that it were unduly burdensome, strongly suggests that the Court would have viewed a blanket ban on privately funded speech as unconstitutional.  *See Velazquez*, 164 F.3d at 765-67.[3]

Defendants strain to portray *United States v. American Library Association*, 539 U.S. 194 (2003) ("*ALA*"), as holding that the government may impose blanket bans on the ability of funding recipients to engage in speech.  Defs.' Br. at 36.  However, the pledge requirement's blanket prohibition cannot be equated with the easily disabled internet filtering requirement upheld there.  In fact, the various opinions issued in *ALA* make clear that five members of the Court – and probably nine – would have invalidated the filtering restriction as a violation of the

---

[3]     Not surprisingly, Defendants' argument ignores the fact that Congress had originally imposed a blanket ban on the use of private funds by legal services programs to engage in speech – a ban strikingly similar to the one at issue here. AOSI Br. at 31-32. Unlike the defendant Legal Services Corporation in *Velazquez*, the Defendants have taken no such remedial action to ameliorate the absolute nature of the pledge requirement.

First Amendment if, as here, the burden imposed by the rule on First Amendment freedoms were more than *de minimis*.[4]

Finally, the government can take no solace from *Buckley v. Valeo* and its progeny. *See* Defs.' Br. at 36. In *Buckley*, the Supreme Court ruled that the First Amendment forbids any effort to limit campaign expenditures by individuals and candidates. 424 U.S. 1 (1976). While campaign expenditures and contributions by for-profit corporations are unprotected, the Court has been very careful to provide full First Amendment protection to expenditures and contributions by non-profit "grassroots" organizations. *See FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986); *accord Wisconsin Right to Life, Inc. v. FEC*, -S. Ct. -, 2006 WL 152676 (Jan. 23, 2006) (per curiam) (as-applied challenge to prohibition against grassroots lobbying advertisements can proceed). As a result, the privately funded speech of philanthropic foundations and non-profit public health and development organizations is entitled to plenary First Amendment protection.

### 2.     The Pledge Requirement Impermissibly Discriminates Based on Viewpoint and Compels Speech.

The obligation to "oppose prostitution" is even more offensive to the First Amendment than the private money restrictions in *League of Women Voters*, *Regan*, *Rust*, and *Velazquez*, because organizations are required to affirmatively adopt the government's viewpoint in order to

---

[4]        Justice Kennedy's opinion was controlling in *ALA*, as the narrowest majority view. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977). In upholding the filtering requirement on the ground that it impinged only minimally on First Amendment rights, the opinion made clear that if filtering proved burdensome "in any significant degree," it would falter before First Amendment scrutiny. *See Am.Library Ass'n*, 539 U.S. at 214-15. Justice Breyer's concurrence similarly upheld the requirement because it imposed only a "comparatively small burden" on library patrons. *Id.* at 220. Justices Stevens, Souter and Ginsburg, in dissent, argued that the restriction was unconstitutional, emphasizing that it imposed a more onerous burden on library patrons than was acknowledged by the plurality and concurrences. *Id.* at 222 (Stevens, J., dissenting); *id.* at 231-34 (Souter, J., dissenting). Even the plurality opinion, on which the Defendants heavily rely, premised approval of filtering on the assumption that the burden on First Amendment activity could easily be avoided. The plurality noted that since libraries traditionally impose controls on minors' access to books, filters are consistent with long-standing library practice and an adult library patron could avoid the filter by the simple expedient of asking a librarian to disable it, thus rendering the real world burden on First Amendment activity *de minimis*. *Id.* at 209.

obtain federal funding.  The pledge requirement violates the First Amendment prohibitions against both viewpoint discrimination and compelled speech.  *See* AOSI Br. at 27-29.

Citing *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), Defendants assert that the pledge requirement ought to pass constitutional scrutiny as long as it is not designed to "drive certain ideas or viewpoints from the marketplace."  Defs.' Br. at 29-30 (quoting *Finley*, 524 U.S. at 587).  In *Finley*, the Court upheld the constitutionality of a guideline that advised, but did not require, the National Endowment for the Arts to consider "general standards of decency and respect for the diverse beliefs and values of the American public" when making grants.  The Court specifically left the door open for future challenges if it could be shown that the "decency and respect" criteria were used to exclude artists with particular points of view.  524 U.S at 587.

The pledge requirement is exactly the sort of viewpoint-based mandate that the *Finley* Court distinguished.  By express design, the requirement excludes from funding, those organizations that refuse to espouse the government-sanctioned point of view.  As applied by Defendants, it is not enough for recipients to decry the harms of prostitution.  Instead, recipients must also oppose the legalization of prostitution and refrain from organizing sex workers for that purpose.  *See* Letter from Christopher Crowley to Galina Karmanova dated October 7, 2005, attached to the Declaration of Richard Rosberger dated Jan. 4, 2006 as Exhibit D.  Moreover, they may not urge the elimination of criminal penalties against sex workers.  *See* Declaration of Rob Kushen dated Sept. 16 2005 ("Kushen Decl.") ¶ 34, attached to Notice of Mot. of AOSI and OSI for a Prelim. Inj.

The pledge requirement also violates the well-established rule that the government may not compel speech as a condition of participation in a government program.  *See* AOSI Br. at 27-

8

29.  The Defendants attempt to distinguish the long line of Supreme Court cases so holding by claiming that each of those cases "concerns direct regulation of speech 'aimed at the suppression of dangerous ideas.'" Defs.' Br. at 35.  The Defendants simply ignore the fact that all of those cases involved requirements that, like the pledge requirement, forced citizens to espouse the government's point of view in order to participate in government programs, including property tax exemptions, agricultural programs, and use of the public highways.  *See* AOSI Br. at 27-28.

### 3.    First Amendment Protections Apply to Spending Clause Enactments.

The First Amendment clearly prohibits government from imposing viewpoint-based, blanket bans on the ability of a funding recipient to engage in private speech.  Faced with this Supreme Court precedent, Defendants attempt to recast the case law.  Avoiding the clearly controlling cases discussed above, Defendants claim that the governing standard is whether a spending condition is rationally related to the purpose of the funding, regardless of how deeply the condition impinges on First Amendment rights.  Defs.' Br. at 28-29.

This argument fails because it mischaracterizes *South Dakota v. Dole*, 483 U.S. 203 (1987), on which the Defendants rely, and ignores the whole line of unconstitutional conditions cases discussed above.  *Dole* concerned Congress's ability to use Article I spending power to influence the states' drinking age laws.  While the *Dole* Court acknowledged that the Spending Clause allows Congress to move beyond the powers enumerated in Article I of the Constitution, it simultaneously underscored that restrictions in other parts of the Constitution continue to apply to conditional funding legislation.  483 U.S. at 208 (the spending power is limited when there is an "independent bar to the conditional grant.").  Thus, while the *Dole* Court concluded that, on the facts before it, the Twenty-First Amendment did not act as an "independent bar" to the exercise of the spending power to influence state drinking ages, it is clear from the opinion that

the First Amendment and other provisions of the Bill of Rights act as "independent bar[s]" to the exercise of that power in cases such as the instant one.[5]

Nearly fifty years of unconstitutional conditions precedent compels the conclusion that citizens cannot be forced to choose between participating in a government program and renouncing their First Amendment rights. Defendants would alter that substantial line of precedent by insisting that, under *Dole* and other cases, Plaintiffs' First Amendment rights are not impinged because they can preserve their rights by not seeking government funding. In the seminal unconstitutional conditions case, *Speiser v. Randall*, however, the Court struck down a California law that conditioned receipt of a property tax exemption on a declaration that the recipient did not advocate the forcible overthrow of the government. 357 U.S. 513 (1958). The *Speiser* Court reasoned that denial of a government benefit as a penalty for exercising a First Amendment right violates the First Amendment. The *Speiser* principle was refined in *League of Women Voters*, in which the Court rejected the Federal Communications Commission's argument that a blanket ban on editorializing by public broadcasting stations was a permissible exercise of Congress's Spending Clause power; instead, the Court analyzed the restriction under a First Amendment narrow tailoring test. 468 U.S. at 374-81, 399-400; *see also infra* section I.A.4.

Moreover, in cases since *Dole*, the Supreme Court has reaffirmed that "the First Amendment certainly has application in the subsidy context." *Finley*, 524 U.S. at 587; *see also*

---

[5]     The *Dole* standard ensures that a deal between equals is not dishonored. Defendants' reliance on *Dole* misleadingly conflates Congress's authority to impose spending conditions on *states* with its authority to abridge the First Amendment protections of *individuals*. "[G]iven their constitutional role, the States are not like any other class of recipients of federal aid." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985). The Court views the states as sovereign entities, who bargain as equals with the federal government. *See Alden v. Maine*, 527 U.S. 706, 737 (1999) (explaining that this is why "a State may waive its sovereign immunity and consent to suit"). The Court, moreover, has declined to inquire whether spending measures are coercive against the states, *see Chas. C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 589 (1937) (rejecting inquiry into whether state was coerced into involvement in social security system), instead viewing them as contracts between two sovereigns that are enforceable as law. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984).

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) (striking down, without invoking the

Spending Clause or *Dole*, a viewpoint-based restriction on federally funded speech); *see also*

*Velazquez*, 164 F.3d at 767 (holding that restrictions on private funds of Legal Services

Corporation grantees would be subject to First Amendment challenge if they could be shown to

"unduly burden" capacity to engage in protected speech).

Defendants' reliance on *American Library Association* to further their contention about

*Dole* is wholly misplaced. As discussed *supra*, the controlling concurrence of Justice Kennedy

makes clear that the relevant inquiry is not whether a funding condition arises under the

Spending Clause but rather to what degree the funding condition burdens speech. The pledge

requirement, unlike an internet filter, can never be "turned off"; it imposes an absolute burden on

First Amendment interests. *See* discussion *supra* at 7 n.4.

### 4. The Pledge Requirement Is Not Narrowly Tailored to Further Any Substantial Government Interest.

As discussed above, Supreme Court case law is unwavering in warning that government

may not impose an absolute ban on the ability of government-funding recipients to engage in

privately funded speech. Even if an absolute ban were theoretically acceptable, it would still

have to satisfy the heightened scrutiny to which restrictions placed on the privately funded

speech of federal funding recipients are subject, *i.e.* it would have to be narrowly tailored to

further a substantial government interest.[6] *See* AOSI Br. at 32-33; see also *Planned Parenthood*

*of Central & Northern Ariz. v. Arizona*, 718 F. 2d 938, 945 (9th Cir. 1983) (holding that ban

---

[6]    Although Defendants argue that the Supreme Court has applied a rational relationship test to funding restrictions on privately-funded speech, they misconstrue the relevant case law. See Defs.' Br. at 38-39. In *Regan*, the Court emphasized that it was upholding the restriction at issue only because it was not "unduly burdensome." 461 U.S. at 544 n.6. In *Rust*, the Court emphasized its finding that the restriction at issue was "narrowly tailored" to the government's interests. 500 U.S. at 195 n.4. When restrictions on the use of *non-federal* funding to engage in speech are at stake, the rational basis test Defendants promote is simply inapposite.

11

excluding abortion providers from state family planning funding not narrowly drawn to further

state's interests in preventing subsidization of abortion).

A blanket ban on speech such as the pledge requirement is, by definition, not narrowly

tailored. *See Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993) ("[A]

statute that totally prohibits begging in all public places cannot be considered 'narrowly tailored'

to achieve that end."); *New York City Unemployed & Welfare Council v. Brezenoff*, 677 F.2d

232, 239 (2d Cir. 1982) ("'Broad prophylactic rules in the area of free expression are suspect.

Precision of regulation must be the touchstone.'") (quoting *Village of Schaumburg v. Citizens for

a Better Env't*, 444 U.S. 620, 637 (1980)). It is the government that bears the burden of proving

that the pledge requirement is narrowly tailored. *United States v. Playboy Entm't Grp., Inc.,* 529

U.S. 803, 816 (2000). The Defendants assert several overlapping interests but fail to meet their

burden to demonstrate that the pledge requirement is narrowly tailored to further any of them.

         **a.**      **The Pledge Requirement Is Not Narrowly Tailored to Further the Asserted Interest in Ensuring the Integrity of the Government's Anti-Prostitution Message.**

First, the Defendants identify an interest in "ensur[ing] that the governmental message of

opposing prostitution in its fight against HIV/AIDS is not distorted or undermined by the funding

recipients." Defs.' Br. at 41. However, this government interest is belied by the fact that the

statute permits private partners to express disagreement with other officially designated priorities

in the fight against HIV/AIDS. For example, the Global AIDS Act endorses a multisectoral

approach to HIV/AIDS, meaning that the government and its partners must treat the disease as a

problem affecting "agriculture, education, the economy, the family and society." 22 U.S.C. §

7601(22)(D); *see also* 22 U.S.C. § 7611(a)(1). Notwithstanding the importance of this approach,

the Act specifically states that grantees should "not be required . . . to endorse or utilize a

multisectoral approach to combating HIV/AIDS." 22 U.S.C. § 7631(d). Similarly, although one

12

of the Act's stated "priorities" is "promoting the effective use of condoms," the Act provides that grantees are not required to endorse condom use. *See* 22 U.S.C. §§ 7611(a)(4), 7631(d). These exemptions establish that Congress determined that the government's interest in promoting messages with respect to HIV/AIDS prevention would not be vitiated by silence or even dissent on the part of independent grant recipients.

Even if protecting the integrity of the government's anti-prostitution message were a substantial interest, it could not justify a blanket ban. In *Rust*, the Supreme Court warned that the analogous interest in "avoid[ing] creating the appearance that the Government is supporting abortion-related activities" could not suffice to support a blanket ban on the ability of federal funding recipients to use private funding to engage in speech. 500 U.S. at 188, 196-97.[7] Likewise, in *League of Women Voters*, the Court held that an "interest in ensuring that the audiences of noncommercial stations will not be led to think that the broadcasters' editorials reflect the official view of the government" was not adequate to support a blanket ban. 468 U.S. at 395.

Despite these warnings, Defendants point to no evidence, either in the legislative record or in the record in this case, demonstrating that the government's anti-prostitution message has been or will be thwarted by grant recipients in the absence of the pledge requirement. When the government seeks to impose content- or viewpoint-based restrictions, it must present "more than anecdote and supposition" about the supposed harms the regulated speech will cause; it must prove that "an actual problem" exists. *Playboy Entm't Group*, 529 U.S. at 822; *see also League*

---

[7]     *See also Velazquez*, 164 F.3d at 766 (observing that the *Rust* restrictions applied to "speech at odds with the values Congress was seeking to advance through its grant program"). The government cites the Supreme Court's *Velazquez* opinion for the proposition that "Title X did not single out a particular idea for suppression because it was disfavored, but simply prohibited doctors from counseling that was outside the scope of the project." Defs.' Br. at 39 n.26 (citing *Velazquez*, 531 U.S. at 541). The government cannot have it both ways. It cannot distinguish *Rust* by claiming the pledge requirement *does* single out a particular, disfavored idea for suppression but then argue elsewhere that the pledge requirement passes First Amendment scrutiny because it "is not designed to suppress ideas inimical to the Government." *See, e.g.*, Defs. Br. at 30.

*of Women Voters*, 468 U.S. at 384-95 (carefully scrutinizing government's assertion that content-based speech regulation will actually prevent asserted harms, and dismissing government's assertions as "speculative at best").  Congress made no findings and heard no testimony regarding the undermining of its anti-prostitution message by funding recipients.  Nor have Defendants even hinted that the government's anti-prostitution message lost currency during the year and a half during which they refrained from applying the pledge requirement to U.S. organizations due to concerns about its constitutionality.

Moreover, the pledge requirement's exemptions of certain major recipients of U.S. funds – some of which recommend the reduction or removal of criminal penalties for sex workers – undercut the claim that it is narrowly tailored to preventing the government's anti-prostitution message from being distorted.  *See League of Women Voters*, 468 U.S. at 395 (ban on editorializing by noncommercial broadcast stations not narrowly tailored to goal of preventing stations from airing controversial views when stations remained free to air views in other ways); *Bery v. City of N.Y.*, 97 F.3d 689, 698 (2d Cir. 1996) ("[T]he City's licensing exceptions for veterans and vendors of written material call into question the City's argument that the regulation is narrowly tailored."); *Loper*, 999 F.2d at 705 (restriction on begging without license did not further government interests where it did not apply to "certain religious, educational and fraternal organizations").  United Nations agencies; The Global Fund to Fight AIDS, Tuberculosis and Malaria; the International AIDS Vaccine Initiative; and the World Health Organization, all of which receive Global AIDS Act funds, are exempt from the pledge requirement.  22 U.S.C. § 7631(f).  Congress's exemption of the International AIDS Vaccine Initiative is particularly telling because that entity, like the Plaintiffs, is a non-governmental organization based in the United States, and it is slated to receive $29 million in Global AIDS Act funding in fiscal year

2006. *See* Declaration of Rebekah Diller dated Jan. 25, 2006 ("Supplemental Diller Decl.") ¶¶ 6-8, Exs. 4, 5, 6; H.R. Conf. Rep. No. 109-265, at 81 (2005), relevant pages of which are attached to Supplemental Diller Decl. as Ex. 3.  Furthermore, two exempt organizations – the World Health Organization and the Joint United Nations Programme on HIV/AIDS ("UNAIDS") – recommend the reduction or removal of criminal penalties applied to sex workers. *See* Declaration of Chris Beyrer dated Sept. 21, 2005 ("Beyrer Decl.") ¶¶ 20, 25, attached to Notice of Mot. of AOSI and OSI for Prelim. Inj.  If such major recipients of U.S. funds need not adopt the government message in order to prevent that message from being undermined, then surely Plaintiffs need not do so either.[8]

Finally, the existence of many less restrictive alternatives further refutes any contention that the pledge requirement is narrowly tailored to prevent hypothetical distortion of the government's anti-prostitution message. *See League of Women Voters*, 468 U.S. at 395 (invalidating blanket ban on ability of federal funding recipients to use private money to engage in speech because the government's asserted interest "can be fully satisfied by less restrictive means that are readily available"); *see also Reno v. American Civil Liberties Union,* 521 U.S. 844, 879 (1997) (noting that government bears the burden of "explain[ing] why a less restrictive provision would not be as effective").  Defendants fail to explain why the restriction on government funds, 22 U.S.C. § 7631(e), is insufficient to prevent the government's anti-prostitution message from being distorted.  Similarly, they have not explained why permitting grantees to refrain from taking a position regarding prostitution would undermine the government's message.  Nor have they explained why the disclaimers currently required of grantees, which state in agency-funded publications that the publication does not indicate the

---

[8]    For Fiscal Year 2006, Congress appropriated $450 million to the Global Fund to Fight AIDS, Tuberculosis and Malaria and $30 million to UNAIDS. *See* H.R. Conf. Rep. No. 109-265, at 81, 95 (2005), attached to Supplemental Diller Decl. as Ex. 3.

agency's support of the views expressed therein, are not sufficient to avoid public confusion. *See, e.g.*, 22 C.F.R. § 226.91(c)(1) (requiring disclaimers in USAID-funded publications); Declaration of Daniel Pellegrom dated January 24, 2006 ("Supplemental Pellegrom Decl."), Ex. 6 at 3 ("Publications" clause of CDC cooperative agreement requires disclaimers). As the Supreme Court has held, disclaimers suffice to prevent public confusion about whether the government endorses particular speech. *See, e.g.*, *League of Women Voters*, 468 U.S. at 395; *Capitol Sq. Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 769 (1995). For these reasons, the pledge requirement is not narrowly tailored to the goal of ensuring that the government's message is not undermined.

Defendants attempt to bolster the importance of their non-distortion interest by noting that the encumbered HIV/AIDS funds are part of an international aid program and by citing to *dicta* in a pre-*Rust* District of Columbia Circuit opinion. Defs.' Br. at 38 (citing *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275 (D.C. Cir. 1989)). As discussed above, however, the government has made clear that it believes its foreign policy interests are *not* subverted by its associations with organizations whose positions on the legalization of prostitution differ considerably from those of the United States. *See supra* at 16-17. Moreover, whether the Defendants are correct in characterizing *DKT Memorial* as requiring courts to defer to the federal government when international aid programs impinge on First Amendment rights, it is clear that in the Second Circuit, First Amendment protections apply to the privately funded speech of domestic organizations participating in a foreign aid program.[9] *See Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev't*, 915 F.2d 59, 64 (2d Cir. 1990).

---

[9]    Defendants themselves have in the past recognized that a restriction on the free speech rights of foreign organizations differs in kind from a restriction on U.S.-based entities, which unquestionably enjoy First Amendment rights. *See* AOSI Br. at 9.

16

**b.    The Pledge Requirement Is Not Narrowly Tailored to Further Any Other Purported Government Interests.**

To the extent that Defendants identify additional government interests, they make no showing that the pledge requirement is narrowly tailored to further any of them.  For example, Defendants cite the finding that prostitution and sex trafficking are "causes of and factors in" the spread of HIV/AIDS.  Defs.' Br. at 2 (citing 22 U.S.C. § 7603(4)).  Yet the Defendants point to no evidence that requiring private organizations to adopt policies opposing prostitution will reduce the role of sex work in the spread of HIV/AIDS.  Nor do they demonstrate that the speech that they have banned would undermine efforts to stop the spread of HIV through sex work.  Indeed, such advocacy has been recognized by public health experts as being among the most effective ways to prevent the spread of HIV.  *See* Beyrer Decl. ¶¶ 20, 25.

Defendants also assert an interest in eradicating prostitution and sex trafficking because they are degrading and harmful to women.  *See*, *e.g.*, Defs.' Br. at 7, 10.  However, Defendants fail to demonstrate that the pledge requirement is narrowly tailored to reducing either the degradation or the harm.  Defendants do cite to a patchwork of hearings concerning other, distinct legislation and matters, as well as to a press release concerning a classified National Security Presidential Directive related to trafficking in persons.  *Id.* at 8-10.  Neither the testimony nor the directive concerning sex trafficking are relevant to the claims here because Plaintiffs do not challenge the requirement that they have policies opposing sex trafficking.[10]  Am. Compl. ¶ 33.  Not only is there no evidence to support the efficacy of the pledge requirement in reducing harm or degradation to women, but there is substantial, undisputed evidence that it, in fact, bars activities that will reduce harm and degradation.  *See* Beyrer Decl.

---

[10]    Moreover, such reliance on the legislative history of entirely separate acts of Congress is disfavored.  *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 n.21 (1982).  Defendants' reliance on a classified national security directive, to which most legislators have no access, is similarly misplaced.  There is no evidence in the legislative history that Congress even considered the classified directive when enacting the pledge requirement.

¶ 35 (explaining how legal and policy reform can protect sex workers from arbitrary arrest and detention).

Because the pledge requirement exacerbates the harm it purports to avoid, and because there are many less restrictive alternatives, it is not narrowly tailored.

## B.     The Pledge Requirement Is Unconstitutionally Vague.

Plaintiffs demonstrated in AOSI's opening brief that the pledge requirement is unconstitutionally vague because it fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" and fails to "provide explicit standards for those who apply [it]." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Unable to satisfy these criteria, Defendants argue for a revision of the doctrine. But the relaxed vagueness standard Defendants assert has no support in the case law. Thus, the pledge requirement is impermissibly vague.

### 1.     First Amendment Vagueness Standards Apply to Funding Conditions.

The exacting *Grayned* standard is not relaxed merely because a First Amendment restriction appears in the form of a condition on the receipt of a government benefit. *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (invalidating for vagueness statute that made "treasonable or seditious" words or acts grounds for removal from public employment); *cf. Speiser v. Randall*, 357 U.S. 513 (1958) (invalidating loyalty oath requirement for tax benefit on due process grounds because overbreadth of provision would deter protected speech). Defendants fail in their attempt to excuse the pledge requirement's lack of clarity by invoking the now-familiar refrain that the Spending Clause obviates the need for compliance with the First Amendment.

Defendants argue that the pledge requirement is not vague because USAID and HHS have informed recipients that the requirement is contained in Plaintiffs' cooperative agreements.

18

Defs.' Br. at 44-45.  Defendants rely almost entirely on cases that did not adjudicate First Amendment vagueness claims but rather considered:  (a) whether the federal government gave states adequate notice of the terms governing their participation in federal-state social welfare programs, and (b) whether states had been improperly coerced into participating in those programs.[11]  As is explained above, unlike individuals and non-profit organizations, whose speech rights are highly vulnerable in transactions with the much more powerful federal government, states stand in a relationship of equals with the federal government.  *See supra* note 5 and accompanying text.  Therefore, the contract law standard used in these cases to evaluate relations between sovereigns has no bearing on a provision that restricts the speech of non-profit organizations.

### 2.    Defendants' Relaxed Vagueness Standard Is Inapplicable to a Speech Restriction Carrying Civil and Criminal Penalties.

Defendants also attempt to evade the vagueness doctrine by observing that the degree of vagueness tolerated in an enactment may depend on the nature of the penalty exacted.  Defs.' Br. at 47-48 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).  Violation of the pledge requirement threatens substantial civil and criminal penalties.[12]

---

[11]    *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (holding that statute creating federal-state program to care for the developmentally disabled did not confer upon mentally retarded individuals a right to treatment in the least restrictive setting because statute did not inform states unambiguously of such an obligation), *cited in* Defs.' Br. at 45; *Chas. C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 594-98) (1937) (upholding provision of the Social Security Act creating federal-state unemployment compensation program in the face of claim that Alabama's sovereignty had been impaired), *cited in* Defs.' Br. at 45; *Kansas v. U.S.*, 214 F.3d 1196, 1199 (10th Cir. 2000) (Kansas had knowledge of welfare reform legislation's requirement that it create databases to aid in enforcement of child support orders), *cited in* Defs.' Br. at 46.  *See also Charles v. Verhagen*, 220 F. Supp. 2d 955  (W.D. Wis. 2002) (rejecting state corrections department's claim that Religious Land Use and Institutionalized Persons Act was unconstitutional as applied to states), *aff'd*, 348 F.3d 601 (7th Cir. 2003), *cited in* Defs.' Br. at 45-46.

[12]    *See AOSI Br. at 22, n.21 (describing federal criminal fraud and false statements statute and USAID remedies for violating the certification).  Defendant HHS may also unilaterally terminate the contract, terminate the award, and permanently disqualify the grantee from receiving future funding as a penalty for violating the pledge requirement.  *See* 45 C.F.R. §§ 74.13, 74.61, 74.62; see also id. § 92.43.  Defendants do not dispute that such penalties could be levied but rather argue that the scienter requirement in the false claims statute would mitigate the risk resulting from any vagueness.  Defs.' Br. at 48 n.34.  However, the mere inclusion of a scienter requirement does not inoculate a criminal statute from a vagueness claim.  *See, e.g.*, *United States v. Sattar*, 272 F. Supp. 2d 348

Moreover, even if the threat of criminal penalties were not present, the First Amendment would still require that the pledge requirement be evaluated by the strictest vagueness standard because it regulates speech. *See Village of Hoffman Estates,* 455 U.S. at 499; *Advance Pharm., Inc. v. United States,* 391 F.3d 377, 396 (2d Cir. 2004) (vagueness test's "sternest application occurs when a law threatens to inhibit the exercise of constitutionally protected rights, particularly those protected by the First Amendment.") (internal quotations omitted).

Defendants also incorrectly rely on *Finley* to insist that the standard applicable to initial eligibility decisions by funders should apply to ongoing decisions about the speech in which grantees engage. Defs.' Br. at 47. In *Finley,* the Court rejected a vagueness challenge to a non-mandatory guideline suggesting that the National Endowment for the Arts take into account "general standards of decency and respect for the diverse beliefs and values of the American public" when awarding grants. 524 U.S. at 576. That holding is inapposite here because artists who received grants were not forced to certify that they would comport themselves with "decency and respect" for the duration of their grants, lest they be forced to repay their grants and risk substantial civil and criminal penalties. Thus, in *Finley,* the Court did not purport to alter the long-standing constitutional requirement that ongoing restrictions on speech carrying civil and criminal penalties must provide clear notice as to what is prohibited.[13]

### 3. The Pledge Requirement Fails to Inform Plaintiffs as to What It Requires and Fails to Provide Standards for Enforcement.

Plaintiffs demonstrated in AOSI's opening brief that the pledge requirement fails to inform either grantees, or officials charged with responsibility for its enforcement, what

---

(S.D.N.Y. 2003) (invalidating as vague a provision criminalizing the act of knowingly providing material support or resources to a terrorist organization).

[13] Defendants' reliance on *General Media Communications v. Cohen* is also misplaced. *See* Defs.' Br. at 46-48. At issue there was a ban on the sale of sexually explicit material in military exchanges. In contrast to the pledge requirement, the ban "specifie[d] no penalties at all" 131 F.3d 273, 286 (2d Cir. 1997). Moreover, the ban included the definitions and guidance that are so sorely lacking here. *See id.* at 276 (statute defined "sexually explicit material," and agency directive defined other terms).

20

constitutes a sufficient policy statement considered to "explicitly oppose prostitution." AOSI Br. at 23-24. Defendants have still not clarified what type of policy statement is required to fulfill the pledge requirement. Plaintiffs also showed that the pledge requirement is vague in failing to define which privately funded speech Defendants deem "inconsistent with an opposition to prostitution." Defs.' Br. at 20; AOSI Br. at 24-26. Confusion over the provision has only increased during the pendency of Plaintiffs' preliminary injunction motion.

In October 2005, USAID sent a letter to AOSI indicating that "advocating for the legalization of prostitution" and "organizing or unionizing prostitutes for the purpose of advocating for the legalization of prostitution" will cause the government to conclude that an organization "does not explicitly oppose prostitution." Defs.' Br. at 46-47. Notably, USAID has not incorporated these guidelines into any generally applicable official guidance or regulations. Thus, plaintiff Pathfinder has no indication whether the guidelines set forth in the letter to AOSI apply to it. Nor has USAID declared that these are the *only* types of advocacy that indicate a failure to oppose prostitution, or said whether other activities may also run afoul of the pledge requirement. Moreover, USAID has not defined any of the terms it used in its letter to AOSI. Given the myriad legal regimes in the various countries in which plaintiffs operate, "legalization" could sweep in a broad range of efforts to reform laws that penalize sex workers and interfere with HIV prevention efforts. *See* Kushen Decl. ¶ 34 (describing USAID official's warning that advocacy for the lifting of criminal penalties against women in sex work could violate pledge); Declaration of Daniel E. Pellgrom dated Dec. 7, 2005 ("Pellegrom Decl.") ¶ 29 (describing Pathfinder's desire to resume work in Brazil advocating reform of regulations that impede HIV prevention efforts), attached to Notice of Mot. of Pl. Pathfinder International for Prelim Inj. dated Dec. 7, 2005.

Defendant HHS's interpretation of the pledge requirement is even more unclear than that of USAID. Defendants' carefully written brief completely evades the question of whether HHS agrees with USAID's construction of the statute. Similarly, while USAID's standstill agreements with Plaintiffs AOSI and Pathfinder make reference to USAID's October letter, HHS's standstill agreement does not.[14] The silent implication in both the brief and the standstill agreement is that HHS does not adopt USAID's interpretation, but whether this is true remains entirely unclear.

In the face of USAID's open-ended guidelines, and HHS's silence about its own position, it is difficult to imagine a more vague speech restriction. As Plaintiffs OSI and AOSI described in their initial brief, the vagueness of the pledge requirement has generated substantial speculation about the requirement's true scope. AOSI Br. at 25. That speculation has continued. For example, Rep. Mark E. Souder has claimed that privately funded financial support of and collaboration with other organizations seeking to lift laws that criminalize sex workers violates the pledge requirement. *See* Ltr. from Mark E. Souder to Defendant Natsios, USAID Administrator, dated Dec. 7, 2005, attached to Supplemental Diller Decl. as Ex. 2. A group of *amici* supporting the pledge requirement construe it as allowing groups to advocate for the complete elimination of criminal penalties for sex workers. Mem. of Law of *Amici Curiae* Equality Now *et al.* at 12-14. With government officials and supporters of the law disagreeing about what the pledge requirement means, grantees and those who enforce the law cannot be

---

[14]    *Compare* Stip. & Order dated Jan. 12, 2006 (Standstill Agreement between Plaintiff Pathfinder and HHS) *with* Stip. & Order dated Oct. 13, 2005 (Standstill Agreement between Plaintiff AOSI and USAID) and Stip. & Order dated Jan.12, 2006 (Standstill Agreement between Plaintiff Pathfinder and USAID). All three standstill agreements contain clauses stating that nothing therein shall prejudice Defendants' defenses in this lawsuit. Plaintiffs refer to the standstill agreements not in an attempt to prejudice the Defendants' defenses on the merits but rather for the fact that two defendant agencies are applying different rules to the Plaintiffs during the pendency of the preliminary injunction motion.

expected to ascertain its parameters.[15]  Therefore, the pledge requirement is impermissibly vague.

Finally, the pledge requirement remains vague with regard to plaintiff OSI.  *See* AOSI Br. at 26.  Defendants correctly concede that plaintiff OSI is not directly bound by the pledge requirement because it is not a party to AOSI's cooperative agreement with USAID.  Defs.' Br. at 44 n.30.  However, the Defendants' concession is most notable for the care it takes to leave open the possibility that the Defendants will penalize AOSI for OSI's actions.  *Id.*  Thus, the pledge requirement remains unconstitutionally vague with regard to OSI because OSI's privately funded activities may be imputed to OSI's related entity, AOSI.

## II.    DEFENDANTS MISCONSTRUE THE PLEDGE REQUIREMENT.

In addition to violating the First Amendment, Defendants' construction of the pledge requirement runs afoul of basic rules of statutory interpretation and of the Supreme Court's admonition that, wherever reasonable, statutes must be construed to avoid serious constitutional questions.  Plaintiffs' interpretation follows the rules of statutory interpretation, avoids constitutional questions, and withstands Defendants' arguments in opposition.

---

[15]    Defendants' observation that Plaintiffs do not challenge the government funds restriction as vague, "indicating that they understand how to conform their activities so as not to "promote or advocate ... the practice of prostitution," Defs.' Br. at 44, is irrelevant for several reasons.  First, in an abundance of caution, plaintiffs have elected to refrain from engaging in any colorable First Amendment conduct with their federal funds – an act of self-constraint that they cannot, as a matter of constitutional law, be compelled to endure with respect to their own funds.  Second, in the context of administering their cooperative agreements, Plaintiffs are in frequent contact with agency personnel, who review detailed proposals, reports and work plans that describe the government-funded work.  *See, e.g.,* Supplemental Kushen Decl., Ex. 1 at 3 (cooperative agreement contains "program reporting" and "substantial involvement" clauses detailing obligations of grantee to apprise USAID of project developments).  In contrast, all of plaintiffs' efforts to obtain definitive guidance on which privately-funded activities are prohibited have been rebuffed.  *See* Kushen Decl. ¶¶ 28-36, 44.  Therefore, plaintiffs do not run the same risk of being told later that they have improperly promoted the practice or legalization of prostitution with their government funds as they do under the pledge requirement.

### A.    Plaintiffs' Construction of the Pledge Requirement is Correct.

### 1.    The Plain Language Requires Plaintiffs' Interpretation.

Plaintiffs have interpreted the phrase "policy explicitly opposing prostitution and sex trafficking" in accordance with the plain meaning of those terms. A "policy" that "explicitly" opposes prostitution and sex trafficking is a statement of "general principles," *see* AOSI Br. at 16, that "[f]ully and clearly expresse[s]" such opposition, *see American Heritage College Dictionary* 1077 (4th ed. 2002).[16] Defendants, however, construe the provision to require Plaintiffs not merely to adopt a "policy explicitly opposing prostitution," but to entitle the government to scrutinize Plaintiffs' privately funded expressive and associational activities and to penalize any of those activities "it deems inconsistent with an opposition to prostitution." Defs.' Br. at 20.

Defendants' expansive claim of power is not supported by the plain language of the Act. First, the actual meaning of the word "policy" does not include the second aspect of Defendants' definition, *i.e.*, the concept that apart from the policy statement, itself, Defendants may monitor all of a grantee's activities to identify any associations or expression that they deem in tension with the policy statement.

Second, when Congress intends to condition the receipt of federal funds on limiting grantees' activities and advocacy, as opposed to a required statement of policy, it does so explicitly in the text of the statute. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of*

---

[16]    Defendants claim that Plaintiffs' definition of "policy" is "refuted by the very dictionary sources on which they rely." Defs.' Br. at 20-21 (citing *The American Heritage College Dictionary of English* (4th ed. 2000) and AOSI/OSI Mem. at 16). Although the *American Heritage* definition uses the phrase "plan or course of action," nowhere does it indicate that a policy is – by *definition* – *both* a statement of general principles (*e.g.*, a pledge) and a course of conduct and speech in strict conformity with such a statement. Tellingly, Defendants cite no authority for the expansive definition of "policy" that their interpretation necessarily requires.

It is also noteworthy that Defendants ignore the plain meaning of the word "explicit" in the phrase "policy *explicitly* opposing prostitution." *See* Defs.' Br. at 20-21 (emphasis added). That fact that Congress used the word "explicitly" as a modifier of the type of policy that Congress had in mind strongly supports Plaintiffs' interpretation because it suggests that Congress intended to require a clear *expression* of policy in the form of a policy statement.

*Denver, N.A.*, 511 U.S. 164, 177 (1994) ("If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text."); *cf. Am. Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69, 75 (D.D.C. 2004) (statute prohibited federal transit grants to "any Federal transit grantee . . . *involved directly or indirectly in any activity that promotes* the legalization or medical use of any substance listed in schedule I of section 202 of the Consolidated Substances Act . . . ") (emphasis added).

Congress's silence with respect to advocacy and promotional activities in subsection (f) follows immediately on the heels of subsection (e), in which Congress expressly prohibited funding recipients from engaging in certain advocacy and activities with government funds. Therefore, it cannot be – as Defendants suggest – that Congress sought with the pledge requirement to impose by implication precisely the same restrictions on private funds that it imposed by express prohibition with regard to government funds in the immediately preceding subsection. *See* 22 U.S.C. § 7631(e) (forbidding government funds from being spent on the promotion or advocacy of the legalization or practice of prostitution). However, 22 U.S.C. § 7631(f) is completely silent with regard to restricting the expenditure of funds on advocacy. Indeed, Congress declined to mention "conduct," "actions," "activities," "speech" or "advocacy" in the pledge requirement. As a result, Defendants may not imply a restriction on activities and advocacy into the "policy" requirement of 22 U.S.C. §7631(f) when Congress expressly articulated such a restriction on activities and advocacy to apply to government funds in 22 U.S.C. § 7631(e).

In an apparent attempt to overcome the consequences of plain language analysis, Defendants argue that "[n]one of the definitions relied on by Plaintiffs reduces the term 'policy' to a simple empty statement." Defs.' Br. at 21. This argument is a strawman. As Defendants

know, Plaintiffs have never said that they can fulfill the pledge requirement with "a mere empty statement" and then violate its terms with impunity. Rather, Plaintiffs have stated on the record that they abide by their policies and have strictly adhered not only to their understanding of the pledge requirement but also to the express statutory restriction on the use of federal funds. *See, e.g.*, AOSI Br. at 8.

Finally, contrary to Defendants' allegation, Plaintiffs have not sought to engage in conduct that is "fully supportive of prostitution." *See* Defs.' Br. at 22. Far from promoting prostitution, Plaintiffs act to prevent HIV/AIDS, increase awareness of HIV/AIDS, and promote human rights. *See* Kushen Decl. ¶ 57; Pellegrom Decl. ¶ 4. The fact that Plaintiffs are willing to support sex workers in the battle against HIV/AIDS should not be misrepresented as – or mistaken for – support for prostitution.

### 2.    The Structure of the Global AIDS Act Supports Plaintiffs' Interpretation.

"It is a cardinal principle of statutory construction that a statute ought . . . to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Here, by reading broadly subsection (f) of 22 U.S.C. § 7631, Defendants render superfluous sub-section (e). Subsection (e) provides in part that "[n]o funds made available to carry out this chapter . . . may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.* § 7631(e). But, according to Defendants, subsection (f) *already* imposes such a funding restriction by supposedly prohibiting any speech or conduct that

is inconsistent with a policy opposing prostitution. Defendants' overly broad interpretation of subsection (f) thus renders subsection (e) redundant and unnecessary.[17]

Subsection (e) also provides that "[N]othing in the preceding sentence [imposing a restriction on the use of government funds] shall be construed to preclude the provision to individuals of palliative care [*i.e.*, relief without curing], treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities …" *Id.* § 7631(e). According to Defendants' broad interpretation, however, subsection (f) may be read to preclude providing those same types of care, treatment, and prophylaxis whenever doing so would evince an insufficient opposition to prostitution. Defendants' broad interpretation of subsection (f) thus undermines and renders potentially meaningless the explicit carve-out in subsection (e), which Congress included apparently for the purpose of ensuring that the overall goal of the Act would not be frustrated by restrictions on government funding. *Cf. Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 300-01 (2d Cir. 2002) (holding that a general statutory provision should not be interpreted to nullify a more specific provision). It is thus clear that Congress intended to preserve the rights of organizations to use their *own funds* as they see fit while ensuring that nothing in the law would prevent organizations from providing the care, treatment, and services necessary to combat HIV/AIDS as they see fit.

### 3.    The Overall Purpose of the Global AIDS Act Supports Plaintiffs' Construction of the Pledge Requirement.

As its title and "Purpose" and "Findings" provisions indicate, the overarching purpose of the Global AIDS Act is to fight the spread of HIV/AIDS and other diseases. *See* 22 U.S.C. §§

---

[17]    Defendants fail to rebut the argument that their interpretation reads subsection (e) out of the statute. Instead, they rely on a spurious distinction between the activities and the entities that Congress chose to subsidize. *See* Defs.' Br. at 22. Under Defendants' interpretation, Congress had no need to clarify in subsection (e) which activities it chose to fund because Congress exercised that choice in subsection (f), which limits the activities of grantees undertaken with private and federal funding.

27

7601, 7603 (1)-(5). Plaintiffs' interpretation, which permits Plaintiffs to participate in that fight in the most effective way, serves the overarching purpose of the Act.

Defendants mistakenly confuse the secondary goal of "eradicating prostitution" with the primary goal of addressing HIV/AIDS. *See* Defs.' Br. at 22. Emphasizing the goal of eradicating prostitution, Defendants argue that Plaintiffs' interpretation "impedes the overall purpose of the Act," *id.* at 21, by permitting funding recipients "to engage in conduct fully supportive of prostitution," thereby "creat[ing] an environment for risky behavior that the Act aims to prevent . . . .," *id.* at 22. Defendants' argument fails for several reasons. First, rather than engaging in, or seeking to be engaged in, "conduct fully supportive of prostitution," Plaintiffs have stated that they are opposed to the harms associated with prostitution, and have signed statements to this effect. *See* Kushen Decl. ¶ 23; Pellegrom Decl. ¶ 17. Second, Plaintiffs are committed to reducing "risky behavior" by promoting HIV/AIDS awareness, educating high-risk groups regarding the dangers of unsafe sex, and engaging in prevention efforts to stop the spread of HIV/AIDS. *See* Kushen Decl. ¶¶ 17, 23, 57; Pellegrom Decl. ¶¶ 25, 27-28.

The problem with Defendants' approach is that it focuses on a single finding regarding prostitution,[18] and ignores the twenty-seven other congressional findings that together call for a massive and collective effort to prevent, treat, and eradicate HIV/AIDS. *See* 22 U.S.C. § 7601 at (1)-(22), (24)-(28). This court need not accept the Executive branch's interpretation of a statute where, as here, it relies on a single congressional finding and operates at the expense of numerous other findings and at cross purposes with the overarching purpose of the Act. To the extent Defendants construe the Global AIDS Act to require non-governmental organizations

---

[18]    Although Congress plainly expressed an opposition to prostitution, *see* 22 U.S.C. § 7601(23) (stating that "[p]rostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices"), it did not state that the general policy against prostitution should trump the primary purpose of the Global AIDS Act. Indeed, Congress did exactly what the pledge requirement mandates that Plaintiffs do—it expressed a general position or policy against prostitution as an institution, while focusing its actions (by exercising its spending power) on the eradication of HIV/AIDS. *See* U.S.C. § 7601(1)-(28).

such as Plaintiffs to refrain from effective advocacy to combat the spread of HIV/AIDS,

Defendants' construction is inconsistent with the overall purpose of the Act.

### 4.    The Legislative History of the Pledge Requirement Provides Additional Support for Plaintiffs' Interpretation.

Finally, the legislative history demonstrates that Congress sought to realistically advance

the fight against HIV/AIDS by enacting a pledge requirement to signal a general opposition to

prostitution and sex trafficking, while ensuring that federal funds would still be made available

to those organizations (such as Plaintiffs) that work closely with sex workers in an effort to halt

the spread of HIV/AIDS.

During the floor debate, Senator Patrick Leahy warned:

> There are organizations who work directly with commercial sex workers and women who have been the victims of trafficking, to educate them about HIV/AIDS, to counsel them to get tested, to help them escape if they are being held against their will, and to provide them with condoms to protect themselves from infection. This work is not easy. It can also be dangerous. It requires a relationship of trust between the organizations and the women who need protection.

> I am concerned that this provision, which requires such organizations to explicitly oppose prostitution and sex trafficking, could impede their effectiveness. In fact, some or many of these organizations may refuse to condemn the behavior of the women who[se] trust they need in order to convince them to protect themselves against HIV. I would ask the Majority Leader how we can avoid that result, because we need to be able to support these organizations.

149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. Leahy).

Senate Majority Leader First responded:

> I agree that these organizations who work with prostitutes and women who are the victims of trafficking play an important role in preventing the spread of HIV/AIDS. We need to support these organizations, because HIV transmission through this type of behavior is widespread in many parts of the world. At the same time, we do not want to condone, either directly or indirectly, prostitution or sex trafficking. Both are abhorrent.

> I believe the answer is to include a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the psychological and physical

risks they pose for women. Such a statement, as part of the contract or grant agreement, would satisfy the intent of this provision.

*Id.* (statement of Sen. First).

Thus, Congress intended the pledge requirement to be satisfied by a statement opposing prostitution because of the risks it poses for women; Congress did not intend for grantees' privately funded speech to be inhibited, as Defendants contend. Defs.' Br. at 23.[19] The pledge requirement was simply a means for Congress to express its opposition to prostitution generally, while funding organizations that work closely with sex workers to prevent the spread of HIV/AIDS.

Thus, all of the standard rules of statutory interpretation support Plaintiffs' construction of the statute, which avoids the constitutional problems that are fatal to Defendants' construction.

**B.    The Canon of Constitutional Avoidance Precludes Defendants' Statutory Construction.**

A fundamental rule of statutory construction is that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988) (internal quotation marks omitted). Here, Defendants' construction of the pledge requirement raises serious constitutional questions, as it would broadly empower the federal government to invade deeply into constitutionally protected speech. *See supra* at 4-8; *see also* AOSI Br. at 21-33. By arguing that the pledge requirement entitles Defendants to deem any

---

[19]    Defendants also erroneously imply that the statements of individual legislators are irrelevant to an analysis of legislative history. *See* Defs.' Br. at 24. Plaintiffs do not contend that the statements are controlling, but rather that they reinforce the other evidence supporting Plaintiffs' reasonable interpretation. *Cf. United States v. Clark,* 445 U.S. 23, 33-34 (1980) (looking to legislative history as a factor supporting a reasonable construction of a statute that would avoid a constitutional question). Statements of individual legislators are legislative history that evidence congressional intent, especially when there are no relevant committee reports to turn to. *See In re Ben Cooper, Inc.,* 896 F.2d 1394, 1398-99 (2d Cir. 1990) (looking to the statements of individual legislators as evidence of legislative intent when no House or Senate report contained a discussion of the relevant statutory provision).

of the grantees' speech and associational activities to be inconsistent with the opposition to prostitution, *see* Defs.' Br. at 20-21, 24-26, and by failing to make clear that the pledge requirement is satisfied by a statement that acknowledges the harms associated with prostitution, Defendants have interpreted the statute to impinge on a vast amount of speech, in violation of the First Amendment.

Plaintiffs' interpretation, on the other hand, is not only mandated by the rules of statutory interpretation, *see supra* at 27-34, but also permits the Court to avoid "needless[ly] reach[ing] constitutional issues." *Solid Waste Agency of Northern Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001). Under these circumstances, the canon of constitutional avoidance precludes Defendants' construction and compels the adoption of Plaintiffs' alternative construction. See *Edward J. DeBartolo Corp.*, 485 U.S. at 575 (requiring adoption of a reasonable construction that avoids constitutional problems and is not clearly contrary to congressional intent).

Defendants, however, maintain that the canon of constitutional avoidance does not apply because Defendants' construction is entitled to deference, because Plaintiffs' alternative construction is allegedly implausible, and because Congress clearly intended to withhold grant money from organizations that engage in speech or conduct that is inconsistent with a policy opposing prostitution. *See* Defs.' Br. at 19-26. These contentions are meritless. First, Defendants' construction is not entitled to deference because deference is impermissible where, as here, it would lead to unconstitutional results. *See Edward J. DeBartolo Corp.*, 485 U.S. at 574-75, 578 (holding that agency deference is inapplicable when the proposed interpretation "poses serious questions of the [constitutional] validity" of the statute). In other words, the canon of constitutional avoidance trumps any deference to which Defendants may have been

31

entitled. *Id.*[20] Second, as is explained *supra* in Section II.A, the text, structure, purpose and legislative history of the Global AIDS Act all compel a conclusion that Plaintiffs' construction of the statute is not only reasonable, but correct.

## III. PLAINTIFFS HAVE DEMONSTRATED THAT THEY WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

Plaintiffs demonstrated in their opening briefs that the pledge requirement continues to threaten them with imminent, concrete and irreparable harm by compelling them to engage in speech against their will, and by subjecting their use of private funds to an unconstitutional restriction. AOSI Br. at 33-34; Mem. of Law in Supp. of Mot. of Pl. Pathfinder International for Prelim. Inj. at 5-6. AOSI, for example, is chilled from fully planning and participating in a conference regarding sex work that it plans to co-sponsor in June 2006. Supplemental Kushen Decl. ¶ 3. Pathfinder must refrain from resuming, with private funding, its collaboration with community organizations in Brazil, which, as part of their efforts to limit exploitation of sex workers, have sought to change regulations so that they do not serve as a pretext for brothel owners, corrupt police and others to abuse sex workers. Pellegrom Decl. ¶ 20. Nor can

---

[20] Defendants nonetheless insist that their interpretation is entitled to "considerable weight" under *Chevron*. *See* Defs.' Br. at 19 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984)). But, as Defendants concede, their interpretation is not the result of formal rulemaking or adjudication, and thus not entitled to any meaningful deference under *Chevron*. *See* Defs.' Br. at 19 & n.13. USAID has offered, at best, only an informal interpretation, *e.g.*, in the form of an opinion letter of October 7, 2005, that does not carry the force of law and therefore is not entitled to *Chevron* deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (holding that informal agency constructions such as opinion letters do not warrant *Chevron* deference). Under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), agency interpretations that lack the force of law are entitled to deference only to the extent they are persuasive. *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001). For the reasons already explained, *see* AOSI Br. at 16-19, Defendants' interpretation has no persuasive force, especially given the constitutional problems it raises.

Defendants' argument that they should be afforded "special deference" because Global AIDS Act funding "impinges on foreign activities" is equally unavailing. *See* Defs.' Br. at 19 & n.14 (citing *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 838 F.2d 649, 654 (2d Cir. 1988); *Population Inst. v. McPherson*, 797 F.2d 1062, 1070, 1072 (D.C. Cir. 1986)). As Defendants acknowledge, *see* Defs.' Br. at 19 n.14, those cases involved restrictions on foreign grantees, *see Planned Parenthood*, 838 F.2d at 651-52; *Population Inst.*, 797 F.2d at 1065, and not on U.S.-based organizations that are engaged in the domestic political process, as is the case here. Defendants also rely on the separation-of-powers principle expressed in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), that "the President alone has the power to speak or listen as a representative of the nation." *Id.* at 319. However, that case involved the negotiation of a treaty and relations with foreign nations, not the distribution of federal grant money to domestic nongovernmental organizations, as is the case here.

Pathfinder's advocacy department, which seeks to inform domestic policy debates about international health issues, speak freely about the lessons of its work with sex workers. *Id.* at 31.

In this Circuit, irreparable harm is presumed when the infringement of First Amendment rights is alleged. AOSI Br. at 33-34 (citing *Green Party of N.Y. v. N.Y. State Bd. Of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). In an effort to distinguish this well-established presumption, Defendants vainly repeat their argument that none of the First Amendment rules apply because the speech restriction is contained in a funding condition rather than a direct prohibition. Defs.' Br. at 50. This simply is not the law. Plaintiffs have demonstrated that courts routinely issue preliminary injunctions when a plaintiff alleges a restriction on free speech, even when that restriction is attached to the receipt of funding. *See* AOSI Br. at 34. For these reasons, Plaintiffs have demonstrated irreparable harm.

Although Defendants have not moved to dismiss OSI from the lawsuit, they argue that OSI lacks the requisite irreparable harm because it does not receive Global AIDS Act funds. Defs.' Br. at 26. However, they carefully avoid assuring OSI that its speech will not be imputed to AOSI, with which it is closely affiliated. *See supra* at 26. In the absence of such assurances, OSI continues to have to monitor its own speech for fear of endangering AOSI and therefore suffers its own irreparable harm.

## CONCLUSION

For the above reasons, as well as the reasons contained in the Plaintiffs opening briefs, the Court should grant Plaintiffs' motions for a preliminary injunction.

Dated: New York, New York
         January 25, 2006

                                        Respectfully submitted,

                                        _Rebekah Diller_ /DWB

                                        _____
                                        Rebekah Diller (RD 7791)


                                        _David W. Bowker_

                                        _____
                                        David W. Bowker (DB 3029)


Burt Neuborne (BN 9092)                 Richard A. Johnston*
Rebekah Diller (RD 7791)                Merriann M. Panarella*
David S. Udell (DU 4762)                Wilmer Cutler Pickering Hale and Dorr LLP
Laura K. Abel (LA 6831)                 60 State Street
Aziz Huq*                               Boston, MA 02109
Brennan Center for Justice              (617) 526-6000
  at NYU School of Law
161 Avenue of the Americas, 12th Floor  David W. Bowker (DB 3029)
New York, NY 10013                      Wilmer Cutler Pickering Hale and Dorr LLP
(212) 998-6730                          399 Park Avenue
                                        New York, NY 10022
                                        (212) 230-8852

                                        *Attorneys for Plaintiffs*


* Not yet admitted to this district.


                                        34