**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. *et al.,*

                        Plaintiffs,

                                    05 Civ. 8209 (VM) (DF)

v.

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.,*

                        Defendants.
-----------------------------------------------------------x

# MEMORANDUM IN SUPPORT OF MOTION OF PLAINTIFFS FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND MOTION BY GLOBAL HEALTH COUNCIL AND INTERACTION FOR A PRELIMINARY INJUNCTION

Richard A. Johnston*
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

David W. Bowker (DB 3029)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

* admitted *pro hac vice*

Laura K. Abel (LA 6831)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 992-8635

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................i

PRELIMINARY STATEMENT ......................................................................1

PROCEDURAL HISTORY.............................................................................2

STATEMENT OF FACTS ..............................................................................4

    A.    The Guidelines .............................................................................5

    B.    The Harm to InterAction, GHC and Their Members............................7

        1.    The Guidelines' Legal Separation Requirement.........................9

        2.    The Guidelines' Separate Management and Governance Requirement...................................................................11

        3.    The Guidelines' Separate Personnel Requirement ....................11

        4.    The Guidelines' Separate Accounts Requirement .....................12

        5.    The Guidelines' Separate Facilities, Equipment, and Supplies Requirement.........................................................13

ARGUMENT ................................................................................................14

I.    PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT TO ADD GHC and InterACTION AS PLAINTIFFS. ..............14

    A.    There Has Been No Undue Delay, Bad Faith, or Undue Prejudice.......14

    B.    Amending the Complaint Would Not Be Futile, Because GHC and InterAction Have Associational Standing on Behalf of Their Members..............15

        1.    GHC and InterAction Each Has at Least One Member With Standing to Sue in Its Own Right. ...........................................15

        2.    The Purposes of GHC and InterAction Are Germane to the Interests at Stake in This Litigation. .........................................17

        3.    The Claims Can Be Adjudicated and the Requested Relief Awarded Without the Participation of Individual Members.....................18

II.    The Court Should Grant GHC and InterAction a Preliminary Injunction. ........................22

    A.    GHC and InterAction Are Likely to Succeed on the Merits................................23

i

1.   The Policy Requirement Still Is Not Narrowly Tailored ........................23

    a.   The Policy Requirement Still Excludes Certain Funding Recipients........................................................................26

    b.   The Policy Requirement Still Imposes a Blanket Ban on Speech by Funding Recipients.......................................26

    c.   The Policy Requirement Continues to Massively Burden Plaintiffs' Privately Funded Speech Without Adequate Justification. ...............................................................28

        i.   The Guidelines' Vagueness Requires Grantees to Maintain an Extreme Level of Separation. ........................28

        ii.   The Extreme Separation Required by the Policy Requirement and Guidelines Imposes Massive Burdens on the Members of InterAction and GHC. ..........30

        iii.   The Extreme Separation Required by the Policy Requirement and Guidelines Is Not Sufficiently Justified by the Government's Interests............................31

    d.   Defendants' Reliance on *Brooklyn Legal Services* and *Velazquez* Is Misplaced.................................................32

2.   The Policy Requirement Continues to Discriminate Based on Viewpoint and Is Thus Unconstitutional. ...................................34

3.   The Policy Requirement Continues to Compel Speech and Is Thus Unconstitutional....................................................................35

4.   The Guidelines Are Impermissibly Vague. ................................37

B.   The Members of GHC and InterAction Will Be Irreparably Harmed Absent an Injunction. ......................................................................39

CONCLUSION...................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*AOSI v. USAID,*
    430 F. Supp. 2d 222 (S.D.N.Y. 2006)..................................................................... *passim*

*AOSI v. USAID,*
    No. 06-4035-cv, summary order (2d Cir. Nov. 8, 2007) ...........................................4

*Abington School District v. Schempp,*
    374 U.S. 203 (1963)...................................................................................................21

*Altman v. Bedford Central School District,*
    245 F.3d 49 (2d Cir. 2001).........................................................................................22

*Baggett v. Bullitt,*
    377 U.S. 360 (1964)...................................................................................................29

*Board of County Commissioners v. Umbehr,*
    518 U.S. 668 (1996)...................................................................................................34

*Block v. First Blood Associates,*
    988 F.2d 344 (2d Cir. 1993).......................................................................................14

*Brooklyn Legal Services Corp. B v. LSC,*
    462 F.3d 219 (2d Cir. 2006).................................................................................33, 34

*Building & Construction Trades Council of Buffalo, N.Y. & Vicinity v. Downtown*
    *Development, Inc.,*
    448 F.3d 138 (2d Cir. 2006).................................................................................15, 17

*DKT International, Inc. v. USAID,*
    477 F.3d 758 (D.C. Cir. 2007)...................................................................................27

*FCC v. League of Women Voters,*
    468 U.S. 364 (1984)...................................................................................................24

*Forsyth County, Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992).............................................................................................37, 38

*Forum for Academic & Institutional Rights, Inc. v. Rumsfeld,*
    291 F. Supp. 2d 269 (D.N.J. 2003), *rev'd on other grounds,* 390 F.3d 219 (3d Cir.
    2004), *rev'd on other grounds,* 544 U.S. 1017 (2006) ...........................................19

US1DOCS 6548878v2

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
    528 U.S. 167 (2000) ..................................................................................15

*Gentile v. State Bar of Nevada,*
    501 U.S. 1030 (1991) .......................................................................... 29-30

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ..............................................................................22, 37

*Harris v. McRae,*
    448 U.S. 297 (1980) ..................................................................................21

*Housing Works, Inc. v. Turner,*
    179 F. Supp. 2d 177 (S.D.N.Y. 2001), *aff'd*, 56 F. App'x 530 (2d Cir. 2003) ........................20

*Infosint S.A. v. H. Lundbeck A/S,*
    No. 06 Civ. 2869 (LAK), 2007 WL 2489650 (S.D.N.Y. Sept. 4, 2007) .................................14

*International Union, United Automobile, Aerospace, & Agriculture Implement Workers
    of America v. Brock,*
    477 U.S. 274 (1986) ..............................................................................18, 21

*Jin v. Metropolitan Life Insurance Co.,*
    310 F.3d 84 (2d Cir. 2002) .........................................................................14

*LSC v. Velazquez,*
    531 U.S. 533 (2001) ..............................................................................33, 35

*Latino Officers Association v. Safir,*
    170 F.3d 167 (2d Cir. 1999) .......................................................................16

*Lee v. Weisman,*
    505 U.S. 577 (1992) ..................................................................................31

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................16

*Marks v. United States,*
    430 U.S. 188 (1977) ..................................................................................25

*McGowan v. State of Maryland,*
    366 U.S. 420 (1961) ..................................................................................22

*NAACP v. Alabama,*
    357 U.S. 449 (1958) ..............................................................................20, 21

iv

*NYC C.L.A.S.H., Inc. v. City of New York,*
    315 F. Supp. 2d 461 (S.D.N.Y. 2004)................................................................19, 20

*National Association of College Bookstores, Inc. v. Cambridge University Press,*
    990 F. Supp. 245 (S.D.N.Y. 1997) ...........................................................................19

*National Endowment for the Arts v. Finley,*
    524 U.S. 569 (1988).................................................................................................34

*New York State National Organization for Women v. Terry,*
    886 F.2d 1339 (2d Cir. 1989)............................................................................16, 19

*Nitke v. Gonzales,*
    413 F. Supp. 2d 262 (S.D.N.Y. 2005)......................................................................19

*O'Hare Truck Service, Inc. v. City of Northlake,*
    518 U.S. 712 (1996).................................................................................................36

*Presser v. Key Food Stores Cooperative,*
    218 F.R.D. 53 (E.D.N.Y. 2003)................................................................................15

*Regan v. Taxation With Representation of Washington*
    461 U.S. 540 (1983).................................................................................................27

*Rumsfeld v. Forum for Academic & International Rights, Inc.,*
    547 U.S. 47 (2006)............................................................................................19, 36

*Rust v. Sullivan,*
    500 U.S. 173 (1991)...............................................................................24, 27, 34, 36

*Southside Fair Housing Committee v. City of New York,*
    928 F.2d 1336 (2d Cir. 1991)...................................................................................16

*Spanierman Gallery, PSP v. Love,*
    320 F. Supp. 2d 108 (S.D.N.Y. 2004)......................................................................14

*Speiser v. Randall,*
    357 U.S. 513 (1958).............................................................................................22, 29

*Time Warner Cable of N.Y.C., a Division of Time Warner Entertainment Co., L.P. v.*
*Bloomberg L.P.,*
    118 F.3d 917 (2d Cir. 1997)......................................................................................22

*Transportation Alternatives, Inc. v. City of New York,*
    340 F.3d 72 (2d Cir. 2003)........................................................................................38

v

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
517 U.S. 544 (1996).................................................................................19

*United States v. American Library Association,*
539 U.S. 194 (2003).................................................................................25

*United States v. Gatewood,*
173 F.3d 983 (6th Cir. 1999) ..................................................................29

*Velazquez v. LSC,*
164 F.3d 757 (2d Cir. 1999), *aff'd*, 531 U.S. 533 (2001)................................33, 34

## STATUTES, REGULATIONS & RULES

22 C.F.R. § 203.2(p)(2)...........................................................................35

22 C.F.R. § 203.3(f)(4) ...........................................................................11

22 C.F.R. § 208.800................................................................................29

22 C.F.R. § 226.62(a)(3).........................................................................29

22 C.F.R. § 226.73..................................................................................29

45 C.F.R. § 1610.2(b) ..............................................................................6

45 C.F.R. § 1610.8................................................................................6, 33

45 C.F.R. § 1610.8(a)(3).........................................................................6

18 U.S.C. § 1001....................................................................................29

22 U.S.C. § 2151u(a)...........................................................................11, 35

22 U.S.C. § 7631(f)..................................................................................2

31 U.S.C. § 3729....................................................................................29

62 Fed. Reg. 27,695-01 (May 21, 1997).................................................7, 28

Fed. R. Civ. P. 15(a)(2)..........................................................................14

Fed. R. Civ. P. 21..................................................................................14

US1DOCS 6548878v2

HHS, Office of Global Health Affairs, Guidance Regarding Section 301(f) of the U.S.
  Leadership Against HIV/AIDS, Tuberculosis & Malaria Act of 2003,
  72 Fed. Reg. 41,076 (July 26, 2007)...................................................................5

HHS, Participation in HHS Programs by Religious Organization,
  69 Fed. Reg. 42,586 (July 16, 2004)...................................................................32

USAID, Acquisition & Assistance Policy Directive 05-04 Amend. 1 .................................. *passim*

USAID, Participation by Religious Organizations in USAID Programs,
  69 Fed. Reg. 61,716-01 (Oct. 20, 2004) ..........................................................31, 32

## OTHER AUTHORITIES

152 Cong. Rec. E1917-01 (Sept. 28, 2006) (Statement of Rep. Souder) .....................................20

S. Rep. No. 110-128 (2007) ...........................................................................................32

US1DOCS 6548878v2

## PRELIMINARY STATEMENT

In today's motions, two preeminent international development and public health organizations – Global Health Council ("GHC") and InterAction – seek to join this case, and obtain a preliminary injunction, on behalf of their members who are dedicated to helping the government accomplish the shared mission of fighting the global HIV/AIDS pandemic. GHC and InterAction seek to protect the ability of their members to receive federal funding for this common purpose without having to surrender their core First Amendment rights to the government as a precondition to the receipt of this funding.

In particular, GHC and InterAction seek to enjoin the federal government from requiring their members to take a pledge "explicitly opposing prostitution" as a condition of receiving federal funds to fight HIV/AIDS (the "Policy Requirement"). This is the very same Policy Requirement that this Court already has enjoined vis-à-vis similarly situated plaintiffs Alliance for Open Society International, Inc. ("AOSI") and Pathfinder International ("Pathfinder") (collectively, "Plaintiffs"), on the grounds that it "cannot survive heightened scrutiny, and also impermissibly discriminates based on viewpoint and compels speech," and therefore "violates the First Amendment." *See AOSI v. USAID*, 430 F. Supp. 2d 222, 276 (S.D.N.Y. 2006).

Rather than remedy these constitutional violations, however, defendants United States Agency for International Development ("USAID") and Department of Health and Human Services ("HHS") (collectively "Defendants") have exacerbated the situation by: (1) refusing to extend to other similarly situated grant recipients the temporary relief won by AOSI and Pathfinder; (2) delaying a ruling on the merits by appealing this Court's preliminary injunction order and then avoiding a decision on their own appeal; (3) declining to seek input from grantees before issuing draconian guidelines that do nothing to cure the Constitutional defects identified by this Court; and (4) seeking to create further delay by announcing the possibility of formal

1

"notice and comment" rulemaking at some unspecified time in the future. In the face of such conduct, it is imperative that GHC and InterAction be permitted to join this case and to obtain a preliminary injunction on behalf of their members.

At stake is nothing less than the ability of their members to engage in life-saving work throughout the world free of unconstitutional restrictions on their speech and activities. If GHC and InterAction succeed, the immediate effect will be to restore their members' First Amendment rights and to enhance the urgently important fight against HIV/AIDS worldwide. Their members will once again be able to bring to that fight the tools that the public health community deems most effective. In particular, where appropriate, they will be able to work closely with sex worker organizations and to advocate for the protection of sex workers' human rights in order to prevent the spread of HIV/AIDS. If, on the other hand, GHC and InterAction are unable to join this lawsuit, that work will continue to be hampered by an unconstitutional restriction on their members' First Amendment rights.

## PROCEDURAL HISTORY

On May 9, 2006, the Court ruled that the federal government may not require independent non-profit organizations to adopt policies "explicitly opposing prostitution" as a condition of receiving federal funds to fight HIV/AIDS internationally. The Court held that the Policy Requirement in 22 U.S.C. § 7631(f) violates the First Amendment as applied to Plaintiffs AOSI and Pathfinder, because it is not narrowly tailored to achieve Congress's goals, discriminates based on viewpoint, and unconstitutionally compels speech.[1] *AOSI v. USAID*, 430

---

[1] In light of the Court's familiarity with the procedural and factual background of this case, Plaintiffs do not recite the procedural history prior to the Court's ruling of May 9, 2006, and do not repeat relevant facts from their prior filings. Instead, Plaintiffs hereby incorporate the Memorandum of Law in Support of Motion of Plaintiffs AOSI and Open Society Institute for a Preliminary Injunction and the Memorandum of Law in Support of Motion of Plaintiff Pathfinder for a Preliminary Injunction.

US1DOCS 6548878v2

F. Supp. 2d 222, 276 (S.D.N.Y. 2006). Accordingly, the Court issued a preliminary injunction

enjoining Defendants USAID and HHS from enforcing the Policy Requirement against those

Plaintiffs. (Prelim. Inj. Order, June 29, 2006.)

In the wake of the decision, Defendants indicated that they would continue to enforce the

Policy Requirement against similarly situated U.S.-based grantees who were not parties to this

case. By letter, and at a subsequent conference, Plaintiffs alerted Defendants and the Court that

additional parties sought to join this action to obtain protection. (*See* Ltr. from Rebekah Diller to

Hon. Victor Marrero, May 25, 2006; Tr. of Ct. Conf. 4:4 to 4:12, June 2, 2006.)

In an effort to avoid unnecessary motion practice, Plaintiffs then provided Defendants

with declarations from the proposed new parties – InterAction and GHC – and several of their

members, showing that their claims were in every material respect factually and legally identical

to those on which the Court had already ruled. Defendants, however, refused to consent to

extending the terms of the preliminary injunction and amending the complaint. (Ltr. from

Richard Rosberger to Hon. Victor Marrero, Aug. 9, 2006.)

In light of this opposition, and at the Court's suggestion, GHC and InterAction conducted

surveys of their members to determine how many were affected, and reported the results to the

Court. (*See* Ltr. from Laura Abel to Hon. Victor Marrero, Nov. 13, 2007.) Shortly thereafter,

Defendants appealed the preliminary injunction order to the U.S. Court of Appeals for the

Second Circuit, and the case was placed on this Court's suspense docket pending the outcome of

the appeal. (*See* docket entry 63.)

At oral argument before the Second Circuit on June 1, 2007, Defendants announced their

intention to issue guidelines explaining the Policy Requirement that would purportedly provide

grantees an avenue through which they could speak freely with their private funds. On July 23,

US1DOCS 6548878v2

2007, without soliciting or responding to comments from the public, Defendants issued their

Guidelines.  On November 8, 2007, the Court of Appeals issued a summary order remanding this

case to this Court "to determine in the first instance whether the preliminary injunction should be

granted in light of the new guidelines." *AOSI v. USAID*, No. 06-4035-cv (2d Cir. Nov. 8, 2007),

at 5.  In the same order, the Court of Appeals stated, "[J]urisdiction shall be returned to this

Court upon a letter request from any party.  Upon such a restoration of jurisdiction, the matter is

to be sent to this panel." *Id.* at 6.  The Court of Appeals made clear that it was "offer[ing] no

opinion on the merits concerning the propriety of the guidelines or the constitutionality of the

statutory regime, and [that] the District Court on remand may consider any legal arguments it

deems relevant and take any additional evidence that may be appropriate." *Id.* at 5.  Finally, the

Court of Appeals ordered, "The injunction is to remain in place pending the outcome of the

proceedings before the District Court." *Id.* at 5-6.

On November 30, 2007, this Court held a conference, at which Plaintiffs advised the

Court of their desire to amend the Complaint to add GHC and InterAction as Plaintiffs, and of

the desire of GHC and InterAction to seek preliminary injunctions on behalf of their members.

By letter dated December 14, 2007, Defendants advised the Court that they would not consent to

either motion, and that the parties had agreed on a briefing schedule.  On February 4, 2008, the

Court granted Plaintiffs' request for leave to file a 40-page brief in support of both motions.

## STATEMENT OF FACTS

This Statement of Facts addresses two new sets of facts not addressed in the preliminary

injunction motion of Plaintiffs AOSI and Pathfinder or the Court's May 6, 2006 ruling granting

that motion:  the July 2007 Guidelines, and the ongoing harm that Defendants' enforcement of

the Policy Requirement is causing GHC, InterAction, and their respective members.

4

A.     **The Guidelines**

The Guidelines require agency officials to determine whether grantees required to adopt

policies opposing prostitution are sufficiently separate from any other organization that does not

have an anti-prostitution policy and/or espouses any viewpoint about prostitution with which the

government does not agree.  The Guidelines require the two organizations to be legally separate.

They also require the two organizations to maintain physical and financial separation, and warn

that whether such separation is sufficient will be judged on a case by case basis, according to five

non-exclusive factors, including:  1) separate personnel, management and governance; 2)

separate accounts and accounting and timekeeping records; 3) separate facilities, equipment and

supplies, and the extent to which the non-grantee engages in restricted activities; 4) signage and

other distinguishing factors; and 5) protection of Defendants, the U.S. government and the

funded project from public association with the non-grantee organization.  *See* USAID,

Acquisition & Assistance Policy Directive 05-04 Amend. 1 ("USAID Guidelines") at 3-4,

attached as Exhibit B to Decl. of Rebekah Diller dated February 7, 2008 ("Diller Decl."); HHS,

Office of Global Health Affairs, Guidance Regarding Section 301(f) of the U.S. Leadership

Against HIV/AIDS, Tuberculosis & Malaria Act of 2003, 72 Fed. Reg. 41,076, 41,076 (July 26,

2007) ("HHS Guidelines"), attached as Exhibit C to Diller Decl. (collectively "Guidelines").[2]

The Guidelines exceed the scope of the Policy Requirement, which purports to govern only

grantees' own speech, insofar as the Guidelines proscribe grantee relationships with entities that

are legally separate, over which grantees exercise no control, if such entities engage in speech of

which the Defendants disapprove.

---

[2] The USAID and HHS Guidelines are nearly identical.  For ease of reference, Plaintiffs will cite
herein to the USAID Guidelines.

The Guidelines purport to be modeled on a Legal Services Corporation ("LSC") regulation, 45 C.F.R. § 1610.8, which requires the legal aid programs that LSC funds to remain separate from other organizations that represent certain categories of immigrants, bring class actions, seek attorneys' fee awards, and engage in other forms of legal representation, *see* USAID Guidelines at 3, but they are more stringent and burdensome than the LSC regulation in several respects. Whereas the LSC rule does not require grantees to espouse any message as organizational policy, *see* 45 C.F.R. § 1610.8, the Guidelines require grantees to espouse an anti-prostitution message as their own organizational policy, *see* USAID Guidelines at 2. Whereas the LSC rule requires a degree of "physical and financial" separation between grantees and other organizations, *see* 45 C.F.R. § 1610.8(a)(3), the Guidelines require agency officials to also consider: i) whether the other organization has separate management and governance; and ii) the extent to which "[Defendants], the U.S. Government and the project name are protected from public association with the affiliated organization and its restricted activities in materials such as publications, conferences and press or public statements," *see* USAID Guidelines at 4. Furthermore, unlike the LSC rules, the Guidelines operate in an international context and fail to take into account the additional burdens on grantees in that context. The Guidelines also do nothing to clarify the considerable vagueness of the Policy Requirement itself. For example, they do not clarify what a grantee's "policy" must say in order to comply with the requirement. Unlike the LSC rules, which require grantees to form an affiliate in order to engage in a number of clearly defined, restricted activities, the Guidelines refer to "restricted activities" but never explain what those activities are, other than to state in circular terms that they are "activities inconsistent with a policy opposing prostitution." *Compare* USAID Guidelines, at 3, with 45 C.F.R. § 1610.2(b) (incorporating by reference statutory list of LSC-restricted activities).

Finally, unlike the LSC regulation, the Guidelines were never subjected to or modified in response to formal notice and comment. *See* 62 Fed.Reg. 27,695-01 (May 21, 1997) (describing LSC notice and comment process). Accordingly, they contain no explanation of why particular types of separation are required, other than that the Guidelines were modeled on the LSC rule..

### B.    The Harm to InterAction, GHC and Their Members

InterAction and GHC seek to join this action to protect their members who partner with the U.S. government in its worldwide effort to prevent and treat HIV/AIDS. InterAction is the largest alliance of U.S.-based international development and humanitarian non-governmental organizations ("NGOs"). (Decl. of Sam Worthington, President and Chief Executive Officer of InterAction, dated Feb. 4, 2008 ("Worthington Decl.") ¶¶ 4-5.) InterAction members collectively receive annually more than $1 billion from the U.S. government, including Global AIDS Act funding from the Defendants, and more than $7 billion from private sources. (*See id.* ¶¶ 6-8.) Membership in InterAction permits organizations to share best practices learned from their humanitarian work and to collectively express opinions and ideas about U.S. government policy, with individual anonymity, and therefore less fear of retaliation. (*Id.* ¶¶ 9, 31.)

GHC is a private, nonprofit membership alliance consisting of member organizations dedicated to international public health, including many U.S.-based grantees that receive HIV/AIDS funding from Defendants. (Decl. of Nils Daulaire, President and Chief Executive Officer of GHC, dated Feb. 7, 2008 ("Daulaire Decl.") ¶¶ 3, 12.) Organizations join GHC to collectively express concerns about U.S. policy without fear of government reprisal and to advance their interests in promoting international public-health policy and practice. (*See* Daulaire Decl. ¶ 9; Decl. of Pape Gaye, President of IntraHealth International, Inc., dated Jan. 25, 2008 ("Gaye Decl."), ¶ 8.) GHC also furthers its mission by facilitating debate on public health in frequent conferences, forums, briefings and other events. (Daulaire Decl. ¶ 7.)

7

The Policy Requirement forces the members of GHC and InterAction to serve as a mouthpiece for the government by requiring them to express Defendants' views about prostitution and to suppress any contrary viewpoint or conduct. Twenty-eight GHC members, eighteen of which wish to remain anonymous, have told GHC that they are both subject to the Policy Requirement and desire relief from it. (Daulaire Decl. ¶ 20.) Likewise, twenty InterAction members, fourteen of which wish to remain anonymous, have told InterAction that they are both subject to the Policy Requirement and desire relief from it. (Worthington Decl. ¶ 17.) It is likely that additional members desire relief but are too afraid say so. (Daulaire Decl. ¶ 20; Worthington Decl. ¶ 17.) The Policy Requirement has undercut the private character and independence that is fundamental to the members' functioning and credibility as NGOs. (Daulaire Decl. ¶ 34; Worthington Decl. ¶ 22) As NGOs, the members are careful to take policy positions that derive from their experiences providing services in the field. (Daulaire Decl. ¶ 34; Gaye Decl. ¶ 27; Decl. of Dan Pellegrom, President of Pathfinder, dated Feb. 7, 2008 ("Pellegrom Decl.") ¶ 24.) Many believe that prostitution causes serious health, psychological, and physical risks for women and work to assist women in finding alternatives. At the same time, they believe that by forcing them to explicitly oppose prostitution, the Policy Requirement causes them to stigmatize the very group whose trust they must earn to stop the spread of HIV/AIDS. (Daulaire Decl. ¶ 32;  Gaye Decl. ¶ 28; Decl. of Helene Gayle, President and Chief Executive Officer of CARE, dated Feb. 6, 2008 ("Gayle Decl.") ¶ 23; Worthington Decl. ¶ 25.)

The Policy Requirement also undercuts the privately funded speech of GHC and InterAction members. For example, CARE, which is a member of both InterAction and GHC, has been recognized by UNAIDS and the World Health Organization as a best practices leader in preventing HIV/AIDS for its sex worker peer education program in Bangladesh. Yet, the Policy

8

Requirement has threatened this work, as well as similar work in India, and has forced CARE to refrain from sharing the lessons of its highly effective HIV prevention strategies at conferences and in public communications. (Gayle Decl. ¶¶ 23-24.) Even after this Court issued the injunction, Defendant USAID inquired into CARE's relationship with an organization, funded privately by CARE, which works with Indian sex workers. (Gayle Decl. ¶¶ 21-22.) Similarly, IntraHealth—a member of GHC—is refraining from developing privately funded programs to serve and remove barriers to healthcare for sex workers. (Gaye Decl. ¶ 30.) Additionally, were it not protected by this Court's preliminary injunction, Plaintiff Pathfinder, a member of both GHC and InterAction, would need to censor discussions of the lessons learned from its privately funded HIV prevention programs with sex workers. (*See* Pellegrom Decl. ¶¶ 34, 42-43.)

The guidelines do not mitigate these harms, but rather perpetuate these impermissible burdens on speech and do not provide real alternative channels for protected expression.

### 1.    The Guidelines' Legal Separation Requirement

The Guidelines' legal separation requirement will impose an insuperable barrier for the members of InterAction and GHC seeking to use their private funds to speak through a new organization. In most of the developing countries where the members of InterAction and GHC operate, all NGOs must register with and obtain the approval of the host country prior to operating. (Daulaire Decl. ¶ 46; Worthington Decl. ¶ 33.) In order to establish a new, legally separate NGO, the members will be required to secure a new registration for the new entity and explain to foreign government authorities – often multiple authorities at different levels – why such a structure is necessary. (Decl. of Mark Sidel, dated Feb. 5, 2008 ("Sidel Decl.") ¶ 12; Daulaire Decl. ¶ 42; Worthington Decl. ¶ 47) InterAction and GHC members operate in nearly every country in the developing world. (Daulaire Decl. ¶ 5; Worthington Decl. ¶5) Pathfinder, for example, operates in 27 countries; CARE operates in over 35 countries; IntraHealth operates

9

in 19 countries. (*See* Pellegrom Decl. ¶ 5; Gayle Decl. ¶ 32; Gaye Decl. ¶3). As is detailed in

the accompanying expert declaration of Professor Mark Sidel and documented in numerous U.S.

Department of State ("State Department") reports, foreign registration is by no means assured

and can be a prohibitively long, cumbersome and exceptionally difficult procedure, involving

substantial burdens and costs. (Sidel Decl. ¶ 13.) It may be an even longer and more difficult

process where it entails creating a second affiliate of an American charitable organization. (*Id.*)

Moreover, the creation of a separate entity to do work that is already being done is likely to

create suspicion among foreign authorities, who often have broad and arbitrary discretion over

the issuance of permits. (*Id.* ¶ 14.)

      For example, in India and Bangladesh, where Pathfinder and CARE run privately funded

HIV prevention programs targeting sex workers, the process for registering and establishing a

new entity typically takes months or years and requires clearances from multiple government

agencies, including intelligence authorities. (Sidel Decl. ¶ 29.) Past practice indicates that there

is no guarantee that a new, separate entity will even be allowed to operate in either country. (*Id.*

¶¶ 30, 38.). To take another example, in Mozambique, where Pathfinder runs privately funded

HIV prevention programs with sex workers, the State Department reports that registration and

establishment of an NGO takes months, during which the authorities examine, among other

things, the NGO's activities and its proposed board. (Sidel Decl. ¶ 49.)

      The challenge of registration is compounded by myriad host country rules concerning the

tax treatment of foreign offices and branches of American charitable organizations. In certain

cases, national governments may even question whether the tax-exempt status of an existing

grantee organization should be re-classified or revoked. (*See* Sidel Decl. ¶ 18.) Members will

also face difficulties raising funds due to the legal separation requirement. If the newly formed

affiliate is the recipient of funds from the Defendants, U.S. law, regulations and practice provide that it may not be eligible to receive those funds until it has "demonstrated a capacity to undertake effective development activities." 22 U.S.C. § 2151u(a); *see also* 22 C.F.R. § 203.3(f)(4) (requiring entity to have been incorporated for at least 18 months in order to register as a private voluntary organization eligible for certain USAID funding); Pellegrom Decl. ¶¶ 54-55; Exhibit E to Diller Decl. at 13 (noting that past performance is criterion for awards from Global AIDS Act implementing agencies). On the other hand, if the newly formed organization is to be privately funded, it will encounter similar problems attracting funding from the private sector due to the absence of a proven record of past performance and experience. (*See* Gaye Decl. ¶ 34; Pellegrom Decl. ¶ 52; Sidel Decl. ¶ 22; Worthington Decl. ¶ 35.)

### 2.    The Guidelines' Separate Management and Governance Requirement

The Guidelines' requirement of separate management and governance prevents InterAction and GHC members from using their private funds to speak through an affiliate. Non-profit organizations are generally governed and controlled by their board of directors. (*See* Worthington Decl. ¶ 33). This principle is embodied InterAction's Private Voluntary Organization Standards, with which all InterAction members must certify compliance every two years. Those standards provide that a member's board must act as the organization's governing body, accepting responsibility for oversight of all aspects of the organization. If an affiliate's board, as well as its management, must be separate from the grantee organization, the grantee will not have control such that it can speak through the affiliate. (*See id.*)

### 3.    The Guidelines' Separate Personnel Requirement

The Guidelines' separate personnel requirement is particularly onerous in the international context, because many countries may refuse to issue visas or work permits for additional American and other foreign personnel. (*See* Pellegrom Decl. ¶ 77; Sidel Decl. ¶¶ 14-

11

15.)  Governments frequently limit the number of visas and work permits to foreign NGOs,

impose substantial waiting times or approval procedures, and require that entities to whom such

foreign individuals will be assigned to be fully registered and approved.  (Sidel Decl. ¶¶ 14-15.)

       In many countries, an NGO must hire a local attorney and show that it could not find any

local residents qualified for the post.  (Worthington Decl. ¶ 36; Daulaire Decl. ¶¶ 46-47.)  Often,

applications are denied.  For example, Pathfinder was unable to obtain an Indian work permit for

a Bangladeshi employee with needed HIV expertise last year, and has been trying for five

months without success to obtain a Tanzanian visa for another employee. (Pellegrom Decl. ¶ 77.)

### 4.      The Guidelines' Separate Accounts Requirement

       The requirement of separate bank accounts will also cause enormous obstacles in the

international aid context.  (*See* Sidel Decl. ¶ 17.)  In many countries, an entity must be registered

with the government before it can open a bank account.  Governments may limit the number of

bank accounts or even prohibit multiple accounts per organization, per donor, or per project.

(*Id.*)  India, for example, exercises close control over NGO bank accounts through its Foreign

Contribution (Regulation) Act, which limits foreign NGOs to maintaining only one bank

account.  (*See* Foreign Contribution (Regulation) Act, § 6 (India), annexed to Sidel Decl. as

Exhibit C.)  It recently took nearly a year for Pathfinder to obtain permission to have a local

Indian employee added as a signatory to an existing account.  (Pellegrom Decl. ¶ 90.)

       The establishment of new and separate affiliates would also almost certainly cause havoc

and long delays in the receipt of funds from abroad.  India's Foreign Contribution (Regulation)

Act also strictly regulates which Indian nonprofits and charitable affiliates can receive and use

foreign charitable donations.  (Sidel Decl. ¶ 35.)  The U.S. State Department has noted thousands

of instances in which Indian authorities have used this act to prohibit organizations from seeking

and receiving charitable funds. (Sidel Decl. ¶ 37.) Mozambique and Bangladesh are among the

countries imposing similar barriers to the transfer of funds. (Sidel Decl. ¶¶ 38-41, 49-51.)

> **5.    The Guidelines' Separate Facilities, Equipment, and Supplies
> Requirement**

The Guidelines' requirement of separate offices and equipment is also extremely onerous.

U.S. NGOs often must engage in the highly cumbersome and time-consuming process of

importing necessary vehicles and office equipment into the countries in which they operate. (*See*

Sidel Decl. ¶ 16.) In India, for example, it can be very difficult to obtain government

authorization for duty-free import of vehicles and office equipment, and may be particularly

difficult to obtain those permissions for two affiliates of the same foreign organization. Securing

appropriate office space, telephone and Internet access and other necessary services for an

additional office location is likely to take months or longer. (*Id.* at ¶ 32.)

Moreover, the added administrative expenses inherent in running two affiliated entities

with separate staff, offices, and equipment, would hamper the ability of the members of GHC

and InterAction to raise funds from Defendants and private donors. NGOs are increasingly

judged, ranked and rated by independent judging and certification organizations, in response to

concerns about effectiveness and efficiency in the American charitable sector. Dividing the

work that these organizations do in their U.S. headquarters, and in dozens of countries abroad,

into new and separate affiliates, each with significantly increased administrative costs, would

likely result in a downgrading of rankings and ratings because of the higher ratio of

administrative to program costs resulting from the Guidelines. In turn, less favorable rankings or

ratings can hurt the ability of organizations to raise funds from the private sector and the

government. (Sidel Decl. ¶ 25; Pellegrom Decl. ¶¶ 66-67, 69-71.)

13

## ARGUMENT

### I.  PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT TO ADD GHC AND INTERACTION AS PLAINTIFFS.

Plaintiffs should be granted leave, in the interests of justice, to file a Second Amended Complaint in order to add GHC and InterAction as additional plaintiffs. Amendment is in the interests of justice because InterAction's and GHC's members are subject to severe penalties based on their exercise of First Amendment freedoms and because they merely seek the same relief already provided to others. Rule 15(a)(2) provides that a party may amend its complaint a second time with the court's leave, and that the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Similarly, Rule 21 allows plaintiffs to be added "at any time, on just terms . . . ." Fed. R. Civ. P. 21. In determining whether a party may be added under Rule 21, courts are "guided by 'the same standard of liberality afforded to motions to amend pleadings under Rule 15.'" *Infosint S.A. v. H. Lundbeck A/S*, No. 06 Civ. 2869 (LAK)(RLE), 2007 WL 2489650, at *2 (S.D.N.Y. Sept. 4, 2007) (internal citation omitted). Where, as here, there has been no undue delay, bad faith or undue prejudice, and where amendment would not be futile, amendment should be permitted. *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

### A.  There Has Been No Undue Delay, Bad Faith, or Undue Prejudice.

Plaintiffs have not unduly delayed seeking to amend the Complaint, or exhibited any bad faith or dilatory motive. As this Court has held, "Defendants can hardly be heard to complain of undue delay or prejudice [when] the case has not even proceeded to discovery." *Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 113 (S.D.N.Y. 2004) (Marrero, J.). *See also Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (same). Plaintiffs raised the issue of additional parties less than one month after the Court's Decision granting as-applied relief to Plaintiffs AOSI and Pathfinder. *See* discussion *supra* at 3. Because the legal claims in the

14

Second Amended Complaint are the same as those in the Amended Complaint, adding GHC and InterAction as Plaintiffs causes no prejudice. *See Presser v. Key Food Stores Coop.*, 218 F.R.D. 53, 56 (E.D.N.Y. 2003) (finding no prejudice because amended complaint added plaintiffs but did not add a new cause of action). To the extent that Plaintiffs must address any new factual issues in the Second Amended Complaint, those additions are necessitated by Defendants' issuance of the Guidelines after this case had been briefed and argued at the Court of Appeals. Furthermore, Defendants can hardly be heard to complain of undue delay where, as here, they themselves delayed the case by appealing this Court's order and then mooting their own appeal by issuing new guidelines after the parties had filed their appellate briefs and argued the case before the Second Circuit.

**B.    Amending the Complaint Would Not Be Futile, Because GHC and InterAction Have Associational Standing on Behalf of Their Members.**

Amending the Amended Complaint to add GHC and InterAction as parties would not be futile because GHC and InterAction satisfy all three prongs of the associational standing test: 1) their members would otherwise have standing to sue in their own right, 2) the interests at stake in this litigation are germane to each organization's purpose, and 3) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit, and there are important First Amendment interests at stake. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

**1.    GHC and InterAction Each Has at Least One Member With Standing to Sue in Its Own Right.**

GHC and InterAction satisfy the first prong of the associational standing test, because each has at least one member with standing to sue on its own behalf. *See Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("An association bringing suit on behalf of its members must allege that *one or more of its*

15

*members* has suffered a concrete and particularized injury . . . .") (emphasis added); *Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336, 1342 (2d Cir. 1991) (associational standing exists where the organizations' "members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action" (internal quotation marks and citation omitted) (emphasis added)).  An association need not seek relief on behalf of every one of its members; it may act to protect the interests of a subset of its members.  *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989) (holding that plaintiff organization, open to all women, had standing to seek injunction on behalf of members "seek[ing] to avail themselves of health care and family planning services"); *Latino Officers Ass'n v. Safir*, 170 F.3d 167 (2d Cir. 1999) (finding that injury to nine of 1,500 members bestowed standing on plaintiff organization).

　　Here, GHC and InterAction more than satisfy the first prong because they have multiple members who meet the three standing requirements.  An individual has standing if:  (1) it suffers an actual and concrete "injury in fact," (2) the injury is traceable to the defendants' challenged actions, and (3) it is likely that a decision in favor of the individual will redress the injury.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  GHC has 28 U.S.-based members who have said in a survey that they are subject to the Policy Requirement and would like relief from it; InterAction has 20 such members.  (Daulaire Decl. ¶ 20; Worthington Decl. ¶ 17.)  For example, CARE, which is a member of both InterAction and GHC, adopted a policy solely because of the Policy Requirement and therefore is compelled to speak the government's message and is prevented from speaking about its programs with sex worker organizations in India and Bangladesh because of the Policy Requirement.  Plaintiff Pathfinder, also a member of GHC and InterAction, and whose standing in this case the government has never challenged, had

16

to adopt a policy against its will and, but for the preliminary injunction, could be barred from speaking freely on its website and at U.S. conferences about its HIV prevention activities with sex workers. (Pellegrom Decl. ¶¶ 32, 39.) GHC member IntraHealth wishes to remain silent on the social and political aspects of sex work (and therefore does not wish to speak the government's viewpoint), has refrained from using its private funds for programs directed toward sex workers, and has curtailed its speech at conferences in the U.S. and abroad concerning HIV/AIDS-prevention among sex workers. (*See* Gaye Decl. ¶¶ 30-31; *see also* Daulaire Decl. ¶ 35 (describing concerns of GHC member EngenderHealth about alienating partners in its HIV/AIDS prevention outreach).) Since GHC and InterAction each has at least one member that could sue on its own behalf, they satisfy the first requirement of associational standing.

> **2.    The Purposes of GHC and InterAction Are Germane to the Interests at Stake in This Litigation.**

GHC and InterAction satisfy the second prong of the associational standing test because their purposes are directly germane to the interests at stake. "[T]he requirement of germaneness is undemanding; mere pertinence between litigation subject and organizational purpose is sufficient." *Building & Constr. Trades Council*, 448 F.3d at 148 (internal quotation marks omitted). The overriding interest at stake is the ability of domestic Global AIDS Act grantees to retain their independence and use their private funding to engage in HIV prevention activities and speak freely about the issues surrounding HIV/AIDS. GHC and InterAction both exist in order to promote open debate on issues of public policy and to share among their members best practices in public health and humanitarian work. (*See* Daulaire Decl. ¶¶ 5, 7; Worthington Decl. ¶¶ 6, 31.) Thus, the purposes of GHC and InterAction are germane to the interests at stake in this litigation.

### 3.     The Claims Can Be Adjudicated and the Requested Relief Awarded Without the Participation of Individual Members.

The claims of GHC and InterAction can be adjudicated and a preliminary injunction granted without the participation of individual members.  This third prong of the associational standing test is prudential and is satisfied unless the individual participation of *each* injured member is indispensable to resolving the claims.  *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986).  Individual participation is not required for the claims GHC and InterAction seek to assert on behalf of their members -- that the Policy Requirement violates the First Amendment and is impermissibly vague.  *See* Second Am. Compl. ¶¶ 116-18, Diller Decl., Ex. A; *see also infra* Argument, § II.A.

Determination of each of these claims depends on the government's application of the law, but not on the facts concerning any individual grantee.  *All* of the aggrieved members of GHC and InterAction are being compelled to espouse the government's message and adopt a government-mandated viewpoint.  *All* are subject to a ban on the use of private funding to engage in constitutionally protected speech unless they establish a legally, financially and physically separate entity, with separate employees, over whom they exercise no control.  That restriction is not narrowly tailored to fit Congress's intent as to any of them, because, without adequate government justification, the restriction:  1) exempts four entities receiving Leadership Act funds; 2) imposes a blanket ban on the use of private funds by preventing recipients from exercising control over an affiliate's privately funded speech; and 3) imposes massive burdens common to all grantees (such as the difficulty of registering a new legal entity overseas, obtaining visas for staff, obtaining foreign government permission to open separate new bank accounts, and others).  *See infra* Argument, § II.A.

18

This case thus resembles *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, in which the Supreme Court agreed with lower courts that had held that an association of law schools had standing to assert its as-applied claim that a military recruiting condition on federal funds violated the First Amendment rights of its members. 547 U.S. 47, 52 n.2 (2006). As the district court had explained, the association had standing because its claim was that "the Government [was] applying a statute and its implementing regulations to almost every law school in the nation in a way that violates the law schools' First Amendment rights," not that there was "something unconstitutional about the manner in which the Government [was] applying [the statute and regulations] to a particular institution." *Forum for Academic & Institutional Rights, Inc. v. Rumsfeld*, 291 F. Supp. 2d 269, 291 (D.N.J. 2003), *rev'd on other grounds*, 390 F.3d 219 (3d Cir. 2004), *rev'd on other grounds*, 544 U.S. 1017 (2006). *See also Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 249-50 (S.D.N.Y. 1997) (individual participation unnecessary where claims could "be proven largely by reference to" defendants' actions). Just as associational standing was proper there, it is also proper here.

Like the claims asserted, the declaratory and injunctive relief sought does not require individual participation by GHC and InterAction members. *See, e.g., United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996); *New York State Nat'l Org. for Women*, 886 F.2d at 1349; *NYC C.L.A.S.H., Inc.*, 315 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2004 (Marrero, J.). *See also Nitke v. Gonzales*, 413 F. Supp. 2d 262, 272 (S.D.N.Y. 2005) (holding that no individual participation was necessary because the free speech claims asserted addressed "the breadth of [the statute] with respect to all speech it reaches and the relief sought appli[ed] equally to all affected [members]"). A declaration that the Policy

Requirement violates the First Amendment and a preliminary injunction against its application to GHC and InterAction members would not require individualized determinations. For these reasons, GHC and InterAction satisfy the third prong of the associational standing test.

Even if individual participation were necessary, GHC and InterAction would still have associational standing because of the important First Amendment interests at stake. As with all prudential standing requirements, the limitations of the third associational standing prong are relaxed in the context of the First Amendment. *See NYC C.L.A.S.H, Inc.,*, 315 F. Supp. 2d at 468. The First Amendment concerns are particularly pressing here because the affected members of GHC and InterAction, all of whom rely on government funding, risk government retaliation and loss of critical funding if they are unable to participate through their member organizations and instead are forced to participate individually. This case thus implicates the First Amendment's protection of the rights of government grantees to assert their speech rights free of retaliation by the government. *See Housing Works, Inc. v. Turner*, 179 F. Supp.2d 177, 194-99 (S.D.N.Y. 2001) (Marrero, J.), *aff'd*, 56 F. App'x. 530 (2d Cir. 2003). It also implicates the First Amendment's protection of the ability of individuals to assert their rights collectively, particularly when they would face government retaliation if they asserted their rights individually. *See NAACP v. Alabama*, 357 U.S. 449, 460, 462-63 (1958).

Already, Plaintiff Open Society Institute's participation has subjected it to criticism by a senior member of the powerful House Committee on Oversight and Government Reform, who pointed out that OSI "received at least $30 million between 1998 and 2003 from the federal government." *See* 152 Cong. Rec. E1917-01 (Sept. 28, 2006) (Statement of Rep. Souder). Likewise, CARE has been subject to investigation by USAID and has been accused by a member of Congress of violating the Policy Requirement based on its privately funded activities in India.

20

US1DOCS 6548878v2

(Gayle Decl. ¶¶ 20-22.)    Mindful of this criticism, and fearful of jeopardizing their own funding, a substantial number of the other members of GHC and InterAction who want relief from the Policy Requirement determined not to bring suit individually for fear of government retaliation. (*See* Daulaire Decl. ¶¶ 9, 35; Worthington Decl. ¶¶ 9, 17.)  Because proceeding through GHC and InterAction is the only way many members of those organizations can receive relief, this is precisely the sort of case in which organizational standing should be allowed. *See NAACP*, 357 U.S. at 458-61.

In addition, the interests of judicial efficiency weigh in favor of permitting associational participation here.  If GHC and InterAction are not allowed to join then each of their members will be forced to join individually, a factor weighing heavily in favor of allowing associational standing. *See Brock*, 477 U.S. at 290 ("The only practical judicial policy when people pool … their activities under  a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." ) (citations omitted).

Defendants have nonetheless argued that GHC and InterAction fail to satisfy the third prong of the associational standing test, citing *Harris v. McRae*, 448 U.S. 297, 320 (1980), in which the Supreme Court held that an association could not assert a Free Exercise claim on behalf of its members. *See* Ltr. From Richard E. Rosberger to Hon. Victor Marrero, Aug. 9, 2006. Defendants' reliance on *Harris* is misplaced, because the standing requirements for Free Exercise claims are particularly stringent, requiring plaintiffs to allege "'the coercive effect of the enactment as it operates against him in the practice of his religion.'" *Harris*, 448 U.S. at 321 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 223 (1963)).  Thus, an individual advancing a Free Exercise claim must make a showing concerning his particular religious beliefs and how the challenged law prevents him from practicing religion in furtherance of those beliefs.

21