*See McGowan v. State of Md.*, 366 U.S. 420, 429 (1961) (rejecting department store employees' standing to challenge Sunday closing laws when record was silent on their religious beliefs and the effect of challenged laws on those beliefs). In contrast, other provisions of the First Amendment do not require such individualized showings regarding their beliefs. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that vagueness challenge will prevail if speech regulation does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"); *Speiser v. Randall*, 357 U.S. 513 (1958) (ruling on taxpayers' challenge to a requirement that they sign a loyalty oath to obtain a tax exemption, without requiring taxpayers to demonstrate that they held beliefs that would be violated by the oath). *See also Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71-72 (2d Cir. 2001) (contrasting the stringent, individualized standing requirements of the Free Exercise Clause with the Establishment Clause's looser standing requirements). Not only do GHC and InterAction not assert a Free Exercise claim, but the speech claim they do assert merits *looser*, not tighter, standing analysis. *See* discussion *supra* at 20-21. Because the claims advanced and relief requested do not require the participation of individual members and because of the important First Amendment interests at stake, associational standing is appropriate here.

## II. THE COURT SHOULD GRANT GHC AND INTERACTION A PRELIMINARY INJUNCTION.

A preliminary injunction should be granted if plaintiffs demonstrate a likelihood of success on the merits and a threat of irreparable harm. *AOSI*, 430 F. Supp. 2d at 239. *See also Time Warner Cable of N.Y.C., a Div. of Time Warner Entm't Co., L.P. v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir. 1997). GHC and InterAction meet both requirements.

### A. GHC and InterAction Are Likely to Succeed on the Merits.

This Court has held that the Policy Requirement violates the First Amendment rights of AOSI and Pathfinder for three reasons: the restriction is not narrowly tailored to achieve Congress's goals, discriminates based on viewpoint, and compels speech. *AOSI*, 430 F. Supp. 2d at 276.[3] Like AOSI and Pathfinder, the members of GHC and InterAction include U.S.-based recipients of Global AIDS Act funding that have been forced to restrict their privately funded speech and activities, adhere to the government's point of view on a contested social issue, and espouse the government's message as their own. (*See, e.g.*, Daulaire Decl. ¶¶ 27, 31-32; Worthington Decl. ¶¶ 22, 25, 28.) Instead of curing these First Amendment violations, the Guidelines perpetuate the Policy Requirement's constitutional infirmities in all three ways and remains unconstitutionally vague because the Guidelines provide no clarity regarding which privately funded activities and speech may be performed or spoken only through an affiliate.

### 1. The Policy Requirement Still Is Not Narrowly Tailored

The Policy Requirement, as implemented by the Guidelines, remains unconstitutional because it still cannot survive heightened scrutiny. As the Court has held, when government seeks to impose a viewpoint-based restriction that imposes burdens on the privately funded speech of grantees, it must show that the restriction is "narrowly tailored to fit Congress's intent." *AOSI*, 430 F. Supp. 2d at 267 (citation omitted). The Defendants have not shown -- and indeed cannot show -- that the Policy Requirement, as implemented by the Guidelines, passes this test.

The issuance of the Guidelines does not relieve the government of its obligation to justify the massive burdens that the Policy Requirement continues to impose on the privately funded

---

[3] GHC and InterAction incorporate herein the arguments made in support of the motions of Plaintiffs AOSI and Pathfinder for a preliminary injunction.

23

speech of the members of GHC and InterAction. In concluding that the narrow tailoring test applies to the Policy Requirement, the Court relied on *Rust v. Sullivan*, which evaluated a viewpoint-based speech restriction requiring grantees to physically and financially separate federally funded from privately funded activities. *AOSI*, 430 F. Supp. 2d at 267-68 (citing *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991)). Thus, the Guidelines' introduction of requirements that mandate extreme separation between recipients and other organizations does not lessen the operative standard of review.[4] Indeed, the Guidelines should arguably be subjected to even greater scrutiny because the Policy Requirement compels speech while the restriction in *Rust* did not.

This heightened scrutiny requirement is further supported by other cases in which the Supreme Court required funding conditions that impose *substantial* burdens on privately funded speech to be justified by a sufficient government interest. In *FCC v. League of Women Voters*, the Supreme Court invalidated a statute that barred television stations receiving federal public broadcasting funding from using private funds to editorialize, because the government had failed to demonstrate a need for "barr[ing a station] from using even wholly private funds to finance its editorial activity." 468 U.S. 364, 400 (1984). Although the Court noted that a non-burdensome requirement of establishing a separate entity "which could then use the station's facilities to

---

[4] Although the *Rust* Court upheld a requirement that government-funded family planning clinics desiring to engage in privately funded speech concerning abortion do so in a physically separate location, it did so only because the Court: 1) presumed, in the context of the facial challenge before it, that the burden imposed by the restriction was minimal, 500 U.S. at 196-200; and 2) found that the government had demonstrated a need for the restriction, *id.* at 188 (discussing government reports that "the distinction between the recipients' title X and other activities may not be easily recognized"). Here, in contrast, the burdens are far from minimal and the government's need is unclear. Furthermore the government's encroachment on the First Amendment is far greater heare than it was in *Rust* because the Policy Requirement also compels grantees to affirmatively speak the government's message while refraining from contrary speech or conduct. Moreover, as explained below, the Guidelines require far more separation than the *Rust* statute did. *See* discussion *infra* at 27.

editorialize with nonfederal funds" would not violate the First Amendment, *id.*, it is clear from the Court's reasoning that a regulation requiring a separate transmitter in a separate physical space staffed by separate personnel under separate management and board control would have imposed an unconstitutional burden on privately funded speech. In *United States v. American Library Association*, the Court rejected a facial challenge to a statute that conditioned federal funding of public libraries on a requirement that Internet filters be installed in all library computers, including those that were non-federally funded. The Court treated as dispositive the minimal burden the statute imposed – a simple request by an adult patron was sufficient to disable the filters.[5] 539 U.S. 194, 208-09 (2003) (plurality op.); *id.* at 214 (Kennedy, J., concurring) ("If, on the request of an adult user, a librarian will unblock filtered material or disable the Internet software filter without significant delay, there is little to this case."); *id.* at 220 (Breyer, J., concurring) (rejecting facial challenge because of the "comparatively small burden" imposed). However, the crucial concurrences make clear that a plaintiff would be entitled to an as-applied First Amendment exemption on a showing of substantial burden, if the government's interests were insufficient to justify the burden. *Id.* at 215 (Kennedy, J., concurring); *id.* at 217, 219-20 (Breyer, J., concurring). The Policy Requirement and Guidelines require an even higher level of scrutiny because they discriminate based on viewpoint and compel speech.

In issuing a preliminary injunction to protect Plaintiffs AOSI and Pathfinder, this Court held that the Policy Requirement failed to survive heightened scrutiny for three reasons: 1) "the Government's claim that its goals will be jeopardized if the Policy Requirement is not enforced

---

[5] In the absence of a majority opinion in *American Library Association*, Justice Kennedy's concurring opinion is controlling because it was decided on the narrowest grounds. *See Marks v. U.S.*, 430 U.S. 188, 193 (1977).

USIDOCS 6548878v2

as the Government interprets it is undercut by the Act's exclusion provisions exempting certain recipients of funds under the Act;" 2) the Policy Requirement "amounts to a blanket ban on certain constitutionally protected speech;" and 3) less restrictive means exist to satisfy the government's interest. *AOSI*, 430 F. Supp. 2d at 269-71. Even with the issuance of the Guidelines, the Policy Requirement still fails for these same three reasons.

      a.    **The Policy Requirement Still Excludes Certain Funding Recipients.**

When this Court last examined the Policy Requirement, in May 2006, it noted that the following recipients of Global AIDS Act funds were exempted from the requirement: the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative, and all United Nations Agencies. *AOSI*, 430 F. Supp. 2d at 269. The Court noted that "[t]he Government has not advanced any explanation as to why a restriction on Plaintiffs' speech is necessary to protect Congress's goals in promoting uniformity of message while these high profile organizations can engage in clearly dissenting speech." *Id.* Thus, the Court ruled, the Government's asserted interests were undermined and could not support the Policy Requirement. *Id.* Even as modified by the Guidelines, the Policy Requirement continues to exempt those same organizations and continues to fail heightened scrutiny.

      b.    **The Policy Requirement Still Imposes a Blanket Ban on Speech by Funding Recipients.**

In granting a preliminary injunction to Plaintiffs AOSI and Pathfinder, this Court characterized the Policy Requirement as a "blanket ban" and held that, "[a]s such, Defendants' application of the provision is not 'narrowly tailored.'" *AOSI*, 430 F. Supp. 2d at 270. Unfortunately, despite the issuance of the Guidelines, the Policy Requirement still imposes a blanket ban on the speech of funding recipients. The Guidelines do not allow recipients to advance their privately financed speech, free and clear of the Policy Requirement, through any

affiliate organization that they control through overlapping boards and management. *See* discussion *supra* at 11. Thus, funding recipients continue to be unable to spend their private funds to engage in their own speech of which the government disapproves.[6] As the Court has held, such blanket bans on speech cannot be narrowly tailored. 430 F. Supp. 2d at 270.

In this regard, the Guidelines stand in stark contrast to the only affiliate regimes to have survived constitutional scrutiny at the Supreme Court.[7] In *Regan v. Taxation With Representation of Washington*, the Court's ruling that Congress could prohibit lobbying by 501(c)(3) groups that Congress exempts from federal taxation was contingent on the fact that Congress allowed the groups to pursue their First Amendment rights by lobbying through closely affiliated 501(c)(4) groups with which they shared personnel, management and boards. 461 U.S. 540, 544-46 (1983). The separation regulations at issue in *Rust* likewise did not mandate separate legal entities, management, or governance. 500 U.S. at 180-81.

The Guidelines also stand in stark contrast to the LSC separation regulation, which is the subject of ongoing litigation over whether it is adequately tailored. Indeed, after a district court judge criticized an early version of that regulation for failing to allow LSC-funded entities to

---

[6] Although the Guidelines state that separate governance is one of a number of non-exclusive factors and not an absolute requirement, the government retains full authority to declare recipients in violation of the Policy Requirement based on purported insufficient separation from another organization, with respect to each of the five enumerated factors. Thus, the Guidelines require funding recipients to adhere to each factor to the maximum extent, or risk running afoul of the Policy Requirement and paying the consequences. *See* discussion *infra* at 28-30.

[7] The Guidelines are also substantially more burdensome than the regime contemplated by the Court of Appeals for the D.C. Circuit in *DKT International, Inc. v. USAID*, 477 F.3d 758 (D.C. Cir. 2007). The D.C. Circuit panel upheld the constitutionality of the Policy Requirement only because it presumed that the statute did not "'effectively prohibit the recipient from engaging in the protected conduct outside the scope of the federally funded program.'" *Id.* at 763 (quoting *Rust*, 500 U.S. at 197). The panel found that the statute left open channels for protected speech and conduct because grantees could set up subsidiary organizations unburdened by the pledge. *Id.* at 763 n.4. While a "subsidiary organization" structure would, as contemplated by the D.C. Circuit, allow a recipient to exercise control over its subsidiary's speech, Defendants' Guidelines do not tolerate such a structure.

control their privately funded affiliates, LSC amended that regulation to "allow control at the Board level, [so] recipients will have an avenue through which to engage in restricted activities." 62 Fed. Reg. 27,695, 27,697 (May 21, 1997).

Because the Guidelines continue to impose the Policy Requirement's blanket ban on the speech of recipients, the Policy Requirement remains unconstitutional.

### c. The Policy Requirement Continues to Massively Burden Plaintiffs' Privately Funded Speech Without Adequate Justification.

In granting a preliminary injunction to Plaintiffs AOSI and Pathfinder, this Court held that, even apart from the exclusion of several funding recipients and the blanket nature of the Policy Requirement, the requirement was unconstitutional because there exist "other less restrictive methods of protecting the Government interests, which undermine the argument that the Act is narrowly tailored." 430 F. Supp. 2d at 270. This continues to be true.

#### i. The Guidelines' Vagueness Requires Grantees to Maintain an Extreme Level of Separation.

Although the Guidelines require that recipients be "physically and financially separate from the affiliated organizations," neither the Policy Requirement nor the Guidelines state the specific activities that are permitted and prohibited, nor how a recipient can ensure that it is physically and financially separate enough from prohibited activities. Rather, they list five factors relating to separation, warning that the Defendants "will determine, on a case-by-case basis and based on the totality of the facts, whether sufficient physical and financial separation exists. The presence or absence of any one or more factors will not be determinative." USAID Guidelines at 4. The Guidelines also warn that Defendants may take other, as yet undisclosed, factors into account. USAID Guidelines at 4 ("Factors relevant to this determination shall include but will not be limited to . . . ."). Given the enormous financial and even criminal

28

penalties that may flow from a violation of the Policy Requirement and Guidelines,[8] the members of GHC and InterAction, and all other funding recipients, must maintain great separation between their activities and the activities of any other organization that engages in activities that might be barred by the Policy Requirement. Pellegrom Decl. ¶ 47. *See also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (where First Amendment freedoms are involved, a vague law necessarily requires overcompliance, as it forces citizens to "'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked") (*quoting Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

The vagueness of the Policy Requirement and Guidelines is exacerbated by the particular vagueness of the individual factors the Defendants will consider in deciding whether recipients are "physically and financially separate," many of which use inherently vague terms such as "the extent to which" and "the degree of." USAID Guidelines at 4. Recipients have no way of knowing how much of any of these factors is too much. As a result, they must comply with the broadest interpretation of each to avoid potential penalties. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048-49 (1991) (holding that statute allowing attorney to describe at press conference the "general nature of the defense without elaboration" was problematic because

---

[8] Under the federal criminal fraud and false statements statute, a knowing and willful misrepresentation to a federal agency in a certification in connection with a contract may be punished by up to five years imprisonment. 18 U.S.C. § 1001. *See, e.g., U.S. v. Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999) (if contractor made false certification in invoice submitted to U.S. Navy he would be subject to criminal penalties under 18 U.S.C. § 1001). Under the federal false claims statute, grantees could also be subject to civil penalties for misrepresentations of compliance. 31 U.S.C. § 3729. Even without the operation of these statutes, the penalties for violating the certification are quite harsh: USAID may unilaterally terminate the contract, terminate the award, seek a refund of money already disbursed, and permanently disqualify the grantee from receiving future funding. *See* 22 C.F.R. §§ 208.800, 226.62(a)(3), 226.73.

"general" and "elaboration" "are both classic terms of degree" that do not provide sufficient guidance for determining whether conduct is unlawful).

      ii. **The Extreme Separation Required by the Policy Requirement and Guidelines Imposes Massive Burdens on the Members of InterAction and GHC.**

As discussed above, the ban on shared management and governance imposes a blanket ban on the ability of Global AIDS Act grantees to use their private funds to speak through any other organization. *See* discussion *supra* at 26-28. However, even if the Guidelines theoretically permitted grantees to speak through another entity, they would impose severe, and sometimes insurmountable, burdens on their ability to do so. *See generally* discussion *supra* at 9-13. For example, visa, work permit, and registration requirements, as well as limits on foreign entities opening bank accounts and on the transfer of foreign funds, would cause the members of GHC and InterAction to face long delays in their ability to open and staff a new entity. In some countries, they would be simply unable to obtain the necessary permissions. Moreover, in the course of attempting to obtain the necessary permissions for a new entity, the existing members will face intense scrutiny and the possible loss of their own tax-exempt status in some countries. *Id.*

Compliance with the Guidelines would also require the members to bear the substantial cost of running two physically separate sets of offices, with separate staff, offices and equipment. Compounding the financial burden is the fact that this added cost will increase the members' overheads, which in turn will undercut their ability to compete for the funds they need to carry out their missions. *See* discussion *supra* at 13. The members' fundraising competitiveness will be further undermined by the new entity's lack of any track record. *See* discussion *supra* at 13.

US1DOCS 6548878v2

For all of these reasons, it is not viable for recipients to create and operate affiliates in keeping with the Guidelines.

### iii. The Extreme Separation Required by the Policy Requirement and Guidelines Is Not Sufficiently Justified by the Government's Interests.

Defendants have not offered—and cannot provide—valid justifications sufficient to support these enormous burdens on Plaintiffs' speech. Defendants do claim that the Guidelines are intended to "guard against a public perception that the affiliate's views on prostitution and sex trafficking may be attributed to the recipient organization and thus to the government, thereby avoiding the risk of confusing the Government's message." USAID Guidelines at 3. Yet, as the Court observed regarding the Policy Requirement itself, "the Government has failed to demonstrate why the restriction on government funds is not itself adequate to prevent public confusion over its message, or why permitting grantees to refrain entirely from taking a position on prostitution would undermine the Government's message." *AOSI*, 430 F. Supp. 2d at 270.

Nor is there any evidence that the specific types of separation required by the Guidelines are necessary to avoid confusion of the government's message. Indeed, in a related context, Defendants specifically rejected similar separation measures as unnecessary to guard against government endorsement of a grantee's message. During the notice and comment process for regulations governing faith-based grantees, commenters urged USAID to require legal and physical separation between federally funded activities and privately funded religious speech in order to comply with the Establishment Clause bar on endorsing religious speech. USAID, Participation by Religious Organizations in USAID Programs, 69 Fed. Reg. 61,716-01, 61,718, 61,719, 61,721 (Oct. 20, 2004). *See also Lee v. Weisman*, 505 U.S. 577, 609 (1992) (Blackmun, J., concurring) (government may neither sponsor nor endorse religion). USAID rejected these

31

concerns, stating that by permitting religious grantees to engage in religious activities through the same corporate entity, and using the same employees and physical space in which they engage in federally funded activities, the government "does not endorse religion in general or any particular religious view." 69 Fed. Reg. at 61,718. *See also* HHS, Participation in HHS Programs by Religious Organization, 69 Fed. Reg. 42,586, 42,588 (July 16, 2004) (asserting that aid from HHS to inherently religious organizations that engage in religious activities in the same space as their federally funded activities would not impermissibly advance religious purposes).

Thus, Defendants themselves believe that the very same forms of legal, employee and physical separation that they are forcing on Global AIDS Act grantees are not necessary to prevent governmental endorsement of a grantee's privately funded speech in the faith-based context. Defendants' adoption of the burdensome Guidelines, even after the Senate Appropriations Committee and the chairmen of two House of Representatives committees requested them to rely on the faith-based model as a far less burdensome way to achieve Congressional goals, implies that a constitutionally impermissible desire to burden and ultimately suppress disfavored speech is the real motive here.[9]

        **d.**    **Defendants' Reliance on *Brooklyn Legal Services* and *Velazquez* Is Misplaced.**

Instead of offering justifications for the harshness of the Guidelines, Defendants merely claim they were modeled on a regulation upheld as facially constitutional in *Velazquez v. LSC*,

---

[9] *See* S. Rep. No. 110-128, at 33 (2007) (Senate Appropriations Committee "will view unfavorably any requirements that impose more costly and burdensome restrictions than those that apply to faith-based grantees."); Ltr. from Rep. Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform, to Hon. Alberto Gonzales, Attorney General (June 29, 2007), *available at* http://oversight.house.gov/documents/20070629123546.pdf; Ltr. from Reps. Henry A. Waxman and Tom Lantos to Hon. Michael O. Leavitt, Secretary, HHS (July 20, 2007), *available at* http://oversight.house.gov/documents/20070720162655.pdf; Ltr. from Reps. Henry A. Waxman and Tom Lantos to Hon. Henrietta H. Fore, Acting Administrator, USAID (July 20, 2007), *available at* http://oversight.house.gov/documents/20070720162731.pdf.

164 F.3d 757 (2d Cir. 1999), *aff'd on other grounds*, 531 U.S. 533 (2001), and *Brooklyn Legal Services Corp. B v. LSC*, 462 F.3d 219 (2d Cir. 2006).[10] USAID Guidelines at 3.

However, Defendants can draw no comfort from these cases for two reasons. First, those cases hold that viewpoint-discriminatory restrictions on privately funded speech by government funding recipients (precisely the type of restriction at issue here) are unconstitutional. In *Velazquez*, the Supreme Court and Second Circuit invalidated a viewpoint-based restriction that prohibited LSC grantees from using both federal and private funds to challenge welfare laws. *LSC v. Velazquez*, 531 U.S. 533, 542-49 (2001); *Velazquez v. LSC*, 164 F.3d 757, 769-72 (2d Cir. 1999). The courts invalidated the restriction even though the regulatory scheme at issue there offered the affiliate option upon which Defendants claim they have modeled the Guidelines. *See Velazquez*, 164 F.3d at 761-72 (describing affiliate option established by LSC in 45 C.F.R. § 1610.8); USAID Guidelines at 3 (stating that guidance "is modeled on" the LSC affiliate option). If the Supreme Court would not tolerate a grant program barring criticism of government policy, it stands to reason that it would not tolerate the more onerous program here, which not only bars criticism of a government-mandated position, but actually compels grantees to convey that position as their own.

Second, those cases also hold that grantee-affiliate separation requirements are unconstitutional if they "impose[ ] extraordinary burdens that impede grantees from exercising their First Amendment rights, create[ ] prohibitive costs of compliance, and demand[ ] an unjustifiable degree of separation of affiliates." *Brooklyn Legal Servs.*, 462 F.3d at 232 (citing *Velazquez*, 164 F.3d at 767). As Plaintiffs describe above, in the context of U.S. organizations operating in many different countries around the world – as the members of GHC and

---

[10] Significantly, as applied challenges to that regulation continue.

33

InterAction do – the Guidelines certainly impose such extraordinary burdens, which cannot be justified by the Government's unsupported claims of needs. *See* discussion *supra* at 30-31.

   2.   **The Policy Requirement Continues to Discriminate Based on Viewpoint and Is Thus Unconstitutional.**

As the Court has held, the Policy Requirement violates the constitutional prohibition against viewpoint discrimination. *AOSI*, 430 F. Supp. 2d at 271-74. The Guidelines do not even purport to remedy the constitutional infirmity, because an organization's eligibility for government funding remains contingent on its point of view about prostitution. Even when subsidies are at issue, the Supreme Court has ruled, government may not choose funding recipients based on their beliefs. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 680 (1996); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1988). In *Rust*, in which the Supreme Court ruled that a government-subsidized family planning program could be restricted to exclude abortion-related speech, the Court took pains to note that the restrictions did not require the grantee to adopt a particular point of view. *Rust*, 500 U.S. at 196. Yet here the government continues to require the grantee to oppose prostitution and continues to impose the government's view that criminal penalties against prostitutes are the only way to deal with this social ill, even though many InterAction and GHC members would prefer to remain neutral on the question, particularly given the variety of legal approaches to prostitution in the countries in which they operate around the world. (Worthington Decl. ¶ 26; Daulaire Decl. ¶¶ 28, 33.)

The possibility of a relationship with an affiliate or other organization does not undo the constitutional harm. As is described *supra* at 33, in *Legal Services Corp. v. Velazquez*, the Supreme Court and Second Circuit invalidated a viewpoint-based restriction even though the regulatory scheme at issue there offered the affiliate option upon which Defendants claim they have modeled the Guidelines.

34

Moreover, it is impossible to confine the government's viewpoint discrimination to the federally funded speech of the members of GHC and InterAction, because members must (and do) possess private funds as a condition of receiving federal grants. Congress affirmatively requires NGOs to obtain non-government funds in order to participate in foreign assistance programs. *See* 22 U.S.C. § 2151u(a) (finding that the financial resources of NGOs "should be *supplemented* by the contribution of public funds for the purpose of undertaking development activities") (emphasis added); *see also* 22 C.F.R. § 203.2(p)(2) (requiring U.S.-based NGOs to "solicit[ ] and receive[ ] cash contributions from the U.S. general public" in order to be eligible to receive USAID funding); Pellegrom Decl. ¶ 28; Worthington Decl. ¶ 24 Indeed, USAID requires that fully 20 percent of the support for a private and voluntary organization's work come from non-US government sources. (*See* Pellegrom Decl. ¶ 28.) Thus, as implemented by the Guidelines, the Policy Requirement continues to impermissibly discriminate based on viewpoint, even in the use of private funds. Accordingly, the Policy Requirement continues to violate the First Amendment. *See AOSI*, 430 F. Supp. 2d at 271-74.

### 3. The Policy Requirement Continues to Compel Speech and Is Thus Unconstitutional.

As the Court has held, the Policy Requirement violates the clear constitutional prohibition against requiring grantees to adopt a policy "espousing the government's preferred message." *AOSI*, 430 F. Supp. 2d at 274. In both *Rumsfeld v. Forum for Academic and International Rights* and *Rust*, the Supreme Court made clear that the government may not use its funding power to compel private individuals or entities to espouse a government-mandated message. *Rumsfeld v. Forum for Academic & Int'l Rights, Inc.*, 547 U.S. 47, 59-62 (2006); *Rust*, 500 U.S. 173 at 200. The Guidelines do not even purport to remedy the compelled speech violation and, as a result, the Policy Requirement remains unconstitutional.

35

The Guidelines' contemplation of relationships between grantee organizations and other organizations does not change the analysis. Even if the members of GHC and InterAction were able to comply with the requirements in the Guidelines, they would still be *compelled* to adopt anti-prostitution policies, applicable to their own privately financed speech. (Daulaire Decl. ¶ 27; Worthington Decl. ¶ 23; Gaye Decl. ¶ 27; Gayle Decl. ¶ 38.) The fact that other, separate, organizations might be free to express opposition to the government's position cannot cure the constitutional infirmity inherent in forcing an independent nonprofit organization to affirmatively speak the government's viewpoint as the price of participating in a government program. *See Rust,* 500 U.S. at 200 (upholding restrictions on speech by recipient of federal funding, but only because funding recipient is not required "to represent as his own any opinion that he does not in fact hold" and because funding recipient remains free to make clear that the forbidden speech "is simply beyond the scope of the program"). *See also O'Hare Truck Service v. City of Northlake*, 518 U.S. 712 (1996) (city could not require tow truck operator to support mayor's re-election in order to receive city business).

Moreover, given the various requirements for receiving funds from Defendants, the compelled speech requirement inevitably will reach their privately financed speech. *See supra* at 35. Thus, both the Policy Requirement and the Guidelines force grantees to speak the government's message not merely with the government's money but also with the grantees' own private money, a portion of which invariably partially funds the grantee entities.

Since the Guidelines continue to compel independent organizations to parrot the government's message in order to receive government funds, the Policy Requirement continues to be unconstitutional.

### 4. The Guidelines Are Impermissibly Vague.

The Guidelines' failure to provide clear guidance to agency officials and organizations that seek funding provides an independent ground on which to grant the preliminary injunction motion filed by GHC and InterAction.[11] An enactment either regulating speech or carrying potential criminal sanctions must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (striking down a permit requirement that delegated "overly broad licensing discretion to a government official"). The Policy Requirement, as implemented by the Guidelines, fails this test in three ways.

First, like the Policy Requirement itself, the Guidelines fail to inform grantees about what type of organizational policy will be viewed as sufficiently "opposed to" prostitution. Second, the Guidelines fail to inform grantees about which activities are "restricted" and must be performed through a separate organization. Indeed, the Guidelines' sole definition of "restricted activities" is entirely circular: the restrictive activities are those "activities inconsistent with a policy opposing prostitution." USAID Guidelines at 3. This vagueness places the members of GHC and InterAction in an untenable position. Pathfinder and CARE, for example, still do not know if the government views their privately funded HIV prevention programs in India, which develop networks of sex workers as "restricted" such that they would have to be run out of a separate affiliate. *See* Pellegrom Decl. ¶ 18; Gayle Decl. ¶¶ 18-23.

---

[11] In granting Plaintiffs AOSI and Pathfinder a preliminary injunction, the Court did not reach Plaintiffs' vagueness claim. *AOSI*, 430 F. Supp. 2d at 276. However, the impermissible vagueness of the Policy Requirement – as implemented by the Guidelines – provides an alternative ground for extending the injunction to the members of InterAction and GHC.

Case 2:05-cv-08209-VM   Document 67-2   Filed 02/08/2008   Page 17 of 19

Third, the Guidelines introduce a wholly amorphous concept into the regulatory scheme. Although the Guidelines require that a grantee be "physically and financially separate" from a group engaging in restricted activities, the Guidelines do not specify what grantees must do in order to maintain such separation and instead reserve the right to make case-by-case assessments based on five non-exclusive factors. *See* discussion *supra* at 28-30. As a result, grantees must comply with all of the five factors to the maximum extent. *See id.*

Bestowing such unbridled discretion on agency officials violates the First Amendment's requirement that restrictions on speech "'contain narrow, objective and definite standards'" so that they do not become a means for suppressing a particular viewpoint. *Transp. Alternatives, Inc. v. City of N.Y.*, 340 F.3d 72, 78 (2d Cir. 2003) (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). In *Transportation Alternatives*, the court struck down a regulatory scheme in which a parks commission reserved the right to base permit fees on both a list of ten factors, and, as here, any other factors it deemed relevant. *Id.* Also like the Guidelines, the rule did not assign any weight to any particular factor. *Id.* Defendants' Guidelines are even worse because they grant agency officials unbridled discretion on three fronts: (i) in applying the list of physical and financial separation factors, (ii) in deciding whether to take any other, as yet undisclosed, factors into account, and (iii) in determining whether an organization's speech is "contrary to the government's message," *see* USAID Guidelines at 2.

Fourth, the Guidelines' vagueness is exacerbated by the vagueness of the individual factors the Defendants will consider in deciding whether grantees and other entities are "physically and financially separate," many of which use terms such as "the extent to which" and "the degree of." *See* discussion *supra* at 29-30.

38

USIDOCS 6548878v2

Because the Guidelines fail to define the restricted speech and activities and introduce yet more undefined concepts into the regulatory scheme, the Policy Requirement remains unconstitutionally vague.

### B. The Members of GHC and InterAction Will Be Irreparably Harmed Absent an Injunction.

In granting a preliminary injunction to AOSI and Pathfinder, the Court found they had demonstrated irreparable injury "[b]ecause the Policy Requirement, as interpreted by the Agencies, prohibits certain expressive activities and compels the Plaintiffs to speak in contravention of the First Amendment . . . ." *AOSI*, 430 F. Supp.2d at 278. Despite Defendants' Guidelines, the members of GHC and InterAction suffer precisely the same irreparable harm.

Absent injunctive relief, the members of GHC and InterAction remain forced to adopt and voice the government's viewpoint, notwithstanding their objections and their missions to prevent and reduce HIV/AIDS. *See* discussion *supra* at 8. Absent an injunction, the members remain unable to speak in the U.S. regarding their privately funded work to fight HIV/AIDS. *See* discussion *supra* at 8-9. For example, CARE, a member of both organizations, remains unable to share with others the lessons on preventing HIV/AIDS that it has learned through its work with sex workers in India and Bangladesh. *See* discussion *supra* at 9. And absent an injunction, the members remain unable to use their private funds to engage in work that might be barred by the Policy Requirement, because the Guidelines bar them from controlling any entity that engages in such work, and because the Guidelines impose such extensive burdens. *See* discussion *supra* at 9-13, 30-31.

In addition to the harm the Policy Requirement causes the members, and the life or death consequences for individuals with HIV/AIDS, InterAction and GHC suffer direct harm to their ability to serve as forums for the exchange of best practices and lessons learned in the fight

against HIV/AIDS. As a result of the Policy Requirement, GHC members have had to curtail their discussions on sex workers and HIV/AIDS policy in GHC's electronic and print publications. (Daulaire Decl. ¶¶ 25-26.) The Policy Requirement also prevents InterAction members from freely discussing best practices at InterAction's meetings and conferences. (Worthington Decl. ¶ 31.)

In light of these direct injuries to the First Amendment rights of GHC and Interaction and their respective members, a preliminary injunction.is warranted.

## CONCLUSION

For the reasons stated herein, this Court should grant Plaintiffs' motion to file a Second Amended Complaint, and the motion of GHC and InterAction for a preliminary injunction.

February 8, 2008

Richard A. Johnston*
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

David W. Bowker (DB 3029)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

\_\_\_\_Rebekah Diller\_\_\_\_
Laura K. Abel (LA 6831)
Rebekah Diller (RD 7791)
David S. Udell (DU 4762)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 992-8635

* admitted *pro hac vice*

*Attorneys for Plaintiffs*

US1DOCS 6548878v2