Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALLIANCE FOR OPEN SOCIETY INTERNATIONAL,  :
INC., OPEN SOCIETY INSITUTE, PATHFINDER
INTERNATIONAL, GLOBAL HEALTH COUNCIL, and  :
INTERACTION                                                    **SECOND AMENDED**
                                                                      : **COMPLAINT**
                        Plaintiffs,
                                                                      : Civil Action No. 05-CV-8209
v.                                                                     (VM) (DF)
                                                                      :

UNITED STATES AGENCY FOR INTERNATIONAL
DEVELOPMENT and HENRIETTA FORE, in her Official  :
Capacity as Administrator of the United States Agency for
International Development, and her successors;

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES and MICHAEL O. LEAVITT, in his
official capacity as Secretary of the U.S. Department of
Health and Human Services, and his successors; and

UNITED STATES CENTERS FOR DISEASE CONTROL
AND PREVENTION and JULIE LOUISE GERBERDING,
in her official capacity as Director of the U.S. Centers for
Disease Control and Prevention, and her successors;

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I.      INTRODUCTORY STATEMENT

      1.        This is a civil action arising under the First Amendment to the United States

Constitution, seeking redress against three agencies of the United States on behalf of entities

whose constitutional rights are violated by a requirement that private organizations based in the

United States adopt the government's ideology opposing prostitution in exchange for the receipt

of U.S. government funding to stop the spread of HIV/AIDS.

      2.        Plaintiffs, all of which are based in the United States, include two non-profit

recipients of U.S. government funding, a not-for-profit charitable foundation affiliated with one

of the recipients, and two non-profit membership organizations representing a broad range of U.S.-based recipients of government funding. Plaintiffs challenge the requirement that they adopt a policy opposing prostitution ("the policy requirement") as violative of the First Amendment in three ways: a) it is unconstitutionally vague, b) it requires grantees to adopt as their own organization-wide policy the ideologically motivated position of the government regarding prostitution, and c) it bars grantees from using their own, non-government funding to engage in protected speech. Plaintiffs also challenge the implementation of the policy requirement by the defendant agencies as being contrary to the governing law.

## II.    JURISDICTION AND VENUE

3.       Subject matter jurisdiction is conferred upon the Court by 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b), (e).

## III.    THE PARTIES

### The Plaintiffs

4.       Plaintiff OPEN SOCIETY INSTITUTE ("OSI") is a charitable trust organized and existing under New York law. It is a private foundation enjoying tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 400 West 59th Street, New York, New York 10019.

5.       Plaintiff OSI is the principal United States-based foundation of the philanthropist George Soros. OSI works to support a network of more than 30 "Soros Foundations," which operate in more than 60 countries worldwide.

6.       In general, Plaintiff OSI and the Open Society network promote democratic governance, human rights, and economic, legal and social reform. On a local level, members of

the network implement a range of initiatives to support the rule of law, education, public health, and independent media.

7.     Plaintiff OSI has received United States Agency for International Development funding in the past, and is interested in preserving its eligibility to receive Global AIDS Act funding from USAID in the future.

8.     Plaintiff ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC. ("AOSI") is a not-for-profit corporation incorporated under Delaware law. It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 400 West 59th Street, New York, New York 10019. It has a branch office in Almaty, Kazakhstan.

9.     Plaintiff OSI established Plaintiff AOSI in July, 2003, as a separately incorporated not-for-profit organization. Among the reasons for AOSI's separate existence are: 1) a desire to concentrate, in a separate vehicle, the expertise OSI and the Open Society network in general have gained in implementing U.S. federal grants, and 2) a desire to coordinate OSI and Open Society network programs in Central Asia.

10.     In October, 2003, Plaintiff OSI agreed to provide Plaintiff AOSI with a five-year grant in the amount of $2,177,700 to support AOSI's work in seeking and implementing U.S. government grants, as well as to support the creation of a Central Asia office of AOSI that would help coordinate Open Society network projects in that region.

11.     Plaintiff PATHFINDER INTERNATIONAL ("Pathfinder") is a non-profit corporation incorporated under District of Columbia law. It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Its primary office is located at 9 Galen Street, Suite 217, Watertown, Massachusetts, 02472-4501.

12.    Pathfinder was founded in 1957 by Dr. Clarence J. Gamble, a private

philanthropist, and was one of the first U.S.-based organizations to address international

population issues.  Working in nearly 30 countries throughout Africa, Latin America, Asia, and

the Near East, Pathfinder's mission is to provide access to quality family planning and

reproductive health services to women, men, and adolescents throughout the developing world.

Pathfinder's philosophy is to provide this assistance with concern for human rights, for the status

and role of women, and from the perspective of the clients it serves.  In addition to its family

planning work, Pathfinder also works to halt the spread of HIV/AIDS, improve maternal and

child health, and prevent unsafe abortions.  It accomplishes these goals by developing

partnerships with local non-governmental organizations, host country governments, the private

sector, and health care providers.

13.    Pathfinder's annual budget, which in fiscal year 2005 totaled more than $76

million, is funded by grants and donations from multiple sources, including Defendants United

States Agency for International Development and the United States Centers for Disease Control

and Prevention, an operating agency of Defendant Department of Health and Human Services.

Pathfinder also receives funds from several agencies of the United Nations, the Swedish,

Canadian, British, and Dutch governments, the World Bank, and numerous foundations,

corporations and individual donors.

14.    Plaintiff INTERACTION is a private, not-for-profit, membership organization

incorporated in New York and enjoying tax-exempt status under Section 501(c)(3) of the Internal

Revenue Code.  Its primary office is at 1400 16th St. NW, Washington, DC.

15.    InterAction was founded in 1984 with the purpose of convening and

coordinating U.S.-based, non-governmental organizations that work in the fields of international

development and humanitarian work. InterAction's mission is to assist its members in improving their own practices and to advocate for policies that benefit its members and the millions of people they serve worldwide. With one hundred and sixty members, InterAction is the largest alliance of U.S.-based international development and humanitarian non-governmental organizations.

16.     InterAction's members, all of which are U.S.-based, tax-exempt organizations under Section 501(c)(3) of the Internal Revenue Code, are headquartered in twenty-five states, including New York. InterAction's member organizations are both faith-based and secular and operate in every country in the developing world. InterAction's members include Plaintiff Pathfinder.

17.     InterAction's member organizations receive more than $1 billion annually from the United States Government. Those funds come primarily through Defendant USAID, although they also come from Defendants United States Department of Health and Human Services ("HHS") and United States Centers for Disease Control and Prevention ("CDC") (collectively "HHS"). InterAction member organizations also receive more than $7 billion in annual contributions from private donors, primarily individuals but also foundations and corporations. Some also receive funds from United Nations agencies, the World Bank, the European Community Humanitarian Office, and national governments, including those of the United Kingdom and France.

18.     As a membership organization, InterAction provides a means through which members can collectively express concerns about U.S. policy. Sometimes, fear of retaliation by U.S. government agencies from which they receive funding prevents members from individually raising concerns about U.S. government policies. Through their membership in InterAction,

5

member organizations can collectively express objections to government policies in anonymity, and thus without such fear.

19.    Twenty of InterAction's members both receive funding subject to the policy requirement and desire to receive that funding without being subject to the policy requirement.

20.    Plaintiff GLOBAL HEALTH COUNCIL ("GHC") is a private, not-for-profit, membership alliance incorporated in Delaware and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  GHC's executive office is located at 15 Railroad Row, White River Junction, VT 05001.

21.    GHC was founded in 1972 under the name "National Council of International Health" as a U.S.-based, nonprofit membership organization with the purpose of identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions and the world health community.

22.    GHC's member organizations include many prominent U.S. non-profit and academic organizations working to alleviate the burden of disease and disability in the middle- and low-income countries.  Individually and collectively, these organizations work to strengthen the ability of developing nations to address the critical problems of HIV/AIDS, child health, women's health, reproductive health, and infectious disease.  GHC's members also include for-profit institutions and individuals based inside and outside the U.S., as well as non-profit organizations based outside the U.S.

23.    As a membership organization, GHC provides a means through which members can collectively express concerns about U.S. policy.  GHC members are often reluctant to publicly criticize the policies of the U.S. government or government agencies from which they receive funding.  Through their membership in GHC, member organizations can collectively

6

express objections to government policies and make recommendations for new or revised policies.

24.    Many of GHC's U.S.-based members administer programs or provide health care services to people with HIV/AIDS or at high risk of contracting the virus, and more intend to administer such programs in the future. Many of the members administering these programs receive funding to carry out HIV/AIDS work both from Defendants and from other, private sources. Twenty-eight of GHC's members both receive funding subject to the policy requirement and desire to receive that funding without being subject to the policy requirement.

### The Defendants

25.    Defendant UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT ("USAID") is an agency of the United States government. Its primary office is located in the Ronald Reagan Building, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20523.

26.    Defendant USAID uses funding provided by Congress for economic, development and humanitarian assistance around the world.

27.    Defendant HENRIETTA FORE is the Administrator of Defendant USAID. Her office is located at Ronald Reagan Building, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20523.

28.    Defendant Fore has responsibility for formulating and implementing USAID policies and practices. She is sued in her official capacity.

29.    Defendant U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS") is an agency of the United States government. Its primary office is located in the Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, D.C. 20201.

30.     Defendant HHS uses funding provided by Congress to develop programs for health protection and to provide human services to Americans in need.

31.     Defendant MICHAEL O. LEAVITT is the Secretary of Defendant HHS. His office is located at Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, D.C. 20201.

32.     Defendant Leavitt has responsibility for developing and implementing HHS policies and priorities. He is sued in his official capacity.

33.     Defendant United States Centers for Disease Control and Prevention ("CDC") is an operating agency of HHS. Its primary office is located at 1600 Clifton Road, NE, Atlanta, GA, 30333.

34.     Defendant CDC uses Congressional funding to prevent and control infectious and chronic diseases and environmental health threats.

35.     Defendant JULIE LOUISE GERBERDING is the Director of Defendant CDC. Her office is located at 1600 Clifton Road, NE, Atlanta, GA 30333.

36.     Defendant Gerberding is responsible for managing and directing the administrative and scientific activities of the CDC. She is sued in her official capacity.

## IV.     THE GLOBAL AIDS ACT

37.     In 2003, Congress passed, and the President signed, the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act" or "Act"), which is codified at 22 U.S.C. § 7601 *et seq.*

38.     The Act implements the President's Emergency Plan for AIDS Relief, which is a five-year global strategy for fighting HIV/AIDS, focusing on education, research, prevention,

treatment and care of persons living with HIV/AIDS. The Act authorizes the appropriation of $3 billion in funding for each of fiscal years 2004 through 2008. 22 U.S.C. § 7671(a).

39.     The funds, which are distributed by Defendants USAID, CDC, and HHS, and by other U.S. government entities, go to many non-governmental organizations based in the United States but doing work abroad ("US NGOs"), including Plaintiffs AOSI and Pathfinder and members of GHC and InterAction. The funds also go to foreign non-governmental organizations ("foreign NGOs"), which often receive the funds as subgrantees of U.S. groups, and to foreign governments and multilateral organizations.

40.     The Act imposes on recipients of funding distributed under the Act two restrictions regarding sex work. The first provision (the "government funds restriction") prohibits funds made available under the Act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care to a sex worker. 22 U.S.C. § 7631(e).

41.     Plaintiffs do not challenge either the government funds restriction or Defendants' implementation of it.

42.     The second restriction (the "policy requirement") provides, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). The Act does not define "opposing prostitution."

43.     During legislative debate on the scope of the policy requirement prior to passage of the Global AIDS Act, Senate Majority Leader Bill Frist stated that "a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the

9

psychological and physical risks they pose for women . . . would satisfy the intent of the provision." 149 Cong. Rec. S6457 (daily ed. May 15, 2003) (statement of Sen. Frist).

44.    While plaintiffs believe it is unconstitutional for the government to force them to adopt a policy position in order to qualify for Global AIDS Act funds, they do not challenge either the requirement that they have a "policy explicitly opposing . . . sex trafficking," or the Defendants' implementation of that requirement.

## V.    USAID'S IMPLEMENTATION OF THE POLICY REQUIREMENT

45.    From February 2004 until June 2005, Defendant USAID did not apply the policy requirement to US NGOs on the advice of the federal Department of Justice ("DOJ"), which had issued a draft opinion stating that enforcement of the policy requirement against organizations based in the United States would be unconstitutional.

46.    Then, in a letter dated September 20, 2004, the DOJ's Office of Legal Counsel withdrew its earlier draft opinion that had declared enforcement of the policy requirement against US NGOs to be unconstitutional, and stated that "there are reasonable arguments to support [the] constitutionality" of the requirement.

47.    USAID, in turn, began applying the policy requirement to US NGOs. USAID did this by issuing a policy directive requiring grantees to have in place "a policy explicitly opposing . . . prostitution and sex trafficking." *See* USAID Acquisition & Assistance Policy Directive 05-04 (June 9, 2005). Neither in this policy directive, nor in any other written document, does USAID either define "explicitly opposing prostitution" or provide clear guidance on what privately funded activities are permissible and impermissible under the policy requirement.

10

## VI.     CDC AND HHS'S IMPLEMENTATION OF THE POLICY REQUIREMENT

48.     Until May 2005, Defendants HHS and CDC did not apply the policy requirement to US NGOs.  Instead, HHS and CDC required that "any foreign recipient" that received funding under the Global AIDS Act have "a policy explicitly opposing, in its activities outside the United States, prostitution and sex trafficking." *See, e.g.,* Implementation of Prevention of Mother to Child Transmission Services in Kenya, 69 Fed. Reg. 35360, 35363 (June 24, 2004).

49.     Beginning on or about May 2005, HHS and CDC began applying the policy requirement to US NGOs.  They required that "any recipient" of funds under the Global AIDS Act must have "a policy explicitly opposing prostitution and sex trafficking." *See, e.g.,* Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment, 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005).

50.     HHS and CDC have not defined the term "explicitly opposing prostitution" nor have they issued guidance to the public explaining which types of activities are permissible and impermissible under this restriction.

51.     HHS and CDC have required all recipients of Global AIDS Act funding to "agree that HHS may, at any reasonable time, inspect the documents and materials maintained or prepared by the recipient in the usual course of its operations that relate to the organization's compliance [with the policy requirement]." *See, e.g.,* Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment, 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005).

11

### VII.    BROAD CONSTRUCTIONS PLACED ON THE POLICY REQUIREMENT

52.    USAID officials and others have placed a number of broad interpretations on the policy requirement.  These interpretations all indicate how broadly observers can construe the policy requirement in the absence of any guidance from USAID.

53.    In a meeting with AOSI and OSI personnel in April 2005, Kent Hill, the acting assistant administrator for global health of Defendant USAID, articulated several broad, but vague, interpretations of the policy requirement, although he emphasized that he could not provide official guidance on the policy.  First, he stated that he believed the policy requirement bars grantees from advocating legalization of sex work, and might bar advocating for too great a reduction in penalties for sex work, or helping to unionize sex workers.

54.    Second, he stated that he thought organizing sex workers to prevent police from brutalizing them might violate the requirement if USAID decided that the work was merely a front for advocating the legalization of sex work.

55.    Third, he stated that he believed even if a group adopted a policy statement that was compliant on its face, that organization could be found to be in violation of the policy requirement if USAID concluded that the organization truly felt sex work should be legalized and that the totality of statements made that clear.

56.    In a subsequent fax from the Mission Director of the USAID Mission to the Central Asia Republics to Plaintiff AOSI, USAID repeated part of Hill's interpretation.  The October 7, 2005, fax stated that two activities -- "advocating for the legalization of the institution of prostitution" and "organizing or unionizing prostitutes for the purposes of advocating for the legalization of  prostitution, as distinct from organizing for the purposes of deterring human rights abuses and addressing public health issues" -- would indicate that an

organization "does not explicitly oppose prostitution." USAID has refused to confirm that these two activities are the only activities barred by the policy requirement.

57.     Even before USAID started applying the policy requirement to Plaintiff AOSI, staff at the Central Asia Republics mission of Defendant USAID cautioned AOSI not to use the term "sex worker" in publicly available documents because that might connote acceptance of sex work. Plaintiffs do not know whether USAID will construe all public use of the term "sex worker" as violating the policy requirement.

58.     Senator Tom Coburn has construed the policy requirement as barring Global AIDS Act grantees from running a program providing educational materials and health and safety training for sex workers. On May 19, 2005 he demanded that President Bush investigate USAID grantee and GHC member Population Services International for engaging in such activities. Sen. Coburn does not charge that the grantee promoted changes in the legal status of sex work. Rather, his complaint seems to be that the grantee uses non-traditional teaching methods to educate sex workers about HIV transmission. On information and belief, Defendant USAID is delaying renewed funding of this program as a result of Sen. Coburn's complaint.

59.     In still another far-reaching interpretation of the policy requirement, on July 15, 2005, 28 members of Congress wrote to Defendant USAID charging that an HIV prevention project carried out by USAID grantee CARE, an InterAction and GHC member, violates the policy requirement because it has "a rights-based" approach to sex work, which the members of Congress interpret as advocating "the legalization of prostitution and its cultural acceptance as a legitimate form of employment." On information and belief, USAID has not yet responded to this allegation.

13

60.     Likewise, some members of Congress have asserted that a debate program for high school and university students run by the Soros Foundation Kazakhstan, which received USAID civic education funding, promoted the legalization of sex work.  Defendant USAID found this assertion to be unfounded.

61.     In another Congressional interpretation of the policy requirement, on December 7, 2005 Representative Mark Souder wrote a letter to the Hon. Andrew Natsios, the then-Administrator of USAID, accusing CARE, a member of both GHC and InterAction, of violating the policy requirement by using private funds to support a tuberculosis prevention program run through an Indian sex worker organization called the Durbar Mahila Samanwaya Committee ("DMSC").  Representative Souder accused CARE of violating the policy requirement by working with and providing private funding to DMSC, which he stated advocates for the decriminalization of adult prostitution.

62.     In June 2006, USAID officers contacted CARE's senior managers in India and Bangladesh to inquire about CARE's relationship with DMSC, which only receives private funds from CARE and is not connected with CARE's USAID- or CDC-funded HIV/AIDS work.

63.     Upon information and belief, Defendants HHS and CDC have made no effort to limit or define the scope of the policy requirement.

## VIII.   THE INTERIM GUIDELINES

64.     In July 2007, Defendants USAID and HHS issued new guidelines purporting to allow recipients of Global AIDS Act funding to use private funds to engage in activities prohibited by the policy requirement, so long as the recipients maintained sufficient separation between those activities and activities funded by the Global AIDS Act.  USAID's guidelines are contained in Acquisition and Assistance Policy Directive 05-04, Amendment 1 (July 23, 2007).

14

HHS's guidelines are contained in a document entitled, Guidance Regarding Section 301(f) of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003, 72 Fed. Reg. 41,076 (July 26, 2007).

65.    The Interim Guidelines continue to require recipients of Global AIDS Act funds to adopt policies explicitly opposing prostitution.

66.    The Interim Guidelines require recipients of cooperative agreements to "have objective integrity and independence from any affiliated organization that engages in activities inconsistent with a policy opposing prostitution and sex-trafficking ('restricted activities')." According to the guidelines, a recipient will satisfy this test if "(1) The affiliated organization is a legally separate entity; (2) The affiliated organization receives no transfer of Leadership Act funds, and Leadership Act funds do not subsidize restricted activities; and (3) The Recipient is physically and financially separate from the affiliated organization."

67.    The Interim Guidelines do not provide clear guidance regarding how a grantee can ensure that it is physically and financially separate enough from an affiliate that engages in "restricted activities." Rather, they list five non-exclusive factors, warning that the agencies "will determine, on a case-by-case basis and based on the totality of the facts, whether sufficient physical and financial separation exists. The presence or absence of any one or more factors will not be determinative."

68.    The five factors that may be considered in determining physical and financial separation are: "(i) The existence of separate personnel, management, and governance; (ii) The existence of separate accounts, accounting records, and timekeeping records; (iii) The degree of separation from facilities, equipment and supplies used by the affiliated organization to conduct restricted activities, and the extent of such restricted activities by the affiliate; (iv) The extent to

15

which signs and other forms of identification which distinguish the Recipient from the affiliated organization are present, and signs and materials that could be associated with the affiliated organization or restricted activities are absent; and (v) The extent to which USAID, the U.S. Government and the project name are protected from public association with the affiliated organization and its restricted activities in materials such as publications, conferences and press or public statements."

69.     The July 2007 USAID and HHS guidelines were issued without either notice or an opportunity for the public to provide comments. Upon information and belief, Defendant HHS intends to begin a notice and comment process by April 2008.

## IX.    HOW THE POLICY REQUIREMENT AND INTERIM GUIDELINES AFFECT THE PLAINTIFFS

### The Effect of the Policy Requirement on Plaintiffs AOSI and OSI

70.     Plaintiffs AOSI and OSI are opposed to the harms that sex work inflicts both on the individuals directly involved and to others in various ways.

71.     Nonetheless, the policy requirement detrimentally affects Plaintiff AOSI and the clients it serves in several ways. If Defendant USAID construes the policy requirement as covering Plaintiff OSI, then the policy requirement detrimentally affects OSI too.

72.     Both AOSI and OSI have, as their principles of governance, an adherence to the principles of an open society, including opposition to adopting any policy positions that would lead to the stigmatization of socially marginalized groups. Adopting a policy opposing sex work violates this principle.

73.     In addition to requiring USAID grantees and contractors to adopt a policy, the policy requirement appears to also require USAID grantees and contractors, including Plaintiff AOSI, to conform their activities to the policy. The policy requirement applies both to activities

16

conducted with government funding and to activities conducted with funding that comes from other sources.

74.     Consequently, the policy requirement places a blanket ban on the use of the private, non-governmental funds possessed by Plaintiff AOSI to do work that Defendant USAID construes as being insufficiently opposed to sex work.

75.     Plaintiffs do not know whether USAID also construes the policy requirement as requiring Plaintiff OSI to conform its activities – including its privately funded activities – to any policy opposing sex work that AOSI may adopt.  On at least one occasion, USAID has indicated that it views OSI as a "partner" in AOSI's USAID-funded work.

76.     AOSI and OSI engage in a significant amount of privately funded activity that could be barred by the policy requirement.  Both are at the forefront of efforts to reduce the spread of HIV/AIDS by working with people who are at particularly high risk of contracting HIV/AIDS and passing it on to others.

77.     In many regions, when the HIV/AIDS epidemic begins it is concentrated in small populations of people, including sex workers, drug users, and others.  When public health officials are able to focus their efforts on those populations, they can stop the epidemic before it spreads to the rest of the population.

78.     In order to stop the epidemic among sex workers it is necessary to approach sex workers and other people at high risk of becoming infected with HIV in a non-judgmental manner, in order to establish a trusting relationship with them and engage them in needed HIV prevention efforts.

79.     Efforts recognized as highly successful in fighting the spread of HIV/AIDS have involved organizing sex workers, or working cooperatively with sex worker organizations.

80.     In some regions, advocating for a change in the legal regime surrounding sex work has been an essential part of fighting the HIV/AIDS epidemic, because when sex workers are subject to high fines, arrest, or violence, they go underground, avoiding doctors, outreach workers, and others who want to provide them with the education, condoms, and other tools they need to avoid becoming infected and infecting others.

81.     As discussed above, Plaintiffs do not know how broadly USAID construes the policy requirement.  However, if USAID construes the policy requirement broadly to bar advocating changes in the legal treatment of sex workers; promoting community organizing among sex workers; or working with, or talking about, sex workers in a non-judgmental fashion, then advocacy of the most successful tactics in the fight against HIV/AIDS may well be forbidden.

82.     For this reason, the government of Brazil, and a number of highly respected US NGOs and foreign NGOs, have turned down USAID funding since implementation of the policy requirement.  Other NGOs operating under the policy requirement have documented the ways in which the requirement is impeding their efforts to fight HIV/AIDS.

83.     Plaintiffs AOSI and OSI are committed to using their private funding to facilitate discussion among public health experts, doctors, social service providers, advocates, government officials, and others regarding the most effective ways to fight the spread of the epidemic in the populations at the highest risk for contracting HIV/AIDS.

84.     For example, OSI's Sexual Health and Rights Program attempts to foster debate regarding policies designed to improve the sexual health and rights of socially marginalized populations, including sex workers, and to encourage the adoption and implementation of the

most effective policies.  It would be difficult for OSI to advocate for a free debate regarding

policies to improve sexual health if it had to stigmatize sex workers.

85.    Likewise, a broad implementation of the policy requirement could prevent OSI

from continuing to promote a publication it has funded, titled *Sex Work, HIV/AIDS, and Human*

*Rights in Central and Eastern Europe and Central Asia,* which recommends that sex work be

decriminalized as a means of protecting sex workers from abuse by law enforcement personnel,

traffickers, and pimps, thus making it easier for sex workers to access the health and social

services they require in order to remain healthy and informed.  OSI does not itself take any

position regarding the contents of the report, or regarding the desirability of changes in the legal

status of sex work.  However, it did provide funding and technical assistance for the Central and

Eastern European Harm Reduction Network, which wrote the report, and it desires to continue

assisting the Network in distributing the report.

86.    AOSI and OSI conduct many other activities potentially affected by a broad

implementation of the policy requirement.  These include:

> a) co-sponsoring conferences in their New York offices, including an October 14,
> 2005 conference entitled, "Sex Work, Sexual Rights and Countering the
> Conservative Sexual Agenda," and a follow-up conference on September 19,
> 2006 entitled  "Sex Work and Human Rights: Promoting Rights-Based
> Perspectives on Sex Work."  The goal of these conferences is to bring together
> members of different advocacy and service delivery communities – such as
> domestic and international groups, and groups working with sex workers and
> victims of trafficking – to discuss key policy issues.  Among the topics of
> discussion  the legal status of sex work;

> b) operating a listserv that provides a forum for participants to share information,
> opinions, and resources related to the health, safety and well-being of sex workers
> in Eastern Europe and the former Soviet Union.  Participants post content
> regarding best practices, service gaps, model legislation, advocacy strategies, and
> new initiatives; and

> c) providing funding and technical assistance to a number of other non-profit
> organizations working with sex workers to fight the spread of HIV/AIDS.

Several of these groups are studying the circumstances in which sex workers work and developing policy recommendations. It is essential that these groups remain free to advocate for the most effective policies, including – where appropriate – changes in the legal treatment of sex workers in order to facilitate outreach to them and ensure their access to needed health care and social services.

87.    There exists a serious risk that AOSI and OSI will be subject to intrusive and unwarranted governmental investigations regarding whether AOSI and OSI are engaged in activities that the investigators construe as insufficiently opposed to sex work.

88.    Plaintiffs AOSI and OSI find the policy requirement to be vague and confusing. They do not know which of their current or future activities Defendant USAID will construe as running afoul of the policy requirement.

89.    Under Acquisition & Assistance Policy Directive 05-04, if a recipient violates the policy requirement, USAID will unilaterally terminate the funding agreement or contract.

90.    Were Defendant USAID to find Plaintiffs AOSI or OSI out of compliance with the policy requirement and unilaterally terminate Plaintiff AOSI's grant, AOSI's clients would suffer.

91.    Were Defendant USAID to find Plaintiffs AOSI or OSI out of compliance with the policy requirement, a danger exists that civil or criminal penalties would be imposed on Plaintiff AOSI for falsely certifying compliance with the requirement.

### AOSI's Decision to Sign the Pledge

92.    AOSI is operating a highly successful, five-year Drug Demand Reduction Program aimed at reducing the use of heroin and other injectable opiates, and stopping the spread of HIV/AIDS, in a region of Central Asia where drug use is rising as a result of rampant drug trafficking and is fueling the spread of HIV/AIDS.

20

93.      AOSI operates this program primarily with a $16,507,402 five-year grant from Defendant USAID.  AOSI contributes some of its non-government funding, and OSI contributes funding, technical assistance, and administrative support.

94.      OSI is not a party to, and has no legal obligations under, the Cooperative Agreement with USAID establishing the Drug Demand Reduction Program.

95.      Since USAID began implementing its policy requirement, the Plaintiffs have been torn between their desire to continue this successful, life-saving work, and their desire to avoid adopting an ideologically driven government policy that will hurt their ability to do their life-saving work with their own funding.

96.      In the spring of 2004, when AOSI's Drug Demand Reduction Program subgrantees based outside of the United States were required to comply with the policy requirement, AOSI adopted the following statement:

> AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways.  AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities.  Rather, our approach is to try to reduce the harms caused by disseminating credible information on questions such as the prevention of disease, and by providing direct public health assistance to vulnerable populations. …

97.      AOSI then wrote to USAID, asking whether this policy statement satisfied the version of the policy requirement then in effect.  USAID responded twice, both times failing to indicate whether the policy was compliant.  In the second response, however, USAID warned AOSI that any failure to comply would be subject to investigation by USAID's Inspector General.

98.      In July 2005, after USAID imposed the policy requirement on US NGOs, AOSI again wrote to USAID, asking whether the policy statement AOSI had adopted in the spring of

2004 satisfied the policy requirement, and also whether USAID would take OSI's activities into account in determining whether AOSI is in compliance.

99.    After receiving that letter, USAID held up releasing the latest installment of funds for the Drug Demand Reduction Program for six weeks, throwing the work of the Drug Demand Reduction Program into disarray.

100.    AOSI finally received a response from USAID on August 2, 2005, stating yet again that it could not provide any guidance regarding whether AOSI's policy satisfies the policy requirement but that AOSI would be subject to sanctions if it failed to comply.

101.    The next day, USAID sent a grant agreement to AOSI, obligating USAID to fund an additional $542,300 for the Drug Demand Reduction Program, but only if AOSI certified its compliance with USAID's policy requirement. In order to restart the flow of USAID funding, and to avoid the harm that clients would suffer if additional components of the Drug Demand Reduction Program were forced to shut down, AOSI decided to sign the certification. It did so after carefully reviewing its own policy and the language of the policy requirement, and assuring itself that, according to its interpretation of the requirement, it was in compliance.

102.    On August 3, 2005, AOSI sent the signed grant agreement to USAID, along with a cover letter reciting the required pledge. In that letter, AOSI stated its belief that the policy it had implemented in the spring of 2004 complies with the policy requirement and that OSI's actions have no bearing on AOSI's compliance or noncompliance with the requirement. Additionally, AOSI reserved its rights "to challenge the policy requirement as violative of the First Amendment and other law." USAID issued an agreement obligating itself to provide enough funding to AOSI to enable the Drug Demand Reduction Program to operate through the

middle of 2006. In subsequent agreements, USAID obligated itself to provide continued funding

for the program.

### The Effect of the Policy Requirement on Plaintiff Pathfinder

103.     In order to be eligible to continue receiving U.S. government funds for

HIV/AIDS work, Pathfinder adopted the following policy in July 2005:

> In order to be eligible for federal funding for HIV/AIDS, Pathfinder opposes
> prostitution and sex trafficking because of the harm they cause primarily to
> women. Pathfinder's HIV/AIDS programs seek to promote effective ways to
> prevent the transmission of HIV/AIDS and to reduce the suffering caused by
> HIV/AIDS. In order to achieve these goals, Pathfinder works with, and provides
> assistance and support to and for, many vulnerable groups, including women who
> are commercial sex workers, who, if not effectively reached by HIV/AIDS
> programs, will suffer and can become drivers of the HIV/AIDS epidemic.

104.     Pathfinder adopted this policy solely in order to remain eligible to receive U.S.

government funding to provide desperately needed HIV/AIDS prevention and care work around

the world. Pathfinder was required to adopt the policy as a condition of receiving funds to

continue its U.S. government-funded work to provide health services in Mozambique, Peru,

Kenya, Tanzania, Botswana, Nigeria and elsewhere.

105.     The policy requirement detrimentally affects Plaintiff Pathfinder and the clients

it serves in several ways.

106.     First, Pathfinder has been forced to stake out a policy position on an issue on

which it wished to remain neutral at this time. Were it not for the mandate in the Global AIDS

Act, Pathfinder would not have adopted the above policy. As an international relief organization

operating in multiple countries, each with their own set of laws and cultures, Pathfinder is

mindful of the need to refrain from taking policy positions without careful study and

deliberation. With the exception of the anti-prostitution policy it adopted to comply with the

policy requirement, its policy positions have been formed only after deeply studying the issue,

primarily by examining its own experience promoting access to health care in the developing world.

107.    Second, Pathfinder has been forced to adopt a policy to comply with a provision that is vague and confusing.  Pathfinder believes it is in compliance with the policy requirement. However, given the lack of guidance from USAID, HHS and CDC as to the requirement's meaning, in the absence of an injunction against operation of the policy requirement it will have to operate in constant fear that defendants USAID, HHS and CDC will apply an overly broad interpretation of the policy requirement to its activities and find it out of compliance with the policy requirement.

108.    Third, Pathfinder engages in a significant amount of privately funded activity that could be barred by an overly broad construction of the policy requirement's blanket ban on the use of the private, non-U.S. government funds possessed by Plaintiff Pathfinder to do work that Defendants construe as being insufficiently opposed to sex work.  Pathfinder firmly believes that it is complying with the policy requirement, but it does not know whether defendants USAID, HHS, and CDC agree.

109.    Much of Pathfinder's HIV/AIDS prevention work is aimed at vulnerable populations, including sex workers.  Pathfinder currently runs programs in Mozambique, India and Brazil to prevent the spread of HIV among sex workers and has in the past run similar programs in Nigeria.  Key to these programs are efforts to organize sex workers and to work cooperatively with existing organizations composed of individuals involved in sex work to promote the health, human rights and well-being of sex workers.

110.    As is common among most international relief organizations, Pathfinder works with local groups to identify their needs and priorities.  Pathfinder seeks to assist local groups,

24

including organizations composed of sex workers, in achieving the goals they have identified within the international framework of their right to health.

111. For example, Pathfinder's privately funded "Mukta" program in India seeks to organize sex workers so that they will collectively agree to engage in HIV prevention methods, such as using condoms. While Pathfinder believes that its organizing of sex workers in India complies with the policy requirement, it fears that defendants USAID, HHS, and CDC may construe the policy requirement in an overly broad manner and subject Pathfinder to penalties should sex worker organizations it has fostered or cooperated with then pursue goals that Defendants view as being inconsistent with opposition to prostitution.

112. Pathfinder's Mukta program also conducts outreach to brothel owners and pimps in an attempt to foster safer sex practices. While Pathfinder conducts this work for the purpose of promoting HIV prevention and assisting the women in the brothels, it also must, at times, secure the trust of brothel owners in order to gain access to the women it is trying to help. Although Pathfinder believes that this outreach does not violate the policy requirement as set forth in the Global AIDS Act, it fears that defendants USAID, HHS and CDC might view this outreach as being insufficiently "opposed to prostitution."

113. Similarly, Pathfinder employee Dr. Carlos Laudari has previously worked with community organizations in Brazil that, as part of their efforts to limit exploitation of sex workers, have sought to change laws and regulations surrounding commercial sex work so that they do not serve as a pretext for brothel owners, corrupt police and others to abuse sex workers.

114. Fourth, Pathfinder engages in a variety of speech in the United States that it could be forced to censor as a result of the policy requirement.

115.    For example, Pathfinder has an active, privately funded advocacy program within the United States that could be forced to censor itself as a result of the policy requirement. Part of Pathfinder's mission is to improve the U.S. policy environment for international family planning and reproductive health programs. Pathfinder accomplishes this by educating U.S. policy-makers and the general public about conditions facing women and their families in developing countries and the impact U.S. policies have on the effectiveness of family planning and HIV/AIDS service delivery. Pathfinder now must ensure that any advocacy it undertakes conforms to the policy requirement.

116.    The policy requirement also affects Pathfinder's ability to publish in the U.S. – on its website and elsewhere – the results of the HIV/AIDS research it conducts and the HIV/AIDS training material it creates.

117.    Likewise, the policy requirement limits Pathfinder's ability to describe its current and past work overseas to potential donors and others in the U.S.

### The Effect of the Policy Requirement on Plaintiffs InterAction and Global Health Council and Their Members

118.    The policy requirement harms Plaintiffs InterAction, GHC, and their members in several ways.

119.    First, the policy requirement forces U.S.-based InterAction and GHC members, which generally prize their independence from the government, to become a mouthpiece for the U.S. government's position on a particular social issue, even when speaking with their private funds. For these members, the adoption of a government-mandated, organization-wide policy on this or any issue violates dearly held principles of independence that are fundamental to their operation as non-governmental organizations.

26

120.     Second, the policy requirement forces InterAction and GHC members to make a

policy statement on an issue on which many wish to remain neutral.  Many members believe that

prostitution causes serious health, psychological, and physical risks for women, and they work to

address those risks and assist women in finding alternatives.  However, these members also

believe that by forcing them to explicitly oppose prostitution, the policy requirement stigmatizes

one of the very groups whose trust they must earn to conduct effective HIV/AIDS prevention

and forces them to approach those engaged in prostitution in what will be perceived as a

judgmental manner.

121.     Third, the policy requirement restricts the ability of U.S.-based InterAction and

GHC members to use non-U.S. government funds to do work that Defendants construe as being

insufficiently opposed to prostitution.  For example, the policy requirement threatens the

privately funded HIV/AIDS prevention work of U.S.-based InterAction and GHC member

CARE with sex worker organizations and networks in India and Bangladesh.  Similarly,

IntraHealth, a U.S.-based GHC member, has been forced to refrain from developing new,

privately funded initiatives to remove barriers to health care for sex workers for fear that such

projects could risk defunding of their USAID- and CDC-funded projects.

122.     Fourth, the policy requirement has caused massive confusion among U.S.-based

InterAction and GHC members over what constitutes compliance with the requirement.  Many of

these members are unsure of what activities and speech they may and may not engage in with

private funds.  Members have received a wide variety of responses by organizations and by

USAID officials to the policy requirement.

123.     Fifth, the policy requirement chills and precludes the policy debate essential to the

functioning of GHC and InterAction as professional associations that depends on the free flow of

27

evidence and opinion among their members to carry out their respective missions of promoting public health and promoting sound international development and humanitarian policy. The Policy Requirement precludes members of GHC and InterAction from freely discussing and sharing the lessons of their HIV prevention work with sex workers at meetings convened by and in publications issued by GHC and InterAction.

## X.    THE EFFECT OF THE INTERIM GUIDELINES

124.    The guidelines issued by Defendants USAID and HHS in July 2007 only exacerbate the problems associated with the policy requirement. They do not answer any of the most basic questions about what Plaintiffs can and cannot say with their private funds and they make the creation of an affiliate prohibitively burdensome.

### A.    Vagueness

125.    The guidelines have only increased Plaintiffs' uncertainty about the speech and activities in which they are permitted to engage under the policy requirement. Significantly, the guidelines offer no guidance about which activities Plaintiffs and the members of GHC and InterAction must conduct through a separate entity.

126.    Moreover, although the guidelines require that Plaintiffs and the members of GHC and InterAction be "physically and financially separate from the affiliated organizations," they do not provide clear guidance regarding how Plaintiffs can ensure that they are physically and financially separate enough.

### B.    The Burdens of Creating a Legally Separate Entity

127.    The guidelines place a prohibitive burden on the ability of Plaintiffs and the members of GHC and InterAction to set up an affiliate that can use private funds to engage in activities otherwise barred by the policy requirement.

128.    By requiring the affiliate to be "a legally separate entity," the Interim Guidelines would force Plaintiffs and the members of GHC and InterAction to register the affiliate in each of the countries in which they operate.  Obtaining approvals from multiple governments to run a second, affiliated organization would be extraordinarily difficult, expensive, and time-consuming, and, in some countries, it would be virtually impossible.

129.    Additionally, Plaintiffs and the members of GHC and InterAction will face difficulties securing visas for American or other foreign employees of the new entity.

130.    The guidelines' requirement of separate management and governance will prevent Plaintiffs and the members of GHC and InterAction from speaking through any affiliate.

131.    The Plaintiffs and members of GHC and InterAction will incur significant expenses of paying for new and separate office space, local staff, foreign staff, necessary vehicles (including customs and tax costs as well as vehicle costs), office equipment, security, telephone and Internet access, and other services.

132.    The Plaintiffs and members of GHC and InterAction will face problems opening new bank accounts in many countries.  Banks may require evidence of registration with and approval by the government, and national laws or regulations may limit the number of bank accounts or even prohibit multiple accounts per organization, per donor, or per project.  Plaintiffs and the members of GHC and InterAction are also likely to face tax burdens.

133.    Plaintiffs and members of GHC and InterAction will also face, as a consequence of complying the guidelines, substantial risk of significantly enhanced suspicion by government, security, intelligence and police authorities in countries concerned that new and separate affiliates are being created in order to evade tax, customs, or other government regulations.

134.     The guidelines will also make it more difficult for Plaintiffs and the members of

GHC and InterAction to raise funds for two reasons.  First, in a highly competitive fundraising

environment, the newly-formed separate affiliates would have no track record of

accomplishment, which potential donors use to decide where to allocate their charitable funds.

Second, the increased administrative costs incurred from dividing the work that a member does

in dozens of countries into new and separate affiliates would likely downgrade a member's

ranking by independent certification organizations that rank charitable organizations, because

those rankings are often largely predicated on how small a percentage of an organization's

budget goes into overhead.

## XI.     CAUSES OF ACTION

135.     The policy requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f);

Acquisition & Assistance Policy Directive 05-04; and as effectuated by CDC and HHS, and the

Interim Guidelines issued thereunder, are unconstitutionally vague, in violation of the First

Amendment and the Due Process Clause of the Fifth Amendment to the United States

Constitution.

136.     The policy requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f);

Acquisition & Assistance Policy Directive 05-04; and as effectuated by CDC and HHS, and the

Interim Guidelines issued thereunder, violate the rights of Plaintiffs under the First Amendment

to the United States Constitution by forcing them to adopt an entity-wide policy opposing

prostitution in exchange for the receipt of government funds.

137.     The policy requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f);

Acquisition & Assistance Policy Directive 05-04, and as effectuated by CDC and HHS, and the

Interim Guidelines issued thereunder, violate the rights of Plaintiffs under the First Amendment

to the United States Constitution by imposing the policy requirement on the funding that the Plaintiffs receive from sources other than the U.S. government.

138.    Any application by Defendants of the anti-prostitution policy requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f), to require a policy statement broader than the policy statement that plaintiff AOSI implemented in the spring of 2004 and plaintiff Pathfinder International adopted in the summer of 2005 is not in accordance with the Global AIDS Act and should be held unlawful pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702, 706(2)(A).

139.    Any application by Defendants of the anti-prostitution policy requirement contained in the Global AIDS Act, 22 U.S.C. § 7631(f), to bar the Plaintiffs from engaging in particular activities because they are perceived as being insufficiently opposed to sex work is not in accordance with the Global AIDS Act and should be held unlawful pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702, 706(2)(A).

WHEREFORE, Plaintiffs respectfully request the Court to:

(1) declare that USAID's application to Plaintiffs AOSI and Pathfinder, the U.S.-based members of Plaintiffs InterAction and GHC, and other US NGOs of the policy requirement contained in Acquisition & Assistance Policy Directive 05-04 and Interim Guidelines violate the First and Fifth Amendments to the United States Constitution;

(2) declare that the application by HHS and CDC to Plaintiff Pathfinder, the U.S.-based members of Plaintiffs InterAction and GHC, and other U.S.-based organizations of the policy requirement and Interim Guidelines violates the First and Fifth Amendments to the United States Constitution;

(3) grant appropriate preliminary, and final, equitable relief

31

(a) barring Defendants from enforcing the Policy Requirement against Plaintiffs AOSI and Pathfinder and the U.S.-based members of Plaintiffs InterAction and GHC, and

(b) barring USAID, HHS and CDC from enforcing the policy requirement against any U.S.-based organization; and

(4) grant such other and further relief as the Court shall deem proper, including the award of reasonable attorneys' fees and costs.

Dated: New York, New York
February 8, 2008

Rebekah Diller (RD 7791)
Laura K. Abel (LA 6831)
David S. Udell (DU 4762)
BRENNAN CENTER FOR JUSTICE
  AT NYU SCHOOL OF LAW
161 Avenue of the Americas,
  12th Floor
New York, NY 10013
(212) 992-8635

Richard A. Johnston*
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

David W. Bowker (DB 3029)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

*Attorneys for Plaintiffs*

\* admitted *pro hac vice*