UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC., OPEN SOCIETY
INSTITUTE, and PATHFINDER INTERNATIONAL,

                    Plaintiffs,

                                                    DECLARATION OF
                                                    NILS DAULAIRE

                    -against-
                                                    05-Civ.-8209 (VM)

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.*,

                    Defendants.
------------------------------------------------------------

                    I, NILS DAULAIRE, hereby declare as follows:


        1.        I am the President and Chief Executive Officer of the Global Health

Council ("GHC").  I have held that position since 1998.

        2.        I make this declaration in support of Plaintiffs' motion seeking leave to

amend the Complaint and GHC's  motion for a preliminary injunction.


                            **The Global Health Council**

        3.        GHC is a private, not-for-profit, membership alliance incorporated in

Delaware and enjoying tax-exempt status under Section 501(c)(3) of the Internal

Revenue Code.  GHC's executive office is located at 15 Railroad Row, White River

Junction, VT 05001.  It has a second office dedicated to global health policy at 1111 19th

Street, NW – Suite 1120, Washington, D.C. 20036.

4.      GHC was founded in 1972 under the name "National Council of International Health" as a U.S.-based, nonprofit membership organization with the purpose of identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions and the world health community.

5.      GHC's member organizations operate in at least 116 countries. GHC member organizations include many prominent U.S. non-profit and academic organizations working to alleviate the burden of disease and disability in the middle- and low-income countries. Individually and collectively, these organizations work to strengthen the ability of developing nations to address the critical problems of HIV/AIDS, child health, women's health, reproductive health, and infectious disease. Many GHC members are heavily engaged in HIV/AIDS prevention, treatment and care in the effort to save lives, relieve suffering, empower communities and build local health capacity.

6.      GHC has 485 members that are organizations, of which approximately 259 are based in the United States.  Of those, approximately 228 are non-profits (including associations, foundations, and non-governmental organizations); 24 are for-profits; and 21 are colleges and universities.  GHC also has one U.S.-based governmental entity as a member, the John E. Fogarty International Center.  In addition, GHC has 4,564 individual members, who include practitioners in health professions and students studying to become professionals, of which 3,904 are based in the United States.

7.      GHC's mission is to ensure that all who strive for improvement and equity in global health have the information and resources they need to succeed.  Essential to

fulfilling the GHC's mission as a professional association is our ability to create a safe and inviting space in which GHC members can opine on and debate important issues of public health, especially issues that are controversial. To that end, the GHC holds, on an almost weekly basis, conferences, forums, briefings, dinners and other events at which GHC members and guests share information, experiences and opinions. As a science-based professional association, GHC's most basic responsibility is to protect the ability of its members to carry out robust debate in the forums provided by GHC. Laws and policies that chill the ability of GHC members to bring evidence and opinion to bear on public health issues therefore inherently vitiate the fundamental rationale for GHC's existence.

8.       GHC further realizes its mission by serving as a convener and host for member coalitions focused on specific issues. These coalitions include the Global AIDS Roundtable, the HIV/AIDS Implementers Work Group, the Neglected Tropical Diseases Coalition, the Malaria Roundtable and the Tuberculosis Working Group. GHC also plays an important role in other coalitions, such as the International Family Planning Coalition, the U.S. Child Survival Coalition and the Stop TB Coalition. HIV/AIDS is a prominent topic in most of these coalitions, since its impact is felt in many domains, including opportunistic infections, pediatric AIDS and reproductive health. These forums provide a vehicle for sharing information and coordinating evidence-based advocacy in favor of health policies that will most advance desired health outcomes. The free flow of information within the coalitions is essential to evolving policy recommendations that reflect the field experience and research of the members. GHC and its members engage in dialogue and advocacy with Congress and government agencies, such as Defendant

United States Agency for International Development ("USAID"), to inform the
government about pressing international health problems and to share evidence as to what
policies help or hinder improved health.  As the world's largest membership alliance
dedicated to improving health throughout the world, GHC has over 30 years of
experience informing the public and the government about critical health issues in the
developing world and advocating for effective U.S. foreign assistance for health.

9.      As a membership organization, GHC provides a means through which
members can collectively express concerns about U.S. policy.  GHC members are often
reluctant to publicly criticize the policies of the U.S. government or government agencies
from which they receive funding.  Through their membership in GHC, member
organizations can collectively express objections to government policies and make
recommendations for new or revised policies, without being publicly identified.  As
explained below, these fears are warranted, because GHC members have, in the past,
been subjected to criticism by members of Congress and other public officials for their
policy positions, particularly in regards to prostitution and other controversial issues.

10.      GHC has the responsibility of advocating for the needs and views of its
members.  GHC's primary advocacy priority areas are HIV/AIDS, children's health,
women's health, infectious disease, health systems and health equity.  GHC is in constant
consultation with its members individually and through the roundtables and coalitions
described above.  GHC reaches its policy positions through these consultations and its
review of the relevant evidence.  On a daily basis, GHC is engaged in dialogue with
authorizing and appropriations committees in Congress on issues of global health.  GHC
also engages in advocacy with multilateral organizations such as UNAIDS, the Global

Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, and other UN agencies. GHC advocates for sufficient investment in health, policies based on scientific evidence, increased access to essential services by populations that are most under-served, and effective management of health programs.

11.     Many of GHC's U.S.-based members administer programs or provide health care services to people with HIV/AIDS or at high risk of contracting the virus, and more intend to administer such programs in the future. Some of these programs expressly target sex workers or include sex workers within their general scope. Many of the members' programs targeting sex workers have a proven track record in reducing HIV infection and providing treatment to those with the virus and have led to significant advances in understanding the physical, cultural, and socioeconomic underpinnings of the AIDS epidemic. Many of the members administering these programs receive funding to carry out HIV/AIDS work both from defendants and from other, private sources. Some examples of U.S.-based member organizations that receive both government and private funds are: EngenderHealth, *see* Declaration of Maurice Middleberg dated August 12, 2005, ¶ 4; plaintiff Pathfinder International, *see* Declaration of Daniel E. Pellegrom dated February 7, 2008, ¶ 7; CARE, *see* Declaration of Helene Gayle dated February 6, 2008, ¶¶ 3, 8; and IntraHealth, *see* Declaration of Pape Gaye dated January 25, 2008, ¶ 7.

### The Global AIDS Act Restrictions

12.     GHC members, including many based in the U.S., execute a number of programs funded by Defendants USAID and HHS, including programs funded by the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

13.     The Global AIDS Act contains a "government funds restriction" which prevents funds made available under the act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care and related services to prostitutes.  22 U.S.C. § 7631(e).  GHC does not herein challenge the government funds restriction.

14.     The Global AIDS Act also contains a "policy requirement" providing, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

15.     USAID did not enforce the policy requirement against U.S. NGO grantees until 2005.  However, starting in 2003, U.S. NGO's have been required to include a clause in all subagreements with foreign organizations stating that, as a condition of entering the subagreement, the foreign organization has "a policy explicitly opposing, in its activities outside of the United States, prostitution and sex trafficking."  Upon information and belief, HHS also did not enforce the policy requirement against U.S.-based non-governmental grantees for at least some of the period between the enactment of the Global AIDS Act and May 2005.

16.     Then, in June 2005, USAID applied the policy requirement to U.S. NGOs by issuing USAID Acquisition & Assistance Policy Directive 05-04 dated June 9, 2005 ("AAPD 05-04").  Neither in this policy directive, nor in any other written document, does USAID either define "explicitly opposing prostitution" or provide clear guidance on what privately funded activities are permissible and impermissible under the policy requirement.

17.     Similarly, beginning on or about May 2005, HHS began applying the policy requirement to U.S. NGOs.  HHS has not defined the term "explicitly opposing prostitution" nor has it issued guidance to the public explaining which types of activities are permissible and impermissible under this restriction.

18.     HHS and CDC have required all recipients of Global AIDS Act funding to "agree that HHS may, at any reasonable time, inspect the documents and materials maintained or prepared by the recipient in the usual course of its operations that relate to the organization's compliance [with the policy requirement]."  *See, e.g.,* "Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment," 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005), annexed to the Declaration of Daniel E. Pellegrom dated December 7, 2005 as Exhibit A.

### How the Policy Requirement Harms GHC and its Members

19.     From the moment of its adoption to the present, GHC and its members have been concerned about the policy requirement.  GHC has followed the progress of the plaintiffs' lawsuit from its inception.  GHC initially hoped that our direct involvement in the lawsuit would not be necessary because the plaintiffs had brought a facial challenge to the policy requirement.  Had that challenge been successful, GHC members would have benefited from it.  However, when the Court ruled solely on the plaintiffs' as-applied challenge and Defendants continued to enforce the policy requirement against all GHC members other than Pathfinder, GHC realized that it was necessary for us to participate in the lawsuit in order to obtain relief for our members.

20.    In the summer of 2006, GHC sought permission from the Court to file a motion to join this case and obtain relief for its members. At the Court's request, GHC surveyed its members in the fall of 2006 to determine how many desired relief from the policy requirement. Twenty-eight members both received funding subject to the policy requirement and desired to receive that funding without being subject to the policy requirement. Eighteen of those 28 members wished to remain anonymous. Some members were afraid to respond to the survey and/or seek relief in the context of this lawsuit for fear that their identities would be exposed and that they would face retaliation from the Defendants, upon whom they rely for substantial funding.

21.    Those members were warranted in their fears, because the policy requirement has subjected U.S.-based GHC members to intense scrutiny from members of Congress, who read the policy requirement extremely broadly and are quick to claim our members are violating it. For example, in a letter dated July 15, 2005 to the Hon. Andrew Natsios, then-Administrator of USAID; Representative Mark Souder (R-IN); and 27 other members of Congress accused GHC member CARE, which is based in the U.S., of violating the policy requirement by promoting a "rights-based" approach to prostitution, which the signatories incorrectly equate with advocacy for the legalization of prostitution and its cultural acceptance as a legitimate form of employment. In the same letter, the members of Congress also accused GHC member International Center for Research on Women, which is also based in the U.S., of holding a "pro-prostitution" stance.

22.    In a subsequent letter dated December 7, 2005 to the Hon. Andrew Natsios, Rep. Souder again accused GHC member CARE of violating the policy

requirement by providing funding to an Indian organization that he said advocates for the decriminalization of adult sex work. In June 2006, USAID officials made inquiries to CARE about its association with this organization, to which CARE provides private funding in connection with a tuberculosis prevention program. *See* Declaration of Helene Gayle dated February 6, 2008, ¶¶ 20-21.

23.     GHC and its members are harmed by the policy requirement in several ways, each of which is discussed in greater detail in the following paragraphs: 1) The policy requirement chills debate in GHC-sponsored meetings and publications and therefore fundamentally undermines GHC's role as a professional association; 2) the policy requirement restricts the use of private funds by GHC's members; 3) the policy requirement compels members to adopt a policy and forces them to speak; and 4) the policy requirement is vague, and as such does not provide sufficient guidance for members to comply.

### 1.     Chilling Debate in GHC-Sponsored Forums

24.     GHC does not receive funds from the United States government, including the Global AIDS Act. Yet GHC is grievously harmed by the Act. The Act's deliberate chilling of free speech by our member organizations vitiates our core mission as a scientific and professional organization that promotes the free exchange of evidence, experience, analysis and opinion among our members. The harm to GHC exemplifies the wide-reaching, pernicious consequences of restricting the marketplace of ideas. The government has a hypothesis that criminalization of sex work assists in HIV prevention. The government then adopts the position that contrary evidence or experience gained by

organizations actually implementing the Leadership Act may not be communicated in

scientific forums organized by their professional association –GHC – or in any other

forum even using non-federal funds. Though the GHC is not party to any agreement with

the US government, GHC members receiving Global AIDS Act funds cannot freely

communicate their experience, evidence or views to GHC staff.  Nor, using non-federal

funds, can they communicate freely with fellow GHC members at forums organized by

the GHC.  Restrictions on speech are dangerous because they deprive the listener as the

well as the speaker of the benefit of diverse views.  In this instance, GHC is precluded

from receiving the honest expression of the field experience of our members, though the

GHC receives no funds from the US government.

   25.  The policy requirement chills and precludes the scientific and policy

debate essential to the functioning of the GHC as a professional association. The position

of the U.S. government that sex work should be criminalized is hotly contested in the

global health profession.  There is substantial contrary evidence in the professional

literature (*see*, for example, M. L. Reckart, "Sex-Work Harm Reduction," *The Lancet*

Vol. 366 (December 17/24/31, 2005): pp. 2123-2134.).  The policy requirement also

stands in opposition to the views expressed by multilateral organizations, including

UNAIDS.  Many of our members disagree, as a public health matter, with the view that

sex work should be criminalized.  Other members do not wish to take a public position on

the legal status of sex work.  However, the policy requirement bars from federal funding

any member organization that fails to support the U.S. government position or presents

evidence or experience at a GHC forum that contradicts the U.S. government position.

GHC members who, on the basis of evidence and experience, do not agree with the U.S.

government position but wish to access U.S. government funds are not permitted to express that view or share relevant evidence at GHC scientific meetings or with GHC staff. This is a fundamental harm to the GHC, which depends on the free flow of evidence and opinion among its members to carry out its mission. This harm can only be redressed by protecting all our members from fear of retaliation for expressing their views at GHC scientific meetings and other forums.

26.    The GHC manages multiple electronic and print publications, including a weekly newsletter, monthly newsletter, a magazine (Global HealthLink) and a newspaper (AIDSLink, which is devoted exclusively to HIV/AIDS). These publications are principally intended as an outlet for expression of member news, experience and opinion. The policy requirement precludes members from expressing a point of view contradicting that of the U.S. government in GHC publications for fear of being barred from federal HIV/AIDS funds. The chilling effect of the policy requirement on the expression of member viewpoints on AIDS policy in GHC publications is a direct harm to GHC. Redress of this harm requires that all our members be granted immunity against being disbarred from U.S. government funds as a result of expressing opinion in GHC publications.

### 2.    Restricting the Use of Members' Private Funds

27.    The policy requirement vitiates members' freedom to utilize private funds in the way they believe best advances public health. The Defendants' ban on the use of the non-U.S. government funds possessed by GHC members to do work that Defendants construe as being insufficiently opposed to prostitution restricts members from engaging

in speech and HIV-prevention activities with their private funds.  The vagueness of the

policy requirement, and Defendants' refusal to clarify what private activities grantees

must abstain from, forces GHC's members to refrain from engaging in any activities that

could possibly be construed as insufficiently opposed to prostitution.  For this reason,

U.S.-based GHC members have reported to GHC a pattern of self-censorship and

reluctance to discuss programs for sex workers in public or for attribution.

28.    GHC does not support the U.S. government's view that sex work must be

criminalized.  It is possible that the policy requirement could be construed as barring

GHC members from making privately funded contributions to GHC in order to avoid

indirectly subsidizing our viewpoint.

29.    As a result of the policy requirement, U.S.-based GHC member

IntraHealth International has been forced to refrain from developing new, privately

funded initiatives to remove barriers to health care for sex workers, for fear that such

projects could risk defunding of their USAID- and CDC-funded projects.  *See*

Declaration of Pape Gaye dated January 25, 2008, ¶ 30.

30.    Were GHC member and plaintiff Pathfinder International not protected by

the preliminary injunction this Court issued in 2006, it would be significantly chilled in

its groundbreaking, highly successful work organizing sex workers in India to further

HIV/AIDS prevention.  This work is described in greater detail in the declaration by

Daniel Pellegrom accompanying this motion.

### 3.    Compelling Speech

31.    The third way in which GHC and its members are harmed by the policy

requirement is that it forces the members to espouse the U.S. government's policy

position on a sensitive political issue.  While the U.S. government clearly believes that criminalizing prostitution is the best and only way to protect women and sexual health, as a public health matter that point of view is disputed by many in the global health profession.

32.    Many of GHC's U.S.-based members believe that prostitution causes serious health, psychological and physical risks for women, and they work to address those risks and assist women in finding alternatives.  However, they also believe that by forcing the members to explicitly oppose prostitution, the policy requirement stigmatizes one of the very groups whose trust they must earn to conduct effective HIV/AIDS prevention and forces them to approach those engaged in prostitution in a judgmental manner.  As a public health matter, they believe that this interferes with their HIV/AIDS prevention work.

33.    Moreover, many U.S.-based members are aware that Defendants have construed the policy requirement as prohibiting advocacy for the elimination of criminal penalties against women engaged in prostitution.  Because GHC members operate under a variety of legal regimes around the world, many members are loathe to adopt a policy that directly contradicts the policy of some of the countries in which they work.

34.    Were it not for the policy requirement, many of GHC's U.S.-based member organizations would not have adopted policies explicitly opposing prostitution. These include the organizations that stated in response to our member survey that they oppose the policy requirement.   It is common practice in the field of international development to refrain from taking policy positions unless those positions flow naturally from the experience of providing services.  For GHC's members, the adoption of a

government-mandated, organization-wide policy infringes on the independence that is fundamental to their operation as non-governmental organizations.

35.     For example, U.S.-based GHC member EngenderHealth has articulated a concern that being forced to adopt the government's policy may jeopardize its work in Brazil. *See* Declaration of Maurice Middleberg dated August 12, 2005, ¶ 15. Because the area of reproductive health is so sensitive, EngenderHealth risks alienating some funders or partners in its work by taking any policy position on the issue of prostitution, which in turn risks threatening the effectiveness of their HIV/AIDS prevention work.

### 4.     Vagueness

36.     The final way in which GHC and its members are harmed is that the policy requirement is confusing and vague and therefore imposes extra administrative costs. Many U.S.-based members are unsure of what activities and speech they may and may not engage in with private funds. Members have reported that USAID missions have been inconsistent in applying the language of the policy requirement. Some members have reported that local USAID missions in countries in which they operate have demanded to see an organization's policy opposing prostitution while others have reported that missions did not demand to see the policy. Some members have reported that, in the absence of guidance from the Defendants, primary recipients of U.S. government funds have inserted their own language in subcontracts about what constitutes compliance with the policy requirement.

37.     One U.S.-based GHC member had to spend months of scarce staff time and resources in discussion with USAID to reinstate a grant after it had been withdrawn

under pressure from U.S. legislators. Because the requirements of the policy are vague, USAID was able to withdraw and reinstate the grant according to political pressure, forcing our members to commit scarce resources to allay the political fears of USAID.

38.     Another U.S.-based GHC member was forced by the local USAID mission to commit scarce resources to training local service providers to comply with the policy requirement.

**The Affiliate Guidelines Do Not Remedy the Harm to GHC And Its Members**

39.     USAID and HHS have issued guidelines with regard to the establishment of "affiliated" organizations that could express an opinion on sex work different from the U.S. government-mandated opinion. Such affiliated organizations must be legally, physically, and financially separate. Factors used in determining whether the affiliate is separate from the entity receiving Leadership Act funds include the existence of separate personnel, management, and governance; separate accounts, accounting records, and timekeeping records; separate facilities, equipment and supplies; distinct signs and other forms of identification which distinguish the Recipient from the affiliated organization; and "protecting" the U.S. Government and the project name from public association with the affiliated organization. The guidelines caution that meeting these conditions would not necessarily constitute compliance with the Leadership Act, but that each instance would be considered on case by case basis.

40.     These guidelines were issued without opportunity for comment. GHC would have issued strong objections to these guidelines had an effort been made by the government to solicit informed views.

41.     The guidelines were issued without any accompanying analysis as to the burden placed on organizations receiving funds under the Leadership Act. No estimate of any kind is provided as to the likely costs and barriers to meeting the conditions.

42.     No effort was made to inquire of the affected organizations as to whether the guidelines would create a realistic opportunity to express positions differing from the government mandated opinion.

43.     The guidelines do not provide clear criteria for the creation of an affiliated organization. They quite clearly caution that an organization meeting all the criteria and factors could still be considered out of compliance and fail to meet some unstated "case by case" test. The guidelines also fail to explain how much weight will be given to each factor in the analysis of whether an affiliate is in compliance. Most importantly, the guidelines fail to achieve their essential purpose; they make no effort to clarify the vague prohibition from the original law and, in fact, only make the contours of that prohibition more unclear.

44.     Significantly, the guidelines appear to bar GHC's members from controlling any organization that uses private funds to engage in speech barred by the policy requirement. One of the five criteria to be taken into account in determining whether enough separation exists is "[t]he existence of separate personnel, management, and governance." This criterion appears to bar our members from using their private money to engage in the forbidden speech through another organization. In this way, the guidelines fail to provide our members with an avenue for constitutionally protected speech.

45.     Even if a GHC member were able to transfer its private funds to an affiliate, and to use those funds to speak through that affiliate, doing so would be logistically and financially difficult, and perhaps impossible.  In order for a GHC member to speak freely with its private funds, it would have to create an affiliate organization in every country in which it operates.  Creating affiliates that will maintain the legal, financial, and physical separation from the parent organizations that the guidelines require will present very heavy burdens on GHC's member organizations.  Even if GHC members were to limit their creation of affiliates just to those countries in which they might express an opinion differing from the U.S. government view on sex work, the requirements would still be heavily burdensome.  These burdens virtually preclude any member from actually developing an affiliate as demanded by the government.

46.     The legal separation mandated by the guidelines imposes heavy costs on GHC's member organizations in terms of time, effort, and money.  In many of the developing countries where GHC's member organizations operate, starting a new NGO is a complex and arduous process.  The NGO must secure the approval of the local government to register, which typically involves complex negotiations with multiple ministries.  That process takes a great deal of time by the NGO's employees and requires the help of attorneys, whose fees the NGO must pay.  Moreover, it is far from a foregone conclusion that the governments of developing countries will approve the registration of affiliates whose only purpose is to satisfy a US government requirement for expressing a point of view.

47.     Even if the registration of the affiliate is approved, it is likely to be very difficult to staff the new entity with the separate personnel required by the guidelines.  If

the new affiliate tries to hire citizens of the United States or of a third country, it will have difficulty securing visas and work permits. The governments of developing countries grant such authorization to secure essential expertise, not to import persons whose job is necessitated by restrictions on the advocacy functions of existing organizations. Local employees are hard to find in many countries either because the requisite skills will not be available or because national staff feel vulnerable to political and other pressures if they espouse unpopular points of view.

48.     Our members will also incur enormous costs recruiting and employing a second, redundant set of employees. It is extremely expensive for our members to hire expatriates or third country nationals to staff their offices. In the case of expatriate employees, members generally pay for such expenses as each employee's moving and housing costs, their children's education, and bringing the family home for visits.

49.     Establishing and operating a physically separate office will also be extremely expensive for our members, who must pay for security, office equipment, furnishings and other items for each office. Additionally, in some developing countries where GHC members operate, technological equipment such as computers, printers, satellites, and networking supplies must be imported. This is not only expensive, but requires the members to work through detailed local customs laws for a second time. It also requires paying for computer set-up and operation (often including installing the necessary wiring and satellite dishes) in a second office.

50.     Another difficulty created by the guidelines is the requirement that the board of directors of the parent NGO be entirely separate from the board of the affiliate. Boards of Directors are the final authority over and control GHC member organizations.

The affiliates, then, would also be controlled by their separate and independent boards. If the premise behind the creation of the affiliate is to create a way for the parent to speak its intended message through another source, this requirement runs counter to the achievement of that ostensible goal. The affiliate having a separate board will make it impossible for the parent NGO to have control over the affiliate and thus control over the message coming from that affiliate. This requirement, then, could again leave the parent NGO with no outlet for its intended message.

51.    The financial separation mandated by the guidelines is equally onerous for members. Since no commingling of funds is allowed between the parent organization and the affiliate, the affiliate would be required to raise all its own funds, starting from nothing. This is a difficult and time consuming process. Fund raising is already extremely challenging for GHC members. The new affiliates would have to allocate valuable man-power and resources towards fund raising and away from achieving the organizations' objectives. The affiliates would have to convince potential donors to give money before the organization has a track record of work to showcase to potential donors. To raise requisite funds, it is very likely that the affiliate will need to draw on the pre-existing donor pool of the parent NGO. Since there is only a finite amount of money donors are willing to give to NGOs, this will deprive the parent organization of much needed funds.

52.    The legal, governance, and financial challenges pose an insuperable burden for our members. The practical consequence will be to bar GHC members from expressing a point of view through any organizational vehicle. The Government proposes that a non-profit organization divert scarce resources from their primary mission of

addressing the HIV/AIDS pandemic and other critical health and poverty alleviation programs to rent or buy facilities, hire a separate staff, create an independent Board, develop separate accounting systems, and create a new, distinct identity *so that it may express an opinion on an issue of public policy*. Even undertaking all these actions may not suffice given the ambiguity of the case-by-case test in the guidelines. The government has created an extremely high and unreasonable hurdle for organizations to surmount.

53.    Even if the legal, governance and financial hurdles could be surmounted, the creation of an affiliate divorced from the rest of the existing organization's program implementation undercuts its utility as an advocate of a point of view. To the extent that groups would have to cordon off sex work advocacy from other programs it would force NGOs to have an artificial separation between advocating policy positions and the practical experience of implementing programs from which their policy positions derive. The utility of NGOs in the policy arena stems largely from their unique vantage point. The positions they advocate come from experience gained on the ground and from their understanding of the true consequences of policies formulated in far away capitals. A forced dichotomy between the NGOs that implement and those that advocate undermines the utility of our members as bridges between policy makers and the complex realities encountered while implementing programs.

54.    More fundamentally, the affiliate guidelines in no way alleviate the central harm to the Global Health Council. As stated above, the very rationale for the existence of the GHC as a professional organization is to create forums at which our members may come and freely share opinions based on the evidence and experience derived from their

work.  We emphasize that this means the work of the organizations actually

implementing the HIV/AIDS programs, not some arms-length affiliate that does not have

the same governance, management, staff, expertise or evidence as those actually

implementing programs.  GHC is, above all, a place at which organizations that

implement programs share the reality that they encounter in the field, including how

public policy affects program implementation.  The anti-prostitution policy requirement

prevents those implementing the HIV/AIDS Leadership Act from providing informed

comment to each other and to the GHC as to the assumptions and impacts of the Act.  For

example, GHC is soon hosting its annual conference.  There, Pathfinder will have a

poster session – a booth with information and a staffer to speak with -  called "Condoms

and Health Care: Sex Workers Need More."  Pathfinder can speak freely at the event

because they have the protection of the injunction, but other conference attendees would

not be able to have poster sessions that engage interested parties in a free and open

exchange of ideas on sex work for fear of violating the policy requirement. The GHC is

therefore robbed of its ability to encourage informed dialogue among its members. The

GHC is prohibited from hearing the views of the members implementing the Global

AIDS Act if those views differ from the government-approved opinion. Any member

receiving Global AIDS Act funds risks losing those funds by communicating a dissenting

opinion to the GHC or at a GHC-sponsored forum.  This means that the GHC cannot

offer Congress or the executive branch an accurate rendering of the experience and

evidence derived from its members if they differ from government-sanctioned opinion.

The creation of  "affiliates" does not address these fundamental damages to the GHC

since we are still barred from hearing the untrammeled views of our members.

55.     For all the above reasons, the anti-prostitution policy requirement constitutes a grievous and irremediable harm to the Global Health Council and our members.  We therefore ask the intercession of the Court to prevent application of the policy requirement to GHC's members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February __6__, 2008
Washington, District of Columbia

_____
Nils Daulaire

21