UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. *et al.*,

                       Plaintiffs,

        -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.,*

                    Defendants.
-------------------------------------------------------------

                         05-CV-8209 (VM) (DF)

                         DECLARATION OF
                         DANIEL E. PELLEGROM

       I, DANIEL E. PELLEGROM, hereby declare as follows:

       1.      I am, and have been since 1984**,** the President of Pathfinder International ("Pathfinder").

       2.      I submit this declaration in support of the Plaintiffs' motion for leave to amend the Complaint and the motion of InterAction and Global Health Council for a preliminary injunction.

I.       <u>Pathfinder International</u>

       3.      Pathfinder is a non-profit corporation incorporated under District of Columbia law.  It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue Code.  Its primary office is located at 9 Galen Street, Suite 217, Watertown, Massachusetts 02472-4501.

       4.      Pathfinder was founded in 1957 by Dr. Clarence J. Gamble, a private philanthropist, and it was one of the first U.S.-based organizations to address international population issues.  Pathfinder's mission is to provide access to quality family planning and reproductive health services to women, men, and adolescents throughout the developing world.

In addition to its family planning work, Pathfinder also works to halt the spread of HIV/AIDS, improve maternal and child health, and prevent unsafe abortions.  It accomplishes these goals by developing partnerships with local non-governmental organizations, host country governments, the private sector, and health care providers.  Pathfinder's governing philosophy is to provide this assistance with concern for human rights, for the status and role of women, and from the perspective of the clients it serves.

5.      Pathfinder operates in the following 27 countries:  Angola, Bangladesh, Bolivia, Botswana, Brazil, Burundi, Colombia, Ecuador, Egypt, Ethiopia, Ghana, Guatemala, Guinea, India, Kenya, Moldova, Mozambique, Nepal, Nigeria, Papua New Guinea, Peru, South Africa, Southern Sudan, Tanzania, Uganda, Vietnam, and Yemen.

6.      Pathfinder's Watertown, Massachusetts office plays a significant role in conceiving of, funding, supervising, evaluating, and otherwise overseeing Pathfinder's international work.

7.      Pathfinder's annual budget, which for fiscal year 2008 totals $89 million, is funded by grants and donations from multiple sources, including Defendants United States Agency for International Development ("USAID") and the United States Centers for Disease Control and Prevention ("CDC"), an operating agency of Defendant Department of Health and Human Services ("HHS").  Pathfinder also receives funds from several agencies of the United Nations, the Swedish, Canadian, and Dutch governments, the World Bank, and numerous foundations, corporations and individual donors.

8.      In the following 18 countries, Pathfinder receives funding from sources other than the US government to operate projects that do not receive any Global AIDS Act funding: Angola, Bangladesh, Bolivia, Brazil, Colombia, Ecuador, Ghana, India, Kenya, Mozambique,

Nigeria, Papua New Guinea, Peru, South Africa, Southern Sudan, Tanzania, Uganda and Vietnam.

II.    The Global AIDS Act Restrictions

9.    Pathfinder carries out a number of programs funded by Defendants USAID and CDC that are encumbered by restrictions contained in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

10.    The Global AIDS Act contains a "government funds restriction" prohibiting funds made available under the Act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care and related services to prostitutes.  22 U.S.C. § 7631(e).

11.    Pathfinder rigorously complies with the government funds restriction and does not challenge it herein.

12.    The Global AIDS Act also contains a "policy requirement" providing, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

13.    In June 2005, USAID applied the policy requirement to Pathfinder and other U.S. non-governmental organizations ("US NGOs") by issuing USAID Acquisition & Assistance Policy Directive 05-04 dated June 9, 2005.  Similarly, beginning on or about May 2005, HHS and CDC began applying the policy requirement to Pathfinder and other US NGOs.

14.    USAID, HHS, and CDC have not defined the term "a policy explicitly opposing prostitution," nor have they issued guidance to the public explaining which activities are permissible and impermissible under the policy requirement.

15.     HHS and CDC have required all recipients of Global AIDS Act funding to "agree that HHS may, at any reasonable time, inspect the documents and materials maintained or prepared by the recipient in the usual course of its operations that relate to the organization's compliance [with the policy requirement]."

16.     In July 2007, Defendants USAID and HHS issued new guidelines permitting recipients of Global AIDS Act funding to transfer private funds to a legally, financially, and physically separate entity over which they exercise no control, which can then engage in activities that would otherwise run afoul of the policy requirement.  USAID's guidelines are contained in Acquisition and Assistance Policy Directive 05-04, Amendment 1 (July 23, 2007). HHS' guidelines are contained in a document entitled, Guidance Regarding Section 301(f) of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003, 72 Fed. Reg. 41,076 (July 26, 2007).

17.     Although the guidelines purport to allow recipients such as Pathfinder to spend their private funds to engage in speech free of the policy requirement's restrictions, in fact they reserve the right to penalize recipients for speech of third party organizations over which they exercise no control.  The guidelines require recipients to "have objective integrity and independence from any affiliated organization that engages in activities inconsistent with a policy opposing prostitution and sex-trafficking ('restricted activities')."  According to the guidelines, a recipient will satisfy this test only if: "(1) The affiliated organization is a legally separate entity; (2) The affiliated organization receives no transfer of Leadership Act funds, and Leadership Act funds do not subsidize restricted activities; and (3) The Recipient is physically and financially separate from the affiliated organization."  As I describe below in further detail, whether a recipient is sufficiently "physically and financially separate" depends on a five-factor

4

test which assesses, among other things, whether the recipient exercises control over the other organization.

18.    The July 2007 USAID and HHS guidelines were issued without either notice or an opportunity for the public to provide comments.  On December 14, 2007, counsel for the Defendants sent a letter to this Court stating that HHS will provide a notice of proposed rulemaking regarding the policy requirement guidelines "within four months, which will be followed by a public comment period."

19.    Pathfinder must comply with the policy requirement, as modified by the guidelines, as a condition of continuing its USAID-funded programs that include HIV/AIDS components.  Among these programs are one project to increase the use of child survival and reproductive health services in Mozambique and another to extend service delivery for reproductive health services globally.

20.    Pathfinder must also comply with the policy requirement as a condition of subcontracts it holds with other development organizations to carry out USAID-funded work, for example a program to improve HIV/AIDS policies in Nigeria.

21.    Pathfinder also must comply with the policy requirement as a condition of continuing its CDC-funded work to implement a program to prevent mother-to-child HIV transmission in Kenya, to expand home-based care programs for HIV-positive persons in Tanzania, and to expand psychosocial and peer counseling services in Botswana.

### III.    Pathfinder's Policy

22.    Solely in order to comply with the policy requirement, and to remain eligible to receive U.S. government funding to provide desperately needed HIV/AIDS prevention and care work around the world, in July 2005, Pathfinder adopted the following policy:

> In order to be eligible for federal funding for HIV/AIDS, Pathfinder opposes prostitution and sex trafficking because of the harm they cause primarily to women. Pathfinder's HIV/AIDS programs seek to promote effective ways to prevent the transmission of HIV/AIDS and to reduce the suffering caused by HIV/AIDS. In order to achieve these goals, Pathfinder works with, and provides assistance and support to and for, many vulnerable groups, including women who are commercial sex workers, who, if not effectively reached by HIV/AIDS programs, will suffer and can become drivers of the HIV/AIDS epidemic.

IV.    How the Policy Requirement Harms Pathfinder

23.    The pledge requirement hurts Pathfinder and the clients it serves, both by compelling Pathfinder to espouse the government's point of view and by limiting Pathfinder's speech and activities.

A.    Compelling Speech and Mandating Viewpoint

24.    Pathfinder has been forced to stake out a policy position on an issue on which it wished to remain neutral at this time. As an international development organization operating in multiple countries, each with its own set of laws and cultures, Pathfinder is mindful of the need to refrain from taking policy positions without careful study and deliberation. With the exception of the anti-prostitution policy it adopted to comply with the policy requirement, Pathfinder's policy positions have been formed only after deeply studying an issue, primarily by examining its own experience promoting access to health care in the developing world. Were it not for the mandate in the Global AIDS Act, Pathfinder would not have adopted its anti-prostitution policy.

25.    Moreover, because the policy requirement is vague and confusing, Pathfinder has no way of knowing whether the policy it has adopted complies with the requirement. To my knowledge, neither the Global AIDS Act nor any of the Defendants has defined what it means to

have a policy "explicitly opposing prostitution." I do not know what Defendants mean by this phrase.

26.     Pathfinder believes its policy does comply with the policy requirement. However, given the lack of guidance from USAID, HHS, and CDC as to the requirement's meaning, Pathfinder fears that if the preliminary injunction is lifted Defendants USAID, HHS, and CDC will apply an overly broad interpretation of the policy requirement to Pathfinder's policy and find Pathfinder out of compliance with the policy requirement.

27.     The guidance adopted by Defendants USAID and HHS in July 2007 does not absolve Pathfinder of the requirement that it adopt a policy "explicitly opposing prostitution." Although it permits Pathfinder to transfer private funds to a legally, financially, and physically separate entity over which Pathfinder exercises no control, which can then engage in activities that would otherwise run afoul of the policy requirement, Pathfinder itself continues to remain obligated to maintain a policy "explicitly opposing prostitution" so long as it accepts any Global AIDS Act funds from Defendants.

28.     That policy necessarily governs not only Pathfinder's use of federal funds, but also the entire Pathfinder entity. Pathfinder must get funds from sources other than Defendants, because Defendants require it to do so to be eligible even to apply for funding. For example, a USAID regulation requires U.S.-based NGOs such as Pathfinder to "solicit[ ] and receive[ ] cash contributions from the U.S. general public" in order to be eligible to receive certain USAID funding. *See.* 22 C.F.R. § 203.3(b) (organization may register as a U.S. private and voluntary organization, a requirement for many cooperative agreement grants, only if it raises funds from the U.S. public). USAID requires that fully 20 percent of the support for Pathfinder's international work come from non-US government sources. *See* USAID, Frequently Asked

Questions, *available at* http://www.usaid.gov/pubs/sourcebook/usgov/faqs.html (accessed Jan. 4, 2008), attached hereto as Exhibit A.  The policy requirement dictates how these private funds can and cannot be used.

B.    <u>Limiting Pathfinder's Speech and Activities</u>

29.    Pathfinder engages in a significant amount of activity not funded by the U.S. government that could be affected by an overly broad construction of the policy requirement.  Currently, this Court's preliminary injunction allows Pathfinder to conduct this work.  Pathfinder believes that even if the preliminary injunction is lifted, a proper interpretation of the policy requirement would permit it to continue engaging in this work.  However, because the policy requirement itself uses vague and confusing language, and because Defendants have refused to clarify what it means, Pathfinder does not know whether Defendants USAID, HHS, and CDC agree that all of Pathfinder's work is permissible under the policy requirement.  Consequently, if the preliminary injunction is lifted, I will need to ensure that Pathfinder refrains from engaging in any activities that could possibly be construed as insufficiently opposed to prostitution, even if Pathfinder itself does not view the activities that way.

1)    <u>Work with vulnerable populations</u>

30.    One category of activities Pathfinder engages in that might be barred by an overly broad construction of the policy requirement concerns Pathfinder's HIV/AIDS prevention work aimed at vulnerable populations, including sex workers.  In Brazil, India, and Mozambique, Pathfinder currently uses funding solely from sources other than the U.S. government to prevent the spread of HIV among vulnerable groups including sex workers.  In the past, it has run similar programs in Nigeria.  One strategy that Pathfinder has found to be highly effective is to organize sex workers and to work cooperatively with existing sex worker organizations to promote their

health and human rights.  Pathfinder engages in this work because, like most international

development organizations, it works with local groups, including organizations composed of sex

workers, to identify their needs and priorities and then to achieve the goals they have identified

within the international framework of their right to health.

a)    <u>India</u>

31.     For example, Pathfinder's privately funded Mukta program in India seeks to

organize sex workers so that they will collectively agree to engage in HIV prevention methods,

such as using condoms.  While Pathfinder believes that its organizing of sex workers in India

complies with the policy requirement, it fears that Defendants USAID, HHS, and CDC may

construe the policy requirement in an overly broad manner and subject Pathfinder to penalties

should sex worker organizations it has fostered or cooperated with then pursue goals that

Defendants view as inconsistent with opposition to prostitution.

32.     In March 2007, Mukta held a convening that brought together more than 1,800

sex workers from Maharashtra to discuss rights, empowerment, and HIV/AIDS prevention.

Among the topics the attendees discussed were the human rights of sex workers and their

interactions with the police and other government officials.  If the preliminary injunction were

not in place, Pathfinder could have faced possible charges that it was violating the policy

requirement for hosting a convening at which the participants spoke so freely.

33.     Pathfinder's Mukta program also conducts outreach to brothel owners and pimps

in an attempt to foster safer sex practices.  While Pathfinder conducts this work for the purpose

of promoting HIV prevention and assisting the women in the brothels, it also must at times gain

the trust of brothel owners in order to gain access to the women it is trying to help.  Although

Pathfinder believes that this outreach does not violate the policy requirement as set forth in the

9

Global AIDS Act, it fears that Defendants USAID, HHS and CDC might view this outreach as being insufficiently "opposed to prostitution."

b) <u>Brazil</u>

34. A second project affected by the policy requirement is work performed by Pathfinder employee Dr. Carlos Laudari in Brazil.  In Brazil, Dr. Laudari provides technical assistance in capacity building.  As part of this work, he serves as a facilitator in strategic planning to various associations including some sex worker associations.  For example, in late February 2008, Dr. Laudari plans to serve as a facilitator at Brazil's National Consultation on Prostitution, HIV/AIDS and Human Rights.  It is likely that participants in the meeting will discuss the vulnerability of prostitutes to rights violations by the police, pimps and others.  Participants may well recommend that prostitution be de-penalized in order to decrease this vulnerability.  Were Pathfinder not under the protection of the preliminary injunction, Dr. Laudari would need to censor his speech at the convening to ensure that his involvement did not bring Pathfinder into violation of the policy requirement.

2) <u>Pathfinder's speech and advocacy in the U.S.</u>

35. In addition to inhibiting Pathfinder's work with vulnerable populations, including sex workers, the policy requirement would limit Pathfinder's speech and advocacy within the U.S. if the preliminary injunction were lifted.  Pathfinder engages in a variety of types of speech within the U.S.

36. For example, part of Pathfinder's mission is to improve the U.S. policy environment for international family planning, reproductive health programs, and HIV/AIDS service delivery.  Pathfinder accomplishes this by educating U.S. policy-makers and the general

10

public about conditions facing women and their families in developing countries and the impact

U.S. policies have on the effectiveness of family planning and HIV/AIDS service delivery.

37.    As part of this work, Pathfinder has attended two conferences sponsored by

plaintiff the Alliance for Open Society International and the Open Society Institute in the past

few years to discuss the policy requirement, and its effect on the ability of Pathfinder and other

organizations to engage in HIV/AIDS prevention abroad.

38.    Also as part of this work, Pathfinder is a member of the Global Health Council

and InterAction.  At meetings, and through other Global Health Council and InterAction

activities, Pathfinder is able to educate other NGOs about its work, and to join with them in order

to further its advocacy goals.

39.    Were the preliminary injunction lifted, Pathfinder would have to ensure that any

advocacy it undertakes conforms to the policy requirement.  For example, while Pathfinder may

wish to discuss its experience doing HIV/AIDS prevention work in Brazil and India, because this

program included work with local organizations that advocated to change the legal treatment of

sex work, Pathfinder could be barred from freely discussing the lessons of this work.

40.    There are two upcoming occasions at which Pathfinder anticipates having to

engage in such discussions.  The first involves activity on Capitol Hill regarding the

reauthorization of PEPFAR, which is due to occur in 2008.  Pathfinder staff anticipate

participating in meetings or briefings with other advocates and members of Congress and their

staff, and possibly testifying before Congress.  The second occasion will come this spring, when

defendant HHS solicits public comment regarding the affiliate guidelines at issue in this case.

Pathfinder anticipates submitting comments during that process.  In both instances, Pathfinder

expects to discuss its experience working with sex workers, and the importance of allowing

NGOs to work with sex workers who advocate for changes in the legal regime regarding sex work. Were the preliminary injunction not in place, the policy requirement would chill Pathfinder's ability to engage in this work.

41.    The policy requirement also affects Pathfinder's ability to publish in the U.S. – on its website and elsewhere – the results of the HIV/AIDS research it conducts and the HIV/AIDS training materials it creates. For example, in 2004 Pathfinder produced a handbook funded by the Canadian International Development Agency, called "The Nigeria HIV/AIDS Responsive Fund (NARF) Handbook on Incorporating Gender and Human Rights in HIV/AIDS Training," the relevant pages of which are attached as Exhibit B. Pathfinder continues to make the handbook available to interested people in Nigeria, the U.S., and elsewhere through its website. Were the preliminary injunction lifted, it is possible that the Defendants would construe the policy requirement broadly to bar Pathfinder from distributing this handbook, because it discusses "laws proscribing sex work" as a human rights factor making women particularly vulnerable to HIV, and lists "legislation" and "government policies" as "possible contents of HIV/AIDS mitigation training." See Exhibit B, pp. 34, 39.

42.    Likewise, Pathfinder staff regularly attend conferences in the U.S., sponsored by Global Health Council, the American Public Health Association ("APHA"), InterAction and other groups, at which they discuss their ongoing work, including their HIV/AIDS prevention work and research among sex workers and their clients. For example, Pathfinder plans to present 14 papers at the upcoming 35th Annual International Conference on Global Health, sponsored by the Global Health Council, which will be held in May, 2008. One of those papers, titled "Condoms and Health Care:  Sex Workers Need More," will be based on the work of Pathfinder's Mukta project with sex workers in India. Pathfinder staff presented another paper

based on the work of the Mukta project at the November 2007 meeting of the APHA. An abstract of that paper, entitled, "Men Behind the Menace: An Ethnographic Study of Male Clients of Female Sex Workers in the Wake of the HIV/AIDS Epidemic in India," is attached as Exhibit C. Were the preliminary injunction lifted, Pathfinder would have to censor its speech at these conferences to ensure that none of its presentations could be construed, even inadvertently, as being insufficiently opposed to sex work.

43.     Finally, were the preliminary injunction not in place, the policy requirement would affect Pathfinder's ability to describe its current and past work overseas to potential donors and others in the United States. For example, Pathfinder maintains an extensive website – run out of its U.S. headquarters – describing the work of its many overseas projects. This website plays a key role in educating donors in the U.S. and elsewhere about our ongoing and past work. Among other items on that website is a detailed description of the organizing work Pathfinder's Mukta project does with sex workers, including the March 2007 conference I describe above and a January 2007 meeting at which Mukta brought together policemen and sex workers to reduce the historically "tense relations" between sex workers and police "[d]ue to the air of illegality surrounding the sex worker profession." These web pages are attached to this declaration as Exhibit D.

44.     The website also posts Mukta's newsletter, which describes those meetings and Mukta's other ongoing work with, and outreach to, sex workers, the police, brothel owners, and others. The most recent version of Mukta's newsletter is attached as Exhibit E. Were the preliminary injunction not in place, Pathfinder could be required to censor all descriptions of Mukta's work on its website.

V.    The Burdens Imposed by the Guidelines

45.    The guidelines issued by Defendants USAID and HHS in July 2007 only exacerbate the problems associated with the policy requirement.  They do not answer any of the most basic questions about what Pathfinder can and cannot say with our private funds and they make the creation of an affiliate prohibitively burdensome.

A.    Vagueness

46.    The guidelines have only increased Pathfinder's uncertainty about the speech and activities in which it is permitted to engage under the policy requirement.  Significantly, the guidelines offer no guidance about which activities Pathfinder must conduct through a separate entity.

47.    Moreover, although the guidelines require that Pathfinder be "physically and financially separate from the affiliated organizations," they do not provide clear guidance regarding how Pathfinder can ensure that it is physically and financially separate enough.  Rather, they list five factors, warning that the agencies "will determine, on a case-by-case basis and based on the totality of the facts, whether sufficient physical and financial separation exists.  The presence or absence of any one or more factors will not be determinative."  As President of Pathfinder, I recognize that, given the enormous financial and even criminal penalties that may flow from a violation of the policy requirement and its guidelines, the only prudent course would be for Pathfinder to maintain very great separation between its activities and the activities of any affiliate that engages in activities barred by the policy requirement.  Although Defendants might conceivably permit a lesser level of separation, I have no way of knowing that without risking grave consequences for the entire organization.

48.     The guidelines' vagueness is exacerbated by the vagueness of the individual factors the Defendants will consider in deciding whether Pathfinder and any other entity are "physically and financially separate," many of which use terms such as "the extent to which" and "the degree of."  For example, among the five factors are:  a) "[t]he degree of separation from facilities, equipment and supplies used by the affiliated organization to conduct restricted activities," b) "the extent of such restricted activities by the affiliate," c) "[t]he extent to which signs and other forms of identification which distinguish the Recipient from the affiliated organization are present, and signs and materials that could be associated with the affiliated organization are absent," and d) "[t]he extent to which [Defendants], the U.S. Government and the project name are protected from public association with the affiliated organization and its restricted activities in materials such as publications, conferences and press or public statements."   I do not know how much of any of these factors is too much.  As a result, if the preliminary injunction is lifted I will need to ensure that Pathfinder complies with each factor to the maximum extent.

B.     Legally separate entity

49.     In addition to being vague, the guidelines place an extremely heavy burden on Pathfinder's ability to set up an affiliate to use private funds to engage in activities otherwise barred by the policy requirement.

50.     For example, the guidelines require that the affiliate be "a legally separate entity." Setting up an affiliate in each of the 27 countries in which Pathfinder operates – or even in each of the 18 countries in which Pathfinder operates programs that receive no PEPFAR funds – would be extraordinarily difficult, expensive, and time-consuming.

15

51.     In some of the countries where Pathfinder operates, it would be virtually impossible to obtain permission to set up a new affiliate, particularly one dedicated to policy advocacy or to the always controversial activity of working with sex workers, or one funded primarily with money coming from the United States.

52.     Even when Pathfinder is able to obtain legal permission to operate a new affiliate, it will be difficult or impossible to obtain funding for such an affiliate.  Whether Pathfinder seeks government or private funds for its initiatives, it must compete against other organizations also wishing to obtain the funding.  Government and private funders alike favor organizations with a proven track record – one that has experience both doing the types of work we seek funding to do, and operating in the countries in which we propose to operate.

53.     Pathfinder tends to be highly competitive in this regard because we have been operating worldwide for over half a century.  We have vast experience, and are able to describe our significant successes, in providing family planning and reproductive health services, halting the spread of HIV/AIDS, improving maternal and child health, and preventing unsafe abortions. We also have a long tenure, and extensive and close relationships, in most of the 27 countries in which we currently operate.  Whether Pathfinder continues receiving Global AIDS Act funds and shifts its private funds to an affiliate, or whether Pathfinder continues using its private funds itself and shifts its Global AIDS Act funds to a new affiliate, the affiliate will lack Pathfinder's proven substantive expertise and deep ties in the 27 countries where Pathfinder operates.

54.     Indeed, if Pathfinder tries to shift its Global AIDS Act funds to an affiliate so that Pathfinder can continue engaging in activities otherwise permitted by the policy requirement, that affiliate will be statutorily barred from receiving Global AIDS Act funds for at least 18 months.  The Foreign Assistance Act provides that the United States' foreign assistance

programs should be carried out "by such private and voluntary organizations and cooperatives as have demonstrated a capacity to undertake effective development activities."  22 U.S.C. § 2151u(a).  In accordance with this statutory obligation, USAID bars non-profits from registering as private voluntary organizations (as they must do to get funded) until they have been incorporated for at least 18 months.  22 C.F.R. § 203.3(f)(4).

55.    Even after the 18-month bar is over, the affiliate will continue to be at a severe competitive disadvantage in obtaining Global AIDS Act funding, because Defendants evaluate funding proposals from Pathfinder and other entities based in part on the experience possessed by the potential recipient.  USAID's own internal guidelines for grant distribution require USAID to take "past performance" into account in evaluating a funding proposal.  USAID, ADS 303.3.6.3.  Accordingly, every USAID application requires us to describe our past performance on other, similar projects.  *See, e.g.*, USAID, Request for Applications Number USAID-Tanzania-08-001-RFA, pp. 5, 18.  CDC also examines our past work.

56.    So long as we are able to operate as Pathfinder, our past performance will continue to make us highly competitive.  For example, in reviewing a proposal that the CDC awarded to Pathfinder in 2004 to expand home-based care for people living with HIV/AIDS in Tanzania, CDC lists as strengths Pathfinder's experience working in the country since 1995, engaging in similar work in other parts of the country, and relationships with US government partners and NGOs.  CDC, Summary Statement, Program Announcement # 04208, pp. 2-5, attached as Exhibit F.  CDC relied on a similar evaluation of Pathfinder's track record in awarding us a cooperative agreement to work in Botswana.  CDC, Summary Statement, Program Announcement 04256, pp. 1-3 (Aug. 24, 2004), attached as Exhibit G.  A new affiliate, unable to rely on this track record, will be unable to compete successfully for Defendants' funding.

57.    If Pathfinder keeps its Global AIDS Act funding, its new affiliate will still be at a competitive disadvantage, this time in seeking non-U.S. government funding.  Like Defendants, the private funders who underwrite Pathfinder's work do so in large part because of our proven track record.  For example, in announcing a $690,000 grant to Pathfinder for a new leadership training program for individuals to help reduce maternal mortality and morbidity and improve young people's sexual and reproductive health in Nigeria, the John D. and Catherine T. MacArthur Foundation wrote, "Pathfinder International, with its long track record in running successful training programs in the field, is well-positioned to help Nigeria build leadership to ensure this happens."  See Exhibit H.

C.    The Five-Factor Physical and Financial Separation Test

58.    As mentioned above, because it is impossible for me to know how much weight Defendants will place on each of the five factors to be weighed in determining whether Pathfinder maintains sufficient physical and financial separation from an affiliate engaging in work otherwise barred by the policy requirement, I would need to ensure that Pathfinder maintains as much separation as possible from any such affiliate.  This would impose severe burdens on Pathfinder's exercise of its First Amendment rights.

1)    Separate personnel, management and governance

59.    The first factor considered in assessing physical and financial separation is "the existence of separate personnel, management, and governance."

a)    Separate personnel

60.    The separate personnel requirement will, in some instances, make it impossible for Pathfinder to do its work and, in all instances, will make it prohibitively more expensive for Pathfinder to operate.

18

i.    <u>Duplicate headquarters staff</u>

61.    To understand the severe burdens the separate personnel requirement would impose on Pathfinder it is necessary to understand how Pathfinder operates.  In order to coordinate its worldwide operations, reduce its worldwide overhead, and ensure that even its smallest and most remote projects are as technically proficient as possible, Pathfinder maintains personnel at its headquarters in Massachusetts who carry out the following functions for, and in coordination with, our field offices:  human resources, resource development (including fundraising), accounting and other financial administration, information technology services, and substantive technical expertise.  For example, our headquarters human resources staff hire senior staff for the field offices, and also any employees who are not residents of the country in which the field office is located.  For small field offices, the human resources staff sometimes does all or part of local hires as well, including by reviewing resumes of local job applicants, checking references, conducting interviews, and making job offers.  The human resources staff also does the following for the field offices:  a) drafts job descriptions, b) conducts country-specific compensation surveys, c) puts together country-specific salary and benefits packages for senior staff and often for other staff too, d) reviews the local employment laws, e) creates country-specific employment handbooks, and f) administers benefits.  When necessary, headquarters human resources staff travel to the field offices to do such tasks as recruiting, conducting job interviews, and counseling local employees.

62.    Similarly, our headquarters information technology staff run a worldwide computer network in which the field offices participate.  They protect the network against spam and viruses, and do other necessary work to ensure that it runs smoothly.  They also arrange for wiring in the field offices, set up computer equipment in those offices, arrange for software

licenses, and do whatever trouble-shooting is necessary on an ongoing basis. When necessary, they travel to the field offices to perform these tasks.

63.    Our headquarters technical services staff, which consists of highly trained professionals with expertise in the substantive work carried out by our field offices, provide substantive assistance to our field offices. For example, we employ: a) a nurse midwife who trains health care providers in our field offices about how to conduct trainings, b) monitoring and evaluations experts who help field office staff design and implement monitoring and evaluation programs to assess the success of their own projects, c) HIV/AIDS experts, and d) an adolescent reproductive health specialist.

64.    Other headquarters staff review and approve all office leases, help open and monitor bank accounts, raise funds from government and private sources, and administer our contract and grant relationships with our funders, subgrantees, and suppliers.

65.    By providing such extensive support to our field offices, we are able to operate high quality programs with very little overhead. This is essential to our ability to carry out our mission, because if we had to spend more of our funding on overhead we would have less available for our programmatic goals.

66.    Moreover, keeping our overhead low is essential to our ongoing fundraising efforts. Fundraising is a competitive business. Given a choice between an organization with high overhead and one with lower overhead, both government and private donors will choose the latter. For this reason, many potential donors ask us how we calculate our overhead, and why it is as high as it is. We hear particular concerns about high overhead from our smaller funders, who want their funding to go to achieving program goals, not to overhead.

67.     Indeed, in my experience raising funds for Pathfinder, I have seen that non-profit ratings published by websites such as Charity Navigator and Charity Watch play an increasing role in our donors' funding decisions.  On those websites, the percentage of budget going to overhead plays a large role in determining how a nonprofit will be rated.

68.     Accordingly, we have worked hard to bring our overhead down as low as possible.  Approximately seven years ago, our overhead was almost 23 percent. At the time, we heard from many funders that our overhead was too high. Today, in large part because of the process efficiencies implemented at our headquarters and increased program support funds, our overhead is 13 percent.  This has made it far easier for us to compete for funding.

69.     One measure of this is the ratings we have received.  We have received four stars – the highest possible score – from Charity Navigator, whose rating of Pathfinder is attached as Exhibit I.  We have received an A+ -- the top rating – from the Charity Watch program run by the American Institute of Philanthropy, whose rating of Pathfinder is attached as Exhibit J.  The Better Business Bureau, whose rating of Pathfinder is attached as Exhibit K, has certified that we meet all 20 of its Standards for Charity Accountability.  The low percent of budget we spend on overhead plays a large role in each of those designations.

70.     If we had to establish a separate affiliate program, we would be faced with a terrible choice, either of which would impose enormous burdens on the organization.  One option would be for us to replicate all of the functions of our headquarters in a second headquarters, leaving us with two duplicative headquarters, each of which would serve fewer (or smaller) programs.  Salary costs alone would make it prohibitively expensive to operate two separate sets of headquarters staff, but there would be other costs too.  For example, our headquarters staff frequently travel to the field offices to attend regional meetings of senior staff, to establish

computer networks and bank accounts, to help with computer problems, employee hiring or other personnel issues, or to provide substantive technical assistance.  If we had two sets of headquarters staff, each serving a separate but parallel set of field offices, we would have to pay for twice as many trips abroad by our headquarters staff, which would be extremely expensive. In these ways, the overhead costs of each organization would be significantly increased.

71.    The other option would be to reduce the size of the headquarters staff for each organization, and require the field offices to take on the tasks that headquarters currently does. This, too, would increase our overhead, because we would lose the efficiencies we currently gain by centralizing so many functions.  Moreover, we simply could not afford to replicate each headquarters function in each field office, and so we would have to function without much of the expertise our field offices currently benefit from.

ii.    <u>Duplicate field offices staff</u>

72.    In addition to duplicating our headquarters staff, we would have to duplicate our field office staff.  Duplicating the head of each field office (called the "country representative") would be difficult or impossible in most instances.  For each country, we try to hire as our representative and senior management the people with the best experience both working in that particular country or region, and carrying out the particular types of programs that field office runs.  This is the only way to make our funding applications competitive, because we must state on our funding applications who our country representative and other key people will be, and funders place great weight on their qualifications.  If another organization has a country representative and other key personnel who are more experienced than ours, they are likely to be funded instead of us.

22

73.     For example, in its funding application guidelines, Defendant USAID asks applicants to designate the "Project Director/Chief of Party" for that project, as well as several other positions that it deems "key positions."  It designates the specific expertise needed for those positions, and warns that USAID reserves the right to approve those personnel.  According to USAID, the skills, expertise and experience of the key personnel are one factor in evaluating applications.  Attached to this declaration, as Exhibit L, are the relevant pages from an example of one such set of funding guidelines, for a USAID project in Tanzania.

74.     Likewise, in evaluating an application we submitted in 2004 for a program in Tanzania that we were eventually awarded, and that is still underway, Defendant CDC designated the qualifications of our key personnel as strengths, writing, "Proposed staff members are local with a wide range of skills and a wealth of experience working with other United States Government partners and NGOs.  Professional personnel involved with this project have 5-18 plus years of experience in the HIV/AIDS universe of OI/HIV/STD."  The relevant pages of this CDC document are attached as Exhibit M.

75.     Moreover, our country representatives and other senior staff must be able to implement a program the moment it is funded, because our funders will not pay for training or start-up time.  As a result, if either Pathfinder or a new affiliate were unable to use our current country representatives and senior staff, and had to hire new ones, it would be at a severe fundraising disadvantage.

76.     In some of the countries in which Pathfinder operates, maintaining two sets of personnel is impossible.  As a general matter, Pathfinders' field offices try to employ residents of the country in which they operate ("local residents"), because they have greater knowledge about and contacts within their country, no visa or work permit restrictions, and are more likely to be

acceptable to the local government.  However, in many of the countries where we operate there

is no professional level workforce from which we can hire senior managers.  Consequently,

many of our country representatives are either United States expatriate or third party nationals

(collectively, "expatriates").  Sometimes we also have to hire expatriates to fill other senior staff

or technical positions.

       77.     It can be extremely difficult, and is sometimes impossible, to get both a visa and a

work permit for non-citizens in the countries in which we operate.  In many countries, the

process requires us to hire a local attorney, advertise the position locally to see if any local

residents apply, and then demonstrate that none of the local applicants are qualified.  This can

take several months, at best.  Often, we are unsuccessful.  For example, last year we were unable

to obtain an Indian work permit for a Bangladeshi employee with extensive expertise in working

to prevent HIV/AIDS transmission among men who have sex with men – expertise we needed

for that particular position.  To take another example, for the past five months we have been

trying, without success, to get a Tanzanian visa for one of our employees.  If we had to try to get

two sets of non-citizens into each country where we work, we would have to do twice the work

to get visas and work permits (including paying double the attorneys' fees), and – because it

would be difficult to explain why we need to bring in so many non-citizens – would have even

more difficulty getting the permissions we need.

       78.     Even when we are able to get permission to bring expatriates into a country,

bringing them in is an expensive proposition.  In order to be attractive to qualified potential

applicants, we match the salary (generally in the six-figure range for our top managers) provided

by the State Department in the countries in which we work.  On top of the base salary, we

provide a "post differential," to compensate employees serving in areas where the U.S.

Department of State considers living conditions to be particularly difficult, demanding, or unhealthful. In Ethiopia, the current post differential is 30 percent of the base salary. We also provide a "danger pay allowance," to compensate employees in foreign areas where civil insurrection, civil war, terrorism or wartime conditions threaten physical harm or imminent danger to the health or well-being of our employees. In Khartoum, Sudan, for example, the danger pay rate is currently 25 percent of base salary.

79.     We also match the benefits packages provided by the State Department. This is an expensive package, and takes a good deal of work by headquarters staff to implement. For example, we provide non-citizens with housing. If we do not have enough information about the cost of comparable housing in that country, the employee must obtain multiple bids before entering into a lease, which can be time-consuming. Suitable housing stock is extremely limited in most of the countries in which we work, so we are forced to pay the exorbitant rents generally charged to non-nationals, which can run between $30,000 and $50,000 annually. Additionally, the shortage of suitable housing allows landlords in many countries to require us to pay not only a security deposit, but also the first and last months rent up front. In some countries we must even pay rent in full a year or two in advance. This vastly increases the up-front cost of hiring new employees, and also increases our financial risks, because if the employee stops working for us before the end of the lease term we generally cannot recover the rent we have pre-paid.

80.     We also pay for and ensure that our employees have access to electricity and other utility services in their residences. In many countries where we work, the electrical grid is unreliable, so we have to pay as much as $20,000 to purchase a generator for each residential unit.

81.     Where necessary, we provide security for our staff living overseas.  For example, because of the ongoing turmoil in Kenya we are currently providing 24-hour security for each employee in that country.

82.     We also pay for education for the children of our expatriate employees.  For older children in countries where the local educational system is insufficient, we pay to send the child to a boarding school abroad.  This can be extremely expensive:  $48,300 per child annually for education abroad for employees based in India, and $54,950 per child annually for education abroad for employees based in Mozambique.

83.     We pay for one trip home each year for all expatriate employees and their immediate family.  For a family of four this can be as much as $8,000 annually.  We also cover the cost of round-trip airfare for expatriates and their families in the event of serious illness or death in their immediate family.

84.     Finally, we pay for our expatriate employees to move to the countries where they will be working, and then to move home again at the end of their employment.  The amount varies depending on the size of the family, but can cost as much as $15,000 for each move, in addition to airfare.

85.     If we had to maintain two field offices in each country instead of one, we would need a separate expatriate country representative for each, instead of the one we currently have.  We also might need duplicate expatriate senior management and technical staff.  For each of these duplicate employees, we would incur all of the costs outlined above.

86.     In addition to duplicating expatriates, we would also have to duplicate staff who are citizens of the country in which the field office operates.  In many cases, this would be difficult or impossible, because in many of the countries in which we operate there are few

26

people with the education and experience we require.  For example, we often need senior staff

with experience in how to prevent the spread of HIV/AIDS among particular populations, or in

non-profit or governmental capacity-building.  Finding one local person with such expertise is

difficult.  In many instances, finding two would be next to impossible.

87.    In many countries in which we operate, cultural norms require us to hire large

staffs of local residents.  This is in part because local employees expect that we will provide

various basic services for them, and in part because the local community expects foreign non-

profits to provide employment for as many people as possible.  Consequently, in our offices we

normally hire administrative assistants, security guards, drivers, cooks, and janitors.  Were we

required to employ two separate sets of staff, we would have to duplicate each of these employee

positions, costing us twice as much in salary and benefits.

88.    A requirement that we maintain two sets of our local and third-party national staff

would also increase the time and expense of getting them into the U.S.  We frequently bring field

office staff to the U.S. for trainings, strategy meetings, board meetings, or other events at our

headquarters or elsewhere in the country.  Since September 11, 2001,, we have been increasingly

encountering great difficulty in bringing non-U.S. citizens into the U.S.  For example, we held a

week-long training in the U.S. for our international financial staff in May 2007.  However, one of

our junior finance employees from India was simply unable to get a visa to attend.  Again, in

November 2007, a Bangladeshi employee was unable to get a visa to attend an international staff

meeting at our headquarters.  In both instances, our headquarters staff engaged in vigorous, time-

consuming efforts to get the necessary permissions.  If we had to hold duplicate meetings in the

U.S., and fly two sets of employees here, we would have to pay not only for duplicate air fare

and lodging, but also for the extra expense of working to try to get visas for all of these employees.

b)    Separate management and governance

89.    The requirement of separate management and governance would make it impossible for Pathfinder to exercise its First Amendment rights through any affiliate. Pathfinder's By-Laws, which are attached as Exhibit N, vest the corporation's governance in a Board of Directors.  If Pathfinder's board were unable to control the board or senior staff of an affiliate, it could not use Pathfinder's non-U.S. government funds to speak through that affiliate.

2)    Separate accounts, accounting records, and timekeeping records

90.    The second factor Defendants' guidelines consider in assessing physical and financial separation is "the existence of separate accounts, accounting records, and timekeeping records."  In some instances, it would be simply impossible for Pathfinder to satisfy the dual accounts requirement.  India, for example, exercises close controls over the bank accounts of foreign NGO's in order to control terrorism and the movement of funds across its borders.  As a foreign NGO, the Foreign Contribution (Regulation) Act limits us to maintaining only one bank account that receives funds from abroad or receives U.S. currency.  Foreign Contribution (Regulation) Act, § 6 (India).  In order to open that account, and to add or remove signatories, we must get government permission, which can be extremely slow.  It recently took us almost an entire year – and a pile of paperwork almost an inch think – to get permission to have a local Indian employee added as a signatory to an existing account.  On some occasions, we have been unable to get former employees removed as signatories for months after we requested that they be removed.  It would be extremely difficult and time-consuming for us to seek permission to

open a second bank account for a new affiliate and there is no guarantee that we would ultimately obtain approval.

91.     Even where we are able to obtain permission to open two separate accounts, doing so would be quite expensive.  Pathfinder's policy is that a member of the headquarters staff should be a signatory on every bank account, in case there is a revolution or other reason for headquarters to need direct access to the account.  In many countries, each potential signatory must appear in person at the bank in order to obtain permission to act as a signatory.  As a result, if we had to maintain two bank accounts in each country, and if we had to have two separate headquarters employees as signatories, we would have to send each of those headquarters employees to each country, instead of sending just one.

            3)    Separate facilities, equipment and supplies, and extent of
                        affiliates' restricted activities

92.     The third factor Defendants' guidelines consider in assessing physical and financial separation is "the degree of separation from facilities, equipment and supplies used by the affiliated organization to conduct restricted activities, and the extent of such restricted activities by the affiliate."  Opening a physically separate office in each country, and every part of each country, in which Pathfinder operates will be extremely difficult in some places, and impossible in others, because some of the countries in which we operate require us to obtain permission before we open a new office.

93.     Additionally, opening and maintaining an office abroad is an extremely expensive proposition for Pathfinder.  Having to duplicate those costs would be exorbitant.  For example, our office rents are often quite expensive.  Moreover, just as often we must prepay a year or two of rent on our residential leases, often we must prepay rent on our office leases.  That increases

our financial risks, because if we have to close an office before the end of the lease term we lose the remainder of the rent we have prepaid.

94.     In many of the countries in which we work, we must install and maintain our own telephone and internet data lines, and satellite dishes, which we would need to duplicate in a second office. We also install and maintain a computer server for each of our offices with at least six employees. For offices with more than one employee, we purchase at least two printers, and use one only for confidential financial and personnel information. We would have to duplicate all of these resources for a second country office.

95.     Maintaining two offices would also require us to maintain two separate insurance policies. We operate in countries where war, civil unrest, crime, car accidents, and disease are all serious threats. We try to minimize our exposure to risk by buying extensive insurance coverage – as many as 8 to 10 different policies in some countries. Buying a second set would be extremely expensive.

96.     We maintain a fleet of cars for most of our offices, because a car and a driver is a security necessity. Also for security reasons, and because of the generally poor conditions of the roads, we tend to buy four-wheel drive, all-terrain SUV's. Buying two separate fleets of cars would, consequently, be extremely expensive.

97.     We must purchase generators for many of our offices, because the electrical grid is unreliable. Because our offices rely heavily on computers for communication, our power needs are extensive. Generators large enough to meet our power needs can cost as much as $50,000.

98.     The guidelines' third factor also takes into account "the extent of such restricted activities by the affiliate." I have no way of knowing how many restricted activities would be

30

too many.  But this factor seems to require that I ensure that each affiliate engage in a substantial amount of activities that are permissible under the policy requirement.  Those activities could not, of course, be funded by the Global AIDS Act, because the affiliate could not receive any Global AIDS Act funding.  So I would need to ensure that we have some other source of funding for those activities.  In effect, this factor permits Pathfinder to use an affiliate to carry out privately funded activities otherwise barred by the policy requirement only if we have funds for those activities, *and* for a substantial number of activities that would be permissible under the policy requirement, *and* to establish and maintain a separate affiliate.  This amounts to an extra, unnecessary tax on our ability to engage in constitutionally protected speech and activities with purely private funds.

99.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2008
Washington, District of Columbia

DANIEL E. PELLEGROM