UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. *et al.*,

                        Plaintiffs,

                        -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.*,

                        Defendants.
-----------------------------------------------------------

DECLARATION OF
SAM WORTHINGTON

I, SAM WORTHINGTON, hereby declare as follows:

1. I am the President and Chief Executive Officer of InterAction: The American Council for Voluntary International Action ("InterAction"). I have held that position since October 2006. I previously served as Chief Executive Officer of Plan USA, a global, 62-country, child-focused development organization.

2. I make this declaration in support of both Plaintiffs' motion seeking leave to amend the Complaint and InterAction's motion for a preliminary injunction.

### InterAction

3. InterAction is a private, not-for-profit, membership organization incorporated in New York and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. Its office is at 1400 16th St. NW, Washington, DC.

4. InterAction was founded in 1984 with the purpose of convening and coordinating U.S.-based, non-governmental organizations ("NGOs") that work in the fields of international development and humanitarian aid. InterAction's mission is to assist its members in improving their own practices and to advocate for policy issues that

affect its members and the millions of people they serve worldwide. With one hundred and seventy members, InterAction is the largest alliance of United States-based international development and humanitarian non-governmental organizations.

5. Interaction's members, all of which are not-for-profit, tax-exempt organizations under Section 501(c)(3) of the Internal Revenue Code, are headquartered in twenty-five states, including New York. InterAction member organizations are both faith-based and secular and operate in every country in the developing world. Member organizations foster economic and social development; promote public health; provide relief to those affected by disaster and war; assist refugees and internally displaced persons; advance human rights; support gender equality; protect the environment; address population concerns; and press for more equitable, just, and effective government policies.

6. InterAction realizes its mission by providing a forum for professional consultation, coordination, and concerted action. Committees and their working groups, composed of InterAction members, engage in dialogue and advocacy with government agencies such as Defendants United States Agency for International Development ("USAID") and Department of Health and Human Services ("HHS") to improve the effectiveness of U.S. foreign assistance and promote policy solutions to eradicate poverty and disease, including HIV/AIDS. InterAction has developed considerable expertise in working with public and private partners to further its members' global health initiatives and objectives.

7. InterAction's member organizations receive more than $1 billion annually from the United States Government, primarily through Defendant USAID although they

also receive funds from Defendants United States Department of Health and Human Services ("HHS") and United States Centers for Disease Control and Prevention ("CDC") (collectively "HHS"). A portion of those funds is for programs authorized by the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

8.  InterAction member organizations also receive more than $7 billion in annual contributions from private individuals, foundations, and corporations. Some also receive funds from United Nations agencies, the World Bank, the European Community Humanitarian Office, and national governments, including those of the United Kingdom and France.

9.  As a membership organization, InterAction provides a means through which members can collectively express concerns about U.S. policy. Sometimes, fear of retaliation by U.S. government agencies from which they receive funding prevents members from individually raising concerns about U.S. government policies. Through their membership in InterAction, member organizations can collectively express objections to government policies in anonymity, and thus without such fear.

10. Some of InterAction's members' programs expressly target sex workers or include sex workers within their general scope. Many of the programs targeting sex workers have proven track records in reducing HIV infection, providing treatment to those with the virus, and have led to significant advances in understanding the physical, cultural, and socioeconomic underpinnings of the AIDS epidemic.

## The Global AIDS Act Restrictions

11.     InterAction members carry out a number of programs funded by Defendants USAID and HHS that are encumbered by the anti-prostitution "policy requirement" in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act"). The "policy requirement" provides, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

12.     Until May 2005, USAID did not enforce the policy requirement against U.S.-based non-governmental grantees such as InterAction's member organizations. HHS also did not enforce the policy requirement against U.S.-based non-governmental grantees for at least some of the period between the enactment of the Global AIDS Act and May 2005.

13.     Then, in June 2005, USAID applied the policy requirement to U.S. non-governmental organizations ("US NGOs") by issuing USAID Acquisition & Assistance Policy Directive 05-04 dated June 9, 2005 ("AAPD 05-04"). Neither in this policy directive, nor in any other written document, does USAID either define "explicitly opposing prostitution" or provide clear guidance on what privately funded activities are permissible and impermissible under the policy requirement.

14.     Similarly, beginning on or about May 2005, HHS began applying the policy requirement to US NGOs. HHS has not defined the term "explicitly opposing prostitution" nor has it issued guidance to the public explaining which types of activities are permissible and impermissible under this restriction.

4

15. HHS and CDC have required all recipients of Global AIDS Act funding to "agree that HHS may, at any reasonable time, inspect the documents and materials maintained or prepared by the recipient in the usual course of its operations that relate to the organization's compliance [with the policy requirement]." *See, e.g.,* "Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment," 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005).

16. InterAction initially appeared in this action through the filing of a brief *amicus curiae* on January 30, 2006. Given the as-applied and facial claims before the Court, InterAction believed at that time that *amicus* involvement in the case would be sufficient to further the interests of its members. However, after the Court's May 9, 2006 Decision and Order declaring the policy requirement unconstitutional as applied to Plaintiffs Alliance for Open Society International and Pathfinder International, Defendants persisted in enforcing the policy requirement against all other U.S.-based organizations, including InterAction's members. In the summer of 2006, InterAction therefore sought to protect the interests of its members by requesting to join this action and seek preliminary injunctive relief that would bar enforcement of the policy requirement against its members.

17. In the fall of 2006, at this Court's request, InterAction surveyed its members to determine how many desired relief from the policy requirement. Twenty members both received funding subject to the policy requirement and desired to receive that funding without being subject to the policy requirement. Fourteen of those twenty members wished to remain anonymous. Some members did not to respond to the survey

and/or seek relief in the context of this lawsuit for fear that their identities would be exposed and that they would face retaliation from the Defendants, upon whom they rely for substantial funding.

18. In June 2006, while this matter was before the U.S. Court of Appeals for the Second Circuit, counsel for the Defendants informed Plaintiffs for the first time that Defendants planned to issue guidelines that would permit Global AIDS Act recipients to use private funds to speak freely about HIV/AIDS and prostitution through legally and physically separate affiliates. The Defendants did not seek public comment. However, due to my grave concerns about the model they were contemplating – a model of stringent legal, physical, and financial separation that had never been applied to U.S.-based international aid grantees – I wrote to Defendants to urge them to consider less stringent requirements. *See* Letter to Henrietta H. Fore, Acting Administrator, USAID, from Sam Worthington dated July 5, 2007, attached hereto as Exhibit A. I did not receive any response from Defendants.

19. In July 2007, Defendants issued affiliate guidelines that purport to allow recipients of Global AIDS Act funding to use private funds free of the policy requirement through a legally, physically, and financially separate affiliate. *See* Acquisition and Assistance Policy Directive 05-04, Amendment 1 (July 23, 2007) (USAID Guidelines); Guidance Regarding Section 301(f) of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003, 72 Fed. Reg. 41,076 (July 26, 2007) (HHS Guidelines) (collectively "the Interim Guidelines").

20. The Interim Guidelines continue to require funding recipients to adopt a "policy explicitly opposing prostitution." They also require funding recipients to "have

6

objective integrity and independence from any affiliated organization that engages in activities inconsistent with a policy opposing prostitution and sex-trafficking ('restricted activities')." According to the guidelines, a recipient will satisfy this test if (1) the affiliate is legally separate; (2) the affiliate receives no Global AIDS Act funds; and (3) the affiliate is "physically and financially separate" from the recipient.. Defendants have reserved the right to determine "on a case by case basis" whether a funding recipient is sufficiently physically and financially separate from an affiliate that does not comply with the policy requirement. They list factors that apply to that determination but say that others may apply too. The factors they do list indicate that affiliates would have to have separate personnel, management, and governance; separate accounts, accounting records, and timekeeping records; and separate facilities, equipment and supplies. The guidelines say Defendants would also consider the extent to which signs distinguish the two entities, and the extent to which the Defendants are "protected from public association with the affiliated organization and its restricted activities in materials such as publications, conferences and press or public statements."

**How the Policy Requirement And Guidelines Harm InterAction and its Members**

21.     The policy requirement continues to harm InterAction and its members in a number of ways, which the guidelines have only perpetuated.

    **a. Compelled Speech**

22.     First, the policy requirement forces international NGOs that generally prize their independence from government to become a mouthpiece for the U.S. government's position on a particular social issue. For these members, the adoption of a government-mandated, organization-wide policy on this or any issue violates dearly held

principles of independence that are fundamental to their operation as non-governmental organizations.

23. The guidelines do nothing to remedy this problem. Even if members were able to cordon off some privately funded activity to a legally, financially, and physically separate affiliate, as the guidelines contemplate, the NGO that receives Global AIDS Act funds would still be forced to adopt an organizational policy that would undermine its independence and force it to parrot the government's message as its own.

24. Moreover, due to separate rules that require USAID grantees to have substantial private funding, the grantee NGO would still possess some degree of private funds that would be subject to the policy requirement. U.S.-based private voluntary organizations must be registered with USAID in order to be eligible for USAID funding. *See* 22 C.F.R. § 203.1(a). In order to register as a private voluntary organization, an NGO must "solicit[] and receive[] cash contributions from the U.S. general public." *id.* § 203.3(b). Therefore, even if InterAction members were able to set up separate affiliates – an unviable proposition for the reasons I explain below – the policy requirement would always reach some portion of InterAction members' private funds.

### b. Viewpoint Discrimination

25. Second, the policy requirement continues to force InterAction members who wish to remain neutral on the issue of prostitution to take a government-mandated position. Many members believe that prostitution causes serious health, psychological, and physical risks for women and work to address those risks and assist women in finding alternatives. However, they also believe that by forcing them to explicitly oppose prostitution, the policy requirement stigmatizes one of the very groups whose trust they

must earn to conduct effective HIV/AIDS prevention and forces them to approach those engaged in prostitution in what will be perceived as a judgmental manner.

26. Many members are aware that Defendants have construed the policy requirement as prohibiting advocacy for the elimination of criminal penalties against women engaged in prostitution. Given the variety of legal regimes relating to prostitution in the countries in which InterAction members operate, some members object to the mandatory adoption of a policy position that contradicts the policy of some of the countries in which they are operating.

27. The guidelines do not remedy this problem. An independent, non-profit member organization still must adopt a particular position in order to be eligible for Global AIDS Act funding and, as described above, even if some private funds were segregated to create an affiliate, the grantee organization would still possess private funds encumbered by the policy requirement.

### c.   The Guidelines Massively Burden Private Speech

28. The third way in which the policy requirement and guidelines harm InterAction and its members is that members engage in a significant amount of activity not funded by the U.S. government that could be barred by Defendants' overly broad construction of the policy requirement. The Defendants' ban on the use of the non-U.S. government funds possessed by InterAction members to do work that Defendants construe as being insufficiently opposed to prostitution restricts members from engaging in speech and HIV-prevention activities with their private funds.

29. Members have expressed concern about the policy requirement's impact on their commitments to private funders to do HIV/AIDS prevention work. For example,

the policy requirement has threatened the privately funded HIV/AIDS prevention work of InterAction member CARE with sex worker organizations and networks. In a letter dated July 15, 2005 to the Hon. Andrew Natsios, Representative Souder and 27 other members of Congress accused InterAction member CARE of violating the pledge requirement by promoting a "rights-based" approach to prostitution, which the signatories equate with advocacy for the legalization of prostitution and its cultural acceptance as a legitimate form of employment. In the same letter, the members of Congress also accused InterAction member International Center for Research on Women of holding a "pro-prostitution" stance. A copy of this letter is attached hereto as Exhibit B. In a subsequent letter dated December 7, 2005 to the Hon. Andrew Natsios, Rep. Souder again accused CARE of violating the policy requirement by providing funding to an Indian organization that he said advocates for the decriminalization of adult sex work. A copy of this letter is attached hereto as Exhibit C. As the accompanying Declaration of Helene Gayle, President and Chief Executive Officer of CARE, in support of this motion, attests, in June 2006, after the issuance of the Court's decision holding that the policy requirement was unconstitutional as applied to AOSI and Pathfinder, USAID officials made inquiries to CARE about its association with this organization, to which CARE provides private funding in connection with a tuberculosis prevention program.

30.    Similarly, as the accompanying Declaration of Dan Pellegrom, President of InterAction member Pathfinder International, in support of this motion attests, if Pathfinder were not protected by the preliminary injunction in this case, it might have to censor discussions of its privately funded program that conducts HIV/AIDS prevention with sex workers in India as well as the speech of a privately funded Brazilian employee

who is slated to facilitate discussions at Brazil's upcoming National Consultation on Prostitution, HIV/AIDS and Human Rights.

31.     The inability of InterAction members to speak freely about the lessons of their work undercuts several of InterAction's main purposes as a membership organization. Through an annual conference, frequent meetings, working groups, and publications, InterAction members share best practices and lessons learned from their humanitarian work. However, discussion about the relationship between HIV and prostitution as well as best practices for HIV prevention among sex workers cannot be held freely due to the policy requirement.

32.     The guidelines do not fix this problem. Although the guidelines purport to create an opportunity for grantees to engage in forbidden speech through a legally, financially, and physically separate affiliate, they impose such massive burdens on the creation of the affiliate that it is not a viable option for our members.

33.     Creating a legally separate affiliate in the international context is a far different proposition from creating one domestically. Most countries in which InterAction members operate have requirements that all NGOs register with the government in order to operate. An InterAction member that operates in twenty countries, who wished to speak freely through an affiliate, would have to navigate lengthy and cumbersome registration processes in each of those countries in order to create a functioning, legally separate entity. In almost all cases, local counsel would have to be hired in each country in which the member sought to register the affiliate, making the process quite costly.

11

34. It is far from certain that a member would even be able to obtain approval for an affiliate in multiple developing countries. InterAction members frequently report long delays and difficulties in registering in various developing countries. For example, it recently took InterAction member Mercy Corps ten months to register an entity in Jordan to provide urgently needed relief to Iraqi refugees. Another InterAction member, International Medical Corps, had its application for registration denied by the Jordanian Ministry of Social Development in November 2007.

35. If a member were somehow able to obtain permission to operate an affiliate in multiple countries, that affiliate would have a very hard time obtaining funding. If the new affiliate were to be government-funded, it would likely be barred from USAID funding opportunities until it had a record of achievement. *See* 22 U.S.C. § 2151u(a) (organization not eligible to receive funds until it has "demonstrated a capacity to undertake effective development activities."); 22 C.F.R. § 203.3(f)(4) (requiring entity to have been incorporated for at least 18 months in order to register as a private voluntary organization eligible for USAID funding). If the new affiliate were to be privately funded, it would be at a severe disadvantage competing with other organizations for non-U.S.-government funding because it would have no track record whatsoever.

33. Even if an InterAction member were able to jump these hurdles and register and fund an affiliate in multiple countries, the affiliate would be a completely separate entity from the InterAction member. The guidelines require that the affiliate be governed by a separate board and run by separate management. For non-profit organizations, as all of our members are, the board of directors generally controls and speaks for the organization. This principle is embodied in InterAction's Private

Voluntary Organization Standards, with which all InterAction members must certify compliance every two years. Those standards provide that a member's board must act as the organization's governing body, accepting responsibility for oversight of all aspects of the organization. Thus, an InterAction member organization will not be able to speak through a separate entity that has a separate board of directors.

36. The requirement of separate personnel also poses unique difficulties in the international setting. Most field offices our headed by "country representatives," who ideally have experience working in the region and in the NGO's programming areas. Very often, an NGO will need to hire the country representative and other senior staff with relevant expertise from outside the country in which the field office is based. To do so, an NGO will have to navigate local visa requirements. Often, visa applications cannot even be started until after an NGO has registered in a country. In many countries, the process requires an NGO to hire a local attorney and show that it could not find any country residents qualified for the position. The requirement to operate a separate affiliate would double the burdens of these laws on our members.

37. The requirement of separate bank accounts poses similar burdens. Many countries have rules that make it difficult to open a new bank account without specific government authorization and approval. Often, if an official from an NGO's headquarters wants to be a signatory to the account, he will have to travel in person to the bank. Opening a separate account for a new entity will thus entail its own lengthy process.

38. Finally, the requirement of separate physical facilities, equipment and supplies additionally burdens our members. In many developing countries where InterAction members operate, members must import computers, printers, networking

13

supplies and other office equipment. To do so for a second office would not only be expensive, but would also require NGOs to navigate cumbersome local customs laws for a second time. In addition, all of these requirements would divert funds that should be spent saving lives in the developing world into unnecessary, duplicate administrative costs.

39.  All of these requirements run counter to our members' efforts to run foreign aid operations efficiently and with as little administrative overhead as possible. Members are often judged by their donors on the percentage of funds that go directly toward service. InterAction's itself, in its Private and Voluntary Organization Standards, which were designed to ensure and strengthen public confidence in the integrity, quality, and effectiveness of member organizations and their programs, requires members' combined fundraising and administration costs to be kept to the minimum necessary to meet the agency's needs. Allocations of expenditures to administration, fundraising, and program services shall reflect the organization's purposes and actual activities, the standards further provide. The requirement to squander funds on duplicate registrations, bank accounts, staff, offices, equipment and supplies – solely in order to be able to speak freely on an issue of public policy – flies in the face of this principle.

40.  In addition, all of these requirements are likely to draw suspicion from local authorities who will not understand why an organization that already operates in a country now must do so through a legally separate entity, with separate personnel, with separate bank accounts, and out of separate offices.

### Vagueness

41.     The fourth way in which the policy requirement harms InterAction and its members is its unresolved vagueness. From the beginning of the policy requirement's implementation, members have been unsure of what activities and speech they may and may not engage in.

42.     Members have reported a wide variety of responses by organizations and USAID officials to the policy requirement. Some members have reported that local USAID missions in countries in which they operate have demanded to see their policies opposing prostitution while others have reported that missions did not demand to see their policies. Some members have reported that, in the absence of guidance from the Defendants, primary recipients of U.S. government funds have inserted their own language into subcontracts about what constitutes compliance with the policy requirement.

43.     After operating in this uncertain environment for more than two years, the humanitarian community had hoped that the guidelines would finally provide some clarity. But the guidelines have failed to answer the most basic questions about just what activities and speech are restricted.

44.     In addition, while the guidelines require "physical[] and financial[] separation" of funding recipients from the affiliated organizations, they do not provide clear guidance regarding what will be considered physically and financially separate enough. For example, USAID states one factor it will examine is "[t]he extent to which USAID, the U.S. Government and the project name are protected from public association with the affiliated organization and its restricted activities in materials such as

publications, conferences and press or public statements." Yet USAID gives no indication of how it will assess "public association." Similarly, USAID states it will examine "[t]he extent to which signs and other forms of identification which distinguish the Recipient from the affiliated organization are present, and signs and materials that could be associated with the affiliated organization or restricted activities are absent." Again, the guidelines give InterAction members no guidance on how much signage would be enough to satisfy this requirement.

45. Given the severe consequences for violating the policy requirement, in the absence of such guidance, members will have to ensure maximum separation to avoid any possibility of running afoul of the guidelines. Moreover, they will now have to scrutinize very carefully their relationships with collaborating organizations and grantees to determine whether they are closely affiliated enough to raise questions about whether the other organization's views may be attributed to the member.

46. For all these reasons, the anti-prostitution policy requirement continues to irreparably harm InterAction and its members.

47. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2008
Washington, District of Columbia

SAM WORTHINGTON