**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------
ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC., OPEN SOCIETY
INSTITUTE, AND PATHFINDER
INTERNATIONAL,                                                    05-CV-8209 (VM)(DF)
                                        Plaintiffs,

                                                                 DECLARATION OF
                                                                 HELENE GAYLE

                        -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.*,

                                        Defendants.
----------------------------------------------------------------

I, Helene Gayle, hereby declare as follows:

1)      I am President and Chief Executive Officer of Cooperative for Assistance

and Relief Everywhere, Inc. ("CARE").

2)      I submit this declaration in support of both Plaintiffs' motion seeking

leave to amend the Complaint and the motion of InterAction and the Global Health

Council for a preliminary injunction.

**CARE Mission and Work**

3)      CARE is a non-profit cooperative association incorporated as the

Cooperative for Assistance and Relief Everywhere, Inc. under the laws of the District of

Columbia.  It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue

Code. Its primary office is located at 151 Ellis Street, NE, Atlanta, Georgia 30303.

CARE also has an office at 32 West 39th Street, 3rd Floor, New York, New York 10018

where it raised over five million dollars in private funding last year. CARE is a member

of CARE International ("CI"), a federation of 12 other CARE nonprofit members

incorporated separately in Australia, Austria, Belgium, Canada, Denmark, France,

Germany, Japan, the Netherlands, Norway, Thailand and the United Kingdom.

4)    CARE is a member of InterAction, a network of U.S.-based humanitarian

organizations.  Membership in InterAction enables CARE to advance its mission and

goals through collaboration and advocacy with other organizations that also seek to

eliminate poverty and improve the quality of life for people in developing countries.

CARE is also a member of the Global Health Council, through which it advances its

interest in the promotion of sound international public health policy and practice.

5)    Founded in 1945, CARE is one of the world's largest private international

humanitarian organizations, committed to helping families in poor communities improve

their lives and achieve lasting victories over poverty by promoting innovative solutions

and advocating global responsibility. CARE facilitates lasting change by:

- Strengthening capacity for self-help
- Providing economic opportunity
- Delivering relief in emergencies
- Influencing policy decisions at all levels

- Addressing discrimination in all its forms

6)    In its last fiscal year (FY 06), CARE projects reached 55 million people in 66 countries throughout Africa, Latin America, Asia, Europe and the Near East.  CARE accomplishes its mission by working closely with local nongovernmental organizations, host country governments, governmental and private donors, other CI members, health care providers and individuals in the communities it serves.  Among its programs, CARE provides quality family planning and reproductive health services, and works to halt the spread of HIV and improve maternal and child health.

7)    Last year, CARE expended $590 million toward its work overseas, funded by grants and donations from sources including Defendants United States Agency for International Development ("USAID") and the United States Centers for Disease Control and Prevention ("CDC"), an operating agency of Defendant Department of Health and Human Services ("HHS"). CARE also receives funds from agencies of the United Nations, European Union, foreign governments, and the World Bank, and numerous foundations, corporations and individual donors.

**The Global AIDS Act Restrictions**

8)    CARE carries out a number of programs funded by Defendants USAID and CDC that are encumbered by restrictions contained in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

9)      The Global AIDS Act contains a "government funds restriction"

prohibiting funds made available under the act from being spent on activities that

"promote or advocate the legalization or practice of prostitution or sex trafficking,"

although it allows for the provision of health care and related services to prostitutes. 22

U.S.C. § 7631(e).

10)     CARE rigorously complies with the government funds restriction.

11)     The Global AIDS Act also contains a "policy requirement" providing that

"no funds made available to carry out this Act. . . may be used to provide assistance to

any group or organization that does not have a policy explicitly opposing prostitution and

sex trafficking." 22 U.S.C. § 7631(f).

12)     Until 2005, CARE was not asked to comply with the policy requirement.

13)     In June 2005, USAID applied the policy requirement to U.S.

nongovernmental organizations by issuing USAID Acquisition & Assistance Policy

Directive 05-04 dated June 9, 2005.  Neither in this policy directive, nor in any other

written document, does USAID either define "explicitly opposing prostitution" or provide

clear guidance on what privately funded activities are permissible and impermissible

under the policy requirement.

14)    Similarly, beginning on or about May 2005, HHS and CDC began applying the policy requirement to U.S. nongovernmental organizations. HHS and CDC have not defined the term "explicitly opposing prostitution." Nor have they issued formal guidance to the public explaining which types of activities are permissible and impermissible under this restriction.

15)    CARE must comply with the policy requirement as a condition of engaging in programs overseen by USAID and the CDC that draw HIV funding authorized by the Global AIDS Act. These programs include assistance to orphans and vulnerable children, prevention of mother-to-child transmission of HIV, and capacity building to train indigenous nonprofits to implement HIV and AIDS programs. CARE receives Global AIDS Act funding for numerous projects including Strengthening and scaling up of the Hope for African Children Initiative in Africa ("SSUH"), a project to provide services to children affected by and/or infected with HIV in Ethiopia, Zambia, Senegal, Ghana, Cameroon, Kenya, Mozambique, Malawi and Uganda; Local Links, a project that assists orphans and vulnerable children in Kenya and South Africa; and two Associate Awards under the Communities Responding to the HIV/AIDS Epidemic ("CORE") Initiative. CARE also conducts privately funded HIV and AIDS initiatives several countries including India, Rwanda, Burundi, Lesotho, Mozambique, Bangladesh, and Mali.

16)    Solely in order to comply with the policy requirement and to remain eligible to receive U.S. government HIV funding to provide desperately needed HIV

prevention, care and treatment work around the world, CARE adopted a Policy on

Working with Vulnerable People Involved in Prostitution and Sex Trafficking. Were it

not for the requirement in the Global AIDS Act, CARE would not have adopted a policy

addressing prostitution.

## How the Policy Requirement Harms CARE

17)     The policy requirement harms CARE by covering activity not funded by

the U.S. government. Although CARE's USAID and CDC funding is limited, CARE's

HIV and AIDS work with private, non-US government, funding is also affected by the

policy requirement.    If an overly broad construction of the policy requirement were

adopted, Defendants may construe CARE's non-U.S. Government funded activities as

being insufficiently opposed to sex work. CARE believes that it is complying with the

policy requirement, but it does not know whether Defendants USAID, HHS and CDC

agree.

18)     For example, the policy requirement threatens CARE's privately funded

HIV prevention work with sex worker organizations and networks. Based on years of

responding to the onslaught of HIV and AIDS on the most vulnerable groups, including

sex workers, CARE has learned that mobilizing community groups and building

collective strength is often the most effective and sustainable way to fight HIV over the

long-term in high-risk communities. Individually, sex workers have little leverage to turn

society's riskiest practices toward safer sex. Collectively, networks of sex workers can

be empowered to influence those most at risk toward preventive behaviors.


19)    With private funding, CARE helps develop these sex worker

organizations, in Bangladesh and India, for example, with the purpose of achieving more

effective HIV prevention outcomes.   While CARE believes that this approach complies

with the policy requirement, it fears that defendants USAID, HHS and CDC may

construe the policy requirement overly broadly and penalize CARE for the independent

views of sex worker organizations with which it works.


20)    CARE's privately funded work with sex worker organizations was

questioned by former Rep. Mark Souder in a letter dated December 7, 2005 to the Hon.

Andrew Natsios, then-Administrator of USAID.  In the letter, Rep. Souder used CARE's

privately funded tuberculosis prevention work with the Durbar Mahila Samanwaya

Committee ("DMSC") to impute the views of DMSC to CARE.  He then asserted that

CARE's association with DMSC constitutes a violation of the policy requirement.  The

vagueness of the policy requirement harms CARE because it makes possible such false

allegations that can do considerable harm to CARE's reputation.


21)    On or about June 23, 2006, USAID officers contacted CARE's senior

managers in India and Bangladesh to inquire about CARE's relationship with DMSC

which received only private funding from CARE and was not connected with CARE's

USAID- or CDC-funded HIV and AIDS work.

22)    In August 2006, USAID's Acting General Counsel sent CARE a letter

asking it to respond to allegations regarding CARE's privately funded work with sex

worker groups in India and Bangladesh. CARE responded to the request but remains

concerned that it is at risk of continued intrusive and unwarranted governmental

investigations regarding whether CARE is engaged in activities that government

investigators may construe as insufficiently opposed to prostitution.


23)    CARE considers it essential to work with vulnerable populations,

including sex workers, to combat the spread of HIV. CARE expends great effort to gain

the trust of these individuals in order to educate individuals at high risk of contracting

HIV about the prevention and treatment of HIV. In Bangladesh, for example, CARE has

been recognized by UNAIDS and the World Health Organization as a best practices

leader for its work in identifying effective prevention strategies that involve sex workers

as peer educators. In CARE's experience, explicitly adopting a written policy that

opposes prostitution may be viewed by this vulnerable group, sex workers, as contrary to

their interests and could undermine their trust in CARE and hamper CARE's efforts to

educate this vulnerable population about HIV and AIDS.   The policy requirement harms

CARE because it compels CARE to speak where CARE would otherwise have remained

silent.


24)    CARE is a prominent advocate of humanitarian best practices that

regularly hosts and engages in vibrant discussion and debate on topics integral to HIV

and AIDS ranging from best practices aimed prevent HIV transmission within high-risk groups, to reducing stigma, and empowering women and girls. These strategies have been shown to be effective in reducing HIV transmission in targeted communities. However, out of caution and uncertainty, CARE has restricted its media and public communication to raise awareness of its work in India and Bangladesh, and has often declined to share what it has learned regarding HIV prevention strategies at conferences both in the United States, including New York, and abroad.

25)    The policy requirement also harms CARE in that it affects CARE's active, privately funded advocacy programs, both within the United States and within the countries and communities where CARE works overseas. CARE actively seeks to improve the U.S. and global policy environments to support effective international family planning, reproductive health and HIV programs. CARE accomplishes this by educating policy-makers and the general public about conditions facing women and their families in developing countries and the impact of laws and policies on the delivery of services related to family planning and HIV prevention, care and treatment. CARE must ensure that any advocacy it undertakes conforms to the policy requirement. CARE fears that it may seem to violate the policy requirement if it broadly discusses alternative approaches to HIV prevention among high-risk groups, either in the United States or abroad, because it is not clear which advocacy approaches are perceived by the Defendants as compliant. The concern is that the advocacy itself may be seen to violate the policy, even if CARE's overseas program activities do not. Thus, although CARE believes itself to be in compliance with the U.S. government policy, the effect of the policy requirement is to

inhibit substantially open discourse regarding innovative and effective approaches to reduce the spread of HIV infection among high-risk groups.

26)     Finally, a basic and explicit tenet of CARE's work in humanitarian assistance and disaster relief is grounded in its efforts to aid exploited, disenfranchised, or marginalized people without conveying a message of condemnation or disrespect. CARE's core values are strongly grounded in an ethical commitment to ensure that it stands with, and not above, the individuals it serves.  The policy requirement harms CARE by compelling it to speak in a manner that is inconsistent with its mission and its core values.  In exercising its right to use its private funds to speak and advocate on behalf of the world's poorest people, CARE should not be constrained the judgmental approach adopted by the U.S. government.

**Why the new guidelines are burdensome to CARE**

27)     In July 2007, Defendants USAID and HHS issued new guidelines to allow recipients of Global AIDS Act funding to use private funds to engage in activities prohibited by the policy requirement so long as the recipients maintained sufficient separation between prohibited activities and activities funded by the Global AIDS Act. The  guidelines for USAID and HHS are contained in Acquisition and Assistance Policy Directive 05-04, Amendment 1 (July 23, 2007) and in a document entitled Guidance Regarding Section 301(f) of the United States Leadership Against HIV/AIDS,

Tuberculosis and Malaria Act of 20003, 72 Fed. Reg. 41,076 (July 26, 2007),

respectively.

28)   The guidelines require contract, grant and cooperative agreement

recipients like CARE to have "objective integrity and independence from any affiliated

organization that engages in activities inconsistent with a policy opposing prostitution

and sex trafficking".  The test of a recipients' objective integrity and independence

requires that (1) the affiliated organization is a legally separate entity; (2) the affiliated

organization receives no transfer of Leadership Act funds and the Leadership Act funds

do not subsidize restricted activities (i.e., activities inconsistent with a policy opposing

prostitution and sex trafficking); and (3) the recipient is physically and financially

separate from the affiliated organization.  With respect to this third requirement mere

bookkeeping separation of Leadership Act funds from other funds will not satisfy the

requirement.  Each agency will determine "on a case-by-case basis and based on the

totality of the facts, whether sufficient physical and financial separation exists" based on

five factors enumerated in the guidelines.  However, the guidelines state that while the

five enumerated factors will be relevant, the agency's determination "will not be limited

to" those factors.

29)   The guidelines are burdensome because (1) the guidelines are vague; (2)

their vagueness makes implementation impractical for a non-profit organization like

CARE; and (3) even if CARE could abide by the guidelines, this would do not resolve

CARE's concern about the harms generated by the policy requirement .

30)    The guidelines are vague because they offer no guidance as to what activities would be considered inconsistent with a policy opposing prostitution and sex trafficking or "restricted activities". Based on its years of field experience responding to the onslaught of HIV and AIDS on the most vulnerable groups, including sex workers, CARE seeks to implement an integrated and holistic set of interventions designed to be most effective and sustainable to fight HIV and AIDS over the long-term in high-risk groups. Under these guidelines, CARE is unable to determine which interventions might be considered "restricted activities" required to be conducted by an affiliate. CARE is concerned that arbitrary parsing of activities and bifurcation of interventions designed to work as an integrated whole would reduce CARE's ability to implement effective HIV programs among the most vulnerable groups.

31)    The vagueness of the five factor physical and financial separation test in the third requirement of the guidelines make creation of an affiliate financially impracticable for a non-profit organization like CARE. The guidelines provide that the agencies will determine sufficient physical and financial separation "on a case-by-case basis…based on the totality of the facts"; that "presence or absence of any one or more factors will not be determinative"; and that factors relevant to the determination "shall include but will not be limited to" the five factors. In addition, three of the five factors are qualified by the phrases "degree of separation" and "the extent to which". Given this, if CARE were to create an affiliate, it would be impossible for CARE to accurately predict how the agencies would evaluate physical and financial separation of the entity.

12

Prudence would require that such an affiliate meet all elements of each factor in the guidelines.  However, expending CARE's limited resources to create, fund,  operate and maintain a separate legal entity with separate personnel, separate management, separate governance, separate accounts, separate accounting records, separate time keeping records, separate facilities, separate equipment, separate supplies and separate signs and forms of identification solely in order to be able to carry out a likely narrow but undetermined list of activities would be impractical in  light of CARE's obligation as a non-profit organization to carefully and responsibly steward financial resources entrusted to it by donors.

32)    In addition, the guidelines are impractical in the context of CARE's international organizational structure.   CARE coordinate operations on behalf of CI in the following countries:  Burundi, Democratic Republic of Congo, Eritrea, Ethiopia, Rwanda, Somalia, Sudan, Tanzania, Uganda, Angola, Benin, Ghana, Ivory Coast, Lesotho, Madagascar, Malawi, Mali, Mozambique, Niger, Sierra Leone, South Africa, Togo, Afghanistan, Bangladesh, India, Nepal, Pakistan, Philippines,  Sri Lanka, Tajikistan, Bolivia, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Nicaragua and Peru.  In many countries, CARE operates through registered branch offices and CARE conducts privately funded programs through all of its branch offices.  In order to be able carry out activities overseas, a CARE affiliate may also be required to register branch offices.  The process of obtaining host government approval and clearance to establish operations and carry out programming in a country can be lengthy, complicated and fraught with bureaucratic hurdles.

33)    In one of the countries in which CARE operates, the law governing foreign NGOs has changed twice since 2005, requiring all foreign NGOs to re-register with relevant ministries.  For CARE, the first re-registration effort took about nine months to complete, while the second took about four months.

34)    CARE's presence in many of the countries where it works is based on agreements with host governments negotiated decades ago.    In some countries, host governments are actively seeking to nurture and promote the growth of indigenous NGOs, limiting the space in which foreign NGOs can operate.  If it were required to obtain, from over 35 individual host governments, permission for a CARE affiliate to operate within their borders, the sheer volume of time and resources necessary to do this would likely make the proposition prohibitive for CARE.

35)    Even if a CARE affiliate were able to obtain the necessary permissions, in order to maintain physical and financial separateness prescribed in the guidelines, country offices of the affiliate would likely have to maintain separate personnel, separate management, separate governance, separate accounts, separate accounting records, separate time keeping records, separate facilities, separate equipment, separate supplies and separate signs and forms of identification from the CARE offices already operating in those countries.    The process of establishing country office operations is akin to opening a small business and includes, among other things, locating and leasing office space, recruiting and hiring local staff, obtaining work permits for international staff if

necessary, obtaining bank accounts, obtaining import licenses for any number of items,

ranging from computers to cars. The level of resources required to create, fund, operate

and maintain a duplicate set of offices would likely make the affiliate option unviable for

CARE.

36)    The requirement to maintain separate signs and forms of identification

suggests that an affiliate may not even be able to use the CARE name and brand.

CARE's vast poverty fighting experience and reputation are inherent in its name and

brand, and is a key to attracting donor funding for its work. If the affiliate is unable

leverage CARE's goodwill and reputation, it is unclear how a new and unknown

organization would be able to attract the type of donor funding necessary to develop

effective and sustainable programs.

37)    As a cooperative association organized under the laws of Washington

D.C., CARE is governed by a Board of Overseers that also acts as its Board of Directors.

Because the guidelines require an affiliate to have separate governance and separate

management from CARE, it is unclear what type of control, if any, CARE would be able

to assert over such an entity.   If the objective of these guidelines is to un-encumber

organizations like CARE from the burdens on speech imposed by the policy requirement

by offering an alternative route through which they might speak, the degree of separation

described in the guidelines do not appear to offer CARE a viable alternative route. It is

unclear that members of the general public would even be able to discern a relationship

between CARE and an affiliate created under these guidelines.

38)    Finally, the guidance adopted by USAID and HHS in July 2007 does not absolve CARE of the requirement to adopt a policy explicitly opposing prostitution. CARE is still being compelled to speak where CARE would otherwise have remained silent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2008
In Atlanta, Georgia

_Helene D. Gayle_
HELENE GAYLE