UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. *et al.*,

                Plaintiffs,

      -against-

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.,*

                Defendants.
-------------------------------------------------------------

05-CV-8209 (VM) (DF)

DECLARATION OF
PAPE GAYE

     I, PAPE GAYE, hereby declare as follows:

     1.     I am, and have been since August 2004, the President of IntraHealth International, Inc. ("IntraHealth").

     2.     I submit this declaration in support of both Plaintiffs' motion seeking leave to amend the Complaint and the Global Health Council's motion for a preliminary injunction.

IntraHealth

     3.     IntraHealth International Inc. ("IntraHealth") is a nonprofit corporation incorporated under North Carolina law.  It enjoys tax-exempt status under section 501(c)(3) of the Internal Revenue Code.  Its primary office is located at 6340 Quadrangle Drive, Suite 200, Chapel Hill, North Carolina 27517.  IntraHealth also maintains offices and/or fields project staff in Armenia, Guatemala, Guinea, Eastern Caribbean, Ethiopia, India,

1

Kenya, Lesotho, Mali, Namibia, Rwanda, Senegal, South Africa, Southern Sudan, Swaziland, Tanzania, Uganda, Vietnam, and Zambia.

    4.     IntraHealth originated in 1979 as a program at the University of North Carolina at Chapel Hill School of Medicine. That program implemented a series of projects funded by Defendant United States Agency for International Development ("USAID") to train primary, auxiliary and community health workers in more than 50 developing countries. In July 2003, IntraHealth became a separate non-profit organization associated with the University of North Carolina. In October 2005, all formal links to the University of North Carolina were ended amicably.

    5.     IntraHealth's mission is to mobilize local talent to create sustainable and accessible health care. Our vision believes in a world where all people have an equal opportunity for health and well being. IntraHealth pursues this mission and vision by strengthening systems that support health care providers, fostering links among health care providers, clients and communities, improving education and training programs for the health care workforce, and delivering front-line health services and referrals at the community level.

    6.     IntraHealth has developed considerable expertise in promoting family planning and reproductive health and in combating HIV/AIDS and other sexually transmitted infections. IntraHealth's HIV/AIDS programs train providers in clinical skills, support providers to reach underserved populations with antiretroviral therapy (ART) and other therapies, treatments, and care, promote voluntary HIV counseling and testing, and prevent the mother-to-child transmission of HIV and integrate HIV/AIDS services into family planning and reproductive health services.

7. IntraHealth's annual budget, which in fiscal year 2008 totals approximately $64.7 million, is funded by grants and donations from multiple sources, including Defendants United States Agency for International Development ("USAID") and the United States Centers for Disease Control and Prevention ("CDC"), an operating agency of Defendant Department of Health and Human Services ("HHS"). IntraHealth also receives contributions from private foundations and individuals. IntraHealth has received funds from multilateral organizations such as the United Nations Population Fund and currently receives funding from the Global Fund and the World Bank.

8. IntraHealth is a member of the Global Health Council, through which IntraHealth advances its interest in international public health advocacy. Through its membership in the Global Health Council, IntraHealth also promotes the funding of public health work, particularly the development of health care systems, and benefits from the sharing of public health best practices.

The Global AIDS Act Restrictions

9. IntraHealth carries out a number of programs funded by Defendants USAID and CDC that are encumbered by restrictions contained in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global AIDS Act").

10. The Global AIDS Act contains a "government funds restriction" prohibiting funds made available under the act from being spent on activities that "promote or advocate the legalization or practice of prostitution and sex trafficking," although it allows for the provision of health care and related services to prostitutes. 22 U.S.C. § 7631(e). IntraHealth rigorously complies with this government funds restriction.

11. The Global AIDS Act also contains a "policy requirement" providing, in pertinent part, that "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

12. Until 2006, USAID did not enforce the policy requirement against U.S.-based non-governmental grantees such as IntraHealth. Upon information and belief, CDC and DHHS also did not enforce the policy requirement against U.S.-based non-governmental grantees for at least some of the period between the enactment of the Global AIDS Act and May 2005.

13. Then, in June 2005, USAID applied the policy requirement to U.S. non-governmental organizations ("US NGOs") by issuing USAID Acquisition & Assistance Policy Directive 05-04 dated June 9, 2005. Neither in this policy directive, nor in any other written document, does USAID define "explicitly opposing prostitution."

14. Similarly, beginning on or about May 2005, DHHS and CDC began applying the policy requirement to US NGOs. *See, e.g.,* "Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment," 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005), annexed to the Declaration of Daniel E. Pellegrom dated December 7, 2005 as Exhibit A.

15. DHHS and CDC have not defined the term "explicitly opposing prostitution."

16. On July 23, 2007, USAID issued Amendment 1 to USAID Acquisition & Assistance Policy Directive 05-04. In this policy directive, USAID provides guidance on

whether an affiliate organization of a US NGO grantee needs to adopt a policy explicitly opposing prostitution and sex trafficking.

17. Similarly, on July 26, 2007, DHHS and CDC issued the same guidance on affiliates and policy requirements for US NGO grantees. 72 FR 41076.

18. The USAID and DHHS and CDC guidance states that a recipient of Global AIDS Act funding "must have objective integrity and independence" from affiliates in order to remain in compliance with the policy and provides a list of factors to determine such. These factors include physical and financial separation between the recipient of funds and an affiliate, including separate personnel, management, governance, accounts, facilities, and signage. AAPD 05-04 Amendment 1 and 72 FR 41076.

19. Solely in order to remain eligible to receive U.S. government funding to provide desperately needed HIV/AIDS prevention and care work around the world, IntraHealth in July 2005 adopted a policy opposing prostitution and sex trafficking.

20. DHHS and CDC have required all recipients of Global AIDS Act funding to "agree that HHS may, at any reasonable time, inspect the documents and materials maintained or prepared by the recipient in the usual course of its operations that relate to the organization's compliance [with the policy requirement]." *See, e.g.,* "Expansion and Support of HIV/AIDS/STI/TB Information, Education, Communication and Behavioral Change Communication Activities in Ethiopia – Amendment," 70 Fed. Reg. 29759, 29759-29760 (May 24, 2005), annexed to the Declaration of Daniel E. Pellegrom dated December 7, 2005 as Exhibit A.

21. IntraHealth must comply with the policy requirement as a condition of continuing its CDC-funded programs that include funding made available under the

Global AIDS Act. These projects include grants by CDC to strengthen HIV/AIDS services in Southern Sudan, Tanzania, and Zambia.

22. IntraHealth must also comply with the policy requirement as a condition of continuing its USAID-funded programs that include funding made available under the Global AIDS Act. These projects include The Capacity Project, a five-year global initiative to improve health care systems in developing countries, primarily in sub-Saharan Africa. IntraHealth leads The Capacity Project, which develops health care workforce policies and planning, implements education and training programs for health care workforces, and strengthens systems to support workforce performance. The project is currently active in more than 15 countries.

23. IntraHealth leads four other USAID-funded projects that are encumbered by the policy requirement, each one a mission-based cooperative agreement. Two were awarded by the USAID mission in Rwanda and focus on (1) expanding access to health care and decentralization of health care and (2) increasing access to comprehensive HIV/AIDS services; another is a maternal and child health project awarded by the USAID mission in Senegal; and IntraHealth is funded by the USAID mission in India to identify and implement best practices in maternal, child, and newborn health and nutrition.

24. IntraHealth must also comply with the policy requirement as a condition of subcontracts it holds with other development organizations to carry out USAID-funded work. Some of these sub-agreements include: the Extending Service Delivery global health project subcontract to Pathfinder International working in multiple countries; the ACQUIRE Fistula Care global health project subcontract to EngenderHealth; the Population, Health, and Nutrition Technical Assistance and Support Contract 3 – Global

6

Health (TASC 3) subcontract to Research Triangle Institute International; and the AIDS Support and Technical Resources (AIDSTAR) Program subcontract to Population Services International.

25.     IntraHealth must also comply with the policy requirement as a condition of applying for funding to lead or subcontract on any USAID or CDC-funded procurements that are to receive Global AIDS Act funding.  At any given time IntraHealth has five to eight of these applications in process.

How the Policy Requirement Harms IntraHealth

26.     The policy requirement detrimentally affects IntraHealth in several ways.

27.     First, IntraHealth does not normally adopt policies on political or social positions. Rather, it seeks to find solutions to public health challenges based on its experience implementing public health programs and on its organizational purpose, "to create sustainable and accessible health care." IntraHealth has now been forced to espouse a policy position that does not arise from its own purpose, programs and research. It is bound to uphold that policy even though IntraHealth has no knowledge or data to demonstrate whether a policy "explicitly opposing prostitution" does or does not promote the health and well-being of women and vulnerable populations.

28.     The second way in which the policy requirement harms IntraHealth is that it makes IntraHealth adopt a judgmental position against a highly marginalized and stigmatized population who is at the epicenter of the HIV/AIDS epidemic and has the least access to health services.  IntraHealth trains health workers who must be able to establish trust and rapport with the populations they serve.  The policy creates a barrier to establishing this trust and perpetuates the stigmatization and marginalization of an

extremely vulnerable population, thereby decreasing access to care and impeding public health efforts to stem the epidemic.

29. The third way in which the policy requirement harms IntraHealth is that it is vague and confusing. IntraHealth believes it is in compliance with the policy requirement; however, the lack of guidance from USAID, HHS and CDC as to the requirement's meaning leaves the organization unable to discern exactly what the policy requirement demands of us. This lack of clarity engenders an overall atmosphere of caution which effectively restrains our speech and our choice in program direction.

30. Fourth, the policy requirement harms IntraHealth by constricting the privately funded work that it can consider doing. Because of the policy requirement's vast reach in regulating privately funded speech and because of the uncertainty regarding its meaning, IntraHealth will not consider developing any privately funded work that removes barriers to health care for sex workers or vulnerable populations that engage in transactional sex for survival. If the policy requirement were lifted, IntraHealth could act with greater freedom to pursue new projects with non-government funding that are aimed at reducing barriers to health care for sex workers.

31. The fifth way in which the policy requirement harms IntraHealth is that it affects IntraHealth's ability to engage in dialogue about public health and sex work. I and other IntraHealth representatives frequently speak at public health conferences in the U.S. and around the world. Yet, if invited to participate in a public panel discussion about whether decriminalization and de-stigmatization of prostitution could benefit public health interventions to stem the spread of HIV/AIDS, we would not participate in that discussion in order to remain in compliance with the required policy.

32.     The sixth way that the policy harms IntraHealth is that the setting up of affiliate organizations is not in line with IntraHealth's mission to create sustainable and accessible health care.  While some US NGOs may use the model of setting up affiliate organizations, IntraHealth works with existing local, indigenous organizations in the countries where we work and builds their capacity in order to create long-term sustainability of public health programs.  Moreover, US NGOs who do set up affiliates to support HIV/AIDS work with those engaged in sex work likely receive Global AIDS Act funding and are thus encumbered by the policy.

33.     The seventh way that the policy harms IntraHealth is that it is impractical to set up an affiliate organization to use private funds that could support projects that increase access to health services for persons engaged in sex work.  The expense and burden of setting up affiliate organizations is prohibitive to IntraHealth as it would be for most similarly situated US NGOs.  For example, the process for registering an organization in a foreign country to implement programs is extremely cumbersome and expensive.  IntraHealth itself must register in many countries where it has programs in order to open a bank account and implement projects.  Registration entails hiring local attorneys, paying registration fees, filling out forms, hiring consultants, traveling to the country, and waiting for months before starting programs.  To have to register twice in a country where IntraHealth would need to set up an affiliate to participate in programs that may involve sex workers is too burdensome to be a viable option for the organization.  Moreover, it is unlikely that other funders such as the European Union, UK Department for International Development, the Canadian International Development Agency, or

private foundations would cover IntraHealth's costs of for setting up an affiliate just to remain in compliance with a US policy.

34. Finally, the policy harms IntraHealth because an affiliate with completely separate personnel, management, and governance structures will not be able to capitalize on IntraHealth's experience, reputation, and current and prior presence in more than 50 countries across the globe, which is how and why IntraHealth receives its funding. For example, as part of the application process to receive both private and government funding, IntraHealth has to complete corporate capability statements and provide past performance references about our projects that delineate why we are the appropriate organization to implement a particular program. To set up an affiliate organization is to diminish the very strength and position that brings IntraHealth its current work and funding. In other words, a new affiliate organization with separate personnel, management, and governance would be limited in citing IntraHealth's corporate capabilities or past performance references to secure funding for new programs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 25, 2008
Chapel Hill, North Carolina

_____
PAPE GAYE

10