UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. *et al.*,

                     Plaintiffs,                          05-CV-8209 (VM) (DF)

                                                          DECLARATION OF
                                                          MARK SIDEL

        -against-


UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT *et al.*,

                     Defendants.

-----------------------------------------------------------


        1.      This Declaration addresses the legal and practical difficulties of

establishing, registering, and operating new nonprofit organizations overseas, in light of

the guidelines issued by the government (U.S. Agency for International Development and

Department of Health and Human Services) under the U.S. Leadership Against

HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Guidelines").  The Guidelines

prohibit grant recipients to from engaging in protected expression unless they do so

through newly created, privately funded separate organizations that would not be required

to follow the Act's policy requirement.[1]  I submit this declaration as an expert on

international and comparative law.

---

[1]  See  Acquisition & Assistance Policy Directive (AAPD) 05-04 Amendment 1, Implementation of the
United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 – Eligibility
Limitation on the Use of Fund and Opposition to Prostitution and Sex Trafficking, issued July 23, 2007
(U.S. AID Guidelines); Guidance issued by the Office of Global Health Affairs, Department of Health and
Human Services, implementing Section 301(f) of the United States Leadership Against HIV/AIDS,
Tuberculosis and Malaria Act of 2003, issued July 23, 2007.

2.     The Guidelines do not allow American charitable organizations working abroad adequate alternative channels for protected expression because it is simply too burdensome for non-profit organizations to create, establish, register, and operate new such organizations everywhere they work overseas.

3.     In particular, the extraordinarily stringent requirements for organizational separation and independence – mandating "legally separate entit[ies]," that are completely "physically and financially separate," judged on factors that include "the existence of separate personnel, management, and governance," "the existence of separate accounts, accounting records, and timekeeping records,"[2] and separate signage and identification, are exceptionally burdensome for the Plaintiffs and for other American charitable and nonprofit organizations seeking to provide critical relief and development services that literally keep people alive in some of the world's most challenging countries.

4.     This Declaration addresses whether, and the extent to which, the Guidelines impose burdens on the establishment of affiliates in all of the countries in which these organizations operate, whether with US or private funds.  By way of example, this Declaration establishes and details the legal and practical burdens in registering a new and separate nonprofit in five of the countries where Pathfinder International and CARE, which are members of InterAction and Global Health Council, operate outside the United States:  India, Bangladesh, Mozambique, Ethiopia, and Peru.

---

[2]    Id. This wording appears in both the U.S. AID and Department of Health and Human Services guidance.

## I.    <u>Background and Statement of Qualifications</u>

5.    I currently serve as Professor of Law and Faculty Scholar at the University of Iowa, where I teach, conduct research and publish scholarly work on the law affecting nonprofit organizations and philanthropy, particularly in international and comparative perspective.

6.    I am President-elect of the International Society for Third Sector Research (ISTR), the international scholarly association promoting research and education on the nonprofit sector, philanthropy and civil society, and will serve as President in 2009-2011. In 2009-2010, I will also serve as Chair of the Section on Nonprofit and Philanthropic Law of the American Association of Law Schools (AALS), the group of law professors and legal scholars teaching, conducting research, and publishing scholarly work on the law of nonprofit and philanthropic institutions.

7.    I have conducted research and published on the law affecting nonprofit and philanthropic institutions, particularly in international and comparative perspective, for many years. My publications in this area, detailed in my Curriculum Vitae, which is attached hereto as Exhibit A, include work published in the <u>Michigan Law Review</u>, <u>UC Davis Law Review</u>, <u>Pittsburgh Law Review</u>, <u>Voluntas: International Journal of Voluntary and Nonprofit Organizations</u>, and other major journals. In 2008 I will publish a scholarly volume on the impact of counter-terrorism law and policy on nonprofit organizations titled <u>Regulation of the Voluntary Sector:  Freedom and Security in an Era of Uncertainty</u> (Routledge, forthcoming 2008).

8.    I have consulted for government agencies, international agencies, foundations and charitable organizations, and other institutions on law and policy

affecting nonprofit and philanthropic institutions. These institutions include the Ford

Foundation, World Bank, United Nations Development Programme, Asia Foundation,

Luce Foundation, Oxfam, and other institutions. In other areas I have served as a

consultant for the U.S. Department of Justice (human trafficking); U.S. Department of

State (human trafficking and forced labor in Asia, and other matters); the U.K. Serious

Organized Crime Agency (SOCA); the Refugee Legal Centre (U.K.); the Vietnamese

Ministry of Justice; Vietnamese Union of Science and Technology Associations; and

other institutions.

   9.  I hold the A.B. degree from Princeton University, the M.A. degree from

Yale University, and the J.D. degree from Columbia Law School, where I studied Asian

law. I read and speak Chinese and read Vietnamese. Earlier I served in senior program

positions with the Ford Foundation in Beijing, Bangkok, Hanoi, and New Delhi,

including directing and managing the Ford Foundation's programs in Vietnam, and

developing a regional program to strengthen the nonprofit sector and philanthropy in

South Asia.

   10.  I have worked very extensively in several of the countries discussed in

detail in this Declaration. In India, I served as Program Officer for the Nonprofit Sector

and Philanthropy with the Ford Foundation, developing and managing a regional program

to strengthen the nonprofit sector and philanthropy in South Asia, based at the Ford

Foundation's regional office in New Delhi. In Bangladesh, I served as consultant to the

Ford Foundation with full responsibility for the establishment of Bangladesh's first

national private foundation, the Bangladesh Freedom Foundation. I have written and

published extensively on the nonprofit sector and philanthropy in India and Bangladesh,

including co-editing a volume titled <u>Philanthropy and Law in South Asia</u>[3] and publishing

several scholarly law articles and book chapters.[4]

## II.    The Guidelines Impose Substantial Burdens on the Establishment and Operations of U.S.-based Nonprofit Organizations that Operate Abroad

11.    The burdens of providing humanitarian assistance in most of the countries

in which the members of InterAction and Global Health Council (collectively

"members") operate become exceptionally burdensome when they must be shouldered

twice, for new and separate organizations.  In virtually every country abroad, including

those in which the members operate, those burdens include those described below.

### A.    Burdens of Registering a New, Legally Separate Entity in Multiple Countries

---

[3]    <u>Philanthropy and Law in South Asia</u> (Mark Sidel and Iftekhar Zaman (eds.), Asia Pacific Philanthropy Consortium, 2004), updated as <u>Philanthropy and Law in South Asia:  Recent Developments in Bangladesh, India, Nepal, Pakistan, and Sri Lanka</u> (Asia Pacific Philanthropy Consortium, 2007, www.asianphilanthropy.org).

[4]    These include Mark Sidel, *Recent Research on Philanthropy and the Nonprofit Sector in India and South Asia*, 12 <u>Voluntas:  International Journal of Voluntary and Nonprofit Organizations</u> 171 (2001); Mark Sidel, *Resource Mobilization and the New Indian Philanthropy*, in Richard Holloway (ed.), <u>Towards Financial Self-Reliance:  Resource Mobilisation for Citizens' Organisations in the South</u> (Earthscan, 2001); Mark Sidel, *Philanthropy in India's High Technology Communities and the Complex Search for Social Innovation*, <u>Harvard Asia Quarterly</u> (Summer 2001); Mark Sidel, *Courts, States, Markets and the Nonprofit Sector:  Judiciaries and the Struggle for Capital in Comparative Perspective*, 78 <u>Tulane Law Review</u> 1611 (2004); Mark Sidel, *The Guardians Guarding Themselves:  Nonprofit Self-Regulation in Comparative Perspective*, 80 <u>Chicago-Kent Law Review</u> 803 (2005); Mark Sidel and Iftekhar Zaman, *Philanthropy and Law in South Asia:  Key Themes and Key Choices*, <u>International Journal of Not-for-Profit Law</u> 7:2 (2005); Mark Sidel, *Diaspora Philanthropy to India: An American Perspective*, in Geithner, Johnson and Chen (eds.), <u>Diaspora Philanthropy and Equitable Development in China and India</u> (Global Equity Initiative, Harvard University, 2005); Mark Sidel, *Focusing on the State:  Government Responses to Diaspora Philanthropy and Implications for Equity*, in Merz, Geithner and Chen (eds.), <u>Diasporas and Development</u> 25-54 (Global Equity Initiative, Harvard University, 2007).

5

12.    The Guidelines would impose significant, often exceptional difficulties in securing permission to register and operate a new nonprofit entity in a foreign country. These difficulties are substantially exacerbated by the fact that organizations will have to explain to local government authorities (often multiple authorities, and at different levels) why a second, separate and new registration for another entity is necessary.

13.    In many countries in which the members operate, for example, approval and registration of a new and separate foreign affiliated organization is a long, cumbersome and exceptionally difficult procedure, involving substantial costs. It will be even longer, more cumbersome and difficult where it involves the second, new, and separate organization related to an American charitable organization and where the American parent must shoulder the additional burden of explaining to the foreign government why this arrangement is necessary. In some countries, government agencies responsible for approval and registration of foreign charities or their local counterparts may only allow each organization to have one address, or only to work in defined, pre-approved areas of the country. As the International Center for Not-for-Profit Law (ICNL) has noted, there is currently "a regulatory backlash against NGOs that has caused growing concern among commentators and practitioners throughout the world. In the past 2 years alone, more than twenty countries have introduced restrictive regulations aimed at undermining civil society. These countries join scores of others with existing laws, policies, and practices that stifle the work of civil society organizations."[5]

---

[5]    David Moore, *Safeguarding Civil Society in Politically Complex Environments*, 9:3 International Journal of Not-for-Profit Law (July 2007), at www.ijnl.org. On the government-caused problems of registration in a disaster-ridden nation, see also International Federation of Red Cross and Red Crescent Societies (IFRC), Law and Legal Issues in International Disaster Response: A Desk Study (2007), at 13.

**B.    Difficulties Securing Visas and Work Permits for Foreign Employees of New Entity**

14.    Members will face difficulties securing visas and/or work permits for American or other foreign employees of the new entity, difficulties exacerbated because many countries may not issue visas or work permits for additional foreign personnel in a new and separate entity – and where the government Guidelines appear clearly to prohibit the "dual use" of personnel across both affiliates.

15.    As the International Red Cross has found, governments frequently limit the number of visas and/or work permits that can be given to foreign nongovernmental organizations, impose substantial waiting times or approval procedures, and require that the organizations to whom such foreign individuals will be assigned be fully registered and approved.  In fact, some 77% of international humanitarian organizations responding to an International Red Cross survey reported significant difficulties in this area.[6]  All of these processes would become considerably more difficult and complex under the Guidelines.

**C.    Expenses of Paying for Separate Office Space, Staff, and Equipment**

16.    Members will face expenses – sometimes exorbitant expenses – of paying for new and separate office space, local staff, foreign staff, necessary vehicles (including

---

[6]    See International Federation of Red Cross and Red Crescent Societies (IFRC), Law and Legal Issues in International Disaster Response: A Desk Study (2007), Sec. 10.1, p. 116, at http://www.reliefweb.int, (attached in relevant portion as Exhibit C hereto).

customs and tax costs as well as vehicle costs),[7] office equipment, security, telephone and Internet access, and other services.[8]  These expenses would be exacerbated because, according to the Guidelines, they cannot be shared by the organizations, which must remain separate in all ways.

### D.    Problems Opening Bank Accounts

17.    Members will face particular problems associated with opening bank accounts by nonprofit and nongovernmental organizations in many countries.  Banks may require evidence of registration with and approval by the government, and national laws or regulations may limit the number of bank accounts or even prohibit multiple accounts per organization, per donor, or per project (as has been the case in India under the Foreign Contribution (Regulation) Act).[9]  These already complex and difficult provisions would be exacerbated by implementation of the Guidelines.

### E.    Tax Burdens

18.    The procedural tax burdens on branches, affiliates or grantees of American charitable organizations in developing countries are already burdensome, and the addition of a requirement for new and separate organizations is likely to significantly confuse the issues of tax exemption and tax deductibility for domestic affiliates, and to re-raise with

---

[7]    For example, the same International Red Cross study cited above noted that 40% of international humanitarian organization headquarters reported that customs problems with importing telecommunications equipment were "always or frequently present." Id. at 199.

[8]    In yet another example, the Red Cross study found that 85% of international humanitarian organization headquarters reported barriers to hiring local staff. Id. at 120.

[9]    The International Red Cross also reported that 85% of international humanitarian organization headquarters had difficulties in opening bank accounts in the countries where they work. Id. at 126.

government officials the question of the tax treatment of organizations related to American charities and nongovernmental organizations, resulting in substantial additional burdens. In certain cases, national governments may even question whether existing organizations, operating on a tax exempt basis, should be re-classified or reexamined, causing exceptional burdens not only for the new and separate affiliate but potentially for the existing organization as well.[10]

### F.    Additional Political and Security Suspicion of New and Separate Establishments in Foreign Jurisdictions

19.    Members will face substantial risk of significantly enhanced suspicion by government, security, intelligence and police authorities in countries concerned that new and separate organizations are being created in order to evade tax, customs, or other government regulations. In a number of countries, government authorities, service providers, the media and other institutions are likely to believe that new and separate groups are being established in order to separate grantmaking and programs from advocacy, and thus to substantially increase advocacy activities, support for dissidents, and other activities that may be highly unpopular to government authorities.

20.    Such "doubling up" would also cause, in many countries, increased foreign country intelligence targeting of the American organizations, and increased suspicion in some countries that the new and separate groups are being formed to engage in destabilizing activities or activities in support of armed or other dissidents.

---

[10]    For examples of the significant tax burdens and difficulties that can be encountered, see the International Red Cross study, id. at secs. 12.1, 12.3, pp. 125-29.

### G.    Fundraising Difficulties

21.    The Guidelines will also make it more difficult – perhaps considerably more difficult – for institutions to raise funds for two reasons.

22.    First, in a highly competitive fundraising environment, the newly-formed separate organizations would have no track record of accomplishment on the ground on which to raise funds.  Because of the exceptionally detailed separation requirement, the new and separate affiliates are unlikely to be able to rely on the track record in effective work on the ground established by the already-existing organization.

23.    Second, the increased administrative costs incurred from dividing the work that a member does in dozens of countries into new and separate organizations would likely downgrade a member's ranking by independent certification organizations that rank charitable organizations.

24.    In response to concerns about effectiveness and efficiency in the American charitable sector, a number of rating and ranking organizations evaluate non-profit administrative costs and the ratio of administrative to program costs.  This burgeoning sector includes the Better Business Bureau Wise Giving Alliance (www.give.org), Charity Navigator (www.charitynavigator.org), Guidestar (www.guidestar.org), Charity Watch (American Institute of Philanthropy) (www.charitywatch.org), and others.

25.    Less favorable rankings or ratings, in turn, can have a distinctly negative impact on the ability of organizations to raise funds from the public.  They may even impact the ability to obtain funds from the government.  In my own experience as a grantmaker with a major private foundation, and as a consultant to other foundations and scholar of philanthropy as documented earlier in this Declaration, I am of the opinion that

the requirements of the Guidelines and the implications of those requirements for administrative expenses, ratings and related issues would negatively impact fundraising by affected institutions.

### H.    All of These Factors Impose Substantial Burdens on Members' Operations in the United States

26.    The cumulative effect of these burdens in multiple countries is likely to be very substantial. But beyond the burdens on the new and existing related organizations in many developing countries, the various burdens, in dozens of countries, will in turn cause substantial burdens for the home offices of American charitable institutions, adding substantial administrative costs that neither government funding nor private donors are likely to cover because these expenses do not contribute directly to the resolution of hunger, poverty, illness and other problems in developing countries, but must be managed solely in response to the government's Guidelines.

### III.    Examples of the Burdens the Guidelines Impose in Five Key Identified Countries in Which Plaintiffs are Active

### A.    India

27.    Requiring American charitable organizations to establish new and separate affiliates in India, in addition to the operations that they have established through long and assiduous effort, is likely to be exceptionally burdensome and result in long delays, expensive processes, and government refusal to allow the registration and establishment of new and separate organizations.

11

28.    The process for registering and establishing Indian affiliates of foreign charitable organizations, or foreign branches of charitable organizations, in India is already exceptionally complex and cumbersome, beginning with a difficult choice between registering and establishing as a society, trust, company or in some other form.

29.    Registration and establishment in India takes months or years of application and seeking government approval, including consideration of the activities that the organization will carry out, examination of the proposed board, and other procedures. For foreign organizations establishing affiliated organizations in India, these processes are complicated by the required clearances that must be obtained from the Indian Intelligence Bureau (IB), Ministry of Foreign Affairs, and other government authorities.

30.    Beyond the complexities and cumbersome process, it is possible or even likely that the Indian authorities, concerned with tracking and understanding the activities of foreign charitable and nonprofit affiliates in India, will merely refuse to allow the registration and establishment of parallel organizations. Such refusals are likely to take place on an organizational basis, and it would be in keeping with past Indian government practice for the government to make such decisions based in part on the advocacy activities of specific organizations.

31.    Visas for foreign personnel are always complex and time-consuming to obtain. The government often imposes limits on the number of foreign personnel that can be employed by the affiliate of a foreign charitable organization, and it may well be impossible to convince the government to loosen that limit for new and separate affiliates of American charitable organizations.

32.     The burdens of operations are particularly problematic in India. Affiliates and branches of foreign charitable and nonprofit organizations must engage in the highly cumbersome and time-consuming process of obtaining government authorization for duty-free import of vehicles and office equipment (because the government may not permit duty-free purchase of existing goods held by other charities in the country), and it may well be very difficult to obtain those permissions for two affiliates of the same foreign organization. Securing appropriate office space, telephone and Internet access and other necessary services can take months or longer. Accomplishing these tasks twice, for separate affiliates of the same American organization, is likely to be exceptionally difficult and spark suspicion that cheating, fraud, illicit or anti-government activities are at work.

33.     There are other restrictions at work as well. The U.S. State Department noted in the most recent (March 2007) Country Reports on Human Rights Practices that "NGOs must secure approval from the Ministry of Home Affairs before organizing international conferences. Human rights groups contended that this provided the government with substantial political control over the work of NGOs and restricted their freedom of assembly and association. NGOs alleged that some members from abroad were denied visas arbitrarily."[11] In addition, "[s]ome domestic NGOs and human rights organizations faced intimidation and harassment by local authorities."[12]

34.     There is a long history of government suspicion of the foreign charitable sector in India, documented by the U.S. Department of State as recently as March 2007 in

---

[11]    See the India section of the U.S. Department of State, <u>Country Reports on Human Rights Practices</u> <u>2006</u> (issued March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78871.htm.

[12]    <u>Id.</u>

13

the most recent annual Country Reports on Human Rights Practices.[13]  These historical

influences increase the burdens on organizations establishing new and separate

organizations, for the Indian government authorities at central and state levels will be

suspicious that the new organization is being established to evade tax or customs

requirements, or to engage in advocacy or political activities.  The government ministries

most likely to hold and act on these suspicions include the Ministry of Home Affairs, the

Intelligence Bureau, and the Ministry of Finance.[14]

35.    The establishment of new and separate affiliates of American charitable

organizations in India would also almost certainly cause havoc and long delays in the

receipt of funds from abroad for charitable work in India.  This is because India has a

long-standing and strictly applied process by which Indian nonprofits and charitable

affiliates can receive and use foreign charitable donations, known in India as foreign

contributions.  The strict Foreign Contribution (Regulation) Act (FCRA) (attached as

Exhibit C hereto), first adopted during the Indian Emergency in the mid-1970s, governs

the receipt and use of foreign donations and requires organizations based in India to apply

for approval as a foreign donation-receiving entity or to apply for special permission to

receive funds on a one time basis.

36.    Each of these alternatives – approval of organizations to receive foreign

charitable donations, or approval of donations on a one-time basis – is exceptionally

difficult and cumbersome.  Indian government authorities – particularly the Ministry of

---

[13]    For extensive information on suspicion of foreign religious and human rights organizations in India, for example, see the India section of the U.S. Department of State, Country Reports on Human Rights Practices (2006), at www.state.gov/g/drl/rls/hrrpt/2006/78871.htm.

[14]    The U.S. Department of State has extensively tracked and documented these issues.  See, e.g. the India section of the U.S. Department of State, Country Reports on Human Rights Practices 2006 (issued March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78871.htm.

Home Affairs, which administers the FCRA system, and the Intelligence Bureau, which conducts FCRA-related investigations of charitable and nonprofit organizations for the Indian government – remain suspicious that foreign charitable funds will be used for destabilizing religious, political, corrupt or other purposes in India. The U.S. State Department has noted multiple instances in which these suspicions have resulted in denials of approval for foreign charitable funds to be used in India.[15]

37.    In addition, as the most recent State Department country report on human rights in India points out, "[i]n February [2006], the Ministry of Home Affairs barred 8,673 organizations from seeking foreign funds under the Foreign Contribution and Regulation Act (FCRA), reportedly for failing to provide the proper paperwork. Under the ruling, these organizations need government approval before seeking aid from abroad. NGOs called the FCRA flawed and extremely restrictive and claimed that the government failed to notify organizations when the requisite paperwork was needed. Some human rights groups contended that FCRA was a means of intimidation and substantial political control by the government over the work of NGOs. NGOs expressed concern that the Home Ministry, which is normally not responsible for financial matters, was tasked with monitoring the finances of NGOs. The act has a clause that states the NGOs must also secure approval from the government before organizing international conferences, and some NGOs alleged that the government has denied visas to prevent

---

[15]    See the India section of the U.S. Department of State, Country Reports on Human Rights Practices 2006 (issued March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78871.htm. I have discussed this problem in India (as well as in Bangladesh) extensively in Sidel, *Courts, States, Markets and the Nonprofit Sector: Judiciaries and the Struggle for Capital in Comparative Perspective*, 78 Tulane Law Review 1611 (2004).

members from holding conferences paid for with foreign funds."[16]  The State Department report also pointed out that "[i]nternational human rights organizations were restricted, and foreign human rights monitors historically have had difficulty obtaining visas to visit the country for investigative purpose."[17]

### B.    Bangladesh

38.    Requiring American charitable and nonprofit organizations to establish new and separate organizations in Bangladesh, under a system in which even the normal, seemingly uncontroversial establishment of a single charitable affiliate can cause enormous burdens and delays, is likely to be exceptionally burdensome and to result in long delays, expensive processes, and even government refusal to allow the registration and establishment of the new and separate organizations.

39.    American charitable organizations have spent decades negotiating the byzantine and conflict-filled processes of government regulation of the foreign charitable sector in Bangladesh, and remain concerned that a conflict-ridden, often violent political culture marked by an impasse between two powerful political parties and military rulers will result in further erosion of the work that charitable organizations can do in Bangladesh.[18]  Under these tenuous and difficult circumstances, where "the relationship between nonprofits and the government has nearly always been characterized by tension

---

[16]    See the India section of the U.S. Department of State, Country Reports on Human Rights Practices 2006 (issued March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78871.htm.

[17]    Id.

[18]    See, e.g., the discussion of charitable activities and dangers in Philanthropy and Law in South Asia: Recent Developments in Bangladesh, India, Nepal, Pakistan, and Sri Lanka (Asia Pacific Philanthropy Consortium, 2007, www.asianphilanthropy.org).  See also The World Bank, Economics and Governance of Nongovernmental Organizations in Bangladesh (World Bank, April 2006, at www.worldbank.org.bd).

and mistrust,"[19] requiring that American charities establish parallel organizations in Bangladesh is likely to prove exceptionally burdensome.

40.    Registration and establishment in Bangladesh, as in India, takes months or years of application and seeking government approval, including consideration of the activities that the organization will carry out, examination of the proposed board, and other procedures.  For foreign organizations establishing groups in Bangladesh, these processes are complicated by the required clearances that must be obtained from multiple government agencies, including the bureaucratic and politically driven NGO Affairs Bureau (NGOAB) and other government institutions.  A report funded partly by U.S. AID found that "delays by NGOAB are frequent and often prolonged…NGOAB lacks capacity in the most fundamental aspects of its ability to perform its functions."[20]

41.    Beyond the complexities and cumbersome process, it is likely that the Bangladesh authorities, as in India, concerned with tracking and understanding the activities of foreign charitable and nonprofit organizations, will merely refuse to allow the registration and establishment of parallel organizations.  Such refusals are likely to take place on an organizational basis, and it would be in keeping with past Bangladeshi government practice for the government to make such decisions based in part on the advocacy activities of specific organizations.  A 2005 report partly funded by U.S. AID

---

[19]    Philanthropy and Law in South Asia, supra note 21, p. 5.

[20]    Leon Irish, Karla Simon, and Fawzia Karim Feroze, Legal and Regulatory Environment for NGOs in Bangladesh (17 April 2005), funded by NORAD, SIDA, and U.S. AID and contracted by UNDP, at http://www.iccsl.org/pubs/bangladeshfinalreportmay15.pdf, p. 10.

commented on the "much bad will and suspicion ... between the NGOs and the GOB [Government of Bangladesh]."[21]

42.    The U.S. State Department, in its most recent report (March 2007) on human rights practice in Bangladesh, noted that "[t]here were many examples of harassment [of foreign and domestic NGOs] by the [Bangladeshi] intelligence agencies."[22] "In September [2006], according to local human rights organizations, in anticipation of opposition protests in Dhaka, the government indiscriminately arrested hundreds of persons, including opposition activists and NGO supporters, on old cases or false charges such as theft. Most detainees were released within a few days. ...In mid-September police throughout the country arrested 172 workers at different offices of the NGO Proshika, according to press reports."[23]

43.    Visas for foreign personnel are usually complex and time-consuming to obtain, as the U.S. Department of State has documented with respect to foreign religious personnel in Bangladesh as recently as March 2007.[24] The government often imposes limits on the number of foreign personnel that can be employed by an organization related to a foreign charitable organization, and it may well be impossible to convince the government to loosen that limit for new and separate affiliates of American charitable organizations.

---

[21]    Id., p. 19.

[22]    See the Bangladesh section of the U.S. Department of State, Country Reports on Human Rights Practices 2006 (issued March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78869.htm.

[23]    Id. The State Department also reported that "No action was taken nor charges filed related to the July 2005 deaths of two employees of the Christian Life Bangladesh NGO who were allegedly killed because they showed an evangelical film. Police initially arrested several suspects for the killing, but they were later released, and no charges had been filed at year's end."

[24]    Id.

44.    The burdens of operations are particularly problematic in Bangladesh. Affiliates of foreign charitable and nonprofit organizations must often engage in a highly cumbersome and time-consuming process of obtaining government authorization for duty-free import of vehicles and office equipment (since the government may not permit foreign charities or their local affiliates to purchase existing, in-country goods on a duty-free basis), and it may well be very difficult to obtain those permissions for two groups related to the same foreign organization. Securing appropriate office space, telephone and Internet access and other necessary services can take months or longer. Accomplishing these tasks twice, for separate affiliates of the same American organization, is likely to be exceptionally difficult and spark suspicion that cheating, fraud, illicit or anti-government activities are at work.

45.    Given the already heightened suspicions of the Bangladeshi authorities toward foreign charitable and nonprofit organizations, the authorities in Dhaka, like those in India, are likely to be highly suspicious that attempts to establish parallel groups in Bangladesh are being undertaken to evade tax or customs requirements, or to engage in advocacy or political activities. The government bodies most likely to hold and act on these suspicions are the NGO Affairs Bureau, Ministry of Home Affairs, and ministries and agencies concerned with security and intelligence.[25]

46.    As in India, the establishment of new and separate related organizations of American charitable organizations in Bangladesh would also almost certainly cause havoc and long delays in the receipt of funds from abroad for charitable work in

---

[25]    See the Bangladesh section of the U.S. Department of State, Country Reports on Human Rights Practices 2006 (issued March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78869.htm, for further information on suspicion of foreign NGOs.

19

Bangladesh. Bangladesh has a regulated system for approval of receipt and use of foreign charitable donations by Bangladeshi affiliates of foreign charities, and a separate system of approval of the activities of foreign charitable and nonprofit organizations working directly in Bangladesh.

47.    The Foreign Donation (Voluntary Activities) Regulation Act 1978, revised in 1982 (attached hereto as Exhibit D), provides the legislative framework for this intensive regulation. The Act has been used to deny release of foreign donated funds to Bangladeshi NGOs allegedly because they were "involved in political activities" among other alleged transgressions, according to the government of Bangladesh.[26] Recently, the government has proposed strengthening and tightening the Act on several occasions. To cite but one example, the government proposed prohibiting "political activity" by nonprofits, defined so broadly that advocacy activities by charitable organizations could well be included if government authorities disapproved of such activities.[27]

48.    Bangladeshi government authorities remain suspicious that foreign charitable funds will be used for destabilizing religious, political, corrupt or other purposes in Bangladesh.

**C.    Mozambique**

49.    In Mozambique, requiring American charitable organizations to establish new and separate organizations for work there would be a highly burdensome task. The

---

[26]    PRIP Trust Signs Undertaking to Get Back Fund, New Age (Dhaka), April 25, 2005, at http://www.newagebd.com/2005/apr/25/front.html.

[27]    Philanthropy and Law in South Asia:  Recent Developments in Bangladesh, India, Nepal, Pakistan, and Sri Lanka (Asia Pacific Philanthropy Consortium, 2007, www.asianphilanthropy.org), pp. 5-7.

situation for American charitable organizations seeking to register and work in Mozambique is already very difficult.  As the U.S. State Department recently reported, "[a] government decree regulates the registration and activities of foreign NGOs. Nonpolitical foreign NGOs and religious groups must register with the Ministry of Foreign Affairs and Cooperation and are required to provide significant details on their organization's projects, staffing, and finances. … The registration process for foreign NGOs and religious groups reportedly involved significant discretion on the part of government officials and regularly took several months."[28]

50.    Human Rights Watch has documented that authorization under this decree, Decree 55/98 (attached hereto as Exhibit E), "is provided to NGOs whose activities conform with the Government program…. The Ministry issues two-year renewable permits to those NGOs who are authorized to register."[29]  Under these difficult circumstances – where registration and establishment of a single foreign charitable office is risky and complex at best – expecting and requiring foreign charitable organizations to establish new and separate organizations in Mozambique under Mozambican law would be exceptionally difficult to well-nigh impossible.

51.    Beyond the complexities and cumbersome process, it is likely that the Mozambican authorities concerned with tracking and understanding the activities of foreign charitable and nonprofit groups, will, at least in some cases, merely refuse to allow the registration and establishment of parallel organizations.  Such refusals are

---

[28]    U.S. Department of State, <u>Country Reports on Human Rights Practices 2006</u> (March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78748.htm.

[29]    Human Rights Watch, *NGO Laws:  Malawi, Mozambique, Namibia, South Africa and Tanzania*, at http://hrw.org/backgrounder/africa/zimbabwe/2004/12/6.htm.

likely to take place on an organizational basis, perhaps penalizing those charitable organizations more involved with advocacy activities that challenge the government.

52.     Permission to work and visas for foreign personnel are complex and time-consuming to obtain. As Human Rights Watch has reported, "Foreign employees working for foreign NGOs must conform with the Labor Law, Decree 8/98 [attached in relevant part hereto as Exhibit F]. Inter alia, the partner organization and the foreign NGO must verify that no Mozambican has the necessary qualifications before an expatriate may be hired...."[30] Under these already difficult circumstances it may be difficult or impossible to convince the government to loosen those limits for new and separate affiliates of American charitable organizations.

53.     The burdens of operations are particularly problematic in Mozambique. Securing appropriate clearances for import of vehicles and office equipment, and securing office space, telephone and Internet access and other necessary services can take months or longer. Accomplishing these tasks twice, for separate groups related to the same American organization, is likely to be exceptionally difficult and spark suspicion that cheating, fraud, illicit or anti-government activities are at work.[31]

54.     Given the already heightened suspicions of the Mozambican authorities toward foreign charitable and nonprofit organizations, the authorities in Maputo are likely to be highly suspicious that attempts to establish parallel related organizations in

---

[30]     Human Rights Watch, *NGO Laws: Malawi, Mozambique, Namibia, South Africa and Tanzania*, at http://hrw.org/backgrounder/africa/zimbabwe/2004/12/6.htm.

[31]     For multiple examples of these difficulties in Mozambique in the customs and import context as recently as 2007, see International Federation of Red Cross and Red Crescent Societies (IFRC), <u>Law and Legal Issues in International Disaster Response: A Desk Study</u> (2007), at 99, 100, 109, 112 (attached in relevant part as Exhibit B hereto).

Mozambique are being undertaken to evade tax or customs requirements, to engage in advocacy or political activities. The government agencies most likely to hold and perhaps act on these suspicions include the Ministry of Interior, Ministry of Planning and Finance, Ministry of Foreign Affairs and Cooperation, and government bodies responsible for security and intelligence.

55.    The establishment of new and separate related organizations of American charitable organizations in Mozambique would also almost certainly cause significant problems and long delays in the receipt of funds from abroad for charitable work in Mozambique.

56.    For each of these reasons, requiring American charitable and nonprofit organizations to establish new and separate groups in Mozambique, under a system in which even the normal, seemingly uncontroversial establishment of a single charitable affiliate can cause enormous burdens and delays, is likely to be exceptionally burdensome to the American organizations.

**D.    Ethiopia**

57.    The situation for American charitable organizations seeking to register and work in Ethiopia is already very difficult, as it is for Ethiopian organizations seeking to carry out autonomous civil society activities. The U.S. State Department has reported in recent years on government "limitations on freedom of association."[32] In such an environment, requiring American organizations to entirely double their establishment and

---

[32]    See the Ethiopia report in U.S. Department of State, Country Reports on Human Rights Practices 2005 (March 2006), at www.state.gov/g/drl/rls/hrrpt/2005/61569.htm; U.S. Department of State, Country Reports on Human Rights Practices 2006 (March 2007), www.state.gov/g/drl/rls/hrrpt/2006/78734.htm.

23

registration activities would be both very difficult and makes no sense, mandating significant new establishment, registration and operating expenses while causing government suspicions of the motivations behind dual organizational arrangements.

58.     Since the Ethiopian elections in 2005, the Ethiopian civil society and nongovernmental sector has been "fragmented and weakened."[33] In recent years, the U.S. State Department as well as reputed American and international organizations such as Freedom House (U.S.), the Christian Relief and Development Agency (CRDA) and the International Center for Not-for-Profit Law (U.S.), have reported increasing interference with the registration of charitable and nonprofit organizations.

59.     The International Center for Not-for-Profit Law reports, for example, that in Ethiopia, "regulations governing the registration process are vague and leave great discretion to the registration officials. As a result, CSOs [civil society organizations] have difficulty registering – they are sometimes denied registration and other times experience long delays or repeated requests for information."[34] The Christian Research and Development Agency (CRDA), an international aid agency working actively in Ethiopia, reported in a lengthy study of the operating environment for nonprofit and charitable organizations in Ethiopia that the "registration process [is] onerous, subjective and open for abuse and provides ample room for denial of registration."[35]

---

[33]     Christian Relief and Development Agency, Assessment of the Operating Environment for CSO/NGOs in Ethiopia (December 2006), at www.crdaethiopia.org, p. 4.

[34]     International Center for Not-for-Profit Law, Recent Laws and Legislative Proposals to Restrict Civil Society and Civil Society Organizations, 8:4 International Journal of Not-for-Profit Law (August 2006), at www.ijnl.org.

[35]     Christian Relief and Development Agency, Assessment of the Operating Environment for CSO/NGOs in Ethiopia (December 2006), at www.crdaethiopia.org, p. 14.

60.    The problems, in fact, well exceed registration.  The Christian Relief and

Development Association reported as recently as December 2006, for example, that "[i]n

Ethiopia … the mandate of the government … has gone beyond registration as far as

closing down organizations, dictating what goes or does not go into an organization's

Memo of Association … thus contravening the very principle of 'freedom of

associational life'.  There is also concern that … NGOs/CSOs will soon have to first

present project documents from regions prior to seeking basic agreements….In other

words, Government now wants to know what precisely NGOs/CSOs want to do before

providing legal certificates.  Furthermore, there was strong feeling that the government is

monitoring the 'political' actions of NGOs /CSOs."[36]

61.    The U.S. State Department has also reported on restrictions on foreign

NGO electoral observers, domestic human rights organizations, and foreign religious

workers, among other groups.  The State Department states: "The government generally

was distrustful and wary of domestic human rights groups and some international

observers.  After the November [2005] protests the government restricted human rights

groups from visiting or investigating detention camps.  In April [2005] the government

expelled representatives of several foreign-based NGOs conducting electoral work."[37]

The situation remained problematic when the most recent State Department human rights

report on Ethiopia was issued in March 2007: "The government generally was distrustful

and wary of domestic human rights groups and some international observers.  NGOs

---

[36]    Christian Relief and Development Agency, Assessment of the Operating Environment for CSO/NGOs in Ethiopia (December 2006), at www.crdaethiopia.org, p. 12.

[37]    See the Ethiopia report in U.S. Department of State, Country Reports on Human Rights Practices 2005 (March 2006), at www.state.gov/g/drl/rls/hrrpt/2005/61569.htm.

25

continued to complain of restrictions on their importation of published materials and complained that they were prevented from bringing foreigner visitors into the country."[38] In both 2006 and 2007, the State Department reported that the Ethiopian government also restricted visas for foreign religious organizations.[39]

62.     Representatives of foreign charitable organizations have been caught up in the government's repression of the charitable and nonprofit sector.  In 2007, for example, the director of the policy department at ActionAid International Ethiopia, the Ethiopian branch of the major international charitable agency ActionAid was put on trial for treason in Addis Ababa, along with another defendant who headed the Organisation for Social Justice in Ethiopia, which had conducted election monitoring.  The arrests of these nonprofit personnel and over 120 others had earlier prompted international donors, including the World Bank and the European Union, to threaten to withhold $375 million in desperately needed foreign aid for Ethiopia.[40]

63.     Under these circumstances in which the charitable, nonprofit and civil society sector already faces substantial pressure in a country in which the effective and efficient provision of aid is critical, requiring American charitable organizations to establish new and separate organizations would be a highly burdensome and entirely counter-productive task.  The creation of such related organizations would mandate significant new establishment, registration and operating expenses while causing

---

[38]   See the Ethiopia report in U.S. Department of State, Country Reports on Human Rights Practices 2006 (March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78734.htm.

[39]   See the Ethiopia report in U.S. Department of State, Country Reports on Human Rights Practices 2005 (March 2006), at www.state.gov/g/drl/rls/hrrpt/2005/61569.htm; U.S. Department of State, Country Reports on Human Rights Practices 2006 (March 2007), at www.state.gov/g/drl/rls/hrrpt/2006/78734.htm.

[40]   International Center for Civil Society Law Newsletter, January 2006 and July 2007, at www.iccsl.org.

government suspicions of the motivations behind dual organizational arrangements, and siphoning urgently needed resources away from addressing Ethiopia's immense problems of poverty, food insecurity, and conflict.

### E.    Peru

64.    In Peru, requiring American charitable organizations to establish new and separate organizations would be a highly burdensome task in a situation where the charitable and nonprofit sector is already under significant pressure.

65.    Freedom House reported in 2007 that "[c]ooperation between the state and NGOs has diminished significantly under the [current] government, which is perceived as wary of NGO motivations.  Given the lack of a coherent opposition in congress, NGOs are seen by the government almost as opposition political parties. This puts them in a difficult position: the more vigorously they oppose government actions, the more the government view that they are political entities is validated."[41]

66.    These suspicions and harassment took a more ominous form in December 2006, when "final amendments were passed to a new law that imposed new registration rules on all NGOs operating in the country. The law [Ley No. 28875]… requires that all NGOs register with [the Peruvian Agency for International Cooperation] and divulge details of the provenance and intended use of all donated funds.  For money channeled through [the Agency], the agency – which as an arm of the foreign affairs ministry is an executive branch institution – will have the ability to "prioritize" spending in line with national development goals, as well as impose sanctions on organizations that are deemed

---

[41]    Freedom House, Countries at the Crossroads 2007 (Peru), at www.freedomhouse.org.

noncompliant with the new regulations."[42]  This new law was perceived as a direct threat by the Peruvian nonprofit and charitable sector.[43]

67.    In such an environment, requiring American organizations to entirely double their establishment and registration activities would be both very difficult and makes no sense, mandating significant new establishment, registration and operating expenses while causing government suspicions of the motivations behind dual organizational arrangements, and siphoning urgently needed resources away from addressing Peru's continuing issues of poverty, food insecurity, and conflict.

## IV.    Conclusion

68.    In summary, the government's Guidelines impose very substantial burdens on American charitable organizations working abroad in each of these areas.  The Guidelines do not allow American charitable organizations working abroad adequate alternative channels for protected expression because it is simply too burdensome for non-profit organizations to create, establish, register, and operate new related entities everywhere they work overseas.

Executed on February 5, 2008
Iowa City, Iowa

_____
Mark Sidel

---

[42]    Id.

[43]    Id.  The law was challenged before the Peruvian Constitutional Court, which held parts of it unconstitutional on August 29, 2007.  International Center for Civil Society Law Newsletter, October 2007, at www.iccsl.org.