# Exhibit B



# Law and legal issues in international disaster response: a desk study

International Federation of Red Cross and Red Crescent Societies

# Part I: Background and context



# Chapter 1

## Background to the study

Before turning to the analysis, it is important to provide some brief background on the origins and primary sources for this study and to explain its scope and limitations.

### 1.1 Origins and linkages to the International Red Cross and Red Crescent Movement

The origins of this study are linked to the long history of the International Red Cross and Red Crescent Movement, as the world's largest humanitarian network, in disaster relief. The Movement, and especially its founding organ, the International Committee of the Red Cross (ICRC), is well known for its role in promoting the development and implementation of international humanitarian law (IHL) for situations of armed conflict, in particular, the Geneva Conventions of 1949 and their Additional Protocols. However, as early as 1869, the 2nd International Conference of the Red Cross (hereinafter, "International Conference"),[38] adopted a resolution calling on National Red Cross Societies to provide relief "in case of public calamity which, like war, demands immediate and organized assistance." This peacetime role was confirmed in practice, emphasized in the 1919 Constitution of the League of Red Cross Societies (now known as the International Federation of Red Cross and Red Crescent Societies) and eventually codified in the Statutes of the International Red Cross and Red Crescent Movement, first adopted in 1928.

Unsurprisingly, the Movement has also been a leading actor in developing the existing norms and standards of international disaster relief. This has included not only instruments concerning its own role and activities, such as the Principles and Rules for Red Cross and Red Crescent Disaster Relief of 1969,[39] but also critical instruments for all actors in the field, such as the Declaration of Principles for International Humanitarian Relief to the Civilian Population in Disaster Situations of 1969, the Measures to Expedite Emergency Relief adopted both by the International Conference and the United Nations General Assembly in 1977, and the Code of Conduct for the Red Cross and Red Crescent Movement and Non-Governmental Organizations in Disaster Relief of 1994 (hereinafter, "the Red Cross Red Crescent NGO Code of Conduct").

In 2000, a chapter of the International Federation's World Disasters Report highlighted the question of international law on disaster response and urged further research and dialogue in this area.[40] As a result, in 2001, the Council of Delegates[41] of the Red Cross and Red Crescent adopted a resolution calling upon the International Federation to "advocate for the development and, where applicable, the improvement and faithful application of International Disaster Response Law." The International Federation then established a dedicated programme, now known as the International Disaster Response Laws, Rules and Principles (IDRL) Programme[42] to initiate research on existing law and the nature of the most common problems. Since its inception, the IDRL Programme has been active in researching and disseminating information about existing international law, preparing case studies of domestic laws and their application in particular disaster settings, and consulting with stakeholders inside and outside the Movement about the problems they have experienced.

In 2003, the 28th International Conference (gathering the components of the Movement and all state parties to the Geneva Conventions) adopted an "Agenda for Humanitarian Action," including Final Goal 3.2 (attached to this study as Appendix 1), which called upon the International Federation and National Red Cross and Red Crescent Societies to "lead collaborative efforts" to research, analyse and disseminate the existing legal and normative framework for international disaster relief, identify gaps, and develop practical solutions. A similar commitment to find solutions in this area was expressed in regional Red Cross/Red Crescent conference instruments, including the Manila Action Plan of 2002,[43] the Santiago de Chile Commitment of 2003[44] and, most recently, the Singapore Declaration of 2006[45] and the 2nd Commonwealth International Humanitarian Law Conference of 2007.[46] Likewise, in November 2005, the Commission of the Council of Delegates on Access to Victims and Vulnerable Persons noted that the International Federation's work on regulatory frameworks to facilitate the delivery of humanitarian was crucial to ensuring access in disasters.[47]

Also in 2005, the General Assembly of the Red Cross and Red Crescent adopted the "Global Agenda and Framework of Action,"[48] setting out overarching goals for the Movement for the next five years. Among these are reducing the number of deaths, injuries and impact from disasters (Goal 1) and reducing the number of deaths, illnesses and impact from diseases and public health emergencies (Goal 2).[49] It also established a number of priorities for action, including "[i]mproving our local, regional and international capacity to respond to disasters and public health emergencies" and "[r]enewing our advocacy on priority humanitarian issues[.]"[50]

The International Federation believes that improving the regulatory environment governing all international disaster response actors will increase the speed and effectiveness of both Red Cross and Red Crescent assistance and the overall response, saving more lives in disasters and public health emergencies, and more completely addressing disaster impact. Sensibly balancing the interest in speed and efficiency of international assistance with the needs for coordination, quality control and complementarity will also help to check the erosion of the roles of local responders that has occurred in some major international operations and that has been regularly criticized in "lessons learned" evaluations of the last two decades.

In accordance with the terms of Final Goal 3.2, the issue of legal regulation and facilitation of international disaster response will again be taken up at the 30th International Conference in November 2007.

## 1.2 Sources

In addition to desk research, this study draws from four main sources. The first of these is the IDRL database, a collection of several hundred international, regional and national legal instruments pertinent to international disaster relief gathered by the IDRL programme and its contributors since 2001. The database is publicly available online at http://www.ifrc.org/idrl.

The second source is the more than two dozen legal and operational case studies conducted by or in coordination with the IDRL programme since 2002, as listed in Appendix 2 to this study. The text of these prior studies is also available on the website above or by request to the International Federation.

The third source is the responses to a series of surveys the IDRL programme sent in 2006 to governments, National Red Cross and Red Crescent Societies, international organizations, and NGOs. These surveys sought respondents' viewpoints and experiences of legal and regulatory issues in international disaster relief operations, as well as exploring the awareness and use of existing international instruments. A summary report on the results of the surveys is included as Appendix 3 to this study.

The fourth, and probably most important, source is the direct consultations and interviews IDRL programme staff have held over the period of the programme's activity with National Red Cross and Red Crescent Societies, logistics and disaster management staff of the International Federation, external humanitarian partners and governments. These include both informal discussions and formal meetings, notably a series of five regional "forums" the International Federation began to organize in 2006 in preparation for the 30th International Conference. These forums convened senior representatives of governments, National Red Cross and Red Crescent Societies, international organizations, NGOs and other stakeholders to discuss current problems and best practices in the regulation and facilitation of international disaster response. Reports from the regional forums are available at http://www.ifrc.org/idrl.

## 1.3 Scope

### 1.3.1 Which law?

This study examines the effectiveness of legal, regulatory and normative frameworks that govern international disaster response. At the international level, this includes analysing the coverage and implementation of existing "hard law" and "soft law"[51] instruments. At the national level, it includes the examination of how successfully applicable legal and institutional regimes have facilitated and regulated international relief and recovery efforts in recent operations.

The legal scope will be limited in several respects. First, it examines regulatory issues related to international disaster response, to the exclusion of rules related to purely domestic activities. Second, it looks mainly at rules for relief and recovery rather than risk reduction. The omission of these topics is not a reflection of their importance. Indeed, progress in these areas is rightly considered a priority for the international community, with hopes of minimizing the need for international disaster assistance in the first instance. Nevertheless, international assistance will, in all likelihood, remain a necessity in many situations and its associated legal issues have received comparatively little attention.

Third, with a few minor exceptions, this study does not address the issue of customary international law in the area of disaster response. Custom is a well recognized form of binding international law formed by general state practice accompanied by an acceptance of that practice as required ("opinio juris").[52] Evidence of these two elements have been found both in the verbal and physical acts of states, and can include a wide range of sources, including conforming domestic legislation and case law, diplomatic correspondence, votes on international resolutions, treaty texts or simple physical presence, such as when patrolling territorial waters.[53] Thus, many of the instruments and field practices identified here would likely be relevant to this inquiry, though this study will be focusing on problem areas rather than a more general description of practice. However, precisely because proof of customary international law must be pieced to-