gether from a myriad of indications of state intent and belief, it requires a scholarly depth beyond the scope of this introductory desk study[54] and there is little prior research from wich to draw conclusions in this area.[55] As noted above, the International Law Commission has recently decided to begin examining the legal issues in disaster relief, and the existence of customary law will likely figure large in its inquiry.

### 1.3.2 Which disasters?

The term "disaster" has been defined in many ways by scholars of various disciplines[56] and the development and humanitarian communities. It is now widely recognized that all of the varying approaches to the term are imbued with particular political, ideological, cultural and other biases[57] and a definitive settlement of "what disaster means" appears unlikely anytime soon. As two scholars noted in a recent publication on this topic, "the more we know about specific disasters, the more definitions of disaster are registered in the literature."[58]

International normative instruments have also approached "disaster" in various ways. Some do so narrowly, focusing exclusively on events of a particular type (e.g., nuclear emergencies[59] or oil pollution[60]) or category (e.g., natural disasters[61] or industrial accidents[62]). Some others have deliberately rejected the term "disaster" due to its uncertain nature[63] or used it without providing a definition.[64] However, there seems to be a tendency in newer international instruments to view and define the term "disaster" quite broadly.

For example, in 1998, the Tampere Convention defined "disaster" as "a serious disruption of the functioning of society, posing a significant, widespread threat to human life, health, property or the environment, whether caused by accident, nature or human activity, and whether developing suddenly or as the result of complex long-term processes."[65] That same year, the Agreement among the Governments of the Participating States of the Black Sea Economic Cooperation on collaboration in Emergency Assistance and Emergency Response in Natural and Man-Made Disasters of 1998 (hereinafter "the BSEC Agreement") deemed "disaster" "an event in a definite area that has occurred as a result of an accident, hazardous natural phenomena, catastrophe, natural or man-made, which may or have caused significant physical, social, economic and cultural damage to human lives or environment."[66] In 2000, the International Civil Defence Organization's Framework Convention on Civil Defence Assistance (hereinafter, "the Framework Convention on Civil Defence") offered this brief definition: "an exceptional situation in which life, property or the environment may be at risk."[67] Most recently, in 2005, the ASEAN Agreement on Disaster Management and Emergency Response (hereinafter, "the ASEAN Agreement") determined that "disaster" "means a serious disruption of the functioning of a community or a society causing widespread human, material, economic or environmental losses."[68] Some additional legal definitions are listed below in Box 1.

For its part, the international humanitarian community has also adopted a broad approach to the term disaster in policy documents. For example, in 1992, an "Agreed Glossary of Basic Terms Related to Disaster Management" prepared by the United Nations Department of Humanitarian Affairs (DHA) (a predecessor to the Office for the Coordination of Humanitarian Affairs (OCHA)) defined disaster as "[a] serious disruption of the functioning of society, causing widespread human, material or en-

> **Box 1: Some international definitions of "disaster"**
>
> "Disaster means a serious disruption of the functioning of society, posing a significant, widespread threat to human life, health, property or the environment, whether caused by accident, nature or human activity, and whether developing suddenly or as the result of complex long-term processes."
>
> Tampere Convention, 1998, art. 1
>
> "Disaster... A serious disruption of the functioning of society, causing widespread human, material or environmental losses which exceed the ability of affected society to cope using only its own resources."
>
> UN DHA, Agreed Glossary of Basic Terms, 1992
>
> "'Disaster' means the sudden event attributable directly and solely either to the operation of the forces of nature or to human intervention or to both of them and characterised by widespread destruction of lives or property accompanied by extensive dislocation of public services, but excluding events occasioned by war, military confrontation or mis-management."
>
> CDERA Agreement, 1991, art. 1(d)
>
> "A disaster is a calamitous event resulting in loss of life, great human suffering and distress, and large scale material damage."
>
> Red Cross/Red Crescent and NGO Code of Conduct, 1995
>
> "The term 'natural or technological disaster' means a situation of great distress involving loss of human life or large-scale damage to property, caused by a natural phenomenon, such as a cyclone, tornado, earthquake, volcanic eruption, flood or forest fire, or by a technological accident, such as pollution by hydrocarbons, toxic or radioactive substances."
>
> International Space Charter, 1999, art. 1
>
> "'Disaster' is an exceptional situation in which life, property or the environment may be at risk."
>
> Framework Convention on Civil Defence, 2000, art. 1(c)

vironmental losses which exceed the ability of affected society to cope using only its own resources."[69] Variants of this definition remain in active use by UN agencies[70] and other humanitarian actors.

Accordingly, this study also adopts a broad approach to disaster, looking at legal issues of operations in both sudden-onset events (such as earthquakes, typhoons, fires, and particularly volatile diseases) and slow-onset events (such as droughts, creeping floods, and slow-spreading disease), and in so-called "natural"[71] and "man-made" disasters.

Like the approaches in the above instruments, it will not focus on incidents that do not pose a widespread threat to a society, such as airplane or naval emergencies or individual traffic accidents. Unlike these definitions, however, it will expressly exclude "armed conflict" as a type of "disaster" to be examined (except tangentially, in its discussion in Chapter 15 of situations when disasters arise in the context of a conflict).[72] This is because there is already a comprehensive global legal framework of IHL, including the Geneva Conventions of 1949 and their three Additional Protocols, which governs humanitarian assistance in conflict. The ICRC, which has a universally recognized role as "guardian" and promoter of IHL,[73] is actively pursuing initiatives to expand and consolidate IHL and its impact.[74] Moreover, there is a formidable array of legal research and writing ongoing in this area in universities, research institutes and other fora across the globe. Finally, there are important differences between the context of conflict and peacetime disaster, as discussed in chapter 15.

### 1.3.3 Which activities?

This study will address disaster preparedness, emergency relief, recovery and rehabilitation. This is a fairly broad scope of activities, and the same rules do not and should not necessarily apply to each stage. However, it quickly became plain in the initial research for the IDRL programme that the scope of its inquiry had to extend beyond the immediate period after a disaster when emergency relief is provided. While a number of existing international legal instruments[75] are specifically focused on this brief period, many others extend well beyond.[76] More importantly, as noted by a number of respondents to the IDRL survey, many of the most troublesome legal problems that arise in disaster operations do so not in the initial days but in the several weeks or months that follow, as "normal" rules of business re-emerge, and the consequences of faulty mechanisms of coordination, quality and accountability become more apparent.[77]

It is not always easy to distinguish between recovery/rehabilitation and development. Ensuring an effective continuum of disaster response, which includes development elements from the beginning and which guarantees a smooth transition between relief and development work has been a major goal of the international community in recent years.[78] A major disaster can have enormous and extremely long-lasting effects on a society, such that subsequent efforts to encourage development must take it into account; likewise, recovery efforts must take long-term development goals into account. Still, at some point, a line is crossed, and existing international instruments do acknowledge a boundary between disaster response and general development.[79]

This dividing line is particularly important for humanitarian actors (i.e., organizations operating according to humanitarian principles, such as those described in the Red Cross Red Crescent NGO Code of Conduct), as their claim for access and "humanitarian space" rests on their independence and commitment to respond impartially, neutrally and solely on the basis of critical need. In contrast, development aid must be intimately tied to the domestic political process of setting long-term goals for the future of the nation.

Without a recognized legal personality, international humanitarian organizations have reported difficulties in a number of areas, ranging from hiring local staff and signing leases for office space as well as opening bank accounts and obtaining tax exemptions (both discussed further below).[984] Nevertheless, given the complexity of procedures, some international NGOs simply go without official registration and "hope for the best." However, their uncertain status can also have other consequences. For example, foreign NGOs in both Thailand and Indonesia that had given up on registration reported feeling significant concern that they might be "asked to leave at a moment's notice" and this impeded their planning and operations.[985]

## 12.2 Bank accounts

As noted above, one of the important consequences of problems with legal personality is difficulty opening bank accounts in the affected state. However, this is not the only reason for difficulties in this area, and even governments and inter-governmental organizations are sometimes affected. Thus, 30 per cent of National Societies, 85 per cent of international humanitarian organization headquarters, and 36 per cent of governments responding to the IDRL survey reported problems opening bank accounts in the affected state. As noted by some respondents, without a local bank account, humanitarian actors have resorted either to carrying large amounts of cash to fund their projects or to opening accounts in the individual names of their staff members.[986] Existing IDRL instruments do not directly address this issue.

## 12.3 Taxation

Many states provide for tax benefits for recognized non-profit organizations, although the degree of exemption and the types of taxes involved varies widely.[987] There is also some variation in the tax treatment of diplomatic corps and inter-governmental organizations, notwithstanding general rules from the law of privileges and immunities exempting them from direct taxes. Moreover there is important variation in the tax treatment of bilateral aid among states, though some aid providers have made it a condition of their help that taxes be waived.[988]

Overall, 38 per cent of respondents to the IDRL survey (including 32 per cent of National Societies and 82 per cent of international humanitarian organization headquarters) reported problems related to taxes in their operations.[989] Moreover, although it has been asserted that, "in general, sovereigns do not tax each other,"[990] 66 per cent of government respondents also reported tax-related problems in their relief activities. As discussed in detail above, these include customs duties and transport-related charges. Additional issues have been reported concerning value-added taxes (VAT) and income tax.

VAT can be an issue both with regard to the goods and services disaster responders import and those they purchase locally.[991] Different states provide differing types of beneficial treatment on VAT to charitable organizations, ranging from exempting them from paying the VAT on their purchases in the first instance, to treating them as "non-taxable persons" (which only exempts their output and does not release them from paying VAT on goods and services they purchase) and "zero-rating" or establishing a low VAT rate for their services and allowing them to apply for a refund on their purchases.[992] Many also limit VAT exemptions to specific types of goods and services, sometimes but not always, including humanitarian assistance.[993] For example, after