the 1999 earthquake in Turkey, imported medications were initially charged VAT, until a specific order was issued creating a special rule.[994]

VAT is generally not considered a "direct tax" under the Convention on the Privileges and Immunities of the United Nations[995] or the Vienna Convention on Diplomatic Relations[996] and is therefore not subject to exemption under those instruments. Nevertheless, bilateral agreements between states and with the UN, International Federation and some NGOs provide for VAT exemptions and a number of states also provide for such exemptions directly in their domestic legislation.

Where VAT reimbursement is provided, it can dramatically lower the costs of operations and allow for a greater level of assistance. For example, it was reported that a 2005 VAT reimbursement on International Federation food distribution operations in Belarus allowed for the purchase and distribution of 1,800 additional food parcels.[997] On the other hand, reimbursement processes can often be quite lengthy and complicated.[998] Exemptions at the point of purchase are plainly preferable from the point of view of aid providers, especially if they are operating in a particular state only temporarily.

Income tax (both organizational and individual) can also be a complex issue in disaster operations. UN agencies and other inter-governmental organizations, as well as their officials and experts are generally exempt from income taxes by operation of their privileges and immunities.[999] International Federation status agreements as well as some bilateral agreements between states and with international NGOs provide for similar rights (though usually not extended to local staff). Moreover, many states have entered into bilateral agreements to guard against double taxation on their nationals, and these might be applicable to certain personnel in an operation.[1000] This still leaves a number of actors, including non-diplomatic foreign state personnel, and the employees of NGOs and foreign National Red Cross and Red Crescent Societies[1001] potentially subject to income tax.

Thus, in both Indonesia and Sri Lanka, donations to international NGOs were considered taxable organizational income, though in the latter case exceptions were made for funds associated with selected relief and rehabilitation activities.[1002] Moreover, in Indonesia, a number of international NGOs reported consulting with government officials and multiple tax lawyers and still remaining unsure whether they were required to withhold tax from employee salaries or not.[1003]

As discussed above in Chapter 9, a great many existing disaster-specific instruments call for the waiver of duties and other taxes on imported relief goods and equipment. Often, the operative language is broad enough to include VAT as well as import-specific taxes. For example, the Inter-American Convention provides that "[t]ransport vehicles, equipment, and supplies... shall be exempt from the payment of taxes, fees, and other charges;"[1004] the CDERA Agreement provides that the affected state shall "accord the sending State exemption from taxes, duties or other charges on equipment and property brought into the territory of the requesting State by the sending State for the purpose of rendering assistance;"[1005] and the BSEC Agreement provides that goods and equipment shall be "exempt from customs duties, taxes and fees."[1006] Some bilateral agreements also have very sweeping language prohibiting any taxation,[1007] and in some instances, United States agreements with some other states have extended these provisions to NGOs carrying out projects funded by USAID.[1008]

The model agreements appended to the Oslo Guidelines and employed by the NATO EADRU both specifically call for exemption from taxation on locally purchased items.[1009] In contrast, both the Nuclear Assistance Convention and the Tampere Convention specifically exclude taxes "normally incorporated in the price of goods or services" from their otherwise general call for immunities from taxation for relief operations and personnel.[1010] This dichotomy of tax treatment between imported and locally purchased goods could create an odd and counter-productive incentive for international actors to favour the former, to the detriment of the local economy. On the other hand, the Oslo Guidelines, the Nuclear Assistance Convention and Tampere Convention all appear to be on the same page with regard to calling for exemption from organizational and personal income taxes for international relief operations.[1011]

In 2005, the International Tax Dialogue (ITD) (a consortium of international development organizations) approached the Committee of Experts on International Cooperation on Tax Matters (an intergovernmental body formed by ECOSOC to identify issues and develop recommendations on tax matters with international dimensions), with the issue of taxation of development aid.[1012] In its paper, the ITD noted that the World Bank and some large donors had begun to move away from insisting that their development aid not be taxed and urged that the Committee recommend this to other donors. However, it also specifically distinguished situations of disaster, noting that taxation of humanitarian relief "might be considered unreasonable."[1013] The Committee generally concurred with this position, recommending that international guidelines be developed on the taxation of international assistance along

> **Box 10: Potential elements for guidelines on taxation of disaster assistance mentioned by the committee of experts on international cooperation on tax matters**
>
> - No taxes or duties on the import of goods for humanitarian relief
>
> - Physical presence of aid personnel should not be taken into account in determining resident status for purpose of income tax
>
> - Government and "public international organisation" aid personnel should be exempt from exmployment income tax
>
> - Foreign private companies and consultants carrying out aid work on behalf of a foreign government should not be subject to income tax for a specific length of time (e.g. six or twelve months)
>
> - Tax rules applicable to transactions connected with aid projects financed by governments or public international organizations should "in no cases be discriminatory or unusually burdensome compared with the otherwise applicable tax regime in the recipient country."[1015]

the lines of the elements described in Box 10.[1014] However, the strong focus on governmental and inter-governmental aid is evident the Committee's current thinking and it does not yet appear to have addressed issues of VAT in disaster relief.

The Committee is scheduled to continue its consideration of this issue at its 2007 session.

## 12.4 Security

The security of international relief personnel, goods, and equipment is normally discussed primarily with regard to situations of armed conflict. However, 39 per cent of the respondents to the IDRL survey[1016] (including 30 per cent of National Societies, 43 per cent of governments and 85 per cent of international humanitarian organization headquarters) reported having encountered security problems in disaster operations.

Such concerns are particularly common when disasters occur in the context of ongoing political instability. For instance, in Somalia, drought relief efforts have been greatly hampered by pervasive banditry and piracy.[1017] Massive disasters can also sometimes provoke civil disturbances, particularly when emergency relief is delayed or inadequate. For example, after the August 2007 earthquake in Peru, delays in provision of relief supplies led to rioting and looting of shops and relief trucks.[1018] Likewise, lawlessness and looting wracked New Orleans after Hurricane Katrina in 2005.[1019]

Even in the absence of widespread lawlessness, large relief operations can be a tempting target for criminals. For example, after Tropical Storm Stan in Guatemala, relief workers reported armed assaults on trucks delivering food assistance.[1020] In fact, International Federation statistics in recent years have indicated that International Federation delegates are more at risk of becoming victims of violent attack in high crime areas than in conflict areas.[1021] Likewise, a 2003 survey of relief and development workers from various agencies in 39 countries found that even among those working in overall environments of little or no violence, over 15 per cent reported obstacles to their operational access to beneficiaries due to concerns about small arms.[1022]

From the regulatory standpoint, security raises issues both with regard to the efforts that should be expected of authorities to protect relief operations as well as to the restrictions they might impose on humanitarian access. Overall, 51 per cent of respondents to the IDRL survey reported that affected state governments had provided them with free security services at least some of the time,[1023] but others complained that their personnel were often "on their own." On the other hand, many organizations have chafed against restrictions on their movement justified by security concerns. For example, the Indonesian army imposed military escorts on some humanitarian actors immediately after the 2004 tsunami.[1024] Moreover, in the United States, governmental authorities reportedly ordered the American Red Cross not to enter New Orleans after Hurricane Katrina, in part due to security concerns.[1025]

As noted above in section 3.1.15, once it enters into force, the Optional Protocol to the Convention on the Safety of the United Nations and Associated Personnel will apply to disaster settings unless the state concerned "opts out" for that operation. However, it will only apply to UN actors and others acting under UN direction. On the other hand, a number of other IDRL instruments at the global,[1026] regional[1027] and bilateral level[1028] also impose obligations on affected states to protect relief per-

# Appendix 3

# Report of the IDRL Questionnaire of 2006

## 1. Background

Since its inception in 2001, the International Federation of Red Cross and Red Crescent Societies (International Federation) has been gathering and disseminating information about legal issues in international disaster response. In addition to legal research and operational case studies, the International Federation has consulted informally with governments, National Red Cross and Red Crescent Societies, NGOs, UN agencies and other stakeholders to better understand how legal issues impact on their disaster relief operations. Through these efforts, the International Federation has received a great deal of suggestive accounts about legal problems in international disaster response and the degree to which international norms are playing a useful role at the national level. However, the information obtained has been mainly anecdotal and it was considered that a more formal survey process would be helpful in identifying broad trends.

Thus, in 2006–2007, the International Federation distributed questionnaires to governments (both as receivers and providers of international disaster assistance), national Red Cross and Red Crescent Societies, NGOs, UN and other inter-governmental entities, and private companies about their experiences of legal issues, their use of certain international instruments, and legal regimes at the national level. Their responses indicate that while legal problems are not central to every relief operation, the common core of issues have been experienced by nearly all stakeholders at one time or another and existing instruments and national laws are not doing as much as might be desired to address them. This report provides an overall summary of the results of the questionnaires and some additional data and information is provided in the text of the IDRL desk study.

### 1.1 The process

#### 1.1.1 Development

International Federation field delegates with experience in dealing with legal issues in disaster operations were interviewed by telephone in November 2005 in order to develop a set of questions which could be used in questionnaires directed at a broader group of stakeholders. The draft questionnaires were then shared with all relevant departments in the International Federation secretariat; interested national Red Cross and Red Crescent Societies; and a number of humanitarian partners for input on the text.

#### 1.1.2 Dissemination

In January 2006, questionnaires were prepared in English, Spanish, French, and Arabic, made available for response through an online format as well as in Microsoft Word and hard copy[1]. They included both closed and open-ended questions, covering a range of issues relating to disaster relief operations, whether undertaken by disaster responders

---

[1] Blank copies of the questionnaires are available on the IDRL Programme website at http://www.ifrc.org/what/disasters/idrl/resources/survey.asp.