Respondents were additionally asked if their operations had been facilitated by any regional intergovernmental organization. Fifty-six percent of governments indicated that they had. Specific positive mention was made of the NATO Euro-Atlantic Disaster Response Coordinating Centre, and the Caribbean Disaster and Emergency Response Agency (CDERA). The figures were much lower for the other target groups (26 per cent of national societies, 16 per cent of all IHOs and 27 per cent of IHO headquarters); moreover, it is not clear if all of those who responded positively interpreted this question in the manner intended by the drafters, inasmuch as some of the particular organizations they listed were UN agencies, the International Federation or domestic agencies.

## 3. Existing legal frameworks

### 3.1 International instruments

There are a number of international instruments that address legal barriers in international response. The questionnaires referred to several of them, but not all were relevant to each group of stakeholders and a complete comparison was therefore not deemed possible for each instrument. In particular, because of the spotty ratification of most of the relevant treaties, it was considered of little use to ask generally about their employment by governments that might or might not be parties.

- All respondents were asked about their use of several international codes or guides listed on the charts below. Respondents reported great use of both the Code of Conduct for the International Red Cross and Red Crescent Movement and NGOs in Disaster Relief (1994) and the Sphere Humanitarian Charter and Minimum Standards in Disaster Response (2000 and 2004). Seventy-six percent of all respondents reported using the Code, and many also stated that they used it frequently or always (61 per cent of national societies, 53 per cent of governments, 82 per cent of IHO headquarters). Likewise, 72 per cent of respondents used the Sphere Handbook, and 50 per cent



Use of the Code of Conduct and Sphere



Use of models and guidelines



Use of selected conventions (humanitarian respondents only)

of national societies, 35 per cent of governments, and 82 per cent of IHO headquarters reported using it frequently or always.

Respondents also indicated that they had made use of some of the leading model agreements and draft rules for international disaster operations. Overall, 35 per cent had used the International Guidelines for Humanitarian Assistance Operations (Max Planck Institute, 1991), 33 per cent had used the Model Rules for Disaster Relief Operations (UNITAR, 1982), 46 per cent had used the Draft Model Agreement Relating to Humanitarian Relief Actions (International Law Association, 1982), 32 per cent had used the Recommendation of the Customs Co-operation Council to expedite the forwarding of relief consignments in the event of disasters (T2-423, 1970), and 38 per cent had used the Model Customs Agreement (World Customs Organisation and OCHA, 1996).

National societies and IHOs were also asked about their use of selected conventions related to customs or telecommunications in disaster relief operations. Overall, these were used less often than the above non-binding documents, but 24 per cent reported using Specific Annex F.5 of the Convention on the Simplification and Harmonization of Customs Procedures of 1973 ("Kyoto Convention"), 24 per cent reported using Specific Annex J.5 of the Revised Kyoto Convention of 1999, 26 per cent reported using the Customs Convention on the A.T.A. Carnet for the temporary admission of goods, 14 per cent reported using Annex B.9 of the Convention on Temporary Admission, and 25 per cent reported using the Tampere Convention on the Provision of Telecommunication Resources for Disaster Mitigation and Relief Operations.

Questionnaire responses indicate that governments generally, but not invariably, consider their existing treaties and agreements helpful in facilitating and coordinating international disaster assistance in their own countries. The majority found their bilateral (68 per cent), regional (65 per cent) and global multilateral treaties (60 per cent) "very helpful". However, this left substantial minorities that felt that these treaties were only "moderately helpful" or "not helpful".



**Governments' assessments of treaties and agreements**

### 3.2 National laws and policies

Governments, national societies and IHO field offices were queried about national laws and policies on international disaster relief[3]. Overall, 68 per cent of respondents indicated that there was disaster-specific legislation in their countries, 67 per cent stated that there was a national-level disaster response plan, and 70 per cent stated that there was a single national coordinating body for disaster relief within the gov-

---

[3] *There was some overlap in responses; 9 national societies and governments replied from the same country as did 10 of the IHO field offices. It is notable that while their responses were mainly consistent, there were also several apparent disagreements. Overall responses provided here count each country only once and, on the assumption that governments are in the best position to describe their own laws, use the government responses in case of disagreement in overlapping answers. In case of disagreement between non-government actors, the answers were not tallied.*

ernment. Fifty percent of respondents indicated that disaster relief was primarily regulated at the national level in their countries, 19 per cent at the provincial level, 24 per cent at the local level, and 7 per cent state that there was no primary level.

Substantially less than half of the respondents indicated that existing disaster-specific laws or policies:

- set out the procedures for requesting and accepting international assistance (38 per cent)
- set out a procedure for determining when international assistance is required (36 per cent) or
- regulated the quality and accountability of international disaster relief operations (25 per cent)

Respondents were also asked to indicate if national law addressed a number of specific issues that might be relevant in disaster operations as indicated on the chart below. Significantly, however, when questioned as to whether disaster-specific laws and/or policies adequately addressed the legal issues of international disaster response, the majority of national societies (54 per cent) and IHO field offices (75 per cent) thought that they did not. On the other hand, 70 per cent of national societies and 60 per cent of IHO Field Offices felt that the relevant provisions of existing laws and policies were adequately implemented when disasters occurred.

**Issues covered by national law**



### 3.3 IHO agreements with governments

IHOs were asked about agreements they had signed with governments of affected states regarding their disaster relief operations. Responses showed that 80 per cent of responding regional offices and 53 per cent of Field Offices had signed specific agreements governing their disaster relief operations with the government of the countries within which they operated. Forty-seven percent of IHO headquarters stated that they frequently or always concluded such agreements.

Sixty-two percent of the IHO headquarters indicated that their agreements were usually made during rather than before disaster relief operations. Twenty-two percent of the IHO headquarters and 67 per cent of the field offices stated that these agreements generally addressed the entire mandate of the organization in the country. Responses from field offices indicated that their agreements are often held with the ministry of health or ministry of foreign affairs. A number of field offices indicated that they had two agreements: a global agreement with the government and also a specific letter of understanding for each emergency operation for the short-term.

The following graph illustrates some of the issues addressed within agreements between governments and IHO headquarters and field offices (for NGOs only).



Issues covered in NGO agreements with governments

None of agreements IHO respondents had with governments addressed recognition of foreign diplomas/professional qualifications, local insurance or over flight and/or landing rights

Even where there agreements addressed relevant problem areas, several IHO respondents noted that they were not always effective. One lamented that "nobody really referred to and most probably nobody [ever] read" its agreement. Others pointed out that, notwithstanding the Government's undertaking in the agreement, they found that they were required to obtain additional permissions from different ministries or that the agreement was not recognized at the provincial or local level.

### 3.4 Briefings on legal issues

National Societies and IHOs were finally asked whether their organisations generally conducted briefings on relevant international and/or national laws for international disaster relief personnel prior to deployment in disaster relief operations. Fifty percent of national societies and 29 per cent of IHOs reported that they did so.

## Conclusion

While their impact varies by sector and actor, the above findings demonstrate that legal difficulties are a real issue for governments, national societies and IHOs in international disaster response. Particularly for IHOs, administrative barriers to entry and operations are apparently widespread. Disturbingly, a great many IHOs are also aware of other international actors providing poor quality assistance or failing to adequately coordinate with others in their work. While many states have disaster-specific laws and plans, respondents indicate that they are not adequate to address the common issues of international disaster response, and it appears that less than half of them address some of the most central issues. At the same time, many affected state governments have provided special exemptions and facilities to international actors to facilitate their work. While good use is being made of some existing international instruments – in particular non-binding codes of conduct and bilateral agreements – it appears that they are not addressing all the most pressing issues.