UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC., et al.,

                    Plaintiffs,                05 Civ. 8209 (VM)

                v.

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT, et al.,

                    Defendants.

------------------------------------------------------------ x

# GOVERNMENT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO FILE A SECOND AMENDED COMPLAINT AND FOR A PRELIMINARY INJUNCTION

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant

BENJAMIN H. TORRANCE
Assistant United States Attorney
86 Chambers Street
New York, New York  10007
Telephone: 212.637.2703
Fax: 212.637.2702
E-mail: benjamin.torrance@usdoj.gov

    – Of Counsel –

## Table of Contents

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Leadership Act Funding Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    HHS and USAID Organizational Integrity Guidelines. . . . . . . . . . . . . . . . . . 4

    C.    HHS Notice-and-Comment Rulemaking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    *DKT International v. USAID.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    GHC and InterAction Lack Standing and Should Not Be Permitted to Join This Action.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    The Association Members' Alleged Injuries are Conjectural. . . . . . . . . . 10

        2.    Individual Participation of the Association Members Is Required. . . . . . 11

    B.    The Preliminary Injunction Should Not Be Extended to GHC or InterAction. . . 16

        1.    *Brooklyn Legal Services* and *Velazquez* Control. . . . . . . . . . . . . . . . . . . . 17

        2.    Cases Decided Since the Preliminary Injunction Have Altered the Legal Landscape.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        3.    The Funding Condition Accompanied by the Affiliate Guidelines Is Constitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            a.    The Leadership Act Guidelines and the LSC Guidelines Are Nearly Identical. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            b.    Plaintiffs Cannot Establish Likelihood of Prevailing on the Question of Substantial or Undue Burden. . . . . . . . . . . . . . . . . . . 25

            c.    The Funding Condition and Guidelines Are Not Unconstitutionally Vague. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            d.    The Funding Condition Does Not Impermissibly Discriminate Based on Viewpoint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

e.    The Funding Condition Does Not Impermissibly Compel Speech
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C.    GHC and DKT's Application for Injunctive Relief is Res Judicata. . . . . . . . . . 34

1.    DKT Should Not Be Party to the Injunction. . . . . . . . . . . . . . . . . . . 35

2.    GHC Itself Is Barred by Res Judicata. . . . . . . . . . . . . . . . . . . . . . . . 35

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# Table of Authorities

*Cases*:

*AOSI v. USAID*, 430 F. Supp. 2d 222 (S.D.N.Y. 2006).. . . . . . . . . . . . . . . . . . . . . . . 15, 21, 22, 30

*AOSI v. USAID*, No. 06-4035, 2007 WL 3334335 (2d Cir. Nov. 8, 2007). . . . . . . . . . . . 2, 12, 20

*Aerojet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir.1975). . . . . . . . . . . . . . . . . . . . . . . . 36

*Alpert's Newspaper Delivery Inc. v. New York Times Co.*, 876 F.2d 266 (2d Cir. 1989). . . . 36, 37

*Altman v. Bedford Central Sch. District*, 245 F.3d 49 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 16

*Animal Legal Defense Fund v. Espy*, 23 F.3d 496 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 10

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . 10, 12, 14, 15

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Borey v. National Union Fire Insurance Co. v. Martin*, 934 F.2d 30 (2d Cir. 1991). . . . . . . . . 16

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bronx Household of Faith v. Board of Education*, 331 F.3d 342 (2d Cir. 2003). . . . . . . . . . . . 35

*Brooklyn Legal Services Corp. v. Legal Services Corp.*, 462 F.3d 219 (2d Cir. 2006). . . . . *passim*

*Chan v. Reno*, 916 F. Supp. 1289 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343 (2d Cir.1995). . . . . . . . . . . . . . 36, 38

*DKT International, Inc. v. USAID*, 477 F.3d 758 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . *passim*

*DKT Memorial Fund, Inc. v. USAID*, 887 F.2d 275 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . 27

*FCC v. League of Women Voters*, 468 U.S. 364 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31

*Gratz v. Bollinger*, 539 U.S. 244 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grutter v. Bollinger*, 539 U.S. 306 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Haig v. Agee*, 453 U.S. 280 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Harris v. McRae*, 448 U.S. 297 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 16

*Hoblock v. Albany County Board of Elections*, , 422 F.3d 77 (2d Cir. 2005). . . . . . . . . . . . . . . 35

*Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264 (1981). . . . . 11

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). . . . . . . . 1, 10, 12

iii

*Irish Lesbian & Gay Organization v. Giuliani*, 143 F.3d 638 (2d Cir. 1998). . . . . . . . . . . . . . . . 34

*League of Women Voters, Regan v. Taxation With Representation*, 461 U.S. 540 (1983). . . 28, 31

*Legal Services Corp. v. Velazquez* ("*Velazquez II*"), 531 U.S. 533 (2001). . . . . . . . . 16, 18, 19, 32

*Lerman v. Board of Elections*, 232 F.3d 135 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Marchi v. Board of Cooperative Education Services*, 173 F.3d 469 (2d Cir. 1999). . . . . . . . . . . 9

*Martin v. Wilks*, 490 U.S. 755 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mazurek v. Armstrong*, 520 U.S. 968 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mitchell v. Keane*, 974 F. Supp. 332 (S.D.N.Y. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Monahan v. New York City Department of Correction*, 214 F.3d 275 (2d Cir. 2000). . . . . . . . . 36

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998). . . . . . . . . . . . . . . . . . . . . . . . 33

*New York City Environmental Justice Alliance v. Giuliani*, 214 F.3d 65 (2d Cir. 2000). . . . . . . 17

*Northeastern Fla. Chapter, Associated General Contractors v. Jacksonville*,
      508 U.S. 656 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Palestine Information Office v. Schultz*, 853 F.2d 932 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . 27

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Rent Stabilization Association v. Dinkins*, 5 F.3d 591 (2d Cir. 1993). . . . . . . . . . . . . . . 12, 13, 14

*Rosenberger v. Rector & Visitors of University of Va.*, 515 U.S. 819 (1995). . . . . . . . . . . . 7, 8, 33

*Ruiz v. Commissioner of Department of Transport*, 858 F.2d 898 (2d Cir. 1988). . . . . . . . . . . . 37

*Rust v. Sullivan*, 500 U.S. 173 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 28, 31

*Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984). . . . . . . . . . 14, 15

*South Dakota v. Dole*, 483 U.S. 203 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
      517 U.S. 544 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 38

*United States v. America Library Association*, 539 U.S. 194 (2003). . . . . . . . . . . . . . . . . . . 21, 33

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . 21, 22

*Velazquez v. Legal Services Corp.* ("*Velazquez I*"), 164 F.3d 757 (2d Cir. 1999). . . . . . . . *passim*

*Velazquez v. Legal Services Corp.*, 532 U.S. 903 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Warth v. Seldin*, 422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wygant v. Jackson Board of Ed.*, 476 U.S. 267 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22


*Statutes and Regulations*:

5 U.S.C. § 553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

22 U.S.C. § 7601. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 U.S.C. § 7611. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 U.S.C. § 7631. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

22 C.F.R. § 203.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

45 C.F.R. § 1610.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

62 Fed. Reg. 27,695. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

72 Fed. Reg. at 41,076. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## Preliminary Statement

Defendants (the "government") respectfully submit this memorandum of law in opposition to the plaintiffs' motion to file a second amended complaint and to extend the preliminary injunction to two additional parties, Global Health Council ("GHC") and InterAction (together, the "associations").

This Court has preliminarily enjoined the government from discontinuing funding to plaintiffs Pathfinder International and Alliance for Open Society International ("AOSI") based on noncompliance with 22 U.S.C. § 7631(f) of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Leadership Act"), which requires that Leadership Act funding be limited to recipients that have a policy explicitly opposing prostitution. Plaintiffs now seek to add GHC and InterAction—each of which is an umbrella association consisting of public health and advocacy organizations—to this action, and to extend the preliminary injunction to those associations and their members. That application should be denied.

First, neither GHC nor InterAction has standing to seek such relief. The injuries they allege on behalf of their members are hypothetical and therefore insufficient to support standing. Moreover, as the Supreme Court has explained, an association lacks standing when either "the claim asserted [or] the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). In this matter, GHC and InterAction claim that their members' rights to free speech have been curtailed because those members, if required to adhere to the statutory policy requirement in order to obtain Leadership Act funding, lack adequate alternative channels of expression due to the alleged burden imposed by the necessity of creating separate affiliates. But that burden can only be assessed based on facts particular to each organization: for instance, which countries the

organizations operate in and the ease or difficulty of creating or operating affiliates in those countries.  GHC and InterAction therefore cannot establish standing, and amendment of the complaint to add them as plaintiffs would thus be futile.

Second, even if the two associations have standing, the preliminary injunction should not be extended.  As the Second Circuit has noted, the case as it now stands is "substantively different" from the case as it was when this Court imposed the injunction, and further fact-finding is needed.  *AOSI v. USAID*, No. 06-4035, 2007 WL 3334335, at *2 (2d Cir. Nov. 8, 2007).  The agencies that administer the grant program at issue here have expressly provided alternative channels of communication through official guidance (which the Department of Health and Human Services will soon consider through notice-and-comment rulemaking).  With this agency guidance in place, plaintiffs must now prove that the guidance imposes such an onerous burden that the plaintiffs are effectively precluded from utilizing the alternative channels available.  *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 232 (2d Cir. 2006), *cert. denied*, 128 S. Ct. 44 (2007).  Plaintiffs cannot carry that burden, certainly not at this stage of the litigation, where the record consists solely of their own untested and conclusory declarations, and before the fact-finding called for by the Second Circuit has been completed.  Accordingly, the preliminary injunction should not be extended to GHC or InterAction.

## Background

### A.    Leadership Act Funding Limitations

Plaintiffs AOSI and Pathfinder International are non-governmental organizations ("NGOs") that receive funding from the United States Government under the Leadership Act, a

statute designed to combat HIV/AIDS abroad, particularly in developing countries.[1]  At the time

Congress enacted the Leadership Act, Congress had been presented with extensive testimony

about the links between prostitution, sex trafficking, and the transmission of HIV/AIDS.  *See*

22 U.S.C. § 7601(23); S. Hrg. 108-105, Hearing before Subcommittee on East Asian and Pacific

Affairs of Senate Committee on Foreign Relations, 108th Cong. 18–19 (Apr. 9, 2003); H.R. Hrg.

108-137, Hearing before Subcommittee on Human Rights and Wellness, House Committee on

Government Reform, 108th Cong. 96 (Oct. 29, 2003).  Congress also had heard evidence that

some organizations receiving foreign aid funding from the United States Government had backed

the legalization of prostitution, advocated weaker legal restrictions on sex trafficking, and

conducted condom distribution projects with pimps and sex traffickers while taking no steps to

assist women and children forced into sexual slavery.  S. Hrg. 108-105, at 21, 35–36.

Given the evidence before it, Congress expressly found that prostitution and sex

trafficking are causes of and factors in the spread of HIV/AIDS.  Accordingly, Congress

concluded that it should be the policy of the United States to eradicate these deadly practices and

that their eradication should be a priority in all prevention efforts under the Leadership Act.

Consistent with Congress's findings and strategy, the Leadership Act provides that "the reduction

of HIV/AIDS behavioral risks shall be a priority of all prevention efforts in terms of funding,

*educational messages*, and activities by . . . *eradicating prostitution*, the sex trade, rape, sexual

assault and sexual exploitation of women and children."  22 U.S.C. § 7611(a)(4) (emphasis

added).  The Act also requires that, with limited exceptions, funding is limited to recipients that

---

[1]    As the Court is already familiar with the statutory background at issue in this case, the government here presents only an abbreviated version.

have a "policy explicitly opposing prostitution and sex trafficking."  22 U.S.C. § 7631(f) (the

"funding condition" or "policy requirement").

## B.    HHS and USAID Organizational Integrity Guidelines

The Leadership Act funding condition was challenged both in this action and in *DKT*

*International, Inc. v. USAID*, 477 F.3d 758 (D.C. Cir. 2007).  In a decision issued on February

27, 2007, the D.C. Circuit in *DKT* found that the funding condition did not violate the First

Amendment, noting that the government in choosing its agents "may use criteria to ensure that its

message is conveyed in an efficient and effective fashion."  *Id.* at 762.  In reaching its decision,

the D.C. Circuit concluded that

> [n]othing prevents DKT from itself remaining neutral [on the question of
> prostitution] and setting up a subsidiary organization that certifies it has a policy
> opposing prostitution. . . . [T]he subsidiary would qualify for government funds as
> long as the two organizations' activities were kept sufficiently separate.  The
> parent organization need not adopt the [anti-prostitution] policy.

*Id.* at 763.

After that ruling, and while the government's appeal from this Court's grant of a

preliminary injunction was pending before the Second Circuit, both HHS and USAID issued

"organizational integrity" guidance.  HHS Guidance, 72 Fed. Reg. 41,076 (July 23, 2007)

(Exhibit A);[2] USAID AAPD 05-04 Amend. 1 (July 23, 2007) (Exhibit B).[3]  The guidelines

(which are identical for each agency) were expressly "modeled on criteria upheld as facially

constitutional by the U.S. Court of Appeals for the Second Circuit in *Vel[a]zquez v. Legal*

---

[2]    Exhibit designations herein refer to those attached to the Declaration of Benjamin H.
Torrance dated March 17, 2008, unless stated otherwise.

[3]    Available at http://www.usaid.gov/business/business_opportunities/cib/pdf/
aapd05_04_amendment1.pdf.  The guidances are attached to the Diller Declaration dated Feb. 7,
2008, as Exhibits 4 and 5.

4

*Services Corporation*, 164 F.3d 757, 767 (2d [C]ir. 1999), and *Brooklyn Legal Services Corp. v. Legal Services Corp.*, 462 F.3d 219, 229–33 (2d Cir. 2006), cases involving similar organization-wide limitations applied to recipients of federal funding." 72 Fed. Reg. at 41,076.[4]  The agencies emphasized that

> [i]t is critical to the effectiveness of Congress's plan and to the U.S. Government's foreign policy underlying this effort, that the integrity of Leadership Act programs and activities implemented by organizations receiving Leadership Act funds is maintained, and that the U.S. Government's message opposing prostitution and sex trafficking is not confused by conflicting positions of these organizations.

*Id.*  In service of those goals, the organizational integrity guidelines were promulgated to permit funding recipients to maintain affiliations with separate organizations, while ensuring that those affiliations "do not threaten the integrity of the Government's programs and its message opposing prostitution and sex trafficking."  *Id.*  The guidelines therefore were designed to ensure "adequate separation" between federally funded organizations and affiliates that "express[ ] views on prostitution and sex trafficking contrary to the government's message."  *Id.*

The guidelines promulgated by HHS and USAID provide that

> [C]ontractors, grantees and recipients of cooperative agreements ("Recipients") [under the Leadership Act] must have objective integrity and independence from any affiliated organization that engages in activities inconsistent with a policy opposing prostitution and sex trafficking ("restricted activities").

72 Fed. Reg. at 41,076.  The guidelines state that a Recipient will be found to have objective integrity and independence from such an affiliated organization if

> (1)     The affiliated organization is a legally separate entity;

---

4     As the USAID and HHS guidelines are identical, only the HHS guidelines, which are published in the Federal Register, are cited here.

      (2)     The affiliated organization receives no transfer of Leadership Act funds, and Leadership Act funds do not subsidize restricted activities; and

      (3)     The Recipient is physically and financially separate from the affiliated organization.  Mere bookkeeping separation of Leadership Act funds from other funds is not sufficient.

*Id.* at 41,076.  The guidance explains that the agencies will "determine, on a case-by-case basis and based on the totality of the facts, whether sufficient physical and financial separation exists." *Id.*  The guidance sets forth several non-exclusive factors to be used in that determination, but "[t]he presence or absence of any one or more factors will not be determinative." *Id.*  The enumerated factors include

      (i)     The existence of separate personnel, management, and governance;

      (ii)     The existence of separate accounts, accounting records, and timekeeping records;

      (iii)     The degree of separation from facilities, equipment and supplies used by the affiliated organization to conduct restricted activities, and the extent of such restricted activities by the affiliate;

      (iv)     The extent to which signs and other forms of identification which distinguish the Recipient from the affiliated organization are present, and signs and materials that could be associated with the affiliated organization or restricted activities are absent; and

      (iv)     The extent to which [the agency], the U.S. Government and the project name are protected from public association with the affiliated organization and its restricted activities in materials such as publications, conferences and press or public statements.

*Id.* at 41,077.

## C.    HHS Notice-and-Comment Rulemaking

     As the government previously noted in response to the Court's inquiry at the November 30, 2007, conference in this case, HHS expects to publish a notice of proposed rulemaking on the topic of organizational integrity by April 14, 2008.  Letter from Benjamin H.

Torrance to the Court dated Dec. 14, 2007.  That notice will be followed by a public comment period and adoption of a final rule in accordance with the Administrative Procedure Act, 5 U.S.C. § 553.  If the comments submitted to HHS provide valid grounds for modifying the policy expressed in the existing guidance, the relevant government agencies will consult to ensure that the agencies implement the Leadership Act consistently.  As indicated to the Court, the parties have agreed that dispositive motions in this case should await the completion of that process.

**D.    *DKT International v. USAID***

After this Court issued its preliminary injunction, and while the government's appeal of that injunction was pending before the Second Circuit, the District of Columbia Circuit issued its decision in *DKT*.  477 F.3d 758 (D.C. Cir. 2007).  That case was brought by DKT International ("DKT")—which is apparently a member of GHC, the proposed plaintiff in this action (*see* GHC list of member organizations, Exhibit C)—and raised essentially the identical challenges plaintiffs assert in this action (Complaint, *DKT Int'l v. USAID*, No 05-cv-1604 (D.D.C. Aug. 11, 2005), Exhibit D).  The *DKT* court uniformly rejected those challenges and upheld the Leadership Act funding condition in all respects.

The D.C. Circuit began by observing that under Supreme Court precedent, "[w]hen [the government] communicates its message, either through public officials or private entities, the government can—and often must—discriminate on the basis of viewpoint."  *Id.* at 761 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).  The court then noted that the Leadership Act reflected the government's strategy of "speak[ing] out against legalizing prostitution in other countries," and generally employing "educational messages," as means toward eradicating HIV/AIDS.  *Id.*  When, as under the Leadership Act, "'the government

7

appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes,'" and in that circumstance the government may "constitutionally communicate a particular viewpoint through its agents and require those agents not convey contrary messages"—even when those agents wish to use non-federal funds for such contrary messages. *Id.* at 762 (quoting *Rosenberger*, 515 U.S. at 833). "[I]n choosing its agents," the court held, "the government may use criteria to ensure that its message is conveyed in an efficient and effective fashion"; to require the government to engage as partners organizations that "advance an opposite viewpoint" would "substantially undermine[ ]" the government's program and "confuse[ ]" the government's message. *Id.* (internal quotation marks omitted).

Addressing the plaintiff's contention that *Rust v. Sullivan*, 500 U.S. 173 (1991), and other cases require alternative channels of communication for private grantees, the D.C. Circuit held that the possibility of a dual organizational structure was sufficient to satisfy the First Amendment, as long as the government did not "'effectively prohibit[ ] the recipient from engaging in the protected conduct outside the scope of the federally funded program.'" *Id.* at 763 (quoting *Rust*, 500 U.S. at 197). As long as the government permits funding recipients to maintain affiliations with non-complaint organizations—even if the government imposes a requirement that the groups be "sufficiently separate"—"[n]othing prevents [such an organization] from itself remaining neutral and setting up a subsidiary organization that certifies it has a policy opposing prostitution. The parent organization need not adopt the policy." *Id.* In so holding, the court saw no need to explore the specifics of a government rule requiring separation between such affiliates, merely relying on the government's representation that some form of organizational separation would be permitted. *Id.* at 763 & n.4.

8

In addition, the court rejected DKT's argument that the exception in the statutory policy requirement for four named organizations rendered it unconstitutional, holding that "the Act's underinclusiveness does not violate the First Amendment. . . . Because viewpoint discrimination raises no First Amendment concerns when the government is speaking, the underinclusiveness of the certification requirement is immaterial." *Id.* at 763 n.5.

In sum, the D.C. Circuit held that "[t]he Act does not compel DKT to advocate the government's position on prostitution and sex trafficking; it requires only that if DKT wishes to receive funds it must communicate the message the government chooses to fund. This does not violate the First Amendment." *Id.* at 764.

## ARGUMENT

### A.  GHC and InterAction Lack Standing and Should Not Be Permitted to Join This Action

Plaintiffs seek to amend the complaint to add GHC and InterAction as new parties. That motion should be denied, however, because those proposed parties lack standing, and therefore amendment of the complaint would be futile. "Although leave to amend is usually freely granted, it may be denied within the trial court's discretion where the proposed amendment would be futile." *Marchi v. Bd. of Cooperative Educ. Servs.*, 173 F.3d 469, 477–78 (2d Cir. 1999). An amendment is futile if the Court lacks jurisdiction over the amended pleading, or it would otherwise be subject to a successful motion to dismiss. *Mitchell v. Keane*, 974 F. Supp. 332, 343–44 (S.D.N.Y. 1997); *Chan v. Reno*, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996).

In this case, the Court lacks jurisdiction to consider the claims of GHC and InterAction because they lack standing. An association attempting to bring suit on behalf of its members must prove that it has associational standing by establishing that

9

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt*, 432 U.S. at 343; *accord Harris v. McRae*, 448 U.S. 297, 321 (1980); *Bano v. Union Carbide Corp.*, 361 F.3d 696, 713 (2d Cir. 2004).

### 1.    The Association Members' Alleged Injuries are Conjectural

Under the first prong of the *Hunt* test for associational standing, the proposed plaintiffs must show that their members would otherwise have standing to sue in their own right.  To establish standing, a party must "allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief."  *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

Here, the injuries alleged by the associations are merely hypothetical, and thus insufficient for standing.  As further detailed below, the associations claim that their members will be burdened in creating affiliate organizations pursuant to the guidance issued by the agencies.  Pls.' Mem. at 7–13; *see infra* Point A.2.  But plaintiffs do not allege that any one of the associations' members has ever attempted to form an affiliate to comply with the agency guidance, or even that it would do so if not for the allegedly prohibitive burdens imposed by that guidance.  The asserted injuries, therefore, are entirely conjectural, at least insofar as application of the affiliate guidelines; there is no indication "that the plaintiff[s'] injury [is] presently suffered or imminently threatened."  *Animal Legal Defense Fund v. Espy*, 23 F.3d 496, 500 (D.C.

Cir. 1994). The associations have failed to meet even the minimal requirement of pleading that their members are "able and ready" to avail themselves of the alternative avenues for communication available to them, and therefore have not pleaded adequate injury in fact. *Gratz v. Bollinger*, 539 U.S. 244, 260–62 (2003); *Northeastern Fla. Chapter, Associated Gen. Contractors v. Jacksonville*, 508 U.S. 656, 666 (1993).

Instead, the associations' sole allegation of constitutional injury in fact to any of their members is the contention that some of those members, in order to apply for government funding, have unwillingly complied with the statutory funding condition and adopted a policy against trafficking and prostitution. Pls.' Mem. at 16–17. That may have been sufficient for standing before the agencies issued their organizational integrity guidelines. But with those guidelines in place, absent any attempt by the associations' members to comply with them and "avail[ ] themselves of the opportunities provided . . . to obtain . . . relief," the associations "cannot at this juncture legitimately raise complaints in this Court about the manner in which the challenged provisions of the Act have been or will be applied in specific circumstances." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 297 (1981) (rejecting constitutional challenge due to failure to seek administrative relief which may have obviated the need for judicial resolution).[5]

### 2.    Individual Participation of the Association Members Is Required

To satisfy the third prong of the *Hunt* test, plaintiffs must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

---

[5]    Although *Hodel* addressed the jurisdictional requirement of ripeness rather than standing, "the two doctrines are closely related, most notably in the shared requirement that the injury be imminent rather than conjectural or hypothetical." *Brooklyn Legal Servs.*, 462 F.3d at 225.

*Hunt*, 432 U.S. at 343; *accord Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir.

1993).[6]

> [A]n association [does not] automatically satisf[y] the third prong of the *Hunt* test
> simply by requesting equitable relief rather than damages. The organization
> lacks standing to assert claims of injunctive relief on behalf of its members where "the
> fact and extent" of the injury that gives rise to the claims for injunctive relief
> "would require individualized proof," or where "the relief requested [would]
> require[ ] the participation of individual members in the lawsuit.

*Bano*, 361 F.3d at 714 (quoting *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975), and *Hunt*, 432

U.S. at 343); *accord Rent Stabilization*, 5 F.3d at 596.

Individualized proof is required in this case. As the Second Circuit recognized in its

remand order, the predominant issue in this matter now that the agencies have issued their

organizational integrity guidelines is whether the statute and those guidelines meet the

requirements of *Brooklyn Legal Services*, 462 F.3d 219, detailed *infra* Point B.1. *AOSI*, 2007

WL 3334335, at *1–*2. Thus, the circuit remanded to this Court "to determine in the first

instance whether the preliminary injunction should be granted in light of the new guidelines," a

task that requires an assessment "'*as a factual matter* [of whether] the regulations have not left

plaintiffs adequate alternative channels for protected expression.'" *Id.* at *2 (quoting *Brooklyn*

*Legal Services*, 462 F.3d at 231 (alterations omitted)). The *Brooklyn Legal Services* test requires

plaintiffs to show that the "restrictions . . . unduly burden the ability of an organization to set up

adequate alternative channels for protected expression such that [it is] in effect precluded from

doing so." *Brooklyn Legal Servs.*, 462 F.3d at 232.

---

[6]    Without conceding that GHC and InterAction will ultimately be able to prove the second
prong of the *Hunt* test, the government does not contest that they have pleaded that element
sufficiently at this pre-discovery stage of the litigation. *See Lujan v. Defenders of Wildlife*, 504
U.S. 555, 561 (1992) (plaintiffs bear burden of establishing each element of standing "with the
manner and degree of evidence required at the successive stages of the litigation").

That fact-specific determination must be made for each allegedly aggrieved funding recipient.  Indeed, the arguments advanced by GHC and InterAction compel that conclusion.  The two proposed plaintiffs contend that their members would be harmed by a number of specific burdens allegedly imposed on them by the separate-affiliate guidance.  In particular, they claim that, in some countries, non-governmental organizations must register before operating, and that to do so they must navigate onerous bureaucracies.  Pls.' Mem. at 9–11.  Putting aside the fact that none of the associations' members has apparently tried to do so, *see supra* Point A.1, any proof that this hurdle is so burdensome that it "in effect preclude[s]" use of affiliates as an alternative channel of communication, *Brooklyn Legal Servs.*, 462 F.3d at 232, will necessarily require organization-specific evidence.  The Court cannot determine the degree to which a funding recipient is burdened without considering, at a minimum, what countries that organization operates in; the degree to which the organization wishes to communicate in that country in a manner inconsistent with the policy required by the Leadership Act; and the actual legal and practical requirements of operating an affiliate in that country.  As the Second Circuit held in *Brooklyn Legal Services*, the Court must "analyze . . . specific financial [and] other burden[s]" to ascertain whether the organizational integrity guidelines are unconstitutionally applied to any particular group.  462 F.3d at 233.  That analysis depends on facts "unique to each [association member]." *Rent Stabilization*, 5 F.3d at 597.  Because each affected organization must show that, under the specific circumstances in which it operates, the guidelines unconstitutionally burden its speech, the associations lack standing.

The proposed plaintiffs also claim that some countries may refuse to issue visas or work permits for separate organization personnel; that in some countries it may be difficult to open separate bank accounts; and that in some countries it may be difficult to obtain separate offices

and equipment.  *Id.* at 11–13.  Those arguments fail for the same reason: they depend on showings that will vary from organization to organization, and therefore individual proof is required.  Additionally, they fail because the organizational integrity guidelines do not actually require separate personnel, separate accounts, or separate offices or equipment; those are simply "[f]actors relevant to th[e] determination" of whether funding recipients and their affiliates are sufficiently physically and financially separate.  72 Fed. Reg. at 41,076–77.  The guidance specifically states that the agencies' analysis of physical and financial separation will be "on a case-by-case basis and based on the *totality of the facts*."  *Id.* (emphasis added).  Separate personnel and management, separate accounts, and separate facilities are factors to be considered, but "[t]he presence or absence of any one or more factors *will not be determinative*."  *Id.* (emphasis added).  Thus, these alleged barriers to forming separate affiliates not only require individualized proof, they are also speculative.

Plaintiffs argue that the standing requirements should be relaxed in this case.  Plaintiffs correctly note that the third prong of the *Hunt* test is a prudential, rather than constitutional, requirement for standing.  *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996).  But while some prudential limits on standing—particularly the limit on third-party standing, as in *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984)—may be relaxed in First Amendment cases,[7] it is not necessary or practical to loosen the strictures of the third *Hunt* prong.  *Bano*, 361 F.3d at 715.  "If the involvement of individual members of an association is necessary"—as it is here—"either

---

[7]    Separately, third-party standing requirements are relaxed in First Amendment overbreadth challenges under the doctrine of *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  *Lerman v. Bd. of Elections*, 232 F.3d 135, 144–45 (2d Cir. 2000).  That is inapplicable here, as plaintiffs have not asserted an overbreadth claim.

because the substantive nature of the claim or the form of the relief sought requires their

participation, [there is] no sound reason to allow the organization standing to press their

claims . . . ." *Id.* Indeed, while the *Munson* Court relaxed the prudential limit against third-party

standing because "practical obstacles [would] prevent a party from asserting rights on behalf of

itself," 467 U.S. at 956, in a case involving the third *Hunt* requirement the opposite is true:

practical obstacles prevent the association from asserting the rights of its members. Thus, there

is "no reason to relax [prudential standing requirements] where, in order for the organizations to

succeed in the lawsuit, there must be participation by the members themselves." *Bano*, 361 F.3d

at 715.[8]

Finally, plaintiffs argue that *Harris*—in which the Supreme Court rejected a

constitutional challenge based on the third *Hunt* prong—is inapplicable because "the standing

requirements for Free Exercise claims are particularly stringent." Pls.' Mem. at 21. But neither

*Harris* nor any other case says that free exercise claims impose heightened standing

requirements. *Harris*, 448 U.S. at 321. Rather, the allegations needed to support standing

---

[8]    Plaintiffs conclusorily assert that the associations' members "risk government retaliation and loss of critical funding if they are unable to participate through their member organizations." Pls.' Mem. at 20. That assertion is unsupported by any evidence and is nothing but conjecture. Plaintiffs allege that the organization CARE was "subject to investigation by USAID," but according to their own description that "investigation" consisted of nothing but a single inquiry and a letter in 2006, to which CARE responded, apparently ending the matter. Those events cannot reasonably be said to be "retaliation"; they constitute nothing more than a responsible grantor's exercising its duty to ensure that grantees remain in compliance with the terms of the grant.

In its prior opinion, the Court described similar arguments as "speculative" and noted that absent concrete steps by the government, any asserted reticence to speak by a party arises "out of an overabundance of caution, and its self-enforced silence cannot properly be said to be caused by Defendants' actions." *AOSI v. USAID*, 430 F. Supp. 2d 222, 277 (S.D.N.Y. 2006). The claim now by anonymous organizations that they fear "retaliation" for unspecified reasons deserves no more weight.

depend on the nature of the claim: the *Harris* Court noted that because the proof required for a free exercise challenge was inherently individual, individualized allegations of injury were required and thus associational standing was not appropriate. *Id.*; *accord Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71–72 (2d Cir. 2001). Here, for the reasons stated above, individualized participation is required just as it was in *Harris*, and for that same reason the associations lack standing under the *Hunt* test.

For all those reasons, the associations cannot demonstrate their standing to sue, and the motion to amend the complaint to add them as plaintiffs would therefore be futile.

## B.  The Preliminary Injunction Should Not Be Extended to GHC or InterAction

Even if permitted to join this action, the associations should not gain the benefit of the preliminary injunction. Unlike at the time the Court entered that injunction, the case is now governed by the agencies' organizational integrity guidance, which, for HHS, is in the process of notice-and-comment rulemaking. The government respectfully suggests that adjudication of whether the organizational integrity guidelines are constitutionally sufficient should await the completion of that rulemaking, to ensure the Court is acting on a complete record. Nevertheless, the associations cannot now establish that they are entitled to a preliminary injunction.

Preliminary injunctive relief, such as that requested by the associations, is an "extraordinary" and "drastic" measure that should be granted only sparingly. *Borey v. Nat'l Union Fire Ins. Co. v. Martin*, 934 F.2d 30, 33–34 (2d Cir. 1991). Further, where as here, a party seeks a preliminary injunction enjoining the enforcement of governmental rules, the party's burden is increased. *Velazquez v. Legal Services Corp.* ("*Velazquez I*"), 164 F.3d 757, 763 (2d Cir. 1999), *aff'd in part*, 531 U.S. 533 (2001). The movant must demonstrate both "(1) that it

will suffer irreparable harm and (2) that it is likely to succeed on the merits." *New York City Environmental Justice Alliance v. Giuliani,* 214 F.3d 65, 68 (2d Cir. 2000).

### 1. *Brooklyn Legal Services* and *Velazquez* Control

The issuance of the affiliate guidelines has significantly changed this action, undermining plaintiffs' argument that they lack an alternative channel for communication and altering a critical fact that underlay this Court's preliminary injunction. With those guidelines in place, this case is now squarely governed by *Brooklyn Legal Services* and *Velazquez I* (together, the "*LSC* cases"). Those precedents addressed essentially identical situations as in this action: in both cases, the Second Circuit addressed the constitutionality of restrictions on local legal assistance programs that receive federal funding through the Legal Services Corporation ("LSC"). *Brooklyn Legal Services*, 462 F.3d at 221–22. Congress had charged LSC with ensuring that federal funds distributed by LSC were not diverted toward activities Congress specifically desired not to subsidize. *Id.* at 222.[9] Organizations receiving LSC funding often receive funding from other sources as well, including state and local governments and private sources. *Id.* Like the policy requirement challenged here, the LSC restrictions apply to all activities of a grantee, not just those that are federally funded. *Id.* at 222. To provide an alternative avenue for speech for such non-federal funds, LSC promulgated a program integrity regulation, which permits an LSC funding recipient to affiliate with an organization that engages in otherwise disfavored activities. *Id.* at 222–23. Thus, the situations presented in the two *LSC* cases and here are virtually identical.

---

[9]     The LSC restrictions included prohibitions on participating in class action lawsuits, in-person solicitation of clients, and seeking certain types of attorney's fees. *Id.*

In *Velazquez I*, the court of appeals rejected a facial challenge to the LSC regulation, including the claim that the LSC program integrity regulation unreasonably burdened a grantee's use of non-federal funds. 164 F.3d at 766. The court explained that "in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." *Id.* As the *Velazquez I* plaintiffs failed to provide any basis for concluding that the LSC regulation could not be applied "in at least some cases without unduly interfering with [a recipient's] First Amendment rights," the court held those plaintiffs could not sustain a facial challenge. *Id.* at 767.[10]

Several years later, the circuit court revisited the constitutionality of the LSC regulation, this time considering an as-applied challenge. *Brooklyn Legal Servs.*, 462 F.3d at 228–36. Noting that its prior rejection of the facial challenge to the LSC regulation had provided the applicable framework, the court reiterated that "'in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression.'" *Id.* at 231 (quoting *Velazquez I*, 164 F.3d at 766). Elaborating, the court stated that "restrictions that unduly burden the ability of an organization to set up adequate alternative channels for protected expression such that they are in effect precluded from doing so should be subject to invalidation." *Id.* at 232 (citing *Velazquez I*, 164 F.3d at 766). Thus, the circuit remanded the case to the district court for factual

---

[10]   The Supreme Court declined to review the conclusion that the LSC regulation was facially valid for First Amendment purposes. *Velazquez v. Legal Servs. Corp.*, 532 U.S. 903 (2001) (denying certiorari). As discussed below, the Second Circuit did find "one tiny restriction in the statute" unconstitutional, 164 F.3d at 772, a decision reviewed and affirmed by the Supreme Court, *Legal Servs. Corp. v. Velazquez* ("*Velazquez II*"), 531 U.S. 533 (2001).

findings "under the adequate alternative test articulated in [*Velazquez I*] and [to] consider whether the associated burdens in effect preclude the plaintiffs from establishing an affiliate." *Id.* at 233.

Those cases control, and provide the framework for the Court to apply here.  Plaintiffs contend that *Velazquez I* and *Brooklyn Legal Services* are inapposite because they "hold that viewpoint-discriminatory restrictions on privately funded speech by government funding recipients . . . are unconstitutional."  Pls.' Mem. at 33.  Plaintiffs' description misreads the cases.  First, *Brooklyn Legal Services* says nothing about viewpoint discrimination.  Second, while the Second Circuit in *Velazquez I* indeed invalidated "one tiny restriction in the statute" as viewpoint-discriminatory, the Supreme Court, reviewing that portion of the decision in *Legal Services Corp. v. Velazquez* ("*Velazquez II*"), 531 U.S. 533 (2001), did not adopt the circuit's reasoning: the Supreme Court never described the restriction as viewpoint-based, instead finding that Congress had exceeded its power to impose funding conditions by attempting to use those conditions to insulate government policies from judicial challenge.  531 U.S. at 540–49; *see id.* at 549 (Scalia, J., dissenting) ("[The statute] does not . . . *discriminate[ ] on the basis of viewpoint. The Court agrees with all this . . . .*" (emphasis added)).  Third, as detailed below at Point B.3.d, even if that portion of *Velazquez I* were still controlling, it was narrowly limited to a particular type of speech in a particular context: the circuit reasoned that a regulation that prohibits lawyers from making certain arguments in judicial proceedings "effectively drives the idea from the marketplace where it can most effectively be offered," since "the courtroom is the prime marketplace for the exposure of that idea."  164 F.3d at 771–72.  In contrast, the regulation here is analogous to the types of rules that the *Velazquez I* court held were permissible, such as favoring "family planning over abortion" or "decency over indecency."  *Id.*  The two *LSC* cases,

upholding the program integrity regulations, are directly on point and govern this Court's analysis.

### 2.   Cases Decided Since the Preliminary Injunction Have Altered the Legal Landscape

As described above, HHS and USAID's organizational integrity guidelines have rendered this case "substantively different" from the matter at the time the Court granted the preliminary injunction. *AOSI*, 2007 WL 3334335, at *2. While that alone is sufficient to defeat the associations' motion for a preliminary injunction, *see infra* Point B.3, the landscape has changed significantly in another way as well: two relevant circuit cases—*Brooklyn Legal Services* and *DKT*—were decided after this Court granted the preliminary injunction. The government respectfully submits that those cases have undercut the Court's reasoning for the preliminary injunction.

First, as more fully described *supra* Background Point D, the D.C. Circuit's opinion in *DKT* rejects precisely the same constitutional challenge as is presented here. 477 F.3d 758. The circuit upheld the Leadership Act's policy requirement in all respects. The court determined that the government did nothing more than "constitutionally communicate a particular viewpoint through its agents and require those agents not convey contrary messages." *Id.* at 762. *DKT* expressly rejected the arguments plaintiffs pose here: for instance, that the statute is unconstitutional due to viewpoint discrimination, that (even before the affiliate guidelines were issued by the agencies) there is not an adequate alternative channel for expression, and that the requirement unconstitutionally compels funding recipients to advocate the government's position on trafficking and prostitution. *Id.* at 761–64. That decision is persuasive authority for the government's positions in this matter.

Second, *Brooklyn Legal Services* was decided several months after this Court's injunction.  As noted above, it provided a framework for consideration of as-applied challenges in this context, and remanded for factfinding by the district court.  Of particular note, however, *Brooklyn Legal Services* held that "the federal government's interest in these cases *cannot be subject to the least- or less-restrictive-means mode of analysis*—which, like the undue burden test itself, is more appropriate for assessing the government's direct regulation of a fundamental right—when the government creates a federal spending program."  462 F.3d at 229 (emphasis added; citing *United States v. Am. Library Ass'n*, 539 U.S. 194, 211–12 (2003); *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).  Thus, "while the First Amendment has application in the subsidy context, the government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech at stake."  *Id.* at 230.

That holding makes clear that the standard used by this Court in deciding the motion for a preliminary injunction is not applicable.  The Court previously determined that "a heightened standard of review is appropriate" in this case, and that "[i]n applying this heightened scrutiny, the Court asks whether the restriction, as interpreted and applied by Defendants, is narrowly tailored to fit Congress's intent."  *AOSI v. USAID*, 430 F. Supp. 2d 222, 267 (S.D.N.Y. 2006) (citing *FCC v. League of Women Voters*, 468 U.S. 364, 395 (1984), for its "less restrictive means" test).  Though the Court did not define "narrow tailoring," the decision several times referred to "less restrictive means" in applying that test, a criterion consistent with precedent elaborating on the meaning of "narrow tailoring" outside the context of strict scrutiny, *e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 450 n.25 (2d Cir. 2001) (noting different definitions of "narrow tailoring" for analysis of content-neutral regulations under the First

21

Amendment).[11] *See* 430 F. Supp. 2d at 270 (listing "less restrictive means" as alternatives to government's approach); 270–71 (finding funding restriction itself, as opposed to requirement of a policy opposing prostitution and trafficking, to be a "less restrictive provision"); *see also id.* at 268–69 (finding funding condition underinclusive, and thus "not narrowly tailored," due to exemptions from policy requirement for four organizations); 269–70 (finding "blanket ban" on private expression not narrowly tailored).

However, after *Brooklyn Legal Services* rejected the "less restrictive means" test, that standard is no longer appropriate. 462 F.3d at 229 ("the federal government's interest in these cases cannot be subject to the least- or *less-restrictive-means* mode of analysis"). An essential element of this Court's opinion—and plaintiffs' argument for an extension of the preliminary injunction, which relies heavily on "narrow tailoring" and "less restrictive means," *e.g.*, Pls.'s Mem. at 18, 23–24, 25–26, 27, 28—has therefore been undercut, and the preliminary injunction should not be extended to new plaintiffs based on that reasoning. After *Brooklyn Legal Services*, the inquiry for the Court to conduct is whether the restrictions impose such an undue burden on

---

[11]    The *Universal City* court found that "narrow tailoring" in that case meant that a "regulation may not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" 273 F.3d at 450 n.25 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). That test, too, requires consideration of "less restrictive means" to determine what is "necessary," and is therefore inconsistent with *Brooklyn Legal Services*. *See also Grutter v. Bollinger*, 539 U.S. 306, 339–40 (2003) ("narrow tailoring 'require[s] consideration' of 'lawful alternative and *less restrictive means*'" (emphasis added; quoting *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 n.6 (1986))).

The Court did expressly reject strict scrutiny in this case. 430 F. Supp. 2d at 267 n.38. As the opinion stated that the Court would assess whether the restriction was "narrowly tailored to fit Congress's intent," it appears that the Court did not apply the "compelling government interest" part of traditional strict scrutiny. That leaves open the question of whether the Court applied the strict-scrutiny version of "narrow tailoring," or some lesser form that also involves an evaluation of "less restrictive means."

plaintiffs that alternative channels of protected expression are in effect precluded, 462 F.3d at

232; no analysis of "narrow tailoring" or "less restrictive means" is needed.

### 3. The Funding Condition Accompanied by the Affiliate Guidelines Is Constitutional

Applying the *Brooklyn Legal Services* and *Velazquez I* opinions, the Court should uphold

the Leadership Act's funding condition in light of the newly issued organizational integrity

guidance. The guidance is virtually identical to that upheld on its face by *Velazquez I*, and

plaintiffs have failed to meet their burden of showing a likelihood of success of establishing that

alternative channels of communication are effectively precluded under *Brooklyn Legal Services.*

### a. The Leadership Act Guidelines and the LSC Guidelines Are Nearly Identical

Under the LSC program integrity regulation, a recipient of LSC funding is permitted to

affiliate with another organization if the funding recipient maintains "'objective integrity and

independence from [the] organization that engages in restricted activities.'" *Brooklyn Legal

Services*, 462 F.3d at 223 (quoting 45 C.F.R. § 1610.8(a) (alteration in original)). The same is

true of the Leadership Act guidelines. 72 Fed. Reg. at 41,076–77 (Leadership Act guidelines

requiring "objective integrity and independence" from any affiliated organization that engages in

activities inconsistent with the Leadership Act requirement of policy against prostitution and sex

trafficking).

The LSC regulation provides a three-part test for objective integrity and independence of

the recipient and affiliate. The three-part LSC test requires that: (1) the other organization is a

legally separate entity; (2) the other organization does not receive any LSC funds, and LSC funds

do not subsidize any prohibited activities; and (3) the recipient is physically and financially

separate from the other organization. 45 C.F.R. § 1610.8(a). The Leadership Act guidelines

23

have the same test. 72 Fed. Reg. at 41,076–77 (three-part test requires that the affiliated organization is a legally separate entity, does not receive any Leadership Act funds or use Leadership Act funds to subsidize restricted activities, and that the Recipient is "physically and financially separate" from the affiliated organization).

Like the Leadership Act guidelines, the LSC regulation provides that mere bookkeeping separation is insufficient; instead, physical and financial separation "will be determined on a case-by-case basis and will be based on the totality of the facts." 45 C.F.R. § 1610.8(a); *compare* 72 Fed. Reg. at 41,076–77 (guidelines providing that separation is not a matter of "mere bookkeeping" but determined on a "case-by-case basis" on the "totality of the facts").

Also like the Leadership Act guidelines, the LSC regulation supplies factors for determining separateness while explicitly cautioning that the "presence or absence of any one or more factors will not be determinative." 45 C.F.R. § 1610.8(a); *compare* 72 Fed. Reg. at 41,076. The LSC regulations set forth four factors: (i) the existence of separate personnel; (ii) the existence of separate accounting and timekeeping records; (iii) the degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and (iv) the presence of signs and other forms of identification that distinguish the recipient from the organization. 45 C.F.R. § 1610.8(a)(3); *compare* 72 Fed. Reg. at 41,077 (four factors in guidelines include existence of separate personnel, management and governance, separate accounting and timekeeping records, degree of separation from facilities where restricted activities occur and presence of signs and other forms of identification which could distinguish between recipient and affiliated organization).

### b.    Plaintiffs Cannot Establish Likelihood of Prevailing on the Question of Substantial or Undue Burden

Notwithstanding the similarity between the Leadership Act guidelines and the LSC regulation, plaintiffs argue that the guidelines are unconstitutional.  Most of their reasons rest on the argument that the funding condition is not "narrowly tailored," Pls.' Mem. at 23–28, an argument that, as explained above, is no longer tenable.  In any event, plaintiffs' contentions regarding the burden imposed by the guidelines fail for the following additional reasons.

Plaintiffs first point to the statute's exclusion of four organizations from the policy requirement.  Pls.' Mem. at 26.  But while that may be pertinent to whether there are less restrictive means to accomplish the government's goals, the exclusion has nothing to do with the *Brooklyn Legal Services* inquiry, i.e., the degree of burden imposed on plaintiffs in availing themselves of the guidelines' alternative avenues of expression.  As the D.C. Circuit stated, "the Act's underinclusiveness does not violate the First Amendment." *DKT*, 477 F.3d at 763 n.5. This Court, too, should reject plaintiff's argument.

Plaintiffs also contend that the burdens on speech under these guidelines are greater than those imposed by the LSC regulation.  Pls.' Mem. at 9–13, 25–28.  More specifically, plaintiffs claim that the guidelines here require separate management and governance.  However, as the plain language of the guidelines make clear, the four factors enumerated under the third prong (regarding physical and financial separation) are not absolute requirements, but rather a list of non-exclusive factors that bear on a case-by-case assessment of overall separateness.  72 Fed. Reg. at 41,076.  Indeed, the Leadership Act guidelines—like the LSC regulation—explicitly provide that the presence or absence of any one of these four factors is "not determinative." *Id.*; *see* 45 C.F.R. § 1610.8(3).  The additional language merely clarifies the range of factors for the

agency to consider when evaluating the separateness between affiliated entities. This assessment includes, among other considerations, the degree to which the low-level employees, mid-level managers, and high-level corporate officials of the respective entities are the same or different. Thus, the additional language spells out a concept that already is implicit in the more generic concept of separate "personnel" contained in the words of the LSC regulation.[12]

Moreover, the existence of separate corporate management and governance in some cases may be germane to the government's interest in avoiding the garbling or confusion of its message under the Leadership Act. For example, a well-known public figure might be the head of both the funding recipient and the affiliate, and the individual's association with both entities is well publicized, leading to confusion among the public about the degree of separation between the entities. Indeed, the prelude to the guidelines clearly articulates this concern:

> It is critical . . . that the U.S. Government's message opposing prostitution and sex trafficking is not confused by conflicting positions of [funding recipients]. . . . By ensuring adequate separation between the recipient and affiliate organizations, these criteria guard against a public perception that the affiliate's views on prostitution and sex trafficking may be attributed to the recipient organization and thus to the government.

72 Fed. Reg. at 41,076. The agencies will consider the "totality of the facts" and determine what degree of separation is required in each individual set of circumstances.

---

[12]    There may be circumstances where a funding recipient benefits from consideration of the new factors objected to by plaintiffs. For example, a funding recipient might benefit from consideration of separate "management and governance" where it already has separate board members and officers from its affiliated organization but the two entities share other relevant connections. Thus, whether this change in formulation will result in a benefit or burden to an individual funding recipient may depend entirely upon the individual circumstances of that recipient—yet another reason that, as argued *supra* Point A.1, plaintiffs' alleged injuries are speculative and adjudication of this matter should await a real and concrete injury.

In addition, the factor for consideration of management and governance is warranted in this case because the government is acting abroad, both heightening the government's need to avoid the garbling of its message and making that task more difficult. As a general matter, government actions in the field of foreign affairs are accorded great latitude. *Haig v. Agee*, 453 U.S. 280, 292, 307–08 (1981). In this regard, there is a special need for organizations or individuals that serve as representatives of the government abroad not to undermine the government's mission. *DKT Memorial Fund, Inc. v. USAID*, 887 F.2d 275, 290–91 (D.C. Cir. 1989) (in foreign affairs, the government speaks "not only with its words and its funds, but also with its associations"); *Palestine Information Office v. Schultz*, 853 F.2d 932, 937 (D.C. Cir. 1988) (holding that, in applying constitutional scrutiny, court must give particular deference to political branches' evaluation of interests in the realm of foreign relations and selection of means to further those interests). More specifically, it may be particularly difficult for the government to police the separation of organizations from their affiliates in foreign countries, due to the inherent difficulty of distance, conditions in foreign countries, the differing forms of corporate governance abroad, or other factors. In this context, the government has greater latitude under the First Amendment to ensure that affiliate separation does not undermine the effective communication of the government's message under the Leadership Act and, ultimately, the United States' foreign policy.

Plaintiffs contend that they may not be able to "control" their separate affiliates. Pls.' Mem. at 11, 18, 26–27. That argument misses the point of a separate affiliate: the idea is not to create shell companies to operate as alter egos for plaintiffs, but to preserve the integrity of the government's anti-trafficking, anti-prostitution message by requiring actual separation between organizations receiving Leadership Act funds and those espousing viewpoints antithetical to the

Leadership Act message. *See* 72 Fed. Reg. at 41,076; *Brooklyn Legal Services*, 462 F.3d at 231

("It is noteworthy that the Supreme Court in *Rust* apparently was not concerned that the

[government's] program integrity regulation, upon which LSC's regulation is modeled, 'required

a *certain degree of separation* . . . in order to ensure the integrity of the federally funded

program.'" (quoting *Rust*, 500 U.S. at 198) (emphasis added; ellipsis in original)). There is

nothing in the First Amendment cases that requires the funding recipient to have "control" over

the affiliate or vice versa; nowhere did the Supreme Court require such "control" over the

affiliates described in the seminal cases of *League of Women Voters*, *Regan v. Taxation With

Representation*, 461 U.S. 540 (1983), or *Rust*, 500 U.S. at 180, 187–90. Plaintiffs' control

argument is entirely inconsistent with *Velazquez I*, which upheld the LSC regulation without

requiring that a grantee be able to "control" its affiliate. As long as the existence of an affiliate

permits expression funded by non-federal sources to occur, the restriction on a federal funding

recipient's speech is constitutional. *Brooklyn Legal Services*, 462 F.3d at 232.[13]

Plaintiffs also suggest that differences between the guidelines and regulations for faith-

based grantees invalidate the guidelines. Pls.' Mem. at 31–32. That is similar to an argument

---

[13] Plaintiffs point to 62 Fed. Reg. 27,695 (May 21, 1997), in which LSC adopted its final regulation. Pls.' Mem. at 27–28. Plaintiffs misread this notice. The interim rule had required application of program integrity rules only if the grantee were "found to control, be controlled by or be subject to common control by the other organization." *Id.* at 27,697. The final rule collapsed that two-step process into one; LSC determined that it need not conduct a preliminary assessment of whether "the recipient and the other organization actually operated as one, rather than two separate organizations," since simply requiring all affiliates to comply with the program integrity rules would ensure "sufficiently separate identity and operational independence." *Id.* The point was thus not to allow more control of an affiliate by a grantee, but to simplify and clarify the process of ensuring independence between organizations. In saying that the regulation "will allow control at the Board level," *id.*, LSC was not referring to the boards of directors of the grantees or their affiliates, but to the Board of LSC itself. *See id.* at 27,695 (defining the capitalized term "Board" as LSC's Board of Directors).

expressly rejected by *Brooklyn Legal Services*, where the plaintiffs claimed that the LSC regulation violated the Establishment Clause because the level of separation required under the LSC regulation was higher than the separation required by the government's so-called faith-based initiative.  462 F.3d at 233.  Concluding that the premise of that argument was "flawed," the court observed that any religious organization that wished to receive funding was required to comply with the same guidelines as a secular entity receiving funding.  *Id.* at 233.  That observation is equally true for the Leadership Act guidelines in this appeal.  Moreover, the court in *Brooklyn Legal Services* specifically rejected the idea that the government was constitutionally compelled to adopt in other contexts the separation standards used in faith-based regulations: "we cannot adopt a view that Congress' decision to accommodate a religious organization in the distribution of its funds must by mandate of the Establishment Clause level the field for all other restrictions the government may place on totally unrelated programs."  *Id.* at 234.  To the extent plaintiffs now argue that the difference alone, apart from Establishment Clause concerns, shows that less restrictive means are available to advance Leadership Act goals, that again rests on a premise rejected by *Brooklyn Legal Services*.

Finally, plaintiffs claim that the burdens of separation are substantial due to the nature of operating in the international arena.  Pls.' Mem. at 7–13.  Plaintiffs' argument is supported only by their own untested and often conclusory declarations.  That evidence should be tested in discovery before the Court concludes that plaintiffs have met their burden of establishing, "by a clear showing," likelihood of success on the merits, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (internal quotation marks omitted)—especially as on the merits, the test under *Brooklyn Legal Services* imposes an onerous burden on plaintiffs to show that the alternative channels of communication are in effect foreclosed.  Moreover, the equities do not

29

weigh in favor of the extraordinary relief of a preliminary injunction, *see Mazurek*, 520 U.S. at

972 ("a preliminary injunction is an extraordinary and drastic remedy" (internal quotation marks

omitted)): the associations did not act to join either this lawsuit or the parallel *DKT* action until

after this Court granted an injunction to plaintiffs, a circumstance that suggests both lack of

urgency and possible forum-shopping.  To the extent the Court views plaintiffs' argument

regarding the burdens of operating in foreign countries to be dispositive, this action should

proceed to discovery under normal rules rather than under an extraordinary injunction.[14]

### c.    The Funding Condition and Guidelines Are Not Unconstitutionally Vague

Plaintiffs reiterate their "vagueness" challenge, an argument this Court declined to reach

previously.  430 F. Supp. 2d at 276.  For the reasons stated by the government in the initial

briefing, that argument too should be rejected.  Defs.' Mem. in Opp. to Pls.' Mots. for Prelim.

Inj., dated Jan. 4, 2006, at 44–49.  In sum, the policy requirement and the guidelines are

sufficiently clear that all potential recipients may make knowing and informed choices; the

degree of clarity required by penal statutes is not mandated here.[15]  The guidelines here are

certainly no more vague than the nearly identical regulation upheld in *Velazquez I.*  As for

plaintiffs' argument that they cannot know how much weight each factor in the guidelines is

given and therefore "must comply with the broadest interpretation of each to avoid potential

---

[14]    Plaintiffs mention, almost in passing, that under USAID regulations, new organizations may not be eligible for funding.  Pls. Mem. at 10–11, citing 22 C.F.R. § 203.3.  The regulations they refer to apply only to certain types of organizations and are not applicable to Leadership Act grants.  Plaintiffs cite no authority to the contrary.

[15]    Plaintiffs make the alarmist argument that they may be prosecuted for making false statements in certifying their compliance with the Leadership Act, Pls.' Mem. at 29 n.8, but fail to explain how the facts of their particular situations could expose them to such liability.  This argument, again, is pure speculation.

penalties," Pls.'s Mem. at 29, the funding recipients may, at any time, attempt to comply with the guidelines by forming an affiliate and seeking funding—a step they have apparently not taken. The vagueness *vel non* of the guidelines can only be properly assessed in light of a real application of those guidelines to concrete facts.

### d.    The Funding Condition Does Not Impermissibly Discriminate Based on Viewpoint

Plaintiffs argue that the funding condition is viewpoint-discriminatory and therefore should be invalidated.  Pls.' Mem. at 34–35.  But with the affiliate guidelines now in place, providing an alternative channel of communication, this case is now no different from *Rust*.  In that case, the government exercised its spending power to favor one message over another and to "selectively fund a program to encourage certain activities it believes to be in the public interest." 500 U.S. at 192–93.  Similarly, under the Leadership Act, Congress has favored an anti-prostitution message over competing viewpoints, and funded the Act's programs accordingly. That presents no constitutional problems as long as there is an adequate alternative means of expression available.  *Velazquez I*, 164 F.3d at 766 ("Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." (citing *Rust*, 500 U.S. at 196–98; *Regan*, 461 U.S. at 544–48; *League of Women Voters*, 468 U.S. at 400)).  The test for determining the adequacy of those channels of expression is set out in *Brooklyn Legal Services*, and further analysis of whether or not the statute is viewpoint-discriminatory is not necessary.  *See DKT*, 477 F.3d at 763 (rejecting viewpoint discrimination and unconstitutional conditions arguments because an alternative means of expression existed).

Plaintiffs maintain that *Velazquez I* is to the contrary because it "invalidated a viewpoint-based restriction even though the regulatory scheme at issue there offered the affiliate option." Pls. Mem. at 34. As described above, Point B.1, the Supreme Court did not adopt that reasoning in affirming that portion of *Velazquez I*. *Velazquez II*, 531 U.S. at 540–49. But even if the Second Circuit's rationale were still controlling, it would not apply here. The *Velazquez I* court was careful to note that its invalidation of one of the LSC provisions was based on the "type[ ] of speech" at issue—"a lawyer's argument to a court that a statute, rule, or governmental practice standing in the way of a client's claim is unconstitutional or otherwise illegal"—and the heightened "degree[ ] of protection under the First Amendment" that type of speech enjoys. 164 F.3d at 771. A proscription on that type of speech "effectively drives the idea from the marketplace where it can most effectively be offered," since "the courtroom is the prime marketplace for the exposure of that idea." *Id.* at 771–72. In contrast, the court noted that "Congress can make grants that favor family planning over abortion, or that favor decency over indecency," without constitutional problems. *Id.* at 771. In this case, there can be no question that Congress's choice of an anti-prostitution message is an exact analogue of its previous choice of an anti-abortion or anti-indecency message. There is no way in which the Leadership Act's funding condition could "drive the [plaintiffs'] idea" out of its "prime marketplace" in the way that the restriction in *Velazquez I* would have driven challenges to statutes' constitutionality out of their only home, the courtroom.

To the contrary, *Velazquez I* supports the government's arguments in this case. In upholding all of the other provisions of the LSC regulations at issue there, the Second Circuit distinguished *Rust*, but did so in ways that illustrate how that case is now directly applicable to the instant action. *Velazquez I* described *Rust* as imposing a "speech restriction [that] was . . .

very narrow; it was limited to speech at odds with the values Congress was seeking to advance through its grant program."  164 F.3d at 766.  *Velazquez I* also noted the justification for the policy in *Rust*: "avoiding the distortion or dilution of the very government message advanced by the program."  *Id.*  Both parts of that reasoning apply here: the Leadership Act policy requirement also limits its restriction to speech at odds with the program's anti-prostitution message, and is also justified by the need to prevent distortion or dilution of that message.  *DKT*, 477 F.3d at 761 (discussing Act's policy of having the United States "speak out against legalizing prostitution" and its emphasis on "behavioral change" and "educational messages").  Under *Rust* and *Velazquez I*, therefore, the Act's policy requirement is constitutional.

### e.    The Funding Condition Does Not Impermissibly Compel Speech

Finally, plaintiffs argue that the Leadership Act funding condition compels speech in violation of the First Amendment.  But the government is no more impermissibly compelling speech than it is impermissibly discriminating based on viewpoint: all the government is doing is "defin[ing] the limits of the program" that it is funding.  *Am. Library Ass'n*, 539 U.S. at 211; *see Rosenberger*, 515 U.S. at 833 (noting that the government has broader latitude to regulate speech when it "disburses public funds to private entities to convey a governmental message"); *id.* (government "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee").  In addition, the government has significantly more leeway in the exercise of its spending power: absent a threat that the denial of a subsidy would "drive certain ideas or viewpoints from the marketplace," "the Government may allocate . . . funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake."  *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998)

(internal quotation marks omitted).  That leeway—especially in conjunction with the alternative means of expression available to funding recipients under the agency guidelines, eliminating the possibility that any message will be suppressed—supports the D.C. Circuit's conclusion that "[t]he Act does not compel [a recipient] to advocate the government's position on prostitution and sex trafficking; it requires only that if [the recipient] wishes to receive funds it must communicate the message the government chooses to fund." *DKT*, 477 F.3d at 764.  For those reasons, plaintiffs' compelled speech argument should be rejected.

## C.    GHC and DKT's Application for Injunctive Relief is Res Judicata

GHC, along with its member DKT, is barred from seeking relief in this action for an additional reason: its application is prohibited by principles of res judicata.  As described above, the District of Columbia Circuit recently rejected a constitutional challenge essentially identical to the one here.  That action was brought by DKT International, which is a member of GHC according to GHC's web site.  (Exhibit C).  DKT was represented in that earlier litigation by the same attorneys that represent plaintiffs and GHC here.  Those facts preclude both DKT and GHC from joining this action.

"The doctrines of res judicata and collateral estoppel are designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'  Res judicata bars litigation of any claim for relief that was available in a prior suit between the same parties or their privies, whether or not the claim was actually litigated.  Collateral estoppel bars a party from raising an issue of law or fact in a second suit that the party had a 'full and fair opportunity to litigate . . . in [a] prior proceeding' and where 'the decision of the issue was necessary to support a valid and final judgment on the merits' in the first action." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d

638, 644 (2d Cir. 1998) (citations and internal quotation marks omitted; quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326–27 & n.5 (1979), and *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992)); *accord Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 362 (2d Cir. 2003).

### 1.    DKT Should Not Be Party to the Injunction

DKT, the sole plaintiff in *DKT*, is apparently a member of GHC, the proposed plaintiff here.  (Exhibit C).  As is evident from the D.C. Circuit's decision and from the complaint in that action (Exhibit D), the claims and issues asserted by DKT in its action against USAID are in all respects identical to those raised in this action.  Having lost its action in the District of Columbia federal courts, DKT now seeks to relitigate the same claim through its membership in GHC, attempting to obtain the same injunction that it was unable to procure in another forum.  Both claim preclusion and issue preclusion bar that result.  Accordingly, DKT should not be a party to this Court's preliminary injunction.

### 2.    GHC Itself Is Barred by Res Judicata

Even though GHC was not a named party in the *DKT* case, it too may be barred by res judicata by virtue of the participation of its privy, DKT.  Although inquiry into privity is fact-intensive, and accordingly further development of the record may be needed, at the least there are sufficient facts apparent to prevent GHC from establishing that it is likely to prevail, and therefore it is not entitled to a preliminary injunction.

"[A] nonparty can be bound by the results of someone else's litigation 'when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party.' " *Hoblock v. Albany County Bd. of Elections*,

422 F.3d 77, 90 (2d Cir. 2005) (quoting *Martin v. Wilks*, 490 U.S. 755, 762 n. 2 (1989)).  The

Second Circuit has recognized that

> "a person may be bound by a judgment even though not a party if one of the
> parties to the suit is so closely aligned with his interests as to be his virtual
> representative." . . . [C]laim preclusion "may bar non-parties to earlier litigation
> . . . when the interests involved in the prior litigation are virtually identical to
> those in later litigation."

*Id.* (quoting *Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.1975), and *Chase*

*Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir.1995)).  The "key" issue is that

"the interests of the non-party have been adequately represented by others who have litigated the

matter and have lost."  *Chase Manhattan*, 56 F.3d at 345 (alterations and internal quotation

marks omitted).  In short, "[i]t is well settled in this circuit that literal privity is not a requirement

for res judicata to apply.  Instead, a party will be bound by the previous judgment if his 'interests

were adequately represented by another vested with the authority of representation.' "  *Monahan*

*v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (quoting *Alpert's Newspaper*

*Delivery Inc. v. New York Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989)).

     Thus, in *Alpert's*, newspaper deliverers brought, and lost, an antitrust action against the

newspaper company in a federal district court.  An entirely separate group of deliverers initiated

similar claims in another federal court.  876 F.2d at 268–69.  Both groups of plaintiffs were

members of the same trade association, and that association assisted both litigations, though was

not a party to either.  *Id.* at 269.  The Second Circuit concluded that there was "sufficient identity

of parties . . . for collateral estoppel and *res judicata* to apply."  *Id.* at 270.  The court reasoned

that "the involvement of a trade association . . . which was undisputedly behind both lawsuits,

requires that the relitigation of previously litigated issues be barred."  *Id.*  Although in *Alpert's*

the trade association was admittedly actively involved in both cases, the court noted that it had

also found "identity of parties" for preclusion purposes when two groups of plaintiffs "were using the same attorneys in the two actions, the allegations were identical, and there were indications of an industry-wide strategy coordinated by counsel." *Id.* at 271 (citing *Ruiz v. Comm'r of Dep't of Transp.*, 858 F.2d 898, 903–04 (2d Cir. 1988)). In *Ruiz*, the court placed special emphasis on the fact that two groups of plaintiffs were represented by the same counsel: "although not conclusive on the issue of privity, the fact that the parties in [prior litigation] and in this case had the same attorney in actions brought at about the same time is of singular significance." *Ruiz*, 858 F.2d at 903 (internal quotation marks omitted).[16]

In this case, too, DKT and the plaintiffs here have "virtually identical" interests. They also "had the same attorney in actions brought at about the same time": as indicated in the D.C. Circuit's opinion and in the *DKT* complaint (filed in August 2005), plaintiffs in *DKT* and this case (filed in September 2005) were represented by the Brennan Center for Justice, and in fact by the same three individual attorneys.[17] (Exhibit D). Although there is no direct evidence at this stage that GHC is the "mastermind" behind both suits as in *Alpert's*, the sharing of counsel, DKT's membership in GHC, and the identical substance of the claims in both actions is an "indication[ ] of an industry-wide strategy coordinated by counsel."

---

[16] Although *Ruiz* applied New York law of preclusion, its analysis was noted favorably in *Alpert's*, where federal preclusion law applied, as it does here. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002) ("We apply federal law in determining the preclusive effect of a federal judgment and New York law in determining the preclusive effect of a New York State court judgment." (citations omitted)).

[17] Rebekah Diller, Laura K. Abel, and David S. Udell were listed as the Brennan Center attorneys for plaintiffs in the complaints in both actions. They were joined in *DKT* by two attorneys from Jenner & Block, and in this action by two attorneys from Wilmer Cutler Pickering Hale & Dorr.

DKT is thus GHC's virtual representative, and GHC should not be permitted to engage in repetitive litigation before this Court.[18]  Alternatively, even if the factual question of virtual representation cannot be definitively resolved on the current record, *see Chase Manhattan*, 56 F.3d at 346, at the least sufficient questions have been raised as to GHC's ability to participate in this litigation that GHC cannot meet its burden of showing that it is likely to prevail, and therefore is not entitled to a preliminary injunction at this stage.

---

[18]    Such an application of res judicata is consistent with due process.  In *Richards v. Jefferson County*, the Supreme Court reiterated that adequate representation of an absent party's interests is necessary to bind that party to a prior judgment.  517 U.S. 793, 798, 800–01 (1996) ("familiar doctrine that members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present, or the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter" (alterations and internal quotation marks omitted)).  At a minimum to satisfy due process, the prior proceeding must "be so devised and applied as to insure that those present are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue."  *Id.* at 801 (internal quotation marks omitted).  Thus, when a prior action was brought by city taxpayers who did not purport to represent a class of taxpayers, that action was not sufficient to bar a similar claim by county (i.e., non-city) taxpayers, as there was "no reason to suppose that the [prior] court took care to protect the[ir] interests," and the two groups of plaintiffs were "mere strangers to one another."  *Id.* at 802 (internal quotation marks omitted).  Here, however, the interests of the different plaintiffs are identical; they are hardly strangers to each other, as one is a member of the other; they are "of the same class" of NGOs funded by the Leadership Act; and, as the claims were identical, the prior litigation was conducted in a manner to ensure "full and fair consideration of the common"—indeed, only—"issue."

## Conclusion

For all of the above reasons, plaintiffs' motion to amend the complaint and extend the

preliminary injunction should be denied.

Dated:  New York, New York                    Respectfully submitted,
            March 17, 2008

                                                        MICHAEL J. GARCIA
                                                        United States Attorney for the
                                                        Southern District of New York
                                                        Attorney for Defendants

                                            By:      /s/ Benjamin H. Torrance
                                                        BENJAMIN H. TORRANCE
                                                        Assistant United States Attorney
                                                        Telephone: 212.637.2703
                                                        Fax: 212.637.2702
                                                        E-mail: benjamin.torrance@usdoj.gov