Financial Group, Inc., and thereby indirectly acquire voting shares of Pan American Bank, both of Chicago, Illinois.

**B. Federal Reserve Bank of St. Louis** (Glenda Wilson, Community Affairs Officer) 411 Locust Street, St. Louis, Missouri 63166-2034:

*1. Central Bancompany, Inc.*, Jefferson City, Missouri; to acquire 100 percent of the voting shares of Millstadt Bancshares, Inc., and thereby indirectly acquire voting shares of First National Bank of Millstadt, both of Millstadt, Illinois.

Board of Governors of the Federal Reserve System, July 23, 2007.

**Robert deV. Frierson,**

*Deputy Secretary of the Board.*

[FR Doc. E7–14446 Filed 7–25–07; 8:45 am]

**BILLING CODE 6210–01–S**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Office of Global Health Affairs; Guidance Regarding Section 301(f) of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003

**AGENCY:** Office of Global Health Affairs, HHS.

**ACTION:** Guidance.

**SUMMARY:** Section 301(f) of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 (the "Leadership Act"), P.L. No. 108–25 (May 27, 2003), 22 U.S.C. 7631(f), prohibits the award of grants, contracts or cooperative agreements for activities funded under the Act to any organization that does not have an explicit policy opposing prostitution and sex trafficking. Section 301(f) states as follows:

Limitation.—No funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking.

The following guidance provides additional information on the policy requirement expressed in this law for entities that receive grants, contracts, or cooperative agreements from the U.S. Department of Health and Human Services ("HHS") to implement programs or projects under the authority of the Leadership Act. Specifically, it describes the legal, financial, and organizational separation that should exist between these recipients of HHS funds and an affiliate organization that engages in activities that are not consistent with a policy opposing prostitution and sex trafficking.

**FOR FURTHER INFORMATION CONTACT:** Maggie Wynne, Office of Global Health Affairs, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Room 639H, Washington, DC 20201.

**SUPPLEMENTARY INFORMATION:** This guidance is designed to provide additional clarity for Contracting and Grant officers, Contracting Officers' Technical Representatives, Program Officials and implementing partners (e.g., grantees, contractors) of HHS regarding the application of language in Notices of Availability, Requests for Proposals, and other documents pertaining to the policy requirement expressed in 22 U.S.C. 7631(f), which provides that organizations receiving Leadership Act funds must have a policy explicitly opposing prostitution and sex trafficking (the "policy requirement").

In enacting the statute from which this requirement originates, the Leadership Act, Congress developed a framework to combat the global spread of HIV/AIDS, tuberculosis, and malaria. As a part of that Act, to ensure that the Government's organizational partners will not undermine this goal through the promotion of counterproductive activities, the Leadership Act provides that all funding recipients, subject to limited exceptions, must have a policy explicitly opposing prostitution and sex trafficking. It is critical to the effectiveness of Congress's plan and to the U.S. Government's foreign policy underlying this effort, that the integrity of Leadership Act programs and activities implemented by organizations receiving Leadership Act funds is maintained, and that the U.S. Government's message opposing prostitution and sex trafficking is not confused by conflicting positions of these organizations.

Accordingly, the U.S. Government provides this "Organizational Integrity" Guidance to clarify that the Government's organizational partners that have adopted a policy opposing prostitution and sex-trafficking may, consistent with the policy requirement, maintain an affiliation with separate organizations that do not have such a policy, provided that such affiliations do not threaten the integrity of the Government's programs and its message opposing prostitution and sex trafficking, as specified in this guidance. To maintain program integrity, adequate separation as outlined in this guidance is required between an affiliate which expresses views on prostitution and sex trafficking contrary to the government's message and any federally-funded partner organization.

The criteria for affiliate independence in this guidance is modeled on criteria upheld as facially constitutional by the U.S. Court of Appeals for the Second Circuit in *Velzquez* v. *Legal Services Corporation,* 164F.3d 757,767 (2d cir. 1999), and *Brooklyn Legal Services Corp.* v. *Legal Services Corp.,* 462 F.3d 219, 229–33 (2d Cir. 2006), cases involving similar organization-wide limitations applied to recipients of federal funding.

This guidance clarifies that an independent organization affiliated with a recipient of Leadership Act funds need not have a policy explicitly opposing prostitution and sex trafficking for the recipient to maintain compliance with the policy requirement. The independent affiliate's position on these issues will have no effect on the recipient organization's eligibility for Leadership Act funds, so long as the affiliate satisfies the criteria for objective integrity and independence detailed in the guidance. By ensuring adequate separation between the recipient and affiliate organizations, these criteria guard against a public perception that the affiliate's views on prostitution and sex-trafficking maybe attributed to the recipient organization and thus to the government, thereby avoiding the risk of confusing the Government's message opposing prostitution and sex trafficking.

This guidance may be shared with HHS implementing partners. *Guidance:* HHS contractors, grantees and recipients of cooperative agreements ("Recipients") must have objective integrity and independence from any affiliated organization that engages in activities inconsistent with a policy opposing prostitution and sex trafficking ("restricted activities"). A recipient will be found to have objective integrity and independence from such organization if:

(1) The affiliated organization is a legally separate entity;

(2) The affiliated organization receives no transfer or Leadership Act funds, and Leadership Act funds do not subsidize restricted activities; and

(3) The Recipient is physically and financially separate from the affiliated organization. Mere bookkeeping separation of Leadership Act funds from other funds is not sufficient. HHS will determine, on a case-by-case basis and based on the totality of the facts, whether sufficient physical and financial separation exists. The presence or absence of any one or more factors will not be determinative. Factors

relevant to this determination shall include but will not be limited to:

(i) The existence of separate personnel, management, and governance;

(ii) The existence of separate accounts, accounting records, and timekeeping records;

(iii) The degree of separation from facilities, equipment and supplies used by the affiliated organization to conduct restricted activities, and the extent of such restricted activities by the affiliate;

(iv) The extent to which signs and other forms of identification which distinguish the Recipient from the affiliated organization are present, and signs and materials that could be associated with the affiliated organization or restricted activities are absent; and

(v) The extent to which HHS, the U.S. Government and the project name are protected from public association with the affiliated organization and its restricted activities in materials such as publications, conference and press or public statements.

**EFFECTIVE DATE:** This guidance is effective on the final date of publication.

Dated: July 23, 2007.

**William R. Steiger,**
*Director.*
[FR Doc. 07–3658 Filed 7–23–07; 11:59 am]
**BILLING CODE 4150–38–M**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**[60Day–07–0666]**

**Proposed Data Collections Submitted for Public Comment and Recommendations**

In compliance with the requirement of Section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 for opportunity for public comment on proposed data collection projects, the Centers for Disease Control and Prevention (CDC) will publish periodic summaries of proposed projects. To request more information on the proposed projects or to obtain a copy of the data collection plans and instruments, call 404–639–5960 and send comments to Maryam I. Daneshvar, CDC Acting Reports Clearance Officer, 1600 Clifton Road, MS–D74, Atlanta, GA 30333 or send an e-mail to *omb@cdc.gov.*

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Written comments should be received within 60 days of this notice.

**Proposed Project**

National Healthcare Safety Network (NHSN) (OMB Control No. 0920–0666)—Revision—National Center for Preparedness, Detection, and Control of Infectious Diseases (NCPDCID), Centers for Disease Control and Prevention (CDC).

*Background and Brief Description*

The National Healthcare Safety Network (NHSN) is a system designed to accumulate, exchange, and integrate relevant information and resources among private and public stakeholders to support local and national efforts to protect patients and to promote healthcare safety. Specifically, the data is used to determine the magnitude of various healthcare-associated adverse events and trends in the rates of these events among patients and healthcare workers with similar risks. The data will be used to detect changes in the epidemiology of adverse events resulting from new and current medical therapies and changing risks.

Healthcare institutions that participate in NHSN voluntarily report their data to CDC using a web browser-based technology for data entry and data management. Data are collected by trained surveillance personnel using written standardized protocols. This application to OMB includes a significant increase in the number of burden hours to the previously approved data collection. The increase is due to inclusion of new forms and an increased number of respondents.

NHSN was first approved by OMB in 2005 and CDC proposes to revise this data collection by adding new modules to the NHSN as well as modifying currently approved forms. Four new forms are proposed: (1) Healthcare Worker Influenza Vaccination form; (2) Healthcare Worker Influenza Antiviral Medication Administration form; (3) Pre-season survey on Influenza Vaccination Programs for Healthcare Workers; and (4) Post-season Survey on Influenza Vaccination Programs for Healthcare Workers. The purpose of these new forms is to help participating healthcare institutions and CDC to: (1) Monitor influenza vaccination coverage among healthcare personnel at individual facilities and to provide aggregate coverage estimates for all participating facilities; (2) monitor progress towards attaining the Healthy People 2010 goal of 60% vaccination coverage among healthcare personnel; (3) monitor influenza vaccination coverage by ward/unit of the facility or occupational group so that areas or groups with low vaccination rates can be targeted for interventions; (4) monitor adverse reactions related to receipt of the vaccine or receipt of antiviral medications; and (5) assess the characteristics of influenza vaccination programs pre- and post-influenza season to identify practices associated with high immunization rates. The total estimated annual burden for these forms is 13,800 hours.

CDC is proposing to add an additional form, Central Line Insertion Practices Monitoring Form, to the Patient Safety Component Device Associated Module. This new form will enable participating facilities and CDC to (1) monitor central line insertion practices in individual patient care units and facilities and provide aggregate data for all participating facilities (facilities have the option of recording inserter-specific adherence data); (2) link gaps in recommended practice with the clinical outcome both in individual facilities and for all participating facilities; (3) facilitate quality improvement by identifying specific gaps in adherence to recommended prevention practices, thereby helping to target intervention strategies for reducing central line infection rates. The total estimated annual burden for this form is 12,500 hours.

CDC proposes to add the Multi-Drug Resistant Organism (MDRO) Prevention Process Monitoring Module to the Patient Safety Component. This module consists of four forms: (1) MDRO Prevention Process Monitoring Form; (2) MDRO Infection Event Form; (3) Laboratory-identified MDRO Event Form; and (4) Laboratory-identified MDRO Event Summary Form. The purpose of these forms is to: (1) Monitor processes and practices in individual patient care units and facilities and to provide aggregate adherence data for all participating facilities; (2) link gaps in recommended practice with the clinical outcome (i.e., MDRO infection) both in individual facilities and for all participating facilities; (3) facilitate quality improvement by identifying specific gaps in adherence to