USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-8-08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- X
ALLIANCE FOR OPEN SOCIETY            :
INTERNATIONAL, INC. et al.,          :
                                     :
                      Plaintiffs,    :        05 Civ. 8209
                                     :
         - against -                 :      **DECISION AND ORDER**
                                     :
UNITED STATES AGENCY FOR             :
INTERNATIONAL DEVELOPMENT et al.,    :
                                     :
                      Defendants.    :
----------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs, Alliance for Open Society International, Inc. ("AOSI"), and Pathfinder International ("Pathfinder") (collectively, "Plaintiffs") brought suit against defendants the United States Agency for International Development and Andrew S. Natsios in his official capacity as its administrator (collectively, "USAID"), the United States Department of Health and Human Services and Michael O. Leavitt in his official capacity as its Secretary (collectively, "HHS"), and the United States Centers for Disease Control and Prevention and Julie Louise Gerberding in her official capacity as its Director (collectively "CDC") (together with USAID, HHS, and CDC "Defendants," or the "Agencies," or the "Government"), alleging that a provision of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Leadership Act"), 22 U.S.C. §§ 7601 et seq., violated their First Amendment Rights.   The Court granted

1

Plaintiffs' motion for a preliminary injunction on May 9, 2006 enjoining Defendants from penalizing Plaintiffs.  See AOSI v. USAID, 430 F. Supp. 2d 222 (S.D.N.Y. 2006) ("AOSI I").

Plaintiffs now move to add Global Health Council ("GHC") and InterAction (collectively, the "Associations") as plaintiffs to this action and to extend the preliminary injunction to the Associations.

## I.  BACKGROUND[1]

Additional background information pertinent to this action is discussed in AOSI I, familiarity with which is presumed.

### A.  PROCEDURAL HISTORY

In AOSI I, Plaintiffs challenged § 7631(f) of the Leadership Act, which provides:

> No funds made available to carry out this Act, or any amendment made to this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except that this subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.

---

[1] The factual recitation below is drawn from Plaintiffs' Memorandum in Support of Motion of Plaintiffs for Leave to File a Second Amended Complaint and Motion by Global Health Council and InterAction for a Preliminary Injunction, dated Feb. 8, 2008 ("Pls.' Mem."); Government's Memorandum in Opposition to Plaintiffs' Motion to File a Second Amended Complaint and for a Preliminary Injunction, dated March 17, 2008 ("Defs.' Opp."); and Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint and Motion by Global Health Council and InterAction for a Preliminary Injunction, dated Apr. 7, 2008 ("Pls.' Reply").   Except as specifically quoted or otherwise cited, no further reference to these documents will be made.

22 U.S.C. § 7631(f) ("§ 7631(f)" or the "Policy Requirement"). The Court granted Plaintiffs' motion for a preliminary injunction, and held that the Policy Requirement, as interpreted by the Government, violated Plaintiffs' First Amendment rights by requiring the Government's private partners in the implementation of the Leadership Act to abstain from all speech, including privately-funded speech, that could be understood by the Government to be contrary to the Policy Requirement.   See AOSI I at 268-70.   The Court stated that a heightened standard of review was appropriate "when a spending enactment substantially impairs First Amendment protected activity conducted by private entities with private funds as a condition of receiving a government benefit," and held that the Policy Requirement was unconstitutional because it was not "narrowly tailored to fit Congress's intent."   Id. at 267-68.

Following the granting of the Court's preliminary injunction in AOSI I, Defendants indicated that they would continue to enforce the Policy Requirement against similarly-situated grantees who were not parties to this case. Plaintiffs attempted to add additional parties to this action to obtain protection from enforcement of the Policy Requirement, but the Government did not consent to extending

3

the terms of the preliminary injunction and amending the complaint. The Government then appealed this Court's decision to the Second Circuit, and the case was placed on this Court's suspense docket pending the outcome of the appeal.

On July 23, 2007, while the Government's appeal was pending before the Second Circuit, both HHS and USAID issued "organizational integrity" guidance. See HHS Guidance, 72 Fed. Reg. 41,076 (July 23, 2007); USAID AAPD 05-04 Amend. 1 (July 23, 2007) (collectively, the "Guidelines"). On November 8, 2007, the Second Circuit issued a summary order remanding the case to this Court to determine whether the preliminary injunction should be granted in light of the issuance of the Guidelines. See AOSI v. USAID, 254 Fed. Appx. 843 (2d Cir. 2007). The Circuit Court did not offer an opinion on the merits of the claims or on the constitutionality of the guidelines or the statute, and stated that, on remand, this Court could "consider any legal arguments it deems relevant and take any additional evidence that may be appropriate." Id. at 846. The Second Circuit also ordered that the injunction remain in place pending the proceeding before this Court.

At a conference held on November 30, 2007, Plaintiffs informed the Court of their desire to amend the complaint to add the Associations as Plaintiffs, and to extend the

4

preliminary injunction to the Associations. Defendants advised the Court that they would not consent to either motion, leading to the dispute now before the Court.

B.    THE GUIDELINES

Under the Guidelines promulgated by the Agencies, the Government no longer interprets the Leadership Act to require a blanket ban on all restricted activities by recipients of Leadership Act funds, but rather, the Guidelines permit recipients to partner with affiliate organizations which may "express views on prostitution and sex trafficking contrary to the government's message," as long as there is "adequate separation" between the recipient and the affiliated organization such that the affiliations "do not threaten the integrity of the Government's programs and its message opposing prostitution and sex trafficking. Guidelines at 41,076. The Guidelines provide that:

[C]ontractors, grantees and recipients of cooperative agreements ("Recipients") [under the Leadership Act] must have objective integrity and independence from any affiliated organization that engages in activities inconsistent with a policy opposing prostitution and sex trafficking ("restricted activities").

Id. The Guidelines state that a Recipient will be found to have objective integrity and independence from such an affiliated organization if:

    (1)    The affiliated organization is a legally separate entity;

5

(2)   The affiliated organization receives no transfer of
       Leadership Act funds and Leadership Act funds do
       not subsidize restricted activities; and

(3)   The  Recipient  is  physically  and  financially
       separate from the affiliated organization.   Mere
       bookkeeping separation of Leadership Act funds from
       other funds is not sufficient.

Id.    The  Guidelines  elaborate  that  the  agencies  will

"determine, on a case-by-case basis and based on the totality

of  the  fact,  whether  sufficient  physical  and  financial

separation  exists."    Id.    The  Guidelines  also  set  forth

several   non-exclusive   factors   to   be   used   in   that

determination, but that the "presence or absence of any one or

more factors will not be determinative."   Id.   The factors

include:

(i)    The  existence  of  separate  personnel,  management,
        and governance;

(ii)  The  existence  of  separate  accounts,  accounting
        records, and timekeeping records;

(iii) The   degree   of   separation   from   facilities,
        equipment,  and  supplies  used  by  the  affiliated
        organization to conduct restricted activities, and
        the  extent  of  such  restricted  activities  by  the
        affiliate;

(iv)  The  extent  to  which  signs  and  other  forms  of
        identification which distinguish the Recipient from
        the  affiliated  organization  are  present,  and  signs
        and  materials  that  could  be  associated  with  the
        affiliated  organization  or  restricted  activities
        are absent; and

(v)    The   extent   to   which   [the   agency],   the   U.S.
        Government and the project name are protected from
        public association with the affiliated organization
        and its restricted activities in materials such as

6

> publications, conferences and press or public
> statements.

Id. at 41,077.

## C.   THE ASSOCIATIONS

InterAction is the largest alliance of United States-
based international development and humanitarian non-
governmental organizations ("NGOs").    InterAction members
collectively receive more than $1 billion from the United
States Government annually, including Leadership Act funding
from Defendants, and more than $7 billion from private
sources.    Plaintiffs represent that twenty members of
InterAction, fourteen of which wish to remain anonymous, have
informed InterAction that they are both subject to the Policy
Requirement and desire relief from it.

GHC is a private, nonprofit membership alliance
consisting of member organizations dedicated to international
public health, including many United States-based grantees
that receive HIV/AIDS funding from the Government.    According
to Plaintiffs, twenty-eight GHC members, eighteen of which
wish to remain anonymous, have told GHC that they are both
subject to the Policy Requirement and desire relief from it.

## II.   **DISCUSSION**

Plaintiffs move to amend the complaint to add the
Associations and to extend the preliminary injunction to the
Associations.    Plaintiffs contend that they can prove a

7

likelihood of success on the merits because the Guidelines (1) unconstitutionally compel speech; (2) impose unconstitutional conditions on Plaintiffs' First Amendment rights; and (3) are unconstitutionally vague.  Defendants argue that Plaintiffs' motion to amend the complaint should be denied, as the Associations lack standing, and therefore, such an amendment would be futile.  Additionally, Defendants argue that Guidelines as promulgated are constitutional under the standards enunciated by the Supreme Court and the Second Circuit.  The Court will first address Defendants' standing argument, and will then address the likelihood of success for Plaintiffs' arguments regarding the constitutionality of the Guidelines.

A.   STANDING

As a threshold matter, the Court must first determine whether the Associations have standing to bring this action, as amending the complaint would otherwise be futile.  An amendment is futile if the court lacks jurisdiction over the amended pleading, or if it would otherwise be subject to a successful motion to dismiss.  See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block, 608 F.2d 28, 42 (2d Cir. 1979); Freeman v. Marine Midland Bank - New York, 494 F.2d 1334, 1338 (2d Cir. 1974); Mitchell v. Keane, 974 F. Supp. 332, 343-44 (S.D.N.Y. 1997).

"The doctrine of standing, which addresses the question of whether the plaintiff is entitled to have the courts decide the merits of the dispute or of particular issues, embraces both 'constitutional' and 'prudential' requirements." Center for Reprod. Law and Policy v. Bush, 304 F.3d 183, 195-96 (2d Cir. 2002) (quoting Sullivan v. Syracuse Hous. Auth., 962 F.3d 1101, 1106 (2d Cir. 1992)). The "irreducible constitutional minimum" of standing contains three elements: (1) the plaintiff must have suffered an "injury-in-fact," meaning an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent, and not conjectural or hypothetical; (2) there must be a "causal connection" between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable ruling. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

An association attempting to bring suit on behalf of its members must satisfy the three-part test for associational standing by establishing that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). The plaintiff has the burden of establishing the

9

elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561.

1.  Standing of Individual Members

To satisfy the first prong of the Hunt test, at least one member of the association must satisfy the constitutional requirements of injury-in-fact, causation, and redressability. See Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc., 448 F.3d 138, 145 (2d Cir. 2006) ("An association bringing suit on behalf of its members must allege that one or more of its members has suffered a concrete and particularized injury ...."). Defendants argue that the injuries alleged by the Associations are merely hypothetical, and thus insufficient for standing, because none of the Associations' members has attempted to form an affiliate to comply with the Guidelines.

The Associations allege that they have multiple members who meet the individual standing requirements, because: (1) they have adopted policies they otherwise would not have adopted, and (2) they do not know what speech is compelled, and what speech and activities are prohibited by the Policy Requirement and Guidelines.  Both GHC and InterAction have conducted surveys of their members to determine the extent of the effect of the Policy Requirement on their membership.  GHC

10

states that it has 28 United States-based members which aver that they are subject to the Policy Requirement and would like relief from it; InterAction has 20 such members. For example, Cooperative for Assistance and Relief Everywhere, Inc. ("CARE"), which is a member of both GHC and InterAction, has purportedly adopted a policy opposing prostitution solely because of the Policy Requirement, and thus alleges that it is compelled to speak the Government's message and is prevented from communicating lessons from its HIV prevention work with prostitutes in India and Bangladesh because of the Policy Requirement. Furthermore, Pathfinder is also a member of GHC and InterAction, and its standing in the case has never been disputed. But for the preliminary injunction, Pathfinder alleges that it would have to refrain from sharing lessons from its privately-funded HIV prevention work with prostitutes. IntraHealth, a member of GHC, has stated that it wishes to remain silent on the social and political aspects of sex work, and therefore does not wish to speak to Government's viewpoint.

The Court is persuaded that the Associations have pled a sufficient injury-in-fact of at least one of their individual members. Bearing in mind that at the pleading stage mere allegations are sufficient to carry the plaintiff's burden of establishing the elements of standing, the Associations have

adequately alleged both actual and imminent injuries. <u>See</u> <u>Lujan</u>, 504 U.S. at 561. The Associations members are given the option of either foregoing Leadership Act funds, or attempting to comply with the legal separation requirement, which they contend is unconstitutional and would impose an extremely high financial cost for its members. <u>See</u> <u>American</u> <u>Booksellers Found. v. Dean</u>, 342 F.3d 96, 101 (2d Cir. 2003) (finding standing where plaintiffs were presented with the choice of risking prosecution or of censoring the content of their websites). Additionally, Plaintiffs have met the threshold for establishing standing for a First Amendment claim by demonstrating "'an actual and well-founded fear that the law will be enforced against [them].'" <u>Id.</u> (quoting <u>Vermont Right to Life Comm. v. Sorrell</u>, 221 F.3d 376, 382 (2d Cir. 2000). Furthermore, the fact that the Associations' members are required to speak the Government's message in exchange for the Leadership Act subsidy is a sufficient injury-in-fact for their compelled speech claim. Plaintiffs should not be forced to either forego their constitutional rights or risk legal action and the loss of their subsidies in order to have standing to challenge the Guidelines and the Policy Requirement.

Accordingly, the Court finds that the Associations have sufficiently demonstrated that at least one of their members

12

would have individual standing to bring this case.

    2.   <u>Germaneness</u>

The second prong of the <u>Hunt</u> test of associational standing requires the plaintiff to establish that "the interests it seeks to protect are germane to the organization's purpose." 432 U.S. at 343. "[T]he requirement of germaneness is undemanding; mere pertinence between litigation subject and organizational purpose is sufficient." <u>Building & Constr. Trades Council of Buffalo</u>, 448 F.3d at 148 (internal quotation marks omitted).

The Associations state that the purpose of their respective organizations is "to promote open debate on issues of public policy and to share among their members best practices in public health and humanitarian work." (Pl. Mem., at 17.) Defendants do not dispute that the purposes of the Associations are germane to the interests at stake in this litigation.

Accordingly, the Court finds that Plaintiffs have sufficiently alleged the germaneness requirement.

    3.   <u>Participation of Individual Members</u>

Under the third prong of the <u>Hunt</u> test, plaintiffs seeking associational standing must establish that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S.

13

at 343. This third prong is a prudential requirement left to
the discretion of the court, not a constitutional requirement.
See United Food & Commercial Workers Union Local 751 v. Brown
Group, Inc., 517 U.S. 544, 555 (1996). With regard to
individual participation in the relief requested:

> whether an association has standing to invoke the court's
> remedial powers on behalf of its members depends in
> substantial measure on the nature of the relief sought.
> If in a proper case the association seeks a declaration,
> injunction, or some other form of prospective relief, it
> can reasonably be supposed that the remedy, if granted,
> will inure to the benefit of those members of the
> association actually injured. Indeed, in all cases in
> which we have expressly recognized standing in
> associations to represent their members, the relief
> sought has been of this kind.

Warth v. Seldin, 422 U.S. 490, 515 (1975).

However, associational standing is not automatically
granted whenever an association requests equitable relief,
rather than damages. See Bano v. Union Carbide Corp., 361
F.3d 696, 714 (2d Cir. 2004) (noting that an "organization
lacks standing to assert claims of injunctive relief on behalf
of its members where the fact and extent of the injury that
gives rise to the claims for injunctive relief would require
individualized proof, or where the relief requested would
require the participation of individual members in the
lawsuit") (internal quotations and citations omitted)).

Here, the Associations assert that there is no
requirement for individualized proof for their claims that the

14

Policy Requirement and its Guidelines are compelled speech, unconstitutionally vague, and do not provide an adequate alternative channel for their protected speech in light of the burdens on their members.  They argue that no individualized determination is necessary because the Policy Requirement and Guidelines apply to all members and impose burdens common to them.  For example, all United States-based Leadership Act grantees must comply with the Policy Requirement, and the burdens of creating a legally and physically separate affiliate organization, registering the new legal entity with a foreign government, obtaining visas for staff and permission to open separate bank accounts, financing the affiliate, and staffing it with new personnel, equipment and supplies, would fall upon all members of the Association attempting to comply with the Guidelines.

The Associations assert that the applicable line of cases are those in which the determination of the claims depend on the Government's application of the law, and not on the facts concerning any individual grantee.  In Rumsfeld v. Forum for Academic & Institutional Rights, Inc., the Supreme Court upheld the associational standing of an association of law schools to assert a claim that a military recruiting condition on federal funds violated the First Amendment rights of its members.  See 547 U.S. 47, 52 n.2 (2006).  The district court

15

found there was no need for individualized proof because the association's claim was "not that there is something unconstitutional about the manner in which the Government is applying the [statute and regulations] to a particular institution," but rather that the claim "is that the Government is applying a statute and its implementing regulations to almost every law school in the nation in a way that violates the law schools' First Amendment rights." Forum for Academic & Institutional Rights, Inc. v. Rumsfeld, 291 F. Supp. 2d 269, 291 (D.N.J. 2003), rev'd on other grounds, 390 F.3d 219 (3d Cir. 2004), rev'd on other grounds, 547 U.S. 47 (2006). The Associations also point to National Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press, where this prong of the Hunt test was satisfied when half of the elements of the claims "can be proven largely by reference to the defendants' [conduct]...." 990 F. Supp. 245, 249-50 (S.D.N.Y. 1997). The College Bookstores Court also found that while "[s]ome individuated proof may be required" it was "not nearly enough to require each [the association's members] to bring suit separately" and "[t]he fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing." Id. (citing New York State Nat'l Org. of Women v. Terry, 886 F.2d 1339, 1349 (2d Cir. 1989) (granting associational standing even though evidence

16

from some individual members was required)).

Plaintiffs argue that as their compelled speech and unconstitutional conditions claims will be proven largely by reference to Defendants' actions, and that some individualized showing of the facts common to all members to support their claims is not fatal to associational standing. Further, they assert that no individualized proof is required to demonstrate that the Policy Requirement and Guidelines are unconstitutionally vague.

Defendants reply that the claims of the Associations cannot be adjudicated without the participation of individual members, i.e. that the "fact and extent" of the alleged injuries-in-fact of the individual members requires "individualized proof." Warth, 422 U.S. at 515-16. They argue that an assessment of whether the Guidelines unduly burden the Associations' members' First Amendment rights or whether the Guidelines provide an adequate alternative channel for protected speech under the relevant case law, will depend upon an assessment of the impact of the Guidelines on each individual member. The Defendants further contend that the Court cannot determine the degree to which a funding recipient is burdened without organization-specific evidence of what countries that organization operates in, whether the organization seeks to use private funding in that country to

17

communicate in a manner inconsistent with an anti-prostitution policy, and the actual legal and practical requirements of operating an affiliate in that country.

Defendants, in turn, rely on those cases where associational standing has been denied because either the claims asserted or relief requested required individualized proof. See, e.g., Rent Stabilization Ass'n v. Dinkins, 5 F.3d 591, 596 (2d Cir. 1993) (finding that an association of landlords did not have standing to challenge city rent regulations on takings grounds, because establishing the takings claim would require a "factual inquiry for each landlord who alleges that he has suffered a taking [in order] to determine the landlord's particular return based on a host of individualized financial data"); Bano, 361 F.3d at 714-15 (finding that organizations representing individual landowners did not have standing to pursue claims for damages on behalf of their members for bodily harm and damage to real property resulting from groundwater contamination, which necessarily would require individualized proof); Warth, 422 U.S. at 515-16 (holding that an organization of construction firms could not seek damages for the profits and business lost by its members because "whatever injury might have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof"). Thus,

18

Defendants argue that because a central issue on remand is whether the burdens imposed by the Guidelines are unconstitutional, the claims asserted by the Associations require individualized proof as to each member's burdens, and so associational standing should be denied.

The Court finds that neither the claims asserted nor the relief requested by the Associations would require any significant participation of individual members in the lawsuit. As the Associations request injunctive and declaratory relief, the "relief requested" aspect of the third prong of the Hunt test is satisfied. See Warth, 422 U.S. at 515. While Defendants' arguments are not without some merit, ultimately they do not speak to the vagueness claims or compelled speech claims asserted by the Associations.

The compelled speech and vagueness claims do not require individualized proof, as it is the conduct of Defendants in the form of the Policy Requirement and the Guidelines that will be the primary subject of inquiry. The Policy Requirement and the Guidelines apply to all Leadership Act grantees which are members of the Associations. While some individualized showing of facts common to all members to support the factual development of the Associations' compelled speech and vagueness claims will be necessary, this test does not preclude granting associational standing. See College

19

Bookstores, 990 F. Supp. at 249-50; New York State Nat'l Org. of Women, 886 F.2d at 1349.   To enjoin an unconstitutional practice, the Associations do not have to show redundant evidence of each separate impact of the Policy Requirement and Guidelines on every one of their members.   See Forum for Academic & Institutional Rights, 291 F. Supp. 2d at 291; cf. American Booksellers Ass'n, Inc. v. Houghton Mifflin Co., Inc., No. 94 Civ. 8566, 1995 WL 92270, at *5 (S.D.N.Y. Mar. 3, 1995) (holding that it was not necessary for the association to show impact on each and every member because "[a]t some point, the proof [provided by individual members] will become redundant").

As for the Associations' claims that the Policy Requirement and its Guidelines do not provide an adequate alternative channel for their protected speech in light of the alleged burdens on their members, these claims will undoubtedly require a more thorough factual development to establish the extent of the burden on the Associations' members.   However, given the enumeration in the Guidelines of the factors to be considered in determining whether legal and physical separation of the parent organization and its affiliate exists, all the Associations' members will share the common burden of complying with the Guidelines.   Thus, requiring an individualized showing of the efforts of every

20

member of the Associations to comply with the Guidelines will necessarily involve duplicative and redundant proof.    While the Court does not doubt that the precise actions and expenditures taken to comply with the Guidelines will vary from organization to organization, at issue in this case is whether the baseline burden enumerated in the Guidelines imposes unconstitutional conditions upon the protected speech of Plaintiffs.    Given that the third prong of the Hunt test is a prudential consideration, that individualized evidence would be duplicative and redundant counsels in favor of granting associational standing in the interests of judicial economy. See Hunt, 432 U.S. at 343-44 (granting such standing where the evidence included an individualized showing of the varying injuries by association members); see also College Bookstores, 990 F. Supp. at 249-50.    In evaluating a challenge by an association of Washington apple growers to a North Carolina statute which required apple containers sold in North Carolina to be either unmarked or contain only the applicable U.S.D.A. grades on the outside, the Hunt Court held that:

> The prerequisites to "associational standing" described in Warth are clearly present here. The Commission's complaint alleged, and the District Court found as a fact, that the North Carolina statute had caused some Washington apple growers and dealers (a) to obliterate Washington State grades from the large volume of closed containers destined for the North Carolina market at a cost ranging from 5 to 15 cents per carton; (b) to abandon the use of preprinted containers, thus diminishing the efficiency of their marketing operations;

21

> or (c) to lose accounts in North Carolina.... [N]either
> the interstate commerce claim nor the request for
> declaratory and injunctive relief requires individualized
> proof and both are thus properly resolved in a group
> context.

Hunt, 432 U.S. 343-44 (emphasis added). Thus, the varying

extent of the burdens incurred by individual members of the

Commission to comply with the North Carolina statute at issue

did not preclude the granting of associational standing. Id.

Authorities cited by Defendants do not suggest a different

result, because takings claims, medical injuries, and damages

to real property are prototypical examples of claims requiring

individualized proof that do not speak to the vagueness claims

or compelled speech claims of the Associations. Cf. Forum for

Academic & Institutional Rights, 547 U.S. at 52 n.2

(recognizing associational standing in the context of a

compelled speech claim).

Moreover, in cases involving a facial challenge to a

statute on First Amendment grounds, the prudential limitations

of associational standing are generally relaxed because of the

important societal interests that are implicated. See

Secretary of State of Maryland v. Joseph H. Munson Co., 467

U.S. 947, 956-57 (1984) ("Litigants, therefore, are permitted

to challenge a statute not because their own rights of free

expression are violated, but because of a judicial prediction

or assumption that the statute's very existence may cause

22

others not before the court to refrain from constitutionally protected speech or expression."); Lerman v. Board of Elections in the City of New York, 232 F.3d 135, 143-45 (2d Cir. 2000) (discussing that a facial challenge to a statute on First Amendment grounds is governed by the overbreadth doctrine where prudential standing concerns are relaxed); New York City C.L.A.S.H. v. City of New York, 315 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2004) (relaxing the prudential standing requirements in the context of an organization's challenge to the New York City smoking ban on First Amendment grounds).

The preceding discussion demonstrates that the Associations have established that at least one member which satisfies the constitutional requirements of injury-in-fact, causation, and redressability, that the Associations' purposes are germane to the interests at stake in this dispute, that the claims asserted and the relief requested do not require the participation of individual members in the lawsuit beyond a limited showing of facts common to their members, and that the interests in judicial economy and protecting the right to free expression balance against the restriction of associational standing.

Accordingly, the Court finds that the Associations have sufficiently demonstrated that they have associational standing to bring this action.

B.    PRELIMINARY INJUNCTION

For the Court to issue a preliminary injunction against the Government, Plaintiffs must demonstrate both a likelihood of success on the merits and a threat of irreparable harm. See, e.g., Velazquez v. Legal Servs. Corp., 164 F.3d 757, 763 (2d Cir. 1999) ("Velazquez I").

1.    Compelled Speech

In AOSI I, the Court held that the Policy Requirement impermissibly compelled speech. See 430 F. Supp. 2d at 274-76. The Court was not persuaded by Defendants' argument that the Policy Requirement did not compel speech because Plaintiffs were subject to the restrictions on their First Amendment rights only if they chose to accept Leadership Act funds. Id. at 274. The Court found that such a "take-it-or-leave-it answer to an infringement of speech ... is simply not in keeping with the expectations our society derives from First Amendment freedoms ...." Id. The Court also disagreed with Defendants' view that Supreme Court doctrine on compelled speech was not applicable because those cases did not address Spending Clause exactments, and held:

> That the Policy Requirement at issue here arises out of
> a Spending Clause enactment, and thus is not a direct
> regulation of speech, is not enough to distinguish it
> from the overriding principle that emerges from [the
> Supreme Court line of] cases: that the government cannot
> compel speech in exchange for participation in a
> government program, even a program to which there is no
> direct entitlement.

24

Id. at 275.

Plaintiffs argue that the Guidelines do not remedy this constitutional defect, and thus also unconstitutionally compel speech. The Court agrees. While the Guidelines may or may not provide an adequate alternate channel for Plaintiffs to express their views regarding prostitution, the clause requiring Plaintiffs to adopt the Government's view regarding the legalization of prostitution remains intact. Plaintiffs are still not permitted to abstain from taking a view with regard to prostitution, but rather, are required to espouse the Government's position. Because the Guidelines do not alter the compelled speech provision of the Policy Requirement, the Court finds, for the same reasons as stated in AOSI I, that the provision unconstitutionally compels speech. Therefore, Plaintiffs have demonstrated a likelihood of success to warrant the extension of the preliminary injunction ordered in AOSI I.

2.  Unconstitutional Conditions

i.  Standard of Review

In AOSI I, this Court used heightened scrutiny to hold that when the Government seeks to implement a viewpoint-based restriction that imposes burdens on the privately funded speech of grantees, it must show that the restriction is "narrowly tailored to fit Congress's intent." 430 F. Supp. 2d

25

at 267. Defendants argue that under the Second Circuit's holding in Brooklyn Legal Servs., 462 F.3d 219 (2d Cir. 2006) ("BLS"), the Court's use of heightened scrutiny was improper.

In BLS, the Second Circuit upheld the constitutionality of federal restrictions on local legal assistance programs that receive funding through the Legal Services Corporation ("LSC"). The restrictions applied regardless of whether the recipients received non-federal funds in addition to LSC funds, and prohibited recipients from, among other things, participating in class action suits, seeking attorneys' fees, and personally soliciting clients. Under the LSC regulations, recipients could engage in restricted activities through affiliate organizations provided the recipient maintained "objective integrity and independence" from the affiliate. Id. at 223. The Second Circuit held that "Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." Id. at 231 (emphasis in original). The Second Circuit rejected the use of heightened scrutiny in stating that the interests of LSC and the federal government "cannot be subject to the least- or less-restrictive-means mode of analysis" as that was "more appropriate for assessing the government's direct regulation of a fundamental right" and not "when the government creates

26

a federal spending program." Id. at 229 (citing United States v. American Library Ass'n, 539 U.S. 194, 211-12 (2003) and South Dakota v. Dole, 483 U.S. 203, 207 (1987)). The BLS Court stated that the district court had "fashioned an 'undue burden' test out of whole cloth from unrelated case law concerning abortion, commerce, and ballot access rights." Id. at 232. Accordingly, Defendants argue that the use of heightened scrutiny in AOSI I was improper, and the appropriate standard is whether the recipients are left with adequate alternative channels for protected expression under the Guidelines.

The Court disagrees with Defendants that BLS provides the appropriate standard by which to review Plaintiffs' unconstitutional conditions claim. The holding in BLS was premised on a finding that the statute at issue did not discriminate on the basis of viewpoint, and the Second Circuit indicated that the result would have been different had the statute done so. See BLS, 462 F.3d at 230 (stating that restrictions "directed toward speech" are on the "'highest rung' of First Amendment values" which may require "closer attention" (quoting Velasquez v. LSC, 164 F. 3d 757, 771 (2d Cir. 1999) ("Velasquez I"), aff'd on other grounds, 531 U.S. 533 (2001) (stating that the Supreme Court would not tolerate a regulation authorizing grants funding support for, but

27

barring criticism of, a government policy)).

Furthermore, in <u>Velasquez I</u>, the Second Circuit invalidated a viewpoint-based restriction that prohibited recipients from using both federal and private funds to challenge welfare laws without referencing the "adequate alternative channels" analysis it used for those provisions it deemed viewpoint neutral. <u>See Velasquez I</u>, 164 F. 3d at 770 (stating that "[w]hether a subsidy that is dependent on viewpoint constitutes illegal discrimination presents a complex question, which is illuminated by three recent Supreme Court holdings"). The Second Circuit held that the because the provision was viewpoint discriminatory, it was "subject to strict First Amendment scrutiny." <u>Id.</u> at 772. However, <u>Velasquez I</u> did not articulate the standard in any additional detail, as it simply noted that the defendants "offered no arguments as to why the provision can survive such scrutiny and [the Second Circuit] perceive[d] none." <u>Id.</u>

In <u>AOSI I</u>, the Court found that the there was no settled articulation of the applicable heightened standard, and adopted the Supreme Court's articulation in <u>Rust v. Sullivan</u>, 500 U.S. 173 (1991), which applied a traditional First Amendment narrow tailoring test to the challenged provision. "In applying this heightened scrutiny, the Court asks whether the restriction, as interpreted and applied by the Defendants

is 'narrowly tailored to fit Congress's intent.'" AOSI I, 430 F. Supp. 2d. at 267 (quoting Rust, 500 U.S. at 195 n.4).

Accordingly, because the Court finds that the Second Circuit's decision in BLS did not change the applicable standard of review for Plaintiffs' unconstitutional conditions claim, the Court's reasoning and determination of the appropriate standard of review in AOSI I is still applicable in determining whether the preliminary injunction should be extended to the Associations, and the Court will apply such heightened scrutiny using the narrow tailoring test.

ii. Application

In AOSI I, the Court held that while the Government had a legitimate interest in not having its message "garbled" and in ensuring the uniformity of its message, such an interest was undercut by the exemption of certain high-profile organizations, which were permitted to engage in dissenting speech, and as such, the Government's interests were not sufficient to warrant a blanket ban on Plaintiffs' privately-funded speech. 430 F. Supp. 2d at 269. The issue now before the Court is whether the Guidelines sufficiently cure this constitutional defect.

Plaintiffs argue that the Guidelines are unconstitutional for the same reasons as the Policy Requirement was found unconstitutional in AOSI I, specifically because: (1) the

29

Policy Requirement still excludes certain funding recipients, and thus, the Government's interests remain undermined; (2) the Policy Requirement still imposes a blanket ban on speech by funding recipients because the Guidelines do not allow recipients to advance their privately-funded speech through an affiliate organization that they control through overlapping boards and management; and (3) the Policy Requirement continues to massively burden Plaintiffs' privately funded speech because of the Guidelines' extreme separation requirement without adequate justification.    Plaintiffs further argue that the affiliate regimes that were upheld by the Supreme Court in two relevant cases did not mandate such extreme separation, but rather, allowed shared personnel, management, governance, and/or boards. See Regan v. Taxation with Representation of Washington, 461 U.S. 540, 544-46 (1983); Rust, 500 U.S. at 180-81. Finally, Plaintiffs argue that the Guidelines can be differentiated from the LSC regulations, which "allow control at the Board level, [so] recipients will have an avenue through which to engage in restricted activities." 62 Fed. Reg. 27,695, 27,697 (May 21, 1997).

Defendants respond that the Guidelines were modeled on the LSC restrictions, and thus, the case is squarely on point with BLS and Velasquez I (collectively, the "LSC Cases"),

30

which upheld restrictions on local legal assistance programs.
Defendants also rely on the recent opinion of the D.C. Circuit
upholding the Policy Requirement, while also acknowledging
that such a holding is only persuasive authority.   See DKT
Int'l, Inc. v. USAID, 477 F.3d 758 (D.C. Cir. 2007).

    The Court finds that there are significant differences
between the instant case and the LSC Cases.   First, as
previously stated, this case is governed by heightened
scrutiny, whereas the LSC cases were not, and thus were not
subject to a narrow-tailoring analysis.   Second, the
Associations operate internationally in dozens of countries,
many of them developing states still lacking administrative
rules under which foreign entities may function effectively,
which increases the burdens imposed by even identical
regulations.   Third, the LSC regulations allow for control at
the board level, whereas the Guidelines contain no such
provision.   Additionally, while the D.C. Circuit upheld the
Policy Requirement in DKT, it did so based on the Government's
representations that recipients would be able to express their
privately-funded views through a subsidiary that was not
subject to the Policy Requirement.   See 477 F.3d at 763
(stating that "nothing prevents DKT from itself remaining
neutral and setting up a subsidiary organization that
certifies that it has a policy opposing prostitution").   The

31

Guidelines had not yet been promulgated at the time of the DKT decision, and therefore, the D.C. Circuit was not aware of the restrictions placed on recipients, such that compliance with the Guidelines is not as straightforward as the simple organization of a subsidiary, which normally does not entail the separations imposed by the Guidelines.

In AOSI I, the Court concluded that "Rust speaks most directly to the issues of the instant case, largely because both cases involve speech regulated through Spending Clause enactments through which the government conveys a message and endeavors to compel compliance with that message by placing conditions on eligibility for government benefits." AOSI I, 430 F. Supp. 2d at 267-68. The Rust plaintiffs challenged the "program integrity" requirement of Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a-6 ("Title X"), which provides federal funding for family planning services. The program integrity requirement mandates that Title X projects not provide counseling services concerning the use of abortion, prohibits Title X projects from engaging in activities that encourage, promote, or advocate abortion, and requires that Title X projects be physically and financially separate from prohibited abortion activities. See Rust, 500 U.S. at 179-80. The Rust Court noted that the separation requirement "distinguishes between a Title X grantee and a

32

Title X project," and that a grantee may continue to engage in abortion-related activities through programs that are separate and independent from projects that receive Title X funds. Id. at 196 (emphasis in original). "To be deemed physically and financially separate, 'a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient. Id. at 180-81 (quoting 42 C.F.R. § 59.9 (1989)). The regulations at issue in Rust enumerated various factors considered by the Government to determine the existence of adequate separation, including: (1) separate accounting records and separate personnel; (2) the degree of separation from facilities (specifically, treatment, consultation, examination and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities; and (3) the extent to which signs and other forms of identification of the Title X project are present, and signs and material promoting abortion are absent. See 42 C.F.R. § 59.9 (1989).

Because the Court has previously noted the similarities between the instant case and Rust, the Court will now also look to Rust in evaluating whether the Guidelines are narrowly tailored to effectuate Congress's intent. In Rust, the Government defended the separation requirements on the grounds

33

that they were "necessary to assure that Title X grantees apply federal funds only to federally authorized purposes and that grantees avoid creating the appearance that the Government is supporting abortion-related activities." Id. at 188.  In this case, the Government's interest is exactly the same as that articulated in Rust, and yet, the burdens imposed on the First Amendment rights of recipients are significantly greater than those imposed by the regulation at issue in Rust. Notably absent from the regulations at issue in Rust is the separate management and governance requirement, which is prescribed in the Guidelines.

Given the symmetry of governmental interests in Rust and the instant case, the existence of a less-burdensome affiliate scheme in Rust supports the argument that the Guidelines are not sufficiently narrowly tailored, because a less-restrictive means is available to adequately protect the Government's interests.  Additionally, the Court agrees with Plaintiffs that the Guidelines' separate management and governance requirement mandates that any Leadership Act recipient that wishes to express views contrary to the Government's mandated opposition to prostitution would be able to do so only through an affiliate over which it exercised no control.  Finally, because a substantial number of significant organizations remain exempt from the Policy Requirement and Guidelines, the

34

Government's interests in conveying a uniform message remain undermined, as noted in AOSI I. See 430 F. Supp. at 269.

The Court finds that the Guidelines require more separation than is reasonably necessary to satisfy the Government's legitimate interest, embodied in the Policy Requirement, and that the Guidelines are not narrowly tailored to achieve Congress's goals. Because the Court finds that the Policy Requirement and the Guidelines would not survive heightened scrutiny, and also impermissibly compel speech, they violate the First Amendment. Accordingly, the Associations have demonstrated a likelihood of success on the merits.

### 3. Vagueness

The Court did not address Plaintiffs' vagueness claims in AOSI I, because it granted the preliminary injunction on the basis of their claims concerning compelled speech and unconstitutional conditions. The Court likewise does the same here, and will not reach this argument since it has already determined that an injunction is warranted for the reasons already discussed.

### C. RES JUDICATA

Defendants argue that DKT International ("DKT"), as a member of GHC, is barred from seeking relief in this action because its application is prohibited by the principles of res

35

judicata.[2]  Plaintiffs concede that the D.C. Circuit's ruling in DKT, 477 F.3d 758, on viewpoint discrimination and compelled speech bars DKT from seeking the protection of this preliminary injunction under the principle of res judicata. However, Plaintiffs argue that their vagueness and unconstitutional conditions challenges to the Policy Requirement, as modified by the Guidelines, were not before the DKT Court, and therefore, that if the Court issues a preliminary injunction based on those challenges, res judicata should not bar DKT from the protections of the preliminary injunction.

The Court finds that DKT is barred from benefitting from the preliminary injunction, as the Court's decision to extend the preliminary injunction is based on a finding that the Policy Requirement does discriminate on the basis of viewpoint and does compel speech.

## V. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 66) of Plaintiffs Alliance for Open Society International ("AOSI") and

---

[2] Defendants also argue in their papers that GHC itself was barred by virtue of the participation of DKT as its privy.  By letter dated, June 20, 2008, Defendants acknowledged that the Supreme Court disapproved the doctrine of "virtual representation" in its recent decision in Taylor v. Sturgell, 128 S.Ct. 2161, 2167 (2008).  Therefore, Defendants concede that they could no longer demonstrate that non-party preclusion principles bar GHC from participating in this action.  Accordingly, the Court will not address Defendants' res judicata argument with regard to GHC.

36

Pathfinder International ("Pathfinder") for leave to file a Second Amended Complaint to add Global Health Council ("GHC") and InterAction as plaintiffs to this action is GRANTED; and it is further

**ORDERED** that the motion of GHC and InterAction for a preliminary injunction barring defendants the United States Agency for International Development and Andrew S. Natsios in his official capacity as its administrator, the United States Department of Health and Human Services and Michael O. Leavitt in his official capacity as its Secretary, and the United States Centers for Disease Control and Prevention and Julie Louise Gerbeding in her official capacity as its Director from enforcing the requirement § 7361(f) of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Leadership Act"), 22 U.S.C. §§ 7601 et seq., is GRANTED, but that DKT International, as a member of GHC, shall be barred from benefitting from the preliminary injunction.

**SO ORDERED.**

Dated:    New York, New York
          7 August 2008



Victor Marrero
U.S.D.J.